**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO: 1:18-CV-25106-KMW-EGT**

UNITED AMERICAN CORP.,

        *Plaintiff*,

    v.

BITMAIN, INC., SAINT BITTS LLC d/b/a
BITCOIN.COM, ROGER VER, BITMAIN
TECHNOLOGIES LTD., BITMAIN
TECHNOLOGIES HOLDING COMPANY,
JIHAN WU, PAYWARD VENTURES, INC.
d/b/a KRAKEN, JESSE POWELL,
AMAURY SECHET, SHAMMAH
CHANCELLOR, and JASON COX,

        *Defendants*.

**DEFENDANT SHAMMAH CHANCELLOR'S MOTION TO DISMISS COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

Shammah Chancellor ("Chancellor"), pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7.1, moves to dismiss the Complaint with prejudice.

## INTRODUCTION

Cognizant that a changing, more competitive digital currency marketplace may leave it behind, United American Corporation ("United") marshals a "kitchen sink" of claims against eleven individual and corporate Defendants (the "Defendants"), whom it seeks to hold responsible for its allegedly diminished prospects. United claims that Defendants conspired to "hijack" the Bitcoin Cash blockchain network and used computing power to dominate a software update, bifurcate the Bitcoin Cash network, and create competing versions of the Bitcoin Cash digital currency. This is the creation, and not the elimination, of competition. The Complaint mentions Defendant Shammah Chancellor by name only twice, and its single substantive allegation against him is that he and two others furthered this scheme by implementing software "checkpoints" that rendered the object of the alleged conspiracy—the adoption of a revised set of rules governing the Bitcoin Cash blockchain—irreversible. United appends a parade of state-law claims to this antitrust conspiracy claim, none of which are connected to Chancellor's purported role in implementing these "checkpoints."

United's Complaint contains the seeds of its own destruction. *First*, United fails to answer any of the essential questions about Chancellor's participation in an antitrust conspiracy: "with whom did he conspire?," "to what did he and the purported co-conspirators agree?," "where did he and the purported co-conspirators hatch this alleged agreement?," and "when did he join the conspiracy?" Indeed, United does not allege that Chancellor communicated with *any* of the other Defendants. *Second*, United fails to allege any restraint of trade or injury to competition. To the contrary, United's pleadings reflect its dissatisfaction with the "vote"—which proceeded *exactly* as the designers of the cryptocurrency ecosystem envisioned, resulted in *more* diversity in the market, and *enhanced* competition—but are devoid of any suggestion of an anticompetitive effect in a relevant geographic or product market. *Finally*, and to make matters worse, United pleads the very facts that reveal its purported injuries derive from enhanced competition, undercutting its claim to antitrust standing and injury.

United's state-law claims are equally deficient. Two of its counts (equitable estoppel and injunctive relief) are not causes of action under Florida law. And United fails to allege any connection between its remaining state-law counts—negligent misrepresentation, negligence, and

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

conversion—and its only substantive allegation against Chancellor: that he implemented software "checkpoints" on one of the emerging networks.  Instead, United simply lumps Chancellor and the rest of the Defendants together in unsupported and undifferentiated "shotgun" pleadings, and invites the Court to provide the ammunition.

The Court need not, and should not, take up that burden.  It should discard United's implausible and convoluted narrative; reject United's attempt to cement the status quo in a dynamic and emerging market; and dismiss the Complaint with prejudice as to Chancellor.

## FACTUAL BACKGROUND[1]

Bitcoin Cash is a form of cryptocurrency.  Compl. ¶ 22.  Like other cryptocurrencies, Bitcoin Cash is a "'peer-to-peer' version of electronic cash" that can be stored in a digital wallet and transferred between parties without the involvement of an intermediary.  *Id.* ¶¶ 25, 27. Recognizing the need to create some type of system to confirm and maintain records of these "peer-to-peer" transactions, digital currency pioneers turned to the "blockchain"—a decentralized network of identical public ledgers that are "continuously updated and compared" to ensure their accuracy.  *Id.* ¶ 28.  This network guards against fraud, because "one would have to tamper with the majority of ledgers simultaneously and in exactly the same manner" to succeed in altering the chain's collective record of transactions.  *Id.*

Given the absence, by design, of any central financial intermediary with an obligation to verify and record new cryptocurrency transactions, blockchain networks instead rely on digital currency "miners" to perform those critical tasks.  *Id.* ¶¶ 22–26.  Miners compete to record, verify, and add "blocks" of new transactions to the end of the "chain" of consummated and verified transactions, *id.* ¶¶ 24, 26; they accomplish these tasks in part by applying computing or "hashing" power to solve complex math puzzles called "Proof-of-Work" problems.  *Id.* ¶¶ 24, 26, 29.  These puzzles increase in complexity as more participants or "nodes" mine a particular currency*, id.* ¶¶ 24, 26, requiring miners to leverage powerful computer servers to solve them.  *Id.* ¶¶ 26, 30. Accordingly, miners regularly collaborate to form "mining pools" in which individual nodes combine their computing power, thereby increasing the likelihood that one member of the pool will win the race to solve a Proof-of-Work puzzle for a given block of transactions and earn a pre-specified reward of newly minted cryptocurrency.  *Id.* ¶ 24, 30.  Participants in mining pools

---

[1] Consistent with Rule 12(b)(6), Chancellor accepts, *arguendo*, United's well-pleaded factual allegations as true for purposes of this Motion to Dismiss.

allocate this reward on a pro rata basis "according to the amount of work [each participant] contributed to the probability of solving the puzzle[]." *Id.* ¶ 30.

Cryptocurrency mining "is predicated on the basic principle that the value of the mining output [must] exceed[] the cost to mine that output." *Id.* ¶ 39. Just as gold miners cannot turn a profit unless the value of gold exceeds the cost to extract it, digital currency miners cannot profit unless the value of the relevant cryptocurrency exceeds the cost to "mine" it. *Id.* ¶ 31, 39. Electricity accounts for cryptocurrency miners' largest operating cost: miners must power the computer servers that identify and record transactions and solve Proof-of-Work puzzles, as well as the climate control systems that maintain the optimal ambient temperature for these servers. *Id.* ¶ 31. To be profitable, then, "miners must generate higher rewards over a period of time than the cost of electricity needed to mine in the same period of time." *Id.*

Like other digital currency networks, the blockchain that forms the backbone of the currency relevant to this case—Bitcoin Cash—requires periodic network-wide software updates or "forks." *Id.* ¶¶ 41–42. Forks provide nodes with an opportunity to make changes to the set of rules governing the features and operation of the blockchain. *Id.* ¶¶ 41–43. If the consensus on a particular set of rule changes breaks down, nodes may advocate for upgrades that diverge from the status quo, setting up a "hash war" to determine which set of rules will govern the blockchain going forward. *Id.* ¶¶ 42–45. The Bitcoin Cash blockchain provides for a "voting by doing" method of resolving these upgrade disputes: nodes "vote" for their preferred upgrade by implementing the relevant upgrade and then applying "hashing power"—the technology that miners use to solve Proof-of-Work puzzles—to add blocks of transactions to the chain. *Id.* ¶ 44–45. That approach is consistent with the principles laid out in the "[Satoshi] Nakamoto Whitepaper," the intellectual framework that underpins the cryptocurrency ecosystem and encourages competition between rules sets. *Id.* ¶ 44 & n.3 (quoting Ex. A ¶ 12). As the Complaint notes, the Whitepaper foresaw that nodes would "leave and rejoin the [relevant blockchain] network[s]" at will, *id.* ¶ 64, and "vote with their CPU power" to approve or reject rule changes. *Id.* ¶ 44 n.3.

