UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:18-CV-25106-WILLIAMS/TORRES

UNITED AMERICAN CORP.,

        Plaintiff,

   v.

BITMAIN INC., SAINT BITTS LLC d/b/a
BITCOIN.COM, ROGER VER, BITMAIN
TECHNOLOGIES LTD., BITMAIN
TECHNOLOGIES HOLDING COMPANY,
JIHAN WU, PAYWARD VENTURES, INC.
d/b/a KRAKEN, JESSE POWELL,
AMAURY SECHET, SHAMMAH
CHANCELLOR, and JASON COX,

        Defendants.

_____ /

**DEFENDANT BITMAIN INC.'S MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................ 1

II.    STATEMENT OF FACTS ............................................................................ 2

III.   LEGAL STANDARD..................................................................................... 4

IV.   ARGUMENT ................................................................................................. 6

      A.     THE COMPLAINT FAILS TO STATE A SHERMAN ACT CLAIM ............... 6

           1.     UAC Has Not Alleged Essential Elements of a Section 1 Violation......... 6

           2.     UAC's Sherman Act Claim Fails Under a Per Se or Rule of Reason Analysis.............................................................................................. 12

      B.     UAC'S STATE LAW CLAIMS MUST BE DISMISSED................................. 13

           1.     UAC Fails to Plead Key Elements of its Negligent Misrepresentation Claim. ............................................................... 13

           2.     UAC Fails to Plead a Valid Claim for Negligence. ................................ 16

           3.     Equitable Estoppel is Not an Independent Cause of Action. .................. 18

           4.     UAC Fails to Plead Key Elements of its Unjust Enrichment Claim........ 18

           5.     UAC Fails to Plead Key Elements of its Conversion Claim. .................. 19

           6.     Injunctive Relief is Not an Independent Cause of Action. ...................... 20

V.     CONCLUSION................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*4658 N. Ocean Inc. v. Branch Bank & Tr. Co.*,
  2011 WL 13216975 (S.D. Fla. Feb. 15, 2011) ........................................................................19

*Abromats v. Abromats*,
  2016 WL 4917153 (S.D. Fla. Sept. 14, 2016) ........................................................................18

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988)................................................................................................................12

*Am. Key Corp. v. Cole Nat'l Corp.*,
  762 F.2d 1569 (11th Cir. 1985) .............................................................................................12

*Aquatherm Indus., Inc. v. Fla. Power & Light Co.*,
  145 F.3d 1258 (11th Cir. 1998) ....................................................................................6, 10, 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................................4, 9, 10

*Ashmore v. FAA*,
  2011 WL 3915752 (S.D. Fla. Sept. 2, 2011) ...........................................................................5

*Ass'n of Irritated Residents v. C&R Vanderham Dairy*,
  2007 WL 2815038 (E.D. Cal. Sept. 25, 2007)........................................................................16

*B.M.I. Interior Yacht Refinishing, Inc. v. M/Y Claire*,
  2014 WL 11706426 (S.D. Fla. Dec. 1, 2014) ........................................................................14

*Bair v. City of Clearwater*,
  196 So. 3d 577 (Fla. 2d DCA 2016) ......................................................................................18

*Bank of New York v. Fremont Gen. Corp.*,
  523 F.3d 902 (9th Cir. 2008) .................................................................................................19

*Bell Atlantic. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................................6, 7, 8, 9

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993)................................................................................................11

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962)................................................................................10, 12, 13

*Ceithaml v. Celebrity Cruises, Inc.,*
207 F. Supp. 3d 1345 (S.D. Fla. 2016) ...................................................................5

*City of San Diego v. Monsanto Co.,*
334 F. Supp. 3d 1072 (S.D. Cal. 2018)............................................................18, 19

*De La Flor v. Ritz-Carlton Hotel Co.,*
556 F. App'x 938 (11th Cir. 2014) .......................................................................17

*Duty Free Americas, Inc. v. Estée Lauder Cos., Inc.,*
946 F. Supp. 2d 1321 (S.D. Fla. 2013) ...................................................................6

*Emma C. v. Eastin,*
2014 WL 2989946 (N.D. Cal. July 2, 2014)..........................................................16

*Espinoza v. Countrywide Home Loans Servicing, L.P.,*
2014 WL 3845795 (S.D. Fla. Aug. 5, 2014)..........................................................20

*Fla. Seed Co., Inc. v. Monsanto Co.,*
105 F.3d 1372 (11th Cir. 1997) ............................................................................11

*Garcia v. United Auto Credit Corp.,*
2008 WL 141579 (S.D. Fla. Jan. 11, 2008) .............................................................5

*In re Resistors Antitrust Litig.,*
2017 WL 3895706 (N.D. Cal. Sept. 5, 2017) ..........................................................7

*In re Suboxone Antitrust Litig.,*
2017 WL 4642285 (E.D. Pa. Oct. 17, 2017)............................................................7

*Jacobs v. Tempur-Pedic Int'l, Inc.,*
626 F.3d 1327 (11th Cir. 2010) ....................................................................10, 12, 13

*James River Ins. Co. v. Med Waste Mgmt., LLC,*
46 F. Supp. 3d 1350 (S.D. Fla. 2014) ...................................................................13

*L.A. Fitness Int'l, LLC v. Mayer,*
980 So. 2d 550 (Fla. 4th DCA 2008) ....................................................................17

*Lamm v. State Street Bank and Trust*,
    749 F.3d 938 (11th Cir. 2014) ........................................................................................15

*Liwanag v. Bank of Am., N.A.*,
    2015 WL 9701137 (C.D. Cal. May 27, 2015) ...............................................................13

*Lombard's, Inc. v. Prince Mfg., Inc.*,
    753 F.2d 974 (11th Cir. 1985) ..........................................................................................7

*Magluta v. Samples*,
    256 F.3d 1282 (11th Cir. 2001) ........................................................................................5

*McGee v. JP Morgan Chase Bank, NA*,
    520 F. App'x 829 (11th Cir. 2013) .................................................................................15

*Mehta v. Wells Fargo Bank, N.A.*,
    737 F. Supp. 2d 1185 (S.D. Cal. 2010).........................................................................20

