**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:18-cv-25106 (KMW)(EGT)**

_____

UNITED AMERICAN CORP., a Florida )
company, )
        )
        Plaintiff, )
        )
v. )
        )
BITMAIN, INC., SAINT BITTS LLC d/b/a )
BITCOIN.COM, ROGER VER, BITMAIN )
TECHNOLOGIES LTD., BITMAIN )
TECHNOLOGIES HOLDING COMPANY, )
JIHAN WU, PAYWARD VENTURES, INC. )
d/b/a KRAKEN, JESSE POWELL, )
AMAURY SECHET, SHAMMAH )
CHANCELLOR, and JASON COX, )
        )
        Defendants. )
_____)


## DEFENDANTS PAYWARD VENTURES, INC.'S AND JESSE POWELL'S MOTION TO DISMISS THE COMPLAINT


Baker Marquart LLP
777 S. Figueroa Street
Suite 2850
Los Angeles, California 90017
T: +1 424 652 7800

Kobre & Kim LLP
201 South Biscayne Boulevard
Suite 1900
Miami, Florida 33131
T: +1 202 664 1907

_Attorneys for Defendants Payward_
_Ventures, Inc. and Jesse Powell_

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION................................................................................................................ 1

BACKGROUND .................................................................................................................. 3

LEGAL STANDARD .......................................................................................................... 4

DISCUSSION ....................................................................................................................... 5

I.      UAC Fails To Plausibly Allege An Actionable Antitrust Conspiracy Exists .............. 5

    a.      UAC's Antitrust Conspiracy Theory Fails Because
It Makes No Economic Sense ..................................................................... 6

    b.      UAC's Conspiracy Theory Is Not Supported By Sufficient Factual
Allegations Of Any Unlawful Anticompetitive Conduct ........................... 7

    c.      UAC Fails To State A "Per Se" Antitrust Violation ................................... 9

    d.      UAC Fails To State A Plausible "Rule Of Reason" Antitrust Claim .................. 10

        i.      UAC Does Not Define a Plausible Relevant Market.................................. 11

        ii.     UAC Does Not Allege Market Power ........................................................ 12

        iii.    UAC Does Not Allege Any Actual Or Potential Cognizable Injury To
Competition As A Whole.................................................................................. 13

    e.      UAC Lacks "Antitrust Standing" To Maintain This Antitrust Action ................ 13

        i.      UAC Has Not, And Cannot, Demonstrate Any "Antitrust Injury"............... 14

        ii.     UAC Is Not An "Efficient Enforcer" Of The Antitrust Laws ..................... 15

II.     UAC Fails To State Plausible Florida State Law Claims For Relief.......................... 15

    a.      UAC's Negligent Representation Claim (Count II) Fails..................................... 15

    b.      UAC's Negligence Claim (Count III) Fails ......................................................... 18

    c.      UAC's Equitable Estoppel Claim (Count IV) Fails............................................. 19

    d.      UAC's Conversion Claim (Count VI) Fails......................................................... 19

CONCLUSION .................................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Ad-Vantage Telephone Directory Consultants, Inc. v. GTE,*
   849 F.2d 1336 (11th Cir. 1987) ................................................................... 12

*Agency for Health Care Administration v. MIED, Inc.,*
   869 So. 2d 13 (Fla. 1st DCA 2004) ............................................................. 19

*Allied Orthopedic Appliances, Inc., v. Tyco Health Care Group LP,*
   592 F.3d 991 (9th Cir. 2010) ........................................................................ 9

*Altenel, Inc. v. Millennium Partners,*
   947 F. Supp. 2d 1357 (S.D. Fla. 2013) (Williams, J.) .............................. 18

*American Federation of Labor & Congress of Industry Organizations v. City of
   Miami, Florida,*
   637 F.3d 1178 (11th Cir. 2011) .............................................................. 5, 20

*Ambrosia Cole & Construction Co. v. Pages Morales,*
   482 F.3d 1309 (11th Cir. 2007) .............................................................. 5, 16

*American Key Corp. v. Cole National Corp.,*
   762 F.2d 1569 (11th Cir. 1985) ................................................................. 11

*Aquatherm Industries v. Florida Power & Light Co.,*
   145 F.3d 1258 (11th Cir. 1998) ................................................................... 7

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................................... 5

*Associated General Contractors, Inc. v. California State Council of Carpenters,*
   459 U.S. 519 (1983) ................................................................................. 14,15

*Atlantic Richfield Co. v. USA Petroleum Co.,*
   495 U.S. 328 (1990) ..................................................................................... 14

*Austin v. Blue Cross and Blue Shield of Alabama,*
   903 F.2d 1385 (11th Cir. 1990) ................................................................. 14

*Bair v. City of Clearwater,*
   196 So. 3d 577 (Fla. 2d DCA 2016) .......................................................... 19

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................ 4, 5, 15

*Berkey Photo v. Eastman Kodak Co.,*
   603 F.2d 263 (2d Cir. 1979) ........................................................................ 8

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
    441 U.S. 1 (1979) ............................................................................................10

*Brown v. Vega (In re Vega)*,
    Adversary No. 6:10–ap–00299–KSJ,
    2014 WL 2621118 (Bankr. M.D. Fla. June 12, 2014) ...........................................20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ........................................................................................14

*Business Electronics Corp. v. Sharp Electronics Corp.*,
    485 U.S. 717 (1988) ..........................................................................................9

*California Computer Products v. IBM Corp.*,
    613 F.2d 727 (9th Cir. 1979) ..............................................................................8

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986) ........................................................................................14

*Ceithaml v. Celebrity Cruises, Inc.*,
    207 F. Supp. 3d 1345 (S.D. Fla. 2016) (Williams, J.) .....................................5, 16

*Chicago Board of Trade v. United States*,
    246 U.S. 231 (1918) ........................................................................................10

*Cockrell v. Sparks*,
    510 F.3d 1307 (11th Cir. 2007) .........................................................................15

*Consultants & Designers, Inc. v. Butler Service Group, Inc.*,
    720 F.2d 1553 (11th Cir. 1983) .........................................................................10

*Duty Free Americas, Inc. v. Estee Lauder Costmetics, Inc.*,
    946 F. Supp. 2d 1321 (S.D. Fla. 2013) ...............................................................7

*Duty Free Americas, Inc. v. Estee Lauder Cosmetics, Inc.*,
    797 F.3d 1248 (11th Cir. 2015) ......................................................................7, 8

*In re Energy Smart, Inc.*,
    381 B.R. 359 (Bankr. M.D. Fla. 2007) ...............................................................19

*Federal Trade Commission v. Indiana Federation of Dentists*,
    476 U.S. 447 (1986)........................................................................................13

*Florida Department of Corrections v. Abril*,
    969 So. 2d 201 (Fla. 2007)..............................................................................18

*Graphic Products Distributors v. Itek Corp.*,
    7167 F.2d 1560 (11th Cir. 1983) .......................................................................12

*Hawaiian Airlines, Inc. v. AAR Aircraft Services, Inc.*,
   167 F. Supp. 3d 1311 (S.D. Fla. 2016) ............................................................................16, 18

*Helicopter Support Sys. Inc. v. Hughes Helicopter, Inc.*,
   818 F.2d 1530 (11th Cir. 1987) ..............................................................................................7

*J & J Sports Productions, Inc. v. Pit Restaurant, Inc.*,
   Case No. 14-CV-24264-WILLIAMS, 2015 WL 12781196
   (S.D. Fla. Feb. 20, 2015) ......................................................................................................19

