UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:18-cv-25106-KMW-EGT

UNITED AMERICAN CORP.,

    Plaintiff

v.

BITMAIN, INC., SAINT BITTS LLC d/b/a
BITCOIN.COM, ROGER VER, BITMAIN
TECHNOLOGIES LTD., BITMAIN
TECHNOLOGIES HOLDING COMPANY,
JIHAN WU, PAYWARD VENTURES, INC.
d/b/a KRAKEN, JESSE POWELL,
AMAURY SECHET, SHAMMAH
CHANCELLOR, and JASON COX,

    Defendants.
_____/

## PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS COMPLAINT

Plaintiff United American Corp. ("UAC"), by and through its attorneys, hereby files this consolidated opposition to the Motions to Dismiss filed by Defendants Payward Ventures, Inc. ("Kraken") and Jesse Powell, Bitmain, Inc., and Shammah Chancellor (collectively, "Defendants") [ECF Nos. 41-43].

## INTRODUCTION

This lawsuit – the first antitrust action brought in the United States involving the cryptocurrency industry – has exposed a scheme by a tight knit network of individuals and organizations to manipulate the cryptocurrency market for Bitcoin Cash. For the reasons and in the manner set forth in great detail in the Complaint, the Defendants effectively hijacked the Bitcoin Cash network, centralized the market, and violated all accepted standards, protocols and

the course of conduct associated with Bitcoin since its inception. The highly planned and coordinated scheme caused a global capitalization meltdown of more than $4 billion and caused many U.S. Bitcoin holders – including Plaintiff – to suffer damages and irreparable harm. In addition to the significant damages incurred by all stakeholders in Bitcoin Cash as a result of the Defendants' overt take over and manipulation of the market, there are significant long-term implications for world economies and particularly the U.S. economy.

Defendants – hoping to avoid further exposure of their collusion and market manipulation in discovery – seek dismissal of all claims. Despite over 65 pages of motion to dismiss arguments, however, Defendants cannot avoid the inescapable fact that they conspired in restraint of trade in a manner so inherently anticompetitive and damaging to the market that they warrant condemnation without further inquiry into their effects on the market or the existence of an objective competitive justification. Defendants were supposed to be competing, not coordinating with each other or using other entities to facilitate that coordination. But that is exactly what they did, and then they took to social media and the internet and made explicit statements disclosing parts of their scheme.

At bottom, the allegations of the Complaint clearly satisfy applicable standards in providing plausible grounds to infer an agreement in restraint of trade and, thus, an antitrust violation under Section 1 of the Sherman Act. The allegations also assert sufficient facts to support the claims for violation of state law. The motions to dismiss should be denied, and Plaintiff should be afforded the opportunity to further expose the unlawful scheme perpetrated by Defendants.

## ARGUMENT

### I.     Standard for Motion to Dismiss.

To survive a motion to dismiss, the allegations of the Complaint need only "be enough to raise a right to relief above the speculative level … on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp.v. Twombly,* 550 U.S. 544, 555 (2007).  "Detailed factual allegations" are not required.  *Id.*  "[T]he Eleventh Circuit has cautioned that Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases" because "motive and intent play leading roles, the proof is largely in the hands of alleged conspirators, and hostile witnesses thicken the plot."  *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US LLC,* No. 10-2008, 2011 WL 3035226, at *3 (M.D. Fla. July 25, 2011); *see also Parsons v. Bright House Networks,* No. 09-0267, 2010 WL 5094258, at *3-4 (N.D. Ala. Feb. 10, 2010) ("Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases.") (quoting *Spanish Broad. Sys. v. Clear Channel Commc'ns,* 376 F.3d 1065, 1070 (11th Cir. 2004)).

In assessing antitrust claims under Rule 12(b)(6), the Court must examine the allegations of the Complaint as a whole; it is not permissible to parse the allegations into individual conduct and then analyze each in isolation.  *See, e.g., Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."); *U.S. v. Am. Tel. & Tel. Co.,* 524 F. Supp. 1336, 1344 (D.D.C. 1981) ("[T]here is but a single claim of violation of the Sherman Act before the Court, and procedurally that claim cannot be segmented for dismissal purposes."); *In re Pressure Sensitive Labelstock Antitrust Litig.,* 566 F. Supp. 2d 363, 375 (M.D. Pa. 2008) ("Nothing in *Twombly*, however, contemplates this 'dismemberment'

approach to assessing the sufficiency of a complaint. Rather, a district court must consider a complaint in its entirety without isolating each allegation for individualized review.").

## II. UAC's Claim that Defendants Violated Section 1 of the Sherman Act Alleges Sufficient Facts to Support Conspiracy.

Section 1 of the Sherman Act, under which UAC's claims are brought, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  In addition to that bare bones recital of prohibited behavior, the Supreme Court has long concluded that Congress intended only to prohibit "unreasonable" restraints on trade. *See, e.g., Arizona v. Maricopa Cty. Med. Soc.,* 457 U.S. 332, 343, 102 S. Ct. 2466, 2472–73 (1982).  Thus, Section 1 prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade. *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,* 376 F.3d 1065, 1071 (11th Cir. 2004); *see also Ace Pro Sound & Recording v. Albertson,* 512 F. Supp. 2d 1259, 1268-69 (S.D. Fla. 2007) (applying Section 1 of the Sherman Act and requiring (1) an agreement that is (2) designed to achieve an unlawful purpose by unreasonably restraining trade).  UAC has sufficiently pleaded these elements.

### A. UAC Has Alleged Facts Plausibly Showing an Agreement.

"Asking for plausible grounds to infer an agreement [in antitrust cases] does not impose a probability requirement at the pleading stage." *Twombly,* 550 U.S. at 556.  Courts throughout the country have repeatedly held that the inherently secretive nature of a conspiracy should be considered in applying the pleading requirements.  *See, e.g., Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 465 (3d Cir. 1998); *ES Dev., Inc. v. RWM Enters., Inc.,* 939 F.2d 547, 553-54 (8th Cir. 1991); *In re Petroleum Prods. Antitrust Litig.,* 906 F.2d 432, 439 (9th Cir. 1990).  Indeed, direct evidence of conspiracy is not required in the Complaint.  *DeLong Equip. Co. v. Wash. Mills*

*Abrasive Co.,* 887 F.2d 1499, 1515 (11th Cir. 1989) ("Conspiracies are rarely evidenced by explicit agreements and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators."). Rather, circumstantial evidence of agreement is sufficient. *In re Delta/Airtran Baggage Fee Antitrust Litig.,* 733 F. Supp. 2d 1348, 1359-60 (N.D. Ga. 2010) (holding that the absence of direct evidence of conspiracy may be appropriate grounds for summary judgment, but not a motion to dismiss, because "[plaintiffs] need not allege the existence of collusive communications in 'smoke-filled rooms.' … Plaintiffs' complaint is built upon circumstantial evidence of a conspiracy; nevertheless, the Court is unable to say at this stage of the litigation that the inferences Plaintiffs draw from the evidence are implausible."); *North Jackson Pharmacy, Inc. v. Express Scripts, Inc.,* 345 F. Supp. 2d. 1279, 1287-88 (N.D. Ala. 2004) (rejecting the defendants' argument that a complaint "must include factual allegations as to when and how the [] agreements were made, the terms of such alleged agreements, and how those alleged agreements were supposedly implemented" because "these are precisely the kinds of details which … would likely be known only by the alleged coconspirators, and hence should not be required in the complaint") (quotation omitted).

The Eleventh Circuit has adopted a qualitative use of plus factors, taking a holistic view of how allegations, taken together, can support an inference of an agreement. To survive a motion to dismiss, the plaintiff must allege "parallel conduct" plus "further factual enhancement." *Twombly,* 550 U.S. at 557. These so-called "plus factors" serve as proxies for direct evidence of an agreement. But the Eleventh Circuit has never prescribed a rigid set of factors or the weight of any particular factor. Instead, "*any* showing that tends to exclude the possibility of independent action can qualify as a plus factor." *Williamson Oil Co. v. Phillip Morris U.S.A.,* 346 F.3d 1287, 1301 (11th Cir. 2003) (emphasis added). The importance of any

factor rests on its tendency to show that the defendants' behavior is plausibly consistent with the alleged conspiracy, as opposed to a rational and competitive business strategy, independently adopted by competing firms. *Id*.

In the present case, the facts alleged in the complaint more than meet this requirement. Not only have the Defendants acted in uniformity, but **the Defendants have made explicit statements declaring that they coordinated, conspired and agreed with each other**. (Compl. ¶¶ 47-78; 74). The motive for pursuing this was also set out in great detail in the Complaint: that the Defendants sought to dominate the temporary software upgrade and implement a new software version with checkpoints that controlled and manipulated the value of the Bitcoin Cash network going forward. (*Id*. ¶ 82).

The Complaint alleges, *inter alia*, that during the November 15, 2018 Bitcoin Cash network upgrade, Ver and Bitcoin.com colluded with Jihan Wu and Bitmain to reallocate pools of Bitmain servers from the Bitcoin Core network ("BTC") to Bitcoin.com's pools in the Bitcoin Cash network minutes before the implementation of the Bitcoin Cash network upgrade. (Compl. ¶ 59). The Complaint further alleges that these actions were intentional and clearly planned in advance, with Bitmain organizing deployment (or actually redeployment) of up to 90,000 Bitmain Antminer S9 servers in early November.[1] (*Id*. ¶ 61). The Complaint then alleges that Bitcoin ABC – through defendants Amaury Sechet, Shammah Chancellor, and Jason Cox – implemented a checkpoint in the chain that "centralized" what should be a *decentralized* market

---

[1] As alleged by UAC, the Bitcoin ABC pool hashing power rose to a level that had not previously been seen indicating the intermittent deployment of "rented" hashing. This type of hashing peak is not a normal occurrence. The peaks continued several times in the subsequent days until they leveled off to normal levels once Bitcoin ABC had taken control of the blockchain. (Compl. ¶ 60).

and coordinated, conspired and agreed with Kraken (a well-known Bitcoin exchange) to have the ABC chain effectively recognized as the official blockchain of Bitcoin Cash.  (*Id*. ¶¶ 69-76).

Indeed, the Complaint references and incorporates a YouTube video of an online forum wherein Andreas Brekken – a software engineer at *Kraken* (the exchange) – acknowledges that Bitcoin ABC developers and crypto exchanges such as Kraken agreed to the entire scheme in advance, stating among other things:

- "**this has been planned for so long**, we knew we were going to win, and we knew we were going to checkpoint, and we knew we are not going to do deep-reorgs, so we have just been… drinking beers all day because we knew we won…"

- "another step you do is, **you talk to all the exchanges… then you have them apply a patch which adds a checkpoint** that anchored to blockmine by Bitcoin ABC which prevents all future re-orgs (audible whistle)…"

(*Id*. ¶ 74, citing to and incorporating https://www.youtube.com/watch?v=UjAHJY0QZhs).

In short, the allegations asserted by UAC in the Complaint more than plausibly show an agreement between the Defendants.  The relevant facts with respect to the antitrust claims include (but are not limited to) the following:

- Bitmain re-deployed up to 90,000 servers to the pools of Bitcoin.com (owner by Roger Ver) (*Id*. ¶ 61);

- that Bitcoin ABC developers (including Shammah Chancellor) then implemented a checkpoint that centralized the market and coordinated with exchanges such as Kraken – an exchange in which Roger Ver is a principal investor – so that Kraken would recognize the new chain and effectively prevent all future re-orgs (*Id*. ¶ 69-74); and

- that a Kraken software engineer has openly acknowledged that this was pre-planned and "we knew were going to win." (*Id*. ⁋ 74).

It is telling that an employee of Kraken – the exchange – would be using the term "we" in stating "we knew we were going to win." What did an employee of an ostensibly neutral and open exchange stand to "win" unless they were conspiring with the other Defendants?

An imaginative person might be able to create alternative explanations for why all of these parties acted in unison to dominate the temporary software upgrade, implement a new software version with checkpoints, and take total control of the value of the Bitcoin Cash network going forward – all without having any contact and\or knowledge of what the other defendants were doing. Of course, the video of Mr. Brekken leaves little to the imagination. The bottom line is that Defendants would not have acted as they did if they had not coordinated, conspired and agreed with each other. When they re-deployed 90,000 servers, they knew it was rigged. When the developers created a software with a checkpoint, they knew it was rigged and that the exchange would apply the patch. When all of these acts are viewed as a whole, it is enough to "nudge the claim across the line from conceivable to plausible." *See Jacobs v. Tempur-Pedic Intern., Inc.,* 626 F.3d 1327, 1333 (11th Cir. 2010).[2]

---

[2] It is also evident that the unregulated cryptocurrency market has a structure that is highly susceptible to collusion. Several circuits have held that allegations showing a market susceptible to collusion, while not alone sufficient, can nudge other factual allegations tending to show an agreement across the line to plausibility. *See, e.g., In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 627–28 (7th Cir. 2010); *SD3, LLC v. Black & Decker (U.S.) Inc.,* 801 F.3d 412 (4th Cir. 2015); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.,* 720 F.3d 33, 48 (1st Cir. 2013); *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 323 (2d Cir. 2010); *In re Flat Glass Antitrust Litig.,* 384 F.3d 350, 360–61 (3d Cir. 2004) (considering market structure a plus factor for summary judgment analysis pre-*Twombly*). Market structure susceptible to collusion is not independently a plus factor, but it can place other allegations "in a context that raises a suggestion of preceding agreement." *Twombly*, 550 U.S. at 557 n.4.

In sum, the facts alleged in the Complaint are sufficient for the agreement element of a Sherman Act conspiracy.

### B. UAC Has Sufficiently Alleged Unlawful Purposes of the Conspiracy.

Restraints analyzed under the *per se* rule are those that are always (or almost always) so inherently anticompetitive and damaging to the market that they warrant condemnation without further inquiry into their effects on the market or the existence of an objective competitive justification. *U.S. v Socony-Vacuum Oil Co.,* 310 U.S 150 (1940); *United States v. Sealy, Inc.,* 388 U.S. 350 (1967); *United States v. Topco Associates, Inc.,* 405 U.S. 596 (1972); *Craftsmen Limousine, Inc. v. Ford Motor Co.,* 363 F.3d 761 (8th Cir. 2004). Defendants are not entitled to justify their behavior based on any objective competitive justifications. *Northern Pac. Ry. Co. v. U.S.,* 356 US (1940); *Agnew v. National Collegiate Athletic Ass'n,* 683 F.3d 328 (7th Cir. 2012); *In re Flat Glass Antitrust Litigation,* 385 F.3d 350 (3rd Cir. 2004). And a plaintiff has less responsibility to analyze the market where the restraint is deemed *per se* anticompetitive. *National Soc. of Professional Engineers v. U.S.,* 435 U.S. (1878); *In re Insurance Brokerage Antitrust Litigation,* 618 F 3d 300 (2010); *In re Southeastern Milk Antitrust Litigation,* 739 F.3d 262 (2014).³

---

³ Although defining the relevant market is unnecessary where, as here, the *per se* rule should be applied because the alleged restraints are inherently anticompetitive and damaging to the market, the allegations of the Complaint are nevertheless adequate. Defining the relevant market is a fact-intensive inquiry that will rarely form a basis to dismiss a complaint. *See, e.g., Lakeland Reg'l Med. Ctr., Inc. v. Astellas US LLC,* 2011 U.S. Dist. LEXIS 80723, *8 (M.D. Fla. 2011) (Plaintiff need not "provide the contours of the relevant markets at the complaint stage. At this stage, [plaintiff] is not required to come forward with any evidence to prove that the allegations in its complaint are true."); *Newcal Indus. v. IKON Office Solutions,* 513 F.3d 1038, 1045 (9th Cir. 2008) (holding that "since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial*"); Todd v. Exxon Corp.,* 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."). The

Here, the Complaint alleges that the Defendants' collective actions achieved the unlawful purposes of the alleged conspiracy: (1) manipulating the cryptocurrency market for Bitcoin Cash and effectively hijacking the Bitcoin Cash network, centralizing the market, and violating all accepted standards and protocols associated with Bitcoin since its inception; (2) violating the Nakamoto Whitepaper and consensus rules regarding voting; and (3) precluding future changes to Bitcoin cash functionality as well as changes to the consensus rules. (Compl. ¶¶ 82-83).  Each of these on its own is sufficient to satisfy the unlawful purpose element.

As Defendants Kraken and Powell point out in their motion to dismiss, this is a case of first impression.  (Kraken Mtn. p. 10).  It is the first antitrust action brought in the United States involving the dynamic and constantly evolving cryptocurrency industry.  (*Id.*)  No court has yet decided whether the hijacking of a single cryptocurrency network is a *per se* automatic violation of the federal antitrust laws.  (*Id.*).  The articulated scheme perpetrated by Defendants should absolutely be treated as a *per se* violation.  The actions of Defendants here were akin to bid rigging, except the miners (who are supposed to be competing with each other) were effectively bidding with their votes and then changing the rules of the auction after they won the bid.  Bid rigging has consistently been treated by Courts as a *per se* violation of the Sherman Act.  *See e.g., U.S. v. Joyce,* 895 F.3d 673, 679 (9th Cir. 2018) ("Because bid rigging is *per se* illegal under Section 1 of the Sherman Act, the district court did not err by refusing to permit [Defendant] to introduce evidence of the alleged ameliorative effects of his conduct.").

---

judicial reluctance to dispose of market definition allegations on a motion to dismiss stems from *Twombly's* clear mandate that "the plausibility standard does not require probability." 550 U.S. at 556.  Nevertheless, UAC's Complaint is clear in identifying a plausible product and geographic market – the Bitcoin blocks being mined by miners throughout the world on the Bitcoin Cash blockchain (now Bitcoin Cash ABC).

Although this is an evolving industry, it is well-established that the means through which a restraint on trade is accomplished need not be inherently anticompetitive. *Am. Tobacco Co. v. United States,* 328 U.S. 781, 809 (1946) ("It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."); *Accord LePage's, Inc. v. 3M,* 324 F.3d 141, 162 (3d Cir. 2003) ("The relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together.").

Here, UAC alleges that Nakamoto's Whitepaper makes express that nodes in the system "vote with their CPU power, expressing their acceptance of valid blocks by working on extending them…" (Compl. ¶ 64). While nodes "can leave and rejoin the network," it has always been understood that it is the nodes that are mining the blockchain that are able to "vote with their CPU power." (*Id*.). By essentially bringing in mercenaries from another network (the BTC network) to temporarily mine the Bitcoin Cash network during the software upgrade and then leave, Bitmain and Bitcoin.com effectively "rigged the bid" and hijacked the blockchain. (*Id*. at 65). Their actions diluted the "vote" being exercised by the existing nodes during the upgrade, violated the ground rules of the network that other users had relied on and respected for years, and artificially pumped up the chain implementation with computer hashes to dominate the temporary software upgrade. (*Id*.).

Indeed, UAC alleges very particular data and specificity illustrating that during the week immediately *preceding* the network upgrade, Bitcoin.com and the Bitmain pools were collectively awarded 27.6% of the blocks being mined from the blockchain. (Compl. ¶ 67). The

day *after* the network upgrade, Bitcoin.com and the Bitmain pools were being awarded 100% of the blocks.  (*Id*. ¶ 68).  Add to that the fact that the implementation of the checkpoint precludes current miners on the blockchain from doing exactly what the Defendants did in this scenario.  With the checkpoint/poison pill now in place, to implement a new software in the manner Defendants did would require a miner to mine 10 consecutive blocks in a row – something that has never been done and is effectively impossible.  Only Defendants can remove the checkpoint and change the software now – a reflecting of their manipulation and domination of the market and a tacit admission that what *they* did was an unlawful restraint.

In short, UAC's allegations, and reasonable inferences, reveal a pattern of conduct designed to achieve the unlawful purposes alleged.  No more is required under Twombly.[4]

### III. The Complaint Adequately Alleges Facts in Support of its Negligence Based Claims.

#### A. Count II Adequately States a Claim for Negligent Misrepresentation.

Under Florida law, the elements of a negligent misrepresentation claim are: (1) a misrepresentation of material fact; (2) that the representor either knew or should have known was false; (3) that the representor intended to induce another to act on the misrepresentation; and (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation.  *See e.g., Paine v. Domino's Pizza, LLC,* 2011 WL 1102788, at *3 n.4 (S.D. Fla. Mar. 24, 2011) (quoting *Allocco v. City of Coral Gables,* 221 F.Supp. 2d 1317, 1355 (S.D. Fla. 2002), *aff'd* 88 F. App'x 380 (11th Cir. 2003)).

---

[4]    *Twombly* requires a court to assume as true the facts alleged and all reasonable inferences therefrom; it does not restrict courts to accepting as true only those facts and inferences that, taken alone and without context, are more plausibly consistent with conspiracy than self-interest.  A plaintiff need only show that the facts and reasonable inferences collectively establish a claim that is "plausible on its face."

The motions to dismiss argue that UAC has failed to plead a claim for negligent misrepresentation because UAC has failed to plead the requisite level of particularity and fails to plead the "what, when, where, and how" of the alleged misrepresentation. (Chancellor Mtn. p. 21; Bitmain Mtn. p. 13; Kraken Mtn. p. 15).

The Complaint alleges that Defendants misrepresented to Plaintiff and the market that they would abide by the Whitepaper and accepted standards and protocols. (Compl. ¶ 87). It is clear from the alleged conspiracy and the entirety of the Complaint and the scheme set forth in great detail and particularity therein (which allegations are incorporated into Count I) that Defendants had no intention of abiding by said standards and protocols. (*Id*. ¶ 90). Instead, the Defendants[5] colluded with one another to hijack the blockchain. They diluted the "vote" being exercised by the existing nodes during the upgrade, violated the ground rules of the network that other users had relied on and respected for years, and artificially pumped up the chain implementation with computer hashes to dominate the temporary software upgrade. (*Id*. ¶ 89). Then, for good measure, the Defendants implemented a checkpoint that "centralized" what should be a decentralized market due to the way the checkpoint was added and its location close to the tip of the blockchain. (*Id*.).

The Complaint further alleges that Plaintiff justifiably relied on Defendants' misrepresentations by investing millions of dollars in development and deployment of infrastructure specifically for the mining of Bitcoin Cash. As participants in the Bitcoin Cash network, Defendants should have known that the other participants in the network were relying

---

[5]   The motions to dismiss each assert that UACs claims impermissibly lump together the individual and corporate defendants, however, the Complaint goes into great detail of the alleged scheme and the various players involved and the actions taken by each vis-à-vis the alleged wrongdoing. (Compl. ¶¶ 47-79). These allegations are incorporated into each and every claim asserted in the Complaint.

on the accepted standards and protocols for the network.  Had UAC known that Bitmain intended to dilute the "vote" being exercised by the existing nodes during the upgrade and artificially pumped up the chain implementation with computer hashes, UAC would not have invested millions.  Had UAC known that Chancellor intended to implement a checkpoint in the software that "centralized" what should be a decentralized market, UAC would not have invested millions.  Had UAC known that the parties intended to collude with Kraken and Powell – facts explicitly acknowledged by Brekken in the video – UAC would not have invested millions.  But instead, UAC (and many other parties like it that Defendants each knew or should have known were mining the network) justifiably relied on the misrepresentation and was damaged.  (*Id.* ¶ 92).

      **B.**      **Count III Adequately States a Claim for Negligence.**

Under Florida law, the elements of a negligence claim are "duty, breach, causation, and damages."  *See e.g., Florida Dept. of Corr. v. Abril,* 969 So. 2d 201, 209 (Fla. 2007); *see also Honig v. Kornfield,* 339 F. Supp. 3d 1323, 1339 (S.D. Fla. 2018).    The motions to dismiss argue that UAC has failed to plead facts giving rise to any cognizable duty of care to UAC or that they breached any such duty.  (Chancellor Mtn. p. 22; Bitmain Mtn. p. 16; Kraken Mtn. p. 18).

Florida law recognizes four sources of duty in negligence-related actions: (1) statutes or regulations; (2) common law interpretations of those statutes or regulations; (3) other sources in the common law; and (4) the general facts of the case.  *See Jackson Hewitt, Inc. v. Kaman,* 100 So. 3d 19, 28 (Fla. 2d DCA 2011).  Importantly, Florida's existing common law imposes, as it should, a duty to exercise reasonable care upon a defendant with respect to its conduct of a foreseeable activity where the consequences of its conduct pose a foreseeable risk to others.  *See, e.g., Limones v. School District of Lee County,* 161 So. 3d 384, 389 (Fla. 2015); *McCain v.*

*Florida Power Co.,* 593 So. 2d 500, 502 (Fla. 1992).  The determination of the existence of a common law duty flowing from the general facts of the case depends upon an evaluation and application of the concept of foreseeability of harm to the specific circumstances alleged.  *See Dorsey v. Reider,* 139 So. 3d 860, 863 (Fla. 2014).  "When a person's conduct is such that it creates a 'foreseeable zone of risk' posing a general threat of harm to others, a legal duty will ordinarily be recognized to ensure the conduct is carried out reasonably." *Id.*

Very similar to the negligent misrepresentation claim, the negligence claim in the Complaint alleges that Defendants owed a duty of care to UAC to abide by the Whitepaper and accepted standards and protocols.  (Compl. ¶ 94).  Defendants breached their duty of care to the Plaintiffs by failing to conform to and abide by the Whitepaper and accepted standards and protocols and hijacking and assuming control of the Bitcoin Cash network and market.  (*Id.* ¶ 95).

Once again, as participants in the Bitcoin Cash network, the conduct of Defendants in failing to conform to and abide by the Whitepaper and accepted standards and protocols, hijacking and assuming control of the Bitcoin Cash network, and implementing a checkpoint that centralized what should be a decentralized market, posed a foreseeable risk to the other participants in the blockchain, including UAC.  For the same reasons already set forth above, the Defendants are alleged to have breached that duty and Plaintiff is alleged to have been damaged.

Defendants knew or should have known that the other participants in the network were relying on the accepted standards and protocols for the network.  Had UAC known that Bitmain intended to dilute the "vote" being exercised by the existing nodes during the upgrade and artificially pumped up the chain implementation with computer hashes, UAC would not have invested millions.  Had UAC known that Chancellor intended to implement a checkpoint in the

software that "centralized" what should be a decentralized market, UAC would not have invested millions. Had UAC known that the parties intended to collude with Kraken and Powell – facts explicitly acknowledged by Brekken in the video – UAC would not have invested millions. But instead, UAC (and many other parties like it that Defendants each knew or should have known were mining the network) justifiably relied on the misrepresentation and was damaged. (*Id.* ¶ 92).

### IV. The Complaint Adequately Alleges Facts in Support of its Unjust Enrichment Claim.

The elements of a claim for unjust enrichment are: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant was aware of and accepted the benefit; and (3) it would be inequitable for the defendant to retain the benefit. *Ascentium Corp. v. Terremark N. Am., Inc.*, 2011 WL 1233256 *2 (S.D. Fla. March 30, 2011) (citation omitted). Bitmain's motion to dismiss argues that UAC's claim for unjust enrichment should be dismissed because UAC has failed to identify any benefit that it conferred upon Bitmain. (Bitmain Mtn. pp. 18-19).

For years, individuals and entities such as UAC mined the Bitcoin network (which continued as Bitcoin Cash as of Aug 15, 2017). The collective efforts of these parties and their significant investment in this cryptocurrency network created significant value. Then, the Defendants colluded with one another to hijack the blockchain and implemented a checkpoint that "centralized" what should be a decentralized market. (Compl. ¶¶ 47-78). The value of the network that UAC helped create was taken by Defendants Bitmain, Bitcoin.com, and Ver, who received and retained the benefit obtained from their manipulative acts. (*Id.* ¶ 107). Meanwhile, other users such as UAC were cut out of the network and lost the value of their significant investments. (*Id.* ¶ 109). Although the value of the cryptocurrency has decreased, the fact remains that Defendants have received the benefit of a significant volume and percentage of the

blocks being mined on the blockchain (at one point as high as 100% of the blocks were being awarded to Bitcoin.com and Bitmain). (Compl. ¶ 68).

For these reasons, UAC has alleged every element to assert a claim for unjust enrichment against Bitmain.

V. **The Complaint Adequately Alleges Facts in Support of its Conversion Claim.**

Under Florida law, "conversion is an 'act of dominion wrongfully asserted over another's property inconsistent with his ownership therein.'" *Nardolilli v. Bank of Am. Corp.,* 2013 WL 12154541, at *5 (S.D. Fla. Dec. 5, 2013) (quoting *United Techs. Corp. v. Mazer,* 556 F.3d 1260, 1270 (11th Cir. 2009)).

UAC alleges that Defendants are wrongfully exercising dominion and control over Bitcoin Cash and its blockchain network and market inconsistent with the use and possessory rights of the Plaintiff. (Compl. ¶ 112). Specifically, Defendants' conduct has deprived the Plaintiff of the right to utilize and possess Bitcoin Cash and its blockchain network as intended pursuant to the Whitepaper and its accepted standards and protocols and the conduct is inconsistent with the Plaintiff's rights to use the network pursuant to said standards and protocols. (*Id.* ¶ 113). In short, but for Defendants' unlawful conspiracy to hijack the blockchain, other users such as UAC would still be mining the network and being awarded blocks for their efforts. Instead, Defendants chose to "lock down" the blockchain (a fact they have explicitly admitted to in the aforementioned video) and effectively exercised dominion over and converted the blockchain. (*Id.* ¶¶ 72-74).

VI. **The Injunctive Relief Should Be Treated As Requested Relief For State Law Claims.**

UAC does not dispute that injunctive relief is a remedy. The facts set forth in the Complaint, however, establish the likelihood of irreparable harm absent the injunctive relief, a clear legal right, and that other remedies at law are inadequate. Accordingly, UAC requests that

its request for injunctive relief – which is also set forth in the Prayer for Relief section on page 26 of the Complaint – be regarded as part of the requested relief for its other asserted claims.

## CONCLUSION

For the reasons discussed above, Plaintiff respectfully requests that the Court deny Defendants' Motions to Dismiss [ECF Nos. 41-43] in their entirety, and for any further relief this Court deems appropriate.

Dated: March 7, 2019                                        Respectfully submitted,

By: /s/ *Michael O. Mena*
Brian P. Miller
Florida Bar No. 0980633
brian.miller@akerman.com
Michael O. Mena
Florida Bar No. 010664
Michael.mena@akerman.com
Joanne Gelfand
Florida Bar No. 515965
Joanne.gelfand@akerman.com

AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, FL 33131
Tel: 305-374-5600
Fax: 305-374-5095

*Attorneys for Plaintiff United American Corp.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 7, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ *Michael O. Mena*
Michael O. Mena