## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No. 1:18-cv-25106-KMW-CMM

United American Corp.,

    *Plaintiff*,

    v.

Bitmain, Inc., Roger Ver, Bitmain
Technologies Ltd., Jihan Wu, Payward
Ventures, Inc. d/b/a Kraken, Jesse Powell,
Shammah Chancellor, and Jason Cox,

    *Defendants*.

## DEFENDANTS' JOINT MOTION TO DISMISS FIRST AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

**TABLE OF CONTENTS**                                                    **Page(s)**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 2

PROCEDURAL HISTORY ................................................................................................ 6

LEGAL STANDARDS ...................................................................................................... 7

ARGUMENT ...................................................................................................................... 8

I.       UAC fails to allege that Defendants joined any agreement, much less an
         unlawful antitrust conspiracy to "hijack" the Bitcoin Cash network.................... 8

         A.       UAC again fails to allege an agreement between Roger Ver, Jihan
                  Wu, Bitmain, Inc., and/or Bitmain Technologies to reallocate hash
                  power. ...................................................................................................... 10

         B.       UAC does not allege facts raising any inference of agreement
                  between Shammah Chancellor, Jason Cox, or any other Defendant
                  to implement "checkpoints."................................................................... 13

         C.       The Amended Complaint fails to allege that Jesse Powell or
                  Kraken played any role in the alleged scheme.......................................... 14

         D.       Viewed in their entirety, UAC's scattershot conspiracy allegations
                  do not cohere into a plausible narrative. ................................................. 15

II.      UAC fails to plead facts suggesting that any Defendant imposed an
         unreasonable restraint on competition. ............................................................... 15

         A.       UAC's amended pleadings do not describe conduct that fits within
                  the narrow category of *per se* unlawful practices. .................................. 16

         B.       None of UAC's amendments bring it any closer to pleading an
                  actionable rule of reason claim. .............................................................. 19

                  1.       None of UAC's allegations evince actual harm to
                           competition. .............................................................................. 20

                  2.       UAC does not plausibly allege potential harm to
                           competition in a relevant product or geographic market. ........... 22

                           a.       UAC does not allege relevant product and
                                    geographic markets. ......................................................... 23

                           b.       UAC does not plead facts demonstrating that
                                    Defendants possessed market power................................. 26

                           c.       The Amended Complaint does not link Defendants'
                                    alleged exercise of market power to an injury to
                                    competition. ..................................................................... 27

III.     UAC lacks antitrust standing, because it does not allege an antitrust injury. ...... 28

CONCLUSION................................................................................................................. 31

## TABLE OF AUTHORITIES                                   Page(s)

**Cases**

*Adidas Am., Inc. v. NCAA*,
  64 F. Supp. 2d 1097 (D. Kan. 1999) ........................................................ 25

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*,
  135 F.3d 740 (11th Cir. 1998) ................................................... 17, 18, 19

*Aquatherm Indus., Inc. v. Fla. Power & Light Co.*,
  971 F. Supp. 1419 (M.D. Fla. 1997) ....................................................... 23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................... 7, 15

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* (*AGC*),
  459 U.S. 519 (1983) ............................................................................ 28, 29

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ....................................................................... 28, 29, 30

*Atlas Bldg. Prod. Co. v. Diamond Block & Gravel Co.*,
  269 F.2d 950 (10th Cir. 1959) ................................................................ 22

*Austin v. Blue Cross & Blue Shield of Ala.*,
  903 F.2d 1385 (11th Cir. 1990) .............................................................. 28

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................... passim

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
  203 F.3d 1028 (8th Cir. 2000) ................................................................ 11

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998) .................................................................... 1

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ............................................................................. 28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ........................................................................... 28, 29

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ................................................................... 14

*Carlock v. Pillsbury Co.*,
  719 F. Supp. 791 (D. Minn. 1989) .......................................................... 25

*Cha-Car, Inc. v. Calder Race Course, Inc.*,
    752 F.2d 609 (11th Cir. 1985) ...................................................................................... 16, 18

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
    851 F.2d 478 (1st Cir. 1988) ............................................................................................. 21

*Clark Mem'ls of Ala. Inc. v. SCI Ala. Funeral Servs. LLC*,
    991 F. Supp. 2d 1151 (N.D. Ala. 2014) ............................................................................ 23

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*,
    720 F.2d 1553 (11th Cir. 1983) ......................................................................................... 16

*Dapeer v. Neutrogena Corp.*,
    95 F. Supp. 3d 1366 (S.D. Fla. 2015) ................................................................................. 7

*Duty Free Americas, Inc. v. Estée Lauder Cos.*,
    797 F.3d 1248 (11th Cir. 2015) .................................................................................... 23, 27

*Duty Free Americas, Inc. v. Estée Lauder Cos.*,
    946 F. Supp. 2d 1321 (S.D. Fla. 2013) .................................................................. 8, 9, 11, 15

*Fin-S Tech, LLC v. Surf Hardware Int'l-USA, Inc.*,
    2014 WL 12461350 (S.D. Fla. 2014) .................................................................................. 26

*Glen Holly Entm't, Inc. v. Tektronics, Inc.*,
    100 F. Supp. 2d 1073 (C.D. Cal. 1999) ............................................................................. 25

*Glynn-Brunswick Hosp. Auth. v. Becton*,
    159 F. Supp. 3d 1361 (S.D. Ga. 2016) ......................................................................... 24, 25

*Graphic Prods. Dist. v. Itek Corp.*,
    717 F.2d 1560 (11th Cir. 1983) ......................................................................................... 25

*Green Country Food Mkt. v. Bottling Grp., LLC*,
    371 F.3d 1275 (10th Cir. 2004) ......................................................................................... 25

*Grunewald v. United States*,
    353 U.S. 391 (1957) ............................................................................................................ 12

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
    466 F.3d 961 (11th Cir. 2006) ........................................................................................... 28

*Hoglund v. Charter Commc'ns, Inc.*,
    2018 WL 4896352 (N.D. Ala. Oct. 9, 2018) ...................................................................... 25

*Holmes v. Securities Investor Protection Corp.*,
    503 U.S. 258 (1992) ............................................................................................................ 30

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ........................................................................................... 9

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) .......................................................................................... 9

*In re Marine Hose Antitrust Litig.*,
2009 WL 10685177 (S.D. Fla. Jan. 28, 2009) ................................................................ 8

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010) .............................................................................. passim

*Johnson v. University Health Servs., Inc.*,
161 F.3d 1334 (11th Cir. 1998) ..................................................................................... 28

*Kleen Prods. LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017) ............................................................................ 12

*Lady Deborah's, Inc. v. VT Griffin Servs., Inc.*,
2007 WL 4468672 (S.D. Ga. Oct. 26, 2007) ................................................................ 25

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
72 F.3d 1538 (11th Cir. 1996) ................................................................... 15, 17, 19, 26

*Magluta v. Samples*,
256 F.3d 1282 (11th Cir. 2001) ....................................................................................... 8

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
302 F.3d 1207 (11th Cir. 2002) ............................................................................... 22, 25

*Metzler v. Bear Auto. Serv. Equip. Co.*,
19 F. Supp. 2d 1345 (S.D. Fla. 1998) ........................................................................... 24

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ......................................................................................................... 9

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ..................................................................................... 30

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998) ................................................................................................. 17, 18

*PayCargo, LLC v. CargoSprint, LLC*,
2019 WL 5793113 (N.D. Ga. Nov. 4, 2019) ................................................................ 24

*Procaps S.A. v. Patheon, Inc.*,
845 F.3d 1072 (11th Cir. 2016) ..................................................................................... 10

*Q Club Resort & Residences Condo. Ass'n, Inc v. Q Club Hotel, LLC*,
　2010 WL 11454483 (S.D. Fla. Jan. 6, 2010) ........................................................ 23

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
　917 F.3d 1249 (11th Cir. 2019) ................................................................... passim

*Regency Oldsmobile, Inc. v. Gen. Motors Corp.*,
　723 F. Supp. 259 (D.N.J. 1989) ........................................................................ 25

*Restore Robotics, LLC v. Intuitive Surgical, Inc.*,
　2019 WL 8063989 (N.D. Fla. Sept. 16, 2019) ............................................... 24, 25

*Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*,
　105 F.3d 1376 (11th Cir. 1997) ........................................................................ 19

*RxStrategies, Inc. v. CVS Pharmacy, Inc.*,
　390 F. Supp. 3d 1341 (M.D. Fla. 2019) ............................................................ 26

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
　801 F.3d 412 (4th Cir. 2015) ......................................................................... 9, 20

*Seagood Trading Corp. v. Jerrico, Inc.*,
　924 F.2d 1555 (11th Cir. 1991) ...................................................................... 9, 16

*Simpson v. Sanderson Farms, Inc.*,
　744 F.3d 702 (11th Cir. 2014) ......................................................................... 21

*Spanish Broad. Sys., Inc. v. Clear Channel Commc'ns, Inc.*,
　242 F. Supp. 2d 1350 (S.D. Fla. 2003) ............................................................. 17

*Spanish Broad. Sys. of Fla, Inc. v. Clear Channel Commc'ns, Inc.*,
　376 F.3d 1065 (11th Cir. 2004) ...................................................... 17, 19, 27, 29

*Spectrofuge Corp. v. Beckman Instruments, Inc.*,
　575 F.2d 256 (5th Cir. 1978) ....................................................................... 24, 25

*Spectrum Sports, Inc. v. McQuillan*,
　506 U.S. 447 (1993) ..................................................................................... 19, 21

*Suboxone Antitrust Litig.*,
　2017 WL 4642285 (E.D. Pa. Oct. 17, 2017) ..................................................... 12

*Todorov v. DCH Healthcare Auth.*,
　921 F.2d 1438 (11th Cir. 1991) ........................................................................ 28

*U.S. Anchor Mfg. Inc. v. Rule Indus., Inc.*,
　7 F.3d 986 (11th Cir. 1993) .......................................................................... 23, 24

*Wilchombe v. TeeVee Toons, Inc.*,
   555 F.3d 949 (11th Cir. 2009) ................................................................................... 2

**Statutes**

15 U.S.C. § 1 ........................................................................................................ 8

**Other Authorities**

Jiang Zhuoer, *ABC vs. BSV Hash War (Part III) — The War of the Hash Power*,
   MEDIUM (Nov. 14, 2018) .................................................................................... 4, 29

Marie Huillet, *Mining Giant Bitmain Hurries to Deploy 90,000 S9 Antminers*
   *Ahead of Bitcoin Cash Hard Fork*, CoinTelegraph (Nov. 8, 2018) .......................... 5, 11

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 338 (2018 Cum. Supp.) ................... 30

*Roger Ver on Bitcoin Cash Hard Fork: How Bitcoin ABC Won The Hash War*,
   Bitcoin.com - Official Channel, YouTube .................................................................. 5

U.S. Dep't of Justice, *Price Fixing, Bid Rigging, and Market Allocation Schemes:*
   *What They Are and What to Look For* (updated June 25, 2015) ................................ 16

Defendants jointly move to dismiss plaintiff United American Corporation's ("UAC") First Amended Complaint (ECF No. 138 ("Amended Complaint" or "FAC")) with prejudice under Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7.1.[1]

## INTRODUCTION

UAC's repackaged pleadings contain few surprises, and reprise the most egregious pleading failures of its predecessor. Now, as before, UAC describes nothing more than a routine, albeit contentious vote among software developers, users, and enthusiasts regarding two proposed upgrades to the software behind the Bitcoin Cash cryptocurrency. There are no factual allegations suggesting that Defendants came to any agreement, much less a *per se* unlawful conspiracy. There is no coherent theory as to how Defendants' alleged conduct, even if the result of a prior agreement, violated the Sherman Act and produced an anticompetitive effect. There is no identification of UAC's antitrust injury, nor any effort to trace that injury to the competition-reducing effect of Defendants' conduct. On those—the critical elements of UAC's *prima facie* case—it is silent. And as Judge Posner once remarked in an antitrust case, "silence about . . . critical piece[s] of evidence can be and here is eloquent." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 595 (7th Cir. 1998).

In lieu of evidentiary facts substantiating its claims, UAC offers strained analogies, none of which bear any substantive relation to this case. UAC has not alleged a *per se* unlawful bid-rigging or group-boycott agreement. It fails to lay even a skeletal foundation for a claim under the antitrust rule of reason. And it has not explained why "[t]he action of Defendants can be likened to concerted action by a group of competitors in the home construction business *not* to build to standards capable of withstanding a Category 5 hurricane." (FAC ¶ 92). The only conclusion to be drawn from UAC's latest effort is that it cannot cure its pleading problems, and that further amendment would be futile.

The Supreme Court addressed these types of implausible antitrust allegations in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). It held that federal pleading standards prevent "a plaintiff with a largely groundless claim from taking up the time of a number of other people,

---

[1] Consistent with the Court's order on the briefing schedule (ECF No. 141), undersigned counsel consented to the filing of this Joint Motion to Dismiss on their clients' behalf.

with the right to do so representing an in terrorem increment of the settlement value." *Id.* at 558.[2] This Court afforded UAC one more opportunity to lift its claims out of that category after dismissing the original Complaint in its entirety. UAC failed again, and it is not entitled to another chance. The Court should dismiss the Amended Complaint with prejudice.

## FACTUAL BACKGROUND[3]

On February 6, 2020, after this Court dismissed its initial Complaint, UAC filed its Amended Complaint. It raises Sherman Act claims against eight Defendants—Bitmain, Inc.; Bitmain Technologies Ltd. ("Bitmain Technologies"); Jihan Wu, founder and CEO of Bitmain Technologies; Roger Ver, founder of Bitcoin.com; Payward Ventures, Inc. d/b/a Kraken ("Kraken"); Jesse Powell, founder and CEO of Kraken; and Shammah Chancellor and Jason Cox, developers of Bitcoin ABC software (collectively "Defendants"). (FAC ¶¶ 7-14, 100-117.)[4] UAC copies the vast majority of its current allegations verbatim from its original Complaint, including those describing a purported two-part scheme. *See generally* Ex. 1.[5] Its core allegations remain the same.

***Bitcoin Cash/Cryptocurrency Background.*** Much of the technology and software behind Bitcoin Cash derives from Bitcoin, which was first described in a whitepaper published on October 31, 2008. (FAC ¶ 27, Whitepaper at 1-2 (attached to the FAC as Ex. A) (hereinafter "WP").) As the Whitepaper explains, cryptocurrency transactions are recorded within groups of data called "blocks" that are linked through cryptography, resulting in a "chain" of blocks referred to as a "blockchain." (WP at 2-3.) The blockchain forms a permanent historical ledger of transactions involving Bitcoin Cash. *Id.*

---

[2] Unless otherwise noted, all emphasis is added and internal citations, quotations, and brackets are omitted.

[3] In ruling on a motion to dismiss, a court may consider "the complaint itself and any documents referred to in the complaint which are central to the claims." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009). Defendants cite to certain news articles and online videos that the Amended Complaint references but does not fully describe.

[4] UAC's Amended Complaint abandons the six state-law claims it initially asserted. Likewise, UAC no longer asserts claims against Bitmain Technologies Holding Co., Saint Bitts LLC d/b/a Bitcoin.com, or Amaury Sechet.

[5] Exhibit 1 to this Motion is a true and correct copy of a comparison—generated by the software Litera Change-Pro—between the original Complaint filed on December 6, 2018 (ECF No. 1) and the Amended Complaint filed on February 28, 2020 (ECF No. 138).

– 2 –

Anyone can download Bitcoin Cash software to a computer (sometimes called a "node" on a peer-to-peer network), and blockchain technology ensures that the ledger remains synchronized across the network. (*Id.* at 1.) This synchronization occurs through a process called "mining," by which nodes compete to solve a math problem for the right to propose the next block of transactions. (FAC ¶ 24.) Successful miners, who sometimes combine their computing power through "mining pools," are rewarded with Bitcoin Cash. (*Id.* ¶¶ 24, 26, 30.) Users "can leave and rejoin the network at will;" when a user joins the network, the software on her node will synchronize her ledger with the others on the network. (WP at 8.)

Like most software programs, Bitcoin Cash requires periodic updates—"a routine feature of the technology." (FAC ¶¶ 46, 47.) Because no single entity controls the code, disagreements about proposed changes may arise and lead to hard forks. (WP at 3.) A hard fork begins when nodes add blocks of transactions to the blockchain using different software updates, resulting in separate but incompatible blockchains. (FAC ¶ 52.)

Any disagreements about updates to Bitcoin Cash software are resolved in a democratic process whereby mining nodes "vote" with their computer power to support a particular update. (*Id.* ¶ 51.) This voting process, which the Whitepaper describes and UAC characterizes as a "hash war," unfolds when nodes download and run one of the competing updates on their computers. (*Id.* ¶ 52, WP at 3.) In this way, nodes "vote with their CPU power," with a "one-CPU-one-vote" metric. (*Id.* ¶ 51 n.2, WP at 3, 8.) Individuals with CPUs can "vote" by choosing their preferred software code, and are free to leave and rejoin the network at will. (WP at 8.) A "hash war" does not eliminate the "losing" update, since its supporters may continue to run and support that software in the hope that it will gain broader acceptance within the community at large. For example, software developers created Bitcoin Cash as a proposed update to the original Bitcoin software. (FAC ¶¶ 42, 65.) Stakeholders continue to support and trade Bitcoin and Bitcoin Cash on cryptocurrency exchanges today. (*Id.* ¶ 71.)

Bitcoin Cash was scheduled for a software upgrade on November 15, 2018. (*Id.* ¶¶ 46, 47.) According to the Complaint, two competing software upgrades—Bitcoin ABC 0.18.4 and Bitcoin SV 0.1.0—contained incompatible rules sets. (*Id.* ¶¶ 46, 48.)[6] Because neither upgrade

---

[6] Following the 2018 hard fork, the ABC chain preserved Bitcoin Cash's "block size"—the number of transactions that the network is capable of recording at a given time—at 32 MB. (FAC

– 3 –

could command a consensus among stakeholders, the dispute had to be resolved by a vote consistent with the procedure set forth above. Whichever update garnered the most "votes" would "continue the Bitcoin Cash blockchain going forward," and the update with less support would split off into a "new and distinct chain" via a "hard fork." (*Id.* ¶¶ 45, 51, 52.)

*The alleged conspiracy.* Like the original Complaint, UAC asserts that Defendants collectively orchestrated a plan to "hijack[]" the Bitcoin Cash network. (*Id.* ¶¶ 82-117.)

*First*, UAC alleges that Roger Ver and Bitcoin.com—now a non-party, (*id.* ¶ 15)—"colluded with Jihan Wu and Bitmain Technologies . . . to reallocate pools of Bitmain Technologies servers from the Bitcoin Core network . . . to Bitcoin.com's pools in the Bitcoin Cash network minutes before the implementation of the Bitcoin Cash network upgrade," with the effect of "increasing Bitcoin.com's hashing power by over 4,000%." (*Id.* ¶ 67.) UAC asserts that Bitcoin.com used that "'rent[ed]' hashing power" to "dilute[] the 'vote' being exercised" by other nodes and ensure that the ABC rules set would (1) survive the "hash war" and (2) apply to new blocks of transactions on one of two blockchains to emerge from the bifurcated Bitcoin Cash blockchain. (*Id.* ¶¶ 67, 82-85.) UAC acknowledges that, consistent with the Whitepaper, nodes were entitled to leave and rejoin the Bitcoin Cash network at will. (*Id.* ¶ 27.) But it nevertheless accuses "Bitmain" and Bitcoin.com of violating the spirit if not the letter of the Whitepaper by "bringing in mercenaries from *another* network . . . to temporarily mine [it] during the software upgrade and then leave." (*Id.* ¶¶ 81-82 (emphasis in original).) To accomplish this reallocation, Bitmain Technologies allegedly marshalled "a significant portion of hash power from customers who had joined the Bitmain mining pools without the[ir] authorization or consent." (*Id.* ¶¶ 68, 69.)[7]

UAC contends that Ver, Bitcoin.com, Wu, and Bitmain Technologies *must* have conspired, because the "reallocation of Bitmain Technologies' hashing power onto the Bitcoin.com pools could not be accomplished" without advance coordination. (*Id.* ¶ 70 (asserting without explanation that Bitcoin.com, the "receiving pool," could not have "accommodate[d] the spike in

---

¶ 49.) The SV version increased the block size to 128 MB, allegedly lowering transaction costs and enabling more transactions at any given time. (*Id.* ¶ 50.)

[7] The article UAC cites to support this allegation notes that "miners in fact do not have to care about what coins they are actually mining" and "might not even know which coins are mined." Jiang Zhuoer, *ABC vs. BSV Hash War (Part III) — The War of the Hash Power*, MEDIUM (Nov. 14, 2018), https://tinyurl.com/wxb7afj (cited at FAC ¶ 68).

hash power on its network" without advance preparation).) UAC alleges that Wu "publicly con-gratulated Bitcoin.com for mining the first block with the ABC rule set." (*Id.* ¶¶ 70, 73.)

In addition to its original claim that Ver, Wu, and "Bitmain" supported the ABC rules set, (ECF No. 1 ¶¶ 57, 62, 66-68 ("Compl.")), UAC now alleges that:

- Ver and Andreas Brekken, now described as a *former* employee of Kraken, appeared in a video together discussing the "hash war" about 5 hours before the upgrade. (FAC ¶ 76.)
- Brekken tweeted on the day of the hard fork that Ver "diverted" miners "to secure the ABC version of the upgrade." (*Id.* ¶ 77.)
- Ver appeared in a video several days after the hard fork and allegedly "alluded to the fact that he had rented hash power during the upgrade." (*Id.* ¶ 79.)[8]

UAC also cites to an article describing efforts by "Bitmain" to "deploy" its machines by "reach-ing out to local mining farms in the coal-rich region of Xianjing, [China]" in advance of the hard fork. Marie Huillet*, Mining Giant Bitmain Hurries to Deploy 90,000 S9 Antminers Ahead of Bitcoin Cash Hard Fork*, CoinTelegraph (Nov. 8, 2018), https://tinyurl.com/ya5ve5vr (cited at FAC ¶ 75). The article notes that "Bitmain is reported to be strategizing its role in the forthcom-ing computing 'power war,'" and that "Bitmain . . . is backing BCH client Bitcoin ABC, which has spearheaded the forthcoming hard fork." *Id.* The author makes no mention of any agreement.

*Second*, UAC alleges that software developers Shammah Chancellor, Amaury Sechet, and Jason Cox—none of whom are alleged to have been aware of any scheme or to have communi-cated with each other or another Defendant at any point—implemented software "checkpoint[s]" that "lock[ed] down" the new ABC blockchain after the Bitcoin Cash blockchain bifurcated. (*Id.* ¶¶ 87, 90.) Those checkpoints allegedly prevented the resulting ABC and SV chains from re-merging and assured that anyone with a majority of the computing power on the ABC chain could "quickly cement control of the [Bitcoin ABC] blockchain ledger." (*Id.* ¶¶ 90.)

*Third*, UAC alleges that "[s]hortly after" these events, Kraken and its CEO Jesse Powell "decided that [they] would maintain the BCH ticker for the ABC chain and renewed [a] pre-fork

---

[8] In the video to which UAC links, Ver allegedly acknowledges the complaints of certain (uni-dentified) SV supporters that he and others were "renting" hash rate. *See Roger Ver on Bitcoin Cash Hard Fork: How Bitcoin ABC Won The Hash War*, Bitcoin.com - Official Channel, YouTube, http://www.youtube.com/watch?v=_kFscvMfGrI. Ver comments: "Hash rate is hash rate, and you have no idea where it came from—maybe it was all our hash rate to begin with, maybe we rented it, maybe it was a combination of those things, but it doesn't matter, hash rate is hash rate." (*Id.* at 2:09-2:36.)

indication to users that the SV chain was a high-risk environment," "effectively recogniz[ing] the ABC chain as the official blockchain of Bitcoin Cash and the 'winner' of the network upgrade." (*Id.* ¶ 96.) UAC now avers that this support for ABC was in tension with Kraken's "neutral role as a cryptocurrency exchange" and its "depend[ence] in part, on the robust trading of numerous forms of cryptocurrency." (*Id.*) Unrelated to the hard fork, UAC also alleges that at some unidentified time, Kraken CEO Jesse Powell tweeted: "The merits of BSV are overshadowed by the alienating threats of a few grandiose personalities. Longer chain! = adoption. Victory may by pyrrhic." (*Id.*)

UAC acknowledges that the cryptocurrencies that emerged from the hard fork—ABC and SV—now compete for users and as tradeable instruments on digital currency exchanges. (*Id.* ¶ 97.) It also concedes that the ABC and SV chains benefit from comparable levels of hashing power—an indication that miners supported both of the new networks. (*Id.* ¶ 74.) The flowering of that new competition notwithstanding, UAC claims to have "suffered antitrust injury" attributable to the fork, for which it seeks a remedy of treble damages and injunctive relief. (*Id.* ¶ 117 et seq.) It ascribes the alleged decline in the value of its cryptocurrency and a "deterioration in the quality of Bitcoin Cash" to the "centralization," "significant uncertainty" and "lack of confidence in the network" that Defendants allegedly set in motion. (*Id.* ¶¶ 38-41, 97–99, 108, 112-15.)

***Allegations about Bitmain, Inc.*** UAC brings this action against two separate entities: Bitmain, Inc. and Bitmain Technologies Ltd. The Amended Complaint contains zero substantive allegations against Bitmain, Inc. Despite repeatedly using the name "Bitmain," to describe the "mining pools," "pools," and "miners" (*Id.* ¶¶ 68, 77, 82 n.6, 84, 85.), the Amended Complaint specifically alleges that those pools were operated by Bitmain Technologies, Ltd., and *not* Bitmain, Inc. (*Id.* ¶¶ 61 ("Bitmain Technologies also operates Antpool and BTC.com, two of the largest Bitcoin and Bitcoin Cash mining pools in the world."); 90 (referencing "Bitmain Technologies' mining pools, AntPool and BTC.com").)

### PROCEDURAL HISTORY

UAC filed its initial Complaint in December 2018. The Defendants whom UAC served moved to dismiss that Complaint. (ECF Nos. 42-43, 56, 98-99, 116.) On January 28, 2020, the Court heard argument on all pending motions to dismiss and other related motions. (*See generally* 1/28/2020 Hearing Tr., ECF No. 136 ("Tr.").) The Court held that UAC's Complaint failed to

state a claim against Defendants under the Clayton Act or UAC's state-law causes of action. (Tr. 154:10-17.) The Court identified a litany of "obvious problems." (Tr. 114:11.)

*First*, the Court observed that the original Complaint contained neither direct allegations of an agreement nor circumstantial allegations of parallel conduct and "plus factors" sufficient to support a plausible inference of agreement; none of the allegations tended to exclude the possibility that Defendants acted independently. (Tr. 115:6-13 (no allegations that, e.g., "Defendants [we]re acting against their own self-interest").)

*Second*, the Court found UAC's "lumping together of the Defendants" to be "very problematic" in its own right (Tr. 114:13-21), but also because UAC's pleadings were conclusory and did not support the allegations of conspiracy. (*See, e.g.*, Tr. 85:17-18 (Plaintiff: "[W]e've alleged . . . that Ver and Bitcoin.com worked with Bitmain in advance to rent that hashing power or rent those servers, and we demonstrated in the complaint how that was an unusual action…."; Court: "But that's a conclusion. Where are the facts that support the plausibility that that's true?").)

*Third*, the Court held that in light of the novelty of the industry and alleged conduct at issue (which UAC conceded in its Complaint and briefing), "[t]his is going to be a rule of reason case, if anything." (Tr. 114:22-115:5 (rejecting the position that "this industry and this conduct is so well understood that [the alleged conduct] is . . . a *per se* violation of the [Sherman] [A]ct").) And with respect to the rule of reason, the Court held that UAC failed to "allege[] a product market or geographic market" or "sufficiently allege[] harm to competition." (Tr. 116:7-15; *see also* Tr. 23:18-22 (agreeing that UAC failed to allege a relevant product market); Tr. 115:14-15 ("[The Court]: . . . I have yet to comprehend why renting servers is an anticompetitive act . . . .").)

Following the hearing, the Court issued an order granting Defendants' motions to dismiss with leave for UAC to amend. (ECF No. 135.) Presaging its approach to the Amended Complaint, the Court noted at the hearing that "if there's a[nother] dismissal for failure to state a claim," the Court would be "very fairly open to dismissal with prejudice" because "we don't do this endlessly, and obviously this isn't a simple complaint." (Tr. 152:8-18.)

## LEGAL STANDARDS

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss" under Rule 12(b)(6). *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1372 (S.D. Fla. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)). "Threadbare recitals of the elements of

a cause of action, supported by mere conclusory statements, do not suffice" to survive dismissal. *Iqbal*, 556 U.S. at 678. Unless a plaintiff has pleaded specific and concrete facts that, if true, would "nudge[] the[] claims across the line from conceivable to plausible," the Court must grant a Rule 12(b)(6) motion. *Twombly*, 550 U.S. at 570. Undifferentiated "shotgun pleadings"—those alleging that all of "'the defendants' engaged in certain conduct" notwithstanding "geographic and temporal realities mak[ing] plain that all of the defendants could not have participated in every act complained of"—do not satisfy that requirement. *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

## ARGUMENT

UAC has not cured the pleading problems that led the Court to dismiss its claim for relief under Section 1 of the Sherman Act. That statute "prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019). UAC's latest attempt to state a claim under Section 1 does not improve upon its first, and all of the "obvious problems" that led the Court to dismiss the original Complaint recur in the repackaged offering. (*See* Tr. 114:11.) The Court's conclusions with respect to UAC's first Complaint apply equally to its current one, and it is clear that UAC cannot cure its pleading failures. The Court should dismiss its claims with prejudice.

**I.      UAC fails to allege that Defendants joined any agreement, much less an unlawful antitrust conspiracy to "hijack" the Bitcoin Cash network.**

Because Section 1 of the Sherman Act prohibits unlawful contracts, combinations, or conspiracies between two or more entities, *see* 15 U.S.C. § 1, an antitrust plaintiff must plead sufficient "factual matter to plausibly suggest an agreement was made" to survive a motion to dismiss. *Duty Free Americas, Inc. v. Estée Lauder Cos.*, 946 F. Supp. 2d 1321, 1329 (S.D. Fla. 2013) (*Duty Free I*); *Quality Auto Painting*, 917 F.3d at 1261 (framing "the crucial question [as] whether the challenged . . . conduct stems from independent decision or from an agreement," and requiring pleadings to contain "facts plausibly suggesting a conspiracy").

In assessing whether a plaintiff has pleaded an agreement between defendants, courts ask whether "the complaint's specific allegations as to who, what, where, and when g[i]ve the defendant sufficient notice of the plaintiff['s] claims and the grounds upon which they rest[]." *Duty Free I*, 946 F. Supp. 2d at 1331-32. "A conclusory allegation of agreement at some unidentified

point does not supply facts adequate to show illegality, no matter how many times it is echoed in the [c]omplaint." *Id.* at 1333. Rather, a plaintiff must allege discrete facts indicating "that each individual [d]efendant joined the conspiracy and played some role"—"general allegations as to all of the defendants are insufficient." *In re Marine Hose Antitrust Litig.*, 2009 WL 10685177, at *8-9 (S.D. Fla. Jan. 28, 2009).[9] Moreover, to establish that each defendant actually *joined* the alleged conspiracy, a plaintiff must plead facts plausibly suggesting that *each* made a "conscious commitment to a common scheme designed to achieve an unlawful objective." *See Duty Free I*, 946 F. Supp. 2d at 1331 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

A plaintiff may rely on direct or circumstantial allegations to plead the agreement element. "Direct evidence in a Section 1 conspiracy . . . is explicit and requires no inferences to establish the proposition or conclusion being asserted. . . . [W]ith direct evidence the fact finder is not required to make inferences to establish facts." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). Circumstantial evidence is that which requires a court to draw "infer[ences] from the behavior of the alleged conspirators." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991). Where, as here, a plaintiff relies on circumstantial allegations, it must allege parallel action by the defendants and "plus factors tending to establish that the defendants were . . . in a collusive agreement to . . . restrain trade." *Quality Auto Painting*, 917 F.3d at 1261-62. "These so-called 'plus factors' serve as proxies for direct evidence of an agreement," and while there is no "rigid set of factors," an allegation must "tend[] to exclude the possibility of independent action [to] qualify." *Id.* at 1280 (Wilson, J., dissenting). "The importance of any factor rests on its tendency to show that the defendants' behavior is plausibly consistent with a[n] [unlawful] conspiracy, as opposed to a rational and competitive business strategy, independently adopted by competing firms." *Id.*

---

[9] *See also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, nonspecific allegations against all of them as a group. . . . [If a complaint] fails to allege particular facts against a particular defendant, then the defendant must be dismissed.").

– 9 –

UAC previously conceded that it did not allege direct evidence of a conspiracy in its orig-
inal Complaint (*see* ECF No. 49 at 4-5), and none of its new allegations so qualify.[10] The only
remaining question is whether its circumstantial allegations, as repackaged, "nudge" its conspir-
acy claims over the plausibility threshold. *See Twombly*, 550 U.S. at 570. They do not.

A. **UAC again fails to allege an agreement between Roger Ver, Jihan Wu,
Bitmain, Inc., and/or Bitmain Technologies to reallocate hash power.**

UAC's Amended Complaint does not fix or even address the core problems of its original
Complaint. To recap, UAC failed plausibly to plead that Bitcoin.com's founder, Roger Ver, en-
tered into an agreement with Jihan Wu or any "Bitmain" entity to reallocate hash power from
Bitcoin Core to Bitcoin Cash before the network upgrade. (Tr. 85:17-18, 115:6-13.) Apart from
UAC's conclusory assertions, the original Complaint did not include *any* allegations tending to
exclude the "'obvious alternative explanation' . . . that Ver, Bitcoin.com, Wu, and 'Bitmain' in-
dependently supported the software implementation they considered to be superior." (ECF No.
98, at 6 (quoting *Twombly*, 550 U.S. at 567-68).) Nor did UAC allege specific communications
between those Defendants (or any of the Defendants, for that matter). And the facts that UAC *did*
plead—that mining pools controlled by Bitcoin.com and "Bitmain" were awarded a higher per-
centage of Bitcoin Cash blocks upgrade than before, and that Ver publicly promoted the Bitcoin
Cash software implementation that he preferred (Compl. ¶¶ 57, 62, 66-68)—did not tend to ex-
clude the possibility of independent action. In fact, UAC's allegations described the exact result
that one would expect independent of any agreement, given those Defendants' undisputed indi-
vidual preference for ABC. (*See* ECF No. 98, at 5-6; ECF No. 42, at 7-10.)

Picking up where the original Complaint left off, the Amended Complaint rests on the
same conclusory allegations of agreement that failed to overcome Defendants' initial motions to
dismiss. UAC still fails to explain how an increase in activity on Bitcoin.com and Bitmain Tech-
nologies' mining pools—especially in advance of a highly anticipated software update—
"indicat[ed] the intermittent deployment of 'rented' hashing" pursuant to a prior agreement. (*See*
FAC ¶ 74.) Nor does UAC describe how or why "rented" hashing *could* constitute part of an un-
lawful scheme, particularly in light of its apparent allegation that Bitmain Technologies is a sup-
plier to Bitcoin.com. (FAC ¶ 62; *see also* ECF No. 98, at 5; ECF No. 111, at 6-7; Tr. 115:14-15

---

[10] The Amended Complaint contains *no* allegations of *any* communications between the Defend-
ants, much less any communications that are "tantamount to an acknowledgement of guilt." *See
In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002).

("I have yet to comprehend why renting servers is an anticompetitive act.")); *cf. Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016) ("[A] contract can serve as the basis for a Section 1 claim only if it embodies an agreement to *unlawfully* restrain trade.").

UAC continues to indulge in the type of backwards reasoning that courts in this Circuit and elsewhere forbid in antitrust pleading. It now alleges that Ver, Bitcoin.com, Wu, and Bitmain Technologies *must* have conspired, because the "reallocation of Bitmain Technologies' hashing power onto the Bitcoin.com pools could not be accomplished" without advance coordination. (FAC ¶ 70 (asserting that "the receiving pool" would have had to prepare in advance "to ensure [its] ab[ility] to accommodate the spike in hash power on its network").) That convenient allegation, which UAC does not support with any facts, simply *assumes* that Bitmain Technologies reallocated hashing power onto the Bitcoin.com pools pursuant to a prior agreement. But as this Court already made clear, UAC cannot back its way into a viable claim under Section 1. (*See* Tr. 85:10-18 ("[Plaintiff]: [W]e've alleged in the complaint . . . that Ver and Bitcoin.com worked with Bitmain in advance to rent that hashing power or rent those servers, and we demonstrate in the complaint how that was an unusual action . . . that is a context that raises a suggestion of preceding agreement. [The Court]: But that's a conclusion. Where are the facts that support the plausibility that that's true?").)

Instead, UAC must allege the predicate *facts* supporting an inference of agreement. *Duty Free I*, 946 F. Supp. 2d at 1331 (granting motion to dismiss of conspiracy claim and holding that it was not reasonable to infer "agree[ment] to anything at all, much less a conscious commitment to a common scheme designed to achieve an unlawful objective" without "specific allegations as to who, what, where, and when" Defendants conspired). An antitrust plaintiff cannot overcome a motion to dismiss on the basis of an unsupported assumption "that a conspiracy is the only plausible explanation" for the Defendants' conduct. *See id.*; *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) ("[A] litigant may not proceed by first assuming a conspiracy and then explaining the evidence accordingly"). Yet that very assumption is the core of UAC's case, even after it amended its pleadings.

None of the new factual allegations in the Amended Complaint—standing alone or in combination with those the Court rejected—"tends to exclude the possibility of independent action, or removes this case from the realm of equipoise." *See Quality Auto Painting*, 917 F.3d at 1267. UAC now alleges that Bitmain Technologies "reallocated" hash power from certain uni-

dentified customers without their authorization or consent (FAC ¶ 68), and that prior to the up-grade, Wu discussed "relocating hash power" from mining Bitcoin Core to mining Bitcoin Cash (*id.* ¶ 69). But nothing connects those decisions to Ver, Bitcoin.com, or any other Defendant. If anything, these allegations suggest that Wu and Bitmain Technologies acted *unilaterally*. The article that UAC cites in paragraph 75 supports that proposition. The author notes that "Bitmain is reported to be strategizing *its role* in the forthcoming computing 'power war,'" and that "*Bitmain . . . is backing BCH client Bitcoin ABC*." Huillet, *supra* at 5 (cited at FAC ¶ 75).

Similarly, UAC's allegation that "Wu publicly congratulated Bitcoin.com for mining the first block with the ABC rule set" (FAC ¶ 73) brings it no closer to plausibly alleging a prior agreement. Aside from the fact that Wu was merely commenting on public knowledge, it is hard-ly plausible that he would publicly commend a co-conspirator on the success of a secret and un-lawful agreement. *See Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 841 (N.D. Ill. 2017) ("It should not be a mark of conspiracy to say what is true, already known by the audience, and articulated by countless third-party analysts, academicians, and jurists alike."); *Grunewald v. United States*, 353 U.S. 391, 402 (1957) ("[E]very conspiracy is by its very nature secret; a case can hardly be supposed where men concert together for crime and advertise their purpose to the world.").

The new allegations applicable to Ver are also totally consistent with, and do nothing to exclude the possibility of, independent action. Even taken at face value, UAC's assertion that Ver "diverted" miners "to secure the ABC version of the upgrade" (FAC ¶ 77) is wholly consistent with independent action. There is no dispute that Ver supported ABC, and it makes perfect sense that he would advocate for miners in the Bitcoin.com pool to support ABC as well. Moreover, notwithstanding UAC's creative characterizations of Ver's comments in YouTube videos, Ver *never* acknowledged that he "rented" hash power in the run-up to the hard fork (much less from Wu and Bitmain Technologies, who as UAC alleged had their own interest in the vote's out-come). Ver made no reference to an agreement to behave in a certain manner or to *any* communi-cation with other Defendants.[11] Even if by some twisted logic renting hash power were anticom-petitive—and it is not—UAC would fail to cross the plausibility threshold on the basis of that allegation.

---

[11] Apart from a passing reference to Kraken, Ver did not mention *any* of the other Defendants.

Finally, the Amended Complaint fails to allege that Bitmain, Inc. participated in the alleged conspiracy at all. UAC explicitly alleges that Bitmain *Technologies*, and not Bitmain, Inc., operated the mining pools at issue. (*Compare* FAC ¶ 61 ("Bitmain Technologies also operates Antpool and BTC.com, two of the largest Bitcoin and Bitcoin Cash mining pools in the world."), *and id.* ¶ 90 (referencing "Bitmain Technologies' mining pools, AntPool and BTC.com"), *with id.* ¶¶ 84-85 (referencing "the Bitmain pools (AntPool and BTC.com)").) UAC does not level a *single* substantive allegation against Bitmain, Inc. Bitmain, Inc. should be dismissed on that basis alone. *See Suboxone Antitrust Litig.*, 2017 WL 4642285, at *11 (E.D. Pa. Oct. 17, 2017) (dismissing antitrust claims where "complaint's allegations lump defendants together by nature of their corporate relationship, but set forth specific facts as to only some defendants").

Like its predecessor, the Amended Complaint is fatally short on facts suggesting that any of the alleged participants in part one of the alleged two-part scheme entered into any agreement. The Court should dismiss those Defendants with prejudice. *See Quality Auto Painting*, 917 F.3d at 1267 (affirming dismissal of Section 1 claim when "independent action [wa]s at least as plausible as concerted action" and "nothing tende[ed] to exclude the possibility of independent action").

> **B.    UAC does not allege facts raising any inference of agreement between Shammah Chancellor, Jason Cox, or any other Defendant to implement "checkpoints."**

There are no new allegations in the Amended Complaint with respect to Defendants Shammah Chancellor or Jason Cox. None. The Court already determined that the very same pleadings that appear in the Amended Complaint did not raise an inference of conspiracy between Cox, Chancellor, or any of the other Defendants. UAC needs "more than a theory, [it] need[s] facts that support that each Defendant entered into the [alleged] agreement." (Tr. 81:10-11.) The Court afforded UAC every opportunity to plead those facts with respect to Chancellor and Cox, and it is now clear that UAC cannot. For the reasons already detailed at length in the earlier briefing,[12] this Court should dismiss Chancellor and Cox from the case with prejudice.

---

[12] *See* ECF No. 41 at 7-8; ECF No. 50, 2-4; ECF No. 56, 2-3.

**C.      The Amended Complaint fails to allege that Jesse Powell or Kraken played any role in the alleged scheme.**

UAC's pleadings with respect to Kraken and its founder, Jesse Powell, are even more threadbare than those it included in its original Complaint. UAC now contends that Kraken and Powell participated in an antitrust conspiracy by (1) releasing statements before the hard fork favoring the ABC implementation and recommending against the SV implementation; (2) issuing a statement noting that "Bitcoin SV does not presently meet Kraken's listing requirements and is unlikely to be supported"; and (3) tweeting that "[t]he merits of BSV are overshadowed by the alienating threats of a few grandiose personalities. Longer chain! = adoption. Victory may by pyrrhic." (FAC ¶¶ 71-72, 96.) Again, UAC needs "more than a theory," it needs "facts that support that each Defendant entered into the [alleged] agreement." (Tr. 81:10-11.) None of UAC's amended pleadings include those facts. There is no hint of any coordination between Powell, Kraken, or any of the other Defendants, and each of UAC's allegations against Kraken and Powell are entirely consistent with independent, lawful conduct. (*See* ECF No. 52 at 3-5.)

UAC also speculates that Kraken "indicat[ed] to users that the SV chain was a high-risk environment" and "effectively recognized the ABC chain as the official blockchain of Bitcoin Cash . . . despite its . . . neutral role as a cryptocurrency exchange, and despite the fact that Kraken's revenue depends, in part, on the robust trading of numerous forms of cryptocurrency." (FAC ¶ 96.) But UAC itself alleges that there was "significant uncertainty and lack of confidence in the network" in the wake of the hard fork (*id.* ¶ 98), suggesting that Kraken's vetting of the SV chain on behalf of its clients was in furtherance of, rather than contrary to, its self-interest. *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 229 (3d Cir. 2011) (affirming dismissal because "[t]he Complaint present[ed] no allegations that the [defendant banks'] decision[s] to limit or refuse credit to [the plaintiff] was against each company's interest rather than a natural response to [the plaintiff]'s declining financial situation"). Moreover, while the Amended Complaint notes that "[s]ome trading platforms have chosen to list only one of the two resulting currencies" (FAC ¶ 97), UAC does not allege that *Kraken was one of these platforms*. That is, while UAC contends that Kraken entered into an unlawful conspiracy to advantage the ABC chain at the expense of the SV chain, *other trading platforms* that UAC did not name as Defendants took the action that purportedly disadvantaged SV relative to ABC.

"There is nothing in these allegations that would suggest action in concert or rule out the possibility that the defendants were acting independently." *See Quality Auto Painting*, 917 F.3d at 1271. The Court should dismiss Kraken and Powell with prejudice.

> **D.      Viewed in their entirety, UAC's scattershot conspiracy allegations do not cohere into a plausible narrative.**

Yet again, UAC fails to fill in the gaping holes in its conspiracy theory. Apart from conclusory allegations that it imports almost verbatim from the original Complaint, UAC makes no effort to weave together the disparate strands of its narrative. There are *zero* new allegations about Chancellor or Cox, much less allegations suggesting that they coordinated with other Defendants. And there are *no* new allegations connecting Powell or Kraken with any of the other Defendants. As noted, the Amended Complaint severs the only remaining link between them—UAC now concedes that Andreas Brekken is a *former* employee of Kraken. (FAC ¶ 76.) The deficiencies of those pleadings are moot, because none of UAC's allegations suggest that *any* Defendant made a "conscious commitment to a common scheme designed to achieve an unlawful objective." *See Duty Free I*, 946 F. Supp. 2d at 1331.

Absent allegations enabling the Court to infer the existence of an unlawful agreement, this case "should not proceed directly past a motion to dismiss and into the expensive and settlement-inducing quagmire of antitrust discovery." *See Quality Auto Painting*, 917 F.3d at 1267. Defendants' "alleged conduct is 'not only compatible with, but indeed is more likely explained by, lawful, unchoreographed free-market behavior,' . . . [and] there is no reasonable expectation that discovery will reveal evidence of illegal agreement." *See Duty Free I*, 946 F. Supp. 2d at 1334 (quoting *Iqbal*, 556 U.S. at 680; citing *Twombly*, 550 U.S. at 556). The Court should bring this meritless case to an end, and dismiss the Amended Complaint with prejudice.

**II.     UAC fails to plead facts suggesting that any Defendant imposed an unreasonable restraint on competition.**

Not only must UAC plead facts that "raise[] a suggestion of a preceding agreement," *Twombly*, 550 U.S. at 557, it must also plausibly allege that the agreement unreasonably harmed competition, *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996). Even assuming that UAC sufficiently alleges that Defendants entered into some kind of agreement (and it does not), the Court should dismiss the Amended Complaint for failure to allege an unreasonable restraint of trade.

**A.      UAC's amended pleadings do not describe conduct that fits within the narrow category of *per se* unlawful practices.**

Determined to force a square peg into a round hole, UAC again attempts to characterize Defendants' conduct as *per se* unlawful. It claims that the alleged conspiracy is "in the nature of bid rigging" and "[a]lternatively . . . in the nature of a group boycott." (FAC ¶¶ 105-06.) But the Supreme Court and the Eleventh Circuit do not recognize new *per se* violations that are "in the nature" of other violations. Strained analogies to bid-rigging, group boycotts, or a conspiracy "not to build to standards capable of withstanding a Category 5 hurricane" (FAC ¶ 92) do not change any of the fundamentals. "This is going to be a rule of reason case, if anything." (Tr. 114:22-115:5.)

"[P]er se violations of § 1 of the Sherman Act are limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010)). The Eleventh Circuit has long been careful not to extend the *per se* rule to "restraints of trade that are of ambiguous effect." *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc*., 720 F.2d 1553, 1562 (11th Cir. 1983). "[T]he per se label should be applied . . . only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability." *Seagood Trading*, 924 F.2d at 1567; Tr. 114:22-115:5 ("[The Court]: I really don't see this Court being the first to jump out there and to say: [t]his conduct – this industry and this conduct is so well understood that it is a priori . . . a *per se* violation of the act. . . .I don't see how you successfully plead that here.").

***Bid-Rigging.*** The Amended Complaint offers no answer to the Court's question: "[h]ow is this bid rigging?" (Tr. 93:1-2.) UAC does not allege that any "competitors agree[d] in advance [as to] who will submit the winning bid on a contract being let through the competitive bidding process." *See* U.S. Dep't of Justice, *Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For* at 3 (updated June 25, 2015), https://tinyurl.com/w8fwe3m. That UAC now uses the label "bid rigging" in its Amended Complaint rather than raising that theory in its briefing does not alter that conclusion. The crux of what makes bid rigging *per se* unlawful is its tendency to eliminate competition between bidders to offer the best commercial terms. That conduct that is in no way analogous to the purported hijacking of a single cryptocurrency network, especially when the end result is additional crypto-

currency choices (i.e., more competition, not less). As before, no amount of jawboning or argument-by-label will fit Defendants' conduct into the bid-rigging category. *See Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 612-13 (11th Cir. 1985) ("[T]he challenged conduct [must] fit[] into a [*per se*] proscribed category without distortion.").

**Group Boycott.** UAC's group boycott theory, the inspiration for which it apparently drew from Defendants' earlier briefing (Tr. 93:12-16), is just as meritless as its bid-rigging allegation. UAC asserts in conclusory fashion:

> "Wu and Bitmain Technologies, along with Ver and non-party Bitcoin.com, with the assistance of the Bitcoin ABC Developers, agreed to participate in a scheme whereby they rendered nugatory the competitive efforts of Plaintiff to prevail during the hash war. Kraken and Powell joined the scheme by supporting the ABC version before the results of the hash war were even known."

(FAC ¶ 106.) Setting aside the fact that the antitrust laws do not provide any remedy to firms whose competitive bets do not pan out,[13] UAC has not pleaded a group boycott subject to the *per se* rule.

The Supreme Court and Eleventh Circuit have "caution[ed] against the haphazard expansion of the 'group boycott label' and the concomitant imposition of per se liability." *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 748 (11th Cir. 1998); *Levine*, 72 F.3d at 1550 ("[T]he attachment of the group boycott label does not necessarily require as a consequence application of the per se approach."). As a result, those courts have established a series of pleading requirements for *per se* group boycott claims. First, a plaintiff must adequately allege a conspiracy to "pressur[e] a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *Quality Auto Painting*, 917 F.3d at 1271. Next, the conspiracy "must involve 'horizontal agreements among direct competitors.'" *Id.* (describing criteria "[f]or boycotting to be per se illegal") (quoting *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998)). "The 'ultimate target' of the [alleged] agreement can be either a competitor or a customer of some or all of the boycotters who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the boycotters." *Id.* at 1271. Finally, the plaintiff must show that the "cooperative possesses market power or

---

[13] *See Spanish Broad. Sys., Inc. v. Clear Channel Commc'ns, Inc.*, 242 F. Supp. 2d 1350, 1365 (S.D. Fla. 2003) ("The Sherman Act was enacted as an aegis to protect the consumer and competition, not as a sword to redress grievances against competitors."), *aff'd*, 376 F.3d 1065 (11th Cir. 2004). *See infra* Section III.

exclusive access to an element essential to effective competition." *All Care Nursing*, 135 F.3d at 748.

UAC's amended pleadings do not come close to meeting those requirements. *First*, UAC does not allege that a Defendant or any another party refused to deal with it, or that Defendants conspired to deny it access to an essential input for competition. *Quality Auto Painting*, 917 F.3d at 1271 (explaining that the gravamen of a group boycott claim is that defendants denied plaintiff "access to desired goods or services because of [the plaintiff's] refusal to accede to particular terms set by some or all of the boycotters"). Tellingly, UAC's counsel did even not know whether the alleged agreement precluded UAC from mining the ABC and SV cryptocurrencies at the hearing on Defendants' initial motions to dismiss. (Tr. 91:16-20 ("The Court: . . . . Does Plaintiff still mine Bitcoin ABC and Bitcoin SV post-fork? Mr. Miller: I don't know. . . . I don't know the answer to that question.").); *see All Care Nursing*, 135 F.3d at 748 (affirming dismissal where "no [collective] refusal to deal has been shown" because "[a]ll agencies were able to participate in the bidding to become preferred providers"). UAC's renewed silence on that very same question speaks volumes.

*Second*, UAC does not allege that Defendants are horizontal competitors in any relevant antitrust market. *See Cha-Car, Inc.*, 752 F.2d at 613 ("A horizontal restraint is an agreement among competitors on the way in which they will compete with one another."). Neither Cox and Chancellor nor Powell and Kraken plausibly compete with each other or any of the other Defendants. And while UAC asserts that non-party Bitcoin.com (the company Ver founded) and Bitmain Technologies each "operate" mining pools (FAC ¶¶ 61-62, 67-68, 84-85), it simultaneously alleges that those two companies have a *vertical* supply relationship. (*Id.* ¶ 62 (alleging that Bitcoin.com operates pool "with hash power provided by Bitmain Technologies").) "'[V]ertical' agreement[s] between supplier and customer" are not subject to the *per se* rule against group boycotts, even if the agreement "depriv[es] a[nother] supplier of a potential customer." *NYNEX*, 525 U.S. at 136.

*Third*, as explained in greater detail below, UAC has not alleged that Defendants possessed market power in a relevant antitrust product or geographic market, nor even made an attempt to plead facts indicating that Defendants possessed and withheld "exclusive access to an element essential to effective competition." *See All Care Nursing*, 135 F.3d at 748. To the contrary, the Amended Complaint concedes that each version of Bitcoin Cash—ABC and SV—now

competes with the other for miners and as tradeable instruments on digital currency exchanges. (FAC ¶ 77.)

* * * *

In sum, UAC has not alleged facts that fit its claims within the ambit of the *per se* rules against "bid rigging" or "group boycotts." More broadly, there is simply no history showing that the kind of agreement UAC alleges, in the industry at issue here, is always or almost always anticompetitive. As UAC previously conceded, "this is a case of first impression;" "the first antitrust action brought in the United States involving the dynamic and constantly evolving cryptocurrency industry;" and "[n]o court has yet decided whether the hijacking of a single cryptocurrency network is a *per se* automatic violation of the federal antitrust laws." (ECF No. 49, at 10.) Those concessions alone are dispositive of the *per se* issue, as the Court made clear at oral argument. (Tr. 114:22-24 ("[The Court]: I don't know how you can rely upon the per se provision of the Sherman Act. This is going to be a rule of reason case, if anything.").)[14]

## B.      None of UAC's amendments bring it any closer to pleading an actionable rule of reason claim.

As a Section 1 plaintiff whose pleadings do not fit within the narrow ambit of the *per se* rule, UAC must satisfy the antitrust rule of reason or face dismissal. *All Care Nursing*, 135 F.3d at 746 ("[A] presumption exists that the circumstances of a case will be looked at in the light of the rule of reason standard and will not be deemed per se unreasonable."). To plead a rule of reason claim, UAC must adequately allege that the challenged conduct inflicted "actual or potential harm to competition." *Jacobs*, 626 F.3d at 1336; *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1072 (11th Cir. 2004). As before, UAC falls short. It does not allege facts connecting Defendants' conduct to any anticompetitive effect—actual or potential. To the contrary, the Amended Complaint shows how the hard fork *enhanced* competition and produced a *greater* diversity of digital currencies. UAC has yet to answer the basic question

---

[14] *See All Care Nursing*, 135 F.3d at 748 (declining to apply *per se* rule where "[n]o history of this kind seems to exist for health-care preferred provider programs materially similar to what we have before us now"); *Levine*, 72 F.3d at 1550 ("Although this Court has in the past stated that group boycotts are unlawful per se, we decline to resolve this case by forcing the [defendant's conduct] into the 'boycott' pigeonhole and invoking the per se rule."); *Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1380-82 (11th Cir. 1997) ("The anticompetitive effect of the alleged boycott is far from being immediately obvious and, as such, analysis under the per se rule is improper.").

at the heart of any antitrust case: how did Defendants' conduct injure competition itself? Its silence provides the Court all the comfort it needs (and then some) to dismiss this case.

**1.      None of UAC's allegations evince actual harm to competition.**

"Actual harm [to competition] is indicated by a factual connection between the alleged harmful conduct and its impact on competition in the market, . . . and the plaintiff claiming it should point to the specific damage done to consumers in the market.'" *Jacobs*, 626 F.3d at 1339. That damage generally takes the form of "reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018); *Jacobs*, 626 F.3d at 1339 (same). UAC cannot rely on conclusory assertions of market harm—it must present "specific factual allegations" describing the actual injury to competition. *Jacobs*, 626 F.3d at 1339. Critically, factual allegations of harm to a particular *firm* rather than to *competition itself* do not suffice. *See, e.g.*, *Spanish Broad.*, 376 F.3d at 1072 (affirming dismissal of Section 1 claims with prejudice for failure to plead harm to competition); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("[T]he purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.").

Pivoting away from its discredited price-based theories of market-wide harm, UAC now stakes its rule of reason claim on the conclusory assertion that "[t]he conspiracy . . . resulted in a deterioration in the quality of Bitcoin Cash." (FAC ¶ 114.) It does not allege any "specific fact[s]" identifying actual indicia of diminished quality, *see Jacobs*, 626 F.3d at 1339, nor does it explain how or why SV and ABC are of inferior quality to the previously unitary cryptocurrency (or how the Court should even approach that question). Instead, UAC asserts that "competing developers who wish to propose innovative ways to improve upon the software implementations used to mine for Bitcoin Cash will be unable to do so to the detriment of all participants in the Bitcoin Cash network." (FAC ¶ 114.) While it uses the umbrella term "Bitcoin Cash," UAC appears to be referring specifically to ABC. Elsewhere, it contends that "[t]he effect of creating the checkpoint was to ensure that only the proponents of Bitcoin Cash ABC could dictate any future software upgrades on that cryptocurrency network." (*Id.* ¶ 91.) The upshot of the alleged conspiracy, UAC avers, is a "reduc[ed] . . . ability of Bitcoin Cash to innovate to prepare for greater and greater scalability" and the "perpetuation of higher transaction costs for Bitcoin Cash consumers." (*Id.* ¶¶ 114-15.)

UAC completely ignores the elephant in the room: SV. Even assuming the truth of UAC's conclusory assertions, there is no dispute that "developers who wish to propose innovative ways to improve upon software implementations used to mine for Bitcoin Cash" remain free to write software for SV. (*Id.* ¶ 114.) If, as UAC appears to assume, SV is the better vehicle for enabling "Bitcoin Cash to be seamlessly utilized by a greater number of merchants and consumers with minimal [per-transaction] costs" (*id.* ¶ 50), then miners, software developers, and other Bitcoin Cash stakeholders will gravitate to it. Some already have, as the Amended Complaint makes clear. Its chart tracking hash rates continues to indicate that ABC and SV attracted comparable and sustained levels of hashing power, with SV—the putative loser in UAC's narrative—attracting *more* hashing power at multiple points post-fork. (*Id.* ¶ 74.) In other words, the fork resulted in *more* competition not less, with SV and ABC each representing a different vision of how best to "scale up Bitcoin Cash for use as a peer-to-peer version of electronic cash." (*Id.* ¶ 38.)[15]

In any event, UAC's repackaged theory of anticompetitive harm is just that—a theory. It elected not to supplement its pleadings with *any* new facts or market data demonstrating an actual injury to competition, despite the Court's clear instruction that its original Complaint was deficient in that regard. (Tr. 116:12-14 ("I don't think you've sufficiently alleged harm to competition. *I don't think you have facts that plausibly establish harm to competition*.").) Instead of responding to the Court's concern by identifying "specific damage done to consumers in the market," *see Jacobs*, 626 F.3d at 1339, UAC offers a steady diet of *ipse dixit* and hopes for a different result. While UAC's theory may have changed, the law did not: "bald statement[s]" attributing losses in value to a defendant's conduct do nothing to establish any "factual connection between the alleged harmful conduct and its impact on competition in the market." *Id.* at 1339 (affirming dismissal of allegations alleging actual harm to competition); *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 711-12 (11th Cir. 2014) (applying *Jacobs* to an alleged RICO conspiracy, rejecting "naked market claim[s]," and holding that "because the plaintiffs' theory of injury turns peculiarly on *assertions about the relevant . . . market*, the amended complaint cannot

---

[15] *Cf. Black & Decker*, 801 F.3d at 436 (affirming dismissal of rule of reason claim against standards organization because plaintiff did not plead that challenged "activity had a *market-closing effect* . . . committed 'through the use of unfair, or improper practices or procedures'") (quoting *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 488 (1st Cir. 1988) (Breyer, J.)).

plausibly show injury without pleading *any* . . . market facts or data"). UAC's say-so is neither a substitute for well-pleaded facts nor a ticket "past a motion to dismiss and into the expensive and settlement-inducing quagmire of antitrust discovery." *Quality Auto Painting*, 917 F.3d at 1267.

To the extent UAC interprets the Sherman Act to forbid the burgeoning competition between ABC and SV (FAC ¶¶ 100-117); remedy a perceived "uncertainty and a lack of confidence in the network" (*id.* ¶ 98); or require the unwinding of the hard fork (*id.* at 30), it is mistaken. It is well aware that hard forks are an immutable part of "the working of th[is] market." *See Spectrum Sports*, 506 U.S. at 458. It "mov[ed] heavily into blockchain and blockchain technologies" in the wake of an August 2017 fork on the "Bitcoin Core" network from which Bitcoin Cash emerged. (FAC ¶¶ 34-41.) The story is familiar: Bitcoin Core forked into two new currencies after "supporters of Bitcoin Core and the supporters of Bitcoin Cash" could not reconcile their "competing beliefs" about the best use for, and technological features of, that cryptocurrency. (*Id.* ¶¶ 42-43.)

Without citing any facts or data, UAC attempts to distinguish the fork at the center of this case from that one by alleging that "the combined value of the two digital currencies [Bitcoin Core and Bitcoin Cash] increased" after the 2017 fork. (*Id.* ¶ 44.) Even had it properly pleaded that allegation, the distinction is of no moment. The imposition of liability under the Sherman Act does not ride on the outcome of any particular market event, but rather on the tendency of a practice to destroy the competitive *process*. *Atlas Bldg. Prod. Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 954 (10th Cir. 1959) ("Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise."). The Amended Complaint does not describe any defect in that process; to the contrary, UAC's allegations indicate that competition is thriving as a result of the fork. As such, UAC has failed to plead actual harm to competition.

### 2. UAC does not plausibly allege potential harm to competition in a relevant product or geographic market.

UAC's remaining avenue to plead a plausible violation of Section 1—"sufficiently alleg[ing] potential harm" to competition—is closed. *See Jacobs*, 626 F.3d at 1339. To do so, a plaintiff must "define both (1) a geographic market and (2) a product market." *Id.* at 1336.[16]

---

[16] Regardless of whether it alleges actual or potential harm to competition, UAC must define relevant antitrust markets. *Jacobs*, 626 F.3d at 1336 ("Regardless of whether the plaintiff alleges

Next, the plaintiff must plausibly allege "that the defendant had market power in [those] well-defined relevant market[s]." *Maris Distrib. Co. v. Anheuser-Busch, Inc.,* 302 F.3d 1207, 1216 (11th Cir. 2002). Finally, the plaintiff must offer "specific allegations linking [that] market power to harm to competition." *Jacobs*, 626 F.3d at 1339. The Amended Complaint flatly fails on each element.

### a. UAC does not allege relevant product and geographic markets.

Even after the Court advised UAC that its failure to allege relevant product and geographic markets was fatal to its rule of reason claim, the phrase "relevant market" does not grace its Amended Complaint. (*See* Tr. 116:8-12 ("[Y]ou haven't alleged a product market or geographic market. And in your response to the motion to dismiss, I think you tried to reform the complaint to state it. And you said: 'It's clearly in there.' And I went back, and I don't think it's there at all.").) The substance is still missing as well.

"Although the parameters of a given market are questions of fact, antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs*, 626 F.3d at 1336. A relevant product market is defined in part by whether a group of providers or suppliers, "because of the similarity of their products, have the ability - actual or potential - to take significant amounts of business away from each other." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir. 1993). To do so generally requires allegations regarding "the cross-elasticity of demand and reasonable substitutability of the products, because if consumers view the products as substitutes, the products are part of the same market." *Jacobs*, 626 F.3d at 1337-38. "The relevant geographic market is the area of effective competition in which a product or its reasonably interchangeable substitutes are traded." *Duty Free Americas, Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1263-64 (11th Cir. 2015) (*Duty Free II*). "Failure to allege either the product or geographic market in the complaint is fatal to the plaintiff's claims." *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 971 F. Supp. 1419, 1426 (M.D. Fla. 1997), *aff'd*, 145 F.3d 1258 (11th Cir. 1998).

Ignoring the Court's clear instructions, UAC does not even *attempt* to define a relevant geographic market. That failure is dispositive. *Q Club Resort & Residences Condo. Ass'n v. Q*

---

actual or potential harm to competition, . . . he must identify the relevant market in which the harm occurs.").

*Club Hotel, LLC*, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010) ("Rule 12(b)(6) dismissal is appropriate where the plaintiff's description of the geographic market is legally inadequate and/or wholly conclusory."). The Amended Complaint does not contain *any* description of a relevant geographic market, much less allegations describing "the commercial realities of the industry" that delineate "the area 'in which consumers can practically seek alternative sources of the product.'" *Id.* UAC's failure to correct this, the "low[est] hanging fruit of obvious problems with the complaint" (Tr. 114:10-11), ends the inquiry under the rule of reason. *See Clark Mem'ls of Ala. Inc. v. SCI Ala. Funeral Servs. LLC*, 991 F. Supp. 2d 1151, 1162 (N.D. Ala. 2014) (dismissing antitrust complaint because "the Court cannot infer that [the plaintiff] has pleaded a plausible geographic market without some facts regarding consumer behavior").

The deficiencies of UAC's product market allegations are just as serious. The Amended Complaint does not define a relevant product market, but UAC appears to contend that the relevant product market is the "Bitcoin Cash cryptocurrency market." (FAC ¶¶ 103, 111.) Bitcoin Cash is allegedly a "unique form of cryptocurrency" because its maximum block size is larger, making it "scalable" and better suited for use in day-to-day transactions than Bitcoin Core. (*Id.* ¶¶ 33, 42-44.) Both versions of Bitcoin Cash—ABC and SV—appear to be similarly "unique" in this regard, although SV's block size is even larger than ABC's. (*Id.* ¶ 50.)

These allegations do not establish "Bitcoin Cash" as a distinct product market. There are "no factual allegations of the cross-elasticity of demand or other indications of price sensitivity that would indicate whether consumers treat" ABC or SV differently than they do other cryptocurrencies, or other assets intended for "day-to-day transactions" in general. *See Jacobs*, 626 F.3d at 1338. General allegations as to a product's "'unique attributes' are . . . of little help" because "[t]hey do not indicate the degree to which consumers prefer [a product] because of these unique attributes and differences in price." *See id.* Moreover, UAC cannot seriously contend that "Bitcoin Cash" is the only product in existence intended for use in "day-to-day transactions." UAC itself notes the existence of a host of other cryptocurrencies (FAC ¶¶ 22-23, 42-44), and does nothing to distinguish between consumers' use of those currencies relative to Bitcoin Core and Bitcoin Cash (or, for that matter, similar financial instruments like fiat currencies).

Though "[i]n some cases, the relevant product market may exist as a distinct subset, or 'submarket,' of a larger product market," the "process for identifying the contours of a product submarket is the same as that for the larger market." *Glynn-Brunswick Hosp. Auth. v. Becton*, 159

F. Supp. 3d 1361, 1378-79 (S.D. Ga. 2016) (citing *Jacobs*, 626 F.3d at 1337; *U.S. Anchor Mfg.*, 7 F.3d at 995). And again, there is nothing in the Amended Complaint indicating that "Bitcoin Cash" is a distinct submarket of the larger cryptocurrency industry, or of the market for all assets intended for use in day-to-day transactions. *See Jacobs*, 626 F.3d at 1337-38.[17]

To the extent that UAC's claims focus on the market for a single cryptocurrency, its allegations are even weaker. "Generally, a relevant antitrust market will not be limited to just one brand because 'every manufacturer has a 'natural' monopoly in the sale and distribution of his own products.'" *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, 2019 WL 8063989, at *5 (N.D. Fla. Sept. 16, 2019) (quoting *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978)); *see Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1355 (S.D. Fla. 1998) ("[A]bsent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market.") (collecting cases). Courts only recognize single-brand markets where "the firm's product is so unique or so dominant in the market in which it competes that any action by the manufacturer to increase his control over that product virtually assures that competition in the market will be destroyed." *Restore Robotics*, 2019 WL 8063989, at *5 (quoting *Spectrofuge*, 575 F.2d at 282). UAC does not allege facts demonstrating that any of those circumstances apply here.[18] To the contrary: UAC's claim that Defendants brought on hash power from *another* network (FAC ¶¶ 67, 74, 82)—i.e., that firms can easily substitute hashing

---

[17] *See also PayCargo, LLC v. CargoSprint, LLC*, 2019 WL 5793113, at *2-3 (N.D. Ga. Nov. 4, 2019) ("The operative question is not whether the product itself is unique, but whether there are alternative sources that consumers can use for the same purposes. . . . PayCargo fails to allege facts demonstrating why SprintPass consumers would not use a panoply of alternative services—such as phone calls and emails—in lieu of the SprintPass platform.").

[18] *See also Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282-85 (10th Cir. 2004) (Pepsi beverages are not a relevant product market); *Adidas Am., Inc. v. NCAA*, 64 F. Supp. 2d 1097, 1102 (D. Kan. 1999) ("An antitrust plaintiff may not define a market so as to cover only the practice complained of, this would be circular or at least result-oriented reasoning.'"); *Glen Holly Entm't, Inc. v. Tektronixs, Inc.*, 100 F. Supp. 2d 1073, 1078 n. 6 (C.D. Cal. 1999) ("[C]ourts have usually rejected the claim that one brand is its own market when there are competing brands."); *Regency Oldsmobile, Inc. v. Gen. Motors Corp.*, 723 F. Supp. 250, 267-68 (D.N.J. 1989) (General Motors' products did not constitute relevant market); *Carlock v. Pillsbury Co.*, 719 F. Supp. 791, 843 (D. Minn. 1989) (Haagen-Dazs ice cream is not so distinctive that no other ice cream can be a reasonable substitute).

power *across* cryptocurrency networks—completely eviscerates its "Bitcoin Cash" single product market claim.[19]

Once again, UAC's product market allegations cannot withstand scrutiny. And "where, as here, [the] plaintiff[] allege[s] a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Glynn-Brunswick*, 159 F. Supp. 3d at 1381; *see also Lady Deborah's, Inc. v. VT Griffin Servs., Inc.*, 2007 WL 4468672, at *9-10 (S.D. Ga. Oct. 26, 2007) ("Failure to allege facts regarding substitute products, to distinguish among comparable products or services, if any, or to aver other facts regarding the cross-elasticity of demand are grounds for dismissal.").

### b.   UAC does not plead facts demonstrating that Defendants possessed market power.

UAC compounds its failure to plead product and geographic markets by neglecting to allege that Defendants possessed market power in those markets. To prevail under the rule of reason, a plaintiff must "establish that the defendant had market power in a well-defined relevant market." *Maris Distrib.*, 302 F.3d at 1216. "Market power is the ability to raise price significantly above the competitive level without losing all of one's business." *Graphic Prods. Dist. Inc. v. Itek Corp.*, 717 F.2d 1560, 1570 (11th Cir. 1983); *see also RxStrategies, Inc. v. CVS Pharmacy, Inc.*, 390 F. Supp. 3d 1341, 1349-51 (M.D. Fla. 2019) ("Market power exists when a seller has some special ability . . . to force a purchaser to do something that he would not do in a competitive market.").

At the outset, UAC's failure to properly define plausible markets renders any assertion of market power fatally speculative. *See id.* (finding plaintiff failed to sufficiently allege market power notwithstanding allegations "about CVS's national market power and market share in certain states" because it elsewhere alleged that the relevant "geographic markets are local"). But regardless of the contours of the relevant markets in which Defendants operate, UAC does not plead facts demonstrating that they possessed any ability to raise prices or force consumers into choices that they would not have made in a competitive market. *See id.* To the contrary, UAC

---

[19] *Cf. Hoglund v. Charter Commc'ns, Inc.*, 2018 WL 4896352, at *2 (N.D. Ala. Oct. 9, 2018) (granting motion to dismiss, in part because relevant market allegations did not reflect that defendant "television providers compete[d] with each other to service consumers throughout the United States and not just the occupants of Hoglund's condominium complex").

concedes that Bitcoin Cash SV is actively mined post-fork. UAC's allegations do not demonstrate that Defendants possessed the power to injure competition.

Even taking the amorphous "Bitcoin Cash" market allegation at face value, the Amended Complaint does not allege that *any* of the Defendants, individually or collectively, possessed power in that market. For example, UAC alleges that from November 25 to December 2, 2018, Bitcoin Technologies "controlled 31% of Bitcoin mining"—not Bitcoin *Cash* mining—"and 40% of Bitcoin Cash ABC," which is but one of two "forks" of Bitcoin Cash. (FAC ¶ 61; *see also id*. ¶ 85 n.7 (alleging "Bitmain/Bitcoin.com controlled 90-95% of all hashing on the *resulting* Bitcoin Cash network," meaning Bitcoin Cash ABC).)[20] None of these pleadings relate to UAC's alleged "Bitcoin Cash cryptocurrency market." (*Id.* ¶ 111.) In any event, UAC's cryptic allegation does not indicate whether Bitmain Technologies (or any other Defendant) had the power to control prices or affect competition, or the size or identity of any of its competitors. *See Levine*, 72 F.3d at 1555. Nor does UAC allege that there are any barriers to entry that would prohibit others—including UAC itself—from exercising comparable hashing power. *See Fin-S Tech, LLC v. Surf Hardware Int'l-USA, Inc.*, 2014 WL 12461350, at *3 (S.D. Fla. Sept. 3, 2014) (dismissing complaint for failure to allege market power, despite 60-70% market share, because plaintiff "fail[ed] to allege any barriers to entry" in the market and "admit[ed] it is currently working and surviving in the . . . market alongside Defendants"). For that matter, the assertion that Defendants brought on hash power from *another* network (FAC ¶¶ 67, 74, 82)—i.e., that firms can easily substitute hashing power *across* cryptocurrency networks—further undermines UAC's claim that Defendants have market power in an antitrust market defined by a single cryptocurrency, because it confirms market outcomes are simply the product of choice (voting by nodes), not foreclosed by barriers.

### c.    The Amended Complaint does not link Defendants' alleged exercise of market power to an injury to competition.

Finally, UAC's rule of reason claims should be dismissed because it does not allege any facts linking Defendants' conduct—much less their exercise of market power—to a likely anticompetitive effect in a relevant market. "[A] showing of market power is necessary, but not sufficient, to establish potential harm to competition." *Jacobs*, 626 F.3d at 1340. The plaintiff must

---

[20] UAC never explains why Antpool and BTC.com's alleged mining share during this period has any significance to the "hash war" waged on November 15, 2018, or the checkpoint installed on November 16, 2018. (FAC ¶¶ 67, 87.)

also "link[] [the defendants'] market power to harm to competition." *Id.* at 1339; *see id.* at 1340 (plaintiff must provide court with "basis on which [it can] determine how harm to competition results from [the alleged] agreement"). As already noted, UAC "bears the burden of drawing that implication with specific factual allegations." *Spanish Broad.*, 376 F.3d at 1072-73.

Simply put, UAC "has not described how [D]efendants' alleged behavior would be likely to harm competition." *See id.* at 1074; (Tr. 116:12-14 ("I don't think you've sufficiently alleged harm to competition. I don't think you have facts that plausibly establish harm to competition.")). It has not explained how Defendants' alleged conduct is likely to "result[] in a deterioration in the quality of Bitcoin Cash" (FAC ¶ 114), and it does not account for the existence of, and competition between, ABC and SV. *See supra* Section II.1. Bottom line: ***the allegations in the Amended Complaint demonstrate that the fork led to more competition, not less.*** *See Duty Free II*, 797 F.3d at 1270 (affirming dismissal for failure to allege potential harm to competition where "the complaint contains numerous examples of robust competition" and there was no allegation plaintiff "is being pushed out of the [relevant] market").

\* \* \* \*

UAC has an "obligation under *Twombly* to indicate that [it] could provide evidence plausibly suggesting" harm to competition. *See Jacobs*, 626 F.3d at 1338. It is now clear that it cannot meet that obligation. The Court should dismiss the Amended Complaint with prejudice.

## III.   UAC lacks antitrust standing, because it does not allege an antitrust injury.

The Amended Complaint falls flat for another reason: it lacks the factual underpinnings to support UAC's claim to antitrust standing and injury. Even if UAC could rely on vague analogies to state a cause of action, it nevertheless fails to plead an antitrust injury, which is indisputably fatal under both the *per se* and rule of reason frameworks.

"Standing in an antitrust case involves more than the 'case or controversy' requirement that drives constitutional standing." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991). A reviewing court must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* (*AGC*), 459 U.S. 519, 535 (1983). To adequately plead antitrust injury—a component of antitrust standing—UAC cannot claim injury from conduct that *increases* competition in the first place. *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 968 (11th Cir. 2006) (holding that an "injury . . . connected to conduct that actually

– 28 –

increased competition in the relevant market . . . [can]not be considered antitrust injury"). Rather, UAC must trace its loss to "a competition-*reducing* aspect or effect of the defendant[s'] behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original). That is, it must plead "more than the fact that [it] was injured through conduct of the defendant," and allege "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful" to avoid dismissal. *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389 (11th Cir. 1990) (affirming dismissal for lack of antitrust standing). This pleading requirement applies to *all* antitrust claims. *Atl. Richfield*, 495 U.S. at 343-45 (antitrust injury must be shown in every antitrust case–"allegation of a per se violation does not obviate the need").

Although its theory of antitrust standing is enigmatic, UAC appears to allege that it suffered cognizable antitrust injury in two ways—first, through a diminution in the combined value of ABC and SV (*e.g.*, FAC ¶ 97), and second, via a "deterioration in the quality of Bitcoin Cash" (*id.* ¶ 114). Neither theory is viable, much less well pleaded. UAC does not and cannot plead facts demonstrating that its purported injuries are of the type the antitrust laws were intended to prevent, or flow from an anticompetitive aspect of Defendants' conduct. *See Austin*, 903 F.2d at 1389.

*First*, UAC has not cured the core problem of its original claim to antitrust injury: it traces its loss to *too much*, rather than too little competition. "[A]ntitrust injuries include only those injuries that result from interference with the freedom to compete." *Johnson v. University Health Servs., Inc.*, 161 F.3d 1334, 1338 (11th Cir. 1998). Any "claim of injury arising from the preservation or enhancement of competition" is therefore "inimical to the purposes of [the antitrust] laws." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 483 n.19 (1982) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)) (alterations in original). Like its predecessor, the Amended Complaint is rife with indicators of the fierce competition between ABC and SV. Industry participants "rush[ed]" to increase their computing power to support their preferred upgrade in advance of the coming "war;" with heated rhetoric on all sides. (FAC ¶¶ 68, 75.) An article referenced in UAC's Amended Complaint describes the hash war as "the epitome of 'survival of the fittest.'" Zhuoer, *supra* note 7 (cited at FAC ¶ 68). ABC and SV immediately competed for users, and as tradeable instruments on cryptocurrency exchanges. (*Id.* ¶¶ 22, 45, 52, 96, 97.) And "hash rates" for SV and ABC—an indicator of the mining activity on each chain

(*id.* ¶ 52)—were comparable within days following the fork and thereafter. (*Id*. ¶ 74.) This is the essence of competition: unpredictable, uninhibited, and unconcerned with the success or failure of any given firm.

Unfazed, UAC occupies an indefensible position. It stakes out the untenable claim that Defendants deprived it of the benefits of diminished competition and increased concentration in the Bitcoin Cash cryptocurrency market, *see Brunswick*, 429 U.S. at 488, and insists that Defendants should have "consult[ed] other Bitcoin development groups and the community at large" before making voting decisions. (FAC ¶ 93.) Further, it claims to have suffered injury via "a deterioration in the quality of Bitcoin Cash [ABC]" without acknowledging SV, the competing alternative that the fork produced. Finally, it asks the Court to invoke the Sherman Act to undo competitive market outcomes. (*Id.* at Prayer for Relief A (seeking injunctive relief "requiring [Defendants] to return the blockchain to its previously decentralized form with the previous consensus rules").)

UAC asks for far too much on the basis of far too little. That UAC wishes that the fork had not occurred, would prefer to capture the value from a consolidated blockchain, and designed its hardware with that status quo in mind does not remotely suffice to plead a *prima facie* case of antitrust injury. *See Atl. Richfield*, 495 U.S. at 338 n.7 ("[A] firm cannot claim antitrust injury from . . . competition on the asserted ground that it is 'ruinous.'"). Because *competition* remained robust even if UAC's business model did not, it has not carried its burden to plead an antitrust injury. *See Spanish Broad*., 376 F.3d at 1072 (holding that "weakened stock prices," "damaged reputation," and "loss of advertising revenue" did not qualify as antitrust injuries because "[n]one of these allegations assert damage to *competition* itself rather than damage to [a particular plaintiff]").

*Second*, UAC does not allege facts articulating *any* causal relationship between Defendants' purported advocacy for ABC and the post-fork value or quality of SV and ABC. *See AGC*, 459 U.S. at 540 (plaintiffs must demonstrate a "chain of causation between the injury and the alleged restraint in the market"). Repackaging its earlier allegations, UAC asserts that the value of its cryptocurrency holdings and its investments in so-called "BlockchainDomes" technology has "fallen significantly" as a result of the fork. (FAC ¶¶ 97-99.) It now appends the claim that "the conspiracy . . . resulted in a deterioration in the quality of Bitcoin Cash." (*Id.* ¶ 114.) But even taking UAC's claims at face value, it does not describe *how* Defendants' purported agree-

ment to support ABC caused those injuries.[21] It is not clear why the alleged conspiracy—presumably what UAC would characterize as "the competition-*reducing* aspect . . . of the defendant[s]' behavior," *see Atlantic Richfield*, 495 U.S. at 344—could be a but-for cause of its injuries, much less a proximate cause sufficient to establish antitrust standing under Section 4 of the Clayton Act. *See Holmes v. Secs. Inv'r Protection Corp.*, 503 U.S. 258, 268 (1992) ("[In *AGC*] we held that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well.").

The hard fork *itself* appears to be the source of UAC's alleged injuries, and none of its pleadings establish that the fork was contingent upon, or the result of, the alleged agreement. As UAC concedes, hard forks are the means by which the Bitcoin Cash network resolves irreconcilable "dispute[s] between supporters" about the features and purpose of a given cryptocurrency. (FAC ¶¶ 43, 48.) In other words, forks are a concomitant of irreconcilable *disputes*, whether or not stakeholders on one side or the other agree to "'rent' hashing power" (*id.* ¶ 67) or anoint themselves "the 'winner[s]' of the network upgrade" (*id.* ¶ 96). For that reason, UAC's claim to antitrust injury fails to "establish some link between the defendant[s'] alleged anticompetitive conduct, on the one hand, and its injuries . . . on the other." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1080 (10th Cir. 2013) (Gorsuch, J.); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 338 (2018 Cum. Supp.) (explaining that where "the several forces causing the plaintiff's [purported] loss are numerous, complex, and beyond reasonable disaggregation, standing will be denied").

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint with prejudice.

---

[21] UAC's allegation that Bitmain Technologies "reallocated a significant portion of hash power . . . without the authorization or consent of those customers" (FAC ¶ 68) is wholly conclusory and, in any event, flatly contradicted by articles cited in the Amended Complaint. The Medium and Cointelegraph articles (*id.* ¶¶ 68, 75) both note that Bitmain Technologies *itself* had 90,000 servers to use in a "hash war," the precise amount of servers it allegedly deployed (*id.* ¶ 75).

Dated: March 27, 2020                    Respectfully submitted,

                                         /s/ Melissa C. Pallett-Vasquez
                                         MELISSA C. PALLETT-VASQUEZ
                                         Florida Bar No. 715816
                                         mpallett@bilzin.com
                                         LORI P. LUSTRIN
                                         Florida Bar No. 59228
                                         llustrin@bilzin.com
                                         **BILZIN SUMBERG BAENA PRICE &**
                                         **AXELROD LLP**
                                         1450 Brickell Ave, Suite 2300
                                         Miami, Florida 33131
                                         Tel.: (305) 374-7580
                                         Fax: (305) 374-7593

                                         IAN SIMMONS (*pro hac vice*)
                                         isimmons@omm.com
                                         KATRINA ROBSON (*pro hac vice*)
                                         krobson@omm.com
                                         SERGEI ZASLAVSKY (*pro hac vice*)
                                         szaslavsky@omm.com
                                         ZHAO LIU (*pro hac vice*)
                                         zliu@omm.com
                                         BRIAN P. QUINN (*pro hac vice*)
                                         bquinn@omm.com
                                         PATRICK JONES (*pro hac vice*)
                                         pjones@omm.com
                                         **O'MELVENY & MYERS LLP**
                                         1625 Eye Street N.W.
                                         Washington, D.C. 20006
                                         Tel.: (202) 383-5300
                                         Fax: (202) 383-5414

                                         *Attorneys for Defendants Shammah Chancellor,*
                                         *Jason Cox, and Roger Ver*

*/s/ Christopher R.J. Pace*
CHRISTOPHER R.J. PACE
Florida Bar No. 721166
crjpace@jonesday.com
MARC A. WEINROTH
Florida Bar No. 42873
mweinroth@jonesday.com
**JONES DAY**
600 Brickell Avenue
Suite 3300
Miami, Florida 33131
Tel.: (305) 714-9700
Fax: (305) 714-9799

JULIE M. MCEVOY (*pro hac vice*)
jmcevoy@jonesday.com
**JONES DAY**
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Tel.: (202) 879-3939
Fax: (202) 626-1700

MARK W. RASMUSSEN (*pro hac vice*)
mrasmussen@jonesday.com
THOMAS D. YORK (*pro hac vice*)
tdyork@jonesday.com
**JONES DAY**
2727 N. Harwood Street
Suite 500
Dallas, TX 75201
Tel.: (214) 220-3939
Fax: (214) 969-5100

*Attorneys for Defendants Bitmain, Inc., Bitmain
Technologies Ltd., and Jihan Wu*

*/s/ Andrew C. Lourie*             
ANDREW C. LOURIE
Florida Bar No. 87772
andrew.lourie@kobrekim.com
**KOBRE & KIM LLP**
201 South Biscayne Boulevard
Suite 1900
Miami, Florida 33131
Tel.: (202) 664-1907
Fax: (305) 967-6120

BRIAN E. KLEIN (*pro hac vice*)
bklein@bakermarquart.com
DONALD R. PEPPERMAN (*pro hac vice*)
dpepperman@bakermarquart.com
**BAKER MARQUART LLP**
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
Tel.: (424) 652-7800
Fax: (424) 652-7850

*Attorneys for Defendants Payward Ventures,
Inc. d/b/a Kraken and Jesse Powell*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 27, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Melissa C. Pallett-Vasquez*
Melissa Pallett-Vasquez