### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:18-cv-25106-KMW-CMM

UNITED AMERICAN CORP.,

          Plaintiff,

    v.

BITMAIN, INC., ROGER VER, BITMAIN
TECHNOLOGIES LTD., JIHAN WU,
PAYWARD VENTURES, INC. d/b/a
KRAKEN, JESSE POWELL, SHAMMAH
CHANCELLOR, and JASON COX,

          Defendants.

_____/

### PLAINTIFF'S OPPOSITION TO DEFENDANTS'
### JOINT MOTION TO DISMISS FIRST AMENDED COMPLAINT

Plaintiff United American Corp. ("UAC"), by and through its counsel, hereby files this

opposition to the Defendants' Joint Motion to Dismiss First Amended Complaint and Incorporated

Memorandum of Law (ECF No. 144) and Defendants Payward Ventures, Inc.'s and Jesse Powell's

Standalone Brief In Support of Defendants' Joint Motion to Dismiss the Amended Complaint (ECF

No. 145)[1], stating as follows:

### INTRODUCTION

The Amended Complaint (ECF No. 138) sets forth in detail factual allegations that, taken

together, plausibly demonstrate a well-orchestrated scheme by a tight-knit network of individuals

_____

[1] Because the issues raised in Defendants Payward Ventures, Inc.'s and Jesse Powell's Standalone
Brief In Support of Defendants' Joint Motion to Dismiss the Amended Complaint (ECF No. 145)
are overlapping with the issues raised in the Defendants' Joint Motion to Dismiss First Amended
Complaint and Incorporated Memorandum of Law (ECF No. 144), UAC files this consolidated
response in opposition.

and organizations to dominate the cryptocurrency market for Bitcoin Cash in violation of Section 1 of the Sherman Act. The Defendants effectively hijacked the Bitcoin Cash network during a routine software upgrade in late 2018, centralized the previously decentralized market, and violated all accepted standards, protocols and the course of conduct associated with Bitcoin since its inception. The highly coordinated scheme caused a global capitalization meltdown of more than $4 billion and caused many U.S. Bitcoin holders – including Plaintiff – to suffer damages and irreparable harm.

Now, Defendants propose alternative explanations for how they could have – unbeknownst to one another – acted in unison to dominate the temporary software upgrade, quickly implemented a new software version with checkpoints, and taken total control of the Bitcoin Cash network going forward. These explanations are too convenient and too implausible to form the basis for an early dismissal of this case. The Court should deny the motion, and the Defendants should answer the Amended Complaint.

## FACTUAL ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

Bitcoin is a form of digital cash first created in 2008 by the presumed pseudonymous person(s), Satoshi Nakamoto, and supported by a robust group of participants (computers or "nodes" of computers) competing to solve complex math puzzles that are used to encrypt and secure the cryptocurrency. Am. Compl. ¶¶ 24, 27. The process of competing to solve those math puzzles is referred to as "mining." *Id.* ¶ 24. The purpose of Bitcoin was to "create a 'peer-to-peer' version of electronic cash that would allow online payments from one party to another without going through a financial institution." *Id.* ¶ 27. The hallmark of Bitcoin was its decentralized public ledger system that continuously works to confirm transactions, compare the results among the multitude of miners to reach a consensus, and maintain the records of digital transactions on a

"blockchain." *Id.* ¶¶ 28, 29.  The blockchain ledger system resides in the global network of computers. *Id.* ¶ 29.

The original Bitcoin blockchain – now called Bitcoin Core (BTC) – was designed with a maximum block size of 1 MB.  *Id.* ¶ 42.  This limitation "meant that Bitcoin could not scale as nodes sought to utilize this form of cryptocurrency because transactions on the network would take too long to be confirmed and those seeking to transact in Bitcoin Core were required to pay disproportionately high fees to have their transactions confirmed."  *Id.*  A dispute arose in the community over how to improve upon Bitcoin Core, with one camp advocating for Bitcoin to be used primarily as a way to store value, and another camp advocating for Bitcoin as a way to conduct day-to-day transactions.  *Id.* ¶ 43.  This resulted in a "hard fork" in the blockchain – whereby there is a change to the blockchain protocol such that "nodes of the newest version of the blockchain follow a new rules set, while nodes of the older version of the blockchain continue to follow the prior rules set."  *Id.* ¶ 45.  Bitcoin Cash (BCH) emerged on August 1, 2017 via a hard fork in order to address the concerns over developing the cryptocurrency for use as a peer-to-peer system supporting cash-like transactions.  *Id.*  Bitcoin Cash grew to become a popular form of cryptocurrency.  *Id.* ¶ 22.

On November 15, 2018, the Bitcoin Cash network was scheduled for a routine biannual software upgrade.  *Id.* ¶ 47.  However, the developers of two software implementations used for mining the Bitcoin Cash network – Bitcoin ABC and Bitcoin SV – decided to proceed with upgrades that would have different rules sets.  *Id.* ¶ 48.  The proposal of the Bitcoin ABC Developers (Amaury Sechet and Defendants Shammah Chancellor and Jason Cox), which was backed by Defendants Roger Ver ("Ver") and Jihan Wu ("Wu"), "sought to preserve Bitcoin Cash's basic structure, including limiting the block size to 32 MB, and immunizing it from major

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

developments in the future."  *Id.* ¶ 49.  "The goal of the Bitcoin SV upgrade was to increase the block size of Bitcoin Cash from 32 MB to a maximum of 128 MB so that network capacity and scale could be increased as well."  *Id.* ¶ 50.  The SV proposal was intended to "allow for Bitcoin Cash to be seamlessly utilized by a greater number of merchants and consumers with minimal costs associated with a transaction."  *Id.*

Nakamoto's original Whitepaper had anticipated such disputes, and it dictated that the prevailing rules set for the Bitcoin Cash network would be determined by the "vote" of the various nodes already mining the network.  *Id.* ¶ 51.  Defendants disregarded this prevailing, market-based practice, however, and entered into a carefully orchestrated agreement to dominate the software chain implementation in an unprecedented manner so they could ensure that the ABC rules set would prevail.

Defendants did so through the combined efforts of various players in the Bitcoin Cash market.  First, the supposedly neutral major cryptocurrency exchange – Payward Ventures, Inc. d/b/a Kraken ("Kraken") – touted the ABC software implementation as less risky and more likely to be supported by Kraken than the SV software implementation even before the upgrade had started.  *Id.* at 71.  In doing so, Kraken showed a bias not demonstrated by a major industry peer, Binance.  *Id.* ¶ 72.   Defendant Ver was an early, principal investor in Kraken, and is a childhood friend of Kraken's founder, Jesse Powell ("Powell").  *Id.* ¶¶ 64, 71, n.5.  Ver was seen on an internet interview vlog just a few hours before the scheduled upgrade with a software engineer with ties to Kraken, Andreas Brekken.  *Id.* at 76.

Defendants Ver and Wu then orchestrated a scheme whereby Bitmain Technologies Ltd. ("Bitmain Technologies"), an entity controlled by Wu, would reallocate its significant hashing power from the Bitcoin Core network to Ver's Bitcoin.com pool in the Bitcoin Cash network solely

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

for the purpose of exercising more votes for the ABC implementation than would otherwise be possible during the upgrade.  *Id.* ¶¶ 67, 74.  "Upon information and belief, Bitmain Technologies reallocated a significant portion of hash power from customers who had joined the Bitmain mining pools without the authorization or consent of those customers."  *Id.* ¶ 68.  This caused an explosive, albeit temporary, increase in Bitcoin.com's hashing power by over 4,000%.  *Id.* ¶¶ 68, 74.  This act "could not be accomplished without coordination between Wu . . . and Ver . . . because the reallocation of extensive amounts of hash power from one pool to another requires preparation by the receiving pool to ensure that it is able to accommodate the spike in hash power on its network."  *Id.* ¶ 70.  The use of this "rented" hash power was not consistent with the Nakamoto Whitepaper's process for resolving disputes concerning the rules set to be used on the Bitcoin blockchain.  *Id.* ¶ 51.  The effect was to rig the true competitive efforts of the actual Bitcoin Cash miners on the network, 70% of which had elected to mine the Bitcoin SV chain.  *Id.* ¶ 82 n.6.

Wu watched the events closely; he publicly congratulated Bitcoin.com for mining the first block with the ABC rule set.  *Id.* ¶ 73.  Brekken publicly stated – on the same day that he and Ver were together during the hash war – that 300,000 Bitmain s9 miners were diverted by Ver to secure the ABC version of the upgrade.  *Id.* ¶ 77.  And Ver publicly noted the unprecedented level of hashing power he brought to bear on the Bitcoin.com pool – more than the entire Bitcoin Cash network had earlier that very same day – and publicly alluded to the fact that he had rented hash power during the upgrade.  *Id.* ¶ 78, 79.

After Kraken publicly pre-judged the outcome of the hash war and foreshadowed the events to come, and Ver and Wu used their corporate entities to improperly dominate the hash war so that the ABC software implementation would prevail, the final step of the scheme was implemented. The very next day, the Bitcoin ABC Developers implemented a "poison pill" in the resulting

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

Bitcoin Cash ABC chain referred to as a "checkpoint."  *Id.* ¶ 87.  This allowed anyone with 51% hashing power to quickly cement control of the blockchain ledger.  *Id.* ¶ 90.  Going forward, Ver (through Bitcoin.com) and Wu (through Bitmain Technologies' mining pools, AntPool and BTC.com) control any changes to Bitcoin Cash functionality as well as changes to the consensus rules.  *Id.* ¶¶ 90, 91.  The same day that the ABC Developers implemented the checkpoint, Brekken stated publicly that the developers and crypto exchanges such as Kraken agreed to implement centralized checkpoints.  *Id.* ¶ 94.  Shortly thereafter, Kraken's CEO, Powell, decided that Kraken would maintain the BCH ticker for the ABC chain, effectively recognizing the ABC chain as the official blockchain of Bitcoin Cash.  *Id.* ¶ 96.

After the acts described in the Amended Complaint, Bitcoin Cash was centralized in the hands of the Defendants, under their exclusive control, and insulated from improvements proposed by software developers not controlled by Defendants.  *Id.* ¶ 102.  The end result is that the quality of Bitcoin Cash has been harmed in the form of reduced innovation and, ultimately, higher transaction costs for consumers using Bitcoin Cash.  *Id.* ¶ 115.

Defendants – hoping to avoid further exposure of their collusion and market manipulation in discovery – seek dismissal of the Amended Complaint with prejudice.  Despite a voluminous brief in support of dismissal, however, Defendants' arguments do not overcome the well-pleaded allegations plausibly demonstrating anticompetitive acts and effects.  The motion to dismiss should be denied, and Plaintiff should be afforded the opportunity to further expose the unlawful scheme perpetrated by Defendants through discovery.

## **LEGAL STANDARD ON MOTION TO DISMISS**

In order to state a claim for relief, Federal Rule of Civil Procedure Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R.

Civ. P. 8(a)(2).  On a motion to dismiss, the Court must "accept the factual allegations in the complaint as true and make all reasonable inferences in favor of the non-moving party." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004). To survive a motion to dismiss, the allegations of the Amended Complaint need only "be enough to raise a right to relief above the speculative level … on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  "Detailed factual allegations" are not required.  *Id.*

 "[T]he Eleventh Circuit has cautioned that Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases" because "motive and intent play leading roles, the proof is largely in the hands of alleged conspirators, and hostile witnesses thicken the plot." *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US LLC,* No. 10-2008, 2011 WL 3035226, at *3 (M.D. Fla. July 25, 2011).

In assessing antitrust claims under Rule 12(b)(6), the Court must examine the allegations of the complaint as a whole; it is not permissible to parse the allegations into individual conduct and then analyze each in isolation.  *See, e.g., Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."); *In re Pressure Sensitive Labelstock Antitrust Litig.,* 566 F. Supp. 2d 363, 375 (M.D. Pa. 2008) ("Nothing in *Twombly*, however, contemplates this 'dismemberment' approach to assessing the sufficiency of a complaint. Rather, a district court must consider a complaint in its entirety without isolating each allegation for individualized review.")*; United States v. Am. Tel. & Tel. Co.,* 524 F. Supp. 1336, 1344 (D.D.C. 1981) ("[T]here is but a single claim of violation of the Sherman Act before the Court, and procedurally that claim cannot be segmented for dismissal purposes.").

## ARGUMENT

I.     **UAC's Claim that Defendants Violated Section 1 of the Sherman Act Is Adequately Pleaded.**

Section 1 of the Sherman Act, under which UAC's claims are brought, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "In addition to that bare bones recital of prohibited behavior, the Supreme Court has long concluded that Congress intended only to prohibit 'unreasonable' restraints on trade." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019); *see also Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 343 (1982). Thus, Section 1 prohibits (1) conspiracies that (2) unreasonably (3) restrain interstate or foreign trade. *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1071; *see also Ace Pro Sound & Recording v. Albertson,* 512 F. Supp. 2d 1259, 1268-69 (S.D. Fla. 2007) (applying Section 1 of the Sherman Act and requiring (1) an agreement that is (2) designed to achieve an unlawful purpose by unreasonably restraining trade). UAC has sufficiently pleaded these elements.

### A.     UAC Has Alleged Facts Plausibly Showing a Conspiracy.

Despite the inherently secretive nature of Defendants' conspiracy to engage in an anticompetitive scheme to dominate the Bitcoin Cash cryptocurrency network during and after the upgrade, Defendants seek early dismissal (conveniently before answering the allegations against them) by essentially arguing that UAC's allegations do not demonstrate that a conspiracy *probably* occurred. But *plausibility*, not *probability*, is the correct standard at this stage of the proceedings. *See Twombly,* 550 U.S. at 556-57 ("Asking for plausible grounds to infer an agreement [in antitrust cases] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.");

*In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1362 (N.D. Ga. 2010) ("*Twombly* imposed a plausibility requirement at the pleadings stage, not a *probability* requirement.") (emphasis in original). Applying the correct standard, this Court should reject Defendants' arguments.

An agreement in violation of the Sherman Act may be tacit or express. *Twombly*, 550 U.S. at 554. Direct evidence of conspiracy is not required in the complaint. *DeLong Equip. Co. v. Wash. Mills Abrasive Co.,* 887 F.2d 1499, 1515 (11th Cir. 1989) ("Conspiracies are rarely evidenced by explicit agreements and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators."). Circumstantial evidence of agreement is sufficient. *In re Delta/Airtran Baggage Fee Antitrust Litig.,* 733 F. Supp. 2d at 1359-60 (holding that the absence of direct evidence of conspiracy may be appropriate grounds for summary judgment, but not a motion to dismiss, because "[plaintiffs] need not allege the existence of collusive communications in 'smoke-filled rooms.' … Plaintiffs' complaint is built upon circumstantial evidence of a conspiracy; nevertheless, the Court is unable to say at this stage of the litigation that the inferences Plaintiffs draw from the evidence are implausible."); *North Jackson Pharmacy, Inc. v. Express Scripts, Inc.,* 345 F. Supp. 2d. 1279, 1287-88 (N.D. Ala. 2004) (rejecting the defendants' argument that a complaint "must include factual allegations as to when and how the [] agreements were made, the terms of such alleged agreements, and how those alleged agreements were supposedly implemented" because "these are precisely the kinds of details which … would likely be known only by the alleged coconspirators, and hence should not be required in the complaint") (quotation omitted).

To survive a motion to dismiss a Section 1 Sherman Act claim, the plaintiff must allege "parallel conduct" plus "further factual enhancement." *Twombly,* 550 U.S. at 557. The Eleventh

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

Circuit has adopted a qualitative use of plus factors, taking a holistic view of how allegations, taken together, can support an inference of an agreement.  These so-called "plus factors" serve as proxies for direct evidence of an agreement.  The Eleventh Circuit has always avoided prescribing a rigid set of factors or the weight to be afforded to any particular factor.  Instead, "*any* showing that tends to exclude the possibility of independent action can qualify as a plus factor." *Williamson Oil Co. v. Phillip Morris U.S.A.,* 346 F.3d 1287, 1301 (11th Cir. 2003) (emphasis added).  The importance of any factor rests solely on its tendency to show that the defendants' behavior is plausibly consistent with the alleged conspiracy, as opposed to a rational and competitive business strategy, independently adopted by competing firms.  *Id.*

"[W]hen allegations of parallel conduct are set out in order to make a §1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.  Defendants implicitly concede that the Amended Complaint adequately pleads parallel conduct, but they argue that there are insufficient additional indications tending to plausibly demonstrate an agreement, rather than self-interested, independent action.  This argument should be rejected.

### 1.    Part One of the Scheme

Part One of the scheme alleged in the Amended Complaint consisted of Defendants Ver and Wu's agreement to improperly dominate the hash war by temporarily reallocating hash power from Bitmain Technologies' Bitcoin Core network onto Ver's mining pool, Bitcoin.com, against the market practices that had been followed since Nakamoto's blueprint for Bitcoin had been released to the world.  Powell assisted his high school friend, Ver, in accomplishing the scheme by using the powerful Kraken exchange to pre-judge the outcome of the hash war and signal to

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

investors and other stakeholders that – regardless of the outcome – only the ABC software version would be supported after the upgrade.

Defendants argue that their actions do not plausibly demonstrate an agreement because each Defendant's role can just as plausibly be explained by their own economic self-interest. But this argument does not withstand scrutiny. The Amended Complaint contains allegations belying the suggestion that Defendants acted independently.

Courts have found an inference of conspiracy where parallel conduct, absent the conspiracy and its ultimate effects, is contrary to each defendant's economic self-interest. *See Quality Auto Painting*, 917 F.3d 1249 (11th Cir. 2019). This "plus factor" is pleaded here. Defendant Wu is alleged to have acted against his interest and that of his entities by temporarily reallocating hash power from customers who had joined Bitmain's Bitcoin Core mining pools without their authorization or consent. Am Compl. ¶¶ 68, 69. He also acted against his self-interest in reallocating the hash power because he publicly stated his belief that doing so would "dump" the price of Bitcoin Core, a network he was significantly dedicated to prior to the hash war. *Id.* ¶ 69. The Amended Complaint also demonstrates coordinated action, not merely coincidental parallel action, when it states that the reallocation of Bitmain Technologies' hashing power onto the Bitcoin.com pools could not be accomplished without coordination because Bitcoin.com needed to prepare ahead of time to receive such an extensive influx of hash power onto its network. *Id.* ¶ 70. Defendants attempt to negate the import of this allegation by calling it "conclusory" in nature, but the allegation is clearly factual and well-pleaded.

The Amended Complaint also alleges plus factors as to Powell, and his cryptocurrency exchange, Kraken. It states that Ver is an investor in Kraken, and that Powell and Ver are old friends. *Id.* ¶¶ 64, 71, n.5. It further states that Kraken released a public statement before the

outcome of the hash war was known that the ABC version was superior to the SV version, and would likely be the only version to meet Kraken's listing requirements. *Id.* ¶ 71.  This lent support to Ver and Wu's scheme by improperly influencing the outcome.  It was also against Kraken's self-interest as a supposedly neutral cryptocurrency exchange.  *Id.*  Indeed, it was inconsistent with the actions of another major cryptocurrency exchange, Binance, which merely acknowledged the upcoming hash war and made no statements vouching for either software version, as would be expected of neutral market players whose revenue is dependent on the volume of trade regardless of the asset being traded.  *Id.* ¶ 72.  This Court recognized the weight of this plus factor when it asked counsel for Kraken, "wouldn't that be against Kraken's own economic interest in making that statement?"  *See* 1/28/2020 Hearing Tr., ECF No. 136, at 66:21-22.

### 2.      Part Two of the Scheme

With respect to the second part of the scheme, the Amended Complaint details the carefully coordinated acts of the ABC Developers, including Defendants Chancellor and Cox, in implementing a "poison pill" that effectively cemented control over future changes to the Bitcoin Cash blockchain in the hands of Bitcoin ABC backers like Ver (through Bitcoin.com) and Wu (through Bitmain Technologies' mining pools, AntPool and BTC.com).  These Defendants then conspired and agreed with Kraken to have the ABC chain effectively recognized as the official blockchain of Bitcoin Cash.  Am. Compl. ⁋ 96.

The facts alleged in the Amended Complaint provide ample support for the inference of a conspiracy based on so-called "plus factors."  Not only were the Defendants' actions carefully choreographed, belying the notion that these acts were merely parallel, but the Amended Complaint alleges numerous public statements tending to demonstrate that Defendants coordinated, conspired and agreed with one other.  *See* Am Compl. ⁋ 69 (Wu proclaiming his

willingness to "fight till death" to win the hash war); ❡ 71 (Kraken publicly supporting ABC even before the hash war); ❡ 73 (Wu publicly congratulates its competitor, Bitcoin.com, for mining the first block with the ABC rule set); ❡ 76 (Ver and Brekken on a public vlog watching the hash war unfold); ❡ 77 (Brekken then posts on Twitter exactly how Ver and Wu accomplished part one of the scheme); ❡ 78 (Ver bragging about the hash power he brought to bear on the network during the upgrade); ❡ 79 (Ver alludes to his actions after the hash war is over); ❡ 94 (Brekken acknowledges the collusion between the Bitcoin ABC Developers and Kraken).

One notable statement is the YouTube video of an online forum wherein Brekken – a former software engineer with Kraken (the exchange) – makes statements tending to demonstrate that the Bitcoin ABC Developers and Kraken agreed to the entire scheme in advance, stating among other things:

- "**this has been planned for so long**, we knew we were going to win, and we knew we were going to checkpoint, and we knew we are not going to do deep-reorgs, so we have just been… drinking beers all day because we knew we won…"

- "another step you do is, **you talk to all the exchanges… then you have them apply a patch which adds a checkpoint** that anchored to blockmine by Bitcoin ABC which prevents all future re-orgs (audible whistle)…"

(Am. Compl. ❡ 94, citing to and incorporating https://www.youtube.com/watch?v=UjAHJY0QZhs).  Also notable is the public statement of Powell commending the merits of the SV software version, but expressing his commitment to the ABC version instead.  Am. Compl. ¶ 96 (alleging that Powell tweeted, "The merits of BSV are overshadowed by the alienating threats of a few grandiose personalities.  Longer chain! = adoption.  Victory may be pyrrhic.").

Defendants seek to downplay the importance and weight to be afforded to the various allegations of public statements, which tend to plausibly demonstrate their agreement.  In

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

referencing Wu's public statements, for example, they state that, "it is hardly plausible that [Wu] would publicly commend a co-conspirator on the success of a secret and unlawful agreement." Mot. at 144-19.  But this would not be the first time that violators of the Sherman Act make public statements that provide a peek into their unlawful agreement.  *See, e.g.*, *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d at 1331-32 (denying motion to dismiss Section 1 Sherman Act claim where defendant airline carriers had allegedly colluded to increase first bag fees as alleged through a series of public statements in quarterly earnings calls and industry conferences) (collecting cases).  And, at this stage, a court must accept the allegations as true and draw inferences in favor of the plaintiff.

Viewed as a whole, as it must be, the Amended Complaint sets forth in great detail a meeting of the minds between the Defendants to accomplish their unlawful purpose.  The careful coordination detailed therein belies the argument that the Defendants' independent roles in the bigger scheme were merely coincidental.  And the motivation was clear.  As UAC alleges, during the week immediately *preceding* the network upgrade, Bitcoin.com and the Bitmain pools were collectively awarded 27.6% of the blocks being mined from the blockchain.  (Am. Compl. ⁋ 84). The day *after* the network upgrade, Bitcoin.com and the Bitmain pools were being awarded 100% of the blocks.  (*Id*. ⁋ 85).

Using their imaginations, Defendants conjure up alternative explanations for how they might have by sheer coincidence acted in unison to dominate the temporary software upgrade, quickly implemented a new software version with checkpoints, and taken total control of the Bitcoin Cash network going forward.  These explanations are too convenient to form the basis for an early dismissal of this case.

In sum, when all of the acts detailed in the Amended Complaint are viewed as a whole,

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

each factual allegation is taken as true, and reasonable inferences are drawn in favor of the Plaintiff, the allegations are enough to "nudge the claim across the line from conceivable to plausible." *See Jacobs v. Tempur-Pedic Intern., Inc.,* 626 F.3d 1327, 1333 (11th Cir. 2010).[2]

**B.      UAC Has Sufficiently Alleged an Unreasonable Restraint on Competition.**

Defendants argue that another basis for them to avoid answering the allegations against them is that Plaintiff has failed to adequately allege that the agreement they entered into unreasonably harmed competition.  Defendants' argument should be rejected.

**1.      The Amended Complaint Describes Conduct That Constitutes a Section 1 Violation Under the Rule of Reason Analysis.**

Count II of the Amended Complaint presents a rule of reason Section 1 claim. Under the rule of reason analysis, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Jacobs*, 626 F.3d at 1333.  Furthermore, the complaint must identify the relevant market in which the alleged harm occurs. *Id.* at 1336.

"The relevant market has two components, and the plaintiff must define both the geographic market and the product market in which the defendant allegedly possesses increasing power." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1263 (11th

---

[2]      It is also evident that the unregulated cryptocurrency market has a structure that is highly susceptible to collusion.  Several circuits have held that allegations showing a market susceptible to collusion, while not alone sufficient, can nudge other factual allegations tending to show an agreement across the line to plausibility. *See, e.g., In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 627–28 (7th Cir. 2010); *SD3, LLC v. Black & Decker (U.S.) Inc.,* 801 F.3d 412 (4th Cir. 2015); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.,* 720 F.3d 33, 48 (1st Cir. 2013); *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 323 (2d Cir. 2010); *In re Flat Glass Antitrust Litig.,* 384 F.3d 350, 360–61 (3d Cir. 2004) (considering market structure a plus factor for summary judgment analysis pre-*Twombly*). Market structure susceptible to collusion is not independently a plus factor, but it can place other allegations "in a context that raises a suggestion of preceding agreement." *Twombly*, 550 U.S. at 557 n.4.

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

Cir. 2015). At the pleading stage, "antitrust plaintiffs . . . must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs*, 626 F.3d at 1336. To survive a motion to dismiss, a plaintiff must allege actual or potential harm to competition in the relevant market. *Id.* at 1339. In other words, a plaintiff must allege a "factual connection between the alleged harmful conduct and its impact [or likely impact] on competition in the market." *Id.* Despite Defendants' protestations, the Amended Complaint adequately alleges harm to competition – both existing now and expected in the future – as a result of Defendants' acts.

**Product Market.** "Defining the relevant product market is a fact-intensive endeavor." *Duty Free Americas,* 797 F.3d at 1263. A variety of factors are considered, including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

The Amended Complaint adequately alleges that Bitcoin Cash was a unique product and distinct subset of the larger cryptocurrency market at the time that Defendants engaged in their unlawful scheme. It states that Bitcoin Cash is a "unique form of cryptocurrency because it is intended to be scalable, meaning that it is designed with larger block data limitations so that transactions using Bitcoin Cash can be performed quickly and with relatively low transaction costs in a peer-to-peer system." Am. Compl. ¶ 33. Bitcoin Cash is also alleged to be "by far, the most widely adopted form of peer-to-peer cryptocurrency cash-like system in the world." *Id.* Bitcoin Core, with its 1 MB block size, was used primarily as a means to store value; whereas, Bitcoin Cash, with a 32 MB block size, was able to be used for peer-to-peer transactions. *Id.* ¶¶ 42, 43, 49.

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL 33131

Defendants argue that Bitcoin Cash SV is also intended for the same uses as Bitcoin Cash, and therefore both virtual currencies should be considered as part of the same product market. But Defendants are ignoring that the relevant product market is that which existed at the time of the fork, not after the fork resulted in Defendants' complete dominance of Bitcoin Cash and caused the proponents of the SV version to have to shift to a new cryptocurrency.

Defendants also attempt to broaden the product market to include any asset used for day-to-day transactions, like fiat currencies. But fiat currencies lack the distinguishing feature that makes Bitcoin Cash unique – its decentralization. Fiat currencies rely on central banks and financial institutions, whereas cryptocurrencies are intangible and intended to be decentralized on public ledgers dispersed throughout the world. Thus, Bitcoin Cash – with its decentralized ledger system, and unique ability to be used efficiently for day-to-day transactions from peer-to-peer – has been adequately described in the Amended Complaint as a subset of a larger category of currencies in general, such that the contours of this unique product market are ascertainable.

While discovery may allow Plaintiff to more precisely define the exact product market involved here, such lack of precision is not a basis to dismiss the complaint at the pleading stage. *See Newcal Indus. v. IKON Office Solutions,* 513 F.3d 1038, 1045 (9th Cir. 2008) (holding that "since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial*"); Todd v. Exxon Corp.,* 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

**Geographic Market.** The relevant geographic market is "the area of effective competition in which a product or its reasonably interchangeable substitutes are traded." *Duty Free Americas,*

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL 33131

797 F.3d at 1263.  The geographic market is "comprised of the area where . . . customers would look to buy . . . a product."  *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991).

      The Amended Complaint pleads facts demonstrating that the geographic market for Bitcoin Cash is the entire world.  Unlike a typical physical product that might be manufactured, marketed, and sold in a particular geographic area, Bitcoin Cash is a *virtual* currency that is mined through a diverse network of computers located anywhere in the world, and it is used to conduct peer-to-peer transactions among other computers likewise located anywhere in the world.  There is no single geographic location where consumers go to purchase Bitcoin Cash.

      **Actual Harm to Competition.**  Defendants claim that their actions enhanced competition because two cryptocurrencies – Bitcoin Cash ABC and Bitcoin Cash SV – emerged after the fork. This was not a pro-competitive result, however, as is detailed in the Amended Complaint.

      "Actual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality."  *Duty Free Americas,* 797 F.3d at 1263.

      As alleged in the Amended Complaint, Defendants rendered the competitive efforts of the Bitcoin Cash community – those miners that were actual participants in the Bitcoin Cash network before the fork – futile.  Ver and Bitcoin.com, by agreeing with dominant players in the industry – Wu and his Bitmain entities and Powell with his cryptocurrency exchange platform, Kraken – rigged the vote to force the ABC version through and further agreed with the ABC Developers to secure that victory for Defendants in perpetuity.  The fact that the losing faction was required to start from scratch with a new form of Bitcoin cryptocurrency was not a win for competition or consumers.

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

The Amended Complaint alleges that the quality of Bitcoin Cash was deteriorated as a result of the Defendants' scheme.  The allegations are not conclusory; they are factual in nature. The Amended Complaint explains that the ABC version of the software implementation proposed during the fork sought to stifle improvements proposed by the SV version; namely, the increased block size capable of more efficiently handling day-to-day transactions.  Am. Compl. ¶¶ 49, 50. The ABC version, however, was pushed through during the upgrade through methods that departed from the Bitcoin network's practice since its inception.  And, the checkpoint put in place after the upgrade had the ongoing effect of preventing truly competing, innovative ideas from being put to an honest vote to the Bitcoin Cash community.  This was inimical to the competitive process that had been previously used by the Bitcoin Cash community.  The Sherman Act protects against such anticompetitive harm, even when the industry involved is novel.

**Potential Harm to Competition.**  In addition to pleading actual harm to competition, the Amended Complaint pleads potential harm to competition.  To show that the defendant's conduct caused potential harm to competition, "the plaintiff must define the relevant market and establish that the defendants possessed power in that market."  *Duty Free Americas, Inc.*, 797 F.3d at 1263; *see also Jacobs*, 626 F.3d at 1339; *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1073.

The Amended Complaint adequately alleges the market power wielded by Defendants Wu (through his Bitmain entities), Ver (through his Bitcoin.com platform), and Powell (through Kraken).  Bitmain Technologies  "is the largest designer of what is referred to as 'ASIC' or Application Specific Integrated Circuit chips for mining operations," and those chips, in turn, power the Antminer series of mining servers "that are the dominant servers operating on a number of cryptocurrency networks such as Bitcoin and Bitcoin derivatives."  Am. Compl. ¶ 58.  Bitmain Technologies "controls well in excess of 60% of the world's cryptocurrency mining computer

(hashing) power." *Id.* ¶ 60.  And Bitmain Technologies operates Antpool and BTC.com, two of the largest Bitcoin and Bitcoin Cash mining pools in the world. *Id.* ¶ 61.

Ver is a "Bitcoin Angel Investor" who was an early source of capital for Bitcoin projects and startups, including Kraken. *Id.* ¶ 64. Kraken "purports to be the largest Bitcoin exchange in Euro volume and liquidity." *Id.* ¶ 71 n.5.

> **2.    The Amended Complaint Describes Conduct that Fits Within the Category of Per Se Unlawful Practices.**

Restraints analyzed under the *per se* rule are those that are always (or almost always) so inherently anticompetitive and damaging to the market that they warrant condemnation without further inquiry into their effects on the market or the existence of an objective competitive justification. *See United States v. Socony-Vacuum Oil Co.,* 310 U.S 150 (1940); *United States v. Sealy, Inc.,* 388 U.S. 350 (1967); *United States v. Topco Associates, Inc.,* 405 U.S. 596 (1972); *Craftsmen Limousine, Inc. v. Ford Motor Co.,* 363 F.3d 761 (8th Cir. 2004).  Under a per se analysis, defendants are not entitled to justify their behavior based on any objective competitive justifications. *Northern Pac. Ry. Co. v. U.S.,* 356 U.S. 1, 4-5 (1958); *Agnew v. National Collegiate Athletic Ass'n,* 683 F.3d 328 (7th Cir. 2012); *In re Flat Glass Antitrust Litigation,* 385 F.3d 350 (3rd Cir. 2004).  And a plaintiff has less responsibility to analyze the market where the restraint is deemed *per se* anticompetitive. *National Soc. of Professional Engineers v. U.S.,* 435 U.S. 679, 692 (1978); *In re Insurance Brokerage Antitrust Litigation,* 618 F.3d 300 (2010); *In re Southeastern Milk Antitrust Litigation,* 739 F.3d 262 (2014).

Whether to apply the rule of reason or per se analysis is not based on any "bright lines," but rather, "[t]he decision to apply the per se rule [instead of the rule of reason] turns on 'whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to 'increase economic efficiency and

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

render markets more, rather than less, competitive.'" *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 746 (11th Cir. 1998).

The Amended Complaint plausibly alleges how the Defendants' scheme is "so facially anticompetitive that by [its] very nature [it is] deemed unreasonable, and thus, per se violative of antitrust laws." *Id*.

**Bid Rigging.**  Bid rigging has consistently been treated by Courts as a *per se* violation of the Sherman Act.  *See e.g., United States v. Joyce,* 895 F.3d 673, 679 (9th Cir. 2018) ("Because bid rigging is *per se* illegal under Section 1 of the Sherman Act, the district court did not err by refusing to permit [Defendant] to introduce evidence of the alleged ameliorative effects of his conduct.").  In a bid rigging context, competing bidders conspire, rather than compete, so as to predetermine the winner of the bid.

The actions of Defendants here were bid rigging. The miners (who are supposed to be competing with each other) were effectively bidding with their votes (their computing power) during the hash war.  Defendants Ver and Wu agreed to rig the bid by reallocating hash power from another cryptocurrency network – essentially, bringing in unqualified bidders.  They then changed the rules of future proposals after they won the bid.

Although this is an evolving industry, it is well-established that the means through which a restraint on trade is accomplished need not be inherently anticompetitive. *Am. Tobacco Co. v. United States,* 328 U.S. 781, 809 (1946) ("It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."); *Accord LePage's, Inc. v. 3M,* 324 F.3d 141, 162 (3d Cir. 2003) ("The relevant

- 21 -

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

inquiry is the anticompetitive effect of 3M's exclusionary practices *considered together*.")
(emphasis added).

**Group Boycott.**  This case is also in the nature of a group boycott.  A boycott consists of
"pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold,
patronage or services from the target."  *Quality Auto Painting Ctr. of Roselle,* 917 F.3d at 1271
(citation omitted).  The target of a boycott can be either a competitor or a customer of some or all
of the boycotters "who is being denied access to desired goods or services because of a refusal to
accede to particular terms set by some or all of the [boycotters]."  *Id.*  For boycotting to be per
se illegal, it must involve "horizontal agreements among direct competitors." *NYNEX Corp. v.
Discon, Inc.*, 525 U.S. 128, 135 (1998).

Here, competitors of the proponents of the SV software implementation agreed to engage
in practices that would effectively deny future access to the Bitcoin Cash network to those
proponents.  The implementation of the checkpoint after the rigged hash war precludes current
miners on the blockchain from implementing new software to improve upon the quality of Bitcoin
Cash so that it can become more efficient and adaptable for widespread use.  Only Defendants can
remove the checkpoint and change the software now – a reflection of their manipulation and
domination of the market and a tacit admission that what they did was an unlawful restraint.

## C.     Plaintiff Has Antitrust Standing

Defendants' final argument is that UAC lacks antitrust standing because the Amended
Complaint does not allege antitrust injury and because UAC is not an efficient enforcer of the
antitrust claim.  Defendants' argument is unavailing.

Section 4 of the Clayton Act creates a private right of action for "any person who shall be
injured in his business or property by reason of anything forbidden in the antitrust laws," and

allows that person to recover treble damages. 15 U.S.C. § 15(a).  To have antitrust standing, a party must "show that it satisfies a number of 'prudential considerations aimed at preserving the effective enforcement of the antitrust laws.'"  *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir.1991)).  The Eleventh Circuit employs a two-prong test for antitrust standing under Section 4 of the Clayton Act: "first, the plaintiff must have alleged an antitrust injury, and second, the plaintiff must be an efficient enforcer of the antitrust laws." *Palmyra*, 604 F.3d at 1299.

An antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.*  UAC has alleged an antitrust injury. As explained above, the Defendants' collective actions had the effect of precluding current miners on the Bitcoin Cash blockchain from implementing new software to improve upon the quality of Bitcoin Cash so that it can become more efficient and adaptable for widespread use.  Only Defendants can remove the checkpoint and change the software now – a reflection of their manipulation and domination of the market and a tacit admission that what they did was an unlawful restraint.

To determine if a plaintiff is an efficient enforcer of the antitrust laws, courts look at a number of factors. *Palmyra*, 604 F.3d at 1299.  Those factors include, but are not limited to, "the directness or indirectness of the injury, the remoteness of the injury, whether other potential plaintiffs were better suited to vindicate the harm, whether the damages were highly speculative, the extent to which the apportionment of damages was highly complex and would risk duplicative recoveries, and whether the plaintiff would be able to efficiently and effectively enforce the judgment." *Id.*  No single factor predominates over the others.  *Id.*

AKERMAN LLP, THREE BRICKELL CITY CENTRE, 98 SOUTHEAST SEVENTH STREET, SUITE 1100, MIAMI, FL  33131

UAC satisfies the flexible efficient enforcer test. As alleged in the Amended Complaint, UAC was a miner of the Bitcoin Cash cryptocurrency who invested more than $4,000,000 in its BlockchainDome technology for the purpose of mining Bitcoin Cash under normal market conditions. Am. Compl. ¶¶ 34-41. Defendants' scheme, however, had the effect of centralizing Bitcoin Cash in Defendants' hands. The result of this was to reduce the economic value of the mining output so low as to eliminate competition and ultimately result in market control and centralization. UAC suffered an immediate and direct injury from Defendants' acts.

## CONCLUSION

For the reasons discussed above, Plaintiff respectfully requests that the Court deny Defendants' Joint Motion to Dismiss (ECF Nos. 144 and 145), and grant any further relief this Court deems just and proper.

Dated: April 24, 2020

Respectfully submitted,

By: _s/ Brian P. Miller_
Brian P. Miller
Florida Bar No. 0980633
brian.miller@akerman.com
Lorayne Perez
Florida Bar No. 085265
lorayne.perez@akerman.com
Joanne Gelfand
Florida Bar No. 515965
Joanne.gelfand@akerman.com

AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, FL 33131
Tel: 305-374-5600
Fax: 305-374-5095

*Attorneys for Plaintiff United American Corp.*

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on April 24, 2020, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

/s/ *Brian P. Miller*
Brian P. Miller