# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No. 1:18-cv-25106-KMW-CMM

United American Corp.,

     *Plaintiff*,

     v.

Bitmain, Inc., Roger Ver, Bitmain
Technologies Ltd., Jihan Wu, Payward
Ventures, Inc. d/b/a Kraken, Jesse Powell,
Shammah Chancellor, and Jason Cox,

     *Defendants*.

# DEFENDANTS' REPLY IN SUPPORT OF
# JOINT MOTION TO DISMISS FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.  UAC fails to allege that Defendants joined any agreement, much less an unlawful antitrust conspiracy to "hijack" the Bitcoin Cash network. ............................... 2

    A.  UAC's attempt to narrow the scope of this Court's review is unavailing. ............ 2

    B.  UAC's pleadings do not support a plausible inference of conspiracy. ................. 3

        1.  UAC does not identify any competitors, much less plead that they acted in parallel. ...................................................................................... 3

        2.  The Amended Complaint does not contain any facts that tend to exclude the possibility of independent action. ........................................... 4

        3.  UAC's remaining allegations do not give rise to any plus factors. ........... 6

II. UAC fails to plead facts suggesting that any Defendant imposed an unreasonable restraint on competition. ........................................................................................ 8

    A.  None of UAC's allegations evinces actual harm to competition. .......................... 8

    B.  UAC does not plausibly allege potential harm to competition in a relevant product or geographic market. ................................................................................ 9

        1.  UAC does not allege a relevant geographic market. ................................... 9

        2.  UAC does not allege a relevant product market. ...................................... 10

        3.  UAC does not plead facts demonstrating that Defendants possessed market power. ............................................................................................. 12

        4.  The Amended Complaint does not link Defendants' alleged exercise of market power to an injury to competition. ........................... 13

III. UAC lacks antitrust standing, because it does not allege an antitrust injury. ................. 14

CONCLUSION ................................................................................................................. 15

CERTIFICATE OF SERVICE ........................................................................................ 19

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Key Corp. v. Cole Nat'l Corp.*,
762 F.2d 1569 (11th Cir. 1985) .................................................................................. 10

*Aquatherm Indus., Inc. v. Fla. Power & Light Co.*,
971 F. Supp. 1419 (M.D. Fla. 1997) ............................................................................ 10

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) .............................................................................................. 14, 15

*Austin v. Blue Cross & Blue Shield of Ala.*,
903 F.2d 1385 (11th Cir. 1990) .................................................................................. 14

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................. 2, 3

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
203 F.3d 1028 (8th Cir. 2000) .................................................................................... 4, 5

*Board of Trade of Chicago v. United States*,
246 U.S. 231 (1918) .................................................................................................... 12

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
691 F. App'x 389 (9th Cir. 2017) ................................................................................. 4

*Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc.*,
101 F. Supp. 3d 1319 (N.D. Ga. 2015) ...................................................................... 13

*Duty Free Americas, Inc. v. Estée Lauder Cos.*,
946 F. Supp. 2d 1321 (S.D. Fla. 2013) ........................................................................ 8

*In re Delta/AirTran Baggage Fee Antitrust Litigation*,
733 F. Supp. 2d 1348 (N.D. Ga. 2010) ........................................................................ 7

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ...................................................................................... 3

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010) ........................................................................... passim

*Johnson v. Univ. Health Servs., Inc.*,
161 F.3d 1334 (11th Cir. 1998) .................................................................................. 14

*Jones v. Micron Technology Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019) .......................................................................... 7

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lakeland Reg'l Med. Ctr. v. Astellas US LLC*,
　No. 10-2008, 2011 WL 3035226 (M.D. Fla. July 25, 2011).......................................................3

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
　302 F.3d 1207 (11th Cir. 2002)....................................................................................................12

*Metzler v. Bear Auto. Serv. Equip. Co.*,
　19 F. Supp. 2d 1345 (S.D. Fla. 1998)..........................................................................................10

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
　734 F.2d 705 (11th Cir. 1984).......................................................................................................10

*Moody v. Ascenda USA Inc.*,
　No. 16-cv-60364-WPD, 2016 WL 4702681 (S.D. Fla. July 1, 2016) ........................................6

*Ohio v. Am. Express Co.*,
　138 S. Ct. 2274 (2018)...................................................................................................................8

*PayCargo, LLC v. CargoSprint, LLC*,
　No. 3:19-cv-85, 2019 WL 5793113 (N.D. Ga. Nov. 4, 2019) ....................................................11

*Q Club Resort & Residences Condo. Ass'n v. Q Club Hotel, LLC*,
　No. 9-cv-60911, 2010 WL 11454483 (S.D. Fla. Jan. 6, 2010) ...................................................12

*Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*,
　917 F.3d 1249 (11th Cir. 2019)............................................................................................1, 3, 6

*Restore Robotics, LLC v. Intuitive Surgical, Inc.*,
　No. 5:19-cv-55, 2019 WL 8063989 (N.D. Fla. Sept, 16, 2019) .................................................10

*RxStrategies, Inc. v. CVS Pharmacy, Inc.*,
　390 F. Supp. 3d 1341 (M.D. Fla. 2019)........................................................................................13

*Sentry Data Sys., Inc. v. CVS Health*,
　361 F. Supp. 3d 1279 (S.D. Fla. 2018).........................................................................................9

*Solomon v. Blue Cross & Blue Shield Ass'n*,
　574 F. Supp. 2d 1288 (S.D. Fla. 2008).........................................................................................3

*Spanish Broadcasting Systems v. Clear Channel Communications*,
　376 F.3d 1065 (11th Cir. 2004).....................................................................................................3

*St. George v. Pinellas Cty.*,
　285 F.3d 1334 (11th Cir. 2002).....................................................................................................10

*Todorov v. DCH Healthcare Auth.*,
　921 F.2d 1438 (11th Cir. 1991).....................................................................................................15

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Williamson Oil Co. v. Philip Morris, USA,*
   346 F.3d 1287 (11th Cir. 2003) ................................................................................ 4

**Other Authorities**

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger
   Guidelines 13 (2010) ................................................................................ 10

# INTRODUCTION[1]

The hour is late for UAC's meandering and self-refuting antitrust claims. After consuming the better part of a year in an on-again, off-again campaign to serve each Defendant, UAC failed to rescue its original pleadings from themselves. The Court—finding UAC's allegations implausible and factually unsupported—dismissed the original Complaint. But the Court also extended UAC a lifeline, granting UAC leave to amend and providing specific guidance on curing the most basic of its pleading problems. UAC, the Court indicated, could expect dismissal with prejudice should it file a commensurately unfounded amended complaint.

UAC chose to ignore the lifeline, which would not have helped it anyways. Its Amended Complaint is rife with unsubstantiated assertions, legal conclusions, and factual non-sequiturs—the defects that prompted the Court to dismiss the original Complaint. UAC raises three familiar but untenable arguments in defense of its indefensible pleadings. *First*, it attempts to narrow the scope of the Court's review. Dismissals are disfavored in antitrust cases, UAC asserts, and its allegations—while improbable—nevertheless cross the plausibility threshold. *Second*, UAC exhorts the Court to overlook inconvenient facts UAC itself alleged: the emergence of Bitcoin SV, the plain text of the Satoshi Nakamoto White Paper, vigorous competition in the cryptocurrency industry, and the avalanche of facts indicative of independent conduct. *Third*, UAC submits that it would be unfair for the Court to order an "early dismissal" of its pleadings. At the very least, UAC insists, it has earned the right to shore up its allegations with discovery.

As before, each argument rings hollow. The en banc Eleventh Circuit refuted the first of UAC's points in *Quality Auto Painting Center of Roselle, Inc. v. State Farm Indemnity Co.*, 917 F.3d 1249 (11th Cir. 2019) (en banc), a case UAC sidesteps yet again. The court underscored Rule 12(b)(6)'s critical role in warding off "the expensive and settlement-inducing quagmire of antitrust discovery." *Id.* at 1267. That axiom resonates with even greater force in cases like this one, in which the key pleadings rest on legal conclusions, motivated reasoning, and factually

---

[1] Consistent with the Court's order on the briefing schedule (ECF No. 141), undersigned counsel consented to the filing of this Joint Reply on their clients' behalf. Unless otherwise noted, all emphasis is added and internal citations, quotations, and brackets are omitted. "UAC" means Plaintiff United American Corporation; "FAC" or "Amended Complaint" refers to the First Amended Complaint (ECF No. 138); "Joint Mot." refers to Defendants' Joint Motion to Dismiss the First Amended Complaint (ECF No. 144); "Opp." or "Opposition" refers to UAC's Opposition to Defendants' Joint Motion to Dismiss (ECF No. 147); and "Tr." refers to the transcript of this Court's January 28, 2020, hearing on Defendants' Motions to Dismiss (ECF No. 136).

unsubstantiated assertions. UAC is equally mistaken in assuming that the Court must adopt a blink-ered view of the facts. *Nothing* compels the Court to conclude that UAC's allegations—which are perfectly consistent with independent action—support any inference that Defendants came to an agreement, much less an unlawful one. Similarly, the Court need not accept at face value UAC's bald assertions that the "quality" of "Bitcoin Cash" decreased, that it adequately pleaded a relevant market, or that it suffered injury attributable to diminished rather than enhanced competition. An antitrust plaintiff's ipse dixit is never sufficient to defeat a motion to dismiss, especially where the pleadings reveal that the challenged practice resulted in *more* competition and *greater* choice.

Finally, it is perfectly fair to dismiss the Amended Complaint with prejudice. The Court afforded UAC substantial leeway to prosecute its case, and aptly pointed out that "we don't do this endlessly." Tr. 152:17. The Supreme Court expressed that same sentiment in *Bell Atlantic Corp. v. Twombly*, holding that antitrust pleading standards operate to "prevent[] a plaintiff with a largely groundless claim from taking up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value." 550 U.S. 544, 546 (2007) (cleaned up). UAC repeatedly failed to plead facts supporting an inference that Defendants came to any agreement, still has not pleaded a plausible *per se* or rule of reason claim, and its latest attempt to recast its failure to compete as an antitrust injury is both transparent and unavailing. There is no competitive problem to be remedied here, and it is time for this case to end.

## ARGUMENT

**I.     UAC fails to allege that Defendants joined any agreement, much less an unlawful antitrust conspiracy to "hijack" the Bitcoin Cash network.**

The Court should be very familiar with UAC's legal and factual arguments in support of its conspiracy allegations, because it has heard them all before. None rescue UAC's claims.

### A.     UAC's attempt to narrow the scope of this Court's review is unavailing.

UAC begins, as before, by shadow boxing. This time, it accuses Defendants of applying a probability standard to its pleadings when *Twombly* only calls for plausibility. (Opp. at 8.) But there is no dispute about the plausibility standard under *Twombly*—as UAC acknowledges, a plain-tiff must plead enough facts to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* (quoting *Twombly*, 550 U.S. at 556-57). As before, it is UAC's assump-tion that its pleadings *meet* that standard that is flawed.

Rather than plead "facts that support that each Defendant entered into the agreement," Tr. 81:7-11, UAC asks the Court to lower its expectations. "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases," UAC asserts, so the Court should overlook the Amended Complaint's factual shortcomings. (Opp. at 7 (quoting *Lakeland Reg'l Med. Ctr. v. Astellas US LLC*, No. 10-2008, 2011 WL 3035226, at *3 (M.D. Fla. July 25, 2011))). Wrong again. As Defendants previously explained, the *Lakeland* court distilled that lesson from the Eleventh Circuit's opinion in *Spanish Broadcasting Systems v. Clear Channel Communications*, 376 F.3d 1065, 1070 (11th Cir. 2004). *Spanish Broadcasting* preceded *Twombly*—in the latter, the Supreme Court "explicitly retired the pleading standard" that the Eleventh Circuit applied in the former. *Solomon v. Blue Cross & Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1291 (S.D. Fla. 2008). Dispelling any lingering doubt, *Quality Auto Painting* confirmed that *Twombly* erased any presumption against dismissals in antitrust cases. 917 F.3d at 1267 (holding that thinly supported antitrust claims "should not proceed directly past a motion to dismiss and into the expensive and settlement-inducing quagmire of antitrust discovery"). Vestigial precedent provides no refuge for UAC.

## B.  UAC's pleadings do not support a plausible inference of conspiracy.

UAC concedes that it lacks direct evidence and relies exclusively on circumstantial allegations of conspiracy. It must therefore plead facts indicative of parallel conduct by competitors and "plus factors tending to establish that the defendants were . . . in a collusive agreement to . . . restrain trade" to overcome a motion to dismiss. *Quality Auto Painting*, 917 F.3d at 1261-62; *Twombly*, 550 U.S. at 557 (antitrust plaintiffs must place any allegations of parallel conduct "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action"). UAC fails each obligation.

### 1.  UAC does not identify any competitors, much less plead that they acted in parallel.

Hoping in vain to score easy points, UAC asserts that Defendants "concede that the Amended Complaint adequately pleads parallel conduct." (Opp. at 10.) Not so. UAC overlooks the passages of Defendants' Joint Motion to Dismiss calling out UAC's failure to plead that Defendants compete in any relevant market. (*See* Joint Mot. at 10.)

UAC does not plead "parallel conduct" within the meaning of the antitrust laws—"competitors adopting similar policies around the same time in response to similar market conditions." *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015). The

– 3 –

Amended Complaint alleges that Bitmain Technologies reallocated some of its "hashing power," but it also states that Wu's company was a *supplier* to Ver's company. (FAC ¶ 67; Joint Mot. at 10). Only Cox and Chancellor were allegedly involved in creating a software checkpoint (FAC ¶ 87; ECF No. 50, at 3), and only Kraken operates a trading exchange (FAC ¶ 71). UAC's failure to plead parallel conduct by competitors is itself grounds for dismissal. *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) (if a plaintiff "has not plausibly alleged any parallel conduct" its "plus factors are … irrelevant").

### 2.    The Amended Complaint does not contain any facts that tend to exclude the possibility of independent action.

The balance of UAC's circumstantial allegations do not advance its argument or raise a plausible inference of agreement (much less an unlawful agreement that restrains trade). UAC concedes, as it must, that a fact or series of facts cannot give rise to a plus factor unless they "tend[] to exclude the possibility of independent action." (Opp. at 10 (quoting *Williamson Oil Co. v. Philip Morris, USA,* 346 F.3d 1287, 1301 (11th Cir. 2003))). None of UAC's allegations so qualify.

UAC first contends that its pleadings make out an "action against self-interest" plus factor with respect to certain Defendants.[2] In general, "acts that would be irrational or contrary to the defendant's economic interest if no conspiracy existed, *but which would be rational if the alleged agreement existed*, . . . tend to exclude the possibility of innocence." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1044 (8th Cir. 2000). The Eleventh Circuit has cautioned courts to "exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest [they] be too quick to second-guess well-intentioned business judgments of all kinds." *Williamson Oil Co.*, 346 F.3d at 1310. "[I]f a benign explanation for the action is equally or more plausible than a collusive explanation," it cannot be a plus factor. *Id.*

Rehashing its unsubstantiated assertion that Wu and Bitmain Technologies "temporarily reallocat[ed] hash power from customers . . . without their authorization or consent," UAC claims that those two Defendants—by electing to mine the Bitcoin Cash network during the fork—were

---

[2] UAC's Opposition does not attempt to address UAC's failure to allege Bitmain, Inc. participated in the conspiracy at all. (*See* Joint Mot. at 13.)

effectively choosing to "'dump' the price of Bitcoin Core, a network [Wu] was significantly dedicated to prior to the hash war." (Opp. at 11 (citing FAC ¶¶ 68-69)).[3] This claim is defective for two reasons. First, none of these arguments tends to exclude the possibility that Wu and Bitmain Technologies were as dedicated to the future of Bitcoin Cash as they were to Bitcoin Core or "independently supported the software implementation they considered to be superior." (*See* Joint Mot. at 17.) The Amended Complaint alleges that (1) Bitmain Technologies actively mined Bitcoin Cash prior to the fork (FAC ¶¶ 61, 84), and (2) Wu was "all in" on supporting the ABC upgrade. (FAC ¶ 69.). Second, neither the Amended Complaint nor UAC's brief explain how or why it would be contrary to Wu's and Bitmain Technologies' self-interest to mine one cryptocurrency over another. Indeed, UAC did even not plead any facts suggesting that the price of Bitcoin Core dropped disproportionately during or after the fork. In sum, it remains unclear why UAC claims the decision to mine the Bitcoin Cash network "would be rational if the alleged agreement existed," but "irrational or contrary to [their] economic interest if no conspiracy existed." *See Blomkest Fertilizer, Inc.*, 203 F.3d at 1044.

Similarly, UAC submits that Kraken CEO Jesse Powell and his company—"a supposedly neutral cryptocurrency exchange"—acted irrationally when they made public statements in support of the ABC chain. (Opp. at 12 (citing FAC ¶¶ 71-72)). Building on yet another unsubstantiated assertion—that Kraken's "revenue is dependent on the volume of trade regardless of the asset being traded"—UAC takes the position that a rational cryptocurrency exchange would *never* provide public guidance on a particular cryptocurrency. *Id.* That argument unravels in multiple directions. UAC itself pleaded that the period in which the fork occurred was one of upheaval in the industry (*see* FAC ¶ 98), but it ignores the reasonable possibility that "Kraken's vetting of the SV chain on behalf of its clients [appears to have been] in furtherance of, rather than contrary to, its self-interest." (Joint Mot. at 14). UAC's silence is all the more inexplicable in light of its allegation that cryptocurrency exchanges *not* identified as conspirators apparently shared Kraken's concerns.

---

[3] UAC repeatedly makes arguments not supported by allegations in the Amended Complaint, including that Wu was "significantly dedicated to" Bitcoin Core. (Opp. at 11.) The Amended Complaint provides a quote that it attributes to Wu based "[u]pon information and belief," (FAC ¶ 69), but never explains what information leads it to believe the quote is from Wu, *id*. Moreover, UAC wholly ignores in its Opposition that its allegation about Bitmain Technologies "reallocat[ing]" customer hash power without their consent is contradicted by the very sources UAC cites in the Amended Complaint. (Joint Mot. at 30 n.21.)

(FAC ¶ 97 ("Some trading platforms have chosen to list only one of the two resulting currencies.").)

Finally, the Amended Complaint and UAC's Opposition are silent as to how the other Defendants—Roger Ver, Shammah Chancellor, and Jason Cox—contravened their self-interest. UAC does not plead *any* new facts with respect to Cox and Chancellor, much less facts suggesting action against self-interest. (*See* Joint Mot. at 20.[4]) Similarly, there is no dispute that Roger Ver's conduct throughout the fork and its aftermath—publicly advocating for ABC and then mobilizing his resources to vote for it—was consistent with his self-interest. (*See* Joint Mot. at 10.) UAC insists that "[c]ourts have found an inference of conspiracy where parallel conduct . . . is contrary *to each defendant's* economic self-interest." (Opp. at 11 (citing *Quality Auto Painting*, 917 F.3d at 1249).) With respect to this category of plus-factor allegations, then, UAC flunked its own test.

At the end of the day, UAC's argument appears to be that because it says Bitcoin Cash SV is clearly superior to Bitcoin Cash ABC, Defendants acted against their own economic self-interest (and thereby violated federal antitrust law) by supporting ABC. But UAC alleges nothing calling into question the common-sense conclusion that these parties—and thousands of others like them—simply disagreed with UAC and independently supported one software upgrade over another.

### 3.     UAC's remaining allegations do not give rise to any plus factors.

The Court dealt with the first set of UAC's remaining allegations at the hearing earlier this year, and it need not revisit the reasons that each failed to raise an inference of agreement.[5] And, as Defendants explained in the Joint Motion to Dismiss (Joint Mot. at 11-12), none of the handful of genuinely new allegations in the Amended Complaint—including the public statements UAC attributes or applies to various Defendants (*see* Opp. at 5, 10-14)—nudge UAC's claims across the line from conceivable to plausible. Notwithstanding UAC's serial mischaracterization of many of

---

[4] The Court earlier concluded that the same set of allegations against Chancellor and Cox did not satisfy antitrust pleading standards. (Tr. 115:6-13.)

[5] (*See* Opp. at 10 (noting Ver and Powell were high school friends), 13 (reprising YouTube video involving former Kraken employee Andreas Brekken).) UAC's contention that the cryptocurrency market is "highly susceptible to collusion (Opp. at 15 n.2)—which it tucked into a footnote and apparently copied directly from its opposition to Chancellor's first motion to dismiss (*see* ECF No. 49, at 8 n.2)—lacks any basis in its pleadings. The Court can and should disregard that argument. *See Moody v. Ascenda USA Inc.*, No. 16-cv-60364-WPD, 2016 WL 4702681, at \*5 (S.D. Fla. July 1, 2016) ("[P]laintiffs cannot amend their complaint through a response to a motion to dismiss.").

those statements (*see* Opp. at 5), *none* of them hints at any coordination between Defendants. (*See* Joint Mot. at 11-13 (discussing Wu's and Ver's public statements, "UAC's creative characterization" of certain of those statements, and explaining why each is more consistent with unilateral action than a conspiracy).)

Reprising its strategy from the last round of briefing, UAC invokes *In re Delta/AirTran Baggage Fee Antitrust Litigation*, 733 F. Supp. 2d 1348 (N.D. Ga. 2010). It argues that the *Baggage Fee* court recognized a category of plus-factor allegations based on the alleged conspirators' public statements. (Opp. at 13-14.) But that court did not hold that *all* public statements may raise an inference of conspiracy, as UAC appears to assume. It instead pointed to specific facts in the complaint describing a series of "collusive communications . . . in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways." 733 F. Supp. 2d at 1359-60. Critically, the court pointed to "collusive communications *among competitors* [that] precede[d] changed/responsive business practices." 733 F. Supp. 2d at 1360. UAC, by contrast, has yet to identify a *single* communication between *any* of the Defendants in its briefing or the Amended Complaint. Not one. For an industry in which the participants liberally exchange information in full view of the public (*see, e.g.*, FAC ¶¶ 76-79), that omission is telling. Instead, UAC points to Defendants' comments about their own business strategies (*see, e.g.*, FAC ¶ 69 (Wu allegedly discussed "relocating [the] hash power . . . to BCH mining"), or public events visible to all industry observers (*see e.g.*, *id.* ¶ 73 (Wu "publicly congratulated Bitcoin.com for mining the first block with the ABC rule set").) Those are exactly the type of public statements that do not, and should not be categorized as evidence suggestive of conspiracy.[6]

Finally, UAC insists that its statement that the "reallocation of Bitmain Technologies' hashing power onto the Bitcoin.com pools could not be accomplished" without advance coordination is not a conclusion, but "clearly factual and well-pleaded." (Opp. at 11.) The cure for a conclusory allegation is not an equally conclusory assertion in an opposition to a motion to dismiss. UAC has

---

[6] *See Jones v. Micron Technology Inc.*, 400 F. Supp. 3d 897, 918-20 (N.D. Cal. 2019) (dismissing complaint, noting that federal courts are "properly reluctant" to characterize public statements concerning business strategies "as evidence of unlawful conspiracies," and holding that "individual Defendants' indications of their own future behavior and descriptions of their past behavior, predictions of industry trends, and observations about competitor behavior . . . . are insufficient to support an inference of conspiracy because they are not 'largely inconsistent with unilateral, lawful conduct.'").

never alleged or explained how Bitmain Technologies—which operated "two of the largest Bitcoin [Core] and Bitcoin Cash mining pools in the world," (FAC ¶ 61), and mined Bitcoin Cash before the fork (*id.* ¶ 84)—would have to coordinate with anyone to continue to operate those pools (even with increased "hash power"). UAC's assertion that "a conspiracy is the only plausible explanation" for Defendants' conduct remains a non-starter. *See Duty Free Americas, Inc. v. Estée Lauder Cos.*, 946 F. Supp. 2d 1321, 1331 (S.D. Fla. 2013).

## II.      UAC fails to plead facts suggesting that any Defendant imposed an unreasonable restraint on competition.

For the reasons this Court already identified and the Defendants already explained, UAC's *per se* theories are factual and legal dead ends. (Joint Mot. at 15-18.) None of UAC's arguments disturbs the Court's conclusion that "[t]his is going to be a rule of reason case, if anything." (*See* Tr. 114:22-115:5.) And UAC offers no answer to the questions "[h]ow is this bid rigging?" (Tr. 93:1-2), and "how is this a group boycott?" Having failed to plead a *per se* claim, UAC's only remaining avenue is through the more demanding rule of reason framework. Neither the Amended Complaint nor UAC's Opposition begin to describe how Defendants' conduct caused "actual or potential harm to competition," the crux of the rule-of-reason inquiry. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010). Instead, UAC grasps at straws: it suggests restraints of trade without any basis in the law, fails to plead product or geographic markets, offers no explanation about the parties' positions in the relevant markets, and cannot identify *any* indication that Defendants—individually or collectively—possessed market power. UAC's repeated failure to explain how Defendants injured competition warrants dismissal with prejudice.

### A.      None of UAC's allegations evinces actual harm to competition.

UAC does not seriously dispute its failure to point to "specific allegations" describing actual harm to competition. *Jacobs*, 626 F.3d at 1339. UAC does not point to any quantifiable loss of output, increase in price, or measureable diminution of quality in a relevant antitrust market. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (identifying actual harms to competition). That outcome is not surprising: the fork *enhanced* consumer choice and competition.

In its Amended Complaint, UAC asserted that "[t]he conspiracy . . . resulted in a deterioration in the quality of Bitcoin Cash." (FAC ¶ 114.) It now advances several equally conclusory arguments in its briefing: that Defendants "rendered the competitive efforts of the Bitcoin Cash community . . . futile"; that the "losing faction was required to start from scratch"; that the "ABC

version of the software implementation proposed during the fork sought to stifle improvements proposed by the SV version"; and that the implementation of a checkpoint prevented "innovative ideas from being put to an honest vote to the Bitcoin Cash community." (Opp. at 18-19.).

None of these arguments rests on a foundation of fact. The Amended Complaint does not identify actual indicia of diminished quality, nor does it explain how or why the two currencies that emerged after the fork—SV and ABC—are in any way inferior to the unitary pre-fork currency. Tellingly, UAC omits any allegations showing how consumers, miners, or other stakeholders actually responded to competition between ABC and SV, and it does not contest that ABC and SV now compete for users and as tradeable instruments. (*See* Joint Mot. at 20-21.) In fact, UAC alleges that Bitcoin Cash SV has the qualities lacking in Bitcoin Cash ABC (FAC ¶ 50), but ignores that anyone seeking those qualities can simply mine SV rather than ABC (FAC ¶¶ 51, 74).

In short, UAC's pleading lacks the requisite "specificity" of allegations showing actual harm to competition. *See Jacobs*, 626 F.3d at 1340 ("[A] sparse allegation [of harm to competition] is precisely the type of bare legal conclusion that was insufficient in *Twombly* and *Iqbal*."). It neither cured nor addressed one of this Court's key concerns: "I don't think you've sufficiently alleged harm to competition . . . [or] have facts that plausibly establish harm to competition." (Tr. 116:12-14.)

**B.    UAC does not plausibly allege potential harm to competition in a relevant product or geographic market.**

Having failed to demonstrate actual harm to competition, UAC asserts that "the Amended Complaint pleads potential harm to competition." (Opp. at 19.) The Court should place little faith in that assertion: UAC never explains or describes this "potential harm," nor does UAC plausibly allege a relevant product or geographic market in which the Defendants exercised market power. *See Jacobs*, 626 F. 3d at 1339.

**1.    UAC does not allege facts in support of a relevant geographic market.**

A rule-of-reason plaintiff must plead a geographic market that "corresponds to the commercial realities of the industry, is economically significant . . . and includes the area in which consumers can practically seek alternative sources of the product." *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1289-91 (S.D. Fla. 2018). The Amended Complaint does not allege a relevant geographic market. Failure to allege a relevant "geographic market in the complaint is

fatal to the plaintiff's claims." *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 971 F. Supp. 1419, 1426 (M.D. Fla. 1997), *aff'd*, 145 F.3d 1258 (11th Cir. 1998).

After flouting this Court's direction to define a relevant geographic market in its Amended Complaint, UAC attempts to ride to the rescue in its briefing (again). It argues in its Opposition that the relevant geographic market encompasses the "entire world." (Opp. at 18.) Nonsense. Not only did UAC not plead any facts defining the contours of a plausible geographic market, it did not even attempt to analyze the factors relevant to that determination.[7] The form of UAC's argument is just as problematic as its substance: it appears for the first time in a brief, but as the Court has already explained, UAC cannot amend its pleadings in an opposition to a motion to dismiss. (*See, e.g.,* Tr. 116:8-12); *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002) (on a motion to dismiss, "review must be limited to the four corners of the complaint."). The Court need not, and should not, afford UAC another chance to comply with basic pleading requirements.

### 2. UAC does not allege a relevant product market.

Shifting to the other extreme end of the antitrust market definition spectrum, UAC impermissibly alleges that the relevant product market consists solely of a single product—"Bitcoin Cash cryptocurrency." (FAC ¶¶ 103, 111). But UAC does not even attempt to describe what is included and excluded from UAC's proposed market for "Bitcoin Cash." And neither the Amended Complaint nor the Opposition contain any arguments or allegations that speak to the cross-elasticity of demand or other indications of consumer sensitivity that would indicate whether consumers treat "Bitcoin Cash" differently than they do other plausible alternatives. *See Jacobs*, 626 F.3d at 1338. The Court should reject UAC's implausible product market definition.

Courts routinely reject single-product or one-brand product markets, because such narrow markets can overstate market power or the anticompetitive effect of the alleged misconduct. *See, e.g., Metzler v. Bear Auto. Serv. Equip. Co*., 19 F. Supp. 2d 1345, 1355 (S.D. Fla. 1998) ("[A]bsent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market."); *Midwestern Waffles, Inc. v. Waffle House, Inc*., 734 F.2d 705, 713-14 (11th Cir. 1984); *Restore Robotics, LLC v. Intuitive Surgical, Inc*., 5:19-cv-55, 2019 WL 8063989,

---

[7] *See Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985); U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES 13 (2010), https://tinyurl.com/y72nj7fn (agencies should consider transportation costs, language, regulations, tariff and non-tariff trade barriers, custom and familiarity, reputation, and service availability).

at *5 (N.D. Fla. Sept, 16, 2019). So too here. UAC cannot, as Defendants have already explained, ignore hundreds of cryptocurrencies and other instruments intended for use in "day-to-day transactions." (*See* Joint Mot. at 24; *see also* FAC ¶¶ 33, 42-44.)[8]

Instead of responding to Defendants' arguments or identifying facts that support its proposed product market definition, UAC reiterates the Amended Complaint's conclusory and ultimately insufficient allegation that "Bitcoin Cash was a unique product." (Opp. at 16-17.) Similarly, UAC asserts (without citing facts) that other instruments like fiat currencies "lack the distinguishing feature that makes Bitcoin Cash unique — its decentralization." (Opp. at 16-17.) But as Defendants have already explained, "[t]he operative question is not whether the product itself is unique, but whether there are alternative sources that consumers can use for the same purpose." *PayCargo, LLC v. CargoSprint, LLC*, No. 3:19-cv-85, 2019 WL 5793113, at *2-3 (N.D. Ga. Nov. 4, 2019); *see also Jacobs*, 626 F.3d at 1338 (allegations detailing "'unique attributes' are … of little help"). As UAC acknowledges, there are numerous other digital currencies, "[p]opular forms of [which] include Bitcoin, Bitcoin Cash and Ethereum." (FAC ¶ 22.) UAC never explains why these "popular" digital currencies are not reasonable substitutes for "Bitcoin Cash" or lack the characteristic that purportedly sets Bitcoin Cash apart (decentralization). UAC cannot chalk up those omissions to a forgivable "lack of precision" at the pleading stage (Opp. at 17)—those facts are critical to identifying the relevant product market in the first instance. *See Jacobs,* 626 F.3d at 1337-38.

Even assuming that "Bitcoin Cash" could be a relevant antitrust product market or submarket, the Amended Complaint is hopelessly vague as to what products are included and excluded from that market. Despite its concession that both versions of Bitcoin Cash (ABC and SV) compete with each other for users and as tradeable instruments on digital currency exchanges (FAC ¶ 77), UAC now suggests that the Court wear blinkers. Without citing a scrap of fact or law, UAC insists that "the relevant product market is that which existed at the time of the fork, not after the fork resulted in Defendants' complete dominance of Bitcoin Cash and caused the proponents of the SV version to have to shift to a new cryptocurrency." (Opp. at 17.) That assertion—that the Court must ignore the competitive effects of the conduct at issue and the emergence of ABC and SV—is wrong

---

[8] That approach is especially inappropriate because UAC's pleadings *undermine* its apparent belief that "Bitcoin Cash" comprises a single-product market. (*See* Joint Mot. at 25 (noting that FAC itself alleges that miners may substitute hash power across cryptocurrency networks)).

as a matter of law, and would turn the antitrust analysis of relevant product markets on its head. In his landmark opinion in *Board of Trade of Chicago v. United States*, 246 U.S. 231 (1918), Justice Brandeis made clear that an antitrust court must "consider the facts peculiar to the business to which the restraint is applied; *its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.*" *Id.* at 238.

UAC's contorted attempt to define a relevant product market illustrates why an antitrust plaintiff may not simply pick and choose products to include or exclude from the relevant market. Properly defining a plausible product market is critical to determining who the market participants are, whether competition in the proposed market has been adversely affected, and gauging a plaintiff's claim to antitrust injury and standing. That UAC now seeks to have this Court ignore SV—the cryptocurrency that it simultaneously champions—is the most tangible proof of its failure to undertake that project.

Finally, as it does elsewhere, UAC seeks to redefine its obligations at the pleading stage. It submits that it will surely shore up its relevant market allegations with discovery, and that it need not precisely define relevant markets at the pleading stage anyways. (Opp. at 17.) But it is not entitled to discovery or the benefit of the doubt unless and until it defines plausible product and geographic markets. It has twice failed to do so, and is not entitled to a third chance. *See Q Club Resort & Residences Condo. Ass'n v. Q Club Hotel, LLC*, No. 9-cv-60911, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010) (granting Rule 12(b)(6) dismissal "where the plaintiff's description of the [relevant] market [wa]s legally inadequate and/or wholly conclusory"); *see also, e.g.*, *Jacobs*, 626 F.3d at 1336 (affirming dismissal for failure to allege plausible relevant market).

### 3. UAC does not plead facts demonstrating that Defendants possessed market power.

Further compounding its problems, UAC never plausibly alleges the necessary market power, and its Opposition has no answer to this fatal flaw. To bring a potential effects rule-of-reason claim, UAC must "establish that the defendant[s] had market power in a well-defined relevant market." *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1216 (11th Cir. 2002). UAC had to plead facts showing that Defendants could raise prices above the competitive level in the alleged "Bitcoin Cash" market, or force consumers to make choices they would not make in a competitive market. (*See* Joint Mot. at 25-27). Those facts do not grace the Amended Complaint.

Even assuming that it could define a "Bitcoin Cash" product market, UAC neglects to show how Defendants—individually or collectively—possessed power in that narrowly defined market. For example, UAC's answering brief focuses on its allegations that Bitmain Technologies "controls in excess of 60% of the world's *cryptocurrency mining* computer hashing power" and operates "two of the largest *Bitcoin* and Bitcoin Cash *mining* pools in the world." (Opp. at 19; FAC ¶¶ 60-61.) Similarly, its Amended Complaint alleges that Kraken "purports to be the largest *Bitcoin* exchange in Euro volume and liquidity." (FAC ¶ 71 n.5.) But according to UAC, Bitcoin and Bitcoin Cash are *not* part of the same market. (*See* FAC ¶¶ 42-44.) UAC cannot exclude products from its proposed market definition (in order to arbitrarily narrow that definition), and then rely on allegations about those excluded products to show market power in the (arbitrarily narrow) market. *Cf. RxStrategies, Inc. v. CVS Pharmacy, Inc.*, 390 F. Supp. 3d 1341, 1349-51 (M.D. Fla. 2019) (finding plaintiff failed to sufficiently allege market power notwithstanding allegations "about CVS's national market power and market share in certain states" because it elsewhere alleged that the relevant "geographic markets are local").

Indeed, it is not at all clear why firms that mine cryptocurrencies and those that operate cryptocurrency exchanges fall into the same antitrust product market. The output of those firms— new cryptocurrency for miners, and transactions for the exchanges—suggests the opposite. *See also supra* Section I.B.1. In any event, even in circumstances in which plaintiffs have pleaded that defendants possess high market shares in a relevant market, those allegations do not translate to an inference of market power in the absence of facts suggesting high barriers to new entry or expansion by existing firms. *See, e.g., Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc.*, 101 F. Supp. 3d 1319, 1341 (N.D. Ga. 2015) ("[E]ven a market share of 100% is not determinative."). UAC never alleges (or argues) that the cryptocurrency market is characterized by high entry barriers. To the contrary, UAC observes that in its relatively short history, the cryptocurrency industry has been the locus of vigorous competition and new entry. (FAC ¶¶ 22, 33.)

### 4. The Amended Complaint does not link Defendants' alleged exercise of market power to an injury to competition.

Finally, an antitrust plaintiff must allege facts linking the defendants' exercise of market power to an injury to competition. (Joint Mot. at 27 (citing *Jacobs,* 626 F.3d at 1339-40).) UAC does not even attempt to explain how Defendants could or did exercise their purported market power to injure competition in the "Bitcoin Cash" market, nor does it point to any indicia of that

injury. (Opp. at 19-20.) All of the facts suggest the opposite: that the allegedly restrained market is characterized by intensifying competition and diversifying consumer choice.

### III.    UAC lacks antitrust standing, because it does not allege an antitrust injury.

Compounding its other pleading failures, UAC again fails to link its alleged injury to any harm to *competition*, a necessary element to establish antitrust injury and a prerequisite to any antitrust suit. *See Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389 (11th Cir. 1990) (affirming dismissal for failure to adequately plead antitrust standing). UAC's vague, conclusory arguments do not cure the basic defects Defendants identified, viz., that UAC claims to have suffered injury as a result of *increased* competition between the Bitcoin Cash ABC and SV chains; and that UAC does not allege facts that show a chain of causation between Defendants' purported advocacy for ABC and the post-fork value of SV and ABC. (Joint Mot. at 27-30; *see also* FAC ¶ 48.)

UAC claims it suffered an antitrust injury when some Defendants allegedly implemented a "checkpoint" on the Bitcoin Cash ABC branch of the fork, supposedly preventing "current miners of the Bitcoin Cash blockchain from implementing new software to improve upon the quality of Bitcoin Cash." (Opp. at 23; FAC ¶ 87.[9]) This claim wholly and inexplicably ignores Bitcoin Cash SV. Rather than tracing its alleged injuries to a competition-*reducing* aspect of Defendants' conduct, *see Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990), the Amended Complaint describes the *burgeoning* competition between ABC and SV (*see, e.g.,* FAC ¶ 74 (showing ongoing mining activity as to both cryptocurrencies)). UAC never resolves that disconnect.

The Amended Complaint also alleges that SV possesses the qualities UAC apparently prefers in a blockchain—increased block sizes, no checkpoint, and scalability. (*Id*. ¶ 50.) Again, UAC offers no allegation that Defendants prevented UAC (or anyone else) from mining and trading SV, and no support for its assertion that Defendants prevented it from implementing software improvements to the SV chain. *See Johnson v. Univ. Health Servs., Inc.*, 161 F.3d 1334, 1338 (11th Cir. 1998) (no antitrust injury where "absolutely no one interfered with [plaintiff's] freedom to compete"). Likewise, UAC apparently concedes that the checkpoint had no impact on the head-to-head

---

[9] Per UAC, "[o]nly Defendants can remove the checkpoint" to change the Bitcoin Cash ABC software now, which somehow is a "reflection of their manipulation and domination of the market and tacit admission that what they did was an unlawful restraint." (Opp. at 23.) But UAC does not explain how the existence of the checkpoint is a "tacit admission" of anything. *Id.*

competition between SV and ABC (or, for that matter, between either Bitcoin Cash and Bitcoin Core, or any of the hundreds of other cryptocurrencies in existence today). In short, the end result of this free market, survival-of-the-fittest "hash war" was *increased*, not diminished competition. UAC cannot dispute that injuries sustained from enhanced rather than diminished competition are not cognizable under the antitrust laws. *See Atl. Richfield*, 495 U.S. at 338 n.7.

UAC next asserts that it would be an efficient enforcer of the antitrust laws because it invested in technology for the purpose of mining Bitcoin Cash, and "Defendants' scheme . . . centraliz[ed] Bitcoin Cash in Defendants' hands" and reduced the economic value of the mining output. (Opp. at 24.) Yet again, UAC fails to offer any facts suggesting *how* Defendants' alleged "centralization" reduced the economic value of its mining output, or linking that reduction with the allegedly diminished value of UAC's Blockchain Domes investment. The facts that UAC *did* allege suggest that the source of its injury was not Defendants' conduct, but the hard fork itself (FAC ¶ 48). UAC does not dispute that the Bitcoin Cash blockchain would have split into two chains, regardless of Defendants' alleged conduct. (*See* Joint Mot. at 27-30.) Similarly, UAC concedes that regardless of the fork's outcome, the "losing" software would continue to exist on "a new and distinct chain." (FAC ¶ 52.[10]) Accordingly, UAC has done nothing to isolate Defendants' alleged conduct as a cause of its purported injuries, and has therefore not shown that it would be an efficient enforcer of the antitrust laws. *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1451–52 (11th Cir. 1991) (to determine whether a plaintiff is an efficient enforcer, courts consider factors such as "the directness or indirectness of the asserted injury," "the remoteness of the plaintiff's alleged harm," and whether the "plaintiffs' damages claims were highly speculative").

In sum, UAC may regret that the hard fork and subsequent hash war occurred. But the undeniable fact is that competition not only remained intact, it *intensified* after the fork. The antitrust laws afford no remedy to those who suffer the slings and arrows of a competitive market.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint with prejudice.

---

[10] In fact, UAC does not even allege that centralizing Bitcoin Cash ABC would decrease the value of mining output. Rather, it asserts that centralization "*can* ultimately result in *predatory pricing* thereby reducing the economic value of the output so low as to eliminate competition and ultimately result in market control and centralization," (FAC ¶ 41), but does not plead any factual basis to demonstrate that any predatory pricing has occurred.

Dated: May 8, 2020

Respectfully submitted,

*/s/ Melissa C. Pallett-Vasquez*
MELISSA C. PALLETT-VASQUEZ
Florida Bar No. 715816
mpallett@bilzin.com
LORI P. LUSTRIN
Florida Bar No. 59228
llustrin@bilzin.com
**BILZIN SUMBERG BAENA PRICE &
AXELROD LLP**
1450 Brickell Ave, Suite 2300
Miami, Florida 33131
Tel.: (305) 374-7580
Fax: (305) 374-7593

IAN SIMMONS (*pro hac vice*)
isimmons@omm.com
KATRINA ROBSON (*pro hac vice*)
krobson@omm.com
SERGEI ZASLAVSKY (*pro hac vice*)
szaslavsky@omm.com
ZHAO LIU (*pro hac vice*)
zliu@omm.com
BRIAN P. QUINN (*pro hac vice*)
bquinn@omm.com
PATRICK JONES (*pro hac vice*)
pjones@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street N.W.
Washington, D.C. 20006
Tel.: (202) 383-5300
Fax: (202) 383-5414

*Attorneys for Defendants Shammah Chancellor,
Jason Cox, and Roger Ver*

– 16 –

*/s/ Christopher R.J. Pace*

CHRISTOPHER R.J. PACE
Florida Bar No. 721166
crjpace@jonesday.com
MARC A. WEINROTH
Florida Bar No. 42873
mweinroth@jonesday.com
**JONES DAY**
600 Brickell Avenue
Suite 3300
Miami, Florida 33131
Tel.: (305) 714-9700
Fax: (305) 714-9799

JULIE M. MCEVOY (*pro hac vice*)
jmcevoy@jonesday.com
**JONES DAY**
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Tel.: (202) 879-3939
Fax: (202) 626-1700

MARK W. RASMUSSEN (*pro hac vice*)
mrasmussen@jonesday.com
THOMAS D. YORK (*pro hac vice*)
tdyork@jonesday.com
**JONES DAY**
2727 N. Harwood Street
Suite 500
Dallas, TX 75201
Tel.: (214) 220-3939
Fax: (214) 969-5100

*Attorneys for Defendants Bitmain, Inc., Bitmain Technologies Ltd., and Jihan Wu*

*/s/ Andrew C. Lourie*

ANDREW C. LOURIE
Florida Bar No. 87772
andrew.lourie@kobrekim.com
**KOBRE & KIM LLP**
201 South Biscayne Boulevard
Suite 1900
Miami, Florida 33131
Tel.: (202) 664-1907
Fax: (305) 967-6120

BRIAN E. KLEIN (*pro hac vice*)
bklein@bakermarquart.com
DONALD R. PEPPERMAN (*pro hac vice*)
dpepperman@bakermarquart.com
**BAKER MARQUART LLP**
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
Tel.: (424) 652-7800
Fax: (424) 652-7850

*Attorneys for Defendants Payward Ventures,
Inc. d/b/a Kraken and Jesse Powell*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 8, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Melissa C. Pallett-Vasquez*
Melissa C. Pallett-Vasquez