As has happened in the past, disputes between proponents of competing rules sets may end in a "hard fork," in which a unitary blockchain governed by a single set of rules splits into new blockchains (and digital currencies) governed by discrete sets of rules. *Id.* ¶ 45. United acknowledges that the Bitcoin Cash blockchain itself emerged after a "hard fork" on the original

3

Bitcoin blockchain, which bifurcated in 2017.  *Id.* ¶ 57.  Here, in advance of a fork scheduled for November 15, 2018, various nodes disagreed over which rules set, Bitcoin ABC ("ABC") or Bitcoin SV ("SV"), would apply to the Bitcoin Cash blockchain going forward.  *Id.* ¶ 43.  Both ABC and SV encoded software upgrades that, if implemented, would alter the prevailing set of rules applicable to the Bitcoin Cash blockchain.  *Id.*  Defendants Bitcoin.com and Bitmain[2]—the former a digital wallet services provider and mining pool operator and the later a cryptocurrency miner and mining pool operator—supported the ABC vision, *id.* ¶¶ 53–54, as did Bitcoin Unlimited, Bitcoin XT, and others.  *Id.* ¶ 43 n.2.  Another cohort of powerful miners supported the SV implementation.  *See id.* ¶ 65 n.6.

Although United does not allege that any of the eleven Defendants ever communicated in a phone call, email, or in-person meeting about this "hash war" to determine "*which* rules set would be applied by software implementations on the [Bitcoin Cash] network going forward," *id.* ¶¶ 44–45, and notwithstanding its failure to plead facts indicating that any Defendant set out to "fix[], maintain, suppress[], stabilize[] and/or otherwise ma[k]e artificial the values associated with the Bitcoin Cash network," *id.* ¶ 83, United nonetheless asserts that Defendants collectively orchestrated a complex, two-step plan to "hijack" the Bitcoin Cash network.  *Id.* ¶¶ 82–83.

First, United avers, Bitcoin.com and its founder Roger Ver "colluded with Jihan Wu and Bitmain" to deploy Bitmain's computing power in support of Bitcoin.com's mining pools during the fork.  *Id.* ¶¶ 59–60.  United alleges that Bitcoin.com used that "'rent[ed]' hashing power" to "dilute[] the 'vote' being exercised" by other nodes and ensure that the ABC rules set would (i) survive the "hash war" and (ii) apply to new blocks of transactions on one of two blockchains to emerge from the bifurcated Bitcoin Cash blockchain, *id.* ¶¶ 59, 65–68.  Although United acknowledges that nodes were entitled to leave and rejoin the Bitcoin Cash network at will, it nevertheless accuses Bitmain and Bitcoin.com of "effectively hijack[ing]" that blockchain by "bringing in mercenaries from *another* network . . . to temporarily mine [it] during the software update and then leave."  *Id.* ¶¶ 64–65 (emphasis in original).  United alleges that after the Bitcoin Cash blockchain officially bifurcated into separate ABC and SV chains, Chancellor, Amaury Sechet, and Jason Cox—none of whom are alleged to have been aware of any scheme or to have communicated with each other or another Defendant at any point—implemented software

---

[2] United names three Bitmain entities as Defendants, but does not specify which of those entities is the relevant one for purposes of this and other allegations, which merely refer to "Bitmain."

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

"checkpoint[s]" that "lock[ed] down" the new ABC blockchain by (i) "preventing the resulting [ABC and SV] chains from . . . remerg[ing]" and (ii) assuring that anyone with a majority of the computing power on the ABC chain could "quickly cement control of the [Bitcoin ABC] blockchain ledger." *Id.* ¶¶ 69–72, 122.

United asserts that Defendants' use of hashing power and checkpoints violated the spirit if not the letter of the Nakamoto Whitepaper, and "created significant uncertainty and a lack of confidence in the network." *Id.* ¶¶ 64–65, 78–79. Notably, United does not allege that any feature or aspect of the ABC software implementation—the locus of the alleged agreement—served as the vector for its injury. Rather, United ascribes the alleged decline in the value of its cryptocurrency and the more competitive post-fork mining environment in which it must operate its BlockchainDome technology to the "centralization" and "lack of democracy within the network" that Defendants allegedly set in motion. *Id.* ¶¶ 37–40, 77, 79, 85. Although United acknowledges that the cryptocurrencies that emerged from the hard fork (ABC and SV) now compete for users and as tradeable instruments on digital currency exchanges, *id.* ¶ 77, and concedes that the ABC and SV blockchains benefit from comparable levels of hashing power—an indication that miners have gravitated to both of the new networks, *id.* ¶ 60—it nevertheless claims to have "suffered injury to [its] business or property" that entitle it to treble damages. *Id.* ¶ 85.

## ARGUMENT[3]

### I. Legal Standards

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss" under Rule 12(b)(6). *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1372 (S.D. Fla. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive dismissal. *Iqbal*, 556 U.S. at 678. Unless a plaintiff has pleaded specific and concrete facts that, if true, would "nudge[] the[] claims across the line from conceivable to plausible," the Court must grant a Rule 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Undifferentiated "shotgun pleadings"—those alleging that all of "'the defendants' engaged in certain conduct" notwithstanding "geographic and temporal realities mak[ing] plain that all of the defendants could

---

[3] Unless otherwise notated, emphasis is added and internal citations and quotations are omitted.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

not have participated in every act complained of"—do not satisfy that requirement.  *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

In addition to meeting the requirements of *Twombly*, *Iqbal*, and Federal Rule of Civil Procedure 8(a), claims sounding in fraud—negligent misrepresentation, for example—are subject to Federal Rule of Civil Procedure 9(b).  *Ceithaml v. Celebrity Cruises, Inc.*, 207 F. Supp. 3d 1345, 1349 (S.D. Fla. 2016) (Williams, J.).  Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

## II.     United does not carry its burden to state a plausible claim for relief against Chancellor under Section 1 of the Sherman Act.

### A.     United fails to allege that Chancellor joined any agreement, much less an unlawful antitrust conspiracy, to "hijack" the Bitcoin Cash network.

Because Section 1 of the Sherman Act prohibits contracts, combinations, or conspiracies between two or more entities that unreasonably restrain trade, *see* 15 U.S.C. § 1, an antitrust plaintiff must plead sufficient "factual matter to plausibly suggest an agreement was made" to survive a motion to dismiss under Rule 12(b)(6).  *See Duty Free Americas, Inc. v. Estée Lauder Cos., Inc.*, 946 F. Supp. 2d 1321, 1329 (S.D. Fla. 2013) (citing *Twombly*, 550 U.S. at 556); *Solomon v. Blue Cross & Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1291 (S.D. Fla. 2008) ("This Court has held before that proof of the agreement is at the heart of a conspiracy claim.").  Consistent with the Sherman Act's agreement requirement and the Eleventh Circuit's rejection of "shotgun pleadings," *see Magluta*, 256 F.3d at 1284, a plaintiff must allege discrete facts indicating "that each individual Defendant joined the conspiracy and played some role" in it, as "general allegations as to all of the defendants are insufficient."  *In re Marine Hose Antitrust Litig.*, 2009 WL 10685177, at *8–9 (S.D. Fla. Jan. 28, 2009) (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116–17 (N.D. Cal. 2008)).[4]  Accordingly, United must plead facts plausibly suggesting that Chancellor made a "conscious commitment to a common scheme designed to achieve an unlawful objective."  *See Duty Free*, 946 F. Supp. 2d at 1331 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

---

[4] *See also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group. . . . [If a complaint] fails to allege particular facts against a particular defendant, then the defendant must be dismissed.").

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

A court must ask whether "the complaint's specific allegations as to who, what, where, and when g[i]ve the defendant sufficient notice of the plaintiff['s] claims and the grounds upon which they rest[]." *Duty Free*, 946 F. Supp. 2d at 1331–32.  Given its application of that test to a discrete defendant, *Duty Free* is instructive: the gravamen of the plaintiff duty-free store operator's claim was that a beauty products manufacturer, ELC, conspired with its affiliated airport duty-free stores to exclude the plaintiff (DFA) from competition at key airports.  *Id.* at 1325–27.  The Court noted that DFA's primary argument—that "a conspiracy [wa]s the only plausible explanation" for ELC's conduct, *see id.* at 1328–31—put the cart before the horse.  DFA could not leapfrog the antecedent requirement to allege ELC's participation in an unlawful agreement, the Court held, but instead needed to plead sufficient "factual meat on the bones of the [] Complaint" to suggest that ELC and DFA's competitors made a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 1331 (quoting *Monsanto*, 465 U.S. at 764); *see also Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) ("[A] litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly.").

Homing in on DFA's specific allegations against ELC, the *Duty Free* court held that DFA failed to plead "any collusive communications between ELC and its co-conspirators" and did not "articulate enough facts to give sufficient notice as to the 'who,' 'what,' 'where,' or 'when' of its conspiracy theories" as applied to ELC.  Quoting *Twombly*, the *Duty Free* Court held that "'conclusory allegation[s] of agreement at some unidentified point does not supply facts adequate to show illegality,' no matter how many times it is echoed in the Complaint."  946 F. Supp. 2d at 1333 (quoting *Twombly*, 550 U.S. at 557).

As in *Duty Free*, the allegations here fail to plausibly suggest Chancellor's participation in an antitrust conspiracy.  *First*, United does not allege that Chancellor made any calls, sent any emails, or otherwise exchanged information with *any* of the other Defendants.  *See Duty Free*, 946 F. Supp. 2d at 1332 ("Unlike *In re Delta* where the plaintiffs alleged a litany of collusive communications leading to the conspiratorial agreement, *DFA has not alleged any collusive communications between ELC and its co-conspirators here*.").  *Second*, the Complaint is "silent as to 'where'" the other Defendants allegedly conspired with Chancellor, nor does it identify "'what' these unidentified persons communicated" about or agreed to with Chancellor.  *See id.* at 1333.  *Third*, the Complaint is again silent as to "when" Chancellor purportedly joined the alleged conspiracy; United does not plead any facts putting Chancellor on notice of when he purportedly

7

joined a concerted effort to "[take] control of the Bitcoin Cash cryptocurrency market." *See* Compl. ¶ 82; *cf. Duty Free*, 946 F. Supp. 2d at 1333 (discounting allegation that defendants "initiated the conspiracy soon after DFA opposed ELC's plan to increase duty free prices" as a "conclusory allegation of agreement at some unidentified point") (quoting *Twombly*, 550 U.S. at 557).

Consistent with its strategy of lumping Defendants together, United avers "[u]pon information and belief, [that] the scheduled Bitcoin Cash network upgrade was manipulated by Defendants in an effort to artificially take control of the network blockchain moving forward," Compl. ¶ 46, and that Defendants' "actions were intentional and clearly planned in advance," Compl. ¶ 61. The Eleventh Circuit rejected exactly this type of vague, shotgun pleading—"replete with allegations that 'the defendants' engaged in certain conduct, making no distinction among the [] defendants charged"—even before the Supreme Court decided *Twombly* and *Iqbal*. *See Magluta*, 256 F.3d at 1284.[5] That proviso applies with even greater force in this case, given the Supreme Court's intervening instruction to "tak[e] care to require allegations that reach the level suggesting conspiracy . . . to avoid the potentially enormous expense of discovery" in antitrust cases, *see Twombly*, 550 U.S. at 559, and its admonition that Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," *see Iqbal*, 556 U.S. at 678. The Court should decline United's invitation to "conjure up unpleaded facts to support [its] conclusory suggestions" as to Chancellor, *see Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir. 1977), and dismiss United's claim under Section 1 of the Sherman Act.

### B. United fails to plead facts suggesting that Chancellor or any Defendant imposed an unreasonable restraint on competition.

"The Supreme Court long ago determined that section 1 prohibits only those agreements that *unreasonably* restrain competition." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996); *accord State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Accordingly, United must not only plead facts that "raises a suggestion of a preceding agreement," *Twombly*, 550 U.S.

---

[5] *See also Mesa v. Pa. Higher Educ. Assistance*, 2018 WL 1863743, at *3 (S.D. Fla. Mar. 15, 2018) (Torres, Mag. J.) (holding "shotgun pleadings"—those that that (i) incorporate swaths of substantive allegations into every count against all "Defendants" without "specify[ing] which of those facts support the elements of a [] claim;" (ii) do not "distinguish which allegations of wrongful conduct are directed to which defendant," or (iii) "lump[] all the [] Defendants together with a string of conclusory allegations"—violate the pleading requirements of Rule 8 and must be dismissed), *adopted by* ECF No. 239 (May 4, 2018) (Williams, J.).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

at 557, but also plausibly allege the second step: that the agreement unreasonably harmed competition. *See Levine*, 72 F.3d at 1545 ("[T]he unreasonableness of the agreement is the second element of a section 1 claim."). Because United does not allege *any* conduct—neither the alleged scheme to win the hash war nor Chancellor's purported implementation of "checkpoints" on the ABC chain—that unreasonably restrained competition, its pleadings on this element fall flat as well.

Reviewing courts apply "two complementary categories of antitrust analysis"—the rule of reason or *per se* framework—to determine whether a given restraint injures competition. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). "[M]ost antitrust claims are analyzed under a 'rule of reason,'" a holistic analysis that takes "account [of] a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Khan*, 522 U.S. at 10. "Some types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *Id.* Because courts "conclusively presume [*per se* agreements] to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use[,] [t]he Supreme Court has made it clear that the per se label should be applied infrequently and with caution." *Seagood Trading Corp. v. Jerrico, Inc*., 924 F.2d 1555, 1567 (11th Cir. 1991) (quotations and citations omitted). United's allegations fall flat under either framework.

### 1.    United does not allege conduct that fits within the narrow category of *per se* illegal practices that are presumed to harm competition.

The *per se* rule applies to a limited set of "business relationships that, in the courts' experience, virtually always stifle competition." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010) ("[P]er se violations of § 1 of the Sherman Act are limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition."). Courts apply the *per se* rule to agreements between competitors to fix prices, restrain output, rig bids, and allocate markets, and in certain circumstances courts have evaluated group boycotts and agreements between buyers and sellers to "tie" certain products together under the *per se* framework. *See id.*; Fed. Trade Comm'n & Dep't of Justice, *Antitrust Guidelines for Collaborations Among Competitors* 3 (2000), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-

9

guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf.   The Eleventh Circuit has been careful not to extend the *per se* rule to "restraints of trade that are of ambiguous effect." *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc*., 720 F.2d 1553, 1562 (11th Cir. 1983). "This cautious approach is mandated in light of the potential costs to the marketplace that would result from mislabeling procompetitive activity as per se illegal."  *Seagood Trading*, 924 F.2d at 1567 (11th Cir. 1991).

 Although its allegations are not clear, United appears to contend that the *per se* rule against price fixing applies to its claim that "Defendants manipulated the cryptocurrency market . . . and fixed, maintained, suppressed, stabilized and/or otherwise made artificial the values associated with the Bitcoin Cash network." *See* Compl. ¶ 83.  Even assuming that the Complaint adequately pleads that Chancellor and the other Defendants entered into an agreement to "hijack" the Bitcoin Cash network—and it does not—United fails to allege any facts suggesting that said agreement was "formed for the purpose and with the effect of" fixing prices.[6]  The Complaint is devoid of facts indicating that *any* Defendant intended to—and succeeded in—fixing, making artificial, or manipulating the price of the pre- or post-fork currencies (Bitcoin Cash, ABC, or SV) or any component or level of any currency.  *Cf. Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765–71 (2d Cir. 2016) (holding that the *per se* rule applies to allegations that banks agreed to depress the London Inter-bank Offered Rate, a "component of the return from various LIBOR-denominated financial instruments" and "an inseparable part of the price").  Nor does United allege that Defendants conspired for the purpose of stabilizing or manipulating the quantity of cryptocurrency to be minted on each network.  *Cf. Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984) (noting that an agreement on an "output limitation [is] ordinarily condemned as a matter of law under an 'illegal per se' approach").  In fact, United fails to plead that Chancellor and the other Defendants even *considered* the impact of their conduct on the price or quantity of any digital currency, much less facts suggesting that they committed to an agreement for the *purpose* and with the *effect* of fixing those prices.

---

[6] *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940); *United States v. Apple, Inc.*, 791 F.3d 290, 327 (2d Cir. 2015) (the *per se* rule prohibits "any conspiracy 'formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity"); *see also Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1504 (11th Cir. 1985) (noting that the "gravamen" of a "price fixing claim . . . is the existence of an *agreement* in which the coconspirators manipulate market prices") (emphasis in original).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Contrary to United's assumptions, its generalized allegations that "Defendants' conspiracy is a per se violation of the federal antitrust laws" or that Defendants caused "the value of the cryptocurrency that [it] mines in its BlockchainDomes [to fall] significantly" do not trigger the *per se* rule.  Compl. ¶¶ 77, 83.  *See Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 596 (S.D.N.Y. 1989) ("[T]he mere talismanic invocation of the term 'price-fixing' in [the] complaint is [in]sufficient to bring the *per se* rule to bear on the actions of the alleged conspirators."); *cf. Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016) ("Our precedent makes clear that just because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies.").  For one thing, United does not describe how any Defendant could have derived a benefit from an agreement to depress the price of the relevant digital currencies.  *See Duty Free*, 946 F. Supp. 2d at 1333–34 (dismissing Section 1 allegations in part because plaintiff failed to explain how purported agreement was at all consistent with each defendant's economic self-interest).[7]  For another, United's perfunctory attempt to invoke the *per se* rule by pleading that Defendants engaged in a type of "constructive price-fixing" is unavailing.  *See United States v. Nu-Phonics, Inc.*, 433 F. Supp. 1006, 1013 (E.D. Mich. 1977).  Courts reject that theory because "business people would be guilty of price-fixing whenever any of their concerted action has the natural and probable consequence of causing increased, decreased, or stabilized prices."  *See id.*; *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints.").

---

[7] United obliquely suggests that Defendants could be suppressing the value of digital currency as a means of driving competitors out of an unidentified market.  *See* Compl. ¶ 40.  The Supreme Court is skeptical that these types of predatory pricing conspiracies ever occur.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–591 (1986) (noting that "predatory pricing conspiracies are generally unlikely to occur," in part because the "success of such schemes is inherently uncertain").  Regardless, United has not alleged any of the required facts to adequately plead that claim.  *See McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1503 (11th Cir. 1988) (identifying below-cost pricing and predatory intent as required elements of a predatory pricing claim).  It fails to plead that Defendants operated below cost in a defined market, *see id.* at 1245, and it does not allege facts demonstrating that Defendants had any ability to recoup the losses that this type of scheme would entail.  *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1257 (11th Cir. 2002) (noting that predatory pricing "that is unaccompanied by an ability to recoup losses only serves to benefit, rather than injure, consumers").

11

Because United fails to allege any detail suggesting that Defendants conspired for the *purpose* and with the *effect* of "fix[ing], maintain[ing], suppress[ing], stabiliz[ing] and/or otherwise ma[king] artificial" any price or value, *see* Compl. ¶ 83, it must satisfy the pleading requirements under the rule of reason analytical framework to avoid dismissal of its Section 1 claims. *See Apex Oil*, 713 F. Supp. at 596 ("[I]f the purpose of the alleged conspiracy is not price-fixing, but prices are nevertheless affected by the challenged behavior, that behavior must be judged under the Rule of Reason.").

### 2.      United does not and cannot plead the elements of a Section 1 rule of reason claim.

Courts applying the rule of reason require plaintiffs to adequately plead two elements: *First*, a plaintiff must sufficiently allege that the defendants' conduct inflicted "actual or potential harm to competition." *Jacobs*, 626 F.3d at 1336.  Specifically, the plaintiff "may either prove that the defendants' behavior had an actual detrimental effect on competition, or that the behavior had the potential for genuine adverse effects on competition." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1072 (11th Cir. 2004).  *Second*, the plaintiff must "identify the relevant market in which the harm occurs." *Jacobs*, 626 F.3d at 1336.  United does neither: it never identifies a relevant product or geographic market in which Defendants' conduct injured competition, nor does it allege facts suggesting that Defendants' purported "hijacking" of the Bitcoin Cash network had any cognizable effect on competition.  To the contrary, United's pleadings underscore the extent to which the "vote" resulted in a greater diversity of digital currencies.

#### a.      None of United's allegations evince actual harm to competition.

"Actual harm [to competition] is indicated by a factual connection between the alleged harmful conduct and its impact on competition in the market, . . . and the plaintiff claiming it should 'point to the specific damage done to consumers' in the market." *Id.* at 1339 (quoting *Spanish Broad. Sys.*, 376 F.3d at 1072).  "Actual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality," and the plaintiff bears "the burden of demonstrating damage to competition with specific factual allegations." *Id.*  Critically, factual allegations of harm to a particular *competitor* rather than to *competition* itself do not suffice to show actual harm to competition. *See, e.g., Spanish Broad. Sys.,* 376 F.3d at 1072 (affirming

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

dismissal of Section 1 claims with prejudice where plaintiff failed to plead harm to competition generally).[8]

United fails to plead any facts suggesting that Defendants' conduct adversely impacted competition.  To the contrary, United acknowledges that the fork resulted in *more* competition, rather than less: it concedes that the digital currencies that emerged from the hard fork now *compete* for users and as tradeable instruments on digital currency exchanges, *see* Compl. ¶ 77, and its chart tracking hash rates indicates that each of the new blockchains that emerged from the fork ultimately attracted comparable and sustained levels of hashing power—an indication that each network is competitive and that miners have gravitated to both.  *Id.* ¶ 60.  In fact, the SV chain—in United's estimation, the putative loser of the network upgrade, *see id*. ¶ 76—has attracted *more* hashing power than the ABC chain at multiple points after the fork.  *See id.* ¶ 60.

It is not surprising, then, that United does not allege that Defendants' purported agreement to "vote" for ABC resulted in *any* reduction in output, increase in prices, deterioration in quality, or anticompetitive exclusion from a relevant market, nor that United never points to "specific damage done to consumers in the market."  *See Jacobs*, 626 F.3d at 1339.  As Eleventh Circuit precedent makes clear, United's pleading on this element—a bare averment that "Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade and commerce," Compl. ¶ 83—does not suffice to plausibly allege actual harm to competition.  Confronting a similarly threadbare claim of anticompetitive harm, the *Jacobs* court held that a "sparse allegation" that "provides no basis on which a court c[an] determine *how* harm to competition results from" the alleged agreement is "precisely the type of bare legal conclusion that was insufficient in *Twombly* and *Iqbal*."  *See Jacobs*, 626 F.3d at 1340.

United's allegation that Defendants' "manipulation of the market . . . created significant uncertainty and a lack of confidence in the network" that caused "the value of the cryptocurrency that [United] mines in its BlockchainDomes [to] fall[] significantly" is similarly incapable of demonstrating harm to competition.  *See* Compl. ¶¶ 77–78.  As the *Jacobs* court noted, "bald statement[s]" attributing losses in value to a defendant's conduct do nothing to establish any "factual connection between the alleged harmful conduct and its impact on competition in the

---

[8] *See also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("[T]he purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.").

market."  626 F.3d at 1339 (discounting plaintiffs' claim that defendants caused "consumers [to] los[e] hundreds of millions of dollars" as incapable of demonstrating actual harm to competition). Like the plaintiffs in *Jacobs*, United fails to plead any "market facts or data" demonstrating such a connection, and its "naked market claim" similarly "fails plausibly to demonstrate the fact of injury" to competition.  *See Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 711–12 (11th Cir. 2014) (applying *Jacobs* in the context of a RICO conspiracy, and holding that "because the plaintiffs' theory of injury turns peculiarly on *assertions about the relevant . . . market*, the amended complaint cannot plausibly show injury without pleading *any . . .* market facts or data.").

United's last salvo invests the Whitepaper—a non-binding and generalized thought experiment—with the force and effect of law, the violation of which amounts to an antitrust violation.  Defendants, United alleges, actually injured competition by "violat[ing] the central tenets and principles established by [the] Whitepaper and relied on by stakeholders and the market." Compl. ¶ 63.[9]  No court has held that assumed non-adherence to the suggestions in a whitepaper violates the antitrust laws under the *per se* or rule of reason framework.  Moreover, United never explains or plausibly alleges how *this* purported breach of the Whitepaper's rules can or did injure competition.  Forks are a feature of competition in this industry: as United acknowledges, *the Bitcoin Cash network itself* emerged from a 2017 fork from the original Bitcoin network.  *Id.* ¶ 57.  In similar contexts—private standard-setting, for example—courts require plaintiffs to adequately plead that the allegedly anticompetitive "activity had a *market-closing effect* that was committed 'through the use of unfair, or improper practices or procedures'" to survive a motion to dismiss.  *See Black & Decker*, 801 F.3d at 436 (quoting *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 488 (1st Cir. 1988) (Breyer, J.)).  United fails to allege either of those elements here: ironically, its pleadings make clear that (i) Defendants adhered to *exactly* the process that the Nakamoto Whitepaper envisaged for the development of any given

---

[9] The Nakamoto Whitepaper contradicts United's characterization of Defendants' conduct: it envisions that nodes will "vote" for their preferred version of the blockchain and "*leave and rejoin the network*" as they wish.  *See* Compl. ¶ 64.  Even under United's contrived set of "ground rules," whereby "it is [only] the nodes that are mining the blockchain that are able to 'vote with their CPU power,'" *see id.* ¶¶ 64–65*,* Defendants qualify as legitimate "voters" because they *mined the Bitcoin Cash blockchain*.  *See id.* ¶¶ 59–60.  United does not and cannot muster any facts that evince a prohibition on nodes (i) joining or leaving a cryptocurrency network in advance of a fork, or (ii) using computing power that they lawfully possess to "vote" for their preferred software update.

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

blockchain, *see supra* note 9, and (ii) Defendants' "vote" for the ABC implementation did not result in any market-closing effect whatsoever. *See Black & Decker*, 801 F.3d at 436. On the contrary, United acknowledges that the "vote" produced a market-*opening* effect: enhanced competition between digital currencies and greater diversity in the digital currency ecosystem. *See* Compl. ¶¶ 60, 76–77.

Left with factual pleadings that undercut its naked assertions of harm to competition and the untenable claim that a Whitepaper provides the rule of decision in this case, United fails to make out the "actual harm" prong of its rule of reason claim.

### b.   United fails to plead facts suggesting potential harm to competition in a relevant market.

If a plaintiff fails to "provide allegations plausibly suggesting actual harm to competition, his only avenue of relief [is] to sufficiently allege potential harm." *Jacobs*, 626 F.3d at 1339. To allege "the potential for genuine adverse effects on competition" prong of a rule of reason claim, United must meet two threshold requirements. *See Spanish Broad. Sys.*, 376 F.3d at 1073. First, it must "define both (1) a geographic market and (2) a product market." *Jacobs*, 626 F.3d at 1336. "Although the parameters of a given market are questions of fact, antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Id.*; *see also Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 971 F. Supp. 1419, 1426 (M.D. Fla. 1997), *aff'd*, 145 F.3d 1258 (11th Cir. 1998) ("Failure to allege either the product or geographic market in the complaint is fatal to the plaintiff's claims."). United's Complaint never so much as mentions the words "relevant market." It fails to plead any facts defining the contours of the product and geographic markets in which Defendants purportedly injured competition, and does not even include an ambiguous "one-line statement that [t]he relevant geographic market is the United States." *See Jacobs*, 626 F.3d at 1336 n.11.[10]

Having failed to define a relevant geographic or product market in which Defendants possessed power, United discards its responsibility to plead the second threshold requirement for a "potential harm" rule of reason claim as well: "specific allegations linking [Defendants'] market power to harm to competition" in a relevant market. *See id.* at 1339 (quoting *Spanish Broad. Sys.*,

---

[10] To plausibly plead an allegation of potential harm to competition, a plaintiff must also "establish that the defendants possessed power" in the relevant market. *Jacobs*, 626 F.3d at 1339. United, having failed to satisfy the predicate step of defining the relevant market, cannot satisfy its obligation to plead that Defendants possessed power in that undefined market.

376 F.3d at 1073).  United fails to allege any specific or even general facts linking Defendants' conduct—much less their exercise of market power—to an anticompetitive effect in a relevant market.  Like the plaintiffs in *Spanish Broadcasting System*, United simply "has not described how the defendants' alleged behavior would be likely to harm competition," *see* 376 F.3d at 1074, an unsurprising result in light of it acknowledgement that ABC and SV now *compete* for users and as tradeable instruments on digital currency exchanges, and given its presentation of data that indicates that each of the new networks appear to be attracting participants.  Compl. ¶¶ 60, 76–78; *see Spanish Broad. Sys.*, 376 F.3d at 1074 (describing thriving competition in an allegedly restrained market and affirming dismissal of rule of reason claim).  Because "[t]he law directs itself not against conduct which is competitive, even severely so," and because United has not adequately pleaded that Defendants engaged in any "conduct which unfairly tend[ed] to destroy competition itself" in a relevant market, it fails to state a Section 1 claim under the rule of reason and its Sherman Act count should be dismissed.  *See Spectrum Sports*, 506 U.S. at 458.

   C.   **United lacks antitrust standing, because it has not pleaded facts that plausibly demonstrate its antitrust injury.**

   United's pleading problems extend even further: the Complaint lacks the necessary facts to support its claim to antitrust injury and standing.  "Standing in an antitrust case involves more than the 'case or controversy' requirement that drives constitutional standing." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991).  Rather, a reviewing court must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* (*AGC*), 459 U.S. 519, 535 (1983).  To adequately plead "antitrust injury," a component of antitrust standing, United must trace its loss to "a competition-*reducing* aspect or effect of the defendant[s'] behavior," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original), and cannot claim injury from conduct that actually *increases* competition in the relevant market.  *See Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 968 (11th Cir. 2006) (holding that an "injury . . . connected to conduct that actually increased competition in the relevant market . . . could not be considered antitrust injury").  United carries the burden to plead "more than the fact that [it] was injured through conduct of the defendant," but also sufficiently allege "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385,

1389 (11th Cir. 1990) (affirming order dismissing complaint for lack of antitrust standing and quoting *Brunswick Co. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Setting aside its conclusory assertion that "it suffered injury to [its] business or property" as a "proximate result of Defendants' unlawful conduct," Compl. ¶ 85,[11] United avers that it has suffered cognizable antitrust injury in two ways: *First*, United alleges that "Defendants' collective actions and manipulation of the market . . . created significant uncertainty and a lack of confidence in the network," which caused "the value of the cryptocurrency that [it] mines in its BlockchainDomes [to] fall[] significantly." *Id*. ¶¶ 77–78. *Second*, United appears to allege that the declining value of the cryptocurrency traded on the Bitcoin Cash network has rendered its BlockchainDome technology uncompetitive relative to that of its competitors, presumably because it is no longer the case "that the value of the mining output [from its BlockchainDomes]"—new cryptocurrency units—"exceeds the cost to mine that output." *Id*. ¶ 39. Each alleged injury stems from the same cause—a decline in the value of the digital currency traded on the Bitcoin Cash network. Accordingly, United must sufficiently allege (i) that Defendants' actions caused the value of its cryptocurrency holdings to decline, and (ii) that its injuries are of the type the antitrust laws were intended to prevent and flow from an unlawful aspect of Defendants' conduct. *See Austin*, 903 F.2d at 1389 ("Both causation and antitrust injury are essential elements of antitrust standing.").

*First*, United asserts that "Defendants and their co-conspirators . . . fixed, maintained, suppressed, stabilized and/or otherwise made artificial the values associated with the Bitcoin Cash network." Compl. ¶ 83. But United fails to allege facts that articulate *any* causal relationship between Defendants' purported advocacy for, and development of, a particular blockchain software implementation on the one hand, *see id*. ¶ 47, and the price or value of the digital currency on the Bitcoin Cash network on the other. *See AGC*, 459 U.S. at 540 (discussing the necessary "chain of causation between the [plaintiff's] injury and the alleged restraint in the market"); *cf. Gelboim*, 823 F.3d at 777 (holding that bank defendants' agreement to rig "a price component to thwart ordinary market conditions" caused plaintiff purchaser of financial instruments to suffer

---

[11] *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (interpreting *Twombly* to require lower courts to "eliminate any allegations in the complaint that are merely legal conclusions").

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

cognizable antitrust injury).[12]   Instead, United asserts that "[t]he combined value of the forked currency is lower than the pre-fork currency," and attributes that state of affairs to Defendants' "collective actions and manipulation of the market" that "created significant uncertainty and a lack of confidence in the network" and caused "confusion [that] has been severely detrimental to the market overall." Compl. ¶ 77–78.

Setting aside the issue of whether those conclusory allegations satisfy United's Article III obligation to plead an injury-in-fact that is fairly traceable to Chancellor's and the other Defendants' conduct, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), United's threadbare pleadings lack any facts that "establish some link between the defendant[s'] alleged anticompetitive conduct, on the one hand, and its injuries . . . on the other." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1080 (10th Cir. 2013) (Gorsuch, J.).  United fails to allege facts that establish any link between a given choice of software implementation on one hand and increases, decreases, or stabilization in the value of digital currency on the other.  *Cf. Sanderson Farms*, 744 F.3d at 713 (analogizing to Section 1 of the Sherman Act and holding in a RICO conspiracy case that "plaintiffs cannot plausibly establish proximate cause merely by tacking a conclusory allegation onto their high-level market claims").  United's allegations, rather, fall into the category of vague and conclusory guesswork that cannot withstand a Rule 12(b)(6) motion to dismiss.  *See Volmar Distribs., Inc. v. N.Y. Post Co.*, 825 F. Supp. 1153, 1160 (S.D.N.Y. 1993) (dismissing Section 1 claim and rejecting "naked assertion" of antitrust injury as "wholly conclusory and [] unsupported by any of the facts alleged").

*Second*, United fails to allege that its injuries derive from "an *anticompetitive aspect*" of Defendants' conduct. *Atl. Richfield*, 495 U.S. at 339.  As the Eleventh Circuit explained in *Johnson v. University Health Services, Inc.*, 161 F.3d 1334 (11th Cir. 1998), "antitrust injuries include only those injuries that result from interference with the freedom to compete." *Id.* at 1338.  It is clear, then, that any "claim of injury arising from the preservation or enhancement of competition is . . . inimical to the purposes of [the antitrust] laws." *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 483 n.19 (1982) (quoting *Brunswick*, 429 U.S. at 488, alterations in original).  Here, the crux

---

[12] *See* Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 338 (3rd and 4th eds., 2018 Cum. Supp. 2010-2017) (explaining that where "the several forces causing the plaintiff's [purported] loss are numerous, complex, and beyond reasonable disaggregation, standing will be denied").

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

of United's grievance is that the "forking" of the Bitcoin Cash blockchain into two distinct and competing chains—Bitcoin ABC and Bitcoin SV—diminished the value of its cryptocurrency relative to its worth on the unitary "pre-fork" blockchain.  Compl. ¶¶ 41, 43–45, 77.  It seeks injunctive relief to prevent Defendants from implementing any "software that would prevent the resulting chains from being able to be re-merged," *id*. ¶ 122, and faults Defendants for failing to "consult[] other Bitcoin development groups and the community at large" before triggering the fork. *Id*. ¶ 73.

Like the *Brunswick* plaintiffs, United stakes out the claim that Defendants' "depriv[ed] [it] of the benefits of increased concentration" and reduced competition in the upstream market to develop different blockchain software implementations, and even goes so far as to suggest that the Defendants should have *agreed* with their competitors before making "a significant and fundamental change to the blockchain." *See* 429 U.S. at 488; Compl. ¶ 73.  But as the Supreme Court held in *Brunswick*, the antitrust laws only afford a remedy to those injured by a *reduction* in competition.  *See* 429 U.S. at 488 (explaining that the antitrust "damages respondents obtained are designed to provide them with the profits they would have realized *had competition been reduced*").  As the Complaint makes plain, the "fork" resulted in *enhanced* competition between different blockchain software implementations.  The Bitcoin ABC and Bitcoin SV blockchains now compete on bitcoin trading platforms, even if "[s]ome trading platforms have chosen to list only one of the two resulting currencies." *See* Compl. ¶ 77.  And United's chart tracking "hash rates" on the Bitcoin ABC and SV chains—an indicator of the mining activity on each chain, *see id*. ¶ 52—suggests that miners are devoting comparable amounts of computing power to both implementations, with hash rates on the Bitcoin SV chain eclipsing those on the Bitcoin ABC chain at multiple points after the fork. *Id*. ¶ 60.  That United wishes that the fork had not occurred, would prefer to capture the value from a consolidated blockchain, and designed its hardware with that status quo in mind does not remotely suffice to plead a *prima facie* case of antitrust injury. *See Atl. Richfield*, 495 U.S. at 338 n.7 ("[A] firm cannot claim antitrust injury from . . . competition on the asserted ground that it is 'ruinous.'").

Shorn of legal conclusions, vague assertions, and complaints about the effects of enhanced competition, United's antitrust injury pleadings rest upon a remarkable and untenable proposition: that any "hard fork" that results in some diminution of value relative to the previous status quo inflicts antitrust injury on owners of digital currency, regardless of whether the plaintiff adequately

19

alleges injury "of the type the antitrust laws were intended to prevent" that "flows from that which makes defendants' acts unlawful." *See id.* at 334. United's rule would eviscerate the well-defined limits that the antitrust injury doctrine imposes to "keep[] the scope of complex antitrust trials within judicially manageable limits," *AGC*, 459 U.S. at 543, and subvert the doctrine's role as the "touchstone for [the] antitrust standing" inquiry. *See Austin*, 903 F.2d at 1389. The Court should reject United's invitation to redefine the limits of antitrust standing and injury, hold United to its obligation to plead facts making out an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *see id.*, and dismiss its Sherman Act claim.

## III. United fails to plead facts that state plausible claims for relief under its state-law causes of action.

United asserts five state-law claims against Chancellor: negligent misrepresentation, negligence, equitable estoppel, conversion, and injunctive relief.[13] As an initial matter, United's shotgun pleading extends to these counts—none of the corresponding factual allegations ever identifies Chancellor by name. *See Magluta*, 256 F.3d at 1284; *McAlpine v. Dr.Ing.hc.F.Porsche A.G.*, 2013 WL 12169926, at *9 (M.D. Fla. Mar. 27, 2013) (dismissing conversion claim because plaintiffs lumped defendants together under a conversion count and failed to allege which defendant converted plaintiffs' property). Because United fails to "provide notice to [Chancellor] of the acts or omissions for which [it] seeks to hold [him] liable" under its state-law causes of action, the Court should dismiss them on that basis alone. *E.g. Erickson v. Merck & Co.*, 2018 WL 2357273, at *7 (M.D. Fla. May 17, 2018) (ordering dismissal because plaintiff impermissibly lumped defendants together in negligence claim).

Furthermore, United's equitable estoppel and injunctive relief counts are non-starters: neither is a cause of action under Florida law. *See Debose v. Univ. of S. Fla.*, 178 F. Supp. 3d

---

[13] United does not assert an unjust enrichment claim against Chancellor. *See* Compl. ¶ 106 ("Bitmain, Bitcoin.com, and Ver have been unjustly enrich[ed] by the conduct described above."). Regardless, that claim fails as a matter of law because United does not allege that it conferred any benefit upon Chancellor (or any Defendant). *See Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1321 (S.D. Fla. 2014) ("No unjust enrichment claim will lie unless the plaintiff conferred a benefit on the defendant."). Moreover, United fails to indicate *which* state law underpins these claims. Chancellor assumes without conceding that Florida state law applies. *See Bell v. Atl. Trucking Co.*, 2009 WL 4730564, at *2 n.1 (M.D. Fla. Dec. 7, 2009) (assuming plaintiff who failed to "reveal which state's law he reference[d] in devising his [state-law claim]" relied on Florida law).

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

1258, 1273 (M.D. Fla. 2016) (dismissing equitable estoppel claim because "[i]n Florida, equitable estoppel is an affirmative defense, not a cause of action"); *Vitacost.com v. Or. Freeze Dry, Inc.*, 2009 WL 10667820, at *4 (S.D. Fla. Jul. 21, 2009) (same); *Int'l Sch. Servs., Inc. v. AAUG Ins. Co.*, 2010 WL 4810847, at *1 n.1 (S.D. Fla. Nov. 19, 2010) (dismissing injunctive relief count because "[it] is not a cause of action"); *Westgate Resorts, Ltd. v. Castle Law Grp., P.C.*, 2017 WL 6512552, at *5 (M.D. Fla. Dec. 20, 2017) (same). The Court should dismiss those counts with prejudice. Each of United's remaining state-law claims against Chancellor—negligent misrepresentation, negligence, and conversion—fails for additional reasons.

### A. Because United fails to allege the "what, when, where, and how" of Chancellor's purported misrepresentations, the Court should dismiss its negligent misrepresentation claim against Chancellor.

To state a claim for negligent misrepresentation, United must allege: (1) misrepresentation of a material fact; (2) that the representor made the misrepresentation without knowledge as to its truth or falsity or under circumstances in which he ought to have known of its falsity; (3) that the representor intended that the misrepresentation induce another to act on it; and (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation. *Celebrity Cruises*, 207 F. Supp. 3d at 1352–53. Federal Rule of Civil Procedure 9(b) applies to negligent misrepresentation claims: plaintiffs must "alert[] defendants to their precise misconduct" to survive a motion to dismiss. *Id.* at 1353. To pass Rule 9(b) muster, "the Complaint must set forth particular allegations about the 'who, what, when, where, and how' of the fraud," including "precisely what statements were made in what documents or oral representations or what omissions were made," "the time and place of each such statement," and "the content of such statements and the manner in which they misled the plaintiff." *Id.* at 1349, 1353. Moreover, Rule 9(b) requires a plaintiff to "inform each defendant of the nature of his alleged participation in the fraud," and proscribes the "lump[ing] together all of the defendants" in undifferentiated pleadings. *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007).

United's Complaint is devoid of specific allegations with respect to Chancellor's alleged misrepresentation. As noted, the Complaint simply lumps "Defendants" together and alleges that they "represented to [United] and the market that they would abide by the Whitepaper and accepted standards and protocols." Compl. ¶ 87. This conclusory allegation fails to identify the precise statements Chancellor made and to whom, the time and place of his statements, or the manner in which his statements misled United. *See Celebrity Cruises*, 207 F. Supp. 3d at 1349, 1353–54

(dismissing negligent misrepresentation claim for failure to make "particularized allegations about the timing, source, and precise content of the statements on which [plaintiff] relied"); *Peacock Med. Lab, LLC v. UnitedHealth Grp., Inc.*, 2015 WL 5118122, at *5 (S.D. Fla. Sept. 1, 2015) (dismissing negligent misrepresentation claim where plaintiffs failed to "'assert the date,' the 'method of communication,' [and] the 'specific content' of the communication"). United's negligent misrepresentation claim falls far short of Rule 9(b)'s particularity requirement, and the Court should dismiss it.

> **B.      Because United fails to allege that Chancellor owed or breached a duty to it in a way that legally caused it to suffer any injury, the Court should dismiss the negligence count.**

To state a cause of action for negligence, a plaintiff must allege "(1) a legal duty owed by defendant to plaintiff, (2) breach of that duty, (3) injury to the plaintiff legally caused by the breach, and (4) damages as a result of that injury." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1339 (S.D. Fla. 2018). United does not plead that Chancellor caused its purported injury, and it fails to allege that Chancellor owed or breached a duty to it. *See* Compl. ¶¶ 93–97.

> **1.      United fails to plead facts giving rise to Chancellor's "duty of care" to protect United from injury.**

The law of negligence only provides a remedy to plaintiffs who have suffered injury to their person or physical property; as a general matter, purely economic losses—those alleged by United here—are not cognizable in negligence. *See Monroe v. Sarasota Cty. Sch. Bd.*, 746 So.2d 530, 534 (Fla. 2d DCA 1999) ("[T]he general standards of care traditionally created by negligence law are standards designed to protect person and property from physical injury."); *see also* Compl. ¶ 79 ("Plaintiff has suffered and continues suffering significant damages through the *loss of value of the currency*."). Accordingly, Florida courts require plaintiffs who bring negligence claims for purely economic injuries to plead facts evincing "a special relationship" between the parties or "some other extraordinary circumstance that justifies recognition of such a claim." *Tank Tech, Inc. v. Valley Tank Testing, L.L.C.*, 244 So. 3d 383, 394 (Fla. 2d DCA 2018) (dismissing negligence claim where "there [was] neither a special relationship between [the parties] nor any extraordinary circumstance that would require imposition of a duty"); *see also Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1340 (11th Cir. 2012) ("[I]t is important to consider whether the specific relationship between the plaintiff and defendant warrants imposing a duty on the defendant to protect the plaintiff's purely economic interests.").

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

Here, the only alleged relationship between United and Chancellor is that they are both "participants in the Bitcoin Cash network."  *See* Compl. ¶¶ 37–38, 94.  But that relationship does not qualify as a "special relationship" or extraordinary circumstance that would warrant imposing a duty on Chancellor to protect United's "purely economic interests" in the value of Bitcoin Cash.  *See Limones v. Sch. Dist. of Lee Cty.*, 161 So.3d 384, 389 n.5 (Fla. 2015) ("[S]ome facts must be established to determine whether a duty exists, such as the identity of the parties, their relationship, and whether that relationship qualifies as a special relationship recognized by tort law and subject to heightened duties.").  No court has ever imposed a duty on a market participant to protect other participants from economic losses absent allegations of some other "special relationship," and this Court should not do so here.  *See Abel & Buchheim, P.R., Inc. v. Citibank Nat'l Ass'n*, 2017 WL 3731002, at *4 (S.D. Fla. Aug. 28, 2017) ("[T]here is no common law duty of a defendant in negligence to protect a plaintiff from mere economic losses.").

Indeed, imposing an economic duty of care on a fellow participant of the Bitcoin Cash network as United advocates here would subject every participant (including every node) that contributed to the creation of a forked version of Bitcoin Cash to negligence liability, *whenever* the combined value of the forked currencies declined after a fork.  *See* Compl. ¶ 44 (new software implementations of Bitcoin Cash are created by the "'vote' of various nodes mining the network").  This dramatic expansion of the ambit of negligence law would subvert the "important barrier to over-extension of liability" that the duty element interposes in economic loss-based negligence cases.  *See Virgilio*, 680 F.3d at 1339; *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So.2d 532, 546 (Fla. 2004) (Cantero, J., concurring) ("The duty prong remains a strong filter in [cases involving only economic damages].").  None of United's thinly pleaded factual allegations justify a remarkable extension of the duty concept, and the Court should reject United's invitation to redraw the bounds of negligence law in this case.

### 2. United fails to allege that Chancellor breached any legal duty.

United does not plead any facts indicating that Chancellor breached any legal duty.  It declares that "Defendants breached their duty of care . . . by failing to conform to and abide by the Whitepaper and accepted standards and protocols and hijacking and assuming control of the Bitcoin Cash network and market," Compl. ¶ 95, but fails to allege—as it must to plead any breach—that Chancellor or the other Defendants failed to "take the same precautions another

23

reasonable and careful person in similar circumstances would have taken." *See Dugas v. 3M Co.*, 101 F. Supp. 3d 1246, 1252 (M.D. Fla. 2015).

Simply put, United's only substantive allegation against Chancellor is that he and two other individuals implemented "checkpoint[s]" on the ABC blockchain. *See* Compl. ¶ 69. But United does not allege any facts evincing Chancellor's role in implementing those checkpoints, nor does it demonstrate how Chancellor's conduct, even if adequately pleaded, breached any legal duty to it. *Cont'l Cas. Co. v. Hardin*, 2016 WL 11234458, at *9 (M.D. Fla. Dec. 5, 2016) (dismissing negligence claim partly because plaintiffs did not "allege[] facts showing how [] duty was breached"). United's shotgun pleadings never identify "which Defendant[s] committed which alleged breach, when each alleged breach was committed, and what specific damages flow from any specific breach." *See Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd.*, 2008 WL 926509, at *10 (S.D. Fla. Mar. 31, 2008). These basic pleading failures are fatal to United's negligence claim, and the Court should dismiss it.

**C.    The Court should dismiss United's conversion count, because it does not allege that Chancellor wrongfully asserted dominion over any property that it owns or possesses.**

"[T]o state a claim for conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property." *Spradley v. Spradley*, 213 So.3d 1042, 1044 (Fla. 2d DCA 2017). Intent to deprive an individual's possession of the subject property is also necessary element of a conversion claim. *See Senfeld v. Bank of N.S. Trust Co. (Cayman) Ltd.*, 450 So.2d 1157, 1161 (Fla. 3d DCA 1984). Here, United fails to allege that Chancellor intended to, or did in fact deprive it of any property. As a threshold matter, United does not plead that Chancellor wrongfully asserted "dominion" over any property United owned or possessed. *See* Compl. ¶¶ 34-38.[14] Rather, it alleges that Defendants' actions caused a decline in the value of the forked Bitcoin Cash currency. *See* Compl. ¶ 77. But that allegation is insufficient to establish any wrongful assertion of dominion. *See Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1144 (M.D. Fla. 2007) (dismissing conversion claim for "value" of plaintiff company where defendant employees

---

[14] For example, United does not allege that Chancellor took possession of its mining equipment or its cryptocurrency holdings. *Cf. Kleiman v. Wright*, 2018 WL 6812914, at *15–*16 (S.D. Fla., Dec. 27, 2018) (denying motion to dismiss where plaintiff adequately pleaded that the defendant transferred Bitcoins owned by plaintiff to defendant's "wallet").

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL 33131-3456

conspired to simultaneously resign, slander company, and go work for a competitor); *Trentalange v. Occulogix, Inc.*, 2007 WL 4482565, at *3 (M.D. Fla., Dec. 17, 2007) (dismissing conversion claim where the allegedly converted property was "the ability to sell her stock at a high price in the IPO").

United next appears to assert that Defendants converted its "right to use" the Bitcoin Cash network. *See* Compl. ¶ 113.  But nothing in the Complaint indicates that Chancellor wrongfully deprived United of this purported right.  As United acknowledges, "nodes can leave and rejoin the network" at will, and it does not allege that Chancellor's purported implementation of checkpoints on the ABC blockchain prevented it from "leav[ing] [or] rejoin[ing] the [Bitcoin Cash] network." *See id.* ¶ 64.  More fundamentally, United's allegations do not establish that it had an ownership or possessory interest in the "right" to use the Bitcoin Cash network.  *See United States v. Bailey*, 419 F.3d 1208, 1214 (11th Cir. 2005) ("[A] plaintiff must have a present or immediate right of possession of the property in question" to give rise to a claim for conversion).  Florida courts routinely dismiss conversion claims for exactly this reason.  *See Coastal Petroleum Co. v. Int'l Minerals & Chem. Corp.*, 709 F. Supp. 1092, 1098 (N.D. Fla. 1988) (rejecting plaintiff's assertion of a possessory interest in an "inchoate right to explore for and produce certain minerals"); *Devlin v. Phoenix, Inc.*, 471 So.2d 93, 95 (Fla. 5th DCA 1985) (dismissing conversion claim of plaintiff whose lease did not convey the asserted possessory right); *Mattocks v. Black Entm't Television LLC*, 43 F. Supp. 3d 1311, 1321 (S.D. Fla. 2014) (dismissing complaint because it did not establish that plaintiff held a property interest in the "likes" on her Facebook page).  The Court should dismiss United's conversion claim, which rests on a similarly inchoate and unestablished right to use the Bitcoin Cash network.

## CONCLUSION

For the reasons stated above, the Court should dismiss with prejudice the Complaint in its entirety.

B I L Z I N   S U M B E R G   B A E N A   P R I C E   &   A X E L R O D   L L P
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456

Dated:  February 1, 2019

Respectfully submitted,

/s/ *Melissa Pallett-Vasquez*
MELISSA C. PALLETT-VASQUEZ
Florida Bar No. 715816
mpallett@bilzin.com
**BILZIN SUMBERG BAENA PRICE & AXELROD
LLP**
1450 Brickell Ave, Suite 2300
Miami, Florida 33131
Tel.: (305) 374-7580  Fax: (305) 374-7593

and

IAN SIMMONS (*admitted pro hac vice*)
D.C. Bar No. 439645
isimmons@omm.com
KATRINA ROBSON (*admitted pro hac vice*)
D.C. Bar No. 989341
krobson@omm.com
SERGEI ZASLAVSKY (*admitted pro hac vice*)
D.C. Bar No. 1010425
szaslavsky@omm.com
ZHAO LIU (*admitted pro hac vice*)
D.C. Bar No. 1022940
zliu@omm.com
BRIAN P. QUINN (*admitted pro hac vice*)
D.C. Bar No. 1048323
bquinn@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street N.W.
Washington, D.C. 20006
Tel: (202) 383-5300  Fax: (202) 383-5414

*Attorneys for Defendant Shammah Chancellor*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on February 1, 2019, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.


/s/ *Melissa Pallett-Vasquez*    
Melissa Pallett-Vasquez

BILZIN SUMBERG BAENA PRICE & AXELROD LLP
1450 Brickell Avenue, Suite 2300, Miami, FL  33131-3456