*Moncada v. West Coast Quartz Corp.*,
    221 Cal. App. 4th 768 (2013) .......................................................................................18

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984)..........................................................................................................9

*Nardolilli v. Bank of Am. Corp.*,
    2013 WL 12154541 (S.D. Fla. Dec. 5, 2013) ...............................................................19

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ......................................................................................11

*Paine v. Domino's Pizza, LLC*,
    2011 WL 1102788 (S.D. Fla. Mar. 24, 2011)...............................................................13

*Peterson v. Cellco P'ship*,
    164 Cal. App. 4th 1583 (2008) .....................................................................................19

*Price v. Grand Bank For Savs.*,
    2018 WL 4852198 (S.D. Cal. Oct. 4, 2018) .................................................................20

*Quatela v. Stryker Corp.*,
    820 F. Supp. 2d 1045 (N.D. Cal. 2010).........................................................................14

*Rubinstein v. Keshet Inter Vivos Tr.*,
2018 WL 3730875 (S.D. Fla. June 11, 2018), *adopted*,
2018 WL 3730867 (S.D. Fla. June 24, 2018) ........................................................................20

*Seagood Trading Corp. v. Jerrico, Inc.*,
924 F.2d 1555 (11th Cir. 1991) .......................................................................................12

*Shin v. Time Squared Global, LLC*,
2015 WL 13284952 (C.D. Cal. Aug. 26, 2015)................................................................16

*Solomon v. Blue Cross & Blue Shield Ass'n*,
574 F. Supp. 2d 1288 (S.D. Fla. 2008) ..............................................................................6

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
376 F.3d 1065 (11th Cir. 2004) ..........................................................................10, 11, 12

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)...........................................................................................................11

*Stone Invest Dakota LLC v. De Bastos*,
2015 WL 6997979 (S.D. Fla. Nov. 12, 2015).....................................................................15

*Todorov v. DCH Healthcare Auth.*,
921 F.2d 1438 (11th Cir. 1991) .................................................................................7, 9, 10

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
7 F.3d 986 (11th Cir. 1993) ..............................................................................................13

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972)...........................................................................................................12

*Virgilio v. Ryland Grp., Inc.*,
680 F.3d 1329 (11th Cir. 2012) ...........................................................................16, 18, 19

*Worldwide Media, Inc. v. Twitter, Inc.*,
2018 WL 5304852 (N.D. Cal. Oct. 24, 2018).....................................................................16

# I.    **INTRODUCTION**

Plaintiff United American Corp., Inc. ("UAC"), Defendant Bitmain Inc., and its co-defendants ("Defendants") are all participants in a broad, worldwide community of software developers, users, and enthusiasts who support a cryptocurrency called Bitcoin Cash.[1]  While the technology behind Bitcoin Cash is complicated, the issues in this case are not.  Following a contentious industry vote and software update to Bitcoin Cash software in November 2018—and a decline in cryptocurrency prices more broadly—UAC has brought a federal antitrust claim and a handful of state law claims against a broad swath of cryptocurrency industry participants, including six individuals and five corporate defendants spanning five countries and three continents.  On the basis of speculative and wholly conclusory allegations UAC contends the industry vote must have been manipulated.  Each of UAC's causes of action suffers from fundamental defects, and each must be dismissed.

First, UAC's Sherman Act claim fails to establish a conspiratorial agreement among the Defendants—much less with Bitmain Inc.—to rig the vote.  To the contrary, the Complaint merely describes a vigorous competition between two competing software upgrades (Bitcoin Cash ABC and Bitcoin Cash SV) and their respective supporters.  Nowhere does the Complaint allege any facts to plausibly establish an illegal *agreement* among Bitmain Inc. and any of the other Defendants, separate and apart from any common (and lawful) interest each individual Defendant may have had in the industry vote.[2]  Nor does the Complaint establish that any alleged agreement harmed *competition;* to the contrary, the Complaint admits that both Bitcoin Cash ABC and Bitcoin Cash SV continue to be supported by cryptocurrency trading platforms and the industry

---

[1]    Bitmain Inc. is the only Bitmain entity named in the Complaint to have been properly served with it, and is therefore the only "Bitmain" referenced in this motion.

[2]    UAC has attempted to obscure the identity of any Bitmain entities involved in alleged misconduct, impermissibly referring only to "Bitmain" throughout the Complaint.

1

more broadly.  Instead, the Complaint demonstrates only that UAC is a disappointed competitor complaining about the impact of fair and vigorous competition on the value of its cryptocurrency assets, and the antitrust laws provide it no relief.

UAC's state law claims fare no better.  UAC has failed to allege facts supporting the most basic elements of four of its claims, including failing to identify any false statement made by Bitmain Inc. (for negligent misrepresentation), any duty owed by Bitmain Inc. to UAC (for negligence), any benefit received by Bitmain Inc. (for unjust enrichment), and any property taken by Bitmain Inc. from UAC (for conversion).  The last two claims (equitable estoppel and injunctive relief) are merely remedies, not causes of action at all.  As such, the Complaint must be dismissed.

## II.   STATEMENT OF FACTS[3]

Much of the technology and software behind Bitcoin Cash derives from Bitcoin, which was first described by Satoshi Nakamoto in a whitepaper published on October 31, 2008 ("Whitepaper").  Compl. ¶ 27, Whitepaper at 1-2 (attached to the Complaint as Ex. A) (hereafter "Ex. A").  As explained in the Whitepaper, cryptocurrency transactions, including those involving Bitcoin Cash, are recorded within groups of data called "blocks" that are linked through cryptography, resulting in a "chain" of blocks referred to as a "blockchain."  *Id.* Ex. A at 2-3.  The blockchain forms a permanent historical ledger of transactions involving Bitcoin Cash.  *Id.*

Because anyone can download Bitcoin Cash software to a computer (sometimes called a "node" on a peer-to-peer network), an essential component of blockchain technology is ensuring that the Bitcoin Cash ledger remains synchronized across the network.  *Id.* Ex. A at 1.  This synchronization occurs through a process called "mining," by which nodes compete to solve a math problem for the right to propose the next block of transactions.  *Id.* ¶ 24.  Successful miners,

---

[3]    While Bitmain Inc. disagrees with many of the Complaint's allegations, it accepts UAC's factual allegations as true for the purposes of this motion and relies only on the Complaint and the Satoshi Whitepaper, which UAC attached to the Complaint as Exhibit A.

who sometimes combine their computing power through "mining pools," are rewarded with Bitcoin Cash. *Id.* ¶¶ 24, 26, 30. Users "can leave and rejoin the network at will," *Id.* Ex. A at 8, and when a user re-joins the Bitcoin Cash network, the software on her node will synchronize her ledger with the others on the network. *Id.*

Like most software programs, Bitcoin Cash is subject to periodic updates. *See id.* ¶¶ 41, 42. Because no single entity controls the code, however, disagreements about proposed changes to the code can sometimes arise and lead to "forks." *Id.* Ex. A at 3. A fork begins when some nodes add blocks of transactions to the blockchain using one software update while others add blocks using another update, resulting in two separate but incompatible blockchains. *Id.* ¶ 45.

Any disagreements about updates to Bitcoin Cash software are resolved in a democratic process whereby mining nodes "vote" with their computer power to support one update proposal or the other. *Id.* ¶ 44. This voting process, which was described in the Whitepaper and characterized by UAC as a "hash war," occurs when nodes download and run one of the competing updates on their respective computers. *Id*. ¶ 45, Ex. A at 3. In this way, nodes "vote with their CPU power," with a "one-CPU-one-vote" metric. *Id.* ¶ 44 n.3, Ex. A at 3, 8. Each person who controls a node can "vote" by choosing which software code to run and is free to direct the node to leave and rejoin the network at will. *Id.* Ex. A at 8.

The outcome of a "hash war" does not eliminate the "losing" update, since its supporters can continue to run and support that version of the software in the hopes that it will gain broader acceptance within the community at large. For example, Bitcoin Cash was created after its developers proposed changes to the original Bitcoin software. *Id.* ¶ 57. Both Bitcoin and Bitcoin Cash continue to be supported and to be traded on cryptocurrency exchanges today. *See id.* ¶ 76.

Bitcoin Cash was scheduled to undergo a software upgrade on November 15, 2018. *Id.* ¶ 42. According to the Complaint, the two competing upgrades proposed—Bitcoin ABC 0.18.4

and Bitcoin SV 0.1.0—were governed by different rules sets, and therefore were incompatible with one another. *Id.* ¶¶ 41, 43. Because the community could not reach a consensus on which upgrade to adopt, the dispute would be resolved by a vote consistent with the procedure set forth in the Whitepaper and described above. Whichever update received the most "votes" would "continue the Bitcoin Cash blockchain going forward," and the update with less support would split off into a "new and distinct chain." *Id.* ¶¶ 44-45.

The Complaint alleges that Defendants engaged in a "systematic and organized scheme" to move hashing power to the Bitcoin Cash network for the purpose of "dominating" the network. *Id.* ¶ 47. UAC acknowledges that the Whitepaper says that nodes "can leave and rejoin the network," but nonetheless asserts without any support that "it has always been understood" only the "nodes that are mining the blockchain" are permitted to vote. *Id.* ¶ 64. UAC concludes in summary fashion that "Bitmain" (without distinguishing between the three Bitmain entities named in the Complaint) and Bitcoin.com must have colluded to "hijack" the Bitcoin Cash blockchain. *Id.* ¶ 65. Finally, the Complaint alleges that individual software developers subsequently modified the blockchain with "centralized checkpoints" to ensure the success of the update, and that other industry participants later bragged about implementing the checkpoints. *Id.* ¶¶ 72, 74-75.

Though it acknowledges both Bitcoin Cash ABC and Bitcoin Cash SV are both still traded on cryptocurrency exchanges, UAC contends that it has suffered "significant damages through the loss of value" of its cryptocurrency assets, including its "BlockchainDome" technology. *Id.* ¶¶ 35-37, 77, 79. UAC seeks damages for alleged violations of Section 1 of the Sherman Act (whether as a *per se* violation or an unreasonable restraint of trade) and various state law doctrines.

### III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atlantic. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This means that "a plaintiff must 'plead [] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Ashmore v. FAA*, 2011 WL 3915752, at *1 (S.D. Fla. Sept. 2, 2011) (alteration in original) (quoting *Iqbal*, 556 U.S. at 678). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Id*.  (quoting *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009)). Undifferentiated "shotgun" pleadings—i.e., those that "mak[e] no distinction" among the defendants and "make plain that all of the defendants could not have participated in every act complained of"—do not satisfy these requirements.  *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).  In deciding a motion to dismiss, a court may consider not only a complaint itself, but also the exhibits attached to the complaint.  *Garcia v. United Auto Credit Corp.*, 2008 WL 141579, at *1 (S.D. Fla. Jan. 11, 2008).

"In addition to the requirements of *Twombly, Iqbal*, and Federal Rules of Civil Procedure 8(a) and 12(b)(6), claims sounding in fraud are subject to the pleading standards of Federal Rule of Civil Procedure 9(b)."  *Ceithaml v. Celebrity Cruises, Inc.*, 207 F. Supp. 3d 1345, 1349 (S.D. Fla. 2016) (Williams, J.).  Rule 9(b) requires a party to state "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."  *Ceithaml*, 207 F. Supp. 3d at 1349 (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

## IV.   ARGUMENT

### A.   THE COMPLAINT FAILS TO STATE A SHERMAN ACT CLAIM

A complaint alleging a conspiracy in violation of Section 1 of the Sherman Act must allege 1) an agreement between two or more persons that is 2) designed to restrain trade. *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1262 (11th Cir. 1998). UAC's Section 1 claim fails because it does not plausibly allege facts to show 1) that Bitmain Inc. entered into an agreement with any other Defendant, or 2) that any such agreement illegally restrained trade.

### 1.   UAC Has Not Alleged Essential Elements of a Section 1 Violation

#### (a)   *UAC Has Not Alleged Facts to Show or Infer An Agreement Between Any of the Defendants*

Under Section 1 of the Sherman Act, UAC must allege "an *agreement* between two or more persons to restrain trade," because "unilateral conduct is not prohibited by § 1." *Aquatherm*, 145 F.3d at 1262. A "conclusory allegation of agreement at some unidentified point" is not sufficient to survive a motion to dismiss. *Twombly*, 550 U.S. at 557. Likewise, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556. UAC must plead sufficient factual allegations sufficient for this Court to draw a reasonable inference that Bitmain Inc. made a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Duty Free Americas, Inc. v. Estée Lauder Cos., Inc.*, 946 F. Supp. 2d 1321, 1333 (S.D. Fla. 2013) (quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984)).

UAC fails to meet this burden. UAC makes *no* attempt to allege the "time, place, or person[s]" involved in the alleged conspiracy. *Solomon v. Blue Cross & Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1292 (S.D. Fla. 2008) (quoting *Twombly*, 550 U.S. at 565); *see Duty Free*, 946 F. Supp. 2d at 1333 (dismissing Section 1 claim where plaintiff failed to allege facts "as to the 'who,' 'what,' 'where,' or 'when' of its conspiracy theories"). Instead, UAC asks this Court to *infer* a conspiracy based solely on speculative and conclusory allegations UAC has made on

6

"information and belief." Compl. ¶ 46. But speculative or conclusory assertions are not entitled to any presumption of truth on a motion to dismiss. *Twombly*, 550 U.S. at 555; *see Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985) ("A conclusory allegation of conspiracy to restrain trade will not survive a motion to dismiss."). And antitrust law "limits the range of permissible inferences in cases based on circumstantial evidence." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991). Critically, allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

Considered individually or as a whole, UAC's allegations are more consistent with Bitmain Inc.'s independent action and its individual interests than with a conspiracy. Indeed, UAC's allegations boil down to the unremarkable assertion that up to and after the November 2018 fork, (i) "Bitmain"[4] and other unnamed Defendants "vote[d] with their CPU power" for the Bitcoin Cash ABC update; (ii) in doing so, "Bitmain" combined its computer hashing power with the Bitcoin.com pool; (iii) after Bitcoin Cash ABC won the vote, independent software developers implemented checkpoints in the Bitcoin Cash blockchain to prevent others from rolling back the

---

[4]     UAC has attempted to lump three different Bitmain defendants together for purposes of these allegations: Bitmain Inc. (a U.S. company, Compl. ¶ 7), Bitmain Technologies Ltd. (a Chinese company, *id*. ¶ 10), and Bitmain Technologies Holding Company (a company registered in the Cayman Islands, *id*., ¶ 11). Blurring their identities to obscure UAC's pleading deficiencies is plainly improper. *See In re Suboxone Antitrust Litig.*, 2017 WL 4642285, at *11 (E.D. Pa. Oct. 17, 2017) (dismissing antitrust claim where "complaint's allegations lump defendants together by nature of their corporate relationship, but set forth specific facts as to only some defendants"); *In re Resistors Antitrust Litig.*, 2017 WL 3895706, at *4 (N.D. Cal. Sept. 5, 2017) ("[I]ndiscriminate and generalized lumping together of defendants does not make for a sound pleading approach."). For example, UAC alleges that Bitcoin.com colluded with "Bitmain (whose electricity rates are subsidized by the Chinese government) to reallocate pools of Bitmain servers . . . ," but Bitmain Technologies Ltd. is based in China, not Bitmain Inc. Compl. ¶¶ 10, 59. UAC also alleges estimates of "Bitmain's market share for ASIC servers" in Complaint ¶ 52, but the preceding paragraph in the Complaint makes clear that "Bitmain Technologies Ltd.," not Bitmain Inc., is the "designer of what is referred to as 'ASIC' . . . chips for mining operations." Compl. ¶ 51.

update, and (iv) some Bitcoin.com and Kraken employees bragged on social media about Bitcoin Cash ABC's victory over Bitcoin Cash SV.

None of these allegations remotely suggests an unlawful agreement, let alone one involving Bitmain Inc.. *First*, the Complaint itself identifies the independent, non-conspiratorial reason Bitmain Inc. might choose to vote for its preferred Bitcoin Cash software update.  UAC alleges that "Bitmain" is a significant cryptocurrency miner and comprises 40% of all Bitcoin Cash ABC mining (Compl. ¶¶ 52, 53), so Bitmain Inc. would have clear incentives to vote in this significant election—as did every other Bitcoin Cash user around the world who preferred one update over the other.[5]  The alleged conspiracy is not plausible in light of this "obvious alternative explanation" for the alleged conduct, which *Twombly* instructed courts to consider when determining whether an antitrust complaint states a plausible claim for relief.  550 U.S. at 567.

*Second*, UAC offers no factual allegations to support an agreement between Bitmain Inc. and Bitcoin.com.  UAC concludes that increased mining activity on Bitcoin Cash ABC must have been attributable to an agreement by "Bitmain" to reallocate its servers to Bitcoin.com's mining pools.  Compl. ¶ 59.  The Court need not credit UAC's conclusory allegations, *Twombly*, 550 U.S. at 555, which in any event are flatly contradicted by UAC's admission that "Bitmain"[6] *independently* mined both Bitcoin Cash (before the fork) and Bitcoin Cash ABC (after the fork) through its Antpool, BTC.com, and ViaBTC pools.  Compl. ¶¶ 53, 67, 68.

*Third*, UAC does not even attempt to link Bitmain Inc. to the actions of the three individual software developers or statements made by other defendants' employees.  Read most charitably,

---

[5]     UAC offers no explanation of why these groups' support of Bitcoin ABC was lawful and legitimate while Bitmain Inc.'s support was conspiratorial.

[6]     UAC does not allege which Bitmain entity operates Antpool, BTC.com, and ViaBTC, though in context it appears to be referencing Bitmain Technologies Ltd.  *See* Compl. ¶¶ 51-53. This lumping of corporate defendants does not satisfy *Twombly*'s pleading requirements.  *See* n.4, *supra*.

the Complaint merely speculates that because other members of the Bitcoin Cash community took actions or made statements in support of Bitcoin Cash ABC, there must have been a grand conspiracy among some or all its supporters. But such a speculative chain of events does not plausibly suggest a "conscious commitment" to an unlawful objective. *Monsanto*, 465 U.S. at 768.

*Finally*, UAC fails to plead any "plus factors" that would permit this Court to infer a Section 1 conspiracy based on parallel conduct. *Twombly*, 550 U.S. at 557. ("An allegation of parallel conduct…without some further factual enhancement[,] stops short of the line between possibility and plausibility"). At a minimum, to plausibly plead an antitrust case, it is "well settled" in the Eleventh Circuit that a plaintiff must establish "each defendant engaging in the parallel action acted contrary to its economic self-interest." *Todorov*, 921 F.2d at 1456 n.30.

UAC failed to plead *any* plus factors, let alone facts demonstrating that Bitmain Inc. or any other Defendant acted against its economic self-interest. To the contrary, Bitmain Inc. had a clear economic incentive to vote for its preferred upgrade because, as UAC concedes, the November 2018 software upgrades were both critical to the future of Bitcoin Cash and important to the cryptocurrency industry as a whole. *See* Compl. ¶¶ 41, 43, 45. Further, UAC admits that other entities—including "Bitcoin Unlimited, [Bitcoin] XT, and others"—actively supported the Bitcoin Cash ABC upgrade, even though they are not alleged to be part of the conspiracy. *Id.* ¶¶ 41, 43 n.2, 45. That these other entities had non-conspiratorial economic incentives to support Bitcoin Cash ABC underscores the fact that Bitmain Inc. did as well. Thus, "judicial experience and common sense" compel the conclusion that collusion is not the reason why a party would use its computing power to support Bitcoin Cash ABC. *Iqbal*, 556 U.S. at 679.

Because Bitmain Inc. and the other Defendants' support of Bitcoin Cash ABC "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-

market behavior," UAC's claim of unlawful conspiracy does not reach the level of being plausible. *Iqbal*, 556 U.S. at 680. Consequently, UAC's Section 1 claim must be dismissed.

(b)     *UAC Has Not Alleged Any Facts to Show An Illegal Restraint of Trade and Corresponding Harm to Competition*

UAC also fails to plead a restraint of trade or corresponding harm to *competition*, the second essential element of a Section 1 claim. *Aquatherm*, 145 F.3d at 1262. UAC was required to allege specific facts demonstrating that it suffered an antitrust injury, *i.e.*, "harm to competition in general, rather than merely damage to an individual competitor." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (antitrust laws are "concern[ed] with the protection of competition, not competitors").[7] UAC must demonstrate damage to competition with "specific factual allegations." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010).

None of UAC's alleged injuries reflects any harm to *competition*. *First*, UAC concedes, as it must, the fork itself and subsequent voting had zero impact on the viability of Bitcoin Cash SV; it continues to exist and be traded on all major exchanges next to Bitcoin Cash ABC, Bitcoin, Ethereum, and hundreds of other cryptocurrencies. Compl. ¶¶ 22, 45, 76, 77. The vote represented competition in its truest form, not a lack of it. *Second*, UAC claims that the value of its investments in so-called "BlockchainDomes" has "fallen significantly." *Id.* ¶ 77. Even if true, the Eleventh Circuit has squarely rejected similar harms such as "weakened stock prices," "damaged reputation," and "loss of advertising revenue" as antitrust injuries because "[n]one of these allegations assert

---

[7]     UAC must allege harm to competition to establish *both* (a) the liability prong of a Section 1 claim, and (b) antitrust standing to assert a Sherman Act claim. "Standing in an antitrust case involves more than the 'case or controversy' requirement that drives constitutional standing." *Todorov*, 921 F.2d at 1448. To have antitrust standing, UAC "must plead and prove that the injury they have suffered derives from some anticompetitive conduct and is the type the antitrust laws were intended to prevent." *Id.* at 1450. Because the Complaint fails to allege harm to competition, UAC cannot establish either antitrust liability or antitrust standing.

damage to *competition* itself rather than damage to [a particular plaintiff]." *Spanish Broad.,* 376 F.3d at 1072 (emphasis added). In any event, UAC offers no factual allegations to support its wholly conclusory assertion that the implementation of Bitcoin Cash ABC upgrade caused the decline in Bitcoin Cash prices, as opposed to broader macroeconomic forces. *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1080 (10th Cir. 2013) (Gorsuch, J.). *Third*, UAC suggests that Defendants "represented to Plaintiff … that they would abide by the Whitepaper and accepted standards and protocols." Compl. ¶ 87. Even if UAC had identified a specific misrepresentation by Defendants (which, as explained in Section IV.B.1 below, it has not), "disseminating false information … is *not* sufficient to support a claim under Section 1." *Aquatherm*, 145 F.3d at 1263; *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition[.]"). Insofar as UAC complains "not about higher prices or about injury to competition, but about injury to [itself]," such as lost value of its mining investments, "[there is] no antitrust injury." *Fla. Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1375 (11th Cir. 1997).

If anything, UAC complains that it suffered because of *too much* competition.[8] The Complaint describes fierce competition between Bitcoin Cash ABC and Bitcoin Cash SV, with industry participants lining up on both sides to vote for their preferred network upgrade. Compl. ¶¶ 43, 60. In the end, UAC complains merely that the vote impacted the value of Bitcoin Cash

---

[8] "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

and UAC's business model in turn.  But harm to a competitor is not an injury that the antitrust laws are meant to prevent.  *See Brown Shoe*, 370 U.S. at 320; *Spanish Broad.*, 376 F.3d at 1069.

2.      UAC's Sherman Act Claim Fails Under a Per Se or Rule of Reason Analysis

Remarkably, the Complaint suggests that a claim born of too much competition should be judged as a *per se* violation of the Sherman Act, a standard reserved for the most pernicious anticompetitive agreements.  *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (*per se* standard only appropriate for "naked restraints of trade with no purpose except stifling of competition").  Yet, as noted above, UAC has failed to allege any facts on which to infer an agreement, let alone one with no purpose "except stifling of competition," and its claim cannot be assessed under a *per se* standard for this reason alone.

Instead, the presumption in Section 1 cases is that the rule of reason standard applies—and especially to those in which parties have taken some action to implement an industry standard. *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988).  This is precisely such a case.  As a "purely 'peer to peer' version of electronic cash," Bitcoin Cash relies on its community of users to develop and improve the standards applicable to it, which expand its availability and enable more users to adopt Bitcoin Cash for "online payments from one party to another without going through a financial institution."  Compl. ¶ 27.  The industry vote for the preferred Bitcoin Cash upgrade must be assessed under the rule of reason standard, and UAC has failed that standard, too.

Under the rule of reason, UAC must plead facts to show, among other things, "both (1) a geographic market and (2) a product market" in which anticompetitive harm occurred.  *Jacobs*, 626 F.3d at 1336, 1339.  The Complaint contains *no* factual allegations concerning a geographic market, which is the "area from which sellers of [the relevant product] derive their customers, and the area within which purchasers . . . can practically turn for such products or services."  *Am. Key*

12

*Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985).  Nor does the Complaint include *any* allegations that would inform a product market, which must be defined by reference to those "products, hav[ing] the ability—actual or potential—to take significant amounts of business away from each other."  *See U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993) (internal citation and quotation marks omitted); *Brown Shoe*, 370 U.S. at 325.

In addition to these pleading deficiencies, and for the reasons described above, UAC has not established—and cannot establish—"actual or potential harm to competition."  *Jacobs*, 626 F.3d at 1336.  Because UAC cannot support these key elements of a Sherman Act claim, Count I must be dismissed.

### B.   UAC'S STATE LAW CLAIMS MUST BE DISMISSED

#### 1.   UAC Fails to Plead Key Elements of its Negligent Misrepresentation Claim.

UAC's state law claims are equally defective.   To state a claim of negligent misrepresentation under Florida law, UAC was required to allege "(1) a misrepresentation of material fact; (2) that the representor either knew or should have known was false . . . ; (3) the representor intended to induce another to act on the misrepresentation; and (4) resulting injury to a party acting in justifiable reliance on the misrepresentation."  *Paine v. Domino's Pizza, LLC*, 2011 WL 1102788, at *3 n.4 (S.D. Fla. Mar. 24, 2011) (quoting *Allocco v. City of Coral Gables*, 221 F. Supp. 2d 1317, 1355 (S.D. Fla. 2002), *aff'd* 88 F. App'x 380 (11th Cir. 2003)).  California law is in accord.  *See Liwanag v. Bank of Am., N.A.*, 2015 WL 9701137, at *3 (C.D. Cal. May 27, 2015).[9]  Because a negligent misrepresentation claim "sounds in fraud," UAC must satisfy Federal

---

[9]      Bitmain Inc.'s principal place of business is in California and UAC alleges that five of the other ten Defendants are domiciled or based in California.  *See* Compl. ¶¶ 7-17.  The Court need not resolve whether Florida or California law applies to UAC's claims, as both states' laws require a plaintiff to plead the same elements for each claim at issue.  *See James River Ins. Co. v. Med Waste Mgmt., LLC*, 46 F. Supp. 3d 1350, 1355-56 (S.D. Fla. 2014).

Rule of Civil Procedure 9(b)'s requirement to plead with particularity the circumstances constituting fraud. *See B.M.I. Interior Yacht Refinishing, Inc. v. M/Y Claire*, 2014 WL 11706426, at *2 (S.D. Fla. Dec. 1, 2014) (Williams, J.); *see also Quatela v. Stryker Corp.*, 820 F. Supp. 2d 1045, 1049 (N.D. Cal. 2010) (negligent misrepresentation plaintiff must "specifically allege [defendant's] role in the purported fraud, the 'time place and manner of each act of fraud,' and the 'who, what, when, where, and how' of the charged misconduct.") (citation omitted).

UAC falls woefully short of meeting these pleading requirements. UAC's entire misrepresentation claim is limited to one conclusory allegation that unnamed "Defendants" made an unspecified representation "to Plaintiff and the market." Compl. ¶¶ 87-91. UAC never alleges *who* made the representation, where it was made, when it was made, or how it was made. This alone dooms UAC's claim. *See B.M.I. Interior*, 2014 WL 11706426 at *2 (dismissing negligent misrepresentation claim that "fail[ed] to state exactly who made the alleged misrepresentation, when it occurred, the content of the false statement, or whether it was made orally or in writing").

In fact, UAC fails to allege any direct communications between it and any of the Defendants. Instead, UAC suggests that Defendants—merely by being "participants in the Bitcoin Cash network"—somehow implicitly represented to UAC that "they would abide by the Whitepaper and accepted standards and protocols." Compl. ¶ 87. This theory lacks any factual support in the Complaint. Parties engaging in independent, competitive business activities do not make implied representations to each other; were it otherwise, a negligent misrepresentation claim would exist for every dispute among competitors involving a party's violation of an alleged industry norm—even in the absence of any communications between the parties. Indeed, the Whitepaper is clear that network participants make no promises to each other; rather, their

14

"honesty" is solely governed by their "profitab[ility]" and whether others "refus[e] to work on" their blockchains.  *Id.* Ex. A at 4, 8.[10]

Likewise, UAC offers no factual allegations to establish that any Defendant intended its "particip[ation] in the Bitcoin Cash network" to induce UAC to act in any particular way.  *See McGee v. JP Morgan Chase Bank, NA*, 520 F. App'x 829, 832 (11th Cir. 2013) (affirming dismissal where "[t]he only allegation concerning reliance repetitively offered by the plaintiffs is the conclusory claim that they 'relied upon the [defendant's] statements," which is "merely a '[t]hreadbare' recitation of negligent misrepresentation's 'reliance' element") (quoting *Iqbal*, 556 U.S. at 678); *Lamm v. State Street Bank and Trust*, 749 F.3d 938, 951 (11th Cir. 2014) (affirming dismissal where plaintiff failed to plead "facts sufficient to establish that [defendant] intended to induce him to rely on its alleged representations").  Nor has UAC offered any allegations that any misrepresentation by any Defendant caused the value of UAC's cryptocurrency investments to decline in value, as opposed to macroeconomic conditions more broadly.

Further, UAC's negligent misrepresentation claim—and every other claim it alleges in the Complaint—suffers from the basic flaw that UAC consistently and impermissibly lumps together all eleven individual and corporate defendants under the umbrella term "Defendants."  *See, e.g.*, Compl. ¶ 87 (alleging that "*Defendants* represented to Plaintiff and the market that they would abide by the Whitepaper and accepted standards and protocols"); *id*. ¶ 91 (alleging UAC "relied on *Defendants'* misrepresentations") (emphasis added).  UAC fails to identify a single misrepresentation attributable to Bitmain Inc., let alone the time, place, declarant or content of such statement.  This is plainly deficient.  *See Stone Invest Dakota LLC v. De Bastos*, 2015 WL

---

[10]    UAC's complaint does not even specifically allege that Bitmain Inc. is a participant in the Bitcoin Cash network.  Rather, at best UAC appears to allege that Bitmain Technologies Ltd. "operates Antpool and BTC.com, two of the largest Bitcoin and Bitcoin Cash mining pools," and never connects Bitmain Inc. to either mining pool.  Compl. ¶¶ 51-53; *see also* n.4, *supra*.

6997979, at *5 (S.D. Fla. Nov. 12, 2015) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.") (internal citation and quotations omitted); *see also Shin v. Time Squared Global, LLC*, 2015 WL 13284952, at *3 (C.D. Cal. Aug. 26, 2015) (dismissing "shotgun pleading" where plaintiff used the omnibus "Defendants" to "group[] defendants together" and "deprive[d] Defendants of knowing exactly what they [were] accused of doing wrong").

### 2.  UAC Fails to Plead a Valid Claim for Negligence.

UAC's claim for negligence is flawed because it fails to allege all essential elements of the claim: "a duty, breach of that duty, causation, and damages." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012). The first element—establishing the existence of a duty—"is a minimum threshold legal requirement that opens the courthouse doors[.]" *Id.* (quoting *Williams v. Davis*, 974 So. 2d 1052, 1057 n.2 (Fla. 2007) (internal quotations omitted)); *see also Worldwide Media, Inc. v. Twitter, Inc.*, 2018 WL 5304852, at *8 (N.D. Cal. Oct. 24, 2018) (negligence claim dismissed where plaintiff failed to "plead facts showing the existence of any duty" owed by the defendant). UAC fails to satisfy that threshold requirement, or any of the remaining elements.

UAC contends that, "[a]s participants in the Bitcoin Cash network, Defendants owed a duty of care . . . to abide by the Whitepaper and accepted standards and protocols." Compl. ¶ 94. But the Whitepaper—a theoretical document that "proposed a system for electronic transactions without relying on trust," *Id.* Ex. A at 8—is not binding law and does not create legal rights or obligations among participants in the Bitcoin Cash network.[11] Nor does the Complaint allege that

---

[11]    *Cf. Emma C. v. Eastin*, 2014 WL 2989946, at *4 (N.D. Cal. July 2, 2014) ("Although it may have been a historically important document in the development of special education law, the White Paper has never been adopted by this Court as a set of standards that applies in this case."); *Ass'n of Irritated Residents v. C&R Vanderham Dairy*, 2007 WL 2815038, at *22 n.9 (E.D. Cal.

16

Defendants ever agreed (with UAC or anyone else) to be bound by the Whitepaper's theoretical underpinnings, without any deviation or modification.  *See also* n.4, *supra* (UAC does not even allege that Bitmain Inc. participated in the Bitcoin Cash network).

Moreover, UAC concedes that the Whitepaper expressly envisions and permits the very conduct at the heart of its grievance:  that "nodes '*can leave and rejoin the network at will*.'" Compl. ¶ 64 (quoting Ex. A at 1, 8) (emphasis added).  Thus, the alleged scheme to bring nodes from another network to temporarily mine the Bitcoin Cash network during a software upgrade and then leave, *see id.* ¶ 65, was in fact envisioned by the Whitepaper and cannot result in the breach of any supposed duty thereunder.

Finally, UAC's repeated references to "accepted standards and protocols," network "ground rules," and what "has always been understood" do not save its claim from dismissal.  *See, e.g.*, Compl. ¶¶ 1, 63-65, 88-89, 94-95, 99-100.  Even assuming that certain industry standards are known by participants in the Bitcoin Cash network—and UAC has not alleged facts to show that they are—such standards do not create a legal duty.  *De La Flor v. Ritz-Carlton Hotel Co*., 556 F. App'x 938, 939 (11th Cir. 2014) ("[T]he adoption of industry standards by [defendant] did not create 'an independent legal duty' with which it had to comply") (citation omitted); *L.A. Fitness Int'l, LLC v. Mayer*, 980 So. 2d 550, 558 (Fla. 4th DCA 2008) ("Although the custom and practice of an industry can help define a standard of care a party must exercise after it has undertaken a duty, industry standards do not give rise to an independent legal duty.").  At bottom, UAC asks this Court to invent a duty between competing entities with no legal relationship, working independently on a system that was designed to function "without relying on trust" or government regulation.  The Court should decline UAC's unprecedented invitation and dismiss the claim.

---

Sept. 25, 2007) ("White Paper" issued by association "is an advisory document that is not legally binding").

3.     Equitable Estoppel is Not an Independent Cause of Action.

UAC's next state law claim—for equitable estoppel—has no merit because it is not a cause of action under Florida or California law.  In those jurisdictions, equitable estoppel is an affirmative defense, not a standalone cause of action.  *See Abromats v. Abromats*, 2016 WL 4917153, at *6 (S.D. Fla. Sept. 14, 2016) (citing *Debose v. Univ. of S. Fla.*, 2016 WL 1367173, at *9 (M.D. Fla. Apr. 5, 2016)); *Bair v. City of Clearwater*, 196 So. 3d 577, 585 (Fla. 2d DCA 2016); *Moncada v. West Coast Quartz Corp.*, 221 Cal. App. 4th 768, 782 (2013).

Even if such a claim existed, however, it would not help because UAC's equitable estoppel claim rehashes the same baseless allegations and suffers from the same defects as its negligent misrepresentation claim.  Having failed to identify an actionable misrepresentation, UAC cannot bypass this element by recasting its claim under an estoppel theory that equally fails to specify any particular inequitable conduct.  Compl. ¶ 99 ("*As participants in the Bitcoin Cash network, Defendants caused Plaintiff and the market to believe* that they would abide by certain accepted standards and protocols.") (emphasis added).  And as explained above, the Complaint fails to plead facts showing that any Defendant intended for UAC to rely to its detriment on the Defendant's participation in the Bitcoin Cash network, or that Bitmain Inc. participated in the network at all.

4.     UAC Fails to Plead Key Elements of its Unjust Enrichment Claim.

UAC also has failed to allege the elements of the claim for unjust enrichment under Florida law, which requires plausible allegations that "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio*, 680 F.3d at 1337.[12]

---

[12]     While some courts have held that California law does not recognize an independent claim for unjust enrichment, *see City of San Diego v. Monsanto Co.*, 334 F. Supp. 3d 1072, 1085 (S.D.

18

UAC has not even alleged the first element of this claim.  While the Complaint alleges that UAC was "cut out of the network and lost the value of [its] significant investments," Compl. ¶ 109, there are no factual allegations demonstrating that any Defendant, let alone Bitmain Inc. specifically, retained the benefit of these investments.  Rather, by UAC's own admission, the vote resulted in a "new and distinct chain" of cryptocurrency.  *Id.* ¶¶ 45, 77.  Because UAC has not identified any benefit it conferred on Bitmain Inc., its claim for unjust enrichment must be dismissed.  *See Virgilio*, 680 F.3d at 1337; *City of San Diego*, 334 F. Supp. 3d at 1085.

5.   UAC Fails to Plead Key Elements of its Conversion Claim.

Under Florida law, "conversion is an 'act of dominion wrongfully asserted over another's property inconsistent with his ownership therein.'"  *Nardolilli v. Bank of Am. Corp.*, 2013 WL 12154541, at *5 (S.D. Fla. Dec. 5, 2013) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009)).  There can be no claim for conversion without actual ownership of, or right to possess, the property that was allegedly converted.  *See 4658 N. Ocean Inc. v. Branch Bank & Tr. Co.*, 2011 WL 13216975, at *4 (S.D. Fla. Feb. 15, 2011).  California law is consistent.  *See Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 914 (9th Cir. 2008).

UAC fails to identify any of its property that was converted by any Defendant, much less by Bitmain Inc.  Instead, UAC references an abstract "right to utilize and possess Bitcoin Cash and its blockchain network."  Compl. ¶ 113.  But UAC has not pled a factual basis for "owning" or "possessing" either the Bitcoin Cash network or any Bitcoin Cash that it did not mine or otherwise obtain.  Nor has it pled that any Defendant took from UAC a single Bitcoin Cash coin.

Further, UAC has not pled any action taken by Bitmain Inc. to impede UAC's ability to use the Bitcoin Cash network or any Bitcoin Cash that UAC lawfully acquired.  To the contrary,

---

Cal. 2018), those courts that have recognized such a claim have applied the same substantive elements as Florida.  *See Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008).

UAC is free to mine Bitcoin Cash ABC, Bitcoin Cash SV, or any other cryptocurrency.  *Id.* ¶ 77.
UAC's true gripe is that Bitcoin Cash SV lost to a competing upgrade in a community vote.  *Id*. ¶
44.  That does not give rise to a cause of action for conversion (or any other tort, for that matter).

6.   <u>Injunctive Relief is Not an Independent Cause of Action.</u>

UAC cannot bring a claim for injunctive relief because injunctive relief is a remedy, not
an independent cause of action under either Florida or California law.  *See, e.g.*, *Price v. Grand
Bank For Savs.*, 2018 WL 4852198, at *6 (S.D. Cal. Oct. 4, 2018); *Rubinstein v. Keshet Inter Vivos
Tr.*, 2018 WL 3730875, at *7 (S.D. Fla. June 11, 2018) (Torres, J.), *adopted*, 2018 WL 3730867
(S.D. Fla. June 24, 2018) (Williams, J.); *Espinoza v. Countrywide Home Loans Servicing, L.P.*,
2014 WL 3845795, at *7 (S.D. Fla. Aug. 5, 2014); *Mehta v. Wells Fargo Bank, N.A.*, 737 F. Supp.
2d 1185, 1205 (S.D. Cal. 2010).

In any event, UAC's claim for injunctive relief does not apply to Bitmain Inc.  UAC seeks
an injunction against three other defendants and aims to restrain behavior in which Bitmain Inc. is
not alleged to participate or control.  *See* Compl. ¶ 122.  As such, the claim must be dismissed.

<strong>V.    <u>CONCLUSION</u></strong>

For the foregoing reasons, Bitmain Inc. respectfully requests that the Complaint be
dismissed in its entirety, with prejudice.

20

Date: February 1, 2019                                    Respectfully submitted,


                                                          */s/ Christopher R.J. Pace*
                                                          Christopher R.J. Pace
                                                          Florida Bar No. 721166
                                                          Email:  crjpace@jonesday.com
                                                          Marc A. Weinroth
                                                          Florida Bar No. 42873
                                                          Email:  mweinroth@jonesday.com
                                                          **JONES DAY**
                                                          600 Brickell Avenue
                                                          Suite 3300
                                                          Miami, Florida  33131
                                                          Telephone: (305) 714-9700
                                                          Facsimile: (305) 714-9799


                                                          Julie M. McEvoy (*pro hac vice*)
                                                          Email:  jmcevoy@jonesday.com
                                                          **JONES DAY**
                                                          51 Louisiana Ave., N.W.
                                                          Washington, D.C. 20001
                                                          Telephone: (202) 879-3939
                                                          Facsimile: (202) 626-1700


                                                          Mark W. Rasmussen (*pro hac vice*)
                                                          Email:  mrasmussen@jonesday.com
                                                          Thomas D. York (*pro hac vice*)
                                                          Email:   tdyork@jonesday.com
                                                          **JONES DAY**
                                                          2727 N. Harwood Street
                                                          Suite 500
                                                          Dallas, TX 75201
                                                          Telephone: (214) 220-3939
                                                          Facsimile: (214) 969-5100


                                                          *Attorneys for Defendant Bitmain Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on February 1, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record for the parties.

_/s/ Christopher R.J. Pace_____
Christopher R.J. Pace