*Jacobs v. Tempur-Pedic Intern., Inc.*,
   626 F.3d 1327 (11th Cir. 2010) ...........................................................................9, 10, 11, 13

*Jessup v. American Kennel Club*,
   61 F. Supp. 2d 5 (S.D.N.Y. 1999) ..........................................................................................8

*Kendall v. VISA U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ................................................................................................7

*Kerivan v. Fogal*,
   22 So. 2d 584 (Fla. 1945)......................................................................................................19

*L.A. Draper & Son v. Wheelabrator-Frye, Inc.*,
   735 F.2d 414 (11th Cir. 1984) ..............................................................................................12

*La Grasta v. First Union Securities, Inc.*,
   358 F.3d 840 (11th Cir. 2004) ................................................................................................3

*Lamm v. State Street Bank & Trust*,
   749 F.3d 938 (11th Cir. 2014) ..............................................................................................18

*Lane v. Capital Acquisitions & Management Co.*,
   No. 04-60602 CIV, 2006 WL 4590705 (S.D. Fla. Apr. 14, 2006),
   *aff'd*, 322 F. App'x 675 (11th Cir. 2009)...................................................................5, 16, 18

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)..............................................................................................................10

*Levine v. Central Florida Medical Affiliates, Inc.*,
   72 F.3d 1538 (11th Cir. 1996) ........................................................................10, 11, 12, 13

*Lipkin v. Norwegian Cruise Line Ltd.*,
   93 F.Supp.3d 1311 (S.D. Fla. 2015) (Williams, J.) ..............................................................18

*Major League Baseball v. Morsani*,
   790 So. 2d 1071 (Fla. 2001)..................................................................................................19

iv

*Maris Distribution Co. v. Anheuser-Busch, Inc.,*
302 F.3d 1207 (11th Cir. 2002) ...................................................................12

*In re Meridian Asset Management, Inc.,*
296 B.R. 243 (Bankr. N.D. Fla. 2003) ...........................................................20

*Meyer v. Meyer,*
25 So. 3d 39 (Fla. 2d DCA 2004) ..................................................................19

*Municipal Utilities Board of Albertville v. Alabama Power Co.,*
934 F.2d 1493 (11th Cir. 1991) ......................................................................5

*North American Soccer League, LLC v. U.S. Soccer Federation, Inc.,*
883 F.3d 32 (2d Cir. 2018)...............................................................................8

*Northern Pacific Railroad Co. v. United States,*
356 U.S. 1 (1958)..............................................................................................9

*Palmyra Park Hospital, Inc. v. Phoebe Putney Memorial Hospital,*
604 F.3d 1291 (11th Cir. 2010) ...............................................................13, 14

*Postel Industry, Inc. v. Abrams Group Contsruction, LLC,*
No. 6:11–cv–1179–Orl–28DAB, 2012 WL 4194660
(M.D. Fla. Sept. 19, 2012) .............................................................................17

*Procaps S.A. v. Patheon, Inc.,*
845 F.3d 1072 (11th Cir. 2016) .................................................................7, 13

*Retina Assocs. P.A. v. So. Baptist Hospital of Florida, Inc.,*
105 F.3d 1376 (11th Cir. 1997) .......................................................................9

*Scranton Construction Co. v. Litton Industry Leasing Corp.,*
494 F.2d 778 (5th Cir. 1974) ...........................................................................9

*Seagood Trading Corp. v. Jerrico, Inc.,*
924 F.2d 1555 (11th Cir. 1991) ...................................................................9, 10

*Spanish Broadcasting Systems of Florida, Inc. v. Clear Channel Communications, Inc.,*
376 F.3d 1065 (11th Cir. 2004) ...........................................................8, 11, 13

*Specialty Marine & Industrial Supplies, Inc. v. Venus,*
66 So. 3d 306 (Fla. DCA 1st 2011) ...............................................................19

*Standard Oil Co. v. United States,*
337 U.S. 293 (1949) .......................................................................................12

*Sunbeam Television Corp. v. Nielsen Media Research, Inc.,*
711 F.3d 1264 (11th Cir. 2103) ...........................................................13, 14, 15

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ................................................................................................9

*Todorov v. DCH Healthcare Authority*,
  921 F.2d 1438 (11th Cir. 1991) ......................................................................6, 14

*Transamerica Computer, Inc. v. IBM Corp.*,
  698 F.2d 1377 (9th Cir. 1983) ..............................................................................9

*United States Anchor Manufacturing v. Rule Industries*,
  7 F.3d 986 (11th Cir. 1993) ................................................................................11

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ............................................................................................11

*United States v. Topco Associates, Inc.*,
  405 U.S. 596 (1972) ..............................................................................................9

*In re Vizio, Inc., Consumer Privacy Litigation*,
  238 F. Supp. 3d 1204 (C.D. Cal. 2017) .............................................................17

*Weight-Rite Golf Corporation v. U.S. Golf Association*,
  766 F. Supp. 1104 (M.D. Fla. 1991) .....................................................................8

*White Motor Co. v. United States*,
  372 U.S. 253 (1963) ..............................................................................................9

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) .............................................................................6

**Statutes**

Clayton Act Section 4 (15 U.S.C. § 15) ........................................................................5, 6

Sherman Act (15 U.S.C. § 1) ................................................................................... *passim*

**Other Authorities**

CoinMarketCap, *BitCoin Cash*,
  https://coinmarketcap.com/currencies/bitcoin-cash/ .............................................3

Federal Rule of Civil Procedure 8 ...................................................................5, 16, 18

Federal Rule of Civil Procedure 9(b) ..............................................................5, 16, 18

Federal Rule of Civil Procedure 12(b)(6) .........................................................1, 4, 6

Federal Rule of Evidence 201(b) .................................................................................3

## INTRODUCTION

All of United American Corp.'s claims against Payward Ventures, Inc. ("Kraken"[1]) and Jesse Powell should be dismissed with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In its 122-paragraph complaint, UAC musters only two paragraphs containing specific allegations as to either Kraken, a cryptocurrency exchange, or Powell, its CEO.  The allegations against these defendants are reed thin and fail on both the law and facts.

UAC's complaint centers around a cryptocurrency called Bitcoin Cash[2] and a "network upgrade" to Bitcoin Cash that happened on November 15, 2018.  Kraken, a leading and well-respected cryptocurrency exchange, permits its customers to exchange various cryptocurrencies (such as Bitcoin, Ethereum, and Bitcoin Cash) for each other or for fiat currencies (such as U.S. Dollars and Yen).  UAC is an alleged developer of technology and equipment for "mining" Bitcoin Cash, but it is not alleged to be (and is not) a competing cryptocurrency exchange, or even a customer[3] of Kraken.  At a high level, "mining" is a process of validating the accuracy of transactions on the Bitcoin Cash network (or as it is often called "blockchain").  Mining requires special technology and computers to do its work and is generally more profitable for mining operations the higher the price of Bitcoin Cash, since they are paid by the network in newly issued Bitcoin Cash.  A network like Bitcoin Cash often has thousands, if not tens of thousands, of people "mining."

Ultimately, UAC's complaint is an elaborate contrivance to attempt to hold defendants, including Kraken and Powell, liable for the "broader, macro-economic[] . . . market forces" that have caused a dramatic decline in the value of Bitcoin Cash over the past year, and have made mining Bitcoin Cash much less profitable.  (*See* Compl. ¶¶ 31, 36, 39-40, 79.)  UAC allegedly entered the Bitcoin Cash mining business in March 2018.  Since then, the market price of Bitcoin Cash has steadily declined, from over $1,500 in May 2018, to around $420 on November 14,

---

[1] The complaint names "Payward Ventures, Inc. d/b/a/ Kraken" as a defendant in the caption and alleges that it "is registered in San Francisco County as the owner of the fictitious business name 'Kraken' and operates the Bitcoin exchange Kraken.com."  (Compl. ¶ 13.)  Without conceding these allegations, Payward Ventures, Inc. uses the trade name "Kraken" in this motion for ease of reference, given that the complaint has done so.

[2] Bitcoin Cash is related to, but different from, the well-known "Bitcoin" cryptocurrency.

[3] Kraken has diligently searched its records, and plaintiff UAC has no registered account on Kraken's exchange platform under that name.

1

2018 – a decline of over 70% – slashing the economic reward for mining Bitcoin Cash.  There is no allegation that Kraken and Powell (or any of the other defendants for that matter) had anything whatsoever to do with this massive market correction.  UAC made an untimely business bet; nothing more.

In a misguided attempt to shift blame, UAC has brought a federal antitrust conspiracy claim and a kitchen sink of state-law claims against various entities and individuals, including Kraken and Powell, predicated on the November 2018 "network upgrade" of Bitcoin Cash.  Although cryptocurrencies, like Bitcoin Cash, are still relatively new and novel, the shortcomings of UAC's complaint are not.

With regard to the antitrust claim, Count I, the complaint fails to state even the most basic elements of a viable Sherman Act Section 1 offense.  Among other things, it utterly fails to connect Kraken and Powell to the purported conspiracy in any plausible way.  Nor does the purported conspiracy make any economic sense: the complaint does not provide any rationale for why Kraken or Powell or any other defendant would have had any incentive to conspire to *lower* Bitcoin Cash prices.  The complaint also does not allege that *lower* Bitcoin Cash prices (or the network upgrade more generally) were bad for consumers or competition.  Instead of alleging a plausible antirust theory, UAC complains of *increased* competition – not *reduced* competition.  This, of course, flies in the face of the explicit aim of the antitrust laws, which is to foster and promote increased and vigorous competition, not to condemn it.

UAC's state law claims do not fare any better.  Three counts – negligent misrepresentation (Count II), negligence (Count III), and equitable estoppel (Count IV) – boil down to the same flawed theory that Kraken and Powell purportedly owed duties to UAC that they breached.  But the complaint does not actually allege any legally relevant duty or representation that was breached.  The complaint likewise fails to state a claim for conversion (Count VI), given that UAC fails to plead any possessory interest, let alone one that Kraken or Powell commandeered.  The remaining causes of action in the complaint are not pleaded against either Kraken or Powell.

UAC's complaint is fatally flawed, particularly with regard to Kraken and Powell, and its deficiencies cannot be cured by amendment.  Accordingly, dismissal with prejudice, even at this stage, is appropriate and should be granted.

**BACKGROUND**

UAC's complaint offers a muddled, confusing explanation of the technologies at issue that is bereft of specific allegations against both Kraken and Powell. But the gist of UAC's allegations is that the often-undifferentiated defendants – many of whom share little in common apart from their alleged involvement in the cryptocurrency space – conspired and agreed "to manipulate the cryptocurrency market for Bitcoin Cash effectively hijacking the Bitcoin Cash network, centralizing the market, and violating all accepted standards, protocols and the course of conduct associated with Bitcoin since its inception." (Compl. ¶ 1.) Bitcoin Cash is one of thousands of competing forms of cryptocurrencies that currently exist. It was created in 2017 when a disagreement over how to address scaling led to a fork with Bitcoin. (*Id.* ¶ 57.)

UAC allegedly entered the Bitcoin Cash mining business in March 2018. (*Id.* ¶ 38.) Its business, as a miner, involves validating the accuracy of Bitcoin Cash transactions on the network (or, as it is often called, "blockchain"). For doing so, the network pays it in newly issued Bitcoin Cash. (*See id.* ¶¶ 24-25, 39.) On March 1, 2018, the market price of Bitcoin Cash was around US $1,200.[4] By May 6, 2018, the market of price had increased to around $1,700. Since then, the price has steadily declined. By November 14, 2018, the day before the "network upgrade" at issue here, the price had declined to around $420.

The purported triggering event for this lawsuit is a Bitcoin Cash "network upgrade" that occurred on November 15, 2018. (*Id.* ¶¶ 41, 43, 66.) That "network upgrade" led to two competing versions of Bitcoin Cash: Bitcoin SV and Bitcoin ABC. UAC alleges that certain of the defendants implemented a "poison pill" into the blockchain by adding a "centralized checkpoint" in a location close to the tip of the blockchain, which in essence favored Bitcoin ABC over Bitcoin SV. (*Id.* ¶¶ 69-70.)

UAC does not allege that it was improper or even ill-advised to upgrade the Bitcoin Cash network. Nor does UAC allege that Bitcoin SV is superior to or should have been adopted instead of Bitcoin ABC. UAC also does not allege that its business depends on mining Bitcoin SV, or that it (or anyone else) has been prevented from mining Bitcoin ABC.

---

[4] *See* CoinMarketCap, *BitCoin Cash*, https://coinmarketcap.com/currencies/bitcoin-cash/. The Court may take judicial notice of Bitcoin Cash prices, which are "not subject to reasonable dispute" and "a proper subject" for notice. *See La Grasta v. First Union Secs., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004) (judicial notice of stock price under Fed. R. Evid. 201(b)).

The complaint's theory of injury appears to be that the process by which the Bitcoin Cash network was upgraded "created uncertainty and a lack of confidence in the network" and thus "loss of value of the currency."  (*Id.* ¶¶ 77-79.)  There is no allegation in the complaint as to why any defendant, including Kraken and Powell, would have wanted to create any loss of value of Bitcoin Cash.

Overall, UAC's complaint presents Kraken and Powell as periphery players with no alleged ties to UAC.  As to Kraken, a cryptocurrency exchange based in San Francisco, California, and Powell, its CEO, the complaint alleges that *after* the alleged "takeover of Bitcoin Cash" by other defendants, Kraken and Powell: (1) "decided that Kraken would maintain the BCH ticker for the ABC chain;" and (2) "indicated to users that the SV chain was a high-risk environment."  (*Id.* ¶ 76.)  The complaint has failed to plead whether this was a unilateral decision made by Powell, or as part of the alleged conspiracy with the other defendants.

UAC also alleges that Kraken "agreed to implement centralized checkpoints."  (*Id.* ¶ 74.) No details are pleaded as to the time, place, reason, or participants of that purported agreement. Nor does the complaint allege that UAC is a competitor or customer of Kraken (or Powell), or has any relationship with Kraken or Powell at all.  (They are not and did not, and in fact, this allegation cannot be reconciled with UAC's allegations as to the involvement of other defendants.)  As the complaint alleges, "Bitcoin ABC through defendants Amaury Sechet, Shammah Chancellor, and Jason Cox implemented a 'poison pill' in the chain referred to as a 'checkpoint."  (*Id.* ¶ 69.)  UAC thus refers to the "decision by Bitcoin ABC."  (*Id.* ¶ 72.)

The complaint does not cite or refer to any law, rule, code, or regulation that required Kraken to choose Bitcoin SV over ABC for the BCH ticker.  (There is none.)  Nor does the complaint address any law, rule, code, or regulation that prohibits implementation of a "centralized checkpoint."  (Because, again, there is none.)  And while the complaint later implies that the Whitepaper and unspecified "standards and protocols" govern the behavior of participants in the Bitcoin Cash network, UAC nowhere alleges what conduct these supposed principles require or prohibit.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim for relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (upholding district court's dismissal of antitrust claims).  To satisfy factual plausibility, a complaint must

plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To meet this standard, a complaint must state enough facts to raise the right to relief "above a speculative level." *Twombly*, 550 U.S. at 555.

A complaint premised upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations, as here, will not suffice.  *Id.* at 555, 557.  A complaint must "contain enough information regarding the material elements of a cause of action to support recovery under some viable legal theory." *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1186 (11th Cir. 2011); *see also Mun. Util. Bd. of Albertville v. Ala. Power Co.*, 934 F.2d 1493, 1501 (11th Cir. 1991) ("A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified.").

To state a claim upon which relief can be granted, UAC must also allege the actions as to each defendant.  Undifferentiated allegations as to a mass of "defendants" does not suffice.  *See Lane v. Capital Acquisitions & Mgmt. Co.*, No. 04-60602 CIV, 2006 WL 4590705, at *5 (S.D. Fla. Apr. 14, 2006) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, the complaint fails to satisfy the minimum standard of Rule 8."), *aff'd*, 322 F. App'x 675 (11th Cir. 2009).

Additionally, claims sounding in fraud – such as negligent misrepresentation – must meet the strict pleading standards of Federal Rule of Civil Procedure 9(b).  *Ceithaml v. Celebrity Cruises, Inc.*, 207 F. Supp. 3d 1345, 1349 (S.D. Fla. 2016) (Williams, J.).  "In allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Rule 9(b) likewise requires that UAC make specific allegations as to each defendant; it does not allow a complaint to lump together all defendants.  *Ambrosia Cole & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007).

DISCUSSION

**I.**     **UAC Fails To Plausibly Allege An Actionable Antitrust Conspiracy Exists**

UAC's antitrust claim, Count I, is defective for numerous reasons.  Count I alleges that the defendants engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15).

(Compl. ¶ 81.)  Section 4 sets forth the standing requirement for an antitrust violation,[5] and Section 1 lays out the elements for the substantive antitrust violation.  To establish a violation of Section 1, a plaintiff must show: (1) a contract, combination, or conspiracy among two or more entities that; (2) unreasonably restrains trade in a relevant market; (3) affects interstate or foreign commerce; (4) causes antitrust injury; and (5) causes damages.  *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455, 1459 (11th Cir. 1991).

UAC has not alleged a plausible antitrust claim, nor can it, for a variety of reasons.  The complaint's fatal defects are, as the following discussion will demonstrate: (a) the conspiracy theory makes no economic sense; (b) no unlawful conduct is alleged; (c) no recognized "per se" offense is alleged; (d) the requisite elements of a "rule of reason" case are not alleged; and (e) the complaint fails to plead antitrust standing or a cognizable antitrust injury.  Any one of these defects alone gives the Court ample grounds to dismiss the complaint with prejudice under Rule 12(b)(6).  The Court should exercise its authority and do so.

> **a.  UAC's Antitrust Conspiracy Theory Fails Because It Makes No Economic Sense**

A starting point for any antitrust claim is it must make "economic sense."  *Williamson Oil Co. v. Philip Morris USA,* 346 F.3d 1287, 1302 (11th Cir. 2003).  UAC's claim does not.

Kraken and Powell are *not* competitors of UAC, are *not* in the same business as UAC, and do *not* have any business relationship with UAC.  The complaint does not allege otherwise, nor could it.  There is no plausible inference that Kraken or Powell had any economic incentive to injure UAC's business in any way.

Furthermore, the complaint gives absolutely no explanation as to why Kraken or Powell would have any economic interest in "hijacking the Bitcoin Cash network", "manipulat[ing] the cryptocurrency market for Bitcoin Cash," creating "significant uncertainty and a lack of confidence in the network," and ultimately causing a "loss of value of the currency." (Compl. ¶¶ 78-79, 83.)  They would not: Kraken is a top-rated, reputable, and secure exchange, providing a platform for users to buy, sell, and trade cryptocurrencies.  If anything, because exchanges make the most money in a market with rising prices, Kraken and Powell would want Bitcoin Cash to succeed, not fail as UAC alleges.

---

[5] Section 4 provides in pertinent part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ."

UAC's failure to allege a plausible economic rationale for Kraken's or Powell's supposed role in this conspiracy requires dismissal.

### b.   UAC's Conspiracy Theory Is Not Supported By Sufficient Factual Allegations Of Any Unlawful Anticompetitive Conduct

In the 122-paragraph complaint, specific allegations concerning the conduct of Kraken and Powell appear in only paragraphs 74 and 76.  Kraken and Powell are accused, in sum, of having purportedly: (1) "decided that Kraken would maintain the BCH ticker for the ABC chain"; (2) "indicated to users that the SV chain was a high-risk environment"; and (3) "Kraken agreed to implement centralized checkpoints."  (*Id.*)

At the threshold, these bare bones and amorphous allegations do not meet the standard of specificity required for an antitrust conspiracy claim.  The scope and the nature of the purported conspiratorial agreements are not identified, nor are the persons, dates, places, or reasons for the alleged conspiratorial actions.  *See Kendall v. VISA U.S.A., Inc*., 518 F.3d 1042, 1047-48 (9th Cir. 2008) (recognizing antitrust complaint must answer the basic questions of "who, did what, to whom (or with whom), where, and when?"); *see also Duty Free Americas, Inc. v. Estee Lauder Cos., Inc*., 946 F. Supp. 2d 1321, 1332 (S.D. Fla. 2013) (same).  The complaint therefore fails to sufficiently allege a meeting of the minds between the co-conspirators and a conscious commitment to a common scheme to achieve an unlawful objective, as is required to state an antitrust claim.  *See Procaps S.A. v. Patheon, Inc*., 845 F.3d 1072, 1081 (11th Cir. 2016); *Helicopter Support Sys. Inc. v. Hughes Helicopter, Inc*., 818 F.2d 1530, 1535 (11th Cir. 1987).

Also, the conduct that is specifically alleged against Kraken and Powell, *i.e.,* paragraphs 74 and 76, does not come close to the level of an antitrust violation, for numerous reasons, including the following.

First, the allegation that Kraken "indicated to users that the SV chain was a high-risk environment" does not give rise to an antitrust violation.  It is well-settled that purported disparaging remarks or opinions directed at a competitor or its products/services are not actionable under the Sherman Act unless "clearly false."  *See Duty Free Americas, Inc. v. Estee Lauder Cos., Inc*., 797 F.3d 1248, 1268-69 (11th Cir. 2015) ("[A] plaintiff alleging anticompetitive disparagement must allege, at a minimum, statements that were demonstrably false in order to survive a motion to dismiss.").  However, "even false statements about a single competitor often do not meet the requisite standard of generating harm to competition."  *Id*. at 1268; *see also Aquatherm Indus. v. Fla. Power & Light Co*., 145 F.3d 1258, 1263 (11th Cir.

1998) (defendant's dissemination of "false information" not sufficient to support a Section 1 antitrust claim); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1072, 1076-77 (11th Cir. 2004).  Indeed, most courts "have adopted a presumption that misrepresentations or false statements about a competitor have a de minimis effect on competition."  *Duty Free Americas*, 797 F.3d at 1268-69.

The complaint fails to overcome these hurdles.  The complaint does not specifically allege when or how Kraken or Powell supposedly "indicated" that Bitcoin SV was a high-risk investment.  In any event, there is no allegation that any such statement was untrue.  In fact, this Court can, and should, judicially notice as a true fact that *all* cryptocurrencies are high-risk investments and exist in a high-risk environment.  Further, none of the alleged statements or opinions, as alleged in paragraph 76, were even directed towards UAC.  Moreover, UAC cannot overcome the presumption that any such statements would have a de minimis effect, having not alleged any connection between the alleged statement and any causal damages.

Second, endorsement or adoption of a product, standard, and/or service generally does not violate the antitrust laws.  *See, e.g., N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 32 (2d Cir. 2018) (denying preliminary injunction against national soccer foundation's application and adoption of standards designating divisional levels of play); *Weight-Rite Golf Corp. v. U.S. Golf Ass'n*, 766 F. Supp. 1104, 1111 (M.D. Fla. 1991) (noting that USGA's ability to decrease the marketability of a manufacturer's golf shoes by amending its rules of play did not constitute rule of reason antitrust violation); *Jessup v. Am. Kennel Club*, 61 F. Supp. 2d 5, 13 (S.D.N.Y. 1999) (upholding standard governing purebred dogs).  One exchange's decision to recognize one type or faction of cryptocurrency over another or to assign a ticker symbol to one on an exchange, which is the wrongful conduct UAC alleges Kraken and Powell engaged in, does not run afoul of the antitrust laws.

Similarly, antitrust defendants, like Kraken and Powell, are under no obligation to predisclose their business plans or advise or warn others on how to invest or allocate their resources.  *See Cal. Computer Prods. v. IBM Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) (antitrust defendant "under no duty to help" other manufacturer competitors "to survive or expand"); *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 281 (2d Cir. 1979) (antitrust defendant does "not have a duty to predisclose information" about new products/services or changes to existing ones).  In short, despite what the complaint alleges, using a ticker symbol on an exchange or

recognizing a blockchain, like Bitcoin SV or ABC, as an "official" blockchain or as "the 'winner' of the network upgrade," cannot serve as predicate acts for an antitrust violation where there is no alleged plausible harm to competition.  (Compl. ¶ 76.)

   Finally, a "checkpoint" is a line of code that provides enhanced security and aids in protecting against block reorganization attacks.  Even if implementation of centralized checkpoints caused some level of incompatibility or inaccessibility, however, such conduct is not unlawful.  *See, e.g.*, *Allied Orthopedic Appliances Inc., v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010) (product redesign or improvements which caused incompatibility were not unlawful); *Transamerica Computer, Inc. v. IBM Corp.*, 698 F.2d 1377 (9th Cir. 1983) (design changes to interface did not violate Sherman Act).

     **c.**    **UAC Fails To State A "Per Se" Antitrust Violation**

There is a "presumption" that claims brought under Section 1 of the Sherman Act, like Count I, are to be evaluated under "rule of reason" scrutiny, rather than invoking "per se" analysis.  *Retina Assocs. P.A. v. So. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381 (11th Cir. 1997); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991).

Some violations of Section 1, however, are deemed to be illegal per se "because of their pernicious effect on competition and lack of any redeeming value."  *N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958); *see also Seagood*, 924 F.2d at 1567.  Such per se antitrust offenses are recognized as "naked restraints of trade with no purpose except stifling competition."  *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963).

Per se violations "are limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition," including "horizontal price fixing among competitors, group boycotts, and horizontal market division."  *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607-08 (1972).  For the reasons discussed below, UAC's antitrust claim, does not fit within any of these recognized per se categories, or any type of antitrust offense.  *See Scranton Constr. Co. v. Litton Indus. Leasing Corp.*, 494 F.2d 778, 782-83 (5th Cir. 1974) (the Sherman Act is not a "panacea for all business affronts which seem to fit nowhere else").

The Supreme Court has admonished "that the per se label should be applied infrequently and with caution."  *Seagood*, 924 F.3d at 1567 (citing *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,

485 U.S. 717, 727 (1988)).  Per se treatment is to be applied "only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability."  *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc*., 720 F.2d 1553, 1562 (11th Cir. 1983); *Seagood,* 924 F.2d at 1567 (same).  Before applying the per se rule, the judiciary must have "considerable experience" with the business practices at issue so that the economic impact of such practices is immediately apparent.  *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 9 (1979); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc*., 551 U.S. 877, 886 (2007); *see also Levine v. Cent. Fla. Med. Affiliates, Inc*., 72 F.3d 1538, 1550 (11th Cir. 1996)) ("[T]his Court is loath to condemn a practice as per se violative of the antitrust laws unless experience has shown that it always leads to anticompetitive effects in the market.").

UAC's claim does not meet these exacting standards.  Its convoluted case appears to be, after a diligent search by defense counsel, the first antitrust action brought in the United States involving the dynamic and constantly evolving cryptocurrency industry.  Accordingly, no court has yet had "considerable experience" in deciding whether the alleged "hijacking" of a single cryptocurrency network is a per se automatic violation of the federal antitrust laws.  Nor has UAC shown that the conduct at issue even remotely fits within the definition of any of the handful of historically recognized per se antitrust offenses, nor could it.

Additionally, Kraken is not alleged to be a horizontal competitor with the other defendants in any market.  Some of the defendants have no relationship at all, and others sit in vertical relationships.  Per se antitrust scrutiny is not implicated when aspects of verticality, as here, exist.  *See Leegin*, 551 U.S. at 901; *Jacobs*, 626 F.3d at 1335 ("non-price vertical restraints are inappropriate for per se condemnation").

### d.      UAC Fails To State A Plausible "Rule Of Reason" Antitrust Claim

Because UAC cannot demonstrate that its antitrust claim is subject to per se analysis for the reasons discussed above, its claim must then meet all of the stricter requirements of "rule of reason" scrutiny.  The "rule of reason" legality inquiry is intended to determine "whether the restraint imposed is such as merely regulates and thereby promotes competition or whether it is such as may suppress or even destroy competition."  *Levine*, 72 F.3d at 1551 (quoting *Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)).  The complaint fails to state a claim under a rule of reason analysis.

To establish a "rule of reason" claim under Section 1 of the Sherman Act, "a plaintiff may show either actual or potential harm to competition." *Jacobs*, 626 F.3d at 1336. To show actual harm, "[t]he plaintiff has the burden of demonstrating damage to competition with specific factual allegations." *Id*. To show potential harm, the plaintiff must (1) "define the relevant market"; (2) "establish that the defendants possessed power in that market"; and (3) show "some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market." *Spanish Broad.,* 376 F.3d at 1073. The Complaint fails to allege a relevant market, power within that relevant market, or facts showing actual or potential effects on competition. UAC therefore fails to state a valid "rule of reason" claim under either the actual or potential harm test.

### i.  UAC Does Not Define a Plausible Relevant Market

The complaint fails to allege both a relevant product market and a relevant geographic market. A relevant product market is defined in part by whether a group of providers or suppliers, "because of the similarity of their products, have the ability – actual or potential – to take significant amounts of business away from each other." *U.S. Anchor Mfg. v. Rule Indus*., 7 F.3d 986, 995 (11th Cir. 1993). A properly defined relevant "market is composed of products that have reasonable interchangeability." *United States v. E.I. du Pont de Nemours & Co*., 351 U.S. 377, 404 (1956); *see also Levine*, 72 F.3d at 1552. A viable relevant product market definition also requires allegations concerning cross-elasticity of demand and supply concerning potential inclusion of products or services in the market. *See U.S. Anchor*, 7 F.3d at 995-97; *Am. Key Corp. v. Cole Nat. Corp*., 762 F.2d 1569, 1580 (11th Cir. 1985).

Nowhere in the complaint does UAC allege or define a "relevant" product market. There are a few fleeting references, without any elaboration, to a "cryptocurrency market for Bitcoin Cash." (*See* Compl. ¶¶ 1, 5, 82, 84). No details, however, are provided as to what this purported "market" comprises and what players participate in that narrow single cryptocurrency market. Moreover, there are no allegations as to what products or services might compete with or be substitutes for Bitcoin Cash, such as other types of existing cryptocurrencies (of which there are thousands), commodities, precious metals, Dollars, Euros, Yen, etc. Finally, there is no mention or analysis of cross-elasticities of demand or supply between Bitcoin Cash and other substitutes. This blatant pleading deficiency is fatal to UAC's antitrust claim.

11

A relevant geographic market is also not alleged.  "The relevant product market must also be accompanied by proof of the relevant geographic market.  This is the 'area of effective competition' within which the parties operate.'"  *Ad-Vantage Telephone Directory Consultants, Inc. v. GTE*, 849 F.2d 1336, 1342 (11th Cir. 1987) (quoting *Standard Oil Co. v. United States*, 337 U.S. 293, 299 (1949)); *see also L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 423 (11th Cir. 1984) (geographic market is "the area in which the product or its reasonably interchangeable substitutes are traded").  The complaint is devoid of any allegations that define the dimensions or parameters of a relevant geographic market.  Both the defendants and the Court are thus left guessing as to whether the geographic market encompasses the world, the nation, a state, or a region.

Without defining a relevant market, UAC cannot plead potential harm to competition.

### ii.  UAC Does Not Allege Market Power

Turning to the next part of the "rule of reason" test, a plaintiff must also "establish that the defendant had market power in a well-defined relevant market."  *Maris Dist. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1216 (11th Cir. 2002).  "Market power is the ability to raise price significantly above the competitive level without losing all of one's business."  *Graphic Prods. Dist. v. Itek Corp.*, 7167 F.2d 1560, 1570 (11th Cir. 1983); *see also Levine*, 72 F.3d at 1555) (plaintiff must "prove that the defendants had sufficient power to adversely affect competition.").  In some instances, evidence of a high market share can be used to show market power.  *Graphic Prods. Dist.,* 7167 F.2d at 1570.

The only scant allegation UAC makes concerning Kraken's size/power is in a footnote: "It [Kraken exchange] purports to be the largest Bitcoin exchange in Euro volume and liquidity." (Compl. ¶ 76 n.8.)  This smidgen of an allegation adds nothing to the market power analysis.  It provides no information concerning Kraken's market share in any defined relevant market, its ability to control or raise prices, its ability to affect competition, or the size or identity of any of its competitors.  Also conspicuously missing is any explanation as to any motive or reason for Kraken to want to manipulate the price of Bitcoin Cash on its exchange – much less in a way that allegedly *lowered* the price of Bitcoin Cash.  Lastly, there is no market power allegation directed at Powell.  Failure to plead market power is yet another reason UAC cannot show potential harm to competition.

### iii.   UAC Does Not Allege Any Actual Or Potential Cognizable Injury To Competition As A Whole

In a "rule of reason" case, the plaintiff must also establish either: (1) "'actual detrimental effect' on competition" as a whole, *Procaps*, 845 F.3d at 1084 (quoting *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)); or (2) a potential effect on competition.  "Actual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." *Jacobs*, 626 F.3d at 1339.  It is the plaintiff's burden to show "damage to competition with specific allegations" – mere conclusory assertions are not sufficient.  *Id.*; *see also Procaps*, 845 F.3d at 1084.  Alternatively, the plaintiff may plead potential effect on competition, which requires, in addition to "defin[ing] the relevant market and establish[ing] that the defendants possessed power in that market," a description of "how the defendants' alleged behavior would be likely to harm competition."  *Spanish Broad.* 376 F.3d at 1073-74.

Rather than alleging potential or actual harm to competition, the complaint affirmatively alleges an *increase* in competition: it alleges that the network upgrade resulted in *more* competing blockchains.  The complaint also does not allege that Bitcoin ABC was inferior to Bitcoin SV, or that any market participant has been excluded.  Under these circumstances, UAC's conclusory allegation that the purported "market manipulation" was "severely detrimental to the market overall" (Compl. ¶ 77) is insufficient to carry its burden in pleading anticompetitive effects on any level or form of competition.

Ultimately, UAC has alleged only injury to itself resulting from a decline in Bitcoin Cash prices.  That is not enough to state an antitrust claim because the "antitrust laws are intended to protect competition, not competitors."  *Levine*, 72 F.3d at 1551; *Procaps*, 845 F.3d at 1086 (harm to an individual competitor will not suffice); *Spanish Broad.,* 376 F.3d at 1071 ("Anticompetitive effects" are measured by their detrimental impact on competition, "rather than by their impact on competitors").

### e.   UAC Lacks "Antitrust Standing" To Maintain This Antitrust Action

UAC does not possess the requisite antitrust standing to bring its antitrust claim.

In the Eleventh Circuit, antitrust standing is analyzed using a two-pronged test that "involves consideration of the nexus between the antitrust violation and the plaintiff's harm and whether the harm alleged is of the type for which Congress provides a remedy."  *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1271 (11th Cir. 2103); *see also Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010).

Under this approach, the first step requires a plaintiff to allege an "antitrust injury." *Palmyra*, 604 F.3d at 1299. Second, "the plaintiff must be an efficient enforcer of the antitrust laws." *Id.*

Absent antitrust standing, the claim must be dismissed. Even if UAC were to plead an antitrust violation has occurred – "'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Todorov*, 921 F.2d at 1448 (quoting *Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983)). "The doctrine of antitrust standing reflects prudential concerns and is designed to avoid burdening the courts with speculative or remote claims." *Sunbeam*, 711 F.3d at 1270. Finally, the determination of antitrust standing is a question of law. *Austin v. Blue Cross and Blue Shield of Ala.*, 903 F.2d 1385, 1387 (11th Cir. 1990).

UAC's antitrust claim fails under both prongs.

### i. UAC Has Not, And Cannot, Demonstrate Any "Antitrust Injury"

An "antitrust injury" is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Todorov*, 921 F.2d at 1449 (showing antitrust injury is a necessary requirement to prove antitrust standing). It is a well-settled maxim of antitrust jurisprudence that the antitrust laws were enacted for "the protection of *competition*, not *competitors*." *Brunswick*, 429 U.S. at 488 (emphasis added). At best, UAC has alleged only a speculative injury to itself, not to any "competition" in any relevant market. This is not a cognizable antitrust injury.

Further, UAC must demonstrate that its claimed loss "stems from a competition-reducing aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 344 (1990). This strict limitation on recovery increases the likelihood that "enforcement of the antitrust laws will further the same goal of increased competition." *Austin*, 903 F.2d at 1389-90. Here, the crux of UAC's antitrust claim runs counter to this fundamental principle. UAC is complaining that it has been injured by reason of *increased* competition, not *reduced* competition. Specifically, UAC alleges that as a consequence of the alleged conduct, Bitcoin Cash is now a "forked currency" leaving "two resulting currencies," instead of one. (Compl. ¶ 77.) *See Atl. Richfield*, 495 U.S. at 344; *Cargill, Inc. v. Monfort of Colo., Inc*., 479 U.S. 104, 122 (1986) ("A loss or damage due merely to increased competition does not constitute [antitrust] injury.").

### ii.   UAC Is Not An "Efficient Enforcer" Of The Antitrust Laws

Relying on the non-exclusive factors enunciated by the Supreme Court in *Associated General*, the Eleventh Circuit has explained that the "efficient enforcer" standing prong requires the trial court to consider the following factors: "(1) the directness or indirectness of the asserted injury; (2) the remoteness of the injury; (3) whether other potential plaintiffs were better suited to vindicate the harm; (4) whether the damages were highly speculative; (5) the extent which the apportionment of damages was highly complex and would risk duplicative recoveries; and (6) whether the plaintiff would be able to efficiently and effectively enforce the judgment." *Sunbeam*, 711 F.3d at 1271.  UAC's complaint does not meet the majority of these factors.

UAC alleges, without any specificity, that as a result of the purported "hijacking [of] the Bitcoin Cash network . . . the value of the cryptocurrency that plaintiff mine[d] in its BlockchainDomes has fallen significantly." (Compl. ¶¶ 1, 77.)  Absent from its complaint, however, is any quantification of losses or any identification of any lost (actual or potential) customer for its products or services.  Nor does UAC explain why it could not readily shift its mining resources or capabilities to another blockchain.  Consequently, UAC cannot be deemed an efficient enforcer because its alleged damages (and position in the market) are indirect, highly speculative, and too remote.

## II.   UAC Fails To State Plausible Florida State Law Claims For Relief

UAC pleads four state law causes of action against Kraken and Powell: negligent misrepresentation (Count II), negligence (Count III), equitable estoppel (Count IV), and conversion (Count VI).  (Counts V and VII are not asserted against Kraken or Powell). The complaint's threadbare allegations against Kraken and Powell do not come close to stating a claim under any of these theories.  *Twombly*, 550 U.S. at 555 (explaining that "a formulaic recitation of the elements of a cause of action will not do").  Because re-pleading would be futile, these claims should be dismissed with prejudice.  *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007).

### a.   UAC's Negligent Representation Claim (Count II) Fails

The complaint fails to allege any of the required elements for a negligent misrepresentation claim.  To withstand a motion to dismiss, a claim of negligent misrepresentation requires particular allegations of facts that if true would establish:

(1)   misrepresentation of a material fact;

> (2)    that the represensor made the misrepresentation without knowledge as to its truth or falsity or under circumstances in which he ought to have known of its falsity;
>
> (3)    that the represensor intended that the misrepresentation induce another to act on it; and
>
> (4)    that injury resulted to the party acting in justifiable reliance on the misrepresentation.

*Ceithaml*, 207 F. Supp. 3d at 1353.  These allegations must meet the heightened pleading standard of Rule 9(b).[6]  Moreover, a negligent misrepresentation claim predicated on an omission mush establish that the speaker had "some fiduciary or fiduciary-like duty to disclose the information."  *Hawaiian Airlines, Inc. v. AAR Aircraft Servs., Inc.*, 167 F. Supp. 3d 1311, 1322 (S.D. Fla. Mar. 2016).

UAC's theory of misrepresentation is that "[a]s participants in the Bitcoin Cash network, Defendants represented to [UAC] and the market that they would abide by the Whitepaper and accepted standards and protocols."  (Compl. ¶ 87.)[7]  According to the complaint, this purported representation was false because "Defendants implemented a checkpoint that 'centralized' what should be a decentralized market due to the way the checkpoint was added and its location close to the tip of the blockchain."  (*Id.* ¶ 89.)

As an initial matter, this type of conclusory group pleading – without any specific allegations as to what Kraken or Powell themselves actually said and when – is insufficient as a matter of law.  *See Lane*, 2006 WL 4590705, at *5 (requiring allegations as to each defendant under Rule 8); *Ambrosia Cole & Constr. Co.*, 482 F.3d at 1317 (same, under Rule 9(b)).  The complaint does not identify a single specific statement made by Kraken or Powell on this topic at any time.  This alone requires dismissal of this claim.

Rather than alleging any affirmative representations by Kraken or Powell, UAC's theory seems to be that they *impliedly* represented at some point in time that they would abide by the "Whitepaper" and other unspecified "standards and protocols."  (*See* Compl. ¶ 87.)  The

---

[6] *See id.* at 1353 (holding that Rule 9(b) "applies to negligent misrepresentation claims" and thus "the Complaint must set forth particular allegations about the 'who, what, when, where, and how' to state a claim for negligent misrepresentation").

[7] To the extent UAC bases its negligent misrepresentation claim on a theory of omission, that claim fails because UAC has not and cannot allege that Kraken or Powell owed it a fiduciary or similar duty of disclosure.

complaint supplies no basis whatsoever for implying such an amorphous implied representation. It does not specify which actions by Kraken or Powell purportedly gave rise to such an implication; it does not allege when such actions took place; and it does not allege which specific aspects of the Whitepaper or which "standards and protocols" Kraken or Powell supposedly represented they would follow.  All these failings are fatal because Florida law requires allegations of specific misrepresentations to state a claim sounding fraud; allusions to amorphous implied representations are not enough.  *Postel Indus. Inc. v. Abrams Grp. Contsr., LLC*, No. 6:11–cv–1179–Orl–28DAB, 2012 WL 4194660, at *2 (M.D. Fla. Sept. 19, 2012) (discussing negligent misrepresentation as species of fraud); *cf. In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1230 (C.D. Cal. 2017) (recognizing that "[a]n 'implied' assertion or representation is not enough" under California law).

Furthermore, even if there were some basis to imply a representation, there is no plausible basis to infer it was false.  The only allegations against Kraken and Powell are that they purportedly: "decided that Kraken would maintain the BCH ticker for the ABC chain;" "indicated to users that the SV chain was a high-risk environment;" and "Kraken agreed to implement centralized checkpoints."  (Compl. ¶¶ 74, 76.)  But there is no allegation that *these* particular actions were contrary to anything in the Whitepaper or any other standards or protocols.[8]  UAC's vague allegation that the checkpoint "'centralized' what should be a decentralized market" (*id.* ¶ 89) does not transmogrify all of Kraken's and Powell's purported business activities involving Bitcoin Cash into one giant negligent misrepresentation.

Given that the complaint fails to identify when and how any implied representations were made, it also fails to sufficiently allege the second, third, and fourth elements of a negligent misrepresentation claim.  There is no plausible inference that Kraken or Powell "ought to have known" of the falsity of an unspecified implied representation made at some unspecified time concerning unspecified "standards and protocols."  That is to say, even if Kraken or Powell had made such representations and not adhered to them, UAC fails to allege that the representations were false at the time they were made.  Nor is there any plausible inference that Kraken or Powell intended to induce UAC to act in any way for some unspecified reason – there is no

---

[8] The Whitepaper specifically contemplates that nodes "can leave and rejoin the network" when voting.  (Compl. ¶ 64.)  That is exactly what the complaint alleges happened here.  Even the alleged conduct by other defendants was consistent with the Whitepaper.

allegation that Kraken or Powell even knew that UAC existed.  Nor could UAC have justifiably relied on the unspecified implied representations at issue.  *See Hawaiian Airlines, Inc.,* 167 F.Supp.3d at 1320 (dismissing negligent misrepresentation claim where plaintiff's "own sophistication, intelligence, and information" made reliance "manifestly unreasonable").  These critical elements of a negligent misrepresentation certainly are not pleaded with the specificity required by Rule 9(b).

> **b.    UAC's Negligence Claim (Count III) Fails**

For many of the same reasons, the complaint also fails to state a negligence claim. "[T]he elements of negligence are "duty, breach, causation, and damages."  *Florida Dept. of Corr. v. Abril*, 969 So. 2d 201, 209 (Fla. 2007).

The complaint does not allege that Kraken or Powell owed any cognizable duty of care to UAC.  The complaint fails to identify any specific standard of care, and instead rests on a vague obligation to "conform to and abide by the Whitepaper and accepted standards and protocols." (Compl. ¶ 94, 95.)  This is not a legally cognizable standard of care under Florida law.  *See Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 948 n.7 (11th Cir. 2014) (requiring plaintiff to "point to Florida law establishing the existence of a legal duty"); *see also Altenel, Inc. v. Millennium Partners*, L.L.C., 947 F. Supp. 2d 1357, 1369 (S.D. Fla. 2013) (Williams, J.) (explaining that "common law contract principles may bar certain tort claims," such as where expectations are set by contract).

Nor does UAC allege any breach of this purported duty by Kraken or Powell.  The complaint's generalized allegations that "Defendants" failed to abide by the Whitepaper or unspecified standards and protocols is insufficient.  *See Lane*, 2006 WL 4590705, at *5 ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, the complaint fails to satisfy the minimum standard of Rule 8.").  As for the allegations against Kraken and Powell specifically, there is no suggestion that the Whitepaper says anything at all about ticker symbols for BCH or checkpoints in the blockchain.  In fact, the complaint affirmatively alleges that the network upgrade *complied* with the Whitepaper.  It alleges that nodes "can leave and rejoin the network," and that the vote took place "consistent with Nakamoto's Whitepaper."  (Compl. ¶¶ 44, 64.)

The complaint also fails to allege any injury that was proximately caused by Kraken or Powell.  *See Lipkin v. Norwegian Cruise Line Ltd*., 93 F.Supp.3d 1311, 1329-30 (S.D. Fla. 2015)

(Williams, J.) (discussing causation requirement for negligence claim); *see also Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 310-11 (Fla. DCA 1st 2011) (negligent misrepresentation claim).  According to UAC's own allegations, Kraken's and Powell's actions in adopting the BCH ticker symbol and recognizing checkpoints came only *after* the supposed "hostile takeover."  (Compl. ¶ 76.)  In sum, this Count must be dismissed.

### c.    UAC's Equitable Estoppel Claim (Count IV) Fails

The equitable estoppel Count is not a valid cause of action under Florida law.  *See, e.g.*, *Bair v. City of Clearwater*, 196 So. 3d 577, 584 (Fla. 2d DCA 2016) ("equitable estoppel is a defensive doctrine rather than a cause of action"); *Agency for Health Care Admin. v. MIED, Inc.*, 869 So. 2d 13, 20 (Fla. 1st DCA 2004) (same); *Meyer v. Meyer*, 25 So. 3d 39, 43 (Fla. 2d DCA 2004) (same); *Kerivan v. Fogal*, 22 So. 2d 584, 586 (Fla. 1945) ("equitable estoppel is not designed to aid a litigant in gaining something, but only in preventing a loss").  Equitable estoppel merely "'estops' or bars a party from asserting something (e.g., a fact, a rule of law, or a defense) that he or she otherwise would be entitled to assert."  *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1077 (Fla. 2001).  The complaint does not ask the Court to bar defendants from any such assertions.  As such, this Count must be dismissed too.

### d.    UAC's Conversion Claim (Count VI) Fails

The conversion claim must be dismissed because the complaint fails to adequately plead any of the elements of conversion, which requires an "(1) act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein."  *J & J Sports Prods, Inc. v. Pit Rest., Inc*., Case No. 14-CV-24264-WILLIAMS, 2015 WL 12781196, at *2 (S.D. Fla. Feb. 20, 2015).  Conversion further requires that UAC demand the return of property.  *In re Energy Smart, Inc*., 381 B.R. 359, 377 (Bankr. M.D. Fla. 2007) (claim for conversion requires allegation of "(i) a right to property; (ii) a demand for the return of that property; and (iii) the defendants' refusal to return the property").

Here, there is no allegation that Kraken or Powell asserted "dominion" over any of UAC's property.  The complaint does not – and cannot – allege that Kraken or Powell controls any of UAC's Bitcoin Cash cryptocurrency.  Nor does it allege that Kraken or Powell themselves have any control over the Bitcoin Cash network.  The complaint makes that allegation generally against "Defendants" (Compl. ¶ 112), but the specific allegations against Kraken and Powell in paragraphs 74 and 76 suggest only that they "recognized the ABC chain as the official

blockchain of Bitcoin Cash and the 'winner' of the network upgrade," not that they actually possess or control it.  Moreover, even if the decline in UAC's business value could be plausibly traced to Kraken's alleged actions, this does not state a claim for conversion.  Engaging in conduct that "[r]educ[es] the value of someone's ownership interest is not the same as exercising dominion over that person's ownership interest" in their property.  *Brown v. Vega (In re Vega)*, Adversary No. 6:10–ap–00299–KSJ, 2014 WL 2621118, at *6 (Bankr. M.D. Fla. June 12, 2014).

Even assuming Kraken or Powell were alleged to have dominion over the Bitcoin Cash network – which they do not – the complaint still fails to allege, as it must, that UAC has *its own* property interest in the network.  It asserts in conclusory fashion that UAC has "use and possessory rights" over "Bitcoin Cash and its blockchain network and market" (Compl. ¶ 112), but it neither pleads any facts supporting that conclusion, nor explains the nature of those supposed rights.  *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, Fla.*, 637 F.3d 1178, 1186 (11th Cir. 2011) (complaint must "contain enough information regarding the material elements of a cause of action to support recovery under some viable legal theory").  To the contrary, the complaint is premised on allegations that the Bitcoin Cash network is "decentralized" and "democratic."  (*See, e.g.*, Compl. ¶¶ 4, 28-29, 32.)

As a final matter, the complaint fails to plead a demand for Kraken or Powell to return any supposedly converted property, which underscores why a theory of conversion is inapplicable to Kraken or Powell.  *See In re Meridian Asset Mgmt, Inc.*, 296 B.R. 243, 265 (Bankr. N.D. Fla. 2003) (dismissing conversion claim where "no allegations that a demand was made . . .  nor was it shown that a demand would be futile").  The complaint's failure to plead demand is not because a demand would be "futile," but because neither Kraken nor Powell have exercised dominion over any property belonging to UAC that could be returned to UAC.  The conversion claim fairs no better than the others; it fails too.

## CONCLUSION

For the foregoing reasons, the complaint should be dismissed with prejudice.


Dated:  February 1, 2019                       Respectfully Submitted,

                                               /s/ Andrew C. Lourie
                                               Andrew C. Lourie (Florida Bar No. 87772)
                                               Andrew.Lourie@kobrekim.com
                                               KOBRE & KIM LLP

201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
T: +1 202 664 1907
F: +1 305 967 6120

- and –

Brian E. Klein (*pro hac vice*)
bklein@bakermarquart.com
Donald R. Pepperman (*pro hac vice*)
dpepperman@bakermarquart.com
BAKER MARQUART LLP
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
T: +1 424 652 7800
F: +1 424 652 7850

*Attorneys for Defendants Payward Ventures, Inc. and Jesse Powell*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 1, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record for the parties.

/s/ Andrew C. Lourie
Andrew C. Lourie

21