```
1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
2                           (MIAMI)
                   CASE NO. 1:18-CV-25106-KMW
3


4    UNITED AMERICAN CORP.

5                                     Davie, Florida

            PLAINTIFF,
6
                                      September 29, 2020
        vs.                           Tuesday
7
    BITMAIN, INC., ET AL.
8                                     Scheduled for 1:00 p.m.
                                      12:57 p.m. to 5:35 p.m.
9           DEFENDANTS.

10                                    Page 1 - 184
    ------------------------------------------------------------
11


12                 TELEPHONIC MOTION HEARING


13

         BEFORE THE HONORABLE CHRIS M. MCALILEY
14             UNITED STATES MAGISTRATE JUDGE


15
    APPEARANCES:
16

17  FOR THE PLAINTIFF:        BRIAN PAUL MILLER, ESQ.
                              Akerman LLP
18                            Three Brickell City Centre
                              98 Southeast Seventh Street
19                            Miami, Florida  33131

20
                              LORAYNE PEREZ, ESQ.
21                            Akerman LLP
                              One Southeast Third Avenue
22                            25th Floor
                              Miami, Florida  33131
23

24

25
```

```
 1    APPEARANCES (CONTINUED):

 2

 3    FOR THE DEFENDANTS        MARK W. RASMUSSEN, ESQ.
      BITMAIN, INC.,            Jones Day
      BITMAIN TECHNOLOGIES,     2727 N. Harwood Street
 4    LTD., JIHAN WU:           Suite 500
                                Dallas, Texas   75201
 5

 6                              CHRISTOPHER R.J. PACE, ESQ.
                                Jones Day
 7                              600 Brickell Avenue
                                Suite 3300
 8                              Miami, Florida   33131

 9

10    FOR THE DEFENDANTS        DONALD R. PEPPERMAN, ESQ.
      PAYWARD VENTURES,         BRIAN E. KLEIN, ESQ.
      KRAKEN, JESSE POWELL:     Baker Marquart
11                              777 S. Figueroa Street
                                Suite 2850
12                              Los Angeles, California  90017

13

14                             ANDREW C. LOURIE, ESQ.
                                Kobre & Kim LLP
                                800 Third Avenue
15                              6th Floor
                                New York, New York  10022
16

17    FOR THE DEFENDANTS        IAN SIMMONS, ESQ.
      VER, CHANCELLOR, COX:     BRIAN P. QUINN, ESQ.
18                              PATRICK J. JONES, ESQ.
                                O'Melveny & Myers LLP
19                              1625 Eye Street, NW
                                Washington, D.C.  20006
20

21                             MELISSA PALLET-VASQUEZ, ESQ.
                                Bilzin Sumberg Baena
22                              Price & Axelrod
                                1450 Brickell Avenue
23                              Suite 2300
                                Miami, Florida  33131-2336
24

25
```

```
 1   STENOGRAPHICALLY
     REPORTED BY:              GLENDA M. POWERS, RPR, CRR, FPR
 2                             Official Court Reporter
                               United States District Court
 3                             400 North Miami Avenue - 8th Floor
                               Miami, Florida  33128
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
1              (Call to the order of the Court:)
2         COURTROOM DEPUTY:  Hi.  Who just called in?  This is
3    Nancy.
4         MR. MILLER:  Hi.  This is Brian Miller from Akerman on
5    behalf of the plaintiff.
6         COURTROOM DEPUTY:  Okay.  Mr. Miller, are you going to
7    be the only one calling in for the plaintiff or should we wait
8    for the rest?
9         MR. MILLER:  My colleague, Lorayne Perez, will be
10   dialing in.  I will be handling the argument.
11        COURTROOM DEPUTY:  Okay.  All right, we've got a few
12   minutes.
13        MR. MILLER:  Thank you.
14        (Brief pause in the proceedings.)
15        THE COURT:  Good afternoon, everyone.  Give me a minute
16   just to get myself settled here, since I have quite a few
17   papers.
18        (Brief pause in the proceedings.)
19        THE COURT:  So, good afternoon.
20        This is the United American Corp. versus Bitmain, Inc.,
21   et al., Case Number 18-25106.
22        Let's start with plaintiff's counsel's appearance.
23        MR. MILLER:  Good afternoon, Your Honor.  It's Brian
24   Miller from Akerman on behalf of the plaintiff, United American
25   Corp.
```

```
 1            And I believe my colleague should be on the line as
 2    well.  I will let her introduce herself.
 3            THE COURT:  Okay.
 4            MS. PEREZ:  Good afternoon, Your Honor.  This is
 5    Lorayne Perez from Akerman, also on behalf of United American
 6    Corp.
 7            THE COURT:  Okay, great.  Thank you very much.
 8            Hold on just a minute.  All right.
 9            And for the defendants?
10            MR. SIMMONS:  Good afternoon, Your Honor.  Ian Simmons,
11    O'Melveny & Myers, for defendants, Ver, Chancellor and Cox.
12            THE COURT:  Hold on, let me write that down.  I know
13    that from before, but still, I need to write it down again.
14            Ver, Chancellor and Cox.  Okay.
15            Anybody else with you, Mr. Simmons, representing those
16    defendants?
17            MR. SIMMONS:  Yes.  I invite my colleagues to introduce
18    themselves.
19            THE COURT:  Okay.
20            MR. QUINN:  Good afternoon, Your Honor.  This is Brian
21    Quinn for that same set of defendants.
22            THE COURT:  Okay.  Anyone else for those defendants?
23            MR. JONES:  Good afternoon, Your Honor.  This is
24    Patrick Jones, also from O'Melveny & Myers, also for the same
25    set of defendants.
```

```
1              THE COURT:  You said Johns?

2              MR. JONES:  Jones.

3              THE COURT:  Jones, okay.

4              MS. PALLET-VASQUEZ:  And, good afternoon, Your Honor.

5    This is Melissa Pallet-Vasquez of Bilzin Sumberg, here, in

6    Miami, on behalf of those same defendants, Cox, Chandler and

7    Ver.

8              THE COURT:  All right.  So is that all the counsel for

9    Ver, Chancellor and Cox?  Okay.

10             So who else do we have for defendants?

11             MR. PACE:  Good afternoon, Your Honor.  This is Chris

12   Pace from Jones Day.  I'm also on with Mark Rasmussen,

13   R-A-S-M-U-S-S-E-N, also from Jones Day.

14             And we are here representing Bitmain, Inc., Bitmain

15   Technologies Ltd., and Jihan Wu.

16             THE COURT:  Okay.  I'm writing that down.  All right.

17   Okay.  Anyone else?

18             MR. PEPPERMAN:  Good morning, Your Honor -- or good

19   afternoon.  This is Donald Pepperman from Baker Marquart on

20   behalf of the Payward/Kraken defendants and Jesse Powell.

21             THE COURT:  I'm writing that down.

22             Did you say Pepperman?

23             MR. PEPPERMAN:  Correct, P-E-P-P-E-R-M-A-N.

24             THE COURT:  Okay.  Anyone else with me, sir?

25             MR. KLEIN:  Yes, Your Honor.  This is Brian Klein,
```

```
 1    K-L-E-I-N, with the same law firm.

 2            THE COURT:  Okay, all right.  Any other counsel?

 3            MR. LOURIE:  Yes, Your Honor.  This is Andrew Lourie,

 4    L-O-U-R-I-E, also on behalf of Payward Ventures and Kraken and

 5    Jesse Powell.

 6            THE COURT:  Okay, I'm writing that down.  Okay.

 7            Anyone else for Payward and Powell?

 8            MR. LOURIE:  No, Your Honor.

 9            THE COURT:  Any other defendants or counsel?

10            MR. LOURIE:  That's everyone, Your Honor.

11            THE COURT:  Very good.  So let me -- so I'm going to

12    take a guess here, am I right, Mr. Simmons, you are doing most

13    of the speaking for the Ver, Chancellor and Cox defendants; is

14    that right?

15            MR. SIMMONS:  That's correct, Your Honor.  I will be

16    doing the argument, the joint argument.  But Mr. Rasmussen,

17    from the Jones Day law firm, will be speaking on the tutorial.

18            THE COURT:  Who is going to do the argument for Powell

19    and Payward?

20            MR. LOURIE:  Andrew Lourie, Your Honor.

21            THE COURT:  Mr. Miller, am I right, that you are going

22    to take the lead for the plaintiff?

23            MR. MILLER:  Correct, Your Honor.  Brian Miller for the

24    plaintiff, correct, Your Honor.

25            THE COURT:  All right, very good.  So, let me, first of
```

1    all, just welcome you again, and thank you for responding to my

2    change of plans requesting a tutorial.

3              I did receive by e-mail a series of documents, I guess

4    it's like a deck, maybe, from a PowerPoint, it's called

5    "Blockchain Fundamentals," which, I understand, is for the

6    tutorials.

7              I breezed through it, although, breezing is not enough

8    for me, but I have, and I see the work that went into it, and

9    I'm just very appreciative of your responding to my request a

10   little late in the game.  I kept thinking that I had this.

11             It turns out -- the factual matters, and I think I

12   mostly do, but I kind of came to terms with the fact -- I guess

13   it was on Thursday -- that I really thought that by having the

14   tutorial you could help me nail it down so that I, when I write

15   up an order, will do so, hopefully, without -- to doing justice

16   to the factual concepts in cryptocurrency.

17             So I appreciate that very much.

18             So we'll start with that, and then we'll take a break.

19   I want to say that my lawyer, A/K/A, law clerk, Ross Roberts --

20   who's sitting here with me -- he and I have been spending a lot

21   of time really studying the pleadings and the first amended

22   complaint and talking about the concepts, both, and how you

23   plead a Sherman Act claim, and the legal concepts and, of

24   course, the factual concepts.

25             And I'm going to, probably, from time to time, going to

```
1    take a moment and check in with Ross, as I told him I want him
2    to help me out with questions, any questions, you know, that I
3    might want to ask, and certainly that would be true for the
4    tutorial.  So we'll start with the tutorial, probably take a
5    little break and then go to the argument.
6            And I have afternoon, so I trust that will be plenty of
7    time.  I did want you to know that I did re-read the
8    transcript -- which I appreciate you ordering and getting
9    filed -- the transcript from the hearing -- the last hearing,
10   in January.  So much has happened since then; right?
11           And so, technically, for me to read it, I do -- and
12   before I forget, and this is pertinent to the argument, I want
13   to mention this.
14           Now, in some of your briefings you quote me from what I
15   said before, which I don't blame you, I understand, but it
16   really won't be helpful for me today, that will probably be
17   more true for the defendants, but maybe the plaintiff, to say,
18   Hey, Judge, back in January you decided that wasn't good enough
19   in the complaint, so they didn't add anything further down.
20           I'm starting fresh.  The first -- real quick -- I have
21   gone back and re-read the first complaint.  I appreciate you
22   sending me the red-line version of the two complaints.
23           I'll be frank with you, I haven't read it.  I just
24   studied the complaint that I had.  I'm trying to do it here now
25   to save face, and so I would find that, frankly, kind of
```

1    distracting.

2         I did re-read the transcript, and I am pretty on top of

3    what was said before, so don't worry about that.

4         So I just want to mention that.

5         Before we start with the tutorial, Mr. Miller, is there

6    anything on behalf of the plaintiff that you want to raise

7    about our procedures today or anything else?

8         MR. MILLER:  I don't think so, Your Honor.  Pursuant to

9    Your Honor's instructions, we corresponded with the defendants

10   about the tutorial and who should do it and what generally

11   would be said, and we agreed that because we're here on the

12   defendants' motion that they would ordinarily go first in any

13   argument, so that it was logical for them to give Your Honor

14   the tutorial.

15        We also discussed -- and I think they all agree -- and

16   Your Honor said in the order -- that it's to be a neutral

17   description of the technical concepts as opposed to getting

18   into argument, that's saved for later.

19        And then the last thing I do understand, Your Honor, in

20   the amended order, we're not hearing the personal jurisdiction

21   issues today, so, needless to say, I did not prepare on those.

22        I only prepared on the 12(b)(6) issue.

23        THE COURT:  Mr. Miller, I was just joking.

24        MR. MILLER:  I could fake it, Your Honor.

25        THE COURT:  I bet you could, and I bet you could do a

1    great job.  I thought we had plenty of work cut out, at least

2    for me, this afternoon.

3         Look, if I think that the complaint survives, then I

4    need to turn to the personal jurisdiction arguments; and if I

5    think that it doesn't, I don't, and I've got a command on the

6    obvious there.  So I thought this all worked out pretty well.

7         If I feel a need of help on personal jurisdiction, I

8    know how to reach you all.  So that's fine.

9         MR. MILLER:  Yes.  And we would welcome the opportunity

10   to present argument on the personal jurisdiction issues,

11   assuming -- we think Your Honor will -- that the complaint

12   survives the 12(b)(6), but I understand we'll deal with that

13   later as the Court deems necessary.

14        THE COURT:  Okay.  That sounds good.  And I should have

15   said -- I will turn to the defendants in a minute -- and this

16   is just for our record, but I have before me, and what we're

17   having a hearing on, is the Defendants' Joint Motion to Dismiss

18   the First Amended Complaint, which is at Docket Entry 144.

19        There is a response at 147, and a reply at 152.

20        Notice, I'm remembering to speak more slowly for our

21   court reporter.  I'm really grateful for your help.

22        The court reporter, if at any point you feel that

23   somebody is going too fast, feel free to just interrupt and say

24   so.

25        Also, counsel, to the extent that there are terms that

```
 1    you use that are not easily spelled, you might submit them to
 2    the court reporter later, and we could let you know her name
 3    and e-mail and how to do that.
 4            I also have defendant, Payward Ventures and Jesse
 5    Powell's, stand-alone brief, a Motion to Dismiss the Amended
 6    Complaint, at Docket Entry 145.
 7            Plaintiff incorporated its response to that in the
 8    response to the main motion that which was, as I said, 147.
 9            And then I have Payward Ventures and Jesse Powell's
10    reply at 153.
11            So I did want to make that record.  Okay.
12            Let me turn to you, Mr. Simmons, on behalf of the
13    defendants, is there any preliminary that you think we need to
14    deal with?
15            MR. SIMMONS:  Just, Your Honor, not to belabor it, but
16    I'm sure I speak for everybody when I say that it does seem
17    like an eternity that we were before you in person in January.
18            We wish we could see you here in person today.
19            As then, we thought you held a very fair and deep
20    hearing, and so I'm sure I speak for everybody when we are
21    privileged to appear before you, and we commend the Court for
22    taking this matter with the seriousness and depth which it
23    deserves.  So thank you for your time today.
24            And that's all I've got as a preliminary matter.
25            THE COURT:  Okay.  Well, I appreciate the compliment.
```

```
 1    Thank you very much.  Honestly, it's a pleasure to have a case

 2    where all the attorneys are so accomplished and so skilled and,

 3    you know, helpful to the Court, and so I am enjoying it.  I'm

 4    putting air quotes around the word "enjoy," because I've let a

 5    little bit of blood here on cryptocurrency, but I feel like I'm

 6    getting my arms around it, and that has been very interesting.

 7    Okay.

 8            And I will say, also, I initially set this for Zoom,

 9    frankly, because I really wish that we were all in the

10    courtroom.  I enjoyed that time.

11            It's an important matter to all your clients being here

12    together addressing the issue -- I don't know, that kind of

13    recognizes the significance of the arguments to your clients --

14    and yet it didn't make sense to me to make you get on airplanes

15    and all of that and come in here.

16            And secondly, I think we've all learned how much we can

17    do remotely, I have, just sitting in a Zoom hearing that a week

18    ago I was, and thinking about how tiring and kind of an extra

19    level of energy that goes into my following the various faces

20    on the tile board, the faces on a Zoom matter, and that little

21    bit of lag in the sound and the image, that I think makes it

22    just so taxing to the brain.

23            And I realized that I really could concentrate much

24    better on what you have to say if I only have to think about

25    your voices and not try to relate to you in that personal kind
```

1    of -- I don't know -- not that desirable a fashion by Zoom.

2         So that was my reason for making the switch.

3         I hope it works for you all.

4         Mr. Rasmussen and Mr. Lourie, do you need to add

5    anything on procedures?

6         MR. LOURIE:  Your Honor, I have nothing to add.

7         Thank you.

8         THE COURT:  Mr. Rasmussen.

9         MR. RUSMUSSEN:  I have nothing to add.

10        THE COURT:  Pronounce your name again, sir.

11        MR. RASMUSSEN:  Rasmussen.

12        THE COURT:  Rasmussen, all right.  Thank you.

13        Mr. Rasmussen, you, I gather, are going to teach me in

14   a way that is, you know, kind of just the facts and not

15   advocacy for either party, and I do have in front of me what

16   you e-mailed as your Blockchain Fundamentals.

17        And I do want to say this, I may, as we go through

18   this, if I think of some questions that I have that really go

19   to advocacy, and I may note them for counsel to write them

20   down.  It won't be for Mr. Rasmussen to answer those questions.

21        I'd like to mention them as we go along for fear that

22   if the question would get lost later on when we're in argument.

23        Okay, Mr. Rasmussen, I'm listening.

24        MR. RASMUSSEN:  Thank you, Your Honor.  Mark Rasmussen

25   at Jones Day.  I appreciate the opportunity to present on this

1    topic, and as I intend it to be, completely neutral.  If I feel

2    a tug of a question pulling into advocacy, I will be sure to

3    let you know that and we will maybe move back to the neutral

4    fundamental.

5         As Your Honor said, you have a copy of our slide deck.

6    Plaintiff's counsel has had a chance to review it, and we

7    proposed using it to walk through together to cover the concept

8    that Your Honor asked us to address in the September 25th

9    order.

10        And I'll say that this is intended to be a visual aid,

11   not something that we intend to supplement the record with or

12   fill in any blanks in the record.  I think a visual can be

13   helpful when you're talking about these concepts.

14        THE COURT:  And let me stop you.  Let me stop you and

15   say that unless you all make a request to make this part of the

16   record, your slide deck, in which case you could file it, I'm

17   not sure that's necessary because you'll be discussing, you

18   know, the concepts with me, and we've got a record there.

19        So you can confer at the end and tell me if you all

20   would like it to be filed or not.

21        MR. RASMUSSEN:  So, with that background, let me start

22   with slide two, and this is our proposed agenda.

23        The first part is an overview of the blockchain

24   technology, generally, and in that portion we plan to cover a

25   number of the concepts that were included in Your Honor's

1  order.  There will be some other ones as well that were not

2  included.

3      And then in the second part -- and we view that first

4  part as really setting the foundation that could be helpful in

5  discussing the second part, where we plan to cover some other

6  topics listed right there.

7      And these are all from Your Honor's order.

8      Moving to slide three, Your Honor, let me just make one

9  preparatory remark here about the technology.  It may be

10  obvious to you.  Blockchain is not a technology that sprang

11  into existence out of nothing in 2008.

12      It's really based upon a mix of different technologies

13  that have been developed over the 50, 60, 70 years, from

14  internet developments in the '50s and '60s, to advances in

15  cryptography in the '70s, peer-to-peer technology developments

16  in the '90s and early 2000s, and then through experiments with

17  digital cash in the '90s and early 2000s, and Satoshi Nakamoto,

18  the owner of the Whitepaper that's attached in the complaint,

19  really combines those technologies.

20      And added to that technology makes a way to eliminate

21  what's called the "double-spend problem."  When you're dealing

22  with digital currency and you don't have an intermediary, how

23  do you confirm that someone is not spending their digital

24  currency twice.

25      So today there are many blockchain systems and many

1    thousands of cryptocurrency.  Bitcoin really is the first,

2    first successful one anyway, and many cryptocurrencies that

3    derive from bitcoin share a lot of its DNA.

4            So what I'm going to focus on today is really what is

5    common DNA for cryptocurrencies that are derived from bitcoin,

6    like Bitcoin Cash, that is part of the complaint.

7            So, turning to slide four, Your Honor, I always think

8    it's helpful to think in the simplest terms possible about this

9    complicated subject, so it's presented here as a blockchain

10   ledger.  It really is just a digital ledger that tracks and

11   shares transactions and information among users.

12           Now, anything of value can be tracked on a blockchain

13   network, from cryptocurrency, to diamonds, to stock, to pork.

14   And there's advances in blockchain technology in all those

15   areas.

16           And this definition is, obviously, oversimplification

17   of the technology, but it really gives you an image in your

18   mind of what we're dealing with here.

19           So the Bitcoin blockchain, specifically, the core idea

20   was to create digital money that didn't depend on financial

21   institutions or banks or intermediary like that.

22           So the bitcoin blockchain is used to create new bitcoin

23   and also to record transfers to bitcoin between users.

24           On slide five, Your Honor, we've listed here some

25   foundational characteristics of a blockchain ledger.

1    First is it's distributed across a peer-to-peer

2  network, and I'll give you a visual of that on the next slide.

3    The second, there's not a single institution

4  maintaining the records of transactions, rather, there are --

5  across the different ledgers across the network that maintain

6  the record of transactions, so there's no trusted intermediary,

7  like a bank, for example.  And again, I have a visual that may

8  capture that for you.

9    Third is that this record is a permanent -- or intended

10  to be a permanent record of transactions that are secured

11  through cryptography.

12    And then lastly, the last characteristic I want to

13  leave you with is, because we have so many different ledgers

14  there needs to be a method of synchronizing them, and that's

15  where mining comes into play.  We will talk about that as well.

16    If you look at slide six with me, Your Honor, I

17  mentioned that ledgers are distributed across a peer-to-peer

18  network, and this map here depicts the nodes that hold copies

19  of the bitcoin ledger and that are connected to the network.

20    And I pulled those from the website listed there

21  Saturday morning, and so this is current as of Saturday

22  morning.  This again is the bitcoin network, not Bitcoin Cash,

23  and it's showing 10,577 nodes.

24    Your Honor may know, a "node" is simply a connection

25  point to a network.  It's comprised of both hardware and

```
 1    software, right, that's how we interact with the blockchain

 2    network, through these nodes.

 3             THE COURT:  Can I ask a question there?

 4             MR. RASMUSSEN:  Sure.

 5             THE COURT:  Is a node a single server?

 6             MR. RASMUSSEN:  It could be.  It could be a laptop.  I

 7    have at my home a laptop that has the whole bitcoin blockchain

 8    on it and communicates with the network.

 9             You could have full nodes like that that include the

10    entire blockchains.  You could have what are called

11    "lightweight nodes" that don't maintain a copy of the entire

12    blockchain but can still transmit data and receive data.

13             And then there's a subset of the full nodes that we'll

14    talk about more in a little bit called "mining nodes," and

15    these are typically very specialized devices that you can

16    purchase online.  They look like rectangular -- they look like

17    a loaf of bread.

18             And they're developed to specifically mine

19    cryptocurrency.  They're very fast and they perform that role

20    very well.  They don't do a lot of other things, but they do

21    that role very well.  So those mining nodes maintain the

22    blockchain.  We will talk about mining a little bit more.

23             THE COURT:  So, of the 10,577 nodes that were connected

24    to -- am I right? -- the bitcoin blockchain on Saturday

25    morning?
```

1             MR. RASMUSSEN:  Correct.

2             THE COURT:  It could be anything from a laptop to a

3     mining node to a -- something else?

4             MR. RASMUSSEN:  Yes.  I believe that this is showing

5     the full nodes, and so you'd have to have the full node, not

6     one of the lightweight nodes.

7             That's my understanding of what's represented there.

8             THE COURT:  Okay.  And I know we're getting ahead, but

9     when nodes -- when there's a pool, when there's multiple nodes

10    mining together, right, that's a mining pool; and if there were

11    a mining pool operating on Saturday morning, it might account

12    for a hundred of those nodes that you counted just working

13    together, using an example?

14            MR. RASMUSSEN:  Right.  Yes, that's correct.

15            THE COURT:  Thank you.

16            MR. RASMUSSEN:  So I'm turning now to slide seven.  I

17    mentioned that there's no trusted intermediary about this

18    network of ledgers that maintain a record of transactions.

19            So the diaphragm on the left represents a traditional

20    system that we are really familiar with because we use the

21    systems everyday.

22            Think of your bank, that's the trusted intermediary

23    that tells you, that tells merchants you're shopping at whether

24    there's sufficient funds in your account to make a purchase.

25    And this recordkeeper holds the single authoritative copy of

1    the data and the transaction ledgers.

2         And others around it can read from that single copy,

3    but it's the trusted intermediary that maintains it and sends

4    information out.

5         So the diagram on the right represents a blockchain

6    ledger network.  A copy of the ledger is maintained by nodes

7    across the network and each nodes' copy has to keep in sync

8    with the others.  And we will cover that synchronization and

9    mining process shortly.

10        But this diagram, really, to me, is perhaps the

11   simplest way to picture what a blockchain network is, as

12   compared to a more traditional financial network that most of

13   us use everyday.

14        THE COURT:  Okay.

15        MR. RASMUSSEN:  So turning to slide eight.  Your Honor

16   asked about blocks in the order, and I'll cover that on the

17   very next slide.

18        But at first, I think it's important to understand hash

19   values and, admittedly, the technical concept, but once you see

20   an example, I think it will be fairly easy to understand.

21        Hashing and hash values are used in a number of

22   different ways in a blockchain system, and they're used to make

23   these blockchains function and keep them secure.

24        So a "hash value" is, basically, think of it as a

25   digital fingerprint for a set of data or a unique serial

1    number, if you want to have those images in your mind.

2          There's software programs -- and I've put a URL there,

3    one that you can go access if you want to experiment with it.

4    But there's software programs that are used to convert a string

5    of data of any size into a unique serial number, of sorts, of a

6    fixed plank.

7          So here, on slide eight at the top, we've got example

8    one showing data that I input into this hashing algorithm

9    through this website and its corresponding hash value.

10         So I typed in, in the message field, "Alice sends Bob

11   one Bitcoin," "Alice sends Charles two Bitcoins."  The program

12   runs it, hashes it, and the result is right beneath it.  That's

13   a unique output that corresponds just to what I input there.

14         And then in example two, you see, I just changed two

15   digits.  Instead of "Alice sends Bob two Bitcoin," "Alice sends

16   Charles" --- instead of "Alice sending Bob one Bitcoin," Alice

17   bought two; and instead of "Alice sending Charles two Bitcoin,"

18   she sends Charles one.

19         Minor change, but look what it does to the hash, it

20   completely changes it.

21         THE COURT:  Right.

22         MR. RASMUSSEN:  You could put the entirety of *War and

23   Peace* into this program and it would result in a 64-character

24   hash that is unique to that text.  You could put a period and

25   it would result in a 64-character hash that can lead to that

1    text.

2           THE COURT:  So, to stop you.  If *War and Peace*, you did

3    that and it had its unique hash, and then *War and Peace* is

4    verbatim on the internet somewhere, could you use the hash,

5    like the hash -- is it a shortcut way of searching the whole

6    internet in your example to find where *War and Peace* is?

7           MR. RASMUSSEN:  No.

8           THE COURT:  Okay.

9           MR. RASMUSSEN:  It's more to verify that the data

10   hasn't been changed, right.  So if we put -- I think let's

11   shift and talk about Gettysburg address.  I like the Gettysburg

12   address as an example because it's shorter.

13          We can put the Gettysburg address in there with all --

14   you know, however many thousands of words, and then you put it

15   in again and you change just one word, that's going to result

16   in a completely different hash.

17          It's just to ensure data integrity, so we know that no

18   one has monkeyed around with that data, and it becomes

19   important in the blockchain because we want to make sure nobody

20   is monkeying around with the transactions that have happened in

21   the past.

22          THE COURT:  Okay.

23          MR. RASMUSSEN:  So, if we move to slide nine, I'm going

24   to talk a little bit about blocks here, and hash values are

25   very important to understanding how blocks work and how they

 1    link together.  That's why I wanted to bring up that previous

 2    slide.

 3            So, blocks are basically units of accounting, and they

 4    store the transactions that are occurring on the blockchain.

 5    And this visual here -- which is very stylized, of course, it's

 6    not actual -- but it depicts a series of blocks in a blockchain

 7    ledger.

 8            Each new block that is added has a record of the latest

 9    transactions that have occurred since the last block was added,

10    and they get added about every 10 minutes.

11            So, let's say, block one has 3,000 transactions and

12    that block gets added to the ledger, those become an official

13    part of the blockchain ledger going forward.

14            And by putting the hash of previous block transactions

15    into the new block we can link them together, and you can see

16    that here in the graphics.

17            I don't know if Your Honor has the colored version --

18    the colored version of this, or black and white, but --

19            THE COURT:  I have black and white.

20            MR. RASMUSSEN:  Okay.  But on the left we have the

21    genesis block and you create a hash of that and you start the

22    next block with that hash value; and then you hash block one

23    and all of those transactions together and you put that in

24    block two; and then you hash block two and all of its

25    transactions together and you put that in block three, and so

1  on, and so on, and so on, and you keep adding and adding and

2  the block gets stronger and stronger and more secure as you go.

3        Because if anybody wants to go back to the original

4  block and change the transactions or go back to block two and

5  change the transactions, we know that occurs because the hash

6  values will change, it won't match.  And so the tampering

7  becomes evident to the entire network.

8        THE COURT:  Okay.  Hold on one second here, okay.  I'm

9  making a few notes first.  I would like to just spend a little

10  time here for a moment.

11        So you gave an example of block one maybe having 3,000

12  transactions; right?

13        MR. RASMUSSEN:  Correct.

14        THE COURT:  And if -- and I'm trying to understand two

15  transactions, right, because I know there's these 10,000-plus

16  nodes on Saturday morning around the world mining this ledger,

17  right, and so let's assume block one -- I realize your genesis

18  block -- let's assume Saturday morning, what we're calling

19  block one, in fact, is at the tip of a chain of a thousand

20  other blocks.  Is that, first, an intelligent assumption to

21  make, I mean, as an example?

22        MR. RASMUSSEN:  I would maybe get rid of the Saturday

23  concept, the timing.  We can go back to say 2009 when the first

24  bitcoin block was mined, and that's our genesis block, and

25  every 10 minutes since that time new blocks have been added.

1   Maybe that's a --

2           THE COURT:  Right, okay.  I think what you're -- you're

3   with me, I'm just not using the right words.

4           I'm trying to block into today, for example, and let's

5   say that what we see, blocks one, two and three happen today.

6           And so block one is somebody -- everything that comes

7   before block one has been mined and verified by somebody,

8   somebody mining -- I guess, one concept I'm trying to make sure

9   I understand is that this ledger is decentralized and that a

10  thousand different nodes can be mining the blocks on that

11  ledger.

12          And I understand that if the node that -- if I'm saying

13  this right -- accounts for all the transactions in the block

14  that it's mining at that moment and solved the math problem

15  that prove this piece of work for this particular block -- I

16  mean block one right now -- it gets awarded a little -- a

17  fraction of Bitcoin, and then that, I gather, just added to the

18  blocks they're mining, which is adding a transaction.

19          And now I'm looking at block two, I'm just -- I guess

20  I'm going to stop there because you probably have something to

21  say to me.

22          MR. RASMUSSEN:.  Sure.  Sure.  Right now, as we're

23  talking, there are hundreds, if not thousands, of transactions

24  being sent out across the Bitcoin blockchain network.  And

25  those are pooling up and mining nodes are collecting them in

```
1    blocks.
2            And when they're ready to mine, they will do a function
3    that we're going to talk about in a minute, and if they they're
4    successful, they get to propose that block to be added to the
5    blockchain.
6            THE COURT:  Okay.
7            MR. RASMUSSEN:  This diagram here, nine, is a pretty
8    high level block-by-block.  Within each block -- we can see it
9    from the next slide -- they're going to have hundreds, maybe a
10   couple thousand transactions in them.
11           And a transaction, what I mean, when I say that, is me
12   sending Your Honor Bitcoins, if --
13           THE COURT:  Right.  Right.  So something that -- and
14   excuse me for interrupting, but something I think I understood
15   there.  These transactions could be you and me having some
16   bitcoin in our digital wallet, and I'm buying something from
17   you and then you're buying something from me, and when we
18   exchange that bitcoin, somehow that transaction becomes
19   available to be mined by anybody mining the blockchain, so it
20   gets added to the blockchain; you're saying?
21           MR. RASMUSSEN:  Exactly.  Our transaction gets
22   broadcast across to all those nodes and it gets picked up,
23   collected, with other transactions by the mining nodes, and
24   then they go to work -- that we're going to talk about in a
25   minute -- to be able to propose the next block of multiple
```

```
 1    transactions.
 2          THE COURT:  And so somewhere, somewhere in all this
 3    there's a decider about collecting a bunch of transactions and
 4    putting them all into the next block; am I right?
 5          MR. RASMUSSEN:  I wouldn't say there's one decider.
 6    It's all of the nodes in the computer software program is
 7    constantly validating this, these transactions.
 8          If I have the Bitcoins that I'm sending you, I haven't
 9    previously spent it, validating that, and the validation and
10    approval occurs when a new block gets added to the blockchain
11    and subsequent blocks are added to that one.
12          So it's the entire network approval that you need for a
13    transaction to be validated, not just one individual.
14          THE COURT:  Right.  And I guess what I was going to say
15    next was the decider may be the software, am I right, that
16    there's --
17          MR. RASMUSSEN:  That's a different way to look at it,
18    yes.
19          THE COURT:  -- that decides that the transactions that
20    just happened in bitcoin in the last 15 minutes, or whatever
21    period of time that makes sense, get organized and put into the
22    next block -- it gets added -- the next block is added to the
23    chain, am I right, we're assuming that the blocks that preceded
24    have been mined, or maybe most of them have, and you have a new
25    block or two sitting at the tip of the chain that is waiting
```

1    for some miners to do the work to verify the transactions and

2    show that proof of work and thereby publish the latest block to

3    the network, if I used that term right?

4         MR. RASMUSSEN:  The only clarification I would add is a

5    block doesn't get added until the proof of work is done and

6    then verified by the network.

7         So miners are working independently on their blocks

8    with the transactions that have been broadcast across the

9    network.  And when they solve the puzzle that we'll talk about,

10   then they announce that to the network and show their work so

11   that the rest of the network can say, yep, you've got that

12   right, we agree with it, we're going to add it to the end of

13   our ledger here, and it will be on -- it will be connected

14   to the -- it will be added on the top there.

15        THE COURT:  Would you say that to me one more time?

16        MR. RASMUSSEN:  So, a block only gets added to the

17   blockchain after the proof of work mining is done and the rest

18   of the network accepts that block.

19        That's the key -- that's the concept.

20        THE COURT:  Okay.  Okay.

21        MR. RASMUSSEN:  Miners may be working on their block --

22   on a block to propose, but they may not succeed, it may not get

23   added.  It only gets added once the proof of work is complete

24   and the network accepts it.

25        THE COURT:  And for the network to accept it, what does

1   that take?

2         MR. RASMUSSEN:  The miner has to have done the

3   computational puzzle or the proof of work correctly, and the

4   transactions need to be valid transactions.

5         THE COURT:  Okay.

6         MR. RASMUSSEN:  We'll talk about that in a couple of

7   slides when we talk about mining.  But if you've not correctly

8   solved the puzzle, your block will not be added.

9         THE COURT:  Okay.

10        MR. RASMUSSEN:  I'm moving to slide 10, unless you want

11  to stay on slide nine?

12        THE COURT:  No.  No.

13        MR. RASMUSSEN:  So slide nine was sort of a stylized

14  diagram of the block.

15        Slide 10 is what you would see if you go online and you

16  search for a specific block.  This is what I pulled, I think,

17  it was Sunday from the Bitcoin Cash blockchain.

18        And it's only partial -- it only partially shows the

19  transactions there, and we don't need to spend a lot of time on

20  this, because I think the important thing is to understand the

21  concept of what's in a block and how it gets added.

22        But this visually shows you some of the information

23  that is being transmitted and that is publicly visible.  So you

24  have the top, the block number; you have a hash of the block,

25  that digital fingerprint that's unique to this block; you've

1    got the date that it was added, September 27th, at 5:52 p.m.;

2    the number of confirmations, meaning the number of blocks that

3    have been added on top of it.

4        That's how the nodes signal their confirmation of

5    accepting it, by adding more blocks on top of it.

6        THE COURT:  So let me stop you.  The date -- this

7    particular block was published and accepted to the blockchain

8    on that date, and when you search for that block, at that point

9    there was yet another block that had been confirmed and added

10   beyond it?

11       MR. RASMUSSEN:  That's right.  And so if we look at

12   this block today, there are going to be additional

13   confirmations on top of that, number one, it would be higher,

14   but everything else in here would be the same.

15       And then towards the bottom there are listed, you know,

16   about 10, or so, of the transactions that are included in the

17   block.

18       If you go up to the website where I pulled this, you

19   can scroll through all of the transactions.  There just wasn't

20   enough space to show it here.

21       THE COURT:  Okay.  Thank you.

22       MR. RASMUSSEN:  But these transactions, you could click

23   on the transaction ID and you could see the information that

24   was being transmitted.

25       You can see the block of Bitcoin Cash that was being

1    transferred in the transaction, and that the amount of the

2    Bitcoin Cash is actually seen there on the far right column,

3    under "output," the 6.25 Bitcoin Cash being transferred, the

4    .014 bitcoin cash being transferred, et cetera.

5              THE COURT:  Okay.

6              MR. RASMUSSEN:  So I am going to move to slide 11,

7    unless Your Honor has questions about 10.

8              THE COURT:  No.  Thank you.

9              MR. RASMUSSEN:  So I mentioned earlier that each full

10   node keeps a copy of the ledger, and so that means that ledgers

11   have to remain synchronized, and at a high level -- again, this

12   is a very stylized diagram that depicts how that works.

13             On the left we have a node that publishes a block of

14   transactions and is proposing that they be added to everyone's

15   ledgers.

16             And the nodes that receive the proposed block confirm

17   that it complies with the blockchain protocol and confirm that

18   the puzzle was solved correctly.  And I will talk a bit more

19   about that puzzle in a moment.

20             And if they accept it, they signify that, and the block

21   of transactions will then be approved and added to the chain.

22   But notice, that this is true even if not all of the nodes

23   accept the block.

24             In the middle diagram we see that one node does not

25   accept it, disagrees with it, but as long as the majority of

1   nodes accept the block, it will be added to the chain and will

2   continue building off of that chain, and that will remain the

3   longest chain in the authoritative version of the transaction

4   history.

5          THE COURT:  So this diagram, that dark block on the

6   upper left, is the ledger -- am I saying that right?  -- and

7   the other squares indicate nodes that are mining that ledger?

8          MR. RASMUSSEN:  No.  The dark block on the upper left

9   is meant to signify a mining node that's proposing a new block

10  of transactions, saying, I solved the puzzle, here's my block

11  of transactions that just occurred, I want you to accept this

12  and validate it and add it to your ledgers.

13         THE COURT:  And why is there a question mark on the one

14  all the way on the left, is that the notion of a proposal?

15         MR. RASMUSSEN:  Yes, that's right.

16         THE COURT:  And in the middle one there's an "X", and I

17  think you are indicating that that would suggest that that

18  particular node doesn't accept the block?

19         MR. RASMUSSEN:  Correct, Your Honor.

20         THE COURT:  But since all the other ones do, there's

21  enough, so then the block gets added to the chain.

22         MR. RASMUSSEN:  It will be added.  The network will

23  continue building off that longest chain where the block was

24  added, correct, yes.

25         THE COURT:  Okay.

1           MR. RASMUSSEN:  So I'm moving to slide 12, where I

2    don't have as many pretty diagrams, but I think we can still

3    discuss the concept.  We're talking about mining now.

4           And a mining node, as I've said, gets the right to

5    publish the next block of transactions by solving a

6    computational puzzle.

7           And this puzzle requires a lot of resources.

8           In fact, computers, energy, you got to keep those

9    computers cool, it costs money to do that.  And the solution to

10   this computational puzzle that they broadcast with the block is

11   the proof that the user -- or the mining node, really,

12   performed that work, and all other mining nodes can validate

13   that the solution is correct and accept the block.

14          If the solution is incorrect, the block is not going to

15   be accepted, it will be rejected, and it won't be added to the

16   blockchain.

17          The computational puzzle, I won't go into details as to

18   what that entails, unless Your Honor would like me to.

19          THE COURT:  No.  A question that I have to the parties

20   later, paragraph 68 of the amended complaint, there's a

21   statement, I think it is, on information and belief, Bitmain

22   Tech did not get the permission of its customers when it

23   allegedly diverted servers, mining, nodes, pools, to mine ABC.

24          And I don't know if in here, this is the place to ask,

25   factually, is there a customer?  I don't understand the concept

 1     of "customer," which counsel -- plaintiff counsel can address

 2     later, but does that fit in, Mr. Rasmussen, here?

 3            MR. RASMUSSEN:  It really fits in with the discussion

 4     of mining pool that I'm getting to just in a moment --

 5            THE COURT:  Okay.

 6            MR. RASMUSSEN:  -- that is where the customer comes

 7     into play.

 8            THE COURT:  Okay.

 9            MR. RASMUSSEN:  And so I'm moving to slide 13,

10     continuing to talk about mining.  But the first mining node to

11     solve the -- correctly solve the puzzle and the block -- I

12     guess it's block added to the ledger, also gets to claim a

13     reward, which is the units of newly mined cryptocurrency.

14            So if you go back just a few slides to the Bitcoin Cash

15     block -- as an example -- in that transaction that involved the

16     6.25 BCH, that's the mining reward there for the mining node

17     that correctly solved the puzzle.  That's how new

18     cryptocurrency gets created.  The winning mining node gets to

19     add it to the block that it's publishing.

20            THE COURT:  So the output on that transaction -- in the

21     (inaudible) of that particular block, the output is the

22     currency that's earned for the effort of mining it?

23            MR. RASMUSSEN:  Correct.

24            THE COURT:  Okay.

25            MR. RASMUSSEN:  And so mining nodes claim that reward,

1    they include it in the block, and then they'll add it to the

2    chain that has the most proof of work, the most blocks on it.

3    And then the other nodes will signify their acceptance by

4    adding it to their ledgers and we continue onto the next block.

5           THE COURT:  Okay.

6           MR. RASMUSSEN:  So now I'm moving to slide 14 where we

7    talk a bit about mining pools, and I'll try to address your

8    question, Your Honor, about paragraph 68 in this complaint as

9    well.

10          Because mining for bitcoin, especially, it becomes so

11   difficult and so resource-intensive, my little laptop at home

12   that maintains a copy of the ledger could never keep up with

13   the more sophisticated computers that are mining.

14          And even a single computer could not keep up, really,

15   because it just happens too quickly, you need too much

16   computational power to solve the puzzle.

17          And so what happens is that mining nodes will organize

18   themselves together to solve the cryptographic puzzle, they'll

19   divide up the workload amongst a group of, let's say, a hundred

20   miners, to use Your Honor's example.

21          Because, collectively, they have more computational

22   power than an individual mining node and they have a better

23   chance of solving the puzzle first, and then the mining pools

24   will split the reward.

25          So there are companies that will organize mining nodes

1    and run mining nodes, and they have customers.  If I wanted to,

2    I could buy a dozen miners and connect them to your dozen

3    miners, and we could connect them to a company that runs a

4    mining node and together we would increase our odds of claiming

5    the -- of solving the puzzle and claiming the reward.

6         But then, of course, we would have to split that based

7    upon the amount of work that we did.

8         THE COURT:  And kind of built -- am I right? -- built

9    into this scenario is this company that will organize mining

10   nodes, they are organizing mining nodes that all agree on what

11   they want to mine; is that fair to say?

12        MR. RASMUSSEN:  Customers will have choice in what they

13   want to mine.  So if I contribute computer power, and I say I

14   want to connect with other computers that are mining specific

15   currency, then we'll go after that, we'll try to solve those

16   puzzles for that currency.

17        Or I could say, I don't really care what coin gets

18   mined, I want the mining pool organizer to mine the one that is

19   most efficient at that time; and if it's easier to solve this

20   puzzle than that puzzle, we'll go after that one.

21        So it all really depends on the mining pool, you know,

22   the agreement that's entered into, what you sign up for.  But

23   there are customers around the world that will sign up with

24   various mining pools and keep themselves together to increase

25   their odds.

```
 1              THE COURT:  Okay.

 2              MR. RASMUSSEN:  Now, with that, I think it's a pretty

 3    solid foundation to move to some of the other concepts from

 4    Your Honor's order from last Friday.

 5              And so I'm going to move to slide 16 and talk for a bit

 6    about "scalability."  And this is the ability of a blockchain

 7    network to handle increasing volumes of transactions.

 8              You know, bitcoin, for example, sort of, at the very

 9    beginning, it couldn't handle very many transactions per

10    second.  I think the estimate is that it can handle about four

11    to seven transactions per second.

12              And if you compare that to Visa or Mastercard, which

13    can handle 5,000, or much more, you can see a big difference

14    there.

15              And so, there's a lot -- there are various

16    cryptocurrencies that have split off from bitcoin because they

17    want to increase their scale and be able to handle more

18    transactions, and Bitcoin Cash is an example of that.

19              And one of the ways that you can do that is by just

20    increasing the number of transactions that a mining node is

21    allowed to include in the block that it's mining.

22              THE COURT:  Okay.  That was helpful.  Thank you.

23              MR. RASMUSSEN:  So, slide 17, I'll address protocols,

24    and these are really excessive rules that participants in a

25    blockchain network use to communicate with each other and share
```

1   data.  Each blockchain network has its own protocol.

2         And protocols contain rule sets, like the block sites,

3   how many transactions in the blocks, the mining rewards, how

4   frequently blocks are mined, what hashing program or algorithm

5   are we going to use, lots of other ones.

6         But these rule sets are -- because we're dealing with

7   hardware, you have to implement those rule sets through

8   software that performs those rule sets.

9         And these protocols and software programs that

10  implement the protocols are periodically updated.  And these

11  updates in the blockchain parlance are called "forks."

12        So, moving to slide 18, I'll talk a bit more about

13  forks, these updates to protocols on the software.  I think of

14  them -- and they're publications that describe them -- as "soft

15  forks" or "hard forks."

16        A "soft fork" is an update whereby you make it or you

17  don't make it, you can still communicate with the network.  So

18  even if a node doesn't adopt the update, you can still use that

19  blockchain system, you can still add blocks to the chain.

20        A "hard fork" is where a node, if it doesn't make the

21  update, it will be prevented from using the blockchain system

22  that implements the change.

23        THE COURT:  I have a question.  So after taking, of

24  course, our hard fork, we know that there was a fork between SV

25  and ABC.  So if somebody, like the plaintiff, mined SV, and

1   then after the outcome of the fork decided it wanted to get --

2   start mining ABC, is that software update available to the

3   plaintiff -- in my hypothetical -- or anyone else, me?

4          I now want to mine SV.  Can I get that software update,

5   add it to my node and decide to start mining something I've

6   never mined before, in this case, ABC?

7          MR. RASMUSSEN:  Generally, yes.  And --

8          THE COURT:  Okay.

9          MR. RASMUSSEN:  -- you know, computer systems of any

10  type, you know, they have to run a software and they frequently

11  get updated, you know, like the iPhone, they just pushed out a

12  new update, right.

13         THE COURT:  Sure.

14         MR. RASMUSSEN:  Those are updates that the software --

15  big software companies are telling us to make and, you know,

16  they say, make this update, do you have any new features.

17         Well, blockchain networks don't run on Apple software,

18  Microsoft, or Google software.  They run on Open Source

19  software.  It's developed publicly, it's released to the

20  community.

21         And you, being the owner of a node, can install on that

22  node any software that's compatible with the node.  You could

23  put the SV software on, you could put the ABC software on it,

24  that's your discretion as the owner of that node.

25         THE COURT:  Okay.  Thanks.

```
 1          MR. RASMUSSEN:  So in advance of -- as the complaint

 2    alleges, the Bitcoin Cash blockchain network had software

 3    updates that occurred every six months, and it's a routine

 4    feature of that network.

 5          And in advance of a scheduled blockchain upgrade,

 6    proposals are released to the community through -- for

 7    discussion.  If you heard of the website GitHub, that's where

 8    these proposals are put for anybody to access and comment on

 9    and improve.

10          And often nodes that are mining a particular blockchain

11    will agree on the update and they'll just continue building on

12    the blockchain that implements the changes.

13          But when there's a disagreement about the update,

14    that's when you end up having two separate and incompatible

15    chains.  And we'll talk a bit about that more.

16          But first I wanted to show you this graphic on 19,

17    which is -- I pulled it from this source here, *Bitcoin*

18    *Magazine*, and it shows a map of the various bitcoin forks that

19    have occurred from 2009, not to the present.

20          I think there's some history that occurred after this

21    chart was made, but, you know, it gives you a good idea of the

22    state of forks that have occurred from bitcoin over time.

23          And then the bottom right there is where you see the

24    action from, you know, Bitcoin Cash, ABC, and Bitcoin SV.

25          THE COURT:  Yes.
```

1          MR. RASMUSSEN:  So, on 5-20, I talk about this notion

2     of voting in a hash war.  So, in advance of a hard fork, the

3     competing protocol, software are proposed, they're refined,

4     they're released, and people who own the node decide which

5     protocol, which software to implement that protocol to accept

6     and install on their device.

7          And by installing the software that implements their

8     preferred protocol, people controlling the nodes signal their

9     acceptance for that protocol.

10          And so during a hard fork, when we have an upgrade,

11     that's going to make it incompatible with the prior version.

12     Nodes get to vote with their computer power or vote with their

13     CPU power by adopting their preferred protocol and then mining

14     and accepting blocks that implement that protocol.

15          THE COURT:  So is the competition that's happening in

16     that hash war measured by the number of nodes that install the

17     software that implements one of the competing protocols, and/or

18     is it also measured by then the number of -- the amount of

19     successful mining of blocks that those nodes do?

20          MR. RASMUSSEN:  Yeah, I think it's both of those,

21     Your Honor.  You vote, both, by installing the software and it

22     implements the protocol on your device and mining blocks that

23     are compatible with that protocol and software.

24          And you might have a hash war where 60 percent of the

25     nodes online pay for another, you know, and the 60 percent

1   could claim to be victorious because they have the higher

2   amount.  But at the end of the day, the losing protocol, it

3   splits off and it creates a new chain, and that still exists.

4   It's not eliminated.

5         It really would only -- a chain would only be

6   eliminated if there's no support for it, meaning, people don't

7   want to transact on it or no mining nodes are supporting that

8   protocol.

9         But when you have a hash war and you've got 60 percent

10  favoring one and 40 percent favoring another, you end up with a

11  world that we've got two different blockchains.

12        THE COURT:  Okay.

13        MR. RASMUSSEN:  Does that make sense?

14        THE COURT:  Yes.

15        MR. RASMUSSEN:  And in slide 21, it just provides a

16  quotation from the Nakamoto Whitepaper that's cited in the

17  amended complaint.

18        THE COURT:  Sure.

19        MR. RASMUSSEN:  It kind of presents this notion of

20  voting with your CPU power.  They leave and rejoin the network

21  at will.  And when they come back, they accept the proof of

22  work as proof of what happened while they were gone, and they

23  vote with their CPU power, expressing their acceptance of valid

24  blocks, you know, by working on them.  So this really captures

25  the concept of what's going on with the voting in a hash war.

1          And then slide 22, Your Honor, with checkpoints, these

2    are automatic -- with the Bitcoin Cash network these are

3    automatic, ongoing software updates to a blockchain that you --

4    that prevent attackers from coming in to change history, to

5    erase hash transactions or to enable double-spending of

6    previously spent coins.

7          One of its key purposes is to prevent attackers from

8    changing transaction history before the checkpoint.  And so

9    users of the network will accept the state of the network from

10   that point forward.

11         And, you know, really, if they want, all they need to

12   do is download the ledger from that point forward, because they

13   know that that checkpoint, that that is a valid representation

14   of everything that happened before.

15         THE COURT:  So does every blockchain have a series of

16   checkpoints?

17         MR. RASMUSSEN:  My understanding is that they are used

18   in various blockchains and cryptocurrencies, but how they are

19   used may very depend on the specific cryptocurrency.

20         THE COURT:  Okay.  I need application of this point.

21   But I think to the allegations about the checkpoint in our

22   case, I have a number of -- a fairly high level of uncertainty

23   that I understand what the allegation is about the particular

24   checkpoint that the plaintiff is focused on in its amended

25   complaint.

1        And so we can leave that, I think, for your argument.

2   I'm not quite sure what to ask here that would be generic.

3        MR. RASMUSSEN:  Yeah, it really is an area where, you

4   know, it tugged me into the advocacy area, I think.  I think

5   the general point of checkpoints is to prevent people from

6   going back in time and changing the transactions that occurred

7   on the ledger.

8        And this may be a little bit more advocacy, I don't

9   know.  I don't -- they don't prevent the upgrades from

10  occurring in the future because there have been software

11  upgrades and protocol upgrades on SV, on ABC, after the hard

12  fork in 2018 and after checkpoints were implemented.

13       THE COURT:  So, but a checkpoint then -- there's a

14  convenience to a checkpoint, am I right, that a miner that is

15  mining a particular blockchain after a checkpoint, right, the

16  checkpoint identifies a particular block before which a miner

17  cannot go back and attempt to change --

18       MR. RASMUSSEN:  Correct.

19       THE COURT:  -- any of the preceding blocks; right?

20       MR. RASMUSSEN:  Correct.  It would be compatible with

21  the software that implements the protocol that was accepted.

22       THE COURT:  And am I right, the notion of a checkpoint

23  is that a checkpoint on a particular block, the system has a

24  high-level of confidence in the accuracy or trustworthiness of

25  the blocks that precede that checkpoint; right?

1        Isn't that part of a mark of trustworthiness, that up

2   to this point, this has been so mined, so reviewed, that

3   there's not a need to go back and do that for that series of

4   blocks?

5        MR. RUSMUSSEN:  I think that's a fair way to put it.

6        I think the technical way to put it is the hash of that

7   block is encoded in the software, and so any attempt to mine

8   blocks prior to that would be inconsistent with that software.

9        THE COURT:  Okay.  Okay.

10        MR. RASMUSSEN:  I think that's a good way to think of

11   it.

12        THE COURT:  Okay.  All right.  Thanks.

13        MR. RASMUSSEN:  And then I just have, really, two more

14   slides to discuss and a final slide that has the glossary for

15   Your Honor.

16        Slide 23 discusses the role of developers here, and

17   just a few bulletpoints on this.  Developers, basically,

18   improve the software.  They make proposals to update this

19   Open Source blockchain protocol and software, and anyone in the

20   world can access these updates.

21        They're made available to the public.

22        The developers will publish them for the community to

23   consider and other developers will analyze them, improve them,

24   and really anybody with a computer engineering skill set can

25   submit proposals, do work on proposals.

1            And typically, there's a core group of developers that

2    have shown through their own skill -- and it's really

3    meritocracy -- that they are capable of working on a specific

4    block change network, and they spend their time working on a

5    specific protocol for that network or -- excuse me -- they

6    spend their time working on a specific blockchain network and

7    developing and improving the protocol for software updates for

8    that network.

9            THE COURT:  How do they make money?

10           Who do they work for?

11           MR. RASMUSSEN:  They receive contributions, donations,

12    grants.  It can come -- they can be self-funded, and so that's

13    largely how they are funded, from the community at large there.

14           THE COURT:  And -- okay.  Okay.

15           MR. RASMUSSEN:  And so they develop the software and

16    propose it to the community, really, because acceptance of the

17    software occurs by those who control the nodes, and no one can

18    force the change in the software or protocol, because users are

19    free to choose whatever software they want to put on their

20    device, you know.

21           And, of course, if it's not compatible with the

22    blockchain network, they just won't be able to participate in

23    that network, they may have to go somewhere else, but it's

24    really up to those that control the nodes to determine what

25    software to put on their device.

1          THE COURT:  Okay.  So they publish these proposed

2     software, and then those mining the currency decide whether to

3     accept their proposal?

4          MR. RASMUSSEN:  Correct.  Correct.

5          THE COURT:  Okay.  Thank you.

6          MR. RASMUSSEN:  Finally, slide 24, Your Honor asked by

7     the role of exchanges.  And really the primary role is to

8     provide a place for people, anyone, either you or I, companies,

9     to buy, sell, and trade cryptocurrency.

10          And there's a lot of different exchanges out there that

11     people can use to purchase cryptocurrency and start selling it,

12     or trading it, or using it to purchase other goods.

13          THE COURT:  Okay.  And a question I have that probably

14     I'll just put out there and leave it for counsel.

15          I know there's an allegation that Kraken decided that

16     ABC software would keep the Bitcoin Cash ticker, but I

17     understand there are a number of exchanges, and I gather

18     they're decentralized, they act independently.

19          And if Bitcoin Cash -- if Bitcoin ABC is traded on

20     multiple exchanges -- I'd want to understand -- do they all

21     have the same ticker, or does every exchange have its own way

22     of identifying the currency that's traded on the exchange that

23     may not be the same identifier with the same currency on

24     another exchange?

25          MR. RASMUSSEN:  Yeah, I can address that, but obviously

1        counsel for Kraken can add to it.

2             Exchanges, there is no requirement that they list or

3        give us the token, it's up to them to decide what to allow

4        trading on.  And every cryptocurrency have its own ticker

5        symbol and an image that's associated with it, and it really

6        gets developed by the original developers of that

7        cryptocurrency.

8             And then exchanges are incentivized to use that ticker

9        symbol that the community accepts, so that there's no

10       confusion.  So if I go to one exchange and I want to purchase a

11       cryptocurrency, I can recognize it by a common ticker symbol

12       and image.

13            And if I go to another exchange, it will be the same.

14            And so, really, it wouldn't make a lot of sense for you

15       to have different ticker symbols because that would sow

16       confusion in the community.

17            THE COURT:  So does it work that, typically, if one

18       exchange adopts a ticker symbol, they're the first to do it,

19       the others most likely would follow?

20            MR. RASMUSSEN:  I don't think so.  I may let counsel

21       for Kraken adopt that.  I think it's more driven by the

22       community at large to settle on this, but maybe counsel for

23       Kraken and Mr. Lourie could address that more for you.

24            THE COURT:  Okay.  We'll deal with that in argument.

25            I feel like I could take the test now.  You did a great

 1    job.  I thank you so much.  You'll be seeing -- I'll be

 2    submitting my paper for your review later.  Hopefully, you

 3    won't find a high error rate there, so thank you for that.

 4         MR. RASMUSSEN:  You're welcome.

 5         Thank you for the opportunity, Your Honor.

 6         THE COURT:  Okay.  So I think we should take a break,

 7    but before we do that, Mr. Miller, I'm going to turn to you,

 8    since it was one of the defense counsel who presented this

 9    tutorial.

10         Obviously, there's the application of a lot of these

11    concepts that you -- I welcome you addressing in your argument,

12    but is there anything in particular that you have any

13    discomfort with that you feel that you need to point out right

14    now?

15         MR. MILLER:  Your Honor, it's Mr. Miller.  I wouldn't

16    say any discomfort.  When I present my argument, I may want to

17    try to amplify or provide some additional explanation from our

18    perspective to the points that Mr. Rasmussen covered.

19         THE COURT:  Okay.  That makes sense.  Okay.  And I'm

20    going to trust that that's the same for defense counsel --

21    every defense counsel.

22         So that was a virtual 30 minutes, and so much for my

23    estimating, but it was worthwhile.

24         Why don't we take a break and start back up at 2:30,

25    okay.  We'll just keep the line open and my courtroom deputy

```
 1    will be in the courtroom or maybe step out for a moment, but
 2    we'll come back at 2:30.
 3              MR. RASMUSSEN:  Thank you, Your Honor.
 4              MR. MILLER:  Thank you, Your Honor.
 5              MR. SIMMONS:  Thank you, Your Honor.
 6              MR. LOURIE:  Thank you, Your Honor.
 7              (Recess taken from 2:19 p.m. to 2:30 p.m.)
 8              THE COURT:  Mr. Miller and Ms. Perez, do we have you
 9    with us?
10              MR. MILLER:  Yes, Your Honor.
11              MS. PEREZ:  Yes, Your Honor.
12              THE COURT:  All right.  And then Ian Simmons, Brian
13    Quinn, Patrick Jones, Melissa Pallet-Vasquez, do we have all of
14    you?
15              MR. QUINN:  Yes, Your Honor.
16              MR. JONES:  Yes, Your Honor.
17              MS. PALLET-VASQUEZ:  Yes, Your Honor.
18              MR. SIMMONS:  Yes, Your Honor.
19              THE COURT:  Okay.  And then Chris Pace and Mark
20    Rasmussen?
21              MR. PACE:  Yes, Your Honor.
22              MR. RASMUSSEN:  Yes, Your Honor.
23              THE COURT:  Donald Pepperman, Brian Klein, Andrew
24    Lourie?
25              MR. PEPPERMAN:  Yes, Your Honor.
```

```
 1              MR. KLEIN:  Yes.

 2              MR. LOURIE:  Yes.

 3              THE COURT:  Okey dokey, everybody's here.  Great.

 4         I think that I would ask you, Mr. Rasmussen, to file

 5    that slide deck just as an exhibit to the hearing.  Listen, I

 6    have my copy that's already all marked up, but if some

 7    reviewing court wanted to review this, they would do so more

 8    easily having the documents in front of them.

 9              MR. RASMUSSEN:  Yes, Your Honor, that will be done.

10         And also, I believe you're already going to do it, but

11    just in case, I will direct that you do order a transcript of

12    this oral argument and file it.  I know I'll find it very

13    helpful, so I appreciate that.  Okay.

14         So, Mr. Simmons, I think you're up next.

15              MR. SIMMONS:  Good afternoon, Your Honor, and all

16    counsel.  Your Honor, again, thank you for giving us this

17    opportunity.

18         Your Honor, I'm going to proceed in four steps, and I'm

19    going to suggest to the Court that plaintiffs fail on each of

20    the steps that we're going to journey through.

21         And I'm going to suggest to the Court that we're

22    beginning in the very same place where we ended last January.

23    I know you want us to put January out of our minds, and I'll do

24    my best to do that, but when you hear me and we discuss this

25    together, I'm going to suggest to the Court, the very same
```

1    failings that the Court painstakingly and accurately identified

2    in January are still present.

3          So first, Your Honor, the first step we're going to

4    take together is, I want to talk about the Per Se Rule in

5    antitrust, because paragraph 105 of the complaint alleges that

6    the alleged conspiracy is, quote, "in the nature of."

7          In the nature of bid-rigging or group boycott."

8          So I'm first going to talk about the Per Se body of law

9    and why the amended complaint fails to map onto that law.

10         The second step we're going to take together is, I'm

11   going to walk through the elements of the Rule of Reason, and

12   I'm going to show the Court why the amended complaint fails to

13   satisfy any, much less every, element of the Rule of Reason.

14         There are four elements you'll hear me talk about

15   there, Your Honor.

16         The third step we're going to take together is, we're

17   going to talk about Antitrust Injury.  A plaintiff has to show

18   that its injury in its business or property is a result of the

19   competition-reducing aspect of the defendants' conduct.  I'm

20   quoting from the Supreme Court Atlantic Richfield case.

21         And I'm going to show the Court that what the

22   complaint -- when you step back and read this complaint, what

23   they are complaining about is more competition, not less.

24         We have two variants now of Bitcoin, you have ABC and

25   SV; before, we had one.  I'm going to suggest to the Court when

1    we talk about this element, it's like we have a city with only

2    a Marriott and then Marriott complains -- claims Antitrust

3    Injury 'cause Hilton decided to open up.  So we're going to

4    spend some time on Antitrust Injury, more time than we spent

5    probably in January.

6          Finally, Your Honor, because, I mean, it segues into

7    any individual arguments, I will talk about how these three

8    steps I'm taking before the fourth step assumes an agreement,

9    assumes any meeting of the minds by any of the defendants.

10         And I'm going to show the Court why, under controlling

11   law, the Supreme Court Twombly decision, the Quality Auto case,

12   why this complaint flatly fails to allege the who, what, why,

13   when, and where by any defendant.  It flatly fails to make the

14   agreement element.  And I think, ending on that agreement point

15   will be most logical for individual defendants to weigh in.

16         One point I want to bear in mind in all of this, Your

17   Honor, the Supreme Court talks about this in Twombly, very

18   famous Supreme Court case that we talked about in January.

19         Let us first define what an "illegal restraint" is

20   about.  The Supreme Court in the 1984 Monsanto case defines it

21   as follows:  An "agreement" is a -- quote -- "conscious

22   commitment designed to achieve an unlawful objective."

23         So, when we get to that last element, are there

24   evidentiary facts required by Twombly, who, what, where, when,

25   why, showing any kind of an agreement.  And, by the way, would

```
 1    that agreement be anything not is illegal objective?
 2          So I'm going to walk through all of this with the
 3    Court.  Before --
 4          THE COURT:  Mr. Simmons, sometimes I feel like your
 5    words are almost a little shallowed.  I'm having a little
 6    trouble hearing some of them.
 7          Glenda, are you experiencing that?
 8          THE COURT REPORTER:  On and off, it's a little --
 9          THE COURT:  All right.  So I don't know what to say to
10    you, Mr. Simmons, but just, you know, just be aware.
11          I don't know if you're on a speaker, sometimes that
12    makes it harder, but I can appreciate why, with a long
13    argument, you don't want to be holding a phone, if that's the
14    case.
15          MR. SIMMONS:  I am on a speaker, but I could dial in
16    individually, if that would be easier for the Court, why don't
17    I do that.
18          THE COURT:  Oh, I see.  You have several people in the
19    room all on a speaker?
20          MR. SIMMONS:  I have one person with me on a speaker.
21          THE COURT:  Right, I see.  Do you have a hands-free,
22    so that if you did that you would be comfortable without using
23    a speaker?
24          MR. SIMMONS:  Yes.  Why don't I dial in with my cell
25    phone and we'll see if that's better.
```

1          THE COURT:  Okay, I think that would be great.  We'll

2    wait.

3          (Brief pause in the proceedings.)

4          MR. SIMMONS:  I'm back, Your Honor.  Is that better?

5          THE COURT:  Yes, it is.  So far, so good.  Thank you.

6    All right, Mr. Simmons, go ahead.  And I don't know if you all

7    reached any sort of agreement on time limitations.

8          I'm assuming we would go until five, if need be.

9          From your discussions, Mr. Simmons, with plaintiff's

10   counsel and your colleagues; is that workable?

11         MR. SIMMONS:  Yes, Your Honor.  I don't -- I'm going to

12   try to be, say, 20 minutes or half-an-hour, depending on

13   questions.

14         THE COURT:  Oh, okay.

15         MR. SIMMONS:  I'll move as quickly as possible.

16         I'm mindful that we have a court reporter on the phone.

17         THE COURT:  Right, yeah.  Okay.  Well, go right ahead.

18         MR. SIMMONS:  Thank you, Your Honor.

19         So I was saying at the outset, I'm going to proceed in

20   four steps.  But before I get to the first step, the Per Se

21   discussion, Your Honor, I want to highlight a couple of

22   passages of the complaint -- of the amended complaint.

23         Paragraphs 42 and 43 make clear that the original --

24   the BCH on the first slide we gave you, the blockchain that

25   gave rise to the fork in controversy, that that chain itself

1    emerged from a fork.  So forks are commonplace, as you heard

2    Mr. Rasmussen say.

3         Secondly, as I indicated earlier, the plaintiff is

4    complaining about more competition, not less.  This is not a

5    situation where the ABC chain came into existence and SV

6    disappeared.  The amended complaint doesn't say that.

7         In fact, the amended complaint, paragraph 86, points

8    out that the SV chain, actually, for periods, had more hashing

9    power brought to bear."

10        So what this is about is about more competition and

11   more diversity of Bitcoin product, not less.  It is backwards

12   from what the antitrust laws require.

13        In fact, Your Honor, this morning, I went onto a

14   website, www.coindust.com, and it shows both currencies are

15   trading.

16        Let me move quickly, Your Honor, to why this complaint

17   fails to map onto anything that the courts have long recognized

18   could be per se unlawful.

19        As you correctly identified in January, Your Honor, the

20   judiciary reserves only for selected and well-defined conduct,

21   per se condemnation.  "Per se condemnation" means we don't

22   necessarily look for effects, we just look at the conduct.

23        And you acknowledged in January correctly that it's

24   with ample judicial experience with conduct or activities that

25   we decide to categorize something's per se or not.  So

1    price-fixing, hotels getting together to fix the price of the

2    hotel rooms, could possibly be the benefits of that.  It's

3    condemned as per se.

4         The only area of the complaint which tries to stakeout

5    the claim of per se, Your Honor, is paragraphs 105 and 106,

6    which I alluded to at the outset.

7         And the language itself doesn't even have the courage

8    of its own convictions, because it says the alleged conspiracy

9    is -- quote -- "in the nature of" -- closed quote --

10   bid-rigging or group boycott.

11        The complaint doesn't even say it is actually

12   bid-rigging.  How do we define "bid-rigging"?

13        Well, "bid-rigging" -- just like price-fixing -- is

14   sellers agreeing on the terms and conditions of sale.  So

15   airlines agreeing on airfares, or a baggage size, or anything

16   like that, bid-rigging is like price-fixing, except on the

17   buying side.

18        Whether - if you and I are going to go and try to bid

19   on a piece of art in Miami, you and I beforehand say, Hey,

20   let's not bid more than $10 for that picture, okay; and if I

21   get it with eight, maybe I'll share it with you, but don't bid

22   me up above eight.  So it's on the buying side.

23        And there's no allegation that Chancellor, Cox, Ver,

24   Wu, Kraken, Bitmain -- all the potpourri of defendants you have

25   here -- there's no allegation that any of them are competitors,

```
 1    much less all buyers.  So they're dead out of the gate,
 2    candidly, on per se.
 3          What else have you heard and do you know from your
 4    studying of this case?
 5          Well, you know, paragraph 81 and the Nakamoto paper,
 6    and as Mr. Rasmussen pointed out, hashing power can come and go
 7    as it pleases.  And hashing isn't bidding, it's people voting
 8    with their feet.  So there's absolutely no indicia of conduct
 9    here that could map onto the Per Se Rule of bid-rigging.
10          The Eleventh Circuit in the Calder case -- Cha-Car -v-
11    Calder, which is 752 F 2d at 612, this is a direct quote from
12    the Eleventh Circuit, quote:  "The challenged conduct must fit
13    into a per se prescribed category without distortion."
14          Closed quote.
15          Well, I mean, trying to characterize this case as
16    bid-rigging just completely fails out of the gate.  And you'll
17    see -- you've seen in our reply brief, Your Honor, we have a
18    quote from a Department of Justice document on what the
19    definition of "bid-rigging."
20          So, we don't have competitors here, they're not buyers,
21    and the conduct doesn't even come close to meeting the
22    characterization of bid-rigging.
23          What's the other per se label they use?  Because,
24    Your Honor, that's really what this case is about, it's
25    argument about label, "group boycott."
```

1          Well, what is a "group boycott"?

2          A "group boycott" is when a group of firms refuse to

3     deal with somebody collectively.  Very importantly -- and this

4     is in our briefs, Your Honor -- the Supreme Court, Justice

5     Breyer, in the NYNEX case -- it's 525 U.S. 128 at 135, 1998.

6     Justice Breyer made clear that the Per Se Rule on boycott only

7     applies when it is horizontal competitors agreeing.

8          So, for example, United Airlines, Delta, and American

9     refusing to do business with American Express as a travel

10    agent, that's horizontal -- that would be per se unlawful.

11         But if it was American Airlines and American Express

12    refusing to do business with Delta, right, it's vertical, the

13    Supreme Court said that is subject to the Rule of Reason.

14         You do not have anywhere in this complaint factual

15    allegations saying any defendants are horizontal competitors,

16    you don't have it.  So we're nowhere near meeting Justice

17    Breyer, the Supreme Court's test in the NYNEX case, for the

18    Per Se Rule applying to the group boycott label, because you

19    don't have allegations of horizontality {sic}.

20         What did the Eleventh Circuit say en banc in Quality

21    Auto?  They said the conspiracy must -- quote -- "involve

22    horizontal agreements among direct competitors for a boycott to

23    be per se illegal."  That's 917 F 3d --

24         THE COURT:  I have the case.  If you cited -- if any of

25    you have cited a case in your brief, you don't need to give me

 1        the citation now.

 2              MR. SIMMONS:  And amazingly, the whole idea of a

 3        boycott, Your Honor, is that somebody kind of falls by the

 4        wayside, because the group of firms are not dealing with them.

 5              Let's look at paragraph 78/74 of the amended complaint.

 6        It says:  The cryptocurrencies that enlarged from the hard

 7        fork, ABC and SV enjoy comparable amounts of hashing power with

 8        SV enjoying a higher hashing rate than ABC at multiple points

 9        after the hard fork.

10              Where's the refusal to deal?

11              Paragraph 97, this is in the amended complaint:

12              ABC and SV compete for users and compete as tradable

13        instruments of currency on exchanges.  So there's now choice.

14        So that's the Per Se discussion, Your Honor.

15              That's the first step I want to take with you, that the

16        Per Se Rule, they're grasping at straws, it should be

17        jettisoned.  It goes.  I think you said that in January, and

18        you were right then and you would be right to do so now.

19              The second step I want to move to, Your Honor, is the

20        Rule of Reason.  You remember, I mentioned Justice Brandeis,

21        the famous Chicago Board of Trade case.  Justice Brandeis

22        himself was a very famous antitrust lawyer before he went on

23        the Court.

24              There are several elements to making out a successful

25        Rule of Reason claim, Your Honor.  The first is, it has to

```
 1   involve -- the plaintiff has to define what we call a "relevant
 2   product market."
 3          The second is, plaintiff has to define a "relevant
 4   geographic market."
 5          The third is, the plaintiff has to say that the parties
 6   subject imposing the restraint has market power.
 7          And finally, the plaintiff has to allege and show
 8   anti-competitive effects in the relevant market.  All right.
 9          So I'm going to go through quickly these elements and
10   argue why the amended complaint fails each, much less satisfies
11   every, because that satisfied all of these.
12          And but before I do that, I just want to draw your
13   attention to the very important language of the
14   Eleventh Circuit in the Jacobs case -- 626 F 3d at 1337 --
15   1336, I'm sorry -- where the Eleventh Circuit makes clear that
16   although relevant product market -- all these things I'm going
17   to talk to you about -- sound facty, that the plaintiffs have
18   to satisfy their Twombly allegation to plead facts that are, if
19   true, they'd make out all of these elements.
20          And amazingly, Your Honor, on the very first -- the
21   predicate fact in the Rule of Reason is relevant product
22   market.  If you take the amended complaint and type in, you
23   know, on Abode (phonetic), you can search your word-search.
24          The term "relevant market" doesn't appear in the
25   amended complaint.  So what is the relevant -- how do we define
```

1    a "relevant product market"?

2          A "relevant product market" is defined as reasonable

3    substitutes.  We look at it from the inside.  Would consumers

4    consider a red car to be a reasonable substitute to a green

5    car?  An eight-cylinder car to a six-cylinder?

6          It's a reasonable substitute.

7          Nowhere in this complaint do they say what are or are

8    not reasonable substitutes.  In fact, those prior paragraphs I

9    just referred the Court to, 74 and 97, show that from the

10   standpoint of hashing, ABC and SV, you know, hashing computers

11   can go to one and can go to the other at will.

12         You and me, as consumers, if we have money and we want

13   to put it somewhere as an instrument of value, you might do SV,

14   Your Honor, I might do ABC.  The complaint does not say they

15   are not reasonable substitutes, and it's their burden.

16         THE COURT:  I have a question.

17         MR. SIMMONS:  Certainly, Your Honor.

18         THE COURT:  I think something that I -- this tutorial

19   confirmed for me, is, any one of us, if we had the proper

20   software on our mining nodes, that we could mine both ABC and

21   SV; correct?

22         MR. SIMMONS:  Correct.  Correct.

23         THE COURT:  Okay.

24         MR. SIMMONS:  You're not excluded -- see, that's the

25   thing, Your Honor, it's really important to the -- we will come

```
 1   to the checkpoint issue maybe later, I don't mean to bounce

 2   around on you -- but there's all this aura, all of these

 3   insinuations.  It's a little bit like this complaint goes close

 4   to the water but then never dives in.  It's a -- the checkpoint

 5   was a poison pill.  This conduct sounds "in the nature of."

 6   It's neither fish, nor fowl.  There's nothing here that's

 7   illegal, and much less a conscious commitment designed to

 8   achieve an unlawful objective.

 9           So after two years of like optics and neither fish, nor

10   fowl, you applied real rigor in January, and now I urge you to

11   do the same once you go back to chambers and take this back

12   with you.  So they don't even use the phrase "relevant market,"

13   it's not in there.

14           They do say -- they do try to say -- quote -- "Bitcoin

15   Cash currency crypto market" -- this is at 103 and 111 of the

16   amended complaint -- but they don't say it's a relevant product

17   market or what's in what's out.

18           The Eleventh Circuit is really clear, when you look at

19   Chief Judge Tjoflat opinion, that opinion is so detailed and

20   the Court there says, look, you need to show elasticities of

21   demand.  This is at 626 at 1338, you need factual allegations

22   across elasticities of demand.

23           -- I'm reading directly from the opinion --

24           Or other indications of price sensitivities that would

25   indicate whether other products are a front.
```

1            So, in other words, if you increase the price of red

2    cars to me, would I switch over to green cars.  And if the

3    answer to that is yes, that's cross-elasticity, then red and

4    green are in the same product market.

5            What I'm trying to suggest to the Court is, not only do

6    they not invoke the label "relevant product market," but they

7    don't allege the Twombly facts that Jacobs and all the courts

8    say you have to.  Remember, Jacobs was on a motion to dismiss,

9    Your Honor.  So nowhere do you find anything about relevant

10   product market.

11           The complaint needs to go on that ground alone.

12           The amended complaint as well, credibly, in paragraphs

13   22, 23, 42 and 44, it talks about other cryptocurrencies.

14           So the complaint, Your Honor, has all of this diversity

15   and heterogeneity of instruments of value in it.  So it's

16   showing you there are all these substitutes.  We don't even

17   know what they're talking about in terms of the relevant

18   product market.

19           Let's go to "relevant geographic market."  As I

20   mentioned, relevant product market, we typically look at it

21   from the inside.  So you and I want to buy a car.  Is a red car

22   a reasonable substitute to a green car, from the demand side?

23           Relevant geographic market, Your Honor, asks the

24   question, once we know what the relevant product is, which

25   suppliers could supply that product and where do they come

```
 1    from.  You see?

 2           So red and green cars are -- okay, in Detroit,

 3    Michigan, Japan, right.  I think you'd probably say the

 4    relevant geographic market for cars is international, because

 5    you can get a German car, or a (inaudible), an Audi, or

 6    whatever.  So it's where does the supply come from?

 7           Again, this is an essential element of a Rule of Reason

 8    claim.  They don't even use the phrase, much less the facts

 9    alleging what the relevant geographic market is.  They may say

10    it's worldwide, but I don't -- you know, they don't allege

11    that.  Okay.  Next is the --

12           THE COURT:  I appreciate your point that it's not in

13    the amended complaint.

14           Would you have any quarrel with the notion of it being

15    worldwide, just in concept?

16           MR. SIMMONS:  Well, no, not in -- no, I don't,

17    Your Honor.  I mean, that's a great question.  I don't.

18           And I think you may have asked me -- which, thankfully,

19    you didn't ask me this time, but I'll address.  I think you

20    asked me in January how would I define the relevant market.

21           Well, it was a great question.  I would say it's any

22    instrument of value.  So if you and I have $500, do you want to

23    put it in any of these Bitcoins?

24           Do you want to put it in a mutual fund?  Where do you

25    want to put your $500?  Under the mattress?
```

1       I mean, it's any instrument of value.

2       But no, I wouldn't have a quarrel with that

3  conceptionally, Your Honor.  But this is about a case moving

4  forward into -- whether this case should go forward at all --

5  and, you know, they don't even use the term "relevant market."

6       They use "Rule of Reason."  So I just -- we

7  shouldn't -- they don't get a free pass on that.

8       Conceptually, it probably is international.  You saw

9  Mr. Rasmussen's slides showing the nodes.  But, you know, this

10  is for the plaintiffs to say, once they say what the product

11  is.  What about market power?

12       Let's go to the third element, Your Honor, because what

13  we're looking for is restrain of trade in a relevant product

14  market and a relevant geographic market.

15       And then to prevail on a Rule of Reason claim, the

16  Eleventh Circuit said in the Maris case, this is 302 F 3d at

17  1216:  To prevail on a Rule of Reason case a plaintiff must --

18  quote -- "establish that the defendant had market power in a

19  well-defined relevant market."  Closed quote.

20       What's the market power here?  They don't say.

21       How do we define "market power"?  All right.

22       The Eleventh Circuit in Graphic Products said market

23  power is the ability to raise price significantly above the

24  competitive level without losing all your business.

25       So I'm the principal maker of cars, I can raise price

1     to you, I impose a restraint to keep people out, and I can

2     exploit my consumers.

3           Where are the price allegations here, Your Honor?

4           THE COURT:  Let me stop you.  Stop.  Let me stop you

5     there.  I wonder if that particular definition of "market

6     power" just doesn't apply, that there might -- because that

7     case you referenced was particular to price, and if price is

8     really not the right way to measure market power here.

9           MR. SIMMONS:  Well, I would push back with you on that,

10    Your Honor.  And I think your question is a really good one,

11    because your question is a theory in search of a problem, all

12    right, which is I think a problem of the complaint.

13          This is a case not only not about competitors,

14    Your Honor.  It's not about buyers or sellers, either.  That's

15    why price-fixing -- they're not buying or selling anything.

16          Because on the bid-rigging side, Your Honor, it might

17    be a bunch of buyers getting together to give the seller a

18    lower price than that.  They have, collectively, market power,

19    to give that seller a price lower than he or she would have

20    gotten had they not gotten together.

21          Likewise, in price-fixing, a bunch of sellers getting

22    together and getting a higher price than had they competed.

23          What is the "it" here that implicates price or output

24    or quality?  I think I may have said to Your Honor back in

25    January, antitrust looks at competition in three dimensions:

1            Price, we want price being lower than it should be for

2     us; output, we want higher output rather than lower output; a

3     quality, we want diversity.  So there's an eight-cylinder car,

4     we want that choice.

5            And if you apply those three limbs to this case, that

6     is the correct definition of market power that the

7     Eleventh Circuit gave us in the Graphics and the Maris case.

8            The problem is price is not implicated in this case.

9            And, in fact, as we know, as you look from our first

10    slides, Your Honor, you now have two chains rather than one.

11    You have Marriott and Hilton, rather than just Marriott in that

12    city, right.  You actually have increased output, because you

13    have two, rather than one.

14           And you have inveterate quality, because even the

15    complaint says that the block capacity of SV is bigger than

16    ABC, and they say SV is better than ABC, but they're sort of

17    mad that ABC maybe has more subscribers.

18           Well, let the marketplace decide, Your Honor.

19           So I would urge the resistance, Your Honor, for any of

20    us to backpedal away from the conventional definition of market

21    power, because it's a disciplining device.

22           And when you stick to that conventional definition, you

23    see there's no "their" there.  There's no -- what is -- this

24    complaint is about labels.  But when we pierce through the

25    labels and think about price, output, quality, it self-refutes.

1          So the plaintiff --

2          THE COURT:  Well, let me ask you, unless I missed it, I

3  haven't heard of "price" being a term that's applicable in this

4  market.

5          I understand there's value assigned to currencies; and

6  if I'm right about this -- and of course Mr. Miller will be

7  able to address this when it's his turn -- if I'm right about

8  it, my question is, for you, Mr. Simmons:

9          Are you suggesting that if I'm right, that price is

10  really not a measure that applies in this market, are you

11  suggesting that antitrust principles in the Sherman Act cannot

12  apply to this market, ever?  Is it that broad?

13          MR. SIMMONS:  No, it's not that broad, Your Honor.

14  It's not that broad.  Your Honor, it's not.

15          If a bunch of -- if companies that are nodes, or

16  hashing nodes, want to get together and say, if you want to

17  join my node, you got to pay a $100 entry fee, right, and they

18  all agreed on that, no.

19          I'm not saying antitrust can never apply to this

20  market.  And I will say to you, Your Honor -- and let me just

21  lead back to the Per Se point.  I think the Court may be aware

22  that is the first antitrust case involving cryptocurrencies,

23  the first.  And you remember that it's only with ample judicial

24  experience that the courts apply the Per Se Rule.

25          But when we look at the Rule of Reason, we are looking

1    at it through the lens of price, output, or quality.  There has

2    to be some diminution -- I'm leading into the next element of

3    the Rule of Reason, the fourth and final one, injury to

4    competition.

5         There has to be some allegation of a diminution on

6    those elements.  And market power, you can't affect price,

7    output, or quality, unless the party imposing the restraint

8    have market power, because market powers defines how the price

9    are output.

10        So, it is those dimensions, Your Honor, we could come

11   up probably with lots of examples of cryptocurrency where those

12   dimensions of competition may be implicated.  But it's --

13        THE COURT:  Excuse me.  It's price or output or

14   quality; correct?

15        MR. SIMMONS:  Yes, correct.  That's right.

16        THE COURT:  So I think plaintiff has some arguments

17   about quality.  I'm not quite sure how to apply the term

18   "output" here.

19        MR. SIMMONS:  Well --

20        THE COURT:  But you're focusing on price, so I'm

21   wondering why, perhaps, you aren't focusing on quality.

22        MR. SIMMONS:  Well, I'd like to walk through -- I'll

23   walk through all three, that they have zero allegations on

24   price, so that's gone.

25        Output.  If you look at the chart we gave Your Honor,

1    just our little picture, after the fork, you have greater

2    output rather than less.  You have two variants of the Bitcoin

3    product, you have SV and you have ABC.

4            It's like my hotel example, that you had a Marriott in

5    Chicago, and you were the only one, and then Hilton decided to

6    build.  So after the fact, is there more output or less?

7    There's more.  There's more competition.

8            Quality.  What's the -- ABC -- Wu said he would fight

9    to the death for ABC.  Wu thinks ABC's better.  Well, the

10   plaintiff thinks SV's better because it has bigger blogs.

11           Well, a marketplace is about diversity and different --

12   right? -- different products for different cases.

13           This complaint is showing the opposite of what it needs

14   to allege.  It needs to allege the diminution in quality in a

15   relevant product market, and remember, we don't even know what

16   that is.

17           The relevant product and relevant geographic markets

18   are the arena in which we are measuring those three dimensions.

19   You don't even have that arena to begin with.

20           When you side-step past that, we don't even have

21   measurements on these dimensions.  And the allegations we do

22   have are showing the opposite of what they should be saying.

23           We have two chains, rather than one; that's more,

24   rather than less.  It's supposed to be less.

25           And we have diversity of qualitative attributes, which

```
 1    is what a marketplace is about.  You have more, rather then --
 2            THE COURT:  I understand --
 3            MR. SIMMONS:  Yeah.
 4            THE COURT:  I understand that point.
 5            MR. SIMMONS:  Yeah.  Let me move to injury to
 6    competition.  I'll just quickly draw your attention,
 7    Your Honor, to pages 24 -- I think -- through 26 of our reply,
 8    I think are quite useful on this, including paragraph 26, where
 9    we talk about the how their market share definitions have no
10    bearing on any relevant markets.  So I would just urge the
11    Court to revisit pages 24 to 26 of our reply.
12            Let me quickly go to injury of competition, and then I
13    want to go to Antitrust Injury and non-agreement.  I basically
14    already covered this, it's the three aspects we look at, price
15    output, or quality.
16            And the Jacobs court said directly -- quote -- "a
17    showing of market power is necessary, but not sufficient to
18    establish potential harm to competition."
19            The plaintiff must also link the market power to a
20    diminution on one of these three elements, and they failed to
21    do that.
22            Jacobs court said -- and this is at 626 F 3d at 1340:
23            A plaintiff must provide a court with -- quote -- "a
24    basis on which it can determine how harm to competition results
25    from the alleged agreement."
```

```
 1              And so, when you look at the absence of price
 2    allegations, when you actually look at the fact that we had
 3    more output, not less, two chains rather than one, and when you
 4    look at the qualitative diversity, I respectfully submit,
 5    Your Honor, that it's backwards.  The complaint is showing the
 6    opposite of injury to competition.
 7              So that's the Rule of Reason.
 8              One point I want to leave the Court with before I move
 9    off the Rule of Reason and go to Antitrust Injury, Your Honor,
10    is amazingly in their papers the other side says, no, no, no,
11    the important thing is to look at competition before the
12    restraint, before like the hard fork.
13              Well, our briefs cite -- if you look at the front and
14    find the cites to Chicago Board of Trade.  Justice Brandeis
15    said in that famous case making the Rule of Reason up by the
16    whole clause, the Court said, you look at the world before and
17    after the restraint, and all of the indicia that you have after
18    the restraint show the opposite of what they need to be showing
19    after Rule of Reason.  You've got to show less after the
20    restraint, not more.  This shows the converse.
21              Let me move to Antitrust Injury, Your Honor.  This is a
22    really important concept to all of us, and I'd like to just
23    talk a little bit more about it than I think we did in January.
24    There's, basically, two statutes in play here, Your Honor.
25              One is Sherman Act, Section 1.  That is the all
```

1    contracts combinations and conspiracies in restraint of trade

2    shall be declared illegal.  Sherman Act, Section 1, is what

3    creates the substantive Rule of Law.  And it has two -- pardon

4    the pun -- two forks, Per Se and Rule of Reason.  We've talked

5    about those (inaudible) elements.

6          The statute that creates the private right of option is

7    Clayton Act, Section 4.  That statute says each person injured

8    in his business or property by reason of something forbidden in

9    the antitrust laws can sue for three-fold damages.

10         The plaintiffs here sued for treble damages.  It is

11   Clayton Act, Section 4, that creates the Antitrust Injury

12   element.  So it's like a conventional tort.

13         The antitrust violation has to factually and

14   proximately cause the plaintiff's injury, and it has to be

15   cognizable.  Very famous Supreme Court case, one of Justice

16   Brennan's last cases from 1990, and we cite this, the Atlantic

17   Richfield case, has a very commonly quoted phrase that says:

18         The injury to the plaintiff must result from --

19   quote -- "a competition-reducing" aspect of the defendants'

20   conduct.  Well, when you go back to our picture on our first

21   slide, we look at that fork.

22         What the plaintiffs are complaining of -- Marriott

23   can't complain, it doesn't have Antitrust Injury because Hilton

24   decided to come into Chicago, right.  Hilton might have -- did

25   Marriott sales go down?  Probably.

1          Did Marriott have to lower its price cause Hilton

2    lowered its price?  Probably.  Did Marriott maybe suffer

3    financial harm because of losing sales to Hilton?  Probably.

4          Does any of that satisfy the Atlantic Richfield test?

5    No.  No.  That's exactly what's going on here.

6          What they're complaining about is more competition, not

7    less, more choice, not less.

8          Remarkably -- I may have said this already --

9    paragraph 52, Your Honor, says a fork was going to happen.

10   This is very important.  The amended complaint itself says a

11   fork was going to happen.  It's not a question of if.  It was

12   going to happen.

13         So ask yourself this question when you think of the

14   Atlantic Richfield test, because it's like a tort, right, that

15   the violation of substantive law has to make you worse off, and

16   compared to what would have happened in the world had you not

17   had that violation.  We call that the but-for world.

18         If the plaintiffs admit that they knew that a fork was

19   going to happen, how does the actual world differ from the

20   but-for world?  You're going to have a fork in the world

21   without the violation, and you're going to have a fork in the

22   world with the violation.  And what was the violation?

23         Because we don't have Per Se.  We don't have Rule of

24   Reason.  And what's the incremental competition-reducing aspect

25   from -- because the but-for world and the actual world look the

1   same, how do you isolate that competition-reducing aspect?

2         This complaint utterly fails the Antitrust Injury, they

3   cannot isolate it.  They can't distinguish the but-for world

4   from the actual world.  And this alone is just a devastating

5   failure.  The complaint admits -- and you heard Mr. Rasmussen

6   talk about -- the complaint is constantly invoking the

7   Whitepaper.

8         Well, the Whitepaper in the complaint admit that hard

9   forks are a way of resolving disputes, and they happen all the

10  time.  Look at that page 19 of Mr. Rasmussen's chart, there's

11  tons of forks.  This is called "competition."

12        So they cannot satisfy the Antitrust Injury.  They have

13  no allegations on but-for causation.  They have no allegations

14  on proximate cause.  They have no allegations isolating how the

15  actual world -- what is the increment of problem in the actual

16  world from the but-for world, and that that was

17  competition-reducing.

18        Finally, Your Honor, let me move to the issue of

19  agreement, and then I will be done.  Maybe you want to hear

20  amplification from each of the individual defendants.

21        Everything I've said to date, these first three steps,

22  they fail Per Se, they fail the Rule of Reason, and they fail

23  Antitrust Injury.

24        All of that discussion you and I have had assumes

25  arguendo in agreement, because you don't have to deal with it

 1    if there's no agreement.

 2         The complaint utterly fails to satisfy the Twombly --

 3    the Supreme Court Twombly and Iqbal standards for alleging an

 4    agreement.  In a very famous case, again, I believe, 1964,

 5    Henry Friendly, being a Second Circuit Judge in the Borelli

 6    case said, "each conspirator has to make the conspiracy his

 7    own."  It's a very famous quote by Judge Friendly.

 8         What are the factual allegations saying anyone here

 9    owned anything?  And the real test is, Your Honor, the real

10    test is whether you're seeing actions that tend to exclude the

11    possibility of independent conduct, right.

12         So our papers take the Court through this.  They plead

13    no direct evidence of any agreement or conspiracy, so that's

14    out the window.  What are they left with under the law?

15         They're left with what we call a "circumstantial

16    evidence case," which is what Twombly itself was, Your Honor, a

17    bunch of telephone companies acting in parallel fashion.  And

18    the Supreme Court said the mere fact they act in parallel

19    doesn't cut the mustard, and it said the case should be

20    dismissed.

21         So what do you have to show in a circumstantial

22    evidence case to show an agreement -- to survive an agreement?

23    You must plead evidentiary facts, who, what, where, when, on a

24    series of things.  First of all, we don't have competitors.

25    The complaint doesn't allege facts any of these people are

```
 1    competitors.

 2          Second of all, we don't have allegation of parallel

 3    conduct, right.  All of the airlines -- the Delta case that the

 4    plaintiffs rely on proves our point.  You had a bunch of

 5    airlines adopting baggage, right, restrictions, and so on.

 6          And the Court, they refused to dismiss that because, A,

 7    they're competitors, they're airlines.  Well, the defendants

 8    here aren't similarly situated, so you fail on that.

 9          B, they all acted in parallel.  They adopted the same

10    kind of baggage restriction.

11          And C, the court said it was kind of an action against

12    self-interest because maybe one of the airlines should have

13    undercut the other one by, right, come to my airline cause you

14    can take on a bigger bag.  In fact, Delta proves why they fail

15    here on an agreement, that Georgia case.

16          So they have no facts showing we're competitors, they

17    have no facts showing we acted in parallel, they have no facts

18    saying anyone's acting against their self-interest, and they

19    certainly don't plead facts that tend to exclude the

20    possibility that because people might have had the same opinion

21    on ABC, that was anything other than independent judgment.

22          Did Roger Ver think ABC was better?  Yes.

23          Did he say so?  Yes.  That's not a problem.  That's not

24    an illegal objective under Monsanto.

25          Did Wu say he'd fight to the death for ABC?  Yes.
```

1          So, they're just -- people are just expressing, but

2   that's not parallel -- that doesn't tend to exclude the

3   possibility of individual action.  Quite the opposite.

4          So, Your Honor, I will rest with this, but I just -- I

5   would urge the Court, I would urge the Court if you think of

6   the logical implications of what the plaintiffs do, they want

7   you to be the first Court to say what nodes can and can't do,

8   when miners can come and go; when the complaint itself in the

9   Whitepaper says nodes can come and go as they please.

10         This complaint fails every theory that it attempts to

11  articulate, and it's much less satisfying any of them.

12         So I will rest with that, Your Honor, unless the Court

13  has questions.

14         THE COURT:  No, I do not.

15         So I think we're turning to Mr. Lourie -- am I right?

16  -- to argue any individual defendants' specific arguments that

17  Mr. Simmons hasn't already covered?  Is that right?

18         Or is it Mr. Rasmussen?

19         MR. QUINN:  Your Honor, this is Mr. Quinn.  I'm an

20  attorney on behalf of Mr. Ver, Chancellor, and Cox.

21         If we might just have a brief minute to submit some

22  individual arguments on behalf of them and then comment to

23  their individual defendants, I think that --

24         THE COURT:  Okay.

25         MR. QUINN:  Is that all right?

1          THE COURT:  Yes.

2          MR. QUINN:  Your Honor, can you hear me?  Just in

3     advance, I want to make sure that I'm coming through clearly.

4          THE COURT:  You are clear.

5          MR. QUINN:  Great.  Well, Your Honor, I thank you for

6     the opportunity to talk with you again.

7          I know it's been awhile since January and a lot has

8     happened since them.  And I hope that everybody on the call --

9     everyone's safe and staying sane during these difficult times.

10          Just to pick up on where Mr. Simmons left off with

11     respect to the allegations against Mr. Ver, and then

12     Mr. Chancellor, and Mr. Cox.

13          The Court, back in January -- I know that I'm coming at

14     this fresh, but it stated the law correctly back in January.

15     I think, Your Honor, you said that United Corp. needs more than

16     a theory, it needs facts to support that each defendant entered

17     into an agreement.

18          And that stems directly from case law in the Southern

19     District of Florida, in the Eleventh Circuit, and in --

20          THE COURT:  Hold on one second.  Just one second.  I

21     hear somebody coming or joining, I just want to make sure we're

22     not losing plaintiff's counsel.

23          Mr. Miller, are you there?

24          MR. MILLER:  I am still here, Your Honor.

25          THE COURT:  Okay.  I would hate for Mr. Quinn to get

```
1    really far downstream and then you tell me, Oh, my God, I lost

2    the connection.  Okay.  Go ahead.

3            MR. QUINN:  That would be a bad result.

4            THE COURT:  You know, it would be a lot of repeating.

5            MR. QUINN:  So with respect to Mr. Ver first.

6            As Mr. Simmons indicated, there's no direct

7    circumstantial evidence that he participated in the conspiracy

8    here.  What United Corp. appears to have principally is all

9    assertions that Mr. Ver must have colluded with Mr. Jihan Wu

10   and with the company Bitmain, because they both supported ABC

11   and because there was a fork on the chain.

12           I take it from the amended complaint that this has to

13   have been a conspiracy, and there's no other explanation for

14   it.  And there's a long line of precedents that we cite in our

15   cases that stands for the proposition that that's just not the

16   proper way to plead a Section 1 violation.

17           You can't back in to a Section 1 violation by stating

18   that conspiracy is the only explanation for what happened here.

19           You have to build it from the bottom up with facts

20   answering a set of key questions.  The duty-free court, which

21   we cite in our papers, assembled those questions and lays them

22   out particularly well.

23           Essentially, you need to lay the stage for the

24   agreement.  It's got to say with whom, to do what, when, and

25   how.
```

1                And with respect to Mr. Ver, those answers are entirely

2    missing from the complaint.  They were missing last time, and

3    they're missing this time as well.

4                What we have, instead, is a series of links to YouTube

5    videos that underscore the point that Mr. Ver was advocating on

6    behalf of the ABC software upgrade.  And no one has ever

7    disputed that Mr. Ver supported the ABC software upgrade.  He

8    publicly supported it.  He advocated for it.  He put his

9    resources behind ABC.

10               And so the ideas that by supporting ABC, it was somehow

11   buying into conspiracy or a scheme to highjack the

12   cryptocurrency network is just missing a lot of the key links

13   that would even get you to that conclusion.

14               So when you look at it, there's no conscious commitment

15   to common scheme, the line that Mr. Simmons used from the

16   Monsanto case.  What we know is what we knew before.

17               We knew that Mr. Ver invested in Kraken.  Investing in

18   a cryptocurrency exchange isn't consistent with participating

19   in an antitrust conspiracy.  We know that he supported ABC.  We

20   know that he used his company resources to advocate on behalf

21   of ABC.

22               Nothing about those steps and that conduct suggest that

23   he participated in this scheme with all of these different

24   people, none of whom he's alleged to have spoken to, to

25   highjack the cryptocurrency.

1          THE COURT:  And just to make a factual point, I believe

2     it's also alleged that Mr. Ver owned Bitcoin.com; right?

3          MR. QUINN:  That's right.  So he is the owner -- he's

4     alleged to be the owner and founder of Bitcoin.

5          THE COURT:  Right.

6          MR. QUINN:  In which Bitcoin.com is no longer a

7     defendant in the case.  But it's widely reported and known that

8     Mr. Ver is the owner and founder of Bitcoin.com, that's right.

9          THE COURT:  Okay.

10         MR. QUINN:  And I'd like to pivot quickly to

11    Mr. Chancellor and Cox.  I think the allegations of Chancellor

12    and Cox are even more poorly pleaded than the allegations

13    against Mr. Ver.

14         The single substantive allegation against Mr. Chandler

15    and Cox is that they wrote software for a checkpoint on the ABC

16    chain, that people who were mining the chain implemented after

17    the fork.

18         Neither of those individuals is alleged to have spoken

19    to or about any other defendant, or to each other, at any time,

20    much less contrives a scheme with Mr. Ver, Wu, and the

21    respective companies to highjack a Bitcoin Cash network.

22         There's no allegation of parallel conduct with respect

23    to Mr. Chancellor and Cox.  What they're alleged to have done

24    is written software code.  That doesn't align with anything

25    else the other defendants are alleged to have done; whether

```
1    it's voted for ABC, or random hashing, or it develops Bitcoin
2    mining technology, they didn't do that.
3         And if you look back at the cases that are parsing that
4    parallel product requirement, they're looking for competitors
5    for adopting similar policies around the same time in response
6    to market conditions.
7         And the Chancellor and Cox piece of thing just doesn't
8    fit into the narrative at all.  There's no nexus between what
9    they're alleged to have done and what the other defendants are
10   alleged to have done.  There's no facts that are the glue that
11   would hold any connection together there.
12        They write Open Source code, like Mr. Rasmussen said,
13   and then they offer that code up to market participants, like
14   miners, exchange with other software developers.  There's
15   allegation that they needed to agree with anybody to perform
16   that function.
17        They put the code out for folks to review, comment
18   upon, accept proposals from third parties to change code, and
19   then they send it out into the world for people to implement.
20        So they're fundamentally distinct from pretty much
21   everything else that's going on here in this complaint.
22        And I will close with this, Your Honor.  To the
23   individuals here, especially Mr. Chancellor and Cox, but
24   Mr. Ver, to an extent, too, they don't understand why United
25   named them in this lawsuit.
```

1           And the pendency of this case is affecting them in

2     their daily lives, and so they just want some closure or some

3     better explanation of why they're alleged to have participated

4     in this alleged conspiracy.

5           So, Your Honor, I'll stop there and take any questions

6     you have on that particular set of defendants.

7           THE COURT:  I don't, at this point.  Thank you.

8           MR. QUINN:  Absolutely.  Thank you, Your Honor.

9           THE COURT:  Okay.  Who's up next for the defendants?

10          MR. LOURIE:  Thank you, Your Honor.  This is Andrew

11    Lourie on behalf of Kraken.  Can you hear me okay?

12          THE COURT:  Yes, I can.  Thank you for asking.

13          MR. LOURIE:  Okay.

14          THE COURT:  But Kraken and Mr. Powell; correct?

15          MR. LOURIE:  Kraken and Mr. Powell, yes, thank you,

16    Your Honor.

17          Your Honor, I think in our written advocacy and in all

18    the defendants written advocacy, and the oral advocacy, we have

19    focused on why the scheme alleged in the complaint is not

20    actionable under the antitrust statutes and why the complaint

21    is deficient in that regard.

22          So I don't want to be redundant of that here.  What I

23    want to focus on, on behalf of Kraken and Mr. Powell, is that

24    the scheme alleged, whether it is actionable or not, under any

25    statute, or whether it's just a non-actionable scheme, the

 1   allegations -- the specific allegations in the complaint

 2   against Kraken and Mr. Powell are insufficient to even suggest

 3   that they are part of the scheme that the complaint describes

 4   or that the plaintiffs have described in their papers.

 5          So, for example, the complaint, you know, clearly sets

 6   out what the plaintiffs call a two-part scheme.

 7          Part 1 is renting votes.  That's it.

 8          Part 2 is after the votes were rented and the election

 9   was had, the next day, a checkpoint was installed.

10          That's Part 2.

11          And nowhere in the complaint do they allege facts that

12   actually put either Kraken or Mr. Powell in that scheme,

13   regardless of whether it's actionable or not.

14          So, for example, starting with Part 1 of the scheme,

15   the allegation of -- they're all between paragraphs 54 and 86

16   of the complaint.  But it is, essentially, all encapsulated in

17   paragraph 67 of the complaint, where the plaintiff alleges that

18   Ver and Wu, and their companies, get together and have an

19   agreement where Ver is going to use Bitmain's power, and

20   whatever level you give it, highjack, cheat on the vote, stuff

21   the ballot box, anything you want to say, the claim is, is that

22   we were cheated by this vote.  That shouldn't have happened.

23          And nowhere does the complaint say that Kraken or

24   Powell either helped that happen or had the power to help that

25   happen.  There's no allegation that they had votes themselves,

88

1    that they influenced any of the voters, that they did anything

2    to facilitate the movement from these nodes, who, apparently,

3    moved from China to elsewhere, and joined this network at the

4    last minute.

5         If you look at the sort of encapsulation of paragraphs

6    54 to 86, which is contained in paragraph 67, you don't see

7    Kraken or Powell mentioned at all.  Paragraph 67 says that

8    during the November 15, 2018, Bitcoin Cash network upgrade,

9    Ver and Bitcoin.com colluded with Wu and Bitmain to reallocate

10   pools of Bitmain Technology servers from the Bitcoin Core

11   network to Bitcoin.com's pools in the Bitcoin Cash network,

12   et cetera, et cetera.

13        There's nothing in there about Kraken doing anything or

14   Powell doing anything.  The first time they try in the amended

15   complaint to loop Kraken and Powell into Part 1 of this scheme

16   that they allege is at paragraph 71, and I think the language

17   is very important.

18        It starts with "upon information and belief."

19        "Upon information and belief, Kraken, a well-known

20   Bitcoin exchange, in which Ver himself is a principal investor,

21   and Powell, Kraken's CEO and co-founder, were involved in the

22   scheme."

23        So they're saying at the beginning of paragraph 71 that

24   they believe, upon information and belief, that Kraken and

25   Powell were -- and they use the word "involved" in the scheme,

1    and then they say why they think that.

2          Because even before the outcome of the fork was known,

3    Kraken released public statements in favor of ABC

4    implementation and against the SV implementation.

5          They don't say anything about how that helped Part 1 of

6    the scheme.  They don't say how making those statements helped

7    Ver rent hashing power from Bitmain to, quote/unquote, highjack

8    the vote.

9          There's nothing in their description in Part 1 of the

10   scheme of some public statement by anybody that actually

11   persuaded voters out there to vote a certain way.

12         So this statement is somewhat of a non sequitur, that

13   because the outcome of the fork was known, they believe, by

14   Kraken before the vote was finished, evidenced by public

15   statements that they made in favor of ABC implementation.

16         That public statement, there's no description anywhere

17   in this complaint how that public statement -- assuming it was

18   made -- contributed to the scheme that they described before --

19   which is a sort of a secretive renting of hashing power -- and

20   bringing all that power to bear in the vote itself.

21         So paragraph 71 does not effectively, in accordance

22   with Twombly, bring Kraken or Powell into this scheme, whether

23   it's actionable or not.

24         When confronted with this in our motion, the plaintiff

25   responded in its opposition brief, at paragraph 10, and they

```
 1    use completely new language that's not in the complaint.

 2         Had they used that language in the complaint, it would

 3    not have troubled us because we would be making the same

 4    argument.  But because they used that language in their

 5    opposition brief, I want to briefly discuss it here.

 6         THE COURT:  Did you say paragraph 10, or maybe you

 7    meant page 10?

 8         MR. LOURIE:  I apologize.  Page 10, the last paragraph.

 9         THE COURT:  Okay.

10         MR. LOURIE:  So in the last paragraph, which they

11    labeled "Part 1 of the scheme," again, they say that the

12    defendants Ver and Wu agreement to improperly dominate the hash

13    war by temporarily reallocating hash power from Bitmain

14    Technologies into Ver's mining pool, Bitcoin.com, against the

15    market practices had been followed since Nakamoto's blueprint

16    for Bitcoin had been released to the world.

17         And the next sentence is where they try again to loop

18    in Powell and Kraken, but using different language than they

19    use in the complaint.

20         And it says, Powell assisted his high school friend,

21    Ver, in accomplishing the scheme by using the powerful Kraken

22    exchange to pre-judge the outcome of the hash war -- whatever

23    that means -- and to signal to invest in other stakeholders --

24    who are completely undefined, either in the complaint or

25    here -- that regardless of the outcome, only the ABC software
```

```
1    version would be supported after the upgrade.

2          And again, this is different language basically saying

3    the same thing as the complaint.  These allegations are

4    completely disconnected from the scheme that the plaintiff

5    alleges.

6          Whether Kraken pre-judged the outcome of the hash war

7    or did anything to signal, to make signals to investors and

8    other stakeholders -- and we don't know what's meant by "other

9    stakeholders" -- there's nothing in the complaint that would

10   explain how signals, public signals, to investors and

11   stakeholders would impact what they say the wrongful conduct

12   was, again, this renting of hashing power and moving it from

13   Bitmain to Bitcoin.com servers.

14         They don't go on to say, either in their papers here or

15   in the complaint itself, how that could assist Part 1 of the

16   scheme in any way whatsoever.

17         The way the complaint is drafted, it insinuates that

18   the vote is the vote, the ballot box has been stuffed, and

19   that, at best, Kraken and Powell know that it's happening and

20   they say things publicly before it's actually completed.

21         But not that anything they say could have changed the

22   outcome or could have contributed to the ballot box stuffing,

23   if you will.  So, that's Part 1 of the scheme.

24         Part 2 of the scheme is the checkpoint, and that starts

25   at paragraph 87 of the complaint, where the complaint says:
```

1          But the plea would not end to be improper allocation of

2     the hash power during upgrade.

3          The next day, the next day Chancellor and Cox are

4     accused of implementing a poison pill -- another phrase for the

5     checkpoint -- in the ABC chain.  And they refer to Chancellor

6     and Cox, and somebody else who's not charged here, as the ABC

7     developers.

8          So, again, Part 2, the installation of the checkpoint,

9     even if it were actionable, they don't allege that Kraken or

10    Powell had participated at all in the creation of the

11    checkpoint.  They say it was the ABC developers that did that.

12         No allegation anywhere that Kraken or Powell are

13    software developers themselves, that they worked on the ABC

14    software, or that they helped Chancellor and Cox develop the

15    software, that they know Chancellor and Cox, or anything of

16    that nature.

17         So how do they show up in Part 2 of the scheme?  They

18    show up for the first time in paragraphs 94, 95, and 96, again,

19    vague allegations that are completely inconsistent and

20    disconnected now with Part 2 of the scheme, the checkpoint.

21         And there's nothing in these paragraphs that's even

22    close to satisfying Twombly's requirements of specificity.  For

23    example, they say individuals in the crypto industry held

24    online forums acknowledging certain things.

25         Completely vague:  Individuals, crypto industry, online

```
 1    forums, acknowledging things.

 2          One of them was named Brekken, and he used to work, not

 3    at the time he was on the online forums -- but sometimes before

 4    that used to work for Kraken.

 5          So they're vaguely describing statements made by

 6    individuals in the crypto industry and not at all explaining

 7    how Kraken participated, assisted, or joined with the ABC

 8    software developers to install a checkpoint, let alone that

 9    Kraken or Powell even had the ability to develop software,

10    develop checkpoints, install checkpoints, et cetera.

11          There's just no allegation, after paragraph 86 -- 87,

12    I'm sorry -- where they start the second part of the scheme

13    that Kraken did anything to further Part 2 of the scheme.

14          There's no allegation as to what Kraken should have

15    done, or what somebody who was not a participant in the scheme

16    would have done, what some other exchange would have done.

17          The only allegation again they make is that --

18    conclusory allegations that they pre-judged the vote.  They

19    don't allege that Kraken is a judge of the vote, or that they

20    get to judge the vote, or that there are any judges of the

21    vote.

22          In fact, the only thing that the complaint says is that

23    the outcome of the vote is determined by the nodes that work on

24    the vote.  Kraken and Powell are not alleged to be nodes or to

25    have any influence over any of that.
```

```
 1              Finally, in paragraphs 95 and 96, they try again to
 2   loop Kraken and Powell's conduct into this two-part scheme.
 3   And they say that giving the BCH ticker to the ABC chain
 4   somehow inserts Kraken and Powell into the scheme that they've
 5   described.
 6              But again, they use vague language that's extremely
 7   difficult to discern what -- how awarding the BCH ticker could
 8   further the conspiracy or the scheme that are actually alleged
 9   in the complaint.
10              What they do say is, by giving the ticker BCH to ABC,
11   Kraken effectively -- they use the word "effectively" --
12   recognized the ABC chain as the official winner -- whatever
13   that means -- of the network upgrade.
14              Well, I don't know what they mean by "effectively," but
15   it seems that they mean is not really, not actually, but
16   somehow it had the effect of.
17              THE COURT:  Can I stop you right there?
18              MR. LOURIE:  Yes.
19              THE COURT:  Something that I wondered about in that
20   paragraph -- and again, Mr. Miller can deal with this when he
21   gets up -- but when I go back to paragraph 48 that says that
22   because two of the software implementations, that is ABC and
23   SV, decided to proceed with upgrades that would no longer
24   respect the same rule sets.
25              A dispute arose over which of the two rule sets being
```

1    applied by the two software implementations would be the rule

2    set that Bitcoin Cash blockchain was going to follow moving

3    forward.

4        Then, so I took it from 48 that in the hard fork there

5    is one prevailing rule set that is voted on as the prevailing

6    rule set and that that would be Bitcoin Cash blockchain going

7    forward.  So I would assume that the BCH ticker, which was the

8    ticker for Bitcoin Cash, would then be applied to that.

9        (Interruption of background noise.)

10       THE COURT:  Somebody needs to mute.  Okay.  Thanks.

11       So, I did -- that's probably more of a question for

12   Mr. Miller to address than for you, but I do put it out to you,

13   Mr. Lourie.

14       MR. LOURIE:  Sure.  Right.  There's nowhere in the

15   complaint where the plaintiffs try to tie-in how the ticker

16   symbol for each of these chains could contribute in any way to

17   the scheme itself.

18       The ticker symbol is merely the symbol used by people

19   who want to trade -- buy, sell, trade the token.  The same way

20   that if I want to buy Facebook stock, I enter FB into my

21   program, or my broker does it, and that's how the Stock

22   Exchange change knows that you want to buy Facebook.

23       If Facebook were to spin off part of its operations

24   into another public company, one of the companies would keep

25   FB, and then a new ticker symbol would have to be given to the

1    new company.  So that's what's happening with every fork.

2         And the complaint concedes that forks are a natural

3    part of the crypto industry in the mining process, and each

4    time there's a fork there's going to be a new rule set and a

5    new token, and there's going to be -- there has to be a new

6    ticker.

7         So what they say is that somehow Kraken and Powell

8    joined this conspiracy -- Parts 1 and 2 -- by merely

9    agreeing -- and we'll assume that it's true for purposes of

10   this motion, that it's actually the exchange that made the

11   choice -- by choosing to keep the BCH ticker for the ABC chain

12   and provide a new ticker for the SV chain.

13        Logically, the only other option was to give the BCH

14   ticker to the SV chain and get a new ticker for the ABC chain.

15   Those are the only really two options.

16        There's no explanation in the complaint how this sort

17   of natural and unavoidable choice furthers the scheme to

18   highjack the vote or install this checkpoint, which is

19   supposedly causing damage by cementing control in some way,

20   which the complaint alleges was done by the ABC developers,

21   Chancellor and Cox.

22        So even if one could conjure up some way that simply

23   giving the original ticker symbol to the ABC chain furthered

24   the scheme that they allege -- which I, frankly, can't conjure

25   up any way that that could happen -- the complaint has to set

1    it forward, it has to -- Twombly requires that it say how.

2         So when it comes to Kraken and Powell, when we read the

3    few allegations that there are in the complaint, they are all

4    completely disconnected from the very actually simple two-part

5    scheme that's alleged.

6         None of these allegations have anything to do with

7    renting hashing power or installing a checkpoint.

8         THE COURT:  Okay.  Does that cover it for you, sir?

9         MR. LOURIE:  That almost covers it for me.

10        The only other points, Your Honor, I wanted to make is,

11   with regard to economic sense and relevant markets, Kraken has

12   no power whatsoever in these markets, because it's not in this

13   market.  It's in a completely different market than everybody

14   else in the case, including the plaintiffs.  No allegation that

15   Kraken even knew who these plaintiffs were.  And then the --

16        THE COURT:  The market -- excuse me -- you would say

17   the market is in one of its cryptocurrency exchanges.

18        MR. LOURIE:  Right, which is completely different than

19   mining, or the manufacture of mining software, or other types

20   of services.

21        And then the final point I wanted to make, Your Honor,

22   is, why this case is here, considering, I think, everybody

23   would agree -- even the plaintiffs -- that this is a square peg

24   in a round hole-type of complaint brought under the antitrust

25   laws.

1          And the reason is, is because there is no contract,

2     there are no regulations that they can point to that were

3     violated, there is no binding contract.

4          The Whitepaper is the only thing they can point to, and

5     they can't point to language in the Whitepaper that was

6     actually breached, let alone that there's some agreement that

7     the Whitepaper would be, you know, the ruling, you know,

8     regulations here.

9          What they're trying to do is get a United States Court

10    to legislate that nodes cannot be nomadic and they cannot move

11    from network to network, and software developers can only

12    install certain types of checkpoints, and here are the types of

13    checkpoints that are acceptable and not acceptable.

14         To deny the motion to dismiss would, essentially, have

15    the Court making law that nodes cannot do what the plaintiffs

16    said or accused the nodes of doing in this case, and there's no

17    basis whatsoever for a federal court to come to that

18    conclusion.

19         THE COURT:  Okay.  Thank you.

20         Mr. Rasmussen, am I right that Bitmain, Inc., the

21    Bitmain entities have been covered by Mr. Simmons' argument.

22         MR. RASMUSSEN:  Yes, that's correct.  And I believe my

23    colleague, Mr. Pace, had a couple of points to make about the

24    paragraph you asked me about on mining pools, if Your Honor

25    would allow it.

1              THE COURT:  Okay.  Briefly, I just really am very

2    aware, poor Mr. Miller hasn't gotten a word in yet, and it's

3    almost 4:00, and I want to be sure that he has all the time

4    that he needs.

5              So, Mr. Pace, if it's real brief, I'm happy to hear it.

6              MR. PACE:  It is, Your Honor.  And Mr. Rasmussen is the

7    tutor, I guess I get to be the advocate.

8              But you asked one question just about allocating server

9    power without customers' authorization or consent, and I just

10   wanted to make sure that we were clear on our argument that

11   there's two parts to it.

12             One is they pleaded on information and belief, but they

13   actually cite to a couple articles, neither of which says that

14   was what occurred.  But of equal importance, there's no

15   allegation that they were required to get anyone's

16   authorization or consent.

17             We could take, for example, my law firm can change my

18   e-mail program, they're allowed to do that, they don't have to

19   have my authorization and consent to do it.  These are mining

20   pools.  The miners, the people running the computers, just care

21   that if they solve a problem first, they get compensation for

22   it.

23             So, Bitmain, which was already mining Bitcoin Cash, can

24   allocate some of its servers over to Bitcoin Cash, when there's

25   a vote, to make sure that the vote comes out the way that it

```
 1   prefers, which is very clear what it preferred.  That doesn't

 2   create conspiracy with anyone else.

 3          That's the only point that I had wanted to raise with

 4   Your Honor.

 5          THE COURT:  Oh, okay.  Good.  Thank you.

 6          Let's take another 10-minute break and it should bring

 7   us back a few minutes after four, and then it will be your

 8   turn, Mr. Miller.  All right, we're in recess.

 9          MR. RASMUSSEN:  Thank you, Your Honor.

10          MR. MILLER:  Thank you, Your Honor.

11          (Recess taken from 3:51 p.m. to 4:02 p.m.)

12          THE COURT:  Mr. Miller, do we have you?

13          MR. MILLER:  Yes, Your Honor.

14          THE COURT:  Mr. Simmons?

15          MR. SIMMONS:  Yes, Your Honor.  Thank you.

16          THE COURT:  I'm going to do a roll call.  Quinn?

17          MR. QUINN:  Yes, Your Honor.

18          THE COURT:  Jones?

19          MR. JONES:  Yes, Your Honor.

20          THE COURT:  Pallet-Vasquez?

21          MS. PALLET-VASQUEZ:  Yes, Your Honor.

22          THE COURT:  Pace?

23          MR. PACE:  Yes, Your Honor.

24          THE COURT:  Rasmussen?

25          MR. RASMUSSEN:  Yes, Your Honor.
```

```
1              THE COURT:  Buehler, Buehler?  No, that was just my

2   only joke today.

3              Pepperman?

4              MR. PEPPERMAN:  Yes, Your Honor.

5              THE COURT:  Okay.  I'm such a barrel of laughs, right.

6              Klein?

7              MR. KLEIN:  Yes, Your Honor.

8              THE COURT:  Louie?

9              MR. LOURIE:  Lourie.

10             THE COURT:  Lourie.  Okay.  And I know Ms. Perez, I

11  trust you're there with Mr. Miller?

12             MS. PEREZ:  Yes, Your Honor.

13             THE COURT:  Okey dokey.  Mr. Miller, go ahead.  I'm

14  sorry, you know, that you're starting at four, but you have

15  whatever time you need.

16             MR. MILLER:  Thank you, Your Honor.  And we understand

17  how the process goes, so we appreciate all the time that the

18  Court is spending on this.  It is very helpful that the Court

19  is delving into these issues and giving us a lot of time and

20  argument.

21             I think I speak for all the other lawyers, we really do

22  appreciate it, because it is helpful to us and our case and our

23  clients to be able to have all of this time to present the

24  arguments.

25             THE COURT:  Good.  Okay.
```

1          MR. MILLER:  So, I think there are kind of three

2    fundamental flaws with what the defendants have been arguing to

3    Your Honor this afternoon, which I want to go over, and then

4    I'll address some of the points that Your Honor's raised as

5    well and summarize our arguments for why the amended complaint

6    does state a claim.

7          The first misconception the defendants seem to be

8    operating under is that they're trying to treat this like a

9    Rule 9(b) pleading as opposed to Rule 8 in Twombly.

10          Yes, Twombly does say that you need to plead facts to

11   show a plausible theory, but that does not mean, for example,

12   as Mr. Simmons alluded to, you need to plead all the who, what,

13   where, when, and why of a Rule 9(b) pleading.

14          It's not heightened pleading, it's Rule 8, so that's

15   kind of the first misconception, and I think that our amended

16   complaint clearly alleges sufficient facts to pass the

17   plausibility standard under Twombly.

18          Next, the defendants are under -- creating a

19   misconception, I guess I would say, Your Honor, that we haven't

20   alleged collusion or activity among the defendants in agreement

21   with plus factors, as required under the cases.

22          There's a lot of discussion by all the defendants about

23   how we haven't pled enough that they were acting together, the

24   implication being that this is just ordinary activity, that

25   they were in favor of the ABC version of the software, and that

1    there's no additional facts that we pled to suggest that they

2    did anything beyond just acting parallel.

3         I'll go through the facts.  I think we do plead very

4    detailed facts, way more than Twombly requires, in order to

5    establish the plus factors to take this out of just parallel

6    conduct.

7         And then the third fundamental misconception I think

8    the defendants have is the whole argument that this created

9    more competition in the market after the fork.  That's not the

10   case, and that's not what we plead in our complaint.

11        It created less competition.  We didn't want to fork.

12   There was no reason why there had to be a fork here.  The

13   reason the hard fork occurred was because of the collusive

14   activity of the defendants to rig the election, if you will,

15   for the ABC.

16        And I think on this point, maybe if I could amplify on

17   the tutorial that Mr. Rasmussen gave earlier --

18        THE COURT:  Can I just stop you one second, Mr. Miller.

19   You're saying that you did not want a fork.

20        Could you finish making that statement again?

21        MR. MILLER:  Yes.  We did not want a fork.  The market

22   here is Bitcoin Cash.  There are really two fundamental Bitcoin

23   currencies.  There is Bitcoin Core, which is the original, and

24   then, as we've alleged in our complaint, that's seen as a store

25   of value.  It's not really scalable and able to be used for

1     transactions.

2          The original hard fork occurred, not with this kind of

3     rancor at all, but because people had different ideas about

4     creating a new type of Bitcoin currency, which was Bitcoin

5     Cash, that would be more scalable and could be used to

6     facilitate ongoing transactions.

7          That's the market that our client was invested in and

8     we're alleging suffered the Antitrust Injury for market for

9     Bitcoin Cash.  That's what we've alleged repeatedly in the

10    complaint, and we've stated that that's what the market was.

11         And prior to the fork that occurred, due to the

12    defendants' conduct, that was the market that everyone was

13    working on, Bitcoin Cash.

14         Bitcoin Cash continues, that's still the market.

15         The problem is now, it's a market with less innovation

16    and, therefore, harm to competition because of the conduct

17    we've alleged in the complaint of rigging the election and

18    putting in place the checkpoint.  So I'll talk more about that.

19         But that's -- to be clear, we are arguing that the

20    market is Bitcoin Cash, that was the market that we were in

21    before the software upgrade.  We did not want to create a new

22    Bitcoin.  And creating the hard fork did not actually result in

23    more competition within the Bitcoin Cash market -- which

24    continues today -- it actually created less competition there,

25    as I'll talk about.

1          THE COURT:  Okay.  Mr. Miller, and you could address

2     this question now or later, but one area of uncertainty I have

3     is, when you say the market is "Bitcoin Cash" -- if my memory

4     serves me correctly, I think it's in your response memoranda --

5     that you said before the hard fork, that that's the market that

6     I should stop the clock before the November 2018 hard fork and

7     look at that market, and that that is the product market that

8     then forms the basis of any analysis regarding harm.

9          Is that what you're saying?

10         MR. MILLER:  Yes, Your Honor, that's what I'm -- where

11    we're heading.

12         THE COURT:  Okay, all right.  Well, I think we'll end

13    up coming back to that, but go ahead.

14         MR. MILLER:  Yes, I'm sure we will.

15         So, to pick back up on the tutorial, just to briefly

16    amplify on what was covered at the beginning of the hearing.

17         If we go back to the original creation of Bitcoin and

18    the Whitepaper by the Nakamoto person, whoever that is, or a

19    group of people that might be, it really was a genius solution

20    because the idea was to try to come up with some type of

21    currency that didn't require Government intervention, or

22    Government regulation, Government control, so that people could

23    create their own currency and work with it.

24         So it had a couple of key parameters in the software to

25    accomplish that.  One is that, originally, if you solved one of

```
 1    these mathematical problems by mining, you would get 50 Bitcoin

 2    for each problem solved.

 3            And the software was designed so that every four years

 4    the amount of Bitcoin you get from solving a problem gets cut

 5    in half.  The notion behind that was that you're creating a

 6    good supply of Bitcoin at the beginning so that it has market

 7    acceptance and there's a critical mass of Bitcoin out there

 8    that people could use, but you're not flooding the market or

 9    printing too much currency.  So over time the amount of

10    currency, if you will, that gets printed goes down.

11            Similarly, there was a limit on the number of Bitcoin

12    that could be mined.  At some point in time all of the Bitcoin

13    that can be mined, pursuant to that software, will be mined,

14    and you'll have a finite amount of it, sort of like the finite

15    amount of gold in the world.

16            So the idea was to create a currency that could be --

17    not have inflation, have sufficient demand that people could

18    use it and wouldn't be subject to any Government control;

19    instead, it would be controlled by the decentralized nodes

20    Mr. Rasmussen spoke about before.

21            Part of this software that was originally designed was

22    also the software upgrades that would take place automatically

23    every six months, I believe, set to be on a schedule, the

24    software upgrades would take place.

25            Because, as Mr. Rasmussen said, this is Open Source
```

1    software, it's available for everybody to try to upgrade, and

2    the system was established so that there would be a process by

3    which people could propose software upgrades.

4         Now, anybody could do this.  I could be some guy

5    sitting in my basement and when the software upgrade time

6    arrives, I could put out into the world my proposed upgrade or

7    changes to the Bitcoin software, and I've created a fork, if

8    you will, but that doesn't mean that it's a hard fork, or that

9    it's a fork that's going to survive, or that my new software

10   suggestion is going to result in a new chain of Bitcoin.

11        And, in fact, Your Honor can see on the demonstrative

12   that was presented that shows some of the history of Bitcoin,

13   you see some of these forks that go off and they fizzle out.

14        Maybe it was some guy in his basement who proposed a

15   new version of software that he thought it was a great idea,

16   nobody else did, and he created one new Bitcoin for himself

17   with that.  But that doesn't do you much good, Your Honor,

18   unless other people begin mining and continuing to build on

19   your chain and build additional Bitcoin.

20        So, the software upgrades were a natural feature of

21   this, but it was not a natural feature that they were supposed

22   to create a hard fork.  And as I mentioned, that's not what

23   United American Corp. and people who were advocating for the SV

24   software wanted to have happen in November of 2018.

25        What they wanted to have happen was a fair election

1   pursuant to the Whitepaper, where people would be using their

2   own CPU power to advocate for which version of the software

3   would be usable for Bitcoin Cash going forward, and that would

4   be the winner.

5          And the key point of contention between the two

6   camps -- other than, I think, Your Honor, there was some

7   personality disputes also going on among these various

8   characters in the Bitcoin market -- but the key economic point

9   of contention between them was the size of the block and,

10  therefore, how much flexibility and scalability it would have

11  to be able to use for transactions going forward.  Because --

12         THE COURT:  Mr. Miller, can I stop you there, one

13  question.

14         MR. MILLER:  Of course, Your Honor.

15         THE COURT:  I don't know if you wanted to finish your

16  sentence first but --

17         MR. MILLER:  Go ahead, Your Honor.

18         THE COURT:  Okay.  So the original hard fork was

19  created with the mining of the original Bitcoin, Bitcoin Core;

20  right?

21         MR. MILLER:  Correct, Your Honor.

22         THE COURT:  And Bitcoin Cash emerged as the winner of

23  that vote.

24         MR. MILLER:  I wouldn't believe the winner.  I believe,

25  instead, Your Honor, that was -- people wanted to go in two

1    different directions.

2            My sense is that was more of a consensual break, where

3    a number of people thought Bitcoin should ought to be used like

4    a gold bar to keep value.  Other people wanted you to be able

5    to use it to go to Starbucks and buy a cup of coffee, and

6    that's where the Bitcoin Cash fork came from.

7            THE COURT:  Nonetheless, that was a hard fork then, as

8    was the November 15th, 2018, event a hard fork; right?

9            MR. MILLER:  Correct, Your Honor.

10           THE COURT:  Right.  And so had -- I understand your

11   allegations, that Bitmain Technologies working with some others

12   diverted their mining pools kind of on the eve of, I gathered,

13   being November 2018 hard fork, kind of jumped in and maybe

14   stuffed the ballot box, so to speak.

15           I understand that allegation.  But even if that had not

16   happened, right, if everybody -- if the folks mining

17   Bitcoin Cash do rather routinely and, I guess, in the couple of

18   months before 2018 reached this hard fork and had to adopt the

19   software upgrades that it was choosing, that would still have

20   led to a hard fork.

21           There would still have been -- again, it sounds to me

22   like a repetition of that choice, which you laid out in your

23   complaint -- between a function of the currency storing value

24   versus highlighting the function of increasing the ability to

25   have transactions.

 1          So, I guess, there's two things -- so now that I've

 2     said that ridiculously long sentence, let me break it down.

 3          I think I have two questions.

 4          One, I think I'm seeing in the original hard fork the

 5     competing interests of storing value versus conducting

 6     transactions.  I think I'm seeing that choice, that difference

 7     of opinion, repeat in the November 2018 hard fork, one.

 8          And two, even had Bitmain Technologies not diverted its

 9     servers to this November 2018 hard fork, you still would have

10     had a hard fork; is that right?

11          MR. MILLER:  I don't think I would agree, Your Honor.

12     First, when your -- if you put yourself in November 14th of

13     2018 prior to this upgrade, you shouldn't really be looking at

14     it as though tomorrow there's going to be a hard fork; rather,

15     tomorrow there's going to be a software upgrade.  So it wasn't

16     a predetermined conclusion that there would be a fork.

17          So, if the defendant hadn't engaged in the collusive

18     activity that they did, there still would have been an upgrade

19     on November 15th, the CPU voting power still would have voted

20     on which version of the software they wanted Bitcoin Cash to

21     use going forward.

22          We don't know, Your Honor, what the outcome would have

23     been.  Maybe the outcome would have been the same, maybe the

24     outcome would have been different, maybe there wouldn't have

25     been a fork at all.

1          The point of our complaint is that was not done in fair

2    competition because of the collusion of all of the defendants.

3    So we don't know exactly what would have happened.

4          Our posit is that had there been a fair election, the

5    majority of people voting would have agreed that the best thing

6    to do for Bitcoin Cash, the market going forward, would be to

7    increase its scalability and size so that it could be used for

8    more transactions.  You could buy a stick of gum with it, as

9    opposed to only being able to buy a car with it, for example.

10   That's what we think would have happened if there had been fair

11   competition.

12         And I think it's a reasonable assumption, although

13   certainly not necessary for the Court ruling on this motion to

14   dismiss, to say that the defendants felt the same way,

15   otherwise, they wouldn't have rigged the elections.

16         THE COURT:  Okay.  Can I draw your attention to

17   paragraph 45 of your complaint, where you define a "hard fork"

18   as a change to the protocol of the blockchain network, whereby

19   the nodes of the newest version of the blockchain follow a new

20   world set, while nodes of the older version of the blockchain

21   continue to follow the prior rule set.

22         The nodes following the older rule set are no longer

23   compatible with the nodes following the new rule set.  This,

24   essentially, creates two different chains of blockchain with a

25   new version branching off.

1          I understood you to be pleading that coming into

2    November 15th of 2018, the plaintiff, and others, understood

3    that there was this -- these incompatible rule sets that had to

4    be voted upon in an upcoming hard fork.

5          MR. MILLER:  I think I would say, Your Honor, they

6    understood that there were these two competing rule sets that

7    had to be voted on, yes, but not necessarily that the vote was

8    going to result in a hard fork -- if that answers Your Honor's

9    question -- that subtle distinction between the two things.

10          THE COURT:  Okay.  All right.  Go ahead.

11          MR. MILLER:  It sounds like it doesn't completely

12    answer Your Honor's question but --

13          THE COURT:  Well, it's not how I read your complaint.

14    Because I was a little surprised, I think you introduced in

15    your argument here by saying -- suggesting that I send you --

16    either I interrupted you or you kind of went off on a tangent,

17    but I thought you started to argue that the illegal actions --

18    the alleged illegal actions of the defendants, such as -- group

19    them all in a pile at the moment -- does the illegality of

20    their actions under the antitrust clause, as you allege it,

21    created a hard fork that would not have otherwise happened.

22          Are you suggesting that?

23          MR. MILLER:  What I'm suggesting, Your Honor, is that

24    we don't know for sure, whether the hard fork would have

25    happened or not, because that's all that I'm saying.

1        We know that there was a vote on the software upgrade,

2   and it could be that if there had been a fair election and the

3   SV rule set with more scalability, more innovation available in

4   the marketplace, was the winning vote, it's not necessarily the

5   case that ABC would have continued on.  We just don't know.

6        Because that's all I'm saying, is that we know there

7   was a software upgrade with a vote.  We don't necessarily know

8   what would have happened if the vote had not been rigged.

9        THE COURT:  But do you agree that the rule sets for ABC

10  and SV were not compatible, you could not use them both in one

11  cryptocurrency and Bitcoin Cash going forward?

12       MR. MILLER:  That we absolutely agree with, Your Honor,

13  yes, and that's what we alleged in one of the paragraphs here

14  in our complaint around where you were just looking, correct.

15       THE COURT:  Yeah, okay.  Okay.  Go ahead.

16       MR. MILLER:  Okay.  So, getting back to the arguments,

17  the legal arguments on the motion to dismiss, with that kind of

18  backdrop of the history of Bitcoin and the software upgrade

19  that was being voted on, we have alleged sufficient facts under

20  Twombly to establish that the defendants were all acting in

21  collusion and not acting through parallel fashion.

22       We outlined that in our brief, I don't want to repeat

23  everything, but I want to focus on a few of the key things that

24  we've alleged and the plus factors for each.

25       We allege that Wu said he was going to reallocate hash

1    power, we've alleged that they were mining Bitcoin Core, and

2    that they reallocated that to Bitcoin ABC in a fight to the

3    death with SV.

4          We've alleged that that was contrary to Wu and

5    Bitmain's economic interest, which is a plus factor, because he

6    stated that the result of this would be a diminution value of

7    Bitcoin Core that he was also mining.  So there's no --

8          THE COURT:  Can I stop you.  Can I stop you there?

9          MR. MILLER:  Of course.

10         THE COURT:  Okay.  It's against his economic interest

11   because of the diminution of the value of Bitcoin Core.

12         I know you say it's against his economic interest, but

13   I -- where are the facts that if proven true establish that

14   it's against his economic interests?

15         MR. MILLER:  In his statement that we alleged in the

16   complaint, he says, in black and white, that it's going to

17   cause a diminution in value of Bitcoin Core.

18         Let's see if I can find --

19         THE COURT:  But if -- if -- okay, so I might -- here's

20   the analogy in my head, so you might as well know it, and then

21   you can address it.

22         I might think that my stock in a particular, you know,

23   company is about to crash., but I might hang onto it -- let

24   me -- maybe, maybe this is a better analogy.

25         I have some money in my pocket and I'm invested in

1    stock A, and I'm going to invest in stock B.  And I think by

2    stock B doing really well, it might hurt stock A, but I'm going

3    to hang onto A, because I think over time, how I think the

4    markets are going to go, I'm going to come out okay, Stock A

5    will recover in value, and stock B will also end up giving me

6    good value, too.

7           I mean, what I guess what I'm saying is, the fact that

8    Bitcoin Core value would drop at the time of this hard fork

9    doesn't -- I'm asking you how your allegations show me that

10   that -- under any circumstance -- is against his economic

11   interests.

12          MR. MILLER:  Well, first of all, we don't have to show

13   that in any circumstance it is against his economic interest.

14          What we have to plead under Twombly is a plausible

15   theory that it's not parallel or innocent conduct, and that is

16   what we've alleged here.

17          He doesn't say in paragraph 69 -- is what I was looking

18   for -- for example, I think I'm going to reallocate hash power

19   to Bitcoin Cash because I know it's going to cause the value of

20   my Bitcoin Core to go down by doing that, but I think that

21   Bitcoin Cash is a great investment.  He doesn't say that.

22          He says, I'm reallocating the power, the Bitcoin Core

23   price will dump below yearly support, might even go below

24   $5,000, and the only explanation he gives is, well, he wants to

25   be in a fight to the death with this guy, Craig Wright.

1          So under the facts we've alleged here and what Mr. Wu

2     actually said, the most plausible explanation is that this

3     wasn't in his economic interest to do that.

4          In addition, Your Honor, that's not the only plus

5     factor.  We also can show that there was, you know, other

6     activity they were doing that is inconsistent with the notion

7     that they were acting independently, because that's really what

8     the defendants' arguing here.  They're saying, under Twombly,

9     these facts that we've alleged in the complaint only establish

10    that they were acting independently and in parallel, rather

11    than collusion.

12         But we have statements like this where he's

13    reallocating hash power to something that is less profitable

14    for him.  We also have allegations that he had to work with

15    Mr. Ver -- and I'm segueing to him here as well -- in advance

16    in order to reallocate these pools, because the incoming

17    recipient of the pool addition needs to prepare the technology

18    in order to accept that incoming addition to the pool.  It

19    doesn't just happen in a vacuum or in a parallel conduct, and

20    we've alleged that in our complaint.

21         THE COURT:  So let me stop you there.

22         The question is whether that statement that there has

23    to be plenty so that Bitcoin.com can accept these new servers,

24    it sounds, again, conclusory, like what about some facts that

25    would tell me, if true, that what the preparation would have to

```
1    be --

2             MR. MILLER:  Well, you're --

3             THE COURT:  -- right?

4             MR. MILLER:  Yes.  I don't think that's what Rule 8 in

5    Twombly require, and that would be more of a Rule 9 pleading.

6             It's not just conclusory.  The conclusory statement

7    wouldn't offer any facts.  It would just say, oh, well, it had

8    to be prepared -- it had to be done in advance.  That would the

9    conclusory.

10            We offer the additional fact to show why it had to be

11   done in advance by alleging that you have to prepare your

12   computers in order to accept this incoming addition to the

13   pool, so that does satisfy Twombly.

14            THE COURT:  Yeah, and it strikes me -- just the

15   commentary on what you said -- in that really so much of the

16   dispute that you have with the defendants is about how to apply

17   the Twombly pleading standard.

18            You read it, it's requiring much less than the

19   defendants do.  And I think everybody agrees that plausibility,

20   not probability, is the standard.  You pointed that out in your

21   response, and I think that's completely right, but that doesn't

22   answer all of our questions, right, about what level of

23   pleading you have to have.

24            I guess, let me ask you a question just to check in on

25   this.  Am I right, you'd agree, Mr. Miller, that you can't
```

```
1   plead just conclusions, right, you need to plead facts and --
2   hold on, in fact, let me look at a note maybe --
3          MR. MILLER:  I agree --
4          THE COURT:  -- you have to plead enough facts to raise
5   a reasonable expectation that discovery will reveal evidence of
6   an illegal agreement, right, so there's something between the
7   conclusion and then those facts that have to be pled.
8          MR. MILLER:  Correct, Your Honor, I agree with that.
9          THE COURT:  Right.  And I think then where you're
10  diverging from the defendants is, for example, that allegation
11  we just talked about, that preparation had to be made.
12         Is that a conclusion or is that a fact?
13         The defendants argue that's really a conclusion, it
14  sounds a little more specific, but what's the preparation?
15  Those would be the facts to plead.
16         And you're saying the allegation that preparation is
17  required is a sufficient pleading of a fact.
18         MR. MILLER:  Yes, because we --
19         THE COURT:  Is that --
20         MR. MILLER:  Yes, Your Honor.
21         THE COURT:  Go ahead.
22         MR. MILLER:  We didn't just say conclusorily {sic} that
23  preparation is required.  We explained why as a matter of the
24  technology it's required, and that is sufficient under Twombly.
25         THE COURT:  Uh-huh.  Interesting.
```

1           MR. MILLER:  If you look at paragraph 60, you know,

2   starting around the mid-'60s, all the way through to the

3   beginning of Count 1, you see that's where we have all of the

4   facts that we have alleged to show the collusive activity and

5   the plus factors that are required under the law.

6           When you have, you know, 30 paragraphs, multiple pages

7   of detailed facts, Tweets, YouTube videos, statements that

8   people made to the world, those are facts.  That's not

9   conclusory.  So I don't really think that the Court could

10  seriously entertain the defendants' motion that this complaint

11  doesn't comply with Twombly.

12          I don't really think that's where the true legal

13  dispute is here, Your Honor.  I think the real dispute is, do

14  we state a claim for antitrust violations, not have we complied

15  with Twombly.

16          THE COURT:  Okay.  All right.  Well, I understand what

17  you said.  I do have this other question that I just don't want

18  to, you know, lose track of.

19          Do you agree with the defendant that parallel action

20  must be between the competitors?  That's something that they

21  argue in, I think, in their reply.  And I'm not hearing a

22  dispute about that, but I want to check in with you on that.

23          MR. MILLER:  I don't think it has to be only between

24  competitors.  But I think here we do have parallel action and

25  collusion between competitors.

1          You have both Bitmain and Wu, and Ver and his entities,

2    clearly, that are mining for the same product, the

3    Bitcoin Cash.  So they're clearly competitors.

4          THE COURT:  Okay.  And keep going, I'm with you that

5    far.

6          MR. MILLER:  Right.

7          THE COURT:  How is an exchange or a software developer

8    a competitor for your company which is mining?

9          MR. MILLER:  The -- I think like I said, you don't have

10   to have only collusion between competitors.  I think that they

11   are all competing in the Bitcoin Cash market, especially as

12   we've described this election, if you will, with the hash vote

13   that took place because the market is Bitcoin Cash, the

14   activity that was going on here is this vote, and all of them

15   are working on that, so they're all competing with United

16   American and the people who were in favor of the SV protocol

17   going forward, all of them are competing on that front.

18         THE COURT:  How is Kraken exchange competing with

19   United American?

20         MR. MILLER:  It's competing on the issue of whether

21   Bitcoin Cash going forward should be the ABC protocol or the SV

22   protocol with more scalability, because Kraken weighed in on

23   that election before the election took place, as we've alleged

24   in the complaint, that's contrary to what other exchanges did,

25   when you would expect an exchange to be neutral and really want

1    to have more things traded, not fewer.

2           THE COURT:  Assuming that Kraken did weigh in, I

3    still -- to me, that doesn't clearly answer the question how

4    that makes them a competitor.  I understand they have an

5    interest in the market, but how are they a competitor with a

6    miner?

7           MR. MILLER:  I don't think that Kraken is competing

8    with the miners, in terms of mining Bitcoin.  I think that's

9    too narrow a view of competition.  But I do agree with

10   Your Honor that they're not competing at that narrow level.

11          THE COURT:  So at what level are they competing?

12          MR. MILLER:  The level that they were competing is what

13   we've alleged in the complaint between the software upgrade

14   protocols that were being considered in November of 2018.

15          THE COURT:  How did they do that, how did they compete

16   on the choice of the software protocol?

17          MR. MILLER:  Kraken competed on that by weighing its

18   thumb on the scale in favor of the ABC protocol prior to the

19   election, and as we've alleged and I said before, they really

20   had no interest in doing that, that was against their economic

21   interest to do so.

22          THE COURT:  Uh-huh.  Okay.  I know I've taken you from

23   your script, but I trust you have a trail of breadcrumbs to

24   bring you back to where you were.

25          MR. MILLER:  No problem, Your Honor.  So I don't want

1    to go through all of the facts and plus factors that we've

2    outlined in the complaint and the brief.  We talked a little

3    bit already about Wu and Bitmain, we talked about Kraken, we

4    talked about Ver.

5         And then with respect to Chancellor and Cox, the

6    developers, we have alleged in the complaint, specifically, at

7    paragraph 94, that it was planned for a long time, that they

8    were going to impose this checkpoint in order to favor ABC.

9         And that as we outlined in our papers, the person in

10   the video, Mr. Brekken, who said that this had been planned so

11   long and said that we knew we were going to win -- and that

12   they were drinking beers all day on November 15th, because they

13   knew they won -- and then he also says, with respect to both

14   Kraken and the developers, another step you do is you talk to

15   all the exchanges, then you have them apply a patch at the

16   checkpoint that anchored the block mine by Bitcoin ABC which

17   prevents all future re-orgs.

18        And then he gives an audible whistle at, you know, how

19   pleased he is with the fact that these people all have

20   succeeded in this scheme together.  So those are all of the

21   plus factors that we've alleged in the complaint.  It's more

22   than sufficient in order to establish that this was not just

23   parallel conduct.

24        I want to speak a bit about the Rule of Reason and

25   Per Se, unless Your Honor has any additional questions about

1    the parallel conduct in the agreement?

2         THE COURT:  Mr. Miller, give me just a minute to look

3    at my notes here.

4         MR. MILLER:  Certainly.

5         (Brief pause in the proceedings.)

6         THE COURT:  When I look at, I think it is -- well, my

7    broad question is -- and I have referenced certain paragraphs

8    here I can go back to -- don't you allege that Bitmain

9    Technology mined Bitcoin Cash before the hard fork --

10   obviously, not in the numbers, not in however many thousands of

11   Bitmain miners that came in on November 15th of 2018 -- but in

12   whatever numbers it was, the Bitmain Technology did mine

13   Bitcoin Cash before that?

14        MR. MILLER:  It's true, Your Honor, but in a much

15   smaller percentage.  But yes, correct.

16        THE COURT:  Okay.  So if the Whitepaper says -- why --

17   and this kind of brings me to the Whitepaper -- I don't have

18   the language in front of me, you probably know it by heart now,

19   but that you quoted, in fact, it was in the tutorial -- by

20   taking that very language -- and I would go to the page if I

21   could -- if somebody knows the page, you can shout it out.

22        MR. MILLER:  Are you asking about in the tutorial where

23   it was quoted?

24        THE COURT:  Yeah, I am asking the tutorial, what page

25   is it on?

1          MR. MILLER:  It was on page 21, I believe, is what

2     you're looking for.

3          THE COURT:  Okay, great.  Yeah, there we go.

4          Nodes can leave and rejoin the network at will.  They

5     vote with their CPU power expressing their acceptance of valid

6     blocks by working on extending them.

7          So if Bitmain Technologies was mining Bitcoin Cash

8     before November of 2018, would that not fit within this concept

9     of nodes that can leave and rejoin the network?

10         MR. MILLER:  Well, those nodes didn't leave and rejoin

11    the network.  What we've alleged is that the nodes that were

12    off mining Bitcoin Core -- not Bitcoin Cash -- is what was

13    relocated -- to quote Mr. Wu -- into the hash war.

14         THE COURT:  Okay.  So you're making a distinction --

15    you're not disputing that Bitcoin Technologies employed certain

16    nodes to mine Bitcoin Cash before the hard fork.  They just

17    didn't use -- they just brought in new nodes on November 18th

18    of 2018 to mine Bitcoin Cash?

19         MR. MILLER:  Correct.

20         THE COURT:  Okay.  While we're on the Whitepaper -- and

21    forgive me again, but I know you've got an awesome outline, so

22    you'll be okay -- isn't the Whitepaper kind of most analogous

23    to like a guideline or a policy statement?

24         I mean, it's not a contract, it's not a law.

25         I've been trying to make sense of your reliance upon

1    it, why the Court -- I think you suggest the Court should

2    enforce some sort of realty to that Whitepaper; am I right?

3         MR. MILLER:  The way I would describe it, Your Honor,

4    is it's a description of how the software operates and the

5    systems that Nakamoto created, as I outlined back in 2008, the

6    genius idea that he had to come up with cryptocurrency that

7    would be decentralized and not dependent on any government.

8    So it's not a contract, it's not a thought-piece either.

9         What it is, is a description of how the software for

10   Bitcoin, which is the same software, ultimately, for Bitcoin

11   Cash, operates.

12        I don't know if that makes sense or answers

13   Your Honor's question.

14        THE COURT:  Well, I think --

15        MR. MILLER:  In other words, he designed the software,

16   he did the coding, came up with the software, and then this is

17   the description of what the software accomplishes and how it is

18   to be used going forward in order to be used as a

19   cryptocurrency.

20        THE COURT:  And I think your client alleges that your

21   client reasonably relied upon expectations -- relied upon the

22   Whitepaper to set its expectations about how this currency

23   would operate?

24        MR. MILLER:  Yes.  I don't remember offhand,

25   Your Honor, whether -- where that is, but I remember we did

```
 1    allege that.

 2              THE COURT:  But I think that's the concept.

 3              MR. MILLER:  Yes, the concept.

 4              THE COURT:  And I know, initially, you had state court

 5    claims that I think involved elements of reliance.

 6              MR. MILLER:  Right.

 7              THE COURT:  At any rate, we don't have that now.

 8              MR. MILLER:  Correct.

 9              THE COURT:  But that --

10              MR. MILLER:  And that's filed, because I know we argued

11    that in connection with those claims, correct.

12              THE COURT:  Right.  But the state law just didn't

13    provide the plaintiff with an avenue to recover for its losses

14    in this hardcore cash war, right, so we're no longer, you know,

15    looking at a cause of action that has reliance as an element.

16              MR. MILLER:  I guess I would say, we're not making

17    those claims anymore.  I'm not going to concede that they were

18    not valid claims.  We decided to focus our amended complaint on

19    antitrust, obviously.

20              THE COURT:  No, I know, I understand that, but I'm just

21    talking about what we're dealing with today --

22              MR. MILLER:  Correct.

23              THE COURT:  -- which is the claims that you've pled.

24              MR. MILLER:  Correct.

25              THE COURT:  If you took the Whitepaper out of your
```

1    amended complaint, could you still just as easily plead your

2    claim, or do you need the Whitepaper?

3         Is it essential to your claim?

4         MR. MILLER:  That's an interesting question,

5    Your Honor.  I guess I haven't thought about it much, but I

6    would say that we don't need it for our claim.

7         THE COURT:  Okay.  While I'm at it, let me just keep

8    looking at a few questions I had here.

9         (Brief pause in the proceedings.)

10        THE COURT:  Well, the question I do have -- and I don't

11   know if you're going to get there already -- is the

12   significance of your allegation at paragraph 68, Upon

13   information and belief Bitmain Tech did not ask the permission

14   of its customers to divert its servers to mine Bitcoin ABC?

15        MR. MILLER:  Yes, that's an additional plus factor that

16   we've alleged in the complaint, and that's based -- it's not

17   made up, obviously, Your Honor -- it's based on what, I guess,

18   I would characterize as "scuttlebutt" in the Bitcoin community,

19   suggesting that that happened.

20        We don't have, at this point in time, without the

21   benefit of discovery, all the contracts between Bitmain

22   Technologies and the people who are giving their servers to the

23   pool to know exactly what those servers -- what those

24   contracts, rather, say about whether Bitmain has the ability to

25   reallocate the miners away from Bitcoin Core to Bitcoin Cash,

1    which is what they did here.  But we pled it because people who

2    are in that marketplace are suggesting that that is what

3    happened.

4         THE COURT:  Well -- yeah, I understand that you don't

5    have all the evidence of it.  I'm asking you what the

6    significance is.  You haven't -- the complaint doesn't tell me

7    why that's important, and I don't know why it's important.

8         MR. MILLER:  I think it's a plus factor, Your Honor,

9    because if they're violating their contracts with these people

10   to reallocate servers away from Core to Bitcoin Cash, then

11   again, they're acting contrary to their economic self-interest,

12   because they're breaching a contract with their own customers

13   and potentially exposing themselves to liability; so that's why

14   it's pled, it's an additional plus factor.

15        THE COURT:  Okay.  Another question I have is, do you

16   need -- and I know you're going to get into, I think, Part 2

17   of the scheme -- do you need Part 2 of the scheme to make out

18   your claim?

19        Could your claim stand alone on Part 1 of your scheme?

20        MR. MILLER:  I think that it could stand alone on

21   Part 1 of the scheme, but the facts we have here is that there

22   was a Part 1 and a Part 2 to it.

23        THE COURT:  Okay.  I will take a pause in my

24   questioning mode.  Why don't you go back to where you were.

25        MR. MILLER:  No problem, Your Honor.  I'm happy to

1   answer any questions that Your Honor has.

2        So I was beginning to talk about the Rule of Reason and

3   Per Se claims that we have in Count 1 and Count 2.  They're,

4   obviously, alternative claims under Section 1 of the Sherman

5   Act that we can rely on.

6        We believe both are adequately pled, but we wanted to

7   plead them clearly in the alternative so that the Court could

8   easily assess them and Your Honor could make your own

9   discrimination on that.

10        So let's talk about a couple -- respond to a couple of

11   the points that the defendants raised.  They spent a lot of

12   time discussing whether the complaint alleges an effect on

13   competition, and Your Honor asked some very good questions

14   about this, because, as I think the Court knows, under the Duty

15   Free Americas case there are three possible anti-competitive

16   effects discussed to have an impact on competition:

17        One is a reduction of output; two is an increase in

18   price; or three is a deterioration in quality.

19        And Your Honor asked questions about the price issue,

20   because there was a lot of discussion of pricing.  Your Honor's

21   right, what we're alleging in our complaint, as the effect on

22   competition is deterioration in quality -- the third factor

23   there -- not reduction of output or increase in price.

24        I don't agree with the premise, as I said before, that

25   there was an increase in output by virtue of the hard fork, but

1    that's really neither here, nor there, because our point now is

2    we're not alleging the output as the antitrust harm.

3         What we are alleging is the deterioration in quality as

4    a result of the decrease in innovation and the decrease in

5    scalability of Bitcoin Cash, because now it's locked in through

6    the collusive vote and the checkpoint that was created, that

7    there are limitations on the scalability of Bitcoin Cash and

8    it's not going to be as effective for customers, consumers of

9    Bitcoin Cash to use it for transactions, which is what it was

10   designed for.  So to be clear on that --

11        THE COURT:  Doesn't your complaint acknowledge, though,

12   that some people value scalability in being able to conduct

13   more day-to-day transactions and some people value the capacity

14   to store value?  Depends on -- right?

15        MR. MILLER:  Right.

16        THE COURT:  Both are legitimate merit, depends on what

17   shoes you're standing in; right?

18        MR. MILLER:  And that's the difference between the

19   Bitcoin Core, which is the storing value currency, and

20   Bitcoin Cash, which is for transactions.

21        That decision, that fork, if you will, Your Honor,

22   happened in 2017 and people agreed that there were going to be

23   two different versions of Bitcoin to accomplish these two

24   different goals.  So now we're talking about Bitcoin Cash going

25   forward, which is the Bitcoin for transactions and scalability.

1          The fork in 2018 was not a debate about whether

2   Bitcoin Cash should be a storing value versus more

3   transactions, that's not what the debate was about.

4          What happened with the software upgrade -- and

5   everything that we've alleged in the complaint -- is that you

6   had a decrease in the quality of Bitcoin Cash, which is to be

7   used to facilitate transactions as a result of the fact that

8   it's not as scalable as it could be and the software is locked

9   down to prevent people from making Bitcoin Cash more scalable

10  in the future.

11         THE COURT:  Okay.  Let me stop you there.

12         And I guess that's in paragraph 49, and you're

13  addressing the backers of Bitcoin ABC, Wu, and Ver were among

14  the earliest Bitcoin start-up investors.

15         The Bitcoin ABC proposal sought to preserve

16  Bitcoin Cash's basic structure, including limiting the block

17  size to 32 megabytes and immunizing it from major developments

18  in the future.

19         Why is that inherently poor quality? -- because I think

20  that's what you're saying, that what --

21         MR. MILLER:  Correct.

22         THE COURT:  -- what the goal of ABC was equals a

23  reduction in quality of the currency?

24         MR. MILLER:  Correct.

25         THE COURT:  How is that universally so?

1          MR. MILLER:  Because the purpose of Bitcoin Cash is to

2     be used like cash for transactions.  And if you stifle the

3     ability of people to innovate or to increase its capacity for

4     more transactions in the future -- which is what happened

5     here -- that's the effect on competition.

6          So that's why it's not as good, because you're

7     artificially, through collusion -- and everything else we've

8     alleged in our complaint -- stifling the ability to have that

9     flexibility for transactions.

10         THE COURT:  So put yourself for a moment in the shoes

11    of somebody mining Bitcoin ABC today, happily mining it, what

12    is their interest?

13         What do they get from mining that currency today?

14         MR. MILLER:  They get -- if you're the miner you get

15    whatever the value is of Bitcoin Cash.  You then have the

16    ability to use it to engage in transactions.  You also have the

17    ability to sell it on Kraken or some other exchange.

18         That's what the miners were getting.

19         THE COURT:  Why isn't that, for them, good quality?

20         MR. MILLER:  It may be good quality for them, but the

21    antitrust damage is that the conduct limits the quality of the

22    overall product going forward.

23         Just with anything, if you have some product out there,

24    there may be some people who are fine with glitches, fine with

25    defects in it.  But if you've created a system where you're not

1    able to innovate to fix those things and to make it more

2    innovative and scalable in the future, then you've limited the

3    effect of -- I'm sorry, you've created a negative effect on

4    competition.

5             THE COURT:  But, of course, you haven't alleged

6    glitches and all of that.

7             MR. MILLER:  No.

8             THE COURT:  You've alleged two different goals to be

9    achieved by the ABC or the SV, two ways of shaping that

10   currency to serve particular interests.  And I guess I'm just

11   really focusing on your world "quality," which seems to me like

12   a very subjective -- it's a harder term to apply, isn't it,

13   than price and output?

14            MR. MILLER:  Yes.

15            THE COURT:  Price, I can objectively measure, and

16   output, I think I can, too, but quality is so subjective.  And

17   that's what I'm spending some time with you on, to understand

18   how your complaint pleads that in your Rule of Reason -- in a

19   Rule of Reason analysis.

20            MR. MILLER:  I agree, it is more subjective than output

21   and price.  But the Eleventh Circuit, in the Duty Free Americas

22   case, it clearly says that that more subjective factor in

23   deterioration in quality can be an anti-competitive effect or

24   antitrust damage.

25            And what we've pled in the complaint is in paragraphs

1    49 and 50 there, about how that negatively impacted the quality

2    of the Bitcoin Cash.  I think -- I'm just looking back -- we

3    might have also included specific allegations about that in

4    Count 2, yes, we did, in paragraph 114, correct.

5              THE COURT:  Uh-huh, right.

6              MR. MILLER:  Paragraphs 114 and 115, actually, where we

7    alleged the deterioration in quality of Bitcoin Cash and higher

8    transaction costs -- which I haven't discussed yet -- but

9    that's very much related to the scalability; if the more

10   scalable the Bitcoin is, the more it can be used for small

11   transactions, like buying a cup of coffee at Starbucks and,

12   by definition, the lower the transaction costs.

13             So, by restricting the scalability of the Bitcoin in

14   the 2018 upgrade, it resulted in higher transaction costs for

15   Bitcoin Cash consumers.

16             That's what we're alleging in paragraph 115.

17             THE COURT:  Okay, I see that.  Okeydoke.  Do you know

18   where you left off?

19             MR. MILLER:  Sure.

20             THE COURT:  Rule of Reason, I think we were talking

21   about.

22             MR. MILLER:  Yes.  We were talking about the

23   anti-competitive factor.  Let me briefly touch on the market

24   issues.  I think we clearly alleged throughout the complaint

25   that the market is Bitcoin Cash, for example, that's in

1    paragraph 111, since I have my complaint open to that portion

2    already, but there are multiple other examples where we allege

3    what the market was.

4         We also allege in the complaint that this is done

5    worldwide.  There are people mining in China and Japan, all

6    over the world.  You have programmers in Europe.  So, as we

7    outlined in our brief, it's a worldwide geographic market.

8         I heard with interest Your Honor's questions about that

9    to Mr. Simmons, could we have more clearly alleged that word in

10   our complaint?  Sure.

11        But it's not fatal, because we are on notice pleading

12   here, and I think we've alleged sufficiently what the market

13   is, and you heard Mr. Simmons say that he wouldn't necessarily

14   take issue with the market being a worldwide market.

15        And I think, also, when we look at the demonstrative,

16   I understand that the map shown by Mr. Rasmussen was for

17   Bitcoin Core, I believe he said, so it's not for Bitcoin Cash.

18   But you can see, and it's common knowledge, that there are

19   nodes all over the world mining Bitcoin Cash, so it's a

20   worldwide market.

21        The last point I would make on that, Your Honor, is we

22   cited cases from the Ninth Circuit and the Second Circuit in

23   our brief that the validity of the definition of the "relevant

24   market" is a fact issue that really ought to be addressed at

25   summary judgment or trial, not on a motion to dismiss.

1          THE COURT:  So your product market is Bitcoin Cash, and

2     you say before the hard fork?

3          MR. MILLER:  Yes.

4          THE COURT:  And one of the defense counsel quoted -- I

5     don't know who it was -- Brandeis, somebody much more learned

6     than I --

7          MR. MILLER:  Mr. Simmons, right, mentioned --

8          THE COURT:  Yes, yes.  The notion that you have to look

9     at the market before and after the alleged antitrust

10    violations.

11         Why do you insist that the market is defined as

12    Bitcoin Cash before the hard fork?

13         MR. MILLER:  Well, the -- because that's -- I would say

14    that, Your Honor, because there's so much focus on trying to

15    say there's more competition now because there's more

16    cryptocurrencies.

17         My point was that we didn't want to create necessarily

18    a second Bitcoin.  What we wanted was to have fair competition

19    in Bitcoin Cash prior to the fork.

20         Bitcoin Cash continues after the fork, as outlined in

21    the demonstrative that we all looked at before.  And as we've

22    alleged in paragraphs 114 and 115 of the complaint that we just

23    looked at, there is that anti-competitive effect on

24    Bitcoin Cash even after the hard fork.

25         So if you were to look at the Justice Brandeis'

1  language that was cited, I think what we've alleged in our

2  complaint is with respect to both before and after the fork on

3  the Bitcoin Cash market.

4       THE COURT:  Okay.  So I'm confused now, because I

5  thought you were really clear that the market --

6       MR. MILLER:  Bitcoin Cash.

7       THE COURT:  -- the product market before the fork --

8       MR. MILLER:  If I said that, I don't think that's

9  exactly right, Your Honor.  The market is Bitcoin Cash.

10      What I was trying to say before was to debunk the

11  notion that there had to be a hard fork and that there was

12  going to be more competition after the fork as opposed to less.

13      THE COURT:  Okay.

14      MR. MILLER:  So we have alleged the market is

15  Bitcoin Cash, and we've alleged anti-competitive effects to

16  continue as a result to the reduced quality and the higher

17  transaction cost even after the fork.

18      THE COURT:  Okay.  So I understand --

19      MR. MILLER:  I hope that --

20      THE COURT:  I'm sorry, go ahead.

21      MR. MILLER:  I was just saying, I hope that clears that

22  up for Your Honor.

23      THE COURT:  Mas o menos.  Mas o menos.

24      Product market and geographic market -- but right now

25  we're focusing on product market.  My understanding is that

1    those concepts are important to set up an analysis of harm to

2    competition; right?

3            MR. MILLER:  Correct.

4            THE COURT:  We need to decide of what the product and

5    geographic market is, and then take the next step to look at

6    actual or potential harm to competition in that market; right?

7            MR. MILLER:  Yes, Your Honor.

8            THE COURT:  So if your product market is limited to the

9    events before the hard fork, then I don't understand the

10   relevance of the poison pill checkpoint later.

11           It's not happening in your market.

12           MR. MILLER:  That's why I say the market is

13   Bitcoin Cash.  The market is not only Bitcoin Cash before 2018,

14   and the effects continue afterwards as a result of the

15   checkpoint, and the diminution in quality, and the higher

16   transaction costs that we've alleged in paragraphs 114 and 115.

17           THE COURT:  Hold on a second.

18           (Brief pause in the proceedings.)

19           THE COURT:  Okay.  Your response memorandum at Docket

20   Entry 147, page 17 -- and at the top it says:

21           "Defendants argue that Bitcoin Cash SV is also intended

22   for the same uses as Bitcoin Cash and, therefore, both virtual

23   currencies should be considered as part of the same product

24   market."

25           But defendants are ignoring that the relevant product

1    market is that which existed at the time of the fork, not after

2    the fork, resulted in defendants' complete dominance of

3    Bitcoin Cash and caused SV folks to have to shift.

4          Now, first of all, that's in your memorandum, and

5    that's not in the complaint.  But I'm still trying to

6    understand your theory, and so I took that to be a clear

7    statement that the relevant product market is Bitcoin Cash at

8    the time of the fork and not after.

9          But I think you're saying something different now, and

10   I'm just trying to get clear on what your position is.

11         MR. MILLER:  Yes, and I think if we can explain a

12   little bit better what that statement at the top of page 17 is

13   trying to say, is that the defendants are arguing that there's

14   more competition now.  We've heard that over and over, because

15   they say now there's more cryptocurrencies.

16         There's regular Bitcoin, there's Bitcoin Cash ABC, and

17   there's Bitcoin SV separately, and so their point and their

18   argument is clearly that the market is more broad, in terms of

19   any type of currency or certainly cryptocurrencies.

20         So what we were saying at the top of page 17 was to

21   respond to that, which is, that the market isn't

22   cryptocurrencies.  The market is Bitcoin Cash, which is what

23   existed at the time of the fork.

24         We're not saying that the market is only things that

25   happened prior to the fork.  What we're saying is the market is

1    what existed prior to the fork, which is Bitcoin Cash, which,

2    of course, continues.

3          I don't know if I did any better job trying to explain

4    it to Your Honor.

5          THE COURT:  So Bitcoin Cash continues today as ABC?

6          MR. MILLER:  ABC continues as Bitcoin Cash is how I

7    would say it, but correct.

8          THE COURT:  And that's part of the market, the product

9    market that you --

10         MR. MILLER:  That is the market.

11         THE COURT: -- that you allege?

12         MR. MILLER:  That is the market we allege.

13         THE COURT:  Okay.  You don't allege that the plaintiff

14   wants to mine ABC, correct, there's no allegation of that?

15         MR. MILLER:  I thought we alleged that, but let me look

16   back at the complaint.

17         THE COURT:  Okay.  While you're looking, I want to

18   speak with my lawyer here, Mr. Roberts.

19         (Discussion held off the record.)

20         THE COURT:  Okay.  All right.  Thanks.

21         Go ahead, Mr. Miller, you were looking for something in

22   the complaint.

23         MR. MILLER:  Yes.  Paragraph 38, Your Honor.

24         THE COURT:  Okay, let me get there and catch up to you.

25   If you don't mind, I'm just going to read it because that will

1    help me.

2        "Plaintiffs development of these technologies was

3    intended to mine the Bitcoin Cash network.

4        "The reason plaintiff has focused on a peer-to-peer

5    payment system is because it will eventually generate more

6    transaction fees than the mining generates."

7        "The viability of plaintiff's business depended on the

8    continued efforts to scale up Bitcoin Cash for use as a

9    peer-to-peer version of electronic cash."

10       Okay, I understand that.  What was of the point you

11   wanted to make about that?

12       MR. MILLER:  I think I was just answering Your Honor's

13   question as to whether we allege that the plaintiff was in the

14   Bitcoin Cash market.

15       THE COURT:  Okay.  No.  I'm focusing on something

16   different.  I'm still struggling with this product market, and

17   I guess I'm coming at it a couple of different ways.

18       One thing, I'm going back to your memorandum at Docket

19   Entry 147 at page 18, you say, as alleged in the amended

20   complaint, "defendants rendered the competitive efforts of the

21   Bitcoin Cash community, those miners that were actual

22   participants in the Bitcoin Cash network before the fork

23   futile."

24       So I understand, right there, just stopping there,

25   you're saying there was a harm to competition before the fork

1    during this hash war; right?

2         MR. MILLER:  Before and during the fork, yes.

3         THE COURT:  Okay.  But I think you're saying to me now

4    that the market is Bitcoin Cash before and after the fork?

5         MR. MILLER:  Correct.

6         THE COURT:  Is that right?

7         MR. MILLER:  Yes.

8         THE COURT:  Okay.  And so I'm trying to understand --

9    and to be honest, that was not clear to me before.

10        MR. MILLER:  I apologize for that, Your Honor.  I can

11   see you're reading, that's why Your Honor was confused, so we

12   should have done a better job on that.

13        THE COURT:  Yeah -- well --

14        MR. MILLER:  And I did not help with my statements

15   earlier when I was trying to respond to what the defendants had

16   said, but anyway...

17        THE COURT:  Okay.  So, but you don't -- I'm trying to

18   understand, one whole cluster of question marks I have is

19   around this checkpoint.

20        And, first of all, I don't understand the 51 percent,

21   I'm going to ask you to address that.

22        But putting that aside for the moment, there's no

23   allegation that plaintiff post-fork wants to mine Bitcoin Cash

24   ABC.  From what I can tell from the complaint, plaintiff is

25   mining SV after the fork, with a lot of disappointment, but

```
 1    that's where plaintiff is.

 2          And if that is so, how does your injury flow from that

 3    allegation of the checkpoint imposed on Bitcoin Cash ABC?

 4          And I think it somewhat goes to the standing argument.

 5          MR. MILLER:  And we just looked at paragraph 38, which

 6    lays that out, I think, Your Honor, that the plaintiff set up

 7    its business to mine Bitcoin Cash.

 8          Bitcoin Cash now is the ABC version as a result of all

 9    the conduct that was alleged in the complaint.  But that is

10    what the plaintiff was set up to mine and wants to mine, is

11    Bitcoin Cash.

12          There's no question the plaintiff here believed that SV

13    was the better software and that SV should have been the winner

14    in a fair election, there's no question about that.

15          But we've alleged in the complaint that we are mining

16    and set up to mine Bitcoin Cash.

17          THE COURT:  Including SV now?

18          MR. MILLER:  No.  Bitcoin SV is not Bitcoin Cash.

19          THE COURT:  I mean -- excuse me -- ABC -- Bitcoin Cash

20    ABC.

21          MR. MILLER:  Correct, Your Honor.

22          ABC is Bitcoin Cash, correct.

23          THE COURT:  So what's stopping you from mining

24    Bitcoin Cash ABC competitively now?

25          MR. MILLER:  Nothing is stopping us from mining
```

1    Bitcoin Cash.  The problem is that the conduct alleged in the

2    complaint had the negative effects on competition that we

3    outlined in paragraphs 114 and 115, and that's the harm that's

4    taking place.  It's not that it's impossible to mine it.

5          It's just that there was an anti-competitive effect.

6          THE COURT:  Well, are you referring -- and I'm sorry to

7    return to this paragraph -- are you referring to the

8    anti-competitive effect in the hash war, or are you referring

9    to it after the hash war was over?

10          MR. MILLER:  I'm referring to the antitrust damages,

11   which was paragraphs 114 and 115, the deterioration in quality

12   and the higher transaction cost as a result of the conduct

13   alleged in the complaint.

14          THE COURT:  I see.  Okay.  Where were we?

15          MR. MILLER:  Let me turn briefly, because this is very

16   helpful -- but we have been going for awhile -- to the Per Se

17   violations.  We have two theories we've outlined in the

18   complaint for a Per Se violation.  One is bid-rigging.

19          The other is a group boycott.

20          The defendants seem to take issue with the fact that we

21   have the words "in the nature of," as though that means it's

22   not a group boycott or it's not bid-rigging.

23          I don't think that's what that language means in

24   paragraphs 105 and 106 of the complaint.  It's just words that

25   say that this is a Per Se violation, and the nature of the

```
 1   Per Se violation is bid-rigging, and the nature of the Per Se
 2   violation is a group boycott.
 3        THE COURT:  What about Quality Auto saying that a group
 4   boycott must involve a horizontal agreement among direct
 5   competitors?
 6        MR. MILLER:  Let me pull up the Quality Auto case here.
 7   Your Honor doesn't happen to know where that is in that case,
 8   specifically?
 9        THE COURT:  I want to show off.  Page 1271.
10        MR. MILLER:  Excellent.  Page 1271.
11        THE COURT:  Only because I typed it there.
12        What I have there -- while you're looking -- is that to
13   be per se illegal, "a group boycott must involve a horizontal
14   agreement among direct competitors."
15        And it would seem what you're alleging is more of a
16   vertical agreement than purely horizontal.
17        MR. MILLER:  Okay.  I have page 1271 here.  Let me just
18   take a quick look at this, I read it before but --
19        THE COURT:  I understand, you can't --
20        MR. MILLER:  -- commit all this to memory.
21        MR. MILLER:  Okay.  I see the language Your Honor's
22   referring to.
23        Clearly, some of the defendants are horizontal
24   competitors.  We have both Bitmain and Wu, and Ver and his
25   companies, mining for Bitcoin Cash, so they're competitors, and
```

         1    that's horizontal competition.

         2          I understand Your Honor's point that the exchange,

         3    you're looking at that more as a vertical arrangement than

         4    horizontal?

         5          THE COURT:  Do you disagree?

         6          MR. MILLER:  I guess, I don't necessarily think that

         7    it's vertical, but I can see that there is some legitimate

         8    question the Court has as to whether it's horizontal, if that

         9    makes sense, because I think a vertical is more somebody in the

        10    supply chain, and I'm not sure that an exchange is necessarily

        11    someone in the supply chain.

        12          THE COURT:  At 45 degrees?

        13          MR. MILLER:  Some degrees, yes.

        14          THE COURT:  Okay.  All right.

        15          So you're talking about the Per Se allegations.

        16          MR. MILLER:  Yes.  So we talked a little bit about the

        17    group boycott just now, and bid-rigging, we addressed that in

        18    our brief as well.  So really that is what you had going on

        19    here, was a vote, it was a bid as to what was going to take

        20    place in the software upgrade -- upgrade, rather.

        21          And as we've alleged in the complaint, that bid was

        22    rigged because you have all the conduct we alleged -- which I

        23    went over before that I want to repeat now -- about the

        24    collusion among everybody to bid on it.  So we do think it does

        25    constitute bid-rigging, and we think it is a Per Se violation.

1          I do think, Your Honor, that the group boycott is more

2     on fours, in terms of the case language, than the bid-rigging,

3     but I think that it satisfies both of them.

4          THE COURT:  Okay.

5          MR. MILLER:  So, I guess, unless Your Honor has any

6     additional questions, we've covered a lot of ground, let me

7     just look at my notes and see if there's anything else I want

8     to --

9          THE COURT:  What about the standing argument?

10         MR. MILLER:  Well, I think the standing we addressed

11    when we talked about paragraph 38, that the plaintiff, United

12    American, was set up to mine Bitcoin Cash, which is the market

13    here.

14         And we also -- I think I was looking at, let me flip

15    back to that portion of the complaint again, Your Honor -- yes,

16    in paragraph 38, you'll see we allege here that the plaintiff

17    wanted to generate more in transaction fees than the mining

18    generates over time.

19         And that gets back to what I was describing about the

20    way that Bitcoin is set up, that there's a finite number of

21    Bitcoins that can be mined, and over time that number that you

22    get for solving one of the -- successfully solving one of the

23    math problems decreases.

24         So, at the beginning, if you got into Bitcoin mining,

25    you get 50 Bitcoins every time you solve a problem.  And now,

1   you get 6.25 Bitcoins for every problem that you solved.

2           Eventually, that 6.25 is going to be cut in half again,

3   and eventually when the maximum number of coins available is

4   reached, there will be no more benefit to mining, in terms of

5   getting a new Bitcoin.

6           And the other thing that we covered in the tutorial is

7   that you also participate in transactions.  You get some

8   transaction fees if you're participating in assembling the

9   block to be used for transactions.

10          It's, essentially, sort of a commission, if you think

11  of it that way, that if you're participating and you

12  successfully put together that block of transactions, you're

13  rewarded with some compensation for doing so.

14          So what we're alleging here, in paragraph 38 -- the

15  reason I was digressing with this explanation -- is that the

16  plaintiff knows that the number of Bitcoins one can achieve by

17  mining and solving a new problem is a diminishing number over

18  time, and that's why the plaintiff felt that the real

19  opportunity is to make money from transaction cost, the

20  commission on each transaction, which is why we need a more

21  scalable Bitcoin that can be used and can facilitate more

22  transactions and, therefore, there will be more transaction

23  income going forward.  So that's the standing.

24          THE COURT:  I totally understand how the plaintiff

25  lost.  The question is, lost competition, and that's, you know,

 1    that's the word I'm focusing on.

 2         MR. MILLER:  Understood.  That's in paragraph 114 and

 3    115, yeah.

 4         THE COURT:  Okay.  Can you give me a second to look at

 5    a couple of notes here?

 6         MR. MILLER:  Certainly, Your Honor.

 7         THE COURT:  Okay.

 8         (Brief pause in the proceedings.)

 9         THE COURT:  So, would you agree with me, Mr. Miller,

10    that to satisfy Rule 12(b)(6) that the complaint has to

11    allege -- sufficiently allege all the essential elements of the

12    cause of action for each defendant?

13         And that if there are any particular defendants for

14    whom that does not happen, that the Court would have to dismiss

15    those particular defendants for failure to -- for plaintiff's

16    failure to state a claim against any particular defendant?

17         MR. MILLER:  Yes, I think I agree with Your Honor's

18    concept.  Obviously, we think we've adequately pled as to each

19    of the defendants, but I agree with that concept.

20         THE COURT:  Yeah, I know that you definitely think

21    that, so I'm just -- on the concept.  So tell me this, why

22    shouldn't Bitmain, Inc., be dismissed?

23         How has the claim been pled against Bitmain, Inc.?

24         MR. MILLER:  Let me look at the complaint here.

25         (Brief pause in the proceedings.)

1          MR. MILLER:  I'm looking to see what specific

2     allegations we have in here against them.

3          THE COURT:  If you just want to rely upon the complaint

4     and your memorandum, that's fine.

5          MR. MILLER:  Why I do that, rather than take up the

6     time, rather than flipping through the complaint at almost 5:20

7     here.

8          THE COURT:  Okay.  Okay.  No problem.

9          So, Mr. Miller, I interrupted you a lot, but you've

10    helped me with a lot of the questions I had.

11         Is there anything else you want to add to your

12    argument?

13         MR. MILLER:  I think we've covered everything, unless

14    Your Honor has anymore questions.

15         THE COURT:  Oh, I'll think of them tomorrow.

16         MR. MILLER:  I'm sure I'll think of some more points

17    tomorrow, too, probably.

18         THE COURT:  Yeah, I think we all will.  I don't feel

19    the need for reply, and I'm very mindful of it being 5:25, and

20    poor Glenda, our court reporter, who has the hardest job here,

21    my courtroom deputy is sitting here.

22         So, Mr. Simmons, is there something essential that you

23    haven't argued before, something that Mr. Miller's argument

24    raised that you've not had a chance to address?

25         MR. SIMMONS:  Well, yes, Your Honor.  If I can just

```
 1    take 90 seconds first.

 2              THE COURT:  Take it.

 3              MR. SIMMONS:  And I appreciate the late hour, but you

 4    can appreciate that this case should not proceed --

 5              THE COURT:  Yes.

 6              MR. SIMMONS:  Right.  First, plaintiff is running away

 7    from his complaint.  Paragraphs 50 through 52 are in the

 8    context of the 2018 fork.  Paragraph 52 makes clear there was

 9    going to be a fork.  It was going to be SV or something else.

10    He's running away from that.

11              Paragraph 38, Your Honor, quite clearly says that

12    plaintiff does not mine ABC.  Could they?  Yes, but they don't.

13              The relevant market discussion that you need to note

14    on, Your Honor, was quite effective.

15              Is ABC and SV in the same market?  He can't say.

16              And he's done nothing in the complaint showing

17    elasticities in the demand, that they're not in the same

18    market.  If ABC is a separate product market, well, his client

19    doesn't even practice there, so they can't have been harmed by

20    the diminution in quality.  If they are -- if both SV and ABC

21    are in the same market, we have a greater diversity of

22    products.  So he's disowning his own complaint.

23              There are no allegations on relevant market.

24              On Per Se, Your Honor, bid-rigging and boycott, he's

25    just using labels.  No one is buying anything here, and there's
```

1    no refusal to deal.

2            In fact, hashing power comes and goes, that's what the

3    Whitepaper says, that's what the complaint says.  There's no

4    boycott.  There's no bid-rigging.  So it's argument by label.

5            He clearly says, on page 17 of the brief, that you

6    submit, they want the Court to focus on before the hard fork.

7            And you're quite right, the Chicago Board of Trade says

8    that's the wrong thing to do.

9            So we really appreciate the Court and the staff's time,

10   and the defendants respectfully request that this complaint be

11   dismissed with prejudice.

12           THE COURT:  Okay.  Mr. Simmons, are you summing it up

13   for everybody, or do you want -- I don't know if you all have

14   conferred, you and your other defense colleagues.

15           MR. LOURIE:  Judge, this is Andrew Lourie.

16           Can I have 30 seconds?

17           THE COURT:  Yes.

18           MR. LOURIE:  With respect to just the questions that

19   you asked Mr. Miller about Kraken, he responded and said they

20   weighed in by putting their thumb on the scale before the

21   election was over.  Again, catchy phrase, but no explanation in

22   the complaint or even the oral argument about what the scale

23   is.  There's nothing in this complaint that alleges a scheme to

24   make public statements and influence voters, just the opposite.

25           It's a mercenary node rental scheme that has nothing to

1    do with any public statements.  So the most he could say from

2    any of this is that Kraken wanted ABC to win, was happy ABC

3    would win, or any of those things, but not that they did

4    anything to contribute to the scheme that he alleges resulted

5    in the win.

6         The only other point I wanted to make is that the

7    relevant market is hundreds of coins, and if there's a flocked

8    quality, then there are hundreds of coins that people can flock

9    to.  And if one coin is better than another, that's where

10   they'll go, just like if there were hundreds of car dealerships

11   on one road.

12        So the idea that he can just pick that one coin and say

13   that's the relevant market doesn't really make any sense at

14   all.

15        THE COURT:  You're saying the proper relevant market

16   would be all cryptocurrencies?

17        MR. LOURIE:  All cryptocurrencies.  And the notion

18   that -- just because he -- just because they wanted,

19   originally, when they set themselves up a few months earlier to

20   mine Bitcoin Cash, they don't get to define that as the

21   relevant market.  They can mine Bitcoins that are scalable and

22   do different things, et cetera.

23        There really is no real insertion point for a District

24   Court to come in and start saying, well, with one coin -- which

25   would then apply to all the other coins -- you have to do

1      things in an exact way so that quality never deteriorates.

2            So checkpoints have to be very, very specific so nobody

3      can come in later and say, oh, there's a deterioration of

4      quality, you will just have miners in court all the time,

5      because -- and that's the whole way this is set up, that miners

6      vote with their hashing power.

7            And the whole idea of a vote is that they don't agree,

8      that's why they vote different ways.  So the notion that the

9      courts can resolve this by saying, well, only this is the right

10     way or else quality will be deteriorated is illogical and --

11           THE COURT:  And I wonder what you would say about this

12     kind of vague question I'm forming.  It's -- you know, a lot of

13     the argument I -- a fair amount of it today, certainly, the

14     tutorial, which I invited, which is background -- but beyond

15     that, some of what's in the briefs and some of what people have

16     argued today falls outside the amended complaint, and it's all

17     very interesting, but it's not going to help me.

18           I have to analyze the amended complaint, does it meet

19     pleading standards that are set out in the law.  But there's an

20     argument about what the proper product market is.

21           And through my questions you can see that it's not

22     intuitively obvious to me, first, what plaintiff pled; and

23     secondly, whether it makes sense.

24           And I guess what I'm thinking about is how I address

25     that in the context of a Rule 12(b)(6) motion --

1          MR. SIMMONS:  I think you --

2          THE COURT:  -- and the other (inaudible) thoughts to

3   me.

4          MR. SIMMONS:  I think you addressed that, Your Honor,

5   by saying, what is it the plaintiff -- what is the relevant

6   product market identified?

7          The answer is the complaint doesn't identify one.

8          Plaintiff says it's Bitcoin Cash now.  That's what he

9   says.  It's Bitcoin Cash, you have a fork, is it just ABC or

10  with SV?

11         He says now it's just ABC, but he's done nothing in the

12  complaint, Your Honor, no price elasticities to distinguish ABC

13  from SV.  In fact, the complaint shows the opposite, that

14  hashing power could come and go and the like.

15         This is Jacobs, Your Honor.  The Jacobs Eleventh

16  Circuit case is very clear affirming a dismissal of a

17  (inaudible) case on product market for failure to include facts

18  on price elasticities and substitutability, so --

19         THE COURT:  Okay.  Is this -- okay, thank you.

20         Is this Mr. Simmons speaking?

21         MR. SIMMONS:  This is Mr. Simmons.

22         THE COURT:  I thought so.  Okay.  I just want to make

23  that clear for Glenda.  Okay.  Thank you.

24         Mr. Lourie, was there anything else you wanted to add,

25  'cause I interrupted you?

1              MR. LOURIE:  No, Your Honor.  Thank you for the chance

2      to give a brief rebuttal.

3              THE COURT:  Of course.  Of course.

4              Mr. Pace, was there something that you felt you needed

5      to add?

6              MR. PACE:  Can I just add one point, and it's a

7      question that Your Honor asked.

8              It relates to paragraph 69 of the amended complaint,

9      and the point about Mr. Wu saying that if he's going to be

10     mining Bitcoin Cash that it could effect the price over Bitcoin

11     Core, because Your Honor was asking, well, why is that an

12     issue.  I think Your Honor is absolutely correct.

13             There's no allegation that Mr. Wu was selling at a

14     lower price his Bitcoin Core.  In other words, he could have --

15     you know, if he's a long-term holder of something and there's a

16     short-term blip, that's fine, if he thinks he's still going to

17     go back.

18             There's no allegation that the long-term price of

19     Bitcoin Core would get tremendously affected.  There's actually

20     not even an allegation that the price get affected.

21             There's just a statement by somebody that says, if I do

22     this, maybe it will have an effect over this other market --

23     you know, over this other cryptocurrency.  Maybe it would.

24     Maybe it wouldn't.  But that also doesn't mean it's against my

25     self-interest.  I'm not selling.

1          If I am still holding onto that cryptocurrency for the

2     long term, it has plenty of time to go back up, so that

3     allegation doesn't actually show action against self-interest.

4          That was the only point I wanted to add, Your Honor.

5          THE COURT:  Okay, great.  Thank you.

6          Mr. Miller, is there anything you need to respond to

7     there?

8          MR. MILLER:  I don't think so, Your Honor.

9          I think we covered it in our brief and then the

10    argument we had already.

11         THE COURT:  Yes, I do, too.  All right.  So, I know

12    you're going to order the transcript, and it would be helpful

13    to me if it was filed by October 12th.  I'm just mentioning you

14    certainly don't need to do an expedited or an overnight for me.

15         But I'm the criminal duty judge next week, and I was in

16    the schedule this week, so I'm not really in a position to even

17    start reading a transcript before then.

18         And I think that's it, other than to tell you to have

19    patience with me.  I would like everything to be done

20    yesterday.  This is a big project, to write this up.  I

21    appreciate the consent that you gave me.

22         It does -- I think I can -- it's a little easier to

23    write an order than a report and recommendation.

24         But in this case I'm going to pretty thoroughly address

25    the issues, I think the parties deserve that, and I don't think

1   there's any way around it.  It's a big project, and I'm going

2   to pick it up and I have to put it down, and that's just the

3   way it goes.

4        This argument today was very, very helpful to me.

5   I think -- I hold each one of you in very high regard.  I think

6   you're really skilled lawyers, and I appreciate your

7   preparation and having the chance to talk with you now twice on

8   this.  So I will be very happy to get this finished as soon as

9   I can, and who knows when that is; right?

10       But truly, as soon as I can.  Okay.

11       Well, stay healthy and safe, everyone.

12       And we're adjourned.

13       MR. SIMMONS:  Thank you, Your Honor.

14       MR. PACE:  Thank you, Your Honor.

15       MR. RASMUSSEN:  Thank you, Your Honor.

16       MR. MILLER:  Thank you, Your Honor.

17       (Proceedings concluded at 5:35 p.m.)

18            C E R T I F I C A T E

19

20        I hereby certify that the foregoing is an

         accurate transcription of the proceedings in the

21

         above-entitled matter.

22

23   October 5th, 2020     Glenda M. Powers
                           GLENDA M. POWERS, RPR, CRR, FPR
24                         United States District Court
                           400 North Miami Avenue
25                         Miami, Florida  33128

## $

**$10** [1] - 58:20
**$100** [1] - 70:17
**$5,000** [1] - 115:24
**$500** [2] - 66:22, 66:25

## '

**'50s** [1] - 16:14
**'60s** [1] - 16:14
**'70s** [1] - 16:15
**'90s** [2] - 16:16, 16:17

## 0

**014** [1] - 32:4

## 1

**1** [20] - 1:10, 74:25, 75:2, 82:16, 82:17, 87:7, 87:14, 88:15, 89:5, 89:9, 90:11, 91:15, 91:23, 96:8, 119:3, 128:19, 128:21, 128:22, 129:3, 129:4
**10** [10] - 24:10, 25:25, 30:10, 30:15, 31:16, 32:7, 89:25, 90:6, 90:7, 90:8
**10,000-plus** [1] - 25:15
**10,577** [2] - 18:23, 19:23
**10-minute** [1] - 100:6
**10022** [1] - 2:15
**103** [1] - 64:15
**105** [3] - 53:5, 58:5, 144:24
**106** [2] - 58:5, 144:24
**11** [1] - 32:6
**111** [2] - 64:15, 135:1
**114** [7] - 134:4, 134:6, 136:22, 138:16, 144:3, 144:11, 149:2
**115** [7] - 134:6, 134:16, 136:22, 138:16, 144:3, 144:11, 149:3
**12** [1] - 34:1
**12(b)(6** [4] - 10:22, 11:12, 149:10, 154:25
**1216** [1] - 67:17
**1271** [3] - 145:9, 145:10, 145:17
**128** [1] - 60:5
**12:57** [1] - 1:8

**12th** [1] - 157:13
**13** [1] - 35:9
**1336** [1] - 62:15
**1337** [1] - 62:14
**1338** [1] - 64:21
**1340** [1] - 73:22
**135** [1] - 60:5
**14** [1] - 36:6
**144** [1] - 11:18
**145** [1] - 12:6
**1450** [1] - 2:22
**147** [4] - 11:19, 12:8, 138:20, 141:19
**14th** [1] - 110:12
**15** [2] - 28:20, 88:8
**152** [1] - 11:19
**153** [1] - 12:10
**15th** [5] - 109:8, 110:19, 112:2, 122:12, 123:11
**16** [1] - 38:5
**1625** [1] - 2:19
**17** [5] - 38:23, 138:20, 139:12, 139:20, 152:5
**18** [2] - 39:12, 141:19
**18-25106** [1] - 4:21
**184** [1] - 1:10
**18th** [1] - 124:17
**19** [2] - 41:16, 77:10
**1964** [1] - 78:4
**1984** [1] - 54:20
**1990** [1] - 75:16
**1998** [1] - 60:5
**1:00** [1] - 1:8
**1:18-CV-25106-KMW** [1] - 1:2

## 2

**2** [13] - 87:8, 87:10, 91:24, 92:8, 92:17, 92:20, 93:13, 96:8, 128:16, 128:17, 128:22, 129:3, 134:4
**20** [1] - 56:12
**20006** [1] - 2:19
**2000s** [2] - 16:16, 16:17
**2008** [2] - 16:11, 125:5
**2009** [2] - 25:23, 41:19
**2017** [1] - 130:22
**2018** [19] - 45:12, 88:8, 105:6, 107:24, 109:8, 109:13, 109:18, 110:7, 110:9, 110:13, 112:2, 121:14, 123:11, 124:8, 124:18, 131:1,

134:14, 138:13, 151:8
**2020** [2] - 1:6, 158:23
**21** [2] - 43:15, 124:1
**22** [2] - 44:1, 65:13
**23** [2] - 46:16, 65:13
**2300** [1] - 2:23
**24** [3] - 48:6, 73:7, 73:11
**25th** [2] - 1:22, 15:8
**26** [3] - 73:7, 73:8, 73:11
**2727** [1] - 2:3
**27th** [1] - 31:1
**2850** [1] - 2:11
**29** [1] - 1:6
**2:19** [1] - 51:7
**2:30** [3] - 50:24, 51:2, 51:7
**2d** [1] - 59:11

## 3

**3,000** [2] - 24:11, 25:11
**30** [3] - 50:22, 119:6, 152:16
**302** [1] - 67:16
**32** [1] - 131:17
**3300** [1] - 2:7
**33128** [2] - 3:3, 158:25
**33131** [3] - 1:19, 1:22, 2:8
**33131-2336** [1] - 2:23
**38** [6] - 140:23, 143:5, 147:11, 147:16, 148:14, 151:11
**3:51** [1] - 100:11
**3d** [4] - 60:23, 62:14, 67:16, 73:22

## 4

**4** [2] - 75:7, 75:11
**40** [1] - 43:10
**400** [2] - 3:3, 158:24
**42** [2] - 56:23, 65:13
**43** [1] - 56:23
**44** [1] - 65:13
**45** [2] - 111:17, 146:12
**48** [2] - 94:21, 95:4
**49** [2] - 131:12, 134:1
**4:00** [1] - 99:3
**4:02** [1] - 100:11

## 5

**5,000** [1] - 38:13
**5-20** [1] - 42:1
**50** [5] - 16:13, 106:1,

134:1, 147:25, 151:7
**500** [1] - 2:4
**51** [1] - 142:20
**52** [3] - 76:9, 151:7, 151:8
**525** [1] - 60:5
**54** [2] - 87:15, 88:6
**5:20** [1] - 150:6
**5:25** [1] - 150:19
**5:35** [2] - 1:8, 158:17
**5:52** [1] - 31:1
**5th** [1] - 158:23

## 6

**6.25** [4] - 32:3, 35:16, 148:1, 148:2
**60** [5] - 16:13, 42:24, 42:25, 43:9, 119:1
**600** [1] - 2:7
**612** [1] - 59:11
**626** [2] - 62:14, 64:21, 73:22
**64-character** [2] - 22:23, 22:25
**67** [3] - 87:17, 88:6, 88:7
**68** [3] - 34:20, 36:8, 127:12
**69** [2] - 115:17, 156:8
**6th** [1] - 2:15

## 7

**70** [1] - 16:13
**71** [3] - 88:16, 88:23, 89:21
**74** [1] - 63:9
**752** [1] - 59:11
**75201** [1] - 2:4
**777** [1] - 2:11
**78/74** [1] - 61:5

## 8

**8** [3] - 102:9, 102:14, 117:4
**800** [1] - 2:14
**81** [1] - 59:5
**86** [4] - 57:7, 87:15, 88:6, 93:11
**87** [2] - 91:25, 93:11
**8th** [1] - 3:3

## 9

**9** [1] - 117:5
**9(b** [2] - 102:9, 102:13
**90** [1] - 151:1
**90017** [1] - 2:12

**917** [1] - 60:23
**94** [2] - 92:18, 122:7
**95** [2] - 92:18, 94:1
**96** [2] - 92:18, 94:1
**97** [2] - 61:11, 63:9
**98** [1] - 1:18

## A

**A/K/A** [1] - 8:19
**ABC** [86] - 34:23, 39:25, 40:2, 40:6, 40:23, 41:24, 45:11, 48:16, 48:19, 53:24, 57:5, 61:7, 61:8, 61:12, 63:10, 63:14, 63:20, 69:16, 69:17, 72:3, 72:8, 72:9, 79:21, 79:22, 79:25, 82:10, 83:6, 83:7, 83:9, 83:10, 83:19, 83:21, 84:15, 85:1, 89:3, 89:15, 90:25, 92:5, 92:6, 92:11, 92:13, 93:7, 94:3, 94:10, 94:12, 94:22, 96:11, 96:14, 96:20, 96:23, 102:25, 103:15, 113:5, 113:9, 114:2, 120:21, 121:18, 122:8, 122:16, 127:14, 131:13, 131:15, 131:22, 132:11, 133:9, 139:16, 140:5, 140:6, 140:14, 142:24, 143:3, 143:8, 143:19, 143:20, 143:22, 143:24, 151:12, 151:15, 151:18, 151:20, 153:2, 155:9, 155:11, 155:12
**ABC's** [1] - 72:9
**ability** [9] - 38:6, 67:23, 93:9, 109:24, 127:24, 132:3, 132:8, 132:16, 132:17
**able** [11] - 27:25, 38:17, 47:22, 70:7, 101:23, 103:25, 108:11, 109:4, 111:9, 130:12, 133:1
**Abode** [1] - 62:23
**above-entitled** [1] - 158:21
**absence** [1] - 74:1

**absolutely** [4] - 59:8, 86:8, 113:12, 156:12
**accept** [16] - 29:25, 32:20, 32:23, 32:25, 33:1, 33:11, 33:18, 34:13, 42:5, 43:21, 44:9, 48:3, 85:18, 116:18, 116:23, 117:12
**acceptable** [2] - 98:13
**acceptance** [6] - 36:3, 42:9, 43:23, 47:16, 106:7, 124:5
**accepted** [3] - 31:7, 34:15, 45:21
**accepting** [2] - 31:5, 42:14
**accepts** [3] - 29:18, 29:24, 49:9
**access** [3] - 22:3, 41:8, 46:20
**accomplish** [2] - 105:25, 130:23
**accomplished** [1] - 13:2
**accomplishes** [1] - 125:17
**accomplishing** [1] - 90:21
**accordance** [1] - 89:21
**account** [2] - 20:11, 20:24
**accounting** [1] - 24:3
**accounts** [1] - 26:13
**accuracy** [1] - 45:24
**accurate** [1] - 158:20
**accurately** [1] - 53:1
**accused** [2] - 92:4, 98:16
**achieve** [3] - 54:22, 64:8, 148:16
**achieved** [1] - 133:9
**acknowledge** [1] - 130:11
**acknowledged** [1] - 57:23
**acknowledging** [2] - 92:24, 93:1
**act** [2] - 48:18, 78:18
**Act** [7] - 8:23, 70:11, 74:25, 75:2, 75:7, 75:11, 129:5
**acted** [2] - 79:9, 79:17
**acting** [9] - 78:17, 79:18, 102:23, 103:2, 113:20, 113:21, 116:7, 116:10, 128:11
**action** [8] - 41:24,

79:11, 80:3, 119:19, 119:24, 126:15, 149:12, 157:3
**actionable** [6] - 86:20, 86:24, 86:25, 87:13, 89:23, 92:9
**actions** [4] - 78:10, 112:17, 112:18, 112:20
**activities** [1] - 57:24
**activity** [7] - 102:20, 102:24, 103:14, 110:18, 116:6, 119:4, 120:14
**actual** [8] - 24:6, 76:19, 76:25, 77:4, 77:15, 138:6, 141:21
**add** [17] - 9:19, 14:4, 14:6, 14:9, 29:4, 29:12, 33:12, 35:19, 36:1, 39:19, 40:5, 49:1, 150:11, 155:24, 156:5, 156:6, 157:4
**added** [31] - 16:20, 24:8, 24:9, 24:10, 24:12, 25:25, 26:17, 27:4, 27:20, 28:10, 28:11, 28:22, 29:5, 29:14, 29:16, 29:23, 30:8, 30:21, 31:1, 31:3, 31:9, 32:14, 32:21, 33:1, 33:21, 33:22, 33:24, 34:15, 35:12
**adding** [5] - 25:1, 26:18, 31:5, 36:4
**addition** [4] - 116:4, 116:17, 116:18, 117:12
**additional** [9] - 31:12, 50:17, 103:1, 107:19, 117:10, 122:25, 127:15, 128:14, 147:6
**address** [19] - 15:8, 23:11, 23:12, 23:13, 35:1, 36:7, 38:23, 48:25, 49:23, 66:19, 70:7, 95:12, 102:4, 105:1, 114:21, 142:21, 150:24, 154:24, 157:24
**addressed** [4] - 135:24, 146:17, 147:10, 155:4
**addressing** [3] - 13:12, 50:11, 131:13
**adequately** [2] - 129:6, 149:18

**adjourned** [1] - 158:12
**admit** [2] - 76:18, 77:8
**admits** [1] - 77:5
**admittedly** [1] - 21:19
**adopt** [3] - 39:18, 49:21, 109:18
**adopted** [1] - 79:9
**adopting** [3] - 42:13, 79:5, 85:5
**adopts** [1] - 49:18
**advance** [7] - 41:1, 41:5, 42:2, 81:3, 116:15, 117:8, 117:11
**advances** [2] - 16:14, 17:14
**advocacy** [8] - 14:15, 14:19, 15:2, 45:4, 45:8, 86:17, 86:18
**advocate** [3] - 83:20, 99:7, 108:2
**advocated** [1] - 83:8
**advocating** [2] - 83:5, 107:23
**affect** [1] - 71:6
**affected** [2] - 156:19, 156:20
**affecting** [1] - 86:1
**affirming** [1] - 155:16
**afternoon** [14] - 4:15, 4:19, 4:23, 5:4, 5:10, 5:20, 5:23, 6:4, 6:11, 6:19, 9:6, 11:2, 52:15, 102:3
**afterwards** [1] - 138:14
**agenda** [1] - 15:22
**agent** [1] - 60:10
**ago** [1] - 13:18
**agree** [20] - 10:15, 29:12, 37:10, 41:11, 85:15, 97:23, 110:11, 113:9, 113:12, 117:25, 118:3, 118:8, 119:19, 121:9, 129:24, 133:20, 149:9, 149:17, 149:19, 154:7
**agreed** [4] - 10:11, 70:18, 111:5, 130:22
**agreeing** [4] - 58:14, 58:15, 60:7, 96:9
**agreement** [29] - 37:22, 54:8, 54:14, 54:21, 54:25, 55:1, 56:7, 73:13, 73:25, 77:19, 77:25, 78:1, 78:4, 78:13, 78:22, 79:15, 81:17, 82:24,

87:19, 90:12, 98:6, 102:20, 118:6, 123:1, 145:4, 145:14, 145:16
**agreements** [1] - 60:22
**agrees** [1] - 117:19
**ahead** [12] - 20:8, 56:6, 56:17, 82:2, 101:13, 105:13, 108:17, 112:10, 113:15, 118:21, 137:20, 140:21
**aid** [1] - 15:10
**air** [1] - 13:4
**airfares** [1] - 58:15
**airline** [1] - 79:13
**Airlines** [2] - 60:8, 60:11
**airlines** [5] - 58:15, 79:3, 79:5, 79:7, 79:12
**airplanes** [1] - 13:14
**Akerman** [5] - 1:17, 1:21, 4:4, 4:24, 5:5
**al** [1] - 4:21
**AL** [1] - 1:7
**algorithm** [2] - 22:8, 39:4
**Alice** [7] - 22:10, 22:11, 22:15, 22:16, 22:17
**align** [1] - 84:24
**allegation** [29] - 44:23, 48:15, 58:23, 58:25, 62:18, 71:5, 79:2, 84:14, 84:22, 85:15, 87:15, 87:25, 92:12, 93:11, 93:14, 93:17, 97:14, 99:15, 109:15, 118:10, 118:16, 127:12, 140:14, 142:23, 143:3, 156:13, 156:18, 156:20, 157:3
**allegations** [29] - 44:21, 60:15, 60:19, 64:21, 68:3, 71:23, 72:21, 74:2, 77:13, 77:14, 78:8, 81:11, 84:11, 84:12, 87:1, 91:3, 92:19, 93:18, 97:3, 97:6, 109:11, 115:9, 116:14, 134:3, 146:15, 150:2, 151:23
**allege** [25] - 54:12, 62:7, 65:7, 66:10, 72:14, 78:25, 87:11,

88:16, 92:9, 93:19, 96:24, 112:20, 113:25, 123:8, 126:1, 135:2, 135:4, 140:11, 140:12, 140:13, 141:13, 147:16, 149:11
**alleged** [63] - 53:6, 58:8, 73:25, 83:24, 84:2, 84:4, 84:18, 84:23, 84:25, 85:9, 85:10, 86:3, 86:4, 86:19, 86:24, 93:24, 94:8, 97:5, 102:20, 103:24, 104:9, 104:17, 112:18, 113:13, 113:19, 113:24, 114:1, 114:4, 114:15, 115:16, 116:1, 116:9, 116:20, 119:4, 120:23, 121:13, 121:19, 122:6, 122:21, 124:11, 127:16, 131:5, 132:8, 133:5, 133:8, 134:7, 134:24, 135:9, 135:12, 136:9, 136:22, 137:1, 137:14, 137:15, 138:16, 140:15, 141:19, 143:9, 143:15, 144:1, 144:13, 146:21, 146:22
**allegedly** [1] - 34:23
**alleges** [10] - 41:2, 53:5, 87:17, 91:5, 96:20, 102:16, 125:20, 129:12, 152:23, 153:4
**alleging** [10] - 66:9, 78:3, 104:8, 117:11, 129:21, 130:2, 130:3, 134:16, 145:15, 148:14
**allocate** [1] - 99:24
**allocating** [1] - 99:8
**allocation** [1] - 92:1
**allow** [2] - 49:3, 98:25
**allowed** [2] - 38:21, 99:18
**alluded** [2] - 58:6, 102:12
**almost** [4] - 55:5, 97:9, 99:3, 150:6
**alone** [7] - 12:5, 65:11, 77:4, 93:8, 98:6, 128:19, 128:20

**alternative** [2] - 129:4, 129:7
**amazingly** [3] - 61:2, 62:20, 74:10
**amended** [29] - 8:21, 10:20, 34:20, 43:17, 44:24, 53:9, 53:12, 56:22, 57:6, 57:7, 61:5, 61:11, 62:10, 62:22, 62:25, 64:16, 65:12, 66:13, 76:10, 82:12, 88:14, 102:5, 102:15, 126:18, 127:1, 141:19, 154:16, 154:18, 156:8
**Amended** [2] - 11:18, 12:5
**American** [11] - 4:20, 4:24, 5:5, 60:8, 60:9, 60:11, 107:23, 120:16, 120:19, 147:12
**AMERICAN** [1] - 1:4
**Americas** [2] - 129:15, 133:21
**amount** [9] - 32:1, 37:7, 42:18, 43:2, 106:4, 106:9, 106:14, 106:15, 154:13
**amounts** [1] - 61:7
**ample** [2] - 57:24, 70:23
**amplification** [1] - 77:20
**amplify** [3] - 50:17, 103:16, 105:16
**analogous** [1] - 124:22
**analogy** [2] - 114:20, 114:24
**analysis** [3] - 105:8, 133:19, 138:1
**analyze** [2] - 46:23, 154:18
**anchored** [1] - 122:16
**Andrew** [5] - 7:3, 7:20, 51:23, 86:10, 152:15
**ANDREW** [1] - 2:13
**Angeles** [1] - 2:12
**announce** [1] - 29:10
**answer** [7] - 14:20, 65:3, 112:12, 117:22, 121:3, 129:1, 155:7
**answering** [2] - 82:20, 141:12
**answers** [3] - 83:1, 112:8, 125:12

**anti** [4] - 62:8, 129:15, 133:23, 134:23, 136:23, 137:15, 144:5, 144:8
**anti-competitive** [4] - 62:8, 129:15, 133:23, 134:23, 136:23, 137:15, 144:5, 144:8
**antitrust** [20] - 53:5, 57:12, 61:22, 68:25, 70:11, 70:19, 70:22, 75:9, 75:13, 83:19, 86:20, 97:24, 112:20, 119:14, 126:19, 130:2, 132:21, 133:24, 136:9, 144:10
**Antitrust** [12] - 53:17, 54:2, 54:4, 73:13, 74:9, 74:21, 75:11, 75:23, 77:2, 77:12, 77:23, 104:8
**anyway** [1] - 17:2
**anyway..** [1] - 142:16
**apologize** [2] - 90:8, 142:10
**appear** [2] - 12:21, 62:24
**appearance** [1] - 4:22
**APPEARANCES** [2] - 1:15, 2:1
**Apple** [1] - 40:17
**applicable** [1] - 70:3
**application** [2] - 44:20, 50:10
**applied** [3] - 64:10, 95:1, 95:8
**applies** [2] - 60:7, 70:10
**apply** [10] - 68:6, 69:5, 70:12, 70:19, 70:24, 71:17, 117:16, 122:15, 133:12, 153:25
**applying** [1] - 60:18
**appreciate** [15] - 8:17, 9:8, 9:21, 12:25, 14:25, 52:13, 55:12, 66:12, 101:17, 101:22, 151:3, 151:4, 152:9, 157:21, 158:6
**appreciative** [1] - 8:9
**approval** [2] - 28:10, 28:12
**approved** [1] - 32:21
**area** [4] - 45:3, 45:4, 58:4, 105:2
**areas** [1] - 17:15

**arena** [2] - 72:18, 72:19
**argue** [6] - 62:10, 80:16, 112:17, 118:13, 119:21, 138:21
**argued** [3] - 126:10, 150:23, 154:16
**arguendo** [1] - 77:25
**arguing** [4] - 102:2, 104:19, 116:8, 139:13
**argument** [34] - 4:10, 7:16, 7:18, 9:5, 9:12, 10:13, 10:18, 11:10, 14:22, 45:1, 49:24, 50:11, 50:16, 52:12, 55:13, 59:25, 90:4, 98:21, 99:10, 101:20, 103:8, 112:15, 139:18, 143:4, 147:9, 150:12, 150:23, 152:4, 152:22, 154:13, 154:20, 157:10, 158:4
**arguments** [10] - 11:4, 13:13, 54:7, 71:16, 80:16, 80:22, 101:24, 102:5, 113:16, 113:17
**arms** [1] - 13:6
**arose** [1] - 94:25
**arrangement** [1] - 146:3
**arrives** [1] - 107:6
**art** [1] - 58:19
**articles** [1] - 99:13
**articulate** [1] - 80:11
**artificially** [1] - 132:7
**aside** [1] - 142:22
**aspect** [4] - 53:19, 75:19, 76:24, 77:1
**aspects** [1] - 73:14
**assembled** [1] - 82:21
**assembling** [1] - 148:8
**assertions** [1] - 82:9
**assess** [1] - 129:8
**assigned** [1] - 70:5
**assist** [1] - 91:15
**assisted** [2] - 90:20, 93:7
**associated** [1] - 49:5
**assume** [4] - 25:17, 25:18, 95:7, 96:9
**assumes** [1] - 54:8, 54:9, 77:24
**assuming** [5] - 11:11, 28:23, 56:8, 89:17,

121:2
**assumption** [2] - 25:20, 111:12
**Atlantic** [4] - 53:20, 75:16, 76:4, 76:14
**attached** [1] - 16:18
**attackers** [2] - 44:4, 44:7
**attempt** [2] - 45:17, 46:7
**attempts** [1] - 80:10
**attention** [3] - 62:13, 73:6, 111:16
**attorney** [1] - 80:20
**attorneys** [1] - 13:2
**attributes** [1] - 72:25
**Audi** [1] - 66:5
**audible** [1] - 122:18
**aura** [1] - 64:2
**authoritative** [2] - 20:25, 33:3
**authorization** [3] - 99:9, 99:16, 99:19
**Auto** [4] - 54:11, 60:21, 145:3, 145:6
**automatic** [2] - 44:2, 44:3
**automatically** [1] - 106:22
**available** [6] - 27:19, 40:2, 46:21, 107:1, 113:3, 148:3
**avenue** [1] - 126:13
**Avenue** [6] - 1:21, 2:7, 2:14, 2:22, 3:3, 158:24
**awarded** [1] - 26:16
**awarding** [1] - 94:7
**aware** [3] - 55:10, 70:21, 99:2
**awesome** [1] - 124:21
**awhile** [2] - 81:7, 144:16
**Axelrod** [1] - 2:22

## B

**backdrop** [1] - 113:18
**backers** [1] - 131:13
**background** [3] - 15:21, 95:9, 154:14
**backpedal** [1] - 69:20
**backwards** [2] - 57:11, 74:5
**bad** [1] - 82:3
**Baena** [1] - 2:21
**bag** [1] - 79:14
**baggage** [3] - 58:15, 79:5, 79:10
**Baker** [2] - 2:10, 6:19

**ballot** [4] - 87:21, 91:18, 91:22, 109:14
**banc** [1] - 60:20
**bank** [2] - 18:7, 20:22
**banks** [1] - 17:21
**bar** [1] - 109:4
**barrel** [1] - 101:5
**based** [4] - 16:12, 37:6, 127:16, 127:17
**basement** [2] - 107:5, 107:14
**basic** [1] - 131:16
**basis** [3] - 73:24, 98:17, 105:8
**BCH** [8] - 35:16, 56:24, 94:3, 94:7, 94:10, 95:7, 96:11, 96:13
**bear** [3] - 54:16, 57:9, 89:20
**bearing** [1] - 73:10
**become** [1] - 24:12
**becomes** [4] - 23:18, 25:7, 27:18, 36:10
**beers** [1] - 122:12
**BEFORE** [1] - 1:13
**beforehand** [1] - 58:19
**begin** [2] - 72:19, 107:18
**beginning** [8] - 38:9, 52:22, 88:23, 105:16, 106:6, 119:3, 129:2, 147:24
**behalf** [14] - 4:5, 4:24, 5:5, 6:6, 6:20, 7:4, 10:6, 12:12, 80:20, 80:22, 83:6, 83:20, 86:11, 86:23
**behind** [2] - 83:9, 106:5
**belabor** [1] - 12:15
**belief** [6] - 34:21, 88:18, 88:19, 88:24, 99:12, 127:13
**below** [2] - 115:23
**beneath** [1] - 22:12
**benefit** [2] - 127:21, 148:4
**benefits** [1] - 58:2
**best** [3] - 52:24, 91:19, 111:5
**bet** [1] - 10:25
**better** [15] - 13:24, 36:22, 55:25, 56:4, 69:16, 72:9, 72:10, 79:22, 86:3, 114:24, 139:12, 140:3, 142:12, 143:13, 153:9

**between** [16] - 17:23, 39:24, 85:8, 87:15, 108:5, 108:9, 109:23, 112:9, 118:6, 119:20, 119:23, 119:25, 120:10, 121:13, 127:21, 130:18
**beyond** [3] - 31:10, 103:2, 154:14
**bid** [25] - 53:7, 58:10, 58:12, 58:13, 58:16, 58:18, 58:20, 58:21, 59:9, 59:16, 59:19, 59:22, 68:16, 144:18, 144:22, 145:1, 146:17, 146:19, 146:21, 146:24, 146:25, 147:2, 151:24, 152:4
**bid-rigging** [19] - 53:7, 58:10, 58:12, 58:13, 58:16, 59:9, 59:16, 59:19, 59:22, 68:16, 144:18, 144:22, 145:1, 146:17, 146:25, 147:2, 151:24, 152:4
**bidding** [1] - 59:7
**big** [4] - 38:13, 40:15, 157:20, 158:1
**bigger** [3] - 69:15, 72:10, 79:14
**Bilzin** [2] - 2:21, 6:5
**binding** [1] - 98:3
**bit** [17] - 13:5, 13:21, 19:14, 19:22, 23:24, 32:18, 36:7, 38:5, 39:12, 41:15, 45:8, 64:3, 74:23, 122:3, 122:24, 139:12, 146:16
**bitcoin** [21] - 17:1, 17:3, 17:5, 17:22, 17:23, 18:19, 18:22, 19:7, 19:24, 25:24, 27:16, 27:18, 28:20, 32:4, 36:10, 38:8, 38:16, 41:18, 41:22, 137:6
**Bitcoin** [187] - 17:6, 17:19, 18:22, 22:11, 22:15, 22:16, 22:17, 26:17, 26:24, 30:17, 31:25, 32:2, 32:3, 35:14, 38:18, 41:2, 41:17, 41:24, 44:2, 48:16, 48:19, 53:24, 57:11, 64:14, 72:2, 84:4, 84:21, 85:1,

88:8, 88:10, 88:11, 88:20, 90:16, 95:2, 95:6, 95:8, 99:23, 99:24, 103:22, 103:23, 104:4, 104:9, 104:13, 104:14, 104:20, 104:22, 104:23, 105:3, 105:17, 106:1, 106:4, 106:6, 106:7, 106:11, 106:12, 107:7, 107:10, 107:12, 107:16, 107:19, 108:3, 108:8, 108:19, 108:22, 109:3, 109:6, 109:17, 110:20, 111:6, 113:11, 113:18, 114:1, 114:2, 114:7, 114:11, 114:17, 115:8, 115:19, 115:20, 115:21, 115:22, 120:3, 120:11, 120:13, 120:21, 121:8, 122:16, 123:9, 123:13, 124:7, 124:12, 124:15, 124:16, 124:18, 125:10, 127:14, 127:18, 127:25, 128:10, 130:5, 130:7, 130:9, 130:19, 130:20, 130:23, 130:24, 130:25, 131:2, 131:6, 131:9, 131:13, 131:14, 131:15, 131:16, 132:1, 132:11, 132:15, 134:2, 134:7, 134:10, 134:13, 134:15, 134:25, 135:17, 135:19, 136:1, 136:12, 136:18, 136:19, 136:20, 136:24, 137:3, 137:9, 137:15, 138:13, 138:21, 138:22, 139:3, 139:7, 139:16, 139:17, 139:22, 140:1, 140:5, 140:6, 141:3, 141:8, 141:14, 141:21, 141:22, 142:4, 142:23, 143:3, 143:7, 143:8,

143:11, 143:16, 143:18, 143:19, 143:22, 143:24, 144:1, 145:25, 147:12, 147:20, 147:24, 148:5, 148:21, 153:20, 155:8, 155:9, 156:10, 156:14, 156:19
**Bitcoin.com** [7] - 84:2, 84:6, 84:8, 88:9, 90:14, 91:13, 116:23
**Bitcoin.com's** [1] - 88:11
**Bitcoins** [9] - 22:11, 27:12, 28:8, 66:23, 147:21, 147:25, 148:1, 148:16, 153:21
**Bitmain** [28] - 4:20, 6:14, 34:21, 58:24, 82:10, 88:9, 88:10, 89:7, 90:13, 91:13, 98:20, 98:21, 99:23, 109:11, 110:8, 120:1, 122:3, 123:8, 123:11, 123:12, 124:7, 127:13, 127:21, 127:24, 145:24, 149:22, 149:23
**BITMAIN** [3] - 1:7, 2:3, 2:3
**Bitmain's** [2] - 87:19, 114:5
**black** [3] - 24:18, 24:19, 114:16
**blame** [1] - 9:15
**blanks** [1] - 15:12
**blip** [1] - 156:16
**block** [92] - 24:8, 24:9, 24:11, 24:12, 24:14, 24:15, 24:21, 24:22, 24:24, 24:25, 25:2, 25:4, 25:11, 25:17, 25:18, 25:19, 25:24, 26:4, 26:6, 26:7, 26:13, 26:15, 26:16, 26:19, 27:4, 27:8, 27:25, 28:4, 28:10, 28:22, 28:25, 29:2, 29:5, 29:16, 29:18, 29:21, 29:22, 30:8, 30:14, 30:16, 30:21, 30:24, 30:25, 31:7, 31:8, 31:9, 31:12, 31:17, 31:25, 32:13, 32:16, 32:20, 32:23,

33:1, 33:5, 33:8, 33:9, 33:10, 33:18, 33:21, 33:23, 34:5, 34:10, 34:13, 34:14, 35:11, 35:12, 35:15, 35:19, 35:21, 36:1, 36:4, 38:21, 39:2, 45:16, 45:23, 46:7, 47:4, 69:15, 108:9, 122:16, 131:16, 148:9, 148:12
**block-by-block** [1] - 27:8
**blockchain** [54] - 15:23, 16:25, 17:9, 17:12, 17:14, 17:19, 17:22, 17:25, 19:1, 19:7, 19:12, 19:22, 19:24, 21:5, 21:11, 21:22, 23:19, 24:4, 24:6, 24:13, 26:24, 27:5, 27:19, 27:20, 28:10, 29:17, 30:17, 31:7, 32:17, 34:16, 38:6, 38:25, 39:1, 39:11, 39:19, 39:21, 40:17, 41:2, 41:5, 41:10, 41:12, 44:3, 44:15, 45:15, 46:19, 47:6, 47:22, 56:24, 95:2, 95:6, 111:18, 111:19, 111:20, 111:24
**Blockchain** [3] - 8:5, 14:16, 16:10
**blockchains** [4] - 19:10, 21:23, 43:11, 44:18
**blocks** [29] - 21:16, 23:24, 23:25, 24:3, 24:6, 25:20, 25:25, 26:5, 26:10, 26:18, 27:1, 28:11, 28:23, 29:7, 31:2, 31:5, 36:2, 39:3, 39:4, 39:19, 42:14, 42:19, 42:22, 43:24, 45:19, 45:25, 46:4, 46:8, 124:6
**blogs** [1] - 72:10
**blood** [1] - 13:5
**blueprint** [1] - 90:15
**Board** [3] - 61:21, 74:14, 152:7
**board** [1] - 13:20
**Bob** [3] - 22:10, 22:15, 22:16
**body** [1] - 53:8
**Borelli** [1] - 78:5
**bottom** [3] - 31:15,

41:23, 82:19
**bought** [1] - 22:17
**bounce** [1] - 64:1
**box** [4] - 87:21, 91:18, 91:22, 109:14
**boycott** [18] - 53:7, 58:10, 59:25, 60:1, 60:2, 60:6, 60:18, 60:22, 61:3, 144:19, 144:22, 145:2, 145:4, 145:13, 146:17, 147:1, 151:24, 152:4
**brain** [1] - 13:22
**branching** [1] - 111:25
**Brandeis** [4] - 61:20, 61:21, 74:14, 136:5
**Brandeis'** [1] - 136:25
**breached** [1] - 98:6
**breaching** [1] - 128:12
**bread** [1] - 19:17
**breadcrumbs** [1] - 121:23
**break** [7] - 8:18, 9:5, 50:6, 50:24, 100:6, 109:2, 110:2
**breezed** [1] - 8:7
**breezing** [1] - 8:7
**Brekken** [2] - 93:2, 122:10
**Brennan's** [1] - 75:16
**Breyer** [3] - 60:5, 60:6, 60:17
**brian** [1] - 7:23
**BRIAN** [3] - 1:17, 2:10, 2:17
**Brian** [6] - 4:4, 4:23, 5:20, 6:25, 51:12, 51:23
**Brickell** [3] - 1:18, 2:7, 2:22
**brief** [15] - 12:5, 59:17, 60:25, 80:21, 89:25, 90:5, 99:5, 113:22, 122:2, 135:7, 135:23, 146:18, 152:5, 156:2, 157:9
**Brief** [8] - 4:14, 4:18, 56:3, 123:5, 127:9, 138:18, 149:8, 149:25
**briefings** [1] - 9:14
**briefly** [5] - 90:5, 99:1, 105:15, 134:23, 144:15
**briefs** [3] - 60:4, 74:13, 154:15
**bring** [4] - 24:1, 89:22, 100:6, 121:24
**bringing** [1] - 89:20

brings [1] - 123:17
broad [5] - 70:12,
  70:13, 70:14, 123:7,
  139:18
broadcast [3] - 27:22,
  29:8, 34:10
broker [1] - 95:21
brought [3] - 57:9,
  97:24, 124:17
Buehler [2] - 101:1
build [4] - 72:6, 82:19,
  107:18, 107:19
building [3] - 33:2,
  33:23, 41:11
built [2] - 37:8
bulletpoints [1] -
  46:17
bunch [6] - 28:3,
  68:17, 68:21, 70:15,
  78:17, 79:4
burden [1] - 63:15
business [7] - 53:18,
  60:9, 60:12, 67:24,
  75:8, 141:7, 143:7
but-for [6] - 76:17,
  76:20, 76:25, 77:3,
  77:13, 77:16
buy [9] - 37:2, 48:9,
  65:21, 95:19, 95:20,
  95:22, 109:5, 111:8,
  111:9
buyers [4] - 59:1,
  59:20, 68:14, 68:17
buying [8] - 27:16,
  27:17, 58:17, 58:22,
  68:15, 83:11,
  134:11, 151:25
BY [1] - 3:1

## C

Calder [2] - 59:10,
  59:11
California [1] - 2:12
camps [1] - 108:6
candidly [1] - 59:2
cannot [7] - 45:17,
  70:11, 77:3, 77:12,
  98:10, 98:15
capable [1] - 47:3
capacity [3] - 69:15,
  130:13, 132:3
capture [1] - 18:8
captures [1] - 43:24
car [10] - 63:4, 63:5,
  65:21, 65:22, 66:5,
  69:3, 111:9, 153:10
Car [1] - 59:10
care [2] - 37:17, 99:20
cars [5] - 65:2, 66:2,

66:4, 67:25
Case [1] - 4:21
CASE [1] - 1:2
case [59] - 13:1, 15:16,
  40:6, 44:22, 52:11,
  53:20, 54:11, 54:18,
  54:20, 55:14, 59:4,
  59:10, 59:15, 59:24,
  60:5, 60:17, 60:24,
  60:25, 61:21, 62:14,
  67:3, 67:4, 67:16,
  67:17, 68:7, 68:13,
  69:5, 69:7, 69:8,
  70:22, 74:15, 75:15,
  75:17, 78:4, 78:6,
  78:16, 78:19, 78:22,
  79:3, 79:15, 81:18,
  83:16, 84:7, 86:1,
  97:14, 97:22, 98:16,
  101:22, 103:10,
  113:5, 129:15,
  133:22, 145:6,
  145:7, 147:2, 151:4,
  155:16, 155:17,
  157:24
cases [6] - 72:12,
  75:16, 82:15, 85:3,
  102:21, 135:22
cash [5] - 16:17, 32:4,
  126:14, 132:2, 141:9
Cash [111] - 17:6,
  18:22, 30:17, 31:25,
  32:2, 32:3, 35:14,
  38:18, 41:2, 41:24,
  44:2, 48:16, 48:19,
  64:15, 84:21, 88:8,
  88:11, 95:2, 95:6,
  95:8, 99:23, 99:24,
  103:22, 104:5,
  104:9, 104:13,
  104:14, 104:20,
  104:23, 105:3,
  108:3, 108:22,
  109:6, 109:17,
  110:20, 111:6,
  113:11, 115:19,
  115:21, 120:3,
  120:11, 120:13,
  120:21, 123:9,
  123:13, 124:7,
  124:12, 124:16,
  124:18, 125:11,
  127:25, 128:10,
  130:5, 130:7, 130:9,
  130:20, 130:24,
  131:2, 131:6, 131:9,
  132:1, 132:15,
  134:2, 134:7,
  134:15, 134:25,
  135:17, 135:19,

136:1, 136:12,
  136:19, 136:20,
  136:24, 137:3,
  137:6, 137:9,
  137:15, 138:13,
  138:21, 138:22,
  139:3, 139:7,
  139:16, 139:22,
  140:1, 140:5, 140:6,
  141:3, 141:8,
  141:14, 141:21,
  141:22, 142:4,
  142:23, 143:3,
  143:7, 143:8,
  143:11, 143:16,
  143:18, 143:19,
  143:22, 143:24,
  144:1, 145:25,
  147:12, 153:20,
  155:8, 155:9, 156:10
Cash's [1] - 131:16
catch [1] - 140:24
catchy [1] - 152:21
categorize [1] - 57:25
category [1] - 59:13
causation [1] - 77:13
caused [1] - 139:3
causing [1] - 96:19
cell [1] - 55:24
cementing [1] - 96:19
Centre [1] - 1:18
CEO [1] - 88:21
certain [5] - 89:11,
  92:24, 98:12, 123:7,
  124:15
certainly [9] - 9:3,
  63:17, 79:19,
  111:13, 123:4,
  139:19, 149:6,
  154:13, 157:14
certify [1] - 158:19
cetera [5] - 32:4,
  88:12, 93:10, 153:22
Cha [1] - 59:10
Cha-Car [1] - 59:10
chain [31] - 25:19,
  28:23, 28:25, 32:21,
  33:1, 33:2, 33:3,
  33:21, 33:23, 36:2,
  39:19, 43:3, 43:5,
  56:25, 57:5, 57:8,
  82:11, 84:16, 92:5,
  94:3, 94:12, 96:11,
  96:12, 96:14, 96:23,
  107:10, 107:19,
  146:10, 146:11
chains [6] - 41:15,
  69:10, 72:23, 74:3,
  95:16, 111:24
challenged [1] - 59:12

chambers [1] - 64:11
chance [5] - 15:6,
  36:23, 150:24,
  156:1, 158:7
Chancellor [18] - 5:11,
  5:14, 6:9, 7:13,
  58:23, 80:20, 81:12,
  84:11, 84:23, 85:7,
  85:23, 92:3, 92:5,
  92:14, 92:15, 96:21,
  122:5
CHANCELLOR [1] -
  2:17
Chandler [2] - 6:6,
  84:14
change [15] - 8:2,
  22:19, 23:15, 25:4,
  25:5, 25:6, 39:22,
  44:4, 45:17, 47:4,
  47:18, 85:18, 95:22,
  99:17, 111:18
changed [2] - 22:14,
  23:10, 91:21
changes [3] - 22:20,
  41:12, 107:7
changing [2] - 44:8,
  45:6
characteristic [1] -
  18:12
characteristics [1] -
  17:25
characterization [1] -
  59:22
characterize [2] -
  59:15, 127:18
characters [1] - 108:8
charged [1] - 92:6
Charles [4] - 22:11,
  22:16, 22:17, 22:18
chart [3] - 41:21,
  71:25, 77:10
cheat [1] - 87:20
cheated [1] - 87:22
check [3] - 9:1,
  117:24, 119:22
checkpoint [31] - 44:8,
  44:13, 44:21, 44:24,
  45:13, 45:14, 45:15,
  45:16, 45:22, 45:23,
  45:25, 64:1, 64:4,
  84:15, 87:9, 91:24,
  92:5, 92:8, 92:11,
  92:20, 93:8, 96:18,
  97:7, 104:18, 122:8,
  122:16, 130:6,
  138:10, 138:15,
  142:19, 143:3
checkpoints [9] -
  44:1, 44:16, 45:5,
  45:12, 93:10, 98:12,

98:13, 154:2
Chicago [5] - 61:21,
  72:5, 74:14, 75:24,
  152:7
Chief [1] - 64:19
China [2] - 88:3, 135:5
choice [9] - 37:12,
  61:13, 69:4, 76:7,
  96:11, 96:17,
  109:22, 110:6,
  121:16
choose [1] - 47:19
choosing [2] - 96:11,
  109:19
CHRIS [1] - 1:13
Chris [2] - 6:11, 51:19
CHRISTOPHER [1] -
  2:6
Circuit [15] - 59:10,
  59:12, 60:20, 62:14,
  62:15, 64:18, 67:16,
  67:22, 69:7, 78:5,
  81:19, 133:21,
  135:22, 155:16
circumstance [2] -
  115:10, 115:13
circumstantial [3] -
  78:15, 78:21, 82:7
citation [1] - 61:1
cite [5] - 74:13, 75:16,
  82:14, 82:21, 99:13
cited [5] - 43:16,
  60:24, 60:25,
  135:22, 137:1
cites [1] - 74:14
city [2] - 54:1, 69:12
City [1] - 1:18
claim [18] - 8:23,
  35:12, 35:25, 43:1,
  58:5, 61:25, 66:8,
  67:15, 87:21, 102:6,
  119:14, 127:2,
  127:3, 127:6,
  128:18, 128:19,
  149:16, 149:23
claiming [2] - 37:4,
  37:5
claims [8] - 54:2,
  126:5, 126:11,
  126:17, 126:18,
  126:23, 129:3, 129:4
clarification [1] - 29:4
clause [2] - 74:16,
  112:20
Clayton [2] - 75:7,
  75:11
clear [16] - 56:23,
  60:6, 62:15, 64:18,
  81:4, 99:10, 100:1,
  104:19, 130:10,

137:5, 139:6,
139:10, 142:9,
151:8, 155:16,
155:23
**clearly** [14] - 81:3,
87:5, 102:16, 120:2,
120:3, 121:3, 129:7,
133:22, 134:24,
135:9, 139:18,
145:23, 151:11,
152:5
**clears** [1] - 137:21
**clerk** [1] - 8:19
**click** [1] - 31:22
**client** [4] - 104:7,
125:20, 125:21,
151:18
**clients** [3] - 13:11,
13:13, 101:23
**clock** [1] - 105:6
**close** [4] - 59:21, 64:3,
85:22, 92:22
**closed** [2] - 58:9,
59:14, 67:19
**closure** [1] - 86:2
**cluster** [1] - 142:18
**co** [1] - 88:21
**co-founder** [1] - 88:21
**code** [5] - 84:24,
85:12, 85:13, 85:17,
85:18
**coding** [1] - 125:16
**coffee** [2] - 109:5,
134:11
**cognizable** [1] - 75:15
**coin** [4] - 37:17, 153:9,
153:12, 153:24
**coins** [5] - 44:6, 148:3,
153:7, 153:8, 153:25
**colleague** [3] - 4:9,
5:1, 98:23
**colleagues** [3] - 5:17,
56:10, 152:14
**collected** [1] - 27:23
**collecting** [2] - 26:25,
28:3
**collectively** [3] -
36:21, 60:3, 68:18
**colluded** [2] - 82:9,
88:9
**collusion** [8] - 102:20,
111:2, 113:21,
116:11, 119:25,
120:10, 132:7,
146:24
**collusive** [4] - 103:13,
110:17, 119:4, 130:6
**colored** [2] - 24:17,
24:18
**column** [1] - 32:2

**combinations** [1] -
75:1
**combines** [1] - 16:19
**comfortable** [1] -
55:22
**coming** [7] - 44:4,
81:3, 81:13, 81:21,
105:13, 112:1,
141:17
**command** [1] - 11:5
**commend** [1] - 12:21
**comment** [3] - 41:8,
80:22, 85:17
**commentary** [1] -
117:15
**commission** [2] -
148:10, 148:20
**commit** [1] - 145:20
**commitment** [3] -
54:22, 64:7, 83:14
**common** [4] - 17:5,
49:11, 83:15, 135:18
**commonly** [1] - 75:17
**commonplace** [1] -
57:1
**communicate** [2] -
38:25, 39:17
**communicates** [1] -
19:8
**community** [10] -
40:20, 41:6, 46:22,
47:13, 47:16, 49:9,
49:16, 49:22,
127:18, 141:21
**companies** [9] -
36:25, 40:15, 48:8,
70:15, 78:17, 84:21,
87:18, 95:24, 145:25
**company** [8] - 37:3,
37:9, 82:10, 83:20,
95:24, 96:1, 114:23,
120:8
**comparable** [1] - 61:7
**compare** [1] - 38:12
**compared** [2] - 21:12,
76:16
**compatible** [6] -
40:22, 42:23, 45:20,
47:21, 111:23,
113:10
**compensation** [2] -
99:21, 148:13
**compete** [3] - 61:12,
121:15
**competed** [2] - 68:22,
121:17
**competing** [13] - 42:3,
42:17, 110:5, 112:6,
120:11, 120:15,
120:17, 120:18,

120:20, 121:7,
121:10, 121:11,
121:12
**competition** [44] -
42:15, 53:19, 53:23,
57:4, 57:10, 68:25,
71:4, 71:12, 72:7,
73:6, 73:12, 73:18,
73:24, 74:6, 74:11,
75:19, 76:6, 76:24,
77:1, 77:11, 77:17,
103:9, 103:11,
104:16, 104:23,
104:24, 111:2,
111:11, 121:9,
129:13, 129:16,
129:22, 132:5,
133:4, 136:15,
136:18, 137:12,
138:2, 138:6,
139:14, 141:25,
144:2, 146:1, 148:25
**competition-
reducing** [5] - 53:19,
75:19, 76:24, 77:1,
77:17
**competitive** [10] -
62:8, 67:24, 129:15,
133:23, 134:23,
136:23, 137:15,
141:20, 144:5, 144:8
**competitively** [1] -
143:24
**competitor** [3] -
120:8, 121:4, 121:5
**competitors** [20] -
58:25, 59:20, 60:7,
60:15, 60:22, 68:13,
78:24, 79:1, 79:7,
79:16, 85:4, 119:20,
119:24, 119:25,
120:3, 120:10,
145:5, 145:14,
145:24, 145:25
**complain** [1] - 75:23
**complaining** [4] -
53:23, 57:4, 75:22,
76:6
**complains** [1] - 54:2
**Complaint** [2] - 11:18,
12:6
**complaint** [154] - 8:22,
9:19, 9:21, 9:24,
11:3, 11:11, 16:18,
17:6, 34:20, 36:8,
41:1, 43:17, 44:25,
53:5, 53:9, 53:12,
53:22, 54:12, 56:22,
57:6, 57:7, 57:16,
58:4, 58:11, 60:14,

61:5, 61:11, 62:10,
62:22, 62:25, 63:7,
63:14, 64:3, 64:16,
65:11, 65:12, 65:14,
66:13, 68:12, 69:15,
69:24, 72:13, 74:5,
76:10, 77:2, 77:5,
77:6, 77:8, 78:2,
78:25, 80:8, 80:10,
82:12, 83:2, 85:21,
86:19, 86:20, 87:1,
87:3, 87:5, 87:11,
87:16, 87:17, 87:23,
88:15, 89:17, 90:1,
90:2, 90:19, 90:24,
91:3, 91:9, 91:15,
91:17, 91:25, 93:22,
94:9, 95:15, 96:2,
96:16, 96:20, 96:25,
97:3, 97:24, 102:5,
102:16, 103:10,
103:24, 104:10,
104:17, 109:23,
111:1, 111:17,
112:13, 113:14,
114:16, 116:9,
116:20, 119:10,
120:24, 121:13,
122:2, 122:6,
122:21, 126:18,
127:1, 127:16,
128:6, 129:12,
129:21, 130:11,
131:5, 132:8,
133:18, 133:25,
134:24, 135:1,
135:4, 135:10,
136:22, 137:2,
139:5, 140:16,
140:22, 141:20,
142:24, 143:9,
143:15, 144:2,
144:13, 144:18,
144:24, 146:21,
147:15, 149:10,
149:24, 150:3,
150:6, 151:7,
151:16, 151:22,
152:3, 152:10,
152:22, 152:23,
154:16, 154:18,
155:7, 155:12,
155:13, 156:8
**complaints** [1] - 9:22
**complete** [2] - 29:23,
139:2
**completed** [1] - 91:20
**completely** [14] - 15:1,
22:20, 23:16, 59:16,
90:1, 90:24, 91:4,
92:19, 92:25, 97:4,

97:13, 97:18,
112:11, 117:21
**complicated** [1] - 17:9
**complied** [1] - 119:14
**complies** [1] - 32:17
**compliment** [1] -
12:25
**comply** [1] - 119:11
**comprised** [1] - 18:25
**computational** [6] -
30:3, 34:6, 34:10,
34:17, 36:16, 36:21
**computer** [6] - 28:6,
36:14, 37:13, 40:9,
42:12, 46:24
**computers** [7] - 34:8,
34:9, 36:13, 37:14,
63:10, 99:20, 117:12
**concede** [1] - 126:17
**concedes** [1] - 96:2
**concentrate** [1] -
13:23
**concept** [17] - 15:7,
21:19, 25:23, 26:8,
29:19, 30:21, 34:3,
34:25, 43:25, 66:15,
74:22, 124:8, 126:2,
126:3, 149:18,
149:19, 149:21
**conceptionally** [1] -
67:3
**concepts** [11] - 8:16,
8:22, 8:23, 8:24,
10:17, 15:13, 15:18,
15:25, 38:3, 50:11,
138:1
**conceptually** [1] -
67:8
**concluded** [1] -
158:17
**conclusion** [6] -
83:13, 98:18,
110:16, 118:7,
118:12, 118:13
**conclusions** [1] -
118:1
**conclusorily** [1] -
118:22
**conclusory** [6] -
93:18, 116:24,
117:6, 117:9, 119:9
**condemnation** [2] -
57:21
**condemned** [1] - 58:3
**conditions** [2] - 58:14,
85:6
**conduct** [28] - 53:19,
57:20, 57:22, 57:24,
59:8, 59:12, 59:21,
64:5, 75:20, 78:11,

79:3, 83:22, 84:22, 91:11, 94:2, 103:6, 104:12, 104:16, 115:15, 116:19, 122:23, 123:1, 130:12, 132:21, 143:9, 144:1, 144:12, 146:22
**conducting** [1] - 110:5
**confer** [1] - 15:19
**conferred** [1] - 152:14
**confidence** [1] - 45:24
**confirm** [3] - 16:23, 32:16, 32:17
**confirmation** [1] - 31:4
**confirmations** [2] - 31:2, 31:13
**confirmed** [2] - 31:9, 63:19
**confronted** [1] - 89:24
**confused** [2] - 137:4, 142:11
**confusion** [2] - 49:10, 49:16
**conjure** [2] - 96:22, 96:24
**connect** [3] - 37:2, 37:3, 37:14
**connected** [3] - 18:19, 19:23, 29:13
**connection** [4] - 18:24, 82:2, 85:11, 126:11
**conscious** [3] - 54:21, 64:7, 83:14
**consensual** [1] - 109:2
**consent** [4] - 99:9, 99:16, 99:19, 157:21
**consider** [2] - 46:23, 63:4
**considered** [2] - 121:14, 138:23
**considering** [1] - 97:22
**consistent** [1] - 83:18
**conspiracies** [1] - 75:1
**conspiracy** [14] - 53:6, 58:8, 60:21, 78:6, 78:13, 82:7, 82:13, 82:18, 83:11, 83:19, 86:4, 94:8, 96:8, 100:2
**conspirator** [1] - 78:6
**constantly** [2] - 28:7, 77:6
**constitute** [1] - 146:25
**consumers** [5] - 63:3,

63:12, 68:2, 130:8, 134:15
**contain** [1] - 39:2
**contained** [1] - 88:6
**contention** [2] - 108:5, 108:9
**context** [2] - 151:8, 154:25
**continue** [7] - 33:2, 33:23, 36:4, 41:11, 111:21, 137:16, 138:14
**CONTINUED** [1] - 2:1
**continued** [2] - 113:5, 141:8
**continues** [6] - 104:14, 104:24, 136:20, 140:2, 140:5, 140:6
**continuing** [2] - 35:10, 107:18
**contract** [5] - 98:1, 98:3, 124:24, 125:8, 128:12
**contracts** [4] - 75:1, 127:21, 127:24, 128:9
**contrary** [3] - 114:4, 120:24, 128:11
**contribute** [3] - 37:13, 95:16, 153:4
**contributed** [2] - 89:18, 91:22
**contributions** [1] - 47:11
**contrives** [1] - 84:20
**control** [5] - 47:17, 47:24, 96:19, 105:22, 106:18
**controlled** [1] - 106:19
**controlling** [2] - 42:8, 54:10
**controversy** [1] - 56:25
**convenience** [1] - 45:14
**conventional** [3] - 69:20, 69:22, 75:12
**converse** [1] - 74:20
**convert** [1] - 22:4
**convictions** [1] - 58:8
**cool** [1] - 34:9
**copies** [1] - 18:18
**copy** [9] - 15:5, 19:11, 20:25, 21:2, 21:6, 21:7, 32:10, 36:12, 52:6
**core** [2] - 17:19, 47:1
**Core** [18] - 88:10, 103:23, 108:19,

114:1, 114:7, 114:11, 114:17, 115:8, 115:20, 115:22, 124:12, 127:25, 128:10, 130:19, 135:17, 156:11, 156:14, 156:19
**CORP** [1] - 1:1
**Corp** [6] - 4:20, 4:25, 5:6, 81:15, 82:8, 107:23
**correct** [43] - 6:23, 7:15, 7:23, 7:24, 20:1, 20:14, 25:13, 33:19, 33:24, 34:13, 35:23, 45:18, 45:20, 48:4, 63:21, 63:22, 69:6, 71:14, 71:15, 86:14, 98:22, 108:21, 109:9, 113:14, 118:8, 123:15, 124:19, 126:8, 126:11, 126:22, 126:24, 131:21, 131:24, 134:4, 138:3, 140:7, 140:14, 142:5, 143:21, 143:22, 156:12
**correctly** [9] - 30:3, 30:7, 32:18, 35:11, 35:17, 57:19, 57:23, 81:14, 105:4
**corresponded** [1] - 10:9
**corresponding** [1] - 22:9
**corresponds** [1] - 22:13
**cost** [3] - 137:17, 144:12, 148:19
**costs** [5] - 34:9, 134:8, 134:12, 134:14, 138:16
**counsel** [19] - 6:8, 7:2, 7:9, 11:25, 14:19, 15:6, 35:1, 48:14, 49:1, 49:20, 49:22, 50:8, 50:20, 50:21, 52:16, 56:10, 81:22, 136:4
**counsel's** [1] - 4:22
**Count** [4] - 119:3, 129:3, 134:4
**counted** [1] - 20:12
**couple** [11] - 27:10, 30:6, 56:21, 98:23, 99:13, 105:24, 109:17, 129:10,

141:17, 149:5
**courage** [1] - 58:7
**course** [12] - 8:24, 24:5, 37:6, 39:24, 47:21, 70:6, 108:14, 114:9, 133:5, 140:2, 156:3
**COURT** [290] - 1:1, 4:15, 4:19, 5:3, 5:7, 5:12, 5:19, 5:22, 6:1, 6:3, 6:8, 6:16, 6:21, 6:24, 7:2, 7:6, 7:9, 7:11, 7:18, 7:21, 7:25, 10:23, 10:25, 11:14, 12:25, 14:8, 14:10, 14:12, 15:14, 19:3, 19:5, 19:23, 20:2, 20:8, 20:15, 21:14, 22:21, 23:2, 23:8, 23:22, 24:19, 25:8, 25:14, 26:2, 27:6, 27:13, 28:2, 28:14, 28:19, 29:15, 29:20, 29:25, 30:5, 30:9, 30:12, 31:6, 31:21, 32:5, 32:8, 33:5, 33:13, 33:16, 33:20, 33:25, 34:19, 35:5, 35:8, 35:20, 35:24, 36:5, 37:8, 38:1, 38:22, 39:23, 40:8, 40:13, 40:25, 41:25, 42:15, 43:12, 43:14, 43:18, 44:15, 44:20, 45:13, 45:19, 45:22, 46:9, 46:12, 47:9, 47:14, 48:1, 48:5, 48:13, 49:17, 49:24, 50:6, 50:19, 51:8, 51:12, 51:19, 51:23, 52:3, 55:4, 55:8, 55:9, 55:18, 55:21, 56:1, 56:5, 56:14, 56:17, 60:24, 63:16, 63:18, 63:23, 66:12, 68:4, 70:2, 71:13, 71:16, 71:20, 73:2, 73:4, 80:14, 80:24, 81:1, 81:4, 81:20, 81:25, 82:4, 84:1, 84:5, 84:9, 86:7, 86:9, 86:12, 86:14, 90:6, 90:9, 94:17, 94:19, 95:10, 97:8, 97:16, 98:19, 99:1, 100:5, 100:12, 100:14, 100:16, 100:18, 100:20, 100:22, 100:24, 101:1, 101:5, 101:8, 101:10, 101:13,

101:25, 103:18, 105:1, 105:12, 108:12, 108:15, 108:18, 108:22, 109:7, 109:10, 111:16, 112:10, 112:13, 113:9, 113:15, 114:8, 114:10, 114:19, 116:21, 117:3, 117:14, 118:4, 118:9, 118:19, 118:21, 118:25, 119:16, 120:4, 120:7, 120:18, 121:2, 121:11, 121:15, 121:22, 123:2, 123:6, 123:16, 123:24, 124:3, 124:14, 124:20, 125:14, 125:20, 126:2, 126:7, 126:7, 126:9, 126:12, 126:20, 126:23, 126:25, 127:7, 127:10, 128:4, 128:15, 128:23, 130:11, 130:16, 131:11, 131:22, 131:25, 132:10, 132:19, 133:5, 133:8, 133:15, 134:5, 134:17, 134:20, 136:1, 136:4, 136:8, 137:4, 137:7, 137:13, 137:18, 137:20, 137:23, 138:4, 138:8, 138:17, 138:19, 140:5, 140:8, 140:11, 140:13, 140:17, 140:20, 140:24, 141:15, 142:3, 142:6, 142:8, 142:13, 142:17, 143:17, 143:19, 143:23, 144:6, 144:14, 145:3, 145:9, 145:11, 145:19, 146:5, 146:12, 146:14, 147:4, 147:9, 148:24, 149:4, 149:7, 149:9, 149:20, 150:3, 150:8, 150:15, 150:18, 151:2, 151:5, 152:12, 152:17, 153:15, 154:11, 155:2,

155:19, 155:22,
156:3, 157:5, 157:11
**court** [14] - 11:21,
11:22, 12:2, 52:7,
56:16, 73:16, 73:22,
73:23, 79:11, 82:20,
98:17, 126:4,
150:20, 154:4
**Court** [57] - 3:2, 3:2,
4:1, 11:13, 12:21,
13:3, 52:19, 52:21,
52:25, 53:1, 53:12,
53:20, 53:21, 53:25,
54:10, 54:11, 54:17,
54:18, 54:20, 55:3,
55:16, 60:4, 60:13,
61:23, 63:9, 64:20,
65:5, 70:21, 73:11,
74:8, 74:16, 75:15,
78:3, 78:12, 78:18,
79:6, 80:5, 80:7,
80:12, 81:13, 98:9,
98:15, 101:18,
111:13, 119:9,
125:1, 129:7,
129:14, 146:8,
149:14, 152:6,
152:9, 153:24,
158:24
**Court's** [1] - 60:17
**COURTROOM** [3] -
4:2, 4:6, 4:11
**courtroom** [4] - 13:10,
50:25, 51:1, 150:21
**courts** [4] - 57:17,
65:7, 70:24, 154:9
**cover** [6] - 15:7, 15:24,
16:5, 21:8, 21:16,
97:8
**covered** [9] - 50:18,
73:14, 80:17, 98:21,
105:16, 147:6,
148:6, 150:13, 157:9
**covers** [1] - 97:9
**COX** [1] - 2:17
**Cox** [20] - 5:11, 5:14,
6:6, 6:9, 7:13, 58:23,
80:20, 81:12, 84:11,
84:12, 84:15, 84:23,
85:7, 85:23, 92:3,
92:6, 92:14, 92:15,
96:21, 122:5
**CPU** [6] - 42:13,
43:20, 43:23, 108:2,
110:19, 124:5
**Craig** [1] - 115:25
**crash** [1] - 114:23
**create** [9] - 17:20,
17:22, 24:21, 100:2,
104:21, 105:23,

106:16, 107:22,
136:17
**created** [12] - 35:18,
103:8, 103:11,
104:24, 107:7,
107:16, 108:19,
112:21, 125:5,
130:6, 132:25, 133:3
**creates** [5] - 43:3,
75:3, 75:6, 75:11,
111:24
**creating** [4] - 102:18,
104:4, 104:22, 106:5
**creation** [2] - 92:10,
105:17
**credibly** [1] - 65:12
**criminal** [1] - 157:15
**critical** [1] - 106:7
**cross** [1] - 65:3
**cross-elasticity** [1] -
65:3
**CRR** [2] - 3:1, 158:23
**crypto** [5] - 64:15,
92:23, 92:25, 93:6,
96:3
**cryptocurrencies** [13]
- 17:2, 17:5, 38:16,
44:18, 61:6, 65:13,
70:22, 136:16,
139:15, 139:19,
139:22, 153:16,
153:17
**cryptocurrency** [23] -
8:16, 13:5, 17:1,
17:13, 19:19, 35:13,
35:18, 44:19, 48:9,
48:11, 49:4, 49:7,
49:11, 71:11, 83:12,
83:18, 83:25, 97:17,
113:11, 125:6,
125:19, 156:23,
157:1
**cryptographic** [1] -
36:18
**cryptography** [2] -
16:15, 18:11
**cup** [2] - 109:5, 134:11
**currencies** [4] - 57:14,
70:5, 103:23, 138:23
**currency** [23] - 16:22,
16:24, 35:22, 37:15,
37:16, 48:2, 48:22,
48:23, 61:13, 64:15,
104:4, 105:21,
105:23, 106:9,
106:10, 106:16,
109:23, 125:22,
130:19, 131:23,
132:13, 133:10,
139:19

**current** [1] - 18:21
**customer** [3] - 34:25,
35:1, 35:6
**customers** [7] - 34:22,
37:1, 37:12, 37:23,
127:14, 128:12,
130:8
**customers'** [1] - 99:9
**cut** [4] - 11:1, 78:19,
106:4, 148:2
**cylinder** [3] - 63:5,
69:3

# D

**D.C** [1] - 2:19
**daily** [1] - 86:2
**Dallas** [1] - 2:4
**damage** [3] - 96:19,
132:21, 133:24
**damages** [3] - 75:9,
75:10, 144:10
**dark** [2] - 33:5, 33:8
**data** [10] - 19:12, 21:1,
21:25, 22:5, 22:8,
23:9, 23:17, 23:18,
39:1
**date** [4] - 31:1, 31:6,
31:8, 77:21
**Davie** [1] - 1:5
**day-to-day** [1] -
130:13
**dead** [1] - 59:1
**deal** [8] - 11:12, 12:14,
49:24, 60:3, 61:10,
77:25, 94:20, 152:1
**dealerships** [1] -
153:10
**dealing** [5] - 16:21,
17:18, 39:6, 61:4,
126:21
**death** [4] - 72:9,
79:25, 114:3, 115:25
**debate** [2] - 131:1,
131:3
**debunk** [1] - 137:10
**decentralized** [4] -
26:9, 48:18, 106:19,
125:7
**decide** [7] - 40:5, 42:4,
48:2, 49:3, 57:25,
69:18, 138:4
**decided** [8] - 9:18,
40:1, 48:15, 54:3,
72:5, 75:24, 94:23,
126:18
**decider** [3] - 28:3,
28:5, 28:15
**decides** [1] - 28:19
**decision** [2] - 54:11,

130:21
**deck** [4] - 8:4, 15:5,
15:16, 52:5
**declared** [1] - 75:2
**decrease** [3] - 130:4,
131:6
**decreases** [1] - 147:23
**deems** [1] - 11:13
**deep** [1] - 12:19
**defects** [1] - 132:25
**defendant** [10] - 12:4,
54:13, 67:18, 81:16,
84:7, 84:19, 110:17,
119:19, 149:12,
149:16
**defendants** [55] - 5:9,
5:11, 5:16, 5:21,
5:22, 5:25, 6:6, 6:10,
6:20, 7:9, 7:13, 9:17,
10:9, 11:15, 12:13,
54:9, 54:15, 58:24,
60:15, 77:20, 79:7,
80:23, 84:25, 85:9,
86:6, 86:9, 86:16,
90:12, 102:2, 102:7,
102:18, 102:20,
102:22, 103:8,
103:14, 111:2,
111:14, 112:18,
113:20, 117:16,
117:19, 118:10,
118:13, 129:11,
138:21, 138:25,
139:13, 141:20,
142:15, 144:20,
145:23, 149:13,
149:15, 149:19,
152:10
**DEFENDANTS** [4] -
1:9, 2:2, 2:9, 2:17
**defendants'** [8] -
10:12, 53:19, 75:19,
80:16, 104:12,
116:8, 119:10, 139:2
**Defendants'** [1] -
11:17
**defense** [5] - 50:8,
50:20, 50:21, 136:4,
152:14
**deficient** [1] - 86:21
**define** [9] - 54:19,
58:12, 62:1, 62:3,
62:25, 66:20, 67:21,
111:17, 153:20
**defined** [4] - 57:20,
63:2, 67:19, 136:11
**defines** [2] - 54:20,
71:8
**definitely** [1] - 149:20
**definition** [8] - 17:16,

59:19, 68:5, 69:6,
69:20, 69:22,
134:12, 135:23
**definitions** [1] - 73:9
**degrees** [2] - 146:12,
146:13
**Delta** [4] - 60:8, 60:12,
79:3, 79:14
**delving** [1] - 101:19
**demand** [5] - 64:21,
64:22, 65:22,
106:17, 151:17
**demonstrative** [3] -
107:11, 135:15,
136:21
**deny** [1] - 98:14
**Department** [1] -
59:18
**depended** [1] - 141:7
**dependent** [1] - 125:7
**depicts** [3] - 18:18,
24:6, 32:12
**depth** [1] - 12:22
**DEPUTY** [3] - 4:2, 4:6,
4:11
**deputy** [2] - 50:25,
150:21
**derive** [1] - 17:3
**derived** [1] - 17:5
**describe** [2] - 39:14,
125:3
**described** [4] - 87:4,
89:18, 94:5, 120:12
**describes** [1] - 87:3
**describing** [2] - 93:5,
147:19
**description** [6] -
10:17, 89:9, 89:16,
125:4, 125:9, 125:17
**deserve** [1] - 157:25
**deserves** [1] - 12:23
**designed** [6] - 54:22,
64:7, 106:3, 106:21,
125:15, 130:10
**desirable** [1] - 14:1
**detailed** [3] - 64:19,
103:4, 119:7
**details** [1] - 34:17
**deteriorated** [1] -
154:10
**deteriorates** [1] -
154:1
**deterioration** [7] -
129:18, 129:22,
130:3, 133:23,
134:7, 144:11, 154:3
**determine** [2] - 47:24,
73:24
**determined** [1] - 93:23
**Detroit** [1] - 66:2

**devastating** [1] - 77:4
**develop** [4] - 47:15, 92:14, 93:9, 93:10
**developed** [4] - 16:13, 19:18, 40:19, 49:6
**developer** [1] - 120:7
**developers** [15] - 46:16, 46:17, 46:22, 46:23, 47:1, 49:6, 85:14, 92:7, 92:11, 92:13, 93:8, 96:20, 98:11, 122:6, 122:14
**developing** [1] - 47:7
**development** [1] - 141:2
**developments** [3] - 16:14, 16:15, 131:17
**develops** [1] - 85:1
**device** [5] - 42:6, 42:22, 47:20, 47:25, 69:21
**devices** [1] - 19:15
**diagram** [7] - 21:5, 21:10, 27:7, 30:14, 32:12, 32:24, 33:5
**diagrams** [1] - 34:2
**dial** [2] - 55:15, 55:24
**dialing** [1] - 4:10
**diamonds** [1] - 17:13
**diaphragm** [1] - 20:19
**differ** [1] - 76:19
**difference** [3] - 38:13, 110:6, 130:18
**different** [30] - 16:12, 18:5, 18:13, 21:22, 23:16, 26:10, 28:17, 43:11, 48:10, 49:15, 72:11, 72:12, 83:23, 90:18, 91:2, 97:13, 97:18, 104:3, 109:1, 110:24, 111:24, 130:23, 130:24, 133:8, 139:9, 141:16, 141:17, 153:22, 154:8
**difficult** [3] - 36:11, 81:9, 94:7
**digital** [8] - 16:17, 16:22, 16:23, 17:10, 17:20, 21:25, 27:16, 30:25
**digits** [1] - 22:15
**digressing** [1] - 148:15
**dimensions** [5] - 68:25, 71:10, 71:12, 72:18, 72:21
**diminishing** [1] - 148:17
**diminution** [9] - 71:2,

71:5, 72:14, 73:20, 114:6, 114:11, 114:17, 138:15, 151:20
**direct** [7] - 52:11, 59:11, 60:22, 78:13, 82:6, 145:4, 145:14
**directions** [1] - 109:1
**directly** [3] - 64:23, 73:16, 81:18
**disagree** [1] - 146:5
**disagreement** [1] - 41:13
**disagrees** [1] - 32:25
**disappeared** [1] - 57:6
**disappointment** [1] - 142:25
**discern** [1] - 94:7
**disciplining** [1] - 69:21
**discomfort** [2] - 50:13, 50:16
**disconnected** [3] - 91:4, 92:20, 97:4
**discovery** [2] - 118:5, 127:21
**discretion** [1] - 40:24
**discrimination** [1] - 129:9
**discuss** [4] - 34:3, 46:14, 52:24, 90:5
**discussed** [3] - 10:15, 129:16, 134:8
**discusses** [1] - 46:16
**discussing** [3] - 15:17, 16:5, 129:12
**discussion** [9] - 35:3, 41:7, 56:21, 61:14, 77:24, 102:22, 129:20, 140:19, 151:13
**discussions** [1] - 56:9
**dismiss** [7] - 65:8, 79:6, 98:14, 111:14, 113:17, 135:25, 149:14
**Dismiss** [2] - 11:17, 12:5
**dismissal** [1] - 155:16
**dismissed** [3] - 78:20, 149:22, 152:11
**disowning** [1] - 151:22
**dispute** [5] - 94:25, 117:16, 119:13, 119:22
**disputed** [1] - 83:7
**disputes** [2] - 77:9, 108:7
**disputing** [1] - 124:15

**distinct** [1] - 85:20
**distinction** [2] - 112:9, 124:14
**distinguish** [2] - 77:3, 155:12
**distortion** [1] - 59:13
**distracting** [1] - 10:1
**distributed** [2] - 18:1, 18:17
**DISTRICT** [2] - 1:1, 1:1
**District** [4] - 3:2, 81:19, 153:23, 158:24
**diverging** [1] - 118:10
**diversity** [7] - 57:11, 65:14, 69:3, 72:11, 72:25, 74:4, 151:21
**divert** [1] - 127:14
**diverted** [3] - 34:23, 109:12, 110:8
**dives** [1] - 64:4
**divide** [1] - 36:19
**DNA** [2] - 17:3, 17:5
**Docket** [4] - 11:18, 12:6, 138:19, 141:18
**document** [1] - 59:18
**documents** [2] - 8:3, 52:8
**dokey** [2] - 52:3, 101:13
**dominance** [1] - 139:2
**dominate** [1] - 90:12
**DONALD** [1] - 2:9
**Donald** [2] - 6:19, 51:23
**donations** [1] - 47:11
**done** [21] - 29:5, 29:17, 30:2, 52:9, 77:19, 84:23, 84:25, 85:9, 85:10, 93:15, 93:16, 96:20, 111:1, 117:8, 117:11, 135:4, 142:12, 151:16, 155:11, 157:19
**double** [2] - 16:21, 44:5
**double-spend** [1] - 16:21
**double-spending** [1] - 44:5
**down** [14] - 5:12, 5:13, 6:16, 6:21, 7:6, 8:14, 9:19, 14:20, 75:25, 106:10, 110:2, 115:20, 131:9, 158:2
**download** [1] - 44:12
**downstream** [1] - 82:1
**dozen** [2] - 37:2
**drafted** [1] - 91:17

**draw** [3] - 62:12, 73:6, 111:16
**drinking** [1] - 122:12
**driven** [1] - 49:21
**drop** [1] - 115:8
**due** [1] - 104:11
**dump** [1] - 115:23
**during** [6] - 42:10, 81:9, 88:8, 92:2, 142:1, 142:2
**duty** [2] - 82:20, 157:15
**Duty** [2] - 129:14, 133:21
**duty-free** [1] - 82:20

## E

**e-mail** [3] - 8:3, 12:3, 99:18
**e-mailed** [1] - 14:16
**earliest** [1] - 131:14
**early** [2] - 16:16, 16:17
**earned** [1] - 35:22
**easier** [3] - 37:19, 55:16, 157:22
**easily** [4] - 12:1, 52:8, 127:1, 129:8
**easy** [1] - 21:20
**economic** [11] - 97:11, 108:8, 114:5, 114:10, 114:12, 114:14, 115:10, 115:13, 116:3, 121:20, 128:11
**effect** [12] - 94:16, 129:12, 129:21, 132:5, 133:3, 133:23, 136:23, 144:5, 144:8, 156:10, 156:22
**effective** [2] - 130:8, 151:14
**effectively** [4] - 89:21, 94:11, 94:14
**effects** [6] - 57:22, 62:8, 129:16, 137:15, 138:14, 144:2
**efficient** [1] - 37:19
**effort** [1] - 35:22
**efforts** [2] - 141:8, 141:20
**eight** [6] - 21:15, 22:7, 58:21, 58:22, 63:5, 69:3
**eight-cylinder** [2] - 63:5, 69:3
**either** [9] - 14:15, 48:8, 68:14, 87:12,

87:24, 90:24, 91:14, 112:16, 125:8
**elasticities** [5] - 64:20, 64:22, 151:17, 155:12, 155:18
**elasticity** [1] - 65:3
**election** [12] - 87:8, 103:14, 104:17, 107:25, 111:4, 113:2, 120:12, 120:23, 121:19, 143:14, 152:21
**elections** [1] - 111:15
**electronic** [1] - 141:9
**element** [9] - 53:13, 54:1, 54:14, 54:23, 66:7, 67:12, 71:2, 75:12, 126:15
**elements** [10] - 53:11, 53:14, 61:24, 62:9, 62:19, 71:6, 73:20, 75:5, 126:5, 149:11
**Eleventh** [12] - 59:10, 59:12, 60:20, 62:14, 62:15, 64:18, 67:16, 67:22, 69:7, 81:19, 133:21, 155:15
**eliminate** [1] - 16:20
**eliminated** [2] - 43:4, 43:6
**elsewhere** [1] - 88:3
**emerged** [2] - 57:1, 108:22
**employed** [1] - 124:15
**en** [1] - 60:20
**enable** [1] - 44:5
**encapsulated** [1] - 87:16
**encapsulation** [1] - 88:5
**encoded** [1] - 46:7
**end** [8] - 15:19, 29:12, 41:14, 43:2, 43:10, 92:1, 105:12, 115:5
**ended** [1] - 52:22
**ending** [1] - 54:14
**energy** [2] - 13:19, 34:8
**enforce** [1] - 125:2
**engage** [1] - 132:16
**engaged** [1] - 110:17
**engineering** [1] - 46:24
**enjoy** [2] - 13:4, 61:7
**enjoyed** [1] - 13:10
**enjoying** [2] - 13:3, 61:8
**enlarged** [1] - 61:6
**ensure** [1] - 23:17
**entails** [1] - 34:18

**enter** [1] - 95:20
**entered** [2] - 37:22, 81:16
**entertain** [1] - 119:10
**entire** [4] - 19:10, 19:11, 25:7, 28:12
**entirely** [1] - 83:1
**entirety** [1] - 22:22
**entities** [2] - 98:21, 120:1
**entitled** [1] - 158:21
**Entry** [4] - 11:18, 12:6, 138:20, 141:19
**entry** [1] - 70:17
**equal** [1] - 99:14
**equals** [1] - 131:22
**erase** [1] - 44:5
**error** [1] - 50:3
**especially** [3] - 36:10, 85:23, 120:11
**ESQ** [11] - 1:17, 1:20, 2:2, 2:6, 2:9, 2:10, 2:13, 2:17, 2:17, 2:18, 2:21
**essential** [4] - 66:7, 127:3, 149:11, 150:22
**essentially** [5] - 82:23, 87:16, 98:14, 111:24, 148:10
**establish** [7] - 67:18, 73:18, 103:5, 113:20, 114:13, 116:9, 122:22
**established** [1] - 107:2
**estimate** [1] - 38:10
**estimating** [1] - 50:23
**et** [6] - 4:21, 32:4, 88:12, 93:10, 153:22
**ET** [1] - 1:7
**eternity** [1] - 12:17
**Europe** [1] - 135:6
**eve** [1] - 109:12
**event** [1] - 109:8
**events** [1] - 138:9
**eventually** [3] - 141:5, 148:2, 148:3
**everyday** [2] - 20:21, 21:13
**evidence** [6] - 78:13, 78:16, 78:22, 82:7, 118:5, 128:5
**evidenced** [1] - 89:14
**evident** [1] - 25:7
**evidentiary** [2] - 54:24, 78:23
**exact** [1] - 154:1
**exactly** [5] - 27:21, 76:5, 111:3, 127:23,
137:9
**example** [25] - 18:7, 20:13, 21:20, 22:7, 22:14, 23:6, 23:12, 25:11, 25:21, 26:4, 35:15, 36:20, 38:8, 38:18, 60:8, 72:4, 87:5, 87:14, 92:23, 99:17, 102:11, 111:9, 115:18, 118:10, 134:25
**examples** [2] - 71:11, 135:2
**excellent** [1] - 145:10
**except** [1] - 58:16
**excessive** [1] - 38:24
**exchange** [19] - 27:18, 48:21, 48:22, 48:24, 49:10, 49:13, 49:18, 83:18, 85:14, 88:20, 90:22, 93:16, 96:10, 120:7, 120:18, 120:25, 132:17, 146:2, 146:10
**Exchange** [1] - 95:22
**exchanges** [10] - 48:7, 48:10, 48:17, 48:20, 49:2, 49:8, 61:13, 97:17, 120:24, 122:15
**exclude** [3] - 78:10, 79:19, 80:2
**excluded** [1] - 63:24
**excuse** [5] - 27:14, 47:5, 71:13, 97:16, 143:19
**exhibit** [1] - 52:5
**existed** [3] - 139:1, 139:23, 140:1
**existence** [2] - 16:11, 57:5
**exists** [1] - 43:3
**expect** [1] - 120:25
**expectation** [1] - 118:5
**expectations** [2] - 125:21, 125:22
**expedited** [1] - 157:14
**experience** [2] - 57:24, 70:24
**experiencing** [1] - 55:7
**experiment** [1] - 22:3
**experiments** [1] - 16:16
**explain** [3] - 91:10, 139:11, 140:3
**explained** [1] - 118:23
**explaining** [1] - 93:6
**explanation** [9] -

50:17, 82:13, 82:18, 86:3, 96:16, 115:24, 116:2, 148:15, 152:21
**exploit** [1] - 68:2
**exposing** [1] - 128:13
**Express** [2] - 60:9, 60:11
**expressing** [3] - 43:23, 80:1, 124:5
**extending** [1] - 124:6
**extent** [2] - 11:25, 85:24
**extra** [1] - 13:18
**extremely** [1] - 94:6
**Eye** [1] - 2:19

---

**F**

**face** [1] - 9:25
**Facebook** [3] - 95:20, 95:22, 95:23
**faces** [2] - 13:19, 13:20
**facilitate** [4] - 88:2, 104:6, 131:7, 148:21
**fact** [26] - 8:12, 25:19, 34:8, 57:7, 57:13, 62:21, 63:8, 69:9, 72:6, 74:2, 78:18, 79:14, 93:22, 107:11, 115:7, 117:10, 118:2, 118:12, 118:17, 122:19, 123:19, 131:7, 135:24, 144:20, 152:2, 155:13
**factor** [8] - 114:5, 116:5, 127:15, 128:8, 128:14, 129:22, 133:22, 134:23
**factors** [6] - 102:21, 103:5, 113:24, 119:5, 122:1, 122:21
**facts** [36] - 14:14, 54:24, 62:18, 65:7, 66:8, 78:23, 78:25, 79:16, 79:17, 79:19, 81:16, 82:19, 85:10, 87:11, 102:10, 102:16, 103:1, 103:3, 103:4, 113:19, 114:13, 116:1, 116:9, 116:24, 117:7, 118:1, 118:4, 118:7, 118:15, 119:4, 119:7, 119:8, 122:1,

128:21, 155:17
**factual** [7] - 8:11, 8:16, 8:24, 60:14, 64:21, 78:8, 84:1
**factually** [2] - 34:25, 75:13
**facty** [1] - 62:17
**fail** [6] - 52:19, 77:22, 79:8, 79:14
**failed** [1] - 73:20
**failings** [1] - 53:1
**fails** [10] - 53:9, 53:12, 54:12, 54:13, 57:17, 59:16, 62:10, 77:2, 78:2, 80:10
**failure** [4] - 77:5, 149:15, 149:16, 155:17
**fair** [11] - 12:19, 37:11, 46:5, 107:25, 111:1, 111:4, 111:10, 113:2, 136:18, 143:14, 154:13
**fairly** [2] - 21:20, 44:22
**fake** [1] - 10:24
**falls** [2] - 61:3, 154:16
**familiar** [1] - 20:20
**famous** [7] - 54:18, 61:21, 61:22, 74:15, 75:15, 78:4, 78:7
**far** [4] - 32:2, 56:5, 82:1, 120:5
**fashion** [3] - 14:1, 78:17, 113:21
**fast** [2] - 11:23, 19:19
**fatal** [1] - 135:11
**favor** [6] - 89:3, 89:15, 102:25, 120:16, 121:18, 122:8
**favoring** [2] - 43:10
**FB** [2] - 95:20, 95:25
**fear** [1] - 14:21
**feature** [3] - 4:1, 107:20, 107:21
**features** [1] - 40:16
**federal** [1] - 98:17
**fee** [1] - 70:17
**fees** [3] - 141:6, 147:17, 148:8
**feet** [1] - 59:8
**felt** [3] - 111:14, 148:18, 156:4
**few** [10] - 4:11, 4:16, 25:9, 35:14, 46:17, 97:3, 100:7, 113:23, 127:8, 153:19
**fewer** [1] - 121:1
**field** [1] - 22:10
**fight** [4] - 72:8, 79:25, 114:2, 115:25

**Figueroa** [1] - 2:11
**file** [3] - 15:16, 52:4, 52:12
**filed** [4] - 9:9, 15:20, 126:10, 157:13
**fill** [1] - 15:12
**final** [3] - 46:14, 71:3, 97:21
**finally** [5] - 48:6, 54:6, 62:7, 77:18, 94:1
**financial** [3] - 17:20, 21:12, 76:3
**fine** [5] - 11:8, 132:24, 150:4, 156:16
**fingerprint** [2] - 21:25, 30:25
**finish** [2] - 103:20, 108:15
**finished** [2] - 89:14, 158:8
**finite** [3] - 106:14, 147:20
**firm** [3] - 7:1, 7:17, 99:17
**firms** [2] - 60:2, 61:4
**First** [1] - 11:18
**first** [48] - 7:25, 8:21, 9:20, 9:21, 10:12, 15:23, 16:3, 17:1, 17:2, 18:1, 21:18, 25:9, 25:20, 25:23, 35:10, 36:23, 41:16, 49:18, 53:3, 53:8, 54:19, 56:20, 56:24, 61:15, 61:25, 62:20, 69:9, 70:22, 70:23, 75:20, 77:21, 78:24, 80:7, 82:5, 88:14, 92:18, 99:21, 102:7, 102:15, 108:16, 110:12, 115:12, 139:4, 142:20, 151:1, 151:6, 154:22
**fish** [2] - 64:6, 64:9
**fit** [4] - 35:2, 59:12, 85:8, 124:8
**fits** [1] - 35:3
**five** [2] - 17:24, 56:8
**fix** [2] - 58:1, 133:1
**fixed** [1] - 22:6
**fixing** [5] - 58:1, 58:13, 58:16, 68:15, 68:21
**fizzle** [1] - 107:13
**flatly** [2] - 54:12, 54:13
**flaws** [1] - 102:2
**flexibility** [2] - 108:10, 132:9
**flip** [1] - 147:14
**flipping** [1] - 150:6

**flock** [1] - 153:8
**flocked** [1] - 153:7
**flooding** [1] - 106:8
**Floor** [3] - 1:22, 2:15, 3:3
**FLORIDA** [1] - 1:1
**Florida** [8] - 1:5, 1:19, 1:22, 2:8, 2:23, 3:3, 81:19, 158:25
**flow** [1] - 143:2
**focus** [6] - 17:4, 86:23, 113:23, 126:18, 136:14, 152:6
**focused** [3] - 44:24, 86:19, 141:4
**focusing** [6] - 71:20, 71:21, 133:11, 137:25, 141:15, 149:1
**fold** [1] - 75:9
**folks** [3] - 85:17, 109:16, 139:3
**follow** [4] - 49:19, 95:2, 111:19, 111:21
**followed** [1] - 90:15
**following** [3] - 13:19, 111:22, 111:23
**follows** [1] - 54:21
**FOR** [4] - 1:17, 2:2, 2:9, 2:17
**forbidden** [1] - 75:8
**force** [1] - 47:18
**foregoing** [1] - 158:19
**forget** [1] - 9:12
**forgive** [1] - 124:21
**fork** [94] - 39:16, 39:20, 39:24, 40:1, 42:2, 42:10, 45:12, 56:25, 57:1, 61:7, 61:9, 72:1, 74:12, 75:21, 76:9, 76:11, 76:18, 76:20, 76:21, 82:11, 84:17, 89:2, 89:13, 95:4, 96:1, 96:4, 103:9, 103:11, 103:12, 103:13, 103:19, 103:21, 104:2, 104:11, 104:22, 105:5, 105:6, 107:7, 107:8, 107:9, 107:22, 108:18, 109:6, 109:7, 109:8, 109:13, 109:18, 109:20, 110:4, 110:7, 110:9, 110:10, 110:14, 110:16, 110:25, 111:17, 112:4,

112:8, 112:21, 112:24, 115:8, 123:9, 124:16, 129:25, 130:21, 131:1, 136:2, 136:12, 136:19, 136:20, 136:24, 137:2, 137:7, 137:11, 137:12, 137:17, 138:9, 139:1, 139:2, 139:8, 139:23, 139:25, 140:1, 141:22, 141:25, 142:2, 142:4, 142:23, 142:25, 151:8, 151:9, 152:6, 155:9
**forks** [12] - 39:11, 39:13, 39:15, 41:18, 41:22, 57:1, 75:4, 77:9, 77:11, 96:2, 107:13
**forming** [1] - 154:12
**forms** [1] - 105:8
**forums** [3] - 92:24, 93:1, 93:3
**forward** [19] - 24:13, 44:10, 44:12, 67:4, 95:3, 95:7, 97:1, 108:3, 108:11, 110:21, 111:6, 113:11, 120:17, 120:21, 125:18, 130:25, 132:22, 148:23
**foundation** [2] - 16:4, 38:3
**foundational** [1] - 17:25
**founder** [3] - 84:4, 84:8, 88:21
**four** [8] - 17:7, 38:10, 52:18, 53:14, 56:20, 100:7, 101:14, 106:3
**fours** [1] - 147:2
**fourth** [2] - 54:8, 71:3
**fowl** [2] - 64:6, 64:10
**FPR** [2] - 3:1, 158:23
**fraction** [1] - 26:17
**frank** [1] - 9:23
**frankly** [3] - 9:25, 13:9, 96:24
**Free** [2] - 129:15, 133:21
**free** [5] - 11:23, 47:19, 55:21, 67:7, 82:20
**frequently** [2] - 39:4, 40:10
**fresh** [2] - 9:20, 81:14
**Friday** [1] - 38:4

**friend** [1] - 90:20
**Friendly** [2] - 78:5, 78:7
**front** [6] - 14:15, 52:8, 64:25, 74:13, 120:17, 123:18
**full** [5] - 19:9, 19:13, 20:5, 32:9
**function** [5] - 21:23, 27:2, 85:16, 109:23, 109:24
**fund** [1] - 66:24
**fundamental** [4] - 15:4, 102:2, 103:7, 103:22
**fundamentally** [1] - 85:20
**Fundamentals** [2] - 8:5, 14:16
**funded** [2] - 47:12, 47:13
**funds** [1] - 20:24
**furthered** [1] - 96:23
**furthers** [1] - 96:17
**futile** [1] - 141:23
**future** [6] - 45:10, 122:17, 131:10, 131:18, 132:4, 133:2

## G

**game** [1] - 8:10
**gate** [2] - 59:1, 59:16
**gather** [3] - 14:13, 26:17, 48:17
**gathered** [1] - 109:12
**general** [1] - 45:5
**generally** [3] - 10:10, 15:24, 40:7
**generate** [2] - 141:5, 147:17
**generates** [1] - 141:6, 147:18
**generic** [1] - 45:2
**genesis** [3] - 24:21, 25:17, 25:24
**genius** [2] - 105:19, 125:6
**geographic** [10] - 62:4, 65:19, 65:23, 66:4, 66:9, 67:14, 72:17, 135:7, 137:24, 138:5
**Georgia** [1] - 79:15
**German** [1] - 66:5
**Gettysburg** [3] - 23:11, 23:13
**GitHub** [1] - 41:7
**given** [1] - 95:25
**GLENDA** [2] - 3:1,

158:23
**Glenda** [4] - 55:7, 150:20, 155:23, 158:23
**glitches** [2] - 132:24, 133:6
**glossary** [1] - 46:14
**glue** [1] - 85:10
**goal** [1] - 131:22
**goals** [2] - 130:24, 133:8
**God** [1] - 82:1
**gold** [2] - 106:15, 109:4
**goods** [1] - 48:12
**Google** [1] - 40:18
**government** [1] - 125:7
**Government** [4] - 105:21, 105:22, 106:18
**grants** [1] - 47:12
**graphic** [1] - 41:16
**Graphic** [1] - 67:22
**graphics** [1] - 24:16
**Graphics** [1] - 69:7
**grasping** [1] - 61:16
**grateful** [1] - 11:21
**great** [12] - 5:7, 11:1, 49:25, 52:3, 56:1, 66:17, 66:21, 81:5, 107:15, 115:21, 124:3, 157:5
**greater** [2] - 72:1, 151:21
**green** [5] - 63:4, 65:2, 65:4, 65:22, 66:2
**ground** [2] - 65:11, 147:6
**group** [19] - 36:19, 47:1, 53:7, 58:10, 59:25, 60:1, 60:2, 60:18, 61:4, 105:19, 112:18, 144:19, 144:22, 145:2, 145:3, 145:13, 146:17, 147:1
**guess** [2] - 7:12, 8:3, 8:12, 26:8, 26:19, 28:14, 35:12, 99:7, 102:19, 109:17, 110:1, 115:7, 117:24, 126:16, 127:5, 127:17, 131:12, 133:10, 141:17, 146:6, 147:5, 154:24
**guideline** [1] - 124:23
**gum** [1] - 111:8
**guy** [3] - 107:4,

107:14, 115:25

## H

**half** [3] - 56:12, 106:5, 148:2
**half-an-hour** [1] - 56:12
**handle** [5] - 38:7, 38:9, 38:10, 38:13, 38:17
**handling** [1] - 4:10
**hands** [1] - 55:21
**hands-free** [1] - 55:21
**hang** [2] - 114:23, 115:3
**happily** [1] - 132:11
**happy** [4] - 99:5, 128:25, 153:2, 158:8
**hard** [44] - 39:15, 39:20, 39:24, 42:2, 42:10, 45:11, 61:6, 61:9, 74:12, 77:8, 95:4, 103:13, 104:2, 104:22, 105:5, 105:6, 107:8, 107:22, 108:18, 109:7, 109:8, 109:13, 109:18, 109:20, 110:4, 110:7, 110:9, 110:10, 110:14, 111:17, 112:4, 112:8, 112:21, 112:24, 115:8, 123:9, 124:16, 129:25, 136:2, 136:12, 136:24, 137:11, 138:9, 152:6
**hardcore** [1] - 126:14
**harder** [2] - 55:12, 133:12
**hardest** [1] - 150:20
**hardware** [2] - 18:25, 39:7
**harm** [10] - 73:18, 73:24, 76:3, 104:16, 105:8, 130:2, 138:1, 138:6, 141:25, 144:3
**harmed** [1] - 151:19
**Harwood** [1] - 2:3
**hash** [39] - 21:18, 21:21, 21:24, 22:9, 22:19, 22:24, 22:25, 23:3, 23:4, 23:5, 23:16, 23:24, 24:14, 24:21, 24:22, 24:24, 25:5, 30:24, 42:2, 42:16, 42:24, 43:9, 43:25, 44:5, 46:6,

90:12, 90:13, 90:22, 91:6, 92:2, 113:25, 115:18, 116:13, 120:12, 124:13, 142:1, 144:8, 144:9
**hashes** [1] - 22:12
**hashing** [19] - 21:21, 22:8, 39:4, 57:8, 59:6, 59:7, 61:7, 61:8, 63:10, 70:16, 85:1, 89:7, 89:19, 91:12, 97:7, 152:2, 154:6, 155:14
**hate** [1] - 81:25
**head** [1] - 114:20
**heading** [1] - 105:11
**healthy** [1] - 158:11
**hear** [7] - 52:24, 53:14, 77:19, 81:2, 81:21, 86:11, 99:5
**heard** [8] - 41:7, 57:1, 59:3, 70:3, 77:5, 135:8, 135:13, 139:14
**hearing** [10] - 9:9, 10:20, 11:17, 12:20, 13:17, 52:5, 55:6, 105:16, 119:21
**HEARING** [1] - 1:12
**heart** [1] - 123:18
**heightened** [1] - 102:14
**held** [3] - 12:19, 92:23, 140:19
**help** [8] - 8:14, 9:2, 11:7, 11:21, 87:24, 141:1, 142:14, 154:17
**helped** [5] - 87:24, 89:5, 89:6, 92:14, 150:10
**helpful** [12] - 9:16, 13:3, 15:13, 16:4, 17:8, 38:22, 52:13, 101:18, 101:22, 144:16, 157:12, 158:4
**Henry** [1] - 78:5
**hereby** [1] - 158:19
**herself** [1] - 5:2
**heterogeneity** [1] - 65:15
**Hi** [1] - 4:2
**hi** [1] - 4:4
**high** [7] - 27:8, 32:11, 44:22, 45:24, 50:3, 90:20, 158:5
**high-level** [1] - 45:24
**higher** [10] - 31:13, 43:1, 61:8, 68:22,

69:2, 134:7, 134:14, 137:16, 138:15, 144:12
**highjack** [1] - 83:11, 83:25, 84:21, 87:20, 89:7, 96:18
**highlight** [1] - 56:21
**highlighting** [1] - 109:24
**Hilton** [7] - 54:3, 69:11, 72:5, 75:23, 75:24, 76:1, 76:3
**himself** [3] - 61:22, 88:20, 107:16
**history** [6] - 33:4, 41:20, 44:4, 44:8, 107:12, 113:18
**hold** [9] - 5:8, 5:12, 18:18, 25:8, 81:20, 85:11, 118:2, 138:17, 158:5
**holder** [1] - 156:15
**holding** [2] - 55:13, 157:1
**holds** [1] - 20:25
**hole** [1] - 97:24
**hole-type** [1] - 97:24
**home** [2] - 19:7, 36:11
**honest** [1] - 142:9
**honestly** [1] - 13:1
**Honor** [213] - 4:23, 5:4, 5:10, 5:20, 5:23, 6:4, 6:11, 6:18, 6:25, 7:3, 7:8, 7:10, 7:15, 7:20, 7:23, 7:24, 10:8, 10:13, 10:16, 10:19, 10:24, 11:11, 12:15, 14:6, 14:24, 15:5, 15:8, 16:8, 17:7, 17:24, 18:16, 18:24, 21:15, 24:17, 27:12, 32:7, 33:19, 34:18, 36:8, 42:21, 44:1, 46:15, 48:6, 50:5, 50:15, 51:3, 51:4, 51:5, 51:6, 51:10, 51:11, 51:15, 51:16, 51:17, 51:18, 51:21, 51:22, 51:25, 52:9, 52:15, 52:16, 52:18, 53:3, 53:15, 54:6, 54:17, 56:4, 56:11, 56:18, 56:21, 57:13, 57:16, 57:19, 58:5, 59:17, 59:24, 60:4, 61:3, 61:14, 61:19, 61:25, 62:20, 63:14, 63:17, 63:25, 65:9, 65:14, 65:23, 66:17, 67:3, 67:12,

68:3, 68:10, 68:14, 68:16, 68:24, 69:10, 69:18, 69:19, 70:13, 70:14, 70:20, 71:10, 71:25, 73:7, 74:5, 74:9, 74:21, 74:24, 76:9, 77:18, 78:9, 78:16, 80:4, 80:12, 80:19, 81:2, 81:5, 81:15, 81:24, 85:22, 86:5, 86:8, 86:10, 86:16, 86:17, 97:10, 97:21, 98:24, 99:6, 100:4, 100:9, 100:10, 100:13, 100:15, 100:17, 100:19, 100:21, 100:23, 100:25, 101:4, 101:7, 101:12, 101:16, 102:3, 102:19, 105:10, 107:11, 107:17, 108:6, 108:14, 108:17, 108:21, 108:25, 109:9, 110:11, 110:22, 112:5, 112:23, 113:12, 116:4, 118:8, 118:20, 119:13, 121:10, 121:25, 122:25, 123:14, 125:3, 125:25, 127:5, 127:17, 128:8, 128:25, 129:1, 129:8, 129:13, 129:19, 130:21, 135:21, 136:14, 137:9, 137:22, 138:7, 140:4, 140:23, 142:10, 142:11, 143:6, 143:21, 145:7, 147:1, 147:5, 147:15, 149:6, 150:14, 150:25, 151:11, 151:14, 151:24, 155:4, 155:12, 155:15, 156:1, 156:7, 156:11, 156:12, 157:4, 157:8, 158:13, 158:14, 158:15, 158:16
**Honor's** [15] - 10:9, 15:25, 16:7, 36:20, 38:4, 102:4, 112:8, 112:12, 125:13, 129:20, 135:8, 141:12, 145:21, 146:2, 149:17

**HONORABLE** [1] - 1:13
**hope** [4] - 14:3, 81:8, 137:19, 137:21
**hopefully** [2] - 8:15, 50:2
**horizontal** [11] - 60:7, 60:10, 60:15, 60:22, 145:4, 145:13, 145:16, 145:23, 146:1, 146:4, 146:8
**horizontality** [1] - 60:19
**hotel** [2] - 58:2, 72:4
**hotels** [1] - 58:1
**hour** [2] - 56:12, 151:3
**hundred** [2] - 20:12, 36:19
**hundreds** [5] - 26:23, 27:9, 153:7, 153:8, 153:10
**hurt** [1] - 115:2
**hypothetical** [1] - 40:3

## I

**Ian** [2] - 5:10, 51:12
**IAN** [1] - 2:17
**ID** [1] - 31:23
**idea** [9] - 17:19, 41:21, 61:2, 105:20, 106:16, 107:15, 125:6, 153:12, 154:7
**ideas** [2] - 83:10, 104:3
**identified** [3] - 53:1, 57:19, 155:6
**identifier** [1] - 48:23
**identifies** [1] - 45:16
**identify** [1] - 155:7
**identifying** [1] - 48:22
**ignoring** [1] - 138:25
**illegal** [10] - 54:19, 55:1, 60:23, 64:7, 75:2, 79:24, 112:17, 112:18, 118:6, 145:13
**illegality** [1] - 112:19
**illogical** [1] - 154:10
**image** [4] - 13:21, 17:17, 49:5, 49:12
**images** [1] - 22:1
**immunizing** [1] - 131:17
**impact** [2] - 91:11, 129:16
**impacted** [1] - 134:1
**implement** [5] - 39:7, 39:10, 42:5, 42:14, 85:19

**implementation** [3] - 89:4, 89:15
**implementations** [2] - 94:22, 95:1
**implemented** [2] - 45:12, 84:16
**implementing** [1] - 92:4
**implements** [6] - 39:22, 41:12, 42:7, 42:17, 42:22, 45:21
**implicated** [2] - 69:8, 71:12
**implicates** [1] - 68:23
**implication** [1] - 102:24
**implications** [1] - 80:6
**importance** [1] - 99:14
**important** [14] - 13:11, 21:18, 23:19, 23:25, 30:20, 62:13, 63:25, 74:11, 74:22, 76:10, 88:17, 128:7, 138:1
**importantly** [1] - 60:3
**impose** [2] - 68:1, 122:8
**imposed** [1] - 143:3
**imposing** [2] - 62:6, 71:7
**impossible** [1] - 144:4
**improper** [1] - 92:1
**improperly** [1] - 90:12
**improve** [3] - 41:9, 46:18, 46:23
**improving** [1] - 47:7
**inaudible** [5] - 35:21, 66:5, 75:5, 155:2, 155:17
**INC** [2] - 1:7, 2:3
**Inc** [5] - 4:20, 6:14, 98:20, 149:22, 149:23
**incentivized** [1] - 49:8
**include** [4] - 19:9, 36:1, 38:21, 155:17
**included** [4] - 15:25, 16:2, 31:16, 134:3
**including** [4] - 73:8, 97:14, 131:16, 143:17
**income** [1] - 148:23
**incoming** [3] - 116:16, 116:18, 117:12
**incompatible** [3] - 41:14, 42:11, 112:3
**inconsistent** [3] - 46:8, 92:19, 116:6
**incorporated** [1] - 12:7
**incorrect** [1] - 34:14

**increase** [9] - 37:4, 37:24, 38:17, 65:1, 111:7, 129:17, 129:23, 129:25, 132:3
**increased** [1] - 69:12
**increasing** [3] - 38:7, 38:20, 109:24
**increment** [1] - 77:15
**incremental** [1] - 76:24
**independent** [2] - 78:11, 79:21
**independently** [4] - 29:7, 48:18, 116:7, 116:10
**indicate** [2] - 33:7, 64:25
**indicated** [2] - 57:3, 82:6
**indicating** [1] - 33:17
**indications** [1] - 64:24
**indicia** [2] - 59:8, 74:17
**individual** [9] - 28:13, 36:22, 54:7, 54:15, 77:20, 80:3, 80:16, 80:22, 80:23
**individually** [1] - 55:16
**individuals** [5] - 84:18, 85:23, 92:23, 92:25, 93:6
**industry** [4] - 92:23, 92:25, 93:6, 96:3
**inflation** [1] - 106:17
**influence** [2] - 93:25, 152:24
**influenced** [1] - 88:1
**information** [10] - 17:11, 21:4, 30:22, 31:23, 34:21, 88:18, 88:19, 88:24, 99:12, 127:13
**inherently** [1] - 131:19
**injured** [1] - 75:7
**Injury** [12] - 53:17, 54:3, 54:4, 73:13, 74:9, 74:21, 75:11, 75:23, 77:2, 77:12, 77:23, 104:8
**injury** [8] - 53:18, 71:3, 73:5, 73:12, 74:6, 75:14, 75:18, 143:2
**innocent** [1] - 115:15
**innovate** [2] - 132:3, 133:1
**innovation** [3] - 104:15, 113:3, 130:4

**innovative** [1] - 133:2
**input** [2] - 22:8, 22:13
**insertion** [1] - 153:23
**inserts** [1] - 94:4
**inside** [2] - 63:3, 65:21
**insinuates** [1] - 91:17
**insinuations** [1] - 64:3
**insist** [1] - 136:11
**install** [7] - 40:21, 42:6, 42:16, 93:8, 93:10, 96:18, 98:12
**installation** [1] - 92:8
**installed** [1] - 87:9
**installing** [3] - 42:7, 42:21, 97:7
**instead** [6] - 22:15, 22:16, 22:17, 83:4, 106:19, 108:25
**institution** [1] - 18:3
**institutions** [1] - 17:21
**instructions** [1] - 10:9
**instrument** [3] - 63:13, 66:22, 67:1
**instruments** [2] - 61:13, 65:15
**insufficient** [1] - 87:2
**integrity** [1] - 23:17
**intelligent** [1] - 25:20
**intend** [2] - 15:1, 15:11
**intended** [4] - 15:10, 18:9, 138:21, 141:3
**intensive** [1] - 36:11
**interact** [1] - 19:1
**interest** [15] - 79:12, 79:18, 114:5, 114:10, 114:12, 115:13, 116:3, 121:5, 121:20, 121:21, 128:11, 132:12, 135:8, 156:25, 157:3
**interesting** [4] - 13:6, 118:25, 127:4, 154:17
**interests** [4] - 110:5, 114:14, 115:11, 133:10
**intermediary** [6] - 16:22, 17:21, 18:6, 20:17, 20:22, 21:3
**international** [2] - 66:4, 67:8
**internet** [3] - 16:14, 23:4, 23:6
**interrupt** [1] - 11:23
**interrupted** [3] - 112:16, 150:9, 155:25
**interrupting** [1] -

27:14
**Interruption** [1] - 95:9
**intervention** [1] - 105:21
**introduce** [2] - 5:2, 5:17
**introduced** [1] - 112:14
**intuitively** [1] - 154:22
**invest** [2] - 90:23, 115:1
**invested** [3] - 83:17, 104:7, 114:25
**investing** [1] - 83:17
**investment** [1] - 115:21
**investor** [1] - 88:20
**investors** [3] - 91:7, 91:10, 131:14
**inveterate** [1] - 69:14
**invite** [1] - 5:17
**invited** [1] - 154:14
**invoke** [1] - 65:6
**invoking** [1] - 77:6
**involve** [4] - 60:21, 62:1, 145:4, 145:13
**involved** [4] - 35:15, 88:21, 88:25, 126:5
**involving** [1] - 70:22
**iPhone** [1] - 40:11
**Iqbal** [1] - 78:3
**isolate** [2] - 77:1, 77:3
**isolating** [1] - 77:14
**issue** [10] - 10:22, 13:12, 64:1, 77:18, 120:20, 129:19, 135:14, 135:24, 144:20, 156:12
**issues** [5] - 10:21, 11:10, 101:19, 134:24, 157:25
**itself** [8] - 56:25, 58:7, 76:10, 78:16, 80:8, 89:20, 91:15, 95:17

# J

**Jacobs** [7] - 62:14, 65:7, 65:8, 73:16, 73:22, 155:15
**January** [18] - 9:10, 9:18, 12:17, 52:22, 52:23, 53:2, 54:5, 54:18, 57:19, 57:23, 61:17, 64:10, 66:20, 68:25, 74:23, 81:7, 81:13, 81:14
**Japan** [2] - 66:3, 135:5
**Jesse** [4] - 6:20, 7:5, 12:4, 12:9

**JESSE** [1] - 2:10
**jettisoned** [1] - 61:17
**JIHAN** [1] - 2:4
**Jihan** [2] - 6:15, 82:9
**job** [5] - 11:1, 50:1, 140:3, 142:12, 150:20
**Johns** [1] - 6:1
**join** [1] - 70:17
**joined** [3] - 88:3, 93:7, 96:8
**joining** [1] - 81:21
**joint** [1] - 7:16
**Joint** [1] - 11:17
**joke** [1] - 101:2
**joking** [1] - 10:23
**jones** [1] - 6:3
**Jones** [10] - 2:3, 2:6, 5:24, 6:2, 6:12, 6:13, 7:17, 14:25, 51:13, 100:18
**JONES** [5] - 2:18, 5:23, 6:2, 51:16, 100:19
**journey** [1] - 52:20
**JUDGE** [1] - 1:14
**Judge** [4] - 9:18, 64:19, 78:5, 78:7
**judge** [5] - 90:22, 93:19, 93:20, 152:15, 157:15
**judged** [2] - 91:6, 93:18
**judges** [1] - 93:20
**judgment** [2] - 79:21, 135:25
**judicial** [2] - 57:24, 70:23
**judiciary** [1] - 57:20
**jumped** [1] - 109:13
**jurisdiction** [4] - 10:20, 11:4, 11:7, 11:10
**Justice** [9] - 59:18, 60:4, 60:6, 60:16, 61:20, 61:21, 74:14, 75:15, 136:25
**justice** [1] - 8:15

# K

**keep** [15] - 21:7, 21:23, 25:1, 34:8, 36:12, 36:14, 37:24, 48:16, 50:25, 68:1, 95:24, 96:11, 109:4, 120:4, 127:7
**keeps** [1] - 32:10
**kept** [1] - 8:10
**key** [8] - 29:19, 44:7,

82:20, 83:12, 105:24, 108:5, 108:8, 113:23
**Kim** [1] - 2:14
**kind** [22] - 8:12, 9:25, 13:12, 13:18, 13:25, 14:14, 37:8, 43:19, 54:25, 61:3, 79:10, 79:11, 102:1, 102:15, 104:2, 109:12, 109:13, 112:16, 113:17, 123:17, 124:22, 154:12
**KLEIN** [5] - 2:10, 6:25, 7:1, 52:1, 101:7
**Klein** [3] - 6:25, 51:23, 101:6
**knowledge** [1] - 135:18
**known** [4] - 84:7, 88:19, 89:2, 89:13
**knows** [5] - 95:22, 123:21, 129:14, 148:16, 158:9
**Kobre** [1] - 2:14
**Kraken** [52] - 7:4, 48:15, 49:1, 49:21, 49:23, 58:24, 83:17, 86:11, 86:14, 86:15, 86:23, 87:2, 87:12, 87:23, 88:7, 88:13, 88:15, 88:19, 88:24, 89:3, 89:14, 89:22, 90:18, 90:21, 91:6, 91:19, 92:9, 92:12, 93:4, 93:7, 93:9, 93:13, 93:14, 93:19, 93:24, 94:2, 94:4, 94:11, 96:7, 97:2, 97:11, 97:15, 120:18, 120:22, 121:2, 121:7, 121:17, 122:3, 122:14, 132:17, 152:19, 153:2
**KRAKEN** [1] - 2:10
**Kraken's** [1] - 88:21

# L

**label** [5] - 59:23, 59:25, 60:18, 65:6, 152:4
**labeled** [1] - 90:11
**labels** [3] - 69:24, 69:25, 151:25
**lag** [1] - 13:21
**laid** [1] - 109:22
**language** [16] - 58:7,

62:13, 88:16, 90:1,
90:2, 90:4, 90:18,
91:2, 94:6, 98:5,
123:18, 123:20,
137:1, 144:23,
145:21, 147:2
**laptop** [4] - 19:6, 19:7,
20:2, 36:11
**large** [2] - 47:13,
49:22
**largely** [1] - 47:13
**last** [14] - 9:9, 10:19,
18:12, 24:9, 28:20,
38:4, 52:22, 54:23,
75:16, 83:2, 88:4,
90:8, 90:10, 135:21
**lastly** [1] - 18:12
**late** [2] - 8:10, 151:3
**latest** [2] - 24:8, 29:2
**laughs** [1] - 101:5
**Law** [1] - 75:3
**law** [16] - 7:1, 7:17,
8:19, 53:8, 53:9,
54:11, 76:15, 78:14,
81:14, 81:18, 98:15,
99:17, 119:5,
124:24, 126:12,
154:19
**laws** [3] - 57:12, 75:9,
97:25
**lawsuit** [1] - 85:25
**lawyer** [3] - 8:19,
61:22, 140:18
**lawyers** [2] - 101:21,
158:6
**lay** [1] - 82:23
**lays** [2] - 82:21, 143:6
**lead** [3] - 7:22, 22:25,
70:21
**leading** [1] - 71:2
**learned** [2] - 13:16,
136:5
**least** [1] - 11:1
**leave** [8] - 18:13,
43:20, 45:1, 48:14,
74:8, 124:4, 124:9,
124:10
**led** [1] - 109:20
**ledger** [20] - 17:10,
17:25, 18:19, 21:6,
24:7, 24:12, 24:13,
25:16, 26:9, 26:11,
29:13, 32:10, 33:6,
33:7, 35:12, 36:12,
44:12, 45:7
**ledgers** [9] - 18:5,
18:13, 18:17, 20:18,
21:1, 32:10, 32:15,
33:12, 36:4
**left** [10] - 20:19, 24:20,

32:13, 33:6, 33:8,
33:14, 78:14, 78:15,
81:10, 134:18
**legal** [3] - 8:23,
113:17, 119:12
**legislate** [1] - 98:10
**legitimate** [2] -
130:16, 146:7
**lens** [1] - 71:1
**less** [24] - 53:13,
53:23, 57:4, 57:11,
59:1, 62:10, 64:7,
66:8, 72:2, 72:6,
72:24, 74:3, 74:19,
76:7, 80:11, 84:20,
103:11, 104:15,
104:24, 116:13,
117:18, 137:12
**level** [11] - 13:19, 27:8,
32:11, 44:22, 45:24,
67:24, 87:20,
117:22, 121:10,
121:11, 121:12
**liability** [1] - 128:13
**lightweight** [2] -
19:11, 20:6
**likely** [1] - 49:19
**likewise** [1] - 68:21
**limbs** [1] - 69:5
**limit** [1] - 106:11
**limitations** [2] - 56:7,
130:7
**limited** [2] - 133:2,
138:8
**limiting** [1] - 131:16
**limits** [1] - 132:21
**line** [5] - 5:1, 9:22,
50:25, 82:14, 83:15
**link** [3] - 24:1, 24:15,
73:19
**links** [2] - 83:4, 83:12
**list** [1] - 49:2
**listed** [4] - 16:6, 17:24,
18:20, 31:15
**listen** [1] - 52:5
**listening** [1] - 14:23
**lives** [1] - 86:2
**LLP** [4] - 1:17, 1:21,
2:14, 2:18
**loaf** [1] - 19:17
**locked** [2] - 130:5,
131:8
**logical** [3] - 10:13,
54:15, 80:6
**logically** [1] - 96:13
**long-term** [2] -
156:15, 156:18
**longest** [2] - 33:3,
33:23
**look** [44] - 11:3, 18:16,

19:16, 22:19, 28:17,
31:11, 57:22, 61:5,
63:3, 64:18, 64:20,
65:20, 69:9, 70:25,
71:25, 73:14, 74:1,
74:2, 74:4, 74:11,
74:13, 74:16, 75:21,
76:25, 77:10, 83:14,
85:3, 88:5, 105:7,
118:2, 119:1, 123:2,
123:6, 135:15,
136:8, 136:25,
138:5, 140:15,
145:18, 147:7,
149:4, 149:24
**looked** [3] - 136:21,
136:23, 143:5
**looking** [17] - 26:19,
67:13, 70:25, 85:4,
110:13, 113:14,
115:17, 124:2,
126:15, 127:8,
134:2, 140:17,
140:21, 145:12,
146:3, 147:14, 150:1
**looks** [1] - 68:25
**loop** [3] - 88:15,
90:17, 94:2
**LORAYNE** [1] - 1:20
**Lorayne** [2] - 4:9, 5:5
**Los** [1] - 2:12
**lose** [1] - 119:18
**losing** [4] - 43:2,
67:24, 76:3, 81:22
**losses** [1] - 126:13
**lost** [4] - 14:22, 82:1,
148:25
**Louie** [1] - 101:8
**LOURIE** [23] - 2:13,
7:3, 7:4, 7:8, 7:10,
7:20, 14:6, 51:6,
52:2, 86:10, 86:13,
86:15, 90:8, 90:10,
94:18, 95:14, 97:9,
97:18, 101:9,
152:15, 152:18,
153:17, 156:1
**Lourie** [12] - 7:3, 7:20,
14:4, 49:23, 51:24,
80:15, 86:11, 95:13,
101:9, 101:10,
152:15, 155:24
**lower** [7] - 68:18,
68:19, 69:1, 69:2,
76:1, 134:12, 156:14
**lowered** [1] - 76:2
**Ltd** [1] - 6:15
**LTD** [1] - 2:4

# M

**mad** [1] - 69:17
**Magazine** [1] - 41:18
**MAGISTRATE** [1] -
1:14
**mail** [3] - 8:3, 12:3,
99:18
**mailed** [1] - 14:16
**main** [1] - 12:8
**maintain** [4] - 18:5,
19:11, 19:21, 20:18
**maintained** [1] - 21:6
**maintaining** [1] - 18:4
**maintains** [2] - 21:3,
36:12
**major** [1] - 131:17
**majority** [2] - 32:25,
111:5
**maker** [1] - 67:25
**manufacture** [1] -
97:19
**map** [6] - 18:18, 41:18,
53:9, 57:17, 59:9,
135:16
**Maris** [2] - 67:16, 69:7
**Mark** [3] - 6:12, 14:24,
51:19
**MARK** [1] - 2:2
**mark** [2] - 33:13, 46:1
**marked** [1] - 52:6
**market** [132] - 62:2,
62:4, 62:6, 62:8,
62:16, 62:22, 62:24,
63:1, 63:2, 64:12,
64:15, 64:17, 65:4,
65:6, 65:10, 65:18,
65:19, 65:20, 65:23,
66:4, 66:9, 66:20,
67:5, 67:11, 67:14,
67:18, 67:19, 67:20,
67:21, 67:22, 68:5,
68:8, 68:18, 69:6,
69:20, 70:4, 70:10,
70:12, 70:20, 71:6,
71:8, 72:15, 73:9,
73:17, 73:19, 85:6,
85:13, 90:15, 97:13,
97:16, 97:17, 103:9,
103:21, 104:7,
104:8, 104:10,
104:12, 104:14,
104:15, 104:20,
104:23, 105:3,
105:5, 105:7, 106:6,
106:8, 108:8, 111:6,
120:11, 120:13,
121:5, 134:23,
134:25, 135:3,
135:7, 135:12,

135:14, 135:20,
135:24, 136:1,
136:9, 136:11,
137:3, 137:5, 137:7,
137:9, 137:14,
137:24, 137:25,
138:5, 138:6, 138:8,
138:11, 138:12,
138:13, 138:24,
139:1, 139:7,
139:18, 139:21,
139:22, 139:24,
139:25, 140:8,
140:9, 140:10,
140:12, 141:14,
141:16, 142:4,
147:12, 151:13,
151:15, 151:18,
151:21, 151:23,
153:7, 153:13,
153:15, 153:21,
154:20, 155:6,
155:17, 156:22
**marketplace** [5] -
69:18, 72:11, 73:1,
113:4, 128:2
**markets** [5] - 72:17,
73:10, 97:11, 97:12,
115:4
**marks** [1] - 142:18
**Marquart** [2] - 2:10,
6:19
**Marriott** [9] - 54:2,
69:11, 72:4, 75:22,
75:25, 76:1, 76:2
**mas** [1] - 137:23
**Mas** [1] - 137:23
**mass** [1] - 106:7
**Mastercard** [1] - 38:12
**match** [1] - 25:6
**math** [2] - 26:14,
147:23
**mathematical** [1] -
106:1
**matter** [6] - 12:22,
12:24, 13:11, 13:20,
118:23, 158:21
**matters** [1] - 8:11
**mattress** [1] - 66:25
**maximum** [1] - 148:3
**MCALILEY** [1] - 1:13
**mean** [16] - 25:21,
26:16, 27:11, 54:6,
59:15, 64:1, 66:17,
67:1, 94:14, 94:15,
102:11, 107:8,
115:7, 124:24,
143:19, 156:24
**meaning** [2] - 31:2,
43:6

**means** [6] - 32:10, 57:21, 90:23, 94:13, 144:21, 144:23
**meant** [3] - 33:9, 90:7, 91:8
**measure** [3] - 68:8, 70:10, 133:15
**measured** [2] - 42:16, 42:18
**measurements** [1] - 72:21
**measuring** [1] - 72:18
**meet** [1] - 154:18
**meeting** [3] - 54:9, 59:21, 60:16
**megabytes** [1] - 131:17
**Melissa** [2] - 6:5, 51:13
**MELISSA** [1] - 2:21
**memoranda** [1] - 105:4
**memorandum** [4] - 138:19, 139:4, 141:18, 150:4
**memory** [2] - 105:3, 145:20
**menos** [2] - 137:23
**mention** [3] - 9:13, 10:4, 14:21
**mentioned** [8] - 18:17, 20:17, 32:9, 61:20, 65:20, 88:7, 107:22, 136:7
**mentioning** [1] - 157:13
**mercenary** [1] - 152:25
**merchants** [1] - 20:23
**mere** [1] - 78:18
**merely** [2] - 95:18, 96:8
**merit** [1] - 130:16
**meritocracy** [1] - 47:3
**message** [1] - 22:10
**method** [1] - 18:14
**MIAMI** [1] - 1:2
**Miami** [10] - 1:19, 1:22, 2:8, 2:23, 3:3, 3:3, 6:6, 58:19, 158:24, 158:25
**Michigan** [1] - 66:3
**Microsoft** [1] - 40:18
**mid-'60s** [1] - 119:2
**middle** [2] - 32:24, 33:16
**might** [19] - 9:3, 12:1, 20:11, 42:24, 63:13, 63:14, 68:6, 68:16, 75:24, 79:20, 80:21,

105:19, 114:19, 114:20, 114:22, 114:23, 115:2, 115:23, 134:3
**MILLER** [133] - 1:17, 4:4, 4:9, 4:13, 4:23, 7:23, 10:8, 10:24, 11:9, 50:15, 51:4, 51:10, 81:24, 100:10, 100:13, 101:16, 102:1, 103:21, 105:10, 105:14, 108:14, 108:17, 108:21, 108:24, 109:9, 110:11, 112:5, 112:11, 112:23, 113:12, 113:16, 114:9, 114:15, 115:12, 117:2, 117:4, 118:3, 118:8, 118:18, 118:20, 118:22, 119:1, 119:23, 120:6, 120:9, 120:20, 121:7, 121:12, 121:17, 121:25, 123:4, 123:14, 123:22, 124:1, 124:10, 124:19, 125:3, 125:15, 125:24, 126:3, 126:6, 126:8, 126:10, 126:16, 126:22, 126:24, 127:4, 127:15, 128:8, 128:20, 128:25, 130:15, 130:18, 131:21, 131:24, 132:1, 132:14, 132:20, 133:7, 133:14, 133:20, 134:6, 134:19, 134:22, 136:3, 136:7, 136:13, 137:6, 137:8, 137:14, 137:19, 137:21, 138:3, 138:7, 138:12, 139:11, 140:6, 140:10, 140:12, 140:15, 140:23, 141:12, 142:2, 142:5, 142:7, 142:10, 142:14, 143:5, 143:18, 143:21, 143:25, 144:10, 144:15, 145:6, 145:10, 145:17, 145:20, 145:21, 146:6,

146:13, 146:16, 147:5, 147:10, 149:2, 149:6, 149:17, 149:24, 150:1, 150:5, 150:13, 150:16, 157:8, 158:16
**Miller** [29] - 4:4, 4:6, 4:24, 7:21, 7:23, 10:5, 10:23, 50:7, 50:15, 51:8, 70:6, 81:23, 94:20, 95:12, 99:2, 100:8, 100:12, 101:11, 101:13, 103:18, 105:1, 108:12, 117:25, 123:2, 140:21, 149:9, 150:9, 152:19, 157:6
**Miller's** [1] - 150:23
**mind** [4] - 17:18, 22:1, 54:16, 140:25
**mindful** [2] - 56:16, 150:19
**minds** [2] - 52:23, 54:9
**mine** [26] - 19:18, 27:2, 34:23, 37:11, 37:13, 37:18, 40:4, 46:7, 63:20, 122:16, 123:12, 124:16, 124:18, 127:14, 140:14, 141:3, 142:23, 143:7, 143:10, 143:16, 144:4, 147:12, 151:12, 153:20, 153:21
**mined** [15] - 25:24, 26:7, 27:19, 28:24, 35:13, 37:18, 39:4, 39:25, 40:6, 46:2, 106:12, 106:13, 123:9, 147:21
**miner** [5] - 30:2, 45:14, 45:16, 121:6, 132:14
**miners** [16] - 29:1, 29:7, 29:21, 36:20, 37:2, 37:3, 80:8, 85:14, 99:20, 121:8, 123:11, 127:25, 132:18, 141:21, 154:4, 154:5
**mining** [99] - 18:15, 19:14, 19:21, 19:22, 20:3, 20:10, 20:11, 21:9, 25:16, 26:8, 26:10, 26:14, 26:18, 26:25, 27:19, 27:23,

29:17, 30:7, 33:7, 33:9, 34:3, 34:4, 34:11, 34:12, 34:23, 35:4, 35:10, 35:16, 35:18, 35:22, 35:25, 36:7, 36:10, 36:13, 36:17, 36:22, 36:23, 36:25, 37:1, 37:4, 37:9, 37:10, 37:14, 37:18, 37:21, 37:24, 38:20, 38:21, 39:3, 40:2, 40:5, 41:10, 42:13, 42:19, 42:22, 43:7, 45:15, 48:2, 63:20, 84:16, 85:2, 90:14, 96:3, 97:19, 98:24, 99:19, 99:23, 106:1, 107:18, 108:19, 109:12, 109:16, 114:1, 114:7, 120:2, 120:8, 121:8, 124:7, 124:12, 132:11, 132:13, 135:5, 135:19, 141:6, 142:25, 143:15, 143:23, 143:25, 145:25, 147:17, 147:24, 148:4, 148:17, 156:10
**minor** [1] - 22:19
**minute** [8] - 4:15, 5:8, 11:15, 27:3, 27:25, 80:21, 88:4, 123:2
**minutes** [7] - 4:12, 24:10, 25:25, 28:20, 50:22, 56:12, 100:7
**misconception** [4] - 102:7, 102:15, 102:19, 103:7
**missed** [1] - 70:2
**missing** [4] - 83:2, 83:3, 83:12
**mix** [1] - 16:12
**mode** [1] - 128:24
**moment** [9] - 9:1, 25:10, 26:14, 32:19, 35:4, 51:1, 112:19, 132:10, 142:22
**money** [6] - 17:20, 34:9, 47:9, 63:12, 114:25, 148:19
**monkeyed** [1] - 23:18
**monkeying** [1] - 23:20
**Monsanto** [3] - 54:20, 79:24, 83:16
**months** [4] - 41:3, 106:23, 109:18, 153:19
**morning** [8] - 6:18,

18:21, 18:22, 19:25, 20:11, 25:16, 25:18, 57:13
**most** [11] - 7:12, 21:12, 28:24, 36:2, 37:19, 49:19, 54:15, 116:2, 124:22, 153:1
**mostly** [1] - 8:12
**motion** [11] - 10:12, 12:8, 65:8, 89:24, 96:10, 98:14, 111:13, 113:17, 119:10, 135:25, 154:25
**MOTION** [1] - 1:12
**Motion** [2] - 11:17, 12:5
**move** [13] - 15:3, 23:23, 32:6, 38:3, 38:5, 56:15, 57:16, 61:19, 73:5, 74:8, 74:21, 77:18, 98:10
**moved** [1] - 88:3
**movement** [1] - 88:2
**moving** [9] - 16:8, 30:10, 34:1, 35:9, 36:6, 39:12, 67:3, 91:12, 95:2
**MR** [295] - 4:4, 4:9, 4:13, 4:23, 5:10, 5:17, 5:20, 5:23, 6:2, 6:11, 6:18, 6:23, 6:25, 7:3, 7:8, 7:10, 7:15, 7:20, 7:23, 10:8, 10:24, 11:9, 12:15, 14:6, 14:9, 14:11, 14:24, 15:21, 19:4, 19:6, 20:1, 20:4, 20:14, 20:16, 21:15, 22:22, 23:7, 23:9, 23:23, 24:20, 25:13, 25:22, 26:22, 27:7, 27:21, 28:5, 28:17, 29:4, 29:16, 29:21, 30:2, 30:6, 30:10, 30:13, 31:11, 31:22, 32:6, 32:9, 33:8, 33:15, 33:19, 33:22, 34:1, 35:3, 35:6, 35:9, 35:23, 35:25, 36:6, 37:12, 38:2, 38:23, 40:7, 40:9, 40:14, 41:1, 42:1, 42:20, 43:13, 43:15, 43:19, 44:17, 45:3, 45:18, 45:20, 46:5, 46:10, 46:13, 47:11, 47:15, 48:4, 48:6, 48:25, 49:20, 50:4, 50:15, 51:3,

51:4, 51:5, 51:6, 51:10, 51:15, 51:16, 51:18, 51:21, 51:22, 51:25, 52:1, 52:2, 52:9, 52:15, 55:15, 55:20, 55:24, 56:4, 56:11, 56:15, 56:18, 61:2, 63:17, 63:22, 63:24, 66:16, 68:9, 70:13, 71:15, 71:19, 71:22, 73:3, 73:5, 80:19, 80:25, 81:2, 81:5, 81:24, 82:3, 82:5, 84:3, 84:6, 84:10, 86:8, 86:10, 86:13, 86:15, 90:8, 90:10, 94:18, 95:14, 97:9, 97:18, 98:22, 99:6, 100:9, 100:10, 100:13, 100:15, 100:17, 100:19, 100:23, 100:25, 101:4, 101:7, 101:9, 101:16, 102:1, 103:21, 105:10, 105:14, 108:14, 108:17, 108:21, 108:24, 109:9, 110:11, 112:5, 112:11, 112:23, 113:12, 113:16, 114:9, 114:15, 115:12, 117:2, 117:4, 118:3, 118:8, 118:18, 118:20, 118:22, 119:1, 119:23, 120:6, 120:9, 120:20, 121:7, 121:12, 121:17, 121:25, 123:4, 123:14, 123:22, 124:1, 124:10, 124:19, 125:3, 125:15, 125:24, 126:3, 126:6, 126:8, 126:10, 126:16, 126:22, 126:24, 127:4, 127:15, 128:8, 128:20, 128:25, 130:15, 130:18, 131:21, 131:24, 132:1, 132:14, 132:20, 133:7, 133:14, 133:20, 134:6, 134:19, 134:22, 136:3, 136:7, 136:13, 137:6, 137:8, 137:14, 137:19, 137:21,

138:3, 138:7, 138:12, 139:11, 140:6, 140:10, 140:12, 140:15, 140:23, 141:12, 142:2, 142:5, 142:7, 142:10, 142:14, 143:5, 143:18, 143:21, 143:25, 144:10, 144:15, 145:6, 145:10, 145:17, 145:20, 145:21, 146:6, 146:13, 146:16, 147:5, 147:10, 149:2, 149:6, 149:17, 149:24, 150:1, 150:5, 150:13, 150:16, 150:25, 151:3, 151:6, 152:15, 152:18, 153:17, 155:1, 155:4, 155:21, 156:1, 156:6, 157:8, 158:13, 158:14, 158:15, 158:16
**MS** [6] - 5:4, 6:4, 51:11, 51:17, 100:21, 101:12
**multiple** [6] - 20:9, 27:25, 48:20, 61:8, 119:6, 135:2
**must** [11] - 59:12, 60:21, 67:17, 73:19, 73:23, 75:18, 78:23, 82:9, 119:20, 145:4, 145:13
**mustard** [1] - 78:19
**mute** [1] - 95:10
**mutual** [1] - 66:24
**Myers** [3] - 2:18, 5:11, 5:24

# N

**nail** [1] - 8:14
**Nakamoto** [5] - 16:17, 43:16, 59:5, 105:18, 125:5
**Nakamoto's** [1] - 90:15
**name** [2] - 12:2, 14:10
**named** [2] - 85:25, 93:2
**Nancy** [1] - 4:3
**narrative** [1] - 85:8
**narrow** [2] - 121:9, 121:10
**natural** [4] - 96:2,

96:17, 107:20, 107:21
**nature** [8] - 53:6, 53:7, 58:9, 64:5, 92:16, 144:21, 144:25, 145:1
**near** [1] - 60:16
**necessarily** [8] - 57:22, 112:7, 113:4, 113:7, 135:13, 136:17, 146:6, 146:10
**necessary** [4] - 11:13, 15:17, 73:17, 111:13
**need** [33] - 5:13, 11:4, 11:7, 12:13, 14:4, 28:12, 30:4, 30:19, 36:15, 44:11, 44:20, 46:3, 50:13, 56:8, 60:25, 64:20, 64:21, 74:18, 82:23, 101:15, 102:10, 102:12, 118:1, 127:2, 127:6, 128:16, 128:17, 138:4, 148:20, 150:19, 151:13, 157:6, 157:14
**needed** [2] - 85:15, 156:4
**needless** [1] - 10:21
**needs** [9] - 18:14, 65:11, 72:13, 72:14, 81:15, 81:16, 95:10, 99:4, 116:17
**negative** [2] - 133:3, 144:2
**negatively** [1] - 134:1
**network** [57] - 17:13, 18:2, 18:5, 18:18, 18:19, 18:22, 18:25, 19:2, 19:8, 20:18, 21:6, 21:7, 21:11, 21:12, 25:7, 26:24, 28:12, 29:3, 29:6, 29:9, 29:10, 29:11, 29:18, 29:24, 29:25, 33:22, 38:7, 38:25, 39:1, 39:17, 41:2, 41:4, 43:20, 44:2, 44:9, 47:4, 47:5, 47:6, 47:8, 47:22, 47:23, 83:12, 84:21, 88:3, 88:8, 88:11, 94:13, 98:11, 111:18, 124:4, 124:9, 124:11, 141:3, 141:22
**networks** [1] - 40:17
**neutral** [4] - 10:16,

15:1, 15:3, 120:25
**never** [5] - 36:12, 40:6, 64:4, 70:19, 154:1
**New** [2] - 2:15
**new** [32] - 17:22, 24:8, 24:15, 25:25, 28:10, 28:24, 33:9, 35:17, 40:12, 40:16, 43:3, 90:1, 95:25, 96:1, 96:4, 96:5, 96:12, 96:14, 104:4, 104:21, 107:9, 107:10, 107:15, 107:16, 111:19, 111:23, 111:25, 116:23, 124:17, 148:5, 148:17
**newest** [1] - 111:19
**newly** [1] - 35:13
**next** [22] - 18:2, 21:17, 24:22, 27:9, 27:25, 28:4, 28:15, 28:22, 34:5, 36:4, 52:14, 66:11, 71:2, 86:9, 87:9, 90:17, 92:3, 102:18, 138:5, 157:15
**nexus** [1] - 85:8
**nine** [4] - 23:23, 27:7, 30:11, 30:13
**Ninth** [1] - 135:22
**NO** [1] - 1:2
**nobody** [3] - 23:19, 107:16, 154:2
**node** [28] - 18:24, 19:5, 20:3, 20:5, 26:12, 32:10, 32:13, 32:24, 33:9, 33:18, 34:4, 34:11, 35:10, 35:16, 35:18, 36:22, 37:4, 38:20, 39:18, 39:20, 40:5, 40:21, 40:22, 40:24, 42:4, 70:17, 152:25
**nodes** [68] - 18:18, 18:23, 19:2, 19:9, 19:11, 19:13, 19:14, 19:21, 19:23, 20:5, 20:6, 20:9, 20:12, 21:6, 25:16, 26:10, 26:25, 27:22, 27:23, 28:6, 31:4, 32:16, 32:22, 33:1, 33:7, 34:12, 34:23, 35:25, 36:3, 36:17, 36:25, 37:1, 37:10, 41:10, 42:8, 42:12, 42:16, 42:19, 42:25, 43:7, 47:17, 47:24, 63:20, 67:9, 70:15, 70:16,

80:7, 80:9, 88:2, 93:23, 93:24, 98:10, 98:15, 98:16, 106:19, 111:19, 111:20, 111:22, 111:23, 124:4, 124:9, 124:10, 124:11, 124:16, 124:17, 135:19
**nodes'** [1] - 21:7
**noise** [1] - 95:9
**nomadic** [1] - 98:10
**non** [3] - 73:13, 86:25, 89:12
**non-actionable** [1] - 86:25
**non-agreement** [1] - 73:13
**none** [2] - 83:24, 97:6
**nonetheless** [1] - 109:7
**North** [2] - 3:3, 158:24
**note** [4] - 14:19, 118:2, 151:13
**notes** [4] - 25:9, 123:3, 147:7, 149:5
**nothing** [14] - 14:6, 14:9, 16:11, 64:6, 83:22, 88:13, 89:9, 91:9, 92:21, 143:25, 151:16, 152:23, 152:25, 155:11
**notice** [3] - 11:20, 32:22, 135:11
**notion** [11] - 33:14, 42:1, 43:19, 45:22, 66:14, 106:5, 116:6, 136:8, 137:11, 153:17, 154:8
**November** [15] - 88:8, 105:6, 107:24, 109:8, 109:13, 110:7, 110:9, 110:12, 110:19, 112:2, 121:14, 122:12, 123:11, 124:8, 124:17
**nowhere** [6] - 60:16, 63:7, 65:9, 87:11, 87:23, 95:14
**number** [20] - 15:25, 21:21, 22:1, 22:5, 30:24, 31:2, 31:13, 38:20, 42:16, 42:18, 44:22, 48:17, 106:11, 109:3, 147:20, 147:21, 148:3, 148:16, 148:17
**Number** [1] - 4:21

**numbers** [2] - 123:10, 123:12
**NW** [1] - 2:19
**NYNEX** [2] - 60:5, 60:17

## O

**O'Melveny** [3] - 2:18, 5:11, 5:24
**objective** [4] - 54:22, 55:1, 64:8, 79:24
**objectively** [1] - 133:15
**obvious** [3] - 11:6, 16:10, 154:22
**obviously** [8] - 17:16, 48:25, 50:10, 123:10, 126:19, 127:17, 129:4, 149:18
**occurred** [11] - 24:9, 33:11, 41:3, 41:19, 41:20, 41:22, 45:6, 99:14, 103:13, 104:2, 104:11
**occurring** [2] - 24:4, 45:10
**occurs** [3] - 25:5, 28:10, 47:17
**October** [2] - 157:13, 158:23
**odds** [2] - 37:4, 37:25
**OF** [1] - 1:1
**offer** [3] - 85:13, 117:7, 117:10
**offhand** [1] - 125:24
**official** [2] - 24:12, 94:12
**Official** [1] - 3:2
**often** [1] - 41:10
**okey** [2] - 52:3, 101:13
**okeydoke** [1] - 134:17
**older** [2] - 111:20, 111:22
**once** [5] - 21:19, 29:23, 64:11, 65:24, 67:10
**one** [94] - 4:7, 16:8, 17:2, 20:6, 22:3, 22:8, 22:11, 22:16, 22:18, 23:15, 23:18, 24:11, 24:22, 25:8, 25:11, 25:17, 25:19, 26:5, 26:6, 26:7, 26:8, 26:16, 28:5, 28:11, 28:13, 29:15, 31:13, 32:24, 33:13, 33:16, 37:18, 37:20, 38:19, 42:17, 43:10,

44:7, 47:17, 49:10, 49:17, 50:8, 53:25, 54:16, 55:20, 63:11, 63:19, 68:10, 69:10, 69:13, 71:3, 72:5, 72:23, 73:20, 74:3, 74:8, 74:25, 75:15, 79:12, 79:13, 81:20, 83:6, 93:2, 95:5, 95:24, 96:22, 97:17, 99:8, 99:12, 103:18, 105:2, 105:25, 107:16, 108:12, 110:4, 110:7, 113:10, 113:13, 129:17, 136:4, 141:18, 142:18, 144:18, 147:22, 148:16, 151:25, 153:9, 153:11, 153:12, 153:24, 155:7, 156:6, 158:5
**One** [1] - 1:21
**ones** [3] - 16:1, 33:20, 39:5
**ongoing** [2] - 44:3, 104:6
**online** [6] - 19:16, 30:15, 42:25, 92:24, 92:25, 93:3
**open** [3] - 50:25, 54:3, 135:1
**Open** [4] - 40:18, 46:19, 85:12, 106:25
**operate** [1] - 125:23
**operates** [2] - 125:4, 125:11
**operating** [2] - 20:11, 102:8
**operations** [1] - 95:23
**opinion** [5] - 64:19, 64:23, 79:20, 110:7
**opportunity** [6] - 11:9, 14:25, 50:5, 52:17, 81:6, 148:19
**opposed** [4] - 10:17, 102:9, 111:9, 137:12
**opposite** [7] - 72:13, 72:22, 74:6, 74:18, 80:3, 152:24, 155:13
**opposition** [2] - 89:25, 90:5
**optics** [1] - 64:9
**option** [2] - 75:6, 96:13
**options** [1] - 96:15
**oral** [3] - 52:12, 86:18, 152:22
**order** [19] - 4:1, 8:15, 10:16, 10:20, 15:9,

16:1, 16:7, 21:16, 38:4, 52:11, 103:4, 116:16, 116:18, 117:12, 122:8, 122:22, 125:18, 157:12, 157:23
**ordering** [1] - 9:8
**ordinarily** [1] - 10:12
**ordinary** [1] - 102:24
**organize** [3] - 36:17, 36:25, 37:9
**organized** [1] - 28:21
**organizer** [1] - 37:18
**organizing** [1] - 37:10
**orgs** [1] - 122:17
**original** [10] - 25:3, 49:6, 56:23, 96:23, 103:23, 104:2, 105:17, 108:18, 108:19, 110:4
**originally** [3] - 105:25, 106:21, 153:19
**otherwise** [2] - 111:15, 112:21
**ought** [2] - 109:3, 135:24
**outcome** [11] - 40:1, 89:2, 89:13, 90:22, 90:25, 91:6, 91:22, 93:23, 110:22, 110:23, 110:24
**outline** [1] - 124:21
**outlined** [8] - 113:22, 122:2, 122:9, 125:5, 135:7, 136:20, 143:3, 144:17
**output** [27] - 22:13, 32:3, 35:20, 35:21, 68:23, 69:2, 69:12, 69:25, 71:1, 71:7, 71:9, 71:13, 71:18, 71:25, 72:2, 72:6, 73:15, 74:3, 129:17, 129:23, 129:25, 130:2, 133:13, 133:16, 133:20
**outset** [2] - 56:19, 58:6
**outside** [1] - 154:16
**overall** [1] - 132:22
**overnight** [1] - 157:14
**oversimplification** [1] - 17:16
**overview** [1] - 15:23
**own** [12] - 39:1, 42:4, 47:2, 48:21, 49:4, 58:8, 78:7, 105:23, 108:2, 128:12, 129:8, 151:22
**owned** [2] - 78:9, 84:2

**owner** [6] - 16:18, 40:21, 40:24, 84:3, 84:4, 84:8

## P

**P-E-P-P-E-R-M-A-N** [1] - 6:23
**p.m** [9] - 1:8, 1:8, 31:1, 51:7, 100:11, 158:17
**PACE** [7] - 2:6, 6:11, 51:21, 99:6, 100:23, 156:6, 158:14
**Pace** [6] - 6:12, 51:19, 98:23, 99:5, 100:22, 156:4
**Page** [2] - 1:10, 145:10
**page** [14] - 77:10, 90:7, 90:8, 123:20, 123:21, 123:24, 124:1, 138:20, 139:12, 139:20, 141:19, 145:9, 145:17, 152:5
**pages** [3] - 73:7, 73:11, 119:6
**painstakingly** [1] - 53:1
**PALLET** [4] - 2:21, 6:4, 51:17, 100:21
**Pallet** [3] - 6:5, 51:13, 100:20
**PALLET-VASQUEZ** [4] - 2:21, 6:4, 51:17, 100:21
**Pallet-Vasquez** [3] - 6:5, 51:13, 100:20
**paper** [2] - 50:2, 59:5
**papers** [7] - 4:17, 74:10, 78:12, 82:21, 87:4, 91:14, 122:9
**paragraph** [43] - 34:20, 36:8, 53:5, 57:7, 59:5, 61:5, 61:11, 73:8, 76:9, 87:17, 88:6, 88:7, 88:16, 88:23, 89:21, 89:25, 90:6, 90:8, 90:10, 91:25, 93:11, 94:20, 94:21, 98:24, 111:17, 115:17, 119:1, 122:7, 127:12, 131:12, 134:4, 134:16, 135:1, 140:23, 143:5, 144:7, 147:11, 147:16, 148:14, 149:2, 151:8, 151:11, 156:8

**paragraphs** [20] - 56:23, 58:5, 63:8, 65:12, 87:15, 88:5, 92:18, 92:21, 94:1, 113:13, 119:6, 123:7, 133:25, 134:6, 136:22, 138:16, 144:3, 144:11, 144:24, 151:7
**parallel** [18] - 78:17, 78:18, 79:2, 79:9, 79:17, 80:2, 84:22, 85:4, 103:2, 103:5, 113:21, 115:15, 116:10, 116:19, 119:19, 119:24, 122:23, 123:1
**parameters** [1] - 105:24
**pardon** [1] - 75:3
**parlance** [1] - 39:11
**parsing** [1] - 85:3
**part** [20] - 15:15, 15:23, 16:3, 16:4, 16:5, 17:6, 24:13, 46:1, 87:3, 87:6, 87:7, 87:8, 93:12, 94:2, 95:23, 96:3, 97:4, 106:21, 138:23, 140:8
**Part** [19] - 87:10, 87:14, 88:15, 89:5, 89:9, 90:11, 91:15, 91:23, 91:24, 92:8, 92:17, 92:20, 93:13, 128:16, 128:17, 128:19, 128:21, 128:22
**partial** [1] - 30:18
**partially** [1] - 30:18
**participant** [1] - 93:15
**participants** [3] - 38:24, 85:13, 141:22
**participate** [2] - 47:22, 148:7
**participated** [5] - 82:7, 83:23, 86:3, 92:10, 93:7
**participating** [1] - 83:18, 148:8, 148:11
**particular** [18] - 26:15, 31:7, 33:18, 35:21, 41:10, 44:23, 45:15, 45:16, 45:23, 50:12, 68:5, 68:7, 86:6, 114:22, 133:10, 149:13, 149:15, 149:16
**particularly** [1] - 82:22

**parties** [4] - 34:19, 62:5, 85:18, 157:25
**parts** [1] - 99:11
**Parts** [1] - 96:8
**party** [2] - 14:15, 71:7
**pass** [2] - 67:7, 102:16
**passages** [1] - 56:22
**past** [2] - 23:21, 72:20
**patch** [1] - 122:15
**patience** [1] - 157:19
**PATRICK** [1] - 2:18
**Patrick** [2] - 5:24, 51:13
**PAUL** [1] - 1:17
**pause** [9] - 4:14, 4:18, 56:3, 123:5, 127:9, 128:23, 138:18, 149:8, 149:25
**pay** [2] - 42:25, 70:17
**payment** [1] - 141:5
**Payward** [5] - 7:4, 7:7, 7:19, 12:4, 12:9
**PAYWARD** [1] - 2:10
**Payward/Kraken** [1] - 6:20
**Peace** [4] - 22:23, 23:2, 23:3, 23:6
**peer** [10] - 16:15, 18:1, 18:17, 141:4, 141:9
**peer-to-peer** [5] - 16:15, 18:1, 18:17, 141:4, 141:9
**peg** [1] - 97:23
**pendency** [1] - 86:1
**people** [45] - 42:4, 42:8, 43:6, 45:5, 48:8, 48:11, 55:18, 59:7, 68:1, 78:25, 79:20, 80:1, 83:24, 84:16, 85:19, 95:18, 99:20, 104:3, 105:19, 105:22, 106:8, 106:17, 107:3, 107:18, 107:23, 108:1, 108:25, 109:3, 109:4, 111:5, 119:8, 120:16, 122:19, 127:22, 128:1, 128:9, 130:12, 130:13, 130:22, 131:9, 132:3, 132:24, 135:5, 153:8, 154:15
**PEPPERMAN** [5] - 2:9, 6:18, 6:23, 51:25, 101:4
**Pepperman** [4] - 6:19, 6:22, 51:23, 101:3
**Per** [23] - 53:4, 53:8,

56:20, 59:9, 60:6, 60:18, 61:14, 61:16, 70:21, 70:24, 75:4, 76:23, 77:22, 122:25, 129:3, 144:16, 144:18, 144:25, 145:1, 146:15, 146:25, 151:24
**per** [14] - 38:9, 38:11, 57:18, 57:21, 57:25, 58:3, 58:5, 59:2, 59:13, 59:23, 60:10, 60:23, 145:13
**percent** [5] - 42:24, 42:25, 43:9, 43:10, 142:20
**percentage** [1] - 123:15
**Perez** [4] - 4:9, 5:5, 51:8, 101:10
**PEREZ** [4] - 1:20, 5:4, 51:11, 101:12
**perform** [2] - 19:19, 85:15
**performed** [1] - 34:12
**performs** [1] - 39:8
**perhaps** [2] - 21:10, 71:21
**period** [2] - 22:24, 28:21
**periodically** [1] - 39:10
**periods** [1] - 57:8
**permanent** [2] - 18:9, 18:10
**permission** [2] - 34:22, 127:13
**person** [6] - 12:17, 12:18, 55:20, 75:7, 105:18, 122:9
**personal** [5] - 10:20, 11:4, 11:7, 11:10, 13:25
**personality** [1] - 108:7
**perspective** [1] - 50:18
**persuaded** [1] - 89:11
**pertinent** [1] - 9:12
**phone** [3] - 55:13, 55:25, 56:16
**phonetic** [1] - 62:23
**phrase** [5] - 64:12, 66:8, 75:17, 92:4, 152:21
**pick** [4] - 81:10, 105:15, 153:12, 158:2
**picked** [1] - 27:22
**picture** [4] - 21:11,

58:20, 72:1, 75:20
**piece** [4] - 26:15, 58:19, 85:7, 125:8
**pierce** [1] - 69:24
**pile** [1] - 112:19
**pill** [3] - 64:5, 92:4, 138:10
**pivot** [1] - 84:10
**place** [10] - 34:24, 48:8, 52:22, 104:18, 106:22, 106:24, 120:13, 120:23, 144:4, 146:20
**plaintiff** [49] - 4:5, 4:7, 4:24, 7:22, 7:24, 9:17, 10:6, 12:7, 35:1, 39:25, 40:3, 44:24, 53:17, 57:3, 62:1, 62:3, 62:5, 62:7, 67:17, 70:1, 71:16, 72:10, 73:19, 73:23, 75:18, 87:17, 89:24, 91:4, 112:2, 126:13, 140:13, 141:4, 141:13, 142:23, 142:24, 143:1, 143:6, 143:10, 143:12, 147:11, 147:16, 148:16, 148:18, 148:24, 151:6, 151:12, 154:22, 155:5, 155:8
**PLAINTIFF** [2] - 1:5, 1:17
**plaintiff's** [7] - 4:22, 15:6, 56:9, 75:14, 81:22, 141:7, 149:15
**plaintiffs** [16] - 52:19, 62:17, 67:10, 75:10, 75:22, 76:18, 79:4, 80:6, 87:4, 87:6, 95:15, 97:14, 97:15, 97:23, 98:15, 141:2
**plan** [2] - 15:24, 16:5
**plank** [1] - 22:6
**planned** [2] - 122:7, 122:10
**plans** [1] - 8:2
**plausibility** [2] - 102:17, 117:19
**plausible** [3] - 102:11, 115:14, 116:2
**play** [3] - 18:15, 35:7, 74:24
**plea** [1] - 92:1
**plead** [17] - 8:23, 62:18, 78:12, 78:23, 79:19, 82:16, 102:10, 102:12,

103:3, 103:10, 115:14, 118:1, 118:4, 118:15, 127:1, 129:7
**pleaded** [2] - 84:12, 99:12
**pleading** [10] - 102:9, 102:13, 102:14, 112:1, 117:5, 117:17, 117:23, 118:17, 135:11, 154:19
**pleadings** [1] - 8:21
**pleads** [1] - 133:18
**pleased** [1] - 122:19
**pleases** [1] - 59:7
**pleasure** [1] - 13:1
**pled** [11] - 102:23, 103:1, 118:7, 126:23, 128:1, 128:14, 129:6, 133:25, 149:18, 149:23, 154:22
**plenty** [4] - 9:6, 11:1, 116:23, 157:2
**plus** [11] - 102:21, 103:5, 113:24, 114:5, 116:4, 119:5, 122:1, 122:21, 127:15, 128:8, 128:14
**pocket** [1] - 114:25
**point** [41] - 11:22, 18:25, 31:8, 44:10, 44:12, 44:20, 45:5, 46:2, 50:13, 54:14, 54:16, 66:12, 70:21, 73:4, 74:8, 79:4, 83:5, 84:1, 86:7, 97:21, 98:2, 98:4, 98:5, 100:3, 103:16, 106:12, 108:5, 108:8, 111:1, 127:20, 130:1, 135:21, 136:17, 139:17, 141:10, 146:2, 153:6, 153:23, 156:6, 156:9, 157:4
**pointed** [2] - 59:6, 117:20
**points** [8] - 50:18, 57:7, 61:8, 97:10, 98:23, 102:4, 129:11, 150:16
**poison** [3] - 64:5, 92:4, 138:10
**policies** [1] - 85:5
**policy** [1] - 124:23
**pool** [11] - 20:9, 20:10,

103:3, 103:10, 115:14, 118:1, 118:4, 118:15, 127:1, 129:7
**pooling** [1] - 26:25
**pools** [10] - 34:23, 36:7, 36:23, 37:24, 88:10, 88:11, 98:24, 99:20, 109:12, 116:16
**poor** [2] - 99:2, 131:19, 150:20
**poorly** [1] - 84:12
**pork** [1] - 17:13
**portion** [3] - 15:24, 135:1, 147:15
**posit** [1] - 111:4
**position** [2] - 139:10, 157:16
**possibility** [3] - 78:11, 79:20, 80:3
**possible** [3] - 17:8, 56:15, 129:15
**possibly** [1] - 58:2
**post** [1] - 142:23
**post-fork** [1] - 142:23
**potential** [2] - 73:18, 138:6
**potentially** [1] - 128:13
**potpourri** [1] - 58:24
**Powell** [26] - 6:20, 7:5, 7:7, 7:18, 86:14, 86:15, 86:23, 87:2, 87:12, 87:24, 88:7, 88:14, 88:15, 88:21, 88:25, 89:22, 90:18, 90:20, 91:19, 92:10, 92:12, 93:9, 93:24, 94:4, 96:7, 97:2
**POWELL** [1] - 2:10
**Powell's** [3] - 12:5, 12:9, 94:2
**power** [46] - 36:16, 36:22, 37:13, 42:12, 42:13, 43:20, 43:23, 57:9, 59:6, 61:7, 62:6, 67:11, 67:18, 67:20, 67:21, 67:23, 68:6, 68:8, 68:18, 69:6, 69:21, 71:6, 71:8, 73:17, 73:19, 87:19, 87:24, 89:7, 89:19, 89:20, 90:13, 91:12, 92:2, 97:7, 97:12, 99:9, 108:2, 110:19, 114:1, 115:18, 115:22, 116:13, 124:5, 152:2, 154:6, 155:14

**powerful** [1] - 90:21
**PowerPoint** [1] - 8:4
**powers** [1] - 71:8
**POWERS** [2] - 3:1, 158:23
**Powers** [1] - 158:23
**practice** [1] - 151:19
**practices** [1] - 90:15
**pre** [3] - 90:22, 91:6, 93:18
**pre-judge** [1] - 90:22
**pre-judged** [1] - 91:6, 93:18
**precede** [1] - 45:25
**preceded** [1] - 28:23
**precedents** [1] - 82:14
**preceding** [1] - 45:19
**predetermined** [1] - 110:16
**predicate** [1] - 62:21
**preferred** [2] - 42:8, 42:13, 100:1
**prefers** [1] - 100:1
**prejudice** [1] - 152:11
**preliminary** [2] - 12:13, 12:24
**premise** [1] - 129:24
**preparation** [6] - 116:25, 118:11, 118:14, 118:16, 118:23, 158:7
**preparatory** [1] - 16:9
**prepare** [3] - 10:21, 116:17, 117:11
**prepared** [2] - 10:22, 117:8
**prescribed** [1] - 59:13
**present** [6] - 11:10, 14:25, 41:19, 50:16, 53:2, 101:23
**presented** [3] - 17:9, 50:8, 107:12
**presents** [1] - 43:19
**preserve** [1] - 131:15
**pretty** [7] - 10:2, 11:6, 27:7, 34:2, 38:2, 85:20, 157:24
**prevail** [2] - 67:15, 67:17
**prevailing** [2] - 95:5
**prevent** [5] - 44:4, 44:7, 45:5, 45:9, 131:9
**prevented** [1] - 39:21
**prevents** [1] - 122:17
**previous** [2] - 24:1, 24:14
**previously** [2] - 28:9, 44:6
**price** [46] - 58:1,

58:13, 58:16, 64:24, 65:1, 67:23, 67:25, 68:3, 68:7, 68:15, 68:18, 68:19, 68:21, 68:22, 68:23, 69:1, 69:8, 69:25, 70:3, 70:9, 71:1, 71:6, 71:8, 71:13, 71:20, 71:24, 73:14, 74:1, 76:1, 76:2, 115:23, 129:18, 129:19, 129:23, 133:13, 133:15, 133:21, 155:12, 155:18, 156:10, 156:14, 156:18, 156:20
**Price** [1] - 2:22
**price-fixing** [5] - 58:1, 58:13, 58:16, 68:15, 68:21
**pricing** [1] - 129:20
**primary** [1] - 48:7
**principal** [2] - 67:25, 88:20
**principally** [1] - 82:8
**principles** [1] - 70:11
**printed** [1] - 106:10
**printing** [1] - 106:9
**private** [1] - 75:6
**privileged** [1] - 12:21
**probability** [1] - 117:20
**problem** [18] - 16:21, 26:14, 68:11, 68:12, 69:8, 77:15, 79:23, 99:21, 104:15, 106:2, 106:4, 121:25, 128:25, 144:1, 147:25, 148:1, 148:17, 150:8
**problems** [2] - 106:1, 147:23
**procedures** [2] - 10:7, 14:5
**proceed** [4] - 52:18, 56:19, 94:23, 151:4
**proceedings** [10] - 4:14, 4:18, 56:3, 123:5, 127:9, 138:18, 149:8, 149:25, 158:17, 158:20
**process** [4] - 21:9, 96:3, 101:17, 107:2
**product** [39] - 57:11, 62:2, 62:16, 62:21, 63:1, 63:2, 64:16, 65:4, 65:6, 65:10, 65:18, 65:20, 65:24, 65:25, 67:10, 67:13,

72:3, 72:15, 72:17, 85:4, 105:7, 120:2, 132:22, 132:23, 136:1, 137:7, 137:24, 137:25, 138:4, 138:8, 138:23, 138:25, 139:7, 140:8, 141:16, 151:18, 154:20, 155:6, 155:17
**Products** [1] - 67:22
**products** [3] - 64:25, 72:12, 151:22
**profitable** [1] - 116:13
**program** [6] - 22:11, 22:23, 28:6, 39:4, 95:21, 99:18
**programmers** [1] - 135:6
**programs** [3] - 22:2, 22:4, 39:9
**project** [2] - 157:20, 158:1
**pronounce** [1] - 14:10
**proof** [9] - 29:2, 29:5, 29:17, 29:23, 30:3, 34:11, 36:2, 43:21, 43:22
**proper** [4] - 63:19, 82:16, 153:15, 154:20
**property** [2] - 53:18, 75:8
**proposal** [3] - 33:14, 48:3, 131:15
**proposals** [6] - 41:6, 41:8, 46:18, 46:25, 85:18
**propose** [5] - 27:4, 27:25, 29:22, 47:16, 107:3
**proposed** [7] - 15:7, 15:22, 32:16, 42:3, 48:1, 107:6, 107:14
**proposing** [2] - 32:14, 33:9
**proposition** [1] - 82:15
**protocol** [25] - 32:17, 39:1, 42:3, 42:5, 42:8, 42:9, 42:13, 42:14, 42:22, 42:23, 43:2, 43:8, 45:11, 45:21, 46:19, 47:5, 47:7, 47:18, 111:18, 120:16, 120:21, 120:22, 121:16, 121:18
**protocols** [7] - 38:23,

39:2, 39:9, 39:10, 39:13, 42:17, 121:14
**prove** [1] - 26:15
**proven** [1] - 114:13
**proves** [2] - 79:4, 79:14
**provide** [5] - 48:8, 50:17, 73:23, 96:12, 126:13
**provides** [1] - 43:15
**proximate** [1] - 77:14
**proximately** [1] - 75:14
**public** [10] - 46:21, 89:3, 89:10, 89:14, 89:16, 89:17, 91:10, 95:24, 152:24, 153:1
**publications** [1] - 39:14
**publicly** [4] - 30:23, 40:19, 83:8, 91:20
**publish** [4] - 29:2, 34:5, 46:22, 48:1
**published** [1] - 31:7
**publishes** [1] - 32:13
**publishing** [1] - 35:19
**pull** [1] - 145:6
**pulled** [4] - 18:20, 30:16, 31:18, 41:17
**pulling** [1] - 15:2
**pun** [1] - 75:4
**purchase** [5] - 19:16, 20:24, 48:11, 48:12, 49:10
**purely** [1] - 145:16
**purpose** [1] - 132:1
**purposes** [2] - 44:7, 96:9
**pursuant** [3] - 10:8, 106:13, 108:1
**push** [1] - 68:9
**pushed** [1] - 40:11
**put** [31] - 22:2, 22:22, 22:24, 23:10, 23:13, 23:14, 24:23, 24:25, 28:21, 40:23, 41:8, 46:5, 46:6, 47:19, 47:25, 48:14, 52:23, 63:13, 66:23, 66:24, 66:25, 83:8, 85:17, 87:12, 95:12, 107:6, 110:12, 132:10, 148:12, 158:2
**putting** [6] - 13:4, 24:14, 28:4, 104:18, 142:22, 152:20
**puzzle** [18] - 29:9, 30:3, 30:8, 32:18, 32:19, 33:10, 34:6, 34:7, 34:10, 34:17,

35:11, 35:17, 36:16, 36:18, 36:23, 37:5, 37:20
**puzzles** [1] - 37:16

**Q**

**qualitative** [2] - 72:25, 74:4
**quality** [34] - 68:24, 69:3, 69:14, 69:25, 71:1, 71:7, 71:14, 71:17, 71:21, 72:8, 72:14, 73:15, 129:18, 129:22, 130:3, 131:6, 131:19, 131:23, 132:19, 132:20, 132:21, 133:11, 133:16, 133:23, 134:1, 134:7, 137:16, 138:15, 144:11, 151:20, 153:8, 154:1, 154:4, 154:10
**Quality** [4] - 54:11, 60:20, 145:3, 145:6
**quarrel** [2] - 66:14, 67:2
**questioning** [1] - 128:24
**questions** [23] - 9:2, 14:18, 14:20, 32:7, 56:13, 80:13, 82:20, 82:21, 86:5, 110:3, 117:22, 122:25, 127:8, 129:1, 129:13, 129:19, 135:8, 147:6, 150:10, 150:14, 152:18, 154:21
**quick** [2] - 9:20, 145:18
**quickly** [7] - 36:15, 56:15, 57:16, 62:9, 73:6, 73:12, 84:10
**Quinn** [5] - 5:21, 51:13, 80:19, 81:25, 100:16
**QUINN** [14] - 2:17, 5:20, 51:15, 80:19, 80:25, 81:2, 81:5, 82:3, 82:5, 84:3, 84:6, 84:10, 86:8, 100:17
**quite** [8] - 4:16, 45:2, 71:17, 73:8, 80:3, 151:11, 151:14, 152:7
**quotation** [1] - 43:16

**quote** [18] - 9:14, 53:6, 54:21, 58:9, 59:11, 59:12, 59:14, 59:18, 60:21, 64:14, 67:18, 67:19, 73:16, 73:23, 75:19, 78:7, 124:13
**quote/unquote** [1] - 89:7
**quoted** [4] - 75:17, 123:19, 123:23, 136:4
**quotes** [1] - 13:4
**quoting** [1] - 53:20

## R

**R.J** [1] - 2:6
**raise** [5] - 10:6, 67:23, 67:25, 100:3, 118:4
**raised** [3] - 102:4, 129:11, 150:24
**rancor** [1] - 104:3
**random** [1] - 85:1
**Rasmussen** [26] - 6:12, 7:16, 14:4, 14:8, 14:11, 14:12, 14:13, 14:20, 14:23, 14:24, 35:2, 50:18, 51:20, 52:4, 57:2, 59:6, 77:5, 80:18, 85:12, 98:20, 99:6, 100:24, 103:17, 106:20, 106:25, 135:16
**RASMUSSEN** [77] - 2:2, 6:13, 14:11, 14:24, 15:21, 19:4, 19:6, 20:1, 20:4, 20:14, 20:16, 21:15, 22:22, 23:7, 23:9, 23:23, 24:20, 25:13, 25:22, 27:7, 27:21, 28:5, 28:17, 29:4, 29:16, 29:21, 30:2, 30:6, 30:10, 30:13, 31:11, 31:22, 32:6, 32:9, 33:8, 33:15, 33:19, 33:22, 34:1, 35:3, 35:6, 35:9, 35:23, 35:25, 36:6, 37:12, 38:2, 38:23, 40:7, 40:9, 40:14, 41:1, 42:1, 42:20, 43:13, 43:15, 43:19, 44:17, 45:3, 45:18, 45:20, 46:10, 46:13, 47:11, 47:15, 48:4, 48:6, 48:25, 49:20, 50:4, 51:3, 51:22, 52:9, 98:22, 100:9,

100:25, 158:15
**Rasmussen's** [2] - 67:9, 77:10
**RASMUSSEN:** [1] - 26:22
**rate** [3] - 50:3, 61:8, 126:7
**rather** [17] - 18:4, 69:2, 69:10, 69:11, 69:13, 72:2, 72:23, 72:24, 73:1, 74:3, 109:17, 110:14, 116:10, 127:24, 146:20, 150:5, 150:6
**re** [4] - 9:7, 9:21, 10:2, 122:17
**re-orgs** [1] - 122:17
**re-read** [3] - 9:7, 9:21, 10:2
**reach** [1] - 11:8
**reached** [3] - 56:7, 109:18, 148:4
**read** [12] - 9:7, 9:11, 9:21, 9:23, 10:2, 21:2, 53:22, 97:2, 112:13, 117:18, 140:25, 145:18
**reading** [3] - 64:23, 142:11, 157:17
**ready** [1] - 27:2
**real** [8] - 9:20, 64:10, 78:9, 99:5, 119:13, 148:18, 153:23
**realize** [1] - 25:17
**realized** [1] - 13:23
**reallocate** [6] - 88:9, 113:25, 115:18, 116:16, 127:25, 128:10
**reallocated** [1] - 114:2
**reallocating** [3] - 90:13, 115:22, 116:13
**really** [68] - 8:13, 8:21, 9:16, 11:21, 13:9, 13:23, 14:18, 16:4, 16:12, 16:19, 17:1, 17:4, 17:10, 17:17, 20:20, 21:10, 34:11, 35:3, 36:14, 37:17, 37:21, 38:24, 43:5, 43:24, 44:11, 45:3, 46:13, 46:24, 47:2, 47:16, 47:24, 48:7, 49:5, 49:14, 59:24, 63:25, 64:18, 68:8, 68:10, 70:10, 74:22, 82:1, 94:15, 96:15, 99:1, 101:21, 103:22, 103:25,

105:19, 110:13, 115:2, 116:7, 117:15, 118:13, 119:9, 119:12, 120:25, 121:19, 130:1, 133:11, 135:24, 137:5, 146:18, 152:9, 153:13, 153:23, 157:16, 158:6
**realty** [1] - 125:2
**reason** [7] - 14:2, 75:8, 98:1, 103:12, 103:13, 141:4, 148:15
**Reason** [24] - 53:11, 53:13, 60:13, 61:20, 61:25, 62:21, 66:7, 67:6, 67:15, 67:17, 70:25, 71:3, 74:7, 74:9, 74:15, 74:19, 75:4, 76:24, 77:22, 122:24, 129:2, 133:18, 133:19, 134:20
**reasonable** [8] - 63:2, 63:4, 63:6, 63:8, 63:15, 65:22, 111:12, 118:5
**reasonably** [1] - 125:21
**rebuttal** [1] - 156:2
**receive** [4] - 8:3, 19:12, 32:16, 47:11
**recess** [3] - 57:7, 100:8, 100:11
**recipient** [1] - 116:17
**recognize** [1] - 49:11
**recognized** [2] - 57:17, 94:12
**recognizes** [1] - 13:13
**recommendation** [1] - 157:23
**record** [13] - 11:16, 12:11, 15:11, 15:12, 15:16, 15:18, 17:23, 18:6, 18:9, 18:10, 20:18, 24:8, 140:19
**recordkeeper** [1] - 20:25
**records** [1] - 18:4
**recover** [2] - 115:5, 126:13
**rectangular** [1] - 19:16
**red** [6] - 9:22, 63:4, 65:1, 65:3, 65:21, 66:2
**red-line** [1] - 9:22
**reduced** [1] - 137:16
**reducing** [5] - 53:19,

75:19, 76:24, 77:1, 77:17
**reduction** [3] - 129:17, 129:23, 131:23
**redundant** [1] - 86:22
**refer** [1] - 92:5
**referenced** [2] - 68:7, 123:7
**referred** [1] - 63:9
**referring** [5] - 146:6, 144:7, 144:8, 144:10, 145:22
**refined** [1] - 42:3
**refusal** [2] - 61:10, 152:1
**refuse** [1] - 60:2
**refused** [1] - 79:6
**refusing** [2] - 60:9, 60:12
**refutes** [1] - 69:25
**regard** [3] - 86:21, 97:11, 158:5
**regarding** [1] - 105:8
**regardless** [2] - 87:13, 90:25
**regular** [1] - 139:16
**regulation** [1] - 105:22
**regulations** [2] - 98:2, 98:8
**rejected** [1] - 34:15
**rejoin** [4] - 43:20, 124:4, 124:9, 124:10
**relate** [1] - 13:25
**related** [1] - 134:9
**relates** [1] - 156:8
**released** [5] - 40:19, 41:6, 42:4, 89:3, 90:16
**relevance** [1] - 138:10
**relevant** [40] - 62:1, 62:3, 62:8, 62:16, 62:21, 62:24, 62:25, 63:1, 63:2, 64:12, 64:16, 65:6, 65:9, 65:17, 65:19, 65:20, 65:23, 65:24, 66:4, 66:9, 66:20, 67:5, 67:13, 67:14, 67:19, 72:15, 72:17, 73:10, 97:11, 135:23, 138:25, 139:7, 151:13, 151:23, 153:7, 153:13, 153:15, 153:21, 155:5
**reliance** [3] - 124:25, 126:5, 126:15
**relied** [1] - 125:21
**relocated** [1] - 124:13
**rely** [3] - 79:4, 129:5,

150:3
**remain** [2] - 32:11, 33:2
**remark** [1] - 16:9
**remarkably** [1] - 76:8
**remember** [6] - 61:20, 65:8, 70:23, 72:15, 125:24, 125:25
**remembering** [1] - 11:20
**remotely** [1] - 13:17
**rendered** [1] - 141:20
**rent** [1] - 89:7
**rental** [1] - 152:25
**rented** [1] - 87:8
**renting** [4] - 87:7, 89:19, 91:12, 97:7
**repeat** [3] - 110:7, 113:22, 146:23
**repeatedly** [1] - 104:9
**repeating** [1] - 82:4
**repetition** [1] - 109:22
**reply** [7] - 11:19, 12:10, 59:17, 73:7, 73:11, 119:21, 150:19
**report** [1] - 157:23
**reported** [1] - 84:7
**REPORTED** [1] - 3:1
**REPORTER** [1] - 55:8
**Reporter** [1] - 3:2
**reporter** [5] - 11:21, 11:22, 12:2, 56:16, 150:20
**representation** [1] - 44:13
**represented** [1] - 20:7
**representing** [2] - 5:15, 6:14
**represents** [2] - 20:19, 21:5
**request** [3] - 8:9, 15:15, 150:10
**requesting** [1] - 8:2
**require** [3] - 57:12, 105:21, 117:5
**required** [7] - 54:24, 99:15, 102:21, 118:17, 118:23, 118:24, 119:5
**requirement** [2] - 49:2, 85:4
**requirements** [1] - 92:22
**requires** [3] - 34:7, 97:1, 103:4
**requiring** [1] - 117:18
**reserves** [1] - 57:20
**resistance** [1] - 69:19
**resolve** [1] - 154:9

**resolving** [1] - 77:9
**resource** [1] - 36:11
**resource-intensive**
   [1] - 36:11
**resources** [3] - 34:7,
   83:9, 83:20
**respect** [9] - 81:11,
   82:5, 83:1, 84:22,
   94:24, 122:5,
   122:13, 137:2,
   152:18
**respectfully** [2] - 74:4,
   152:10
**respective** [1] - 84:21
**respond** [4] - 129:10,
   139:21, 142:15,
   157:6
**responded** [2] - 89:25,
   152:19
**responding** [2] - 8:1,
   8:9
**response** [7] - 11:19,
   12:7, 12:8, 85:5,
   105:4, 117:21,
   138:19
**rest** [5] - 4:8, 29:11,
   29:17, 80:4, 80:12
**restrain** [1] - 67:13
**restraint** [9] - 54:19,
   62:6, 68:1, 71:7,
   74:12, 74:17, 74:18,
   74:20, 75:1
**restricting** [1] - 134:13
**restriction** [1] - 79:10
**restrictions** [1] - 79:5
**result** [17] - 22:12,
   22:23, 22:25, 23:15,
   53:18, 75:18, 82:3,
   104:22, 107:10,
   112:8, 114:6, 130:4,
   131:7, 137:16,
   138:14, 143:8,
   144:12
**resulted** [3] - 134:14,
   139:2, 153:4
**results** [1] - 73:24
**return** [1] - 144:7
**reveal** [1] - 118:5
**review** [4] - 15:6, 50:2,
   52:7, 85:17
**reviewed** [1] - 46:2
**reviewing** [1] - 52:7
**revisit** [1] - 73:11
**reward** [5] - 35:13,
   35:16, 35:25, 36:24,
   37:5
**rewarded** [1] - 148:13
**rewards** [1] - 39:3
**Richfield** [4] - 53:20,
   75:17, 76:4, 76:14

**rid** [1] - 25:22
**ridiculously** [1] -
   110:2
**rig** [1] - 103:14
**rigged** [3] - 111:15,
   113:8, 146:22
**rigging** [20] - 53:7,
   58:10, 58:12, 58:13,
   58:16, 59:9, 59:16,
   59:19, 59:22, 68:16,
   104:17, 144:18,
   144:22, 145:1,
   146:17, 146:25,
   147:2, 151:24, 152:4
**rigor** [1] - 64:10
**rise** [1] - 56:25
**road** [1] - 153:11
**Roberts** [2] - 8:19,
   140:18
**Roger** [1] - 79:22
**role** [5] - 19:19, 19:21,
   46:16, 48:7
**roll** [1] - 100:16
**room** [1] - 55:19
**rooms** [1] - 58:2
**Ross** [2] - 8:19, 9:1
**round** [1] - 97:24
**routine** [1] - 41:3
**routinely** [1] - 109:17
**RPR** [2] - 3:1, 158:23
**rule** [8] - 39:2, 39:6,
   39:7, 39:8, 94:24,
   94:25, 95:1, 95:5,
   95:6, 96:4, 111:21,
   111:22, 111:23,
   112:3, 112:6, 113:3,
   113:9
**Rule** [39] - 53:4, 53:11,
   53:13, 59:9, 60:6,
   60:13, 60:18, 61:16,
   61:20, 61:25, 62:21,
   66:7, 67:6, 67:15,
   67:17, 70:24, 70:25,
   71:3, 74:7, 74:9,
   74:15, 74:19, 75:3,
   75:4, 76:23, 77:22,
   102:9, 102:13,
   102:14, 117:4,
   117:5, 122:24,
   129:2, 133:18,
   133:19, 134:20,
   149:10, 154:25
**rules** [1] - 38:24
**ruling** [2] - 98:7,
   111:13
**run** [4] - 37:1, 40:10,
   40:17, 40:18
**running** [1] - 99:20,
   151:6, 151:10
**runs** [2] - 22:12, 37:3

**RUSMUSSEN** [2] -
   14:9, 46:5

## S

**safe** [2] - 81:9, 158:11
**sale** [1] - 58:14
**sales** [2] - 75:25, 76:3
**sane** [1] - 81:9
**satisfied** [1] - 62:11
**satisfies** [2] - 62:10,
   147:3
**satisfy** [5] - 53:13,
   62:18, 76:4, 77:12,
   78:2, 117:13, 149:10
**satisfying** [2] - 80:11,
   92:22
**Satoshi** [1] - 16:17
**Saturday** [7] - 18:21,
   19:24, 20:11, 25:16,
   25:18, 25:22
**save** [1] - 9:25
**saved** [1] - 10:18
**saw** [1] - 67:8
**scalability** [11] - 38:6,
   108:10, 111:7,
   113:3, 120:22,
   130:5, 130:7,
   130:12, 130:25,
   134:9, 134:13
**scalable** [8] - 103:25,
   104:5, 131:8, 131:9,
   133:2, 134:10,
   148:21, 153:21
**scale** [5] - 38:17,
   121:18, 141:8,
   152:20, 152:22
**scenario** [1] - 37:9
**schedule** [2] - 106:23,
   157:16
**Scheduled** [1] - 1:8
**scheduled** [1] - 41:5
**scheme** [44] - 83:11,
   83:15, 83:23, 84:20,
   86:19, 86:24, 86:25,
   87:3, 87:6, 87:12,
   87:14, 88:15, 88:22,
   88:25, 89:6, 89:10,
   89:18, 89:22, 90:11,
   90:21, 91:4, 91:16,
   91:23, 91:24, 92:17,
   92:20, 93:12, 93:13,
   93:15, 94:2, 94:4,
   94:8, 95:17, 96:17,
   96:24, 97:5, 122:20,
   128:17, 128:19,
   128:21, 152:23,
   152:25, 153:4
**school** [1] - 90:20
**script** [1] - 121:23

**scroll** [1] - 31:19
**scuttlebutt** [1] -
   127:18
**se** [12] - 57:18, 57:21,
   57:25, 58:3, 58:5,
   59:2, 59:13, 59:23,
   60:10, 60:23, 145:13
**Se** [23] - 53:4, 53:8,
   56:20, 59:9, 60:6,
   60:18, 61:14, 61:16,
   70:21, 70:24, 75:4,
   76:23, 77:22,
   122:25, 129:3,
   144:16, 144:18,
   144:25, 145:1,
   146:15, 146:25,
   151:24
**search** [5] - 30:16,
   31:8, 62:23, 68:11
**searching** [1] - 23:5
**Second** [2] - 78:5,
   135:22
**second** [17] - 16:3,
   16:5, 18:3, 25:8,
   38:10, 38:11, 53:10,
   61:19, 62:3, 79:2,
   81:20, 93:12,
   103:18, 136:18,
   138:17, 149:4
**secondly** [1] - 13:16,
   57:3, 154:23
**seconds** [2] - 151:1,
   152:16
**secretive** [1] - 89:19
**Section** [7] - 74:25,
   75:2, 75:7, 75:11,
   82:16, 82:17, 129:4
**secure** [2] - 21:23,
   25:2
**secured** [1] - 18:10
**see** [35] - 8:8, 12:18,
   21:19, 22:14, 24:15,
   26:5, 27:8, 30:15,
   31:23, 31:25, 32:24,
   38:13, 41:23, 55:18,
   55:21, 55:25, 59:17,
   63:24, 66:1, 69:23,
   88:6, 107:11,
   107:13, 114:18,
   119:3, 134:17,
   135:18, 142:11,
   144:14, 145:21,
   146:7, 147:7,
   147:16, 150:1,
   154:21
**seeing** [4] - 50:1,
   78:10, 110:4, 110:6
**seem** [4] - 12:16,
   102:7, 144:20,
   145:15

**segueing** [1] - 116:15
**segues** [1] - 54:6
**selected** [1] - 57:20
**self** [7] - 47:12, 69:25,
   79:12, 79:18,
   128:11, 156:25,
   157:3
**self-funded** [1] - 47:12
**self-interest** [5] -
   79:12, 79:18,
   128:11, 156:25,
   157:3
**self-refutes** [1] - 69:25
**sell** [3] - 48:9, 95:19,
   132:17
**seller** [2] - 68:17,
   68:19
**sellers** [3] - 58:14,
   68:14, 68:21
**selling** [4] - 48:11,
   68:15, 156:13,
   156:25
**send** [2] - 85:19,
   112:15
**sending** [5] - 9:22,
   22:16, 22:17, 27:12,
   28:8
**sends** [6] - 21:3,
   22:10, 22:11, 22:15,
   22:18
**sense** [12] - 13:14,
   28:21, 43:13, 49:14,
   50:19, 97:11, 109:2,
   124:25, 125:12,
   146:9, 153:13,
   154:23
**sensitivities** [1] -
   64:24
**sent** [1] - 26:24
**sentence** [3] - 90:17,
   108:16, 110:2
**separate** [2] - 41:14,
   151:18
**separately** [1] -
   139:17
**September** [3] - 1:6,
   15:8, 31:1
**sequitur** [1] - 89:12
**serial** [2] - 21:25, 22:5
**series** [6] - 8:3, 24:6,
   44:15, 46:3, 78:24,
   83:4
**seriously** [1] - 119:10
**seriousness** [1] -
   12:22
**serve** [1] - 133:10
**server** [2] - 19:5, 99:8
**servers** [10] - 34:23,
   88:10, 91:13, 99:24,
   110:9, 116:23,

127:14, 127:22,
127:23, 128:10
**serves** [1] - 105:4
**services** [1] - 97:20
**set** [28] - 5:21, 5:25,
13:8, 21:25, 46:24,
82:20, 86:6, 95:2,
95:5, 95:6, 96:4,
96:25, 106:23,
111:20, 111:21,
111:22, 111:23,
113:3, 125:22,
138:1, 143:6,
143:10, 143:16,
147:12, 147:20,
153:19, 154:5,
154:19
**sets** [10] - 39:2, 39:6,
39:7, 39:8, 87:5,
94:24, 94:25, 112:3,
112:6, 113:9
**setting** [1] - 16:4
**settle** [1] - 49:22
**settled** [1] - 4:16
**seven** [2] - 20:16,
38:11
**Seventh** [1] - 1:18
**several** [2] - 55:18,
61:24
**shall** [1] - 75:2
**shallowed** [1] - 55:5
**shaping** [1] - 133:9
**share** [4] - 17:3,
38:25, 58:21, 73:9
**shares** [1] - 17:11
**Sherman** [5] - 8:23,
70:11, 74:25, 75:2,
129:4
**shift** [2] - 23:11, 139:3
**shoes** [2] - 130:17,
132:10
**shopping** [1] - 20:23
**short** [1] - 156:16
**short-term** [1] -
156:16
**shortcut** [1] - 23:5
**shorter** [1] - 23:12
**shortly** [1] - 21:9
**shout** [1] - 123:21
**show** [25] - 29:2,
29:10, 31:20, 41:16,
53:12, 53:17, 53:21,
54:10, 62:7, 63:9,
64:20, 74:18, 74:19,
78:21, 78:22, 92:17,
92:18, 102:11,
115:9, 115:12,
116:5, 117:10,
119:4, 145:9, 157:3
**showing** [14] - 18:23,

20:4, 22:8, 54:25,
65:16, 67:9, 72:13,
72:22, 73:17, 74:5,
74:18, 79:16, 79:17,
151:16
**shown** [2] - 47:2,
135:16
**shows** [7] - 30:18,
30:22, 41:18, 57:14,
74:20, 107:12,
155:13
**sic** [1] - 118:22
**sic}** [1] - 60:19
**side** [6] - 58:17, 58:22,
65:22, 68:16, 72:20,
74:10
**side-step** [1] - 72:20
**sign** [2] - 37:22, 37:23
**signal** [4] - 31:4, 42:8,
90:23, 91:7
**signals** [3] - 91:7,
91:10
**significance** [3] -
13:13, 127:12, 128:6
**significantly** [1] -
67:23
**signify** [3] - 32:20,
33:9, 36:3
**similar** [1] - 85:5
**similarly** [2] - 79:8,
106:11
**SIMMONS** [34] - 2:17,
5:10, 5:17, 7:15,
12:15, 51:5, 51:18,
52:15, 55:15, 55:20,
55:24, 56:4, 56:11,
56:15, 56:18, 61:2,
63:17, 63:22, 63:24,
66:16, 68:9, 70:13,
71:15, 71:19, 71:22,
72:3, 73:5, 100:15,
150:25, 151:3,
151:6, 155:1,
155:21, 158:13
**sIMMONS** [1] - 155:4
**Simmons** [24] - 5:10,
5:15, 7:12, 12:12,
51:12, 52:14, 55:4,
55:10, 56:6, 56:9,
70:8, 80:17, 81:10,
82:6, 83:15, 100:14,
102:12, 135:9,
135:13, 136:7,
150:22, 152:12,
155:20, 155:21
**Simmons'** [1] - 98:21
**simple** [1] - 97:4
**simplest** [2] - 17:8,
21:11
**simply** [2] - 18:24,

96:22
**single** [6] - 18:3, 19:5,
20:25, 21:2, 36:14,
84:14
**sites** [1] - 39:2
**sitting** [5] - 8:20,
13:17, 28:25, 107:5,
150:21
**situated** [1] - 79:8
**situation** [1] - 57:5
**six** [4] - 18:16, 41:3,
63:5, 106:23
**six-cylinder** [1] - 63:5
**size** [5] - 22:5, 58:15,
108:9, 111:7, 131:17
**skill** [2] - 46:24, 47:2
**skilled** [2] - 13:2,
158:6
**slide** [34] - 15:5,
15:16, 15:22, 16:8,
17:7, 17:24, 18:2,
18:16, 20:16, 21:15,
21:17, 22:7, 23:23,
24:2, 27:9, 30:10,
30:11, 30:13, 30:15,
32:6, 34:1, 35:9,
36:6, 38:5, 38:23,
39:12, 43:15, 44:1,
46:14, 46:16, 48:6,
52:5, 56:24, 75:21
**slides** [1] - 30:7,
35:14, 46:14, 67:9,
69:10
**slowly** [1] - 11:20
**small** [1] - 134:10
**smaller** [1] - 123:15
**soft** [2] - 39:14, 39:16
**software** [93] - 19:1,
22:2, 22:4, 28:6,
28:15, 39:8, 39:9,
39:13, 40:2, 40:4,
40:10, 40:14, 40:15,
40:17, 40:18, 40:19,
40:22, 40:23, 41:2,
42:3, 42:5, 42:7,
42:17, 42:21, 42:23,
44:3, 45:10, 45:21,
46:7, 46:8, 46:18,
46:19, 47:7, 47:15,
47:17, 47:18, 47:19,
47:25, 48:2, 48:16,
63:20, 83:6, 83:7,
84:15, 84:24, 85:14,
90:25, 92:13, 92:14,
92:15, 93:8, 93:9,
94:22, 95:1, 97:19,
98:11, 102:25,
104:21, 105:24,
106:3, 106:13,
106:21, 106:22,

106:24, 107:1,
107:3, 107:5, 107:7,
107:9, 107:15,
107:20, 107:24,
108:2, 109:19,
110:15, 110:20,
113:1, 113:7,
113:18, 120:7,
121:13, 121:16,
125:4, 125:9,
125:10, 125:15,
125:16, 125:17,
131:4, 131:8,
143:13, 146:20
**solid** [1] - 38:3
**solution** [4] - 34:9,
34:13, 34:14, 105:19
**solve** [9] - 29:9, 35:11,
36:16, 36:18, 37:15,
37:19, 99:21, 147:25
**solved** [8] - 26:14,
30:8, 32:18, 33:10,
35:17, 105:25,
106:2, 148:1
**solving** [7] - 34:5,
36:23, 37:5, 106:4,
147:22, 148:17
**someone** [2] - 16:23,
146:11
**something's** [1] -
57:25
**sometimes** [3] - 55:4,
55:11, 93:3
**somewhat** [2] - 89:12,
143:4
**somewhere** [5] - 23:4,
28:2, 47:23, 63:13
**soon** [2] - 158:8,
158:10
**sophisticated** [1] -
36:13
**sorry** [6] - 62:15,
93:12, 101:14,
133:3, 137:20, 144:6
**sort** [10] - 30:13, 38:8,
56:7, 69:16, 88:5,
89:19, 96:16,
106:14, 125:2,
148:10
**sorts** [1] - 22:5
**sought** [1] - 131:15
**sound** [2] - 13:21,
62:17
**sounds** [6] - 11:14,
64:5, 109:21,
112:11, 116:24,
118:14
**Source** [4] - 40:18,
46:19, 85:12, 106:25
**source** [1] - 41:17

**Southeast** [2] - 1:18,
1:21
**Southern** [1] - 81:18
**SOUTHERN** [1] - 1:1
**sow** [1] - 49:15
**space** [1] - 31:20
**speaker** [5] - 55:11,
55:15, 55:19, 55:20,
55:23
**speaking** [3] - 7:13,
7:17, 155:20
**specialized** [1] - 19:15
**specific** [12] - 30:16,
37:14, 44:19, 47:3,
47:5, 47:6, 80:16,
87:1, 118:14, 134:3,
150:1, 154:2
**specifically** [4] -
17:19, 19:18, 122:6,
145:8
**specificity** [1] - 92:22
**spelled** [1] - 12:1
**spend** [6] - 16:21,
25:9, 30:19, 47:4,
47:6, 54:4
**spending** [5] - 8:20,
16:23, 44:5, 101:18,
133:17
**spent** [4] - 28:9, 44:6,
54:4, 129:11
**spin** [1] - 95:23
**split** [3] - 36:24, 37:6,
38:16
**splits** [1] - 43:3
**spoken** [2] - 83:24,
84:18
**sprang** [1] - 16:10
**square** [1] - 97:23
**squares** [1] - 33:7
**staff's** [1] - 152:9
**stage** [1] - 82:23
**stakeholders** [4] -
90:23, 91:8, 91:9,
91:11
**stakeout** [1] - 58:4
**stand** [3] - 12:5,
128:19, 128:20
**stand-alone** [1] - 12:5
**standard** [3] - 102:17,
117:17, 117:20
**standards** [2] - 78:3,
154:19
**standing** [5] - 130:17,
143:4, 147:9,
147:10, 148:23
**standpoint** [1] - 63:10
**stands** [1] - 82:15
**Starbucks** [2] - 109:5,
134:11
**start** [14] - 4:22, 8:18,

9:4, 10:5, 15:21, 24:21, 40:2, 40:5, 48:11, 50:24, 93:12, 131:14, 153:24, 157:17
**start-up** [1] - 131:14
**started** [1] - 112:17
**starting** [4] - 9:20, 87:14, 101:14, 119:2
**starts** [2] - 88:18, 91:24
**state** [7] - 41:22, 44:9, 102:6, 119:14, 126:4, 126:12, 149:16
**statement** [13] - 34:21, 89:10, 89:12, 89:16, 89:17, 103:20, 114:15, 116:22, 117:6, 124:23, 139:7, 139:12, 156:21
**statements** [9] - 89:3, 89:6, 89:15, 93:5, 116:12, 119:7, 142:14, 152:24, 153:1
**STATES** [2] - 1:1, 1:14
**States** [3] - 3:2, 98:9, 158:24
**stating** [1] - 82:17
**statute** [3] - 75:6, 75:7, 86:25
**statutes** [2] - 74:24, 86:20
**stay** [2] - 30:11, 158:11
**staying** [1] - 81:9
**stems** [1] - 81:18
**STENOGRAPHICAL LY** [1] - 3:1
**step** [12] - 51:1, 53:3, 53:10, 53:16, 53:22, 54:8, 56:20, 61:15, 61:19, 72:20, 122:14, 138:5
**steps** [6] - 52:18, 52:20, 54:8, 56:20, 77:21, 83:22
**stick** [2] - 69:22, 111:8
**stifle** [1] - 132:2
**stifling** [1] - 132:8
**still** [21] - 5:13, 19:12, 34:2, 39:17, 39:18, 39:19, 43:3, 53:2, 81:24, 104:14, 109:19, 109:21, 110:9, 110:18, 110:19, 121:3, 127:1, 139:5,

141:16, 156:16, 157:1
**Stock** [2] - 95:21, 115:4
**stock** [8] - 17:13, 95:20, 114:22, 115:1, 115:2, 115:5
**stop** [17] - 15:14, 23:2, 26:20, 31:6, 68:4, 86:5, 94:17, 103:18, 105:6, 108:12, 114:8, 116:21, 131:11
**stopping** [3] - 141:24, 143:23, 143:25
**store** [3] - 24:4, 103:24, 130:14
**storing** [4] - 109:23, 110:5, 130:19, 131:2
**straws** [1] - 61:16
**Street** [4] - 1:18, 2:3, 2:11, 2:19
**strikes** [1] - 117:14
**string** [1] - 22:4
**stronger** [2] - 25:2
**structure** [1] - 131:16
**struggling** [1] - 141:16
**studied** [1] - 9:24
**studying** [2] - 8:21, 59:4
**stuff** [1] - 87:20
**stuffed** [2] - 91:18, 109:14
**stuffing** [1] - 91:22
**stylized** [3] - 24:5, 30:13, 32:12
**subject** [4] - 17:9, 60:13, 62:6, 106:18
**subjective** [4] - 133:12, 133:16, 133:20, 133:22
**submit** [5] - 12:1, 46:25, 74:4, 80:21, 152:6
**submitting** [1] - 50:2
**subscribers** [1] - 69:17
**subsequent** [1] - 28:11
**subset** [1] - 19:13
**substantive** [3] - 75:3, 76:15, 84:14
**substitutability** [1] - 155:18
**substitute** [3] - 63:4, 63:6, 65:22
**substitutes** [4] - 63:3, 63:8, 63:15, 65:16
**subtle** [1] - 112:9

**succeed** [1] - 29:22
**succeeded** [1] - 122:20
**successful** [4] - 17:2, 27:4, 42:19, 61:24
**successfully** [2] - 147:22, 148:12
**sue** [1] - 75:9
**sued** [1] - 75:10
**suffer** [1] - 76:2
**suffered** [1] - 104:8
**sufficient** [8] - 20:24, 73:17, 102:16, 106:17, 113:19, 118:17, 118:24, 122:22
**sufficiently** [2] - 135:12, 149:11
**suggest** [10] - 33:17, 52:19, 52:21, 52:25, 53:25, 65:5, 83:22, 87:2, 103:1, 125:1
**suggesting** [7] - 70:9, 70:11, 112:15, 112:22, 112:23, 127:19, 128:2
**suggestion** [1] - 107:10
**Suite** [4] - 2:4, 2:7, 2:11, 2:23
**Sumberg** [2] - 2:21, 6:5
**summarize** [1] - 102:5
**summary** [1] - 135:25
**summing** [1] - 152:12
**Sunday** [1] - 30:17
**supplement** [1] - 15:11
**suppliers** [1] - 65:25
**supply** [5] - 65:25, 66:6, 106:6, 146:10, 146:11
**support** [3] - 43:6, 81:16, 115:23
**supported** [5] - 82:10, 83:7, 83:8, 83:19, 91:1
**supporting** [2] - 43:7, 83:10
**supposed** [2] - 72:24, 107:21
**supposedly** [1] - 96:19
**Supreme** [1] - 53:20, 54:11, 54:17, 54:18, 54:20, 60:4, 60:13, 60:17, 75:15, 78:3, 78:18
**surprised** [1] - 112:14
**survive** [2] - 78:22,

107:9
**survives** [2] - 11:3, 11:12
**SV** [42] - 39:24, 39:25, 40:4, 40:23, 41:24, 45:11, 53:25, 57:5, 57:8, 61:7, 61:8, 61:12, 63:10, 63:13, 63:21, 69:15, 69:16, 72:3, 89:4, 94:23, 96:12, 96:14, 107:23, 113:3, 113:10, 114:3, 120:16, 120:21, 133:9, 138:21, 139:3, 139:17, 142:25, 143:12, 143:13, 143:17, 143:18, 151:9, 151:15, 151:20, 155:10, 155:13
**SV's** [1] - 72:10
**switch** [2] - 14:2, 65:2
**symbol** [9] - 49:5, 49:9, 49:11, 49:18, 95:16, 95:18, 95:25, 96:23
**symbols** [1] - 49:15
**sync** [1] - 21:7
**synchronization** [1] - 21:8
**synchronized** [1] - 32:11
**synchronizing** [1] - 18:14
**system** [8] - 20:20, 21:22, 39:19, 39:21, 45:23, 107:2, 132:25, 141:5
**systems** [4] - 16:25, 20:21, 40:9, 125:5

## T

**talks** [2] - 54:17, 65:13
**tampering** [1] - 25:6
**tangent** [1] - 112:16
**taxing** [1] - 13:22
**teach** [1] - 14:13
**Tech** [2] - 34:22, 127:13
**technical** [3] - 10:17, 21:19, 46:6
**technically** [1] - 9:11
**Technologies** [7] - 6:15, 90:14, 109:11, 110:8, 124:7, 124:15, 127:22
**TECHNOLOGIES** [1] - 2:3

**technologies** [3] - 16:12, 16:19, 141:2
**Technology** [3] - 88:10, 123:9, 123:12
**technology** [10] - 15:24, 16:10, 16:10, 16:15, 16:20, 17:14, 17:17, 85:2, 116:17, 118:24
**telephone** [1] - 78:17
**TELEPHONIC** [1] - 1:12
**temporarily** [1] - 90:13
**tend** [3] - 78:10, 79:19, 80:2
**term** [10] - 29:3, 62:24, 67:5, 70:3, 71:17, 133:12, 156:15, 156:16, 156:18, 157:2
**terms** [9] - 8:12, 11:25, 17:8, 58:14, 65:17, 121:8, 139:18, 147:2, 148:4
**test** [6] - 49:25, 60:17, 76:4, 76:14, 78:9, 78:10
**Texas** [1] - 2:4
**text** [2] - 22:24, 23:1
**thankfully** [1] - 66:18
**THE** [294] - 1:13, 1:17, 2:2, 2:9, 2:17, 4:15, 4:19, 5:3, 5:7, 5:12, 5:19, 5:22, 6:1, 6:3, 6:8, 6:16, 6:21, 6:24, 7:2, 7:6, 7:9, 7:11, 7:18, 7:21, 7:25, 10:23, 10:25, 11:14, 12:25, 14:8, 14:10, 14:12, 15:14, 19:3, 19:5, 19:23, 20:2, 20:8, 20:15, 21:14, 22:21, 23:2, 23:8, 23:22, 24:19, 25:8, 25:14, 26:2, 27:6, 27:13, 28:2, 28:14, 28:19, 29:15, 29:20, 29:25, 30:5, 30:9, 30:12, 31:6, 31:21, 32:5, 32:8, 33:5, 33:13, 33:16, 33:20, 33:25, 34:19, 35:5, 35:8, 35:20, 35:24, 36:5, 37:8, 38:1, 38:22, 39:23, 40:8, 40:13, 40:25, 41:25, 42:15, 43:12, 43:14, 43:18, 44:15, 44:20, 45:13, 45:19, 45:22, 46:9, 46:12, 47:9,

47:14, 48:1, 48:5, 48:13, 49:17, 49:24, 50:6, 50:19, 51:8, 51:12, 51:19, 51:23, 52:3, 55:4, 55:8, 55:9, 55:18, 55:21, 56:1, 56:5, 56:14, 56:17, 60:24, 63:16, 63:18, 63:23, 66:12, 68:4, 70:2, 71:13, 71:16, 71:20, 73:2, 73:4, 80:14, 80:24, 81:1, 81:4, 81:20, 81:25, 82:4, 84:1, 84:5, 84:9, 86:7, 86:9, 86:12, 86:14, 90:6, 90:9, 94:17, 94:19, 95:10, 97:8, 97:16, 98:19, 99:1, 100:5, 100:12, 100:14, 100:16, 100:18, 100:20, 100:22, 100:24, 101:1, 101:5, 101:8, 101:10, 101:13, 101:25, 103:18, 105:1, 105:12, 108:12, 108:15, 108:18, 108:22, 109:7, 109:10, 111:16, 112:10, 112:13, 113:9, 113:15, 114:8, 114:10, 114:19, 116:21, 117:3, 117:14, 118:4, 118:9, 118:19, 118:21, 118:25, 119:16, 120:4, 120:7, 120:18, 121:2, 121:11, 121:15, 121:22, 123:2, 123:6, 123:16, 123:24, 124:3, 124:14, 124:20, 125:14, 125:20, 126:2, 126:4, 126:7, 126:9, 126:12, 126:20, 126:23, 126:25, 127:7, 127:10, 128:4, 128:15, 128:23, 130:11, 130:16, 131:11, 131:22, 131:25, 132:10, 132:19, 133:5, 133:8, 133:15, 134:5, 134:17, 134:20, 136:1, 136:4, 136:8, 137:4, 137:7,

137:13, 137:18, 137:20, 137:23, 138:4, 138:8, 138:17, 138:19, 140:5, 140:8, 140:11, 140:13, 140:17, 140:20, 140:24, 141:15, 142:3, 142:6, 142:8, 142:13, 142:17, 143:17, 143:19, 143:23, 144:6, 144:14, 145:3, 145:9, 145:11, 145:19, 146:5, 146:12, 146:14, 147:4, 147:9, 148:24, 149:4, 149:7, 149:9, 149:20, 150:3, 150:8, 150:15, 150:18, 151:2, 151:5, 152:12, 152:17, 153:15, 154:11, 155:2, 155:19, 155:22, 156:3, 157:5, 157:11
**themselves** [7] - 5:18, 36:18, 37:24, 87:25, 92:13, 128:13, 153:19
**theories** [1] - 144:17
**theory** [6] - 68:11, 80:10, 81:16, 102:11, 115:15, 139:6
**thereby** [1] - 29:2
**therefore** [4] - 104:16, 108:10, 138:22, 148:22
**they've** [1] - 94:4
**thinking** [3] - 8:10, 13:18, 154:24
**thinks** [3] - 72:9, 72:10, 156:16
**Third** [2] - 1:21, 2:14
**third** [7] - 18:9, 53:16, 62:5, 67:12, 85:18, 103:7, 129:22
**thoroughly** [1] - 157:24
**thought-piece** [1] - 125:8
**thoughts** [1] - 155:2
**thousand** [3] - 25:19, 26:10, 27:10
**thousands** [4] - 17:1, 23:14, 26:23, 123:10
**Three** [1] - 1:18
**three** [15] - 16:8,

24:25, 26:5, 54:7, 68:25, 69:5, 71:23, 72:18, 73:14, 73:20, 75:9, 77:21, 102:1, 129:15, 129:18
**three-fold** [1] - 75:9
**throughout** [1] - 134:24
**thumb** [2] - 121:18, 152:20
**Thursday** [1] - 8:13
**ticker** [21] - 48:16, 48:21, 49:4, 49:8, 49:11, 49:15, 49:18, 94:3, 94:7, 94:10, 95:7, 95:8, 95:15, 95:18, 95:25, 96:6, 96:11, 96:12, 96:14, 96:23
**tie** [1] - 95:15
**tie-in** [1] - 95:15
**tile** [1] - 13:20
**timing** [1] - 25:23
**tip** [2] - 25:19, 28:25
**tiring** [1] - 13:18
**Tjoflat** [1] - 64:19
**today** [19] - 9:16, 10:7, 10:21, 12:18, 12:23, 16:25, 17:4, 26:4, 26:5, 31:12, 101:2, 104:24, 126:21, 132:11, 132:13, 140:5, 154:13, 154:16, 158:4
**together** [25] - 13:12, 15:7, 20:10, 20:13, 24:1, 24:15, 24:23, 24:25, 36:18, 37:4, 37:24, 52:25, 53:4, 53:10, 53:16, 58:1, 68:17, 68:20, 68:22, 70:16, 85:11, 87:18, 102:23, 122:20, 148:12
**token** [3] - 49:3, 95:19, 96:5
**tomorrow** [4] - 110:14, 110:15, 150:15, 150:17
**tons** [1] - 77:11
**took** [5] - 95:4, 120:13, 120:23, 126:25, 139:6
**top** [10] - 10:2, 22:7, 29:14, 30:24, 31:3, 31:5, 31:13, 138:20, 139:12, 139:20
**topic** [1] - 15:1
**topics** [1] - 16:6
**tort** [2] - 75:12, 76:14

**totally** [1] - 148:24
**touch** [1] - 134:23
**towards** [1] - 31:15
**track** [1] - 119:18
**tracked** [1] - 17:12
**tracks** [1] - 17:10
**tradable** [1] - 61:12
**trade** [5] - 48:9, 67:13, 75:1, 95:19
**Trade** [3] - 61:21, 74:14, 152:7
**traded** [3] - 48:19, 48:22, 121:1
**trading** [3] - 48:12, 49:4, 57:15
**traditional** [2] - 20:19, 21:12
**trail** [1] - 121:23
**transact** [1] - 43:7
**transaction** [24] - 21:1, 26:18, 27:11, 27:18, 27:21, 28:13, 31:23, 32:1, 33:3, 35:15, 35:20, 44:8, 134:8, 134:12, 134:14, 137:17, 138:16, 141:6, 144:12, 147:17, 148:8, 148:19, 148:20, 148:22
**transactions** [67] - 17:11, 18:4, 18:6, 18:10, 20:18, 23:20, 24:4, 24:9, 24:11, 24:14, 24:23, 24:25, 25:4, 25:5, 25:12, 25:15, 26:13, 26:23, 27:10, 27:15, 27:23, 28:1, 28:3, 28:7, 28:19, 29:1, 29:8, 30:4, 30:19, 31:16, 31:19, 31:22, 32:14, 32:21, 33:10, 33:11, 34:5, 38:7, 38:9, 38:11, 38:18, 38:20, 39:3, 44:5, 45:6, 104:1, 104:6, 108:11, 109:25, 110:6, 111:8, 130:9, 130:13, 130:20, 130:25, 131:3, 131:7, 132:2, 132:4, 132:9, 132:16, 134:11, 148:7, 148:9, 148:12, 148:22
**transcript** [6] - 9:8, 9:9, 10:2, 52:11, 157:12, 157:17
**transcription** [1] -

158:20
**transferred** [3] - 32:1, 32:3, 32:4
**transfers** [1] - 17:23
**transmit** [1] - 19:12
**transmitted** [2] - 30:23, 31:24
**travel** [1] - 60:9
**treat** [1] - 102:8
**treble** [1] - 75:10
**tremendously** [1] - 156:19
**trial** [1] - 135:25
**tries** [1] - 58:4
**trouble** [1] - 55:6
**troubled** [1] - 90:3
**true** [9] - 9:3, 9:17, 32:22, 62:19, 96:9, 114:13, 116:25, 119:12, 123:14
**truly** [1] - 158:10
**trust** [4] - 9:6, 50:20, 101:11, 121:23
**trusted** [4] - 18:6, 20:17, 20:22, 21:3
**trustworthiness** [2] - 45:24, 46:1
**try** [13] - 13:25, 36:7, 37:15, 50:17, 56:12, 58:18, 64:14, 88:14, 90:17, 94:1, 95:15, 105:20, 107:1
**trying** [18] - 9:24, 25:14, 26:4, 26:8, 59:15, 65:5, 98:9, 102:8, 124:25, 136:14, 137:10, 139:5, 139:10, 139:13, 140:3, 142:8, 142:15, 142:17
**Tuesday** [1] - 1:7
**tug** [1] - 15:2
**tugged** [1] - 45:4
**turn** [7] - 11:4, 11:15, 12:12, 50:7, 70:7, 100:8, 144:15
**turning** [4] - 17:7, 20:16, 21:15, 80:15
**turns** [1] - 8:11
**tutor** [1] - 99:7
**tutorial** [17] - 7:17, 8:2, 8:14, 9:4, 10:5, 10:10, 10:14, 50:9, 63:18, 103:17, 105:15, 123:19, 123:22, 123:24, 148:6, 154:14
**tutorials** [1] - 8:6
**Tweets** [1] - 119:7

**twice** [2] - 16:24, 158:7
**two** [51] - 9:22, 15:22, 22:11, 22:14, 22:15, 22:17, 24:24, 25:4, 25:14, 26:5, 26:19, 28:25, 41:14, 43:11, 46:13, 53:24, 64:9, 69:10, 69:13, 72:2, 72:23, 74:3, 74:24, 75:3, 75:4, 87:6, 94:2, 94:22, 94:25, 95:1, 96:15, 97:4, 99:11, 103:22, 108:5, 108:25, 110:1, 110:3, 110:8, 111:24, 112:6, 112:9, 129:17, 130:23, 133:8, 133:9, 144:17
**two-part** [3] - 87:6, 94:2, 97:4
**Twombly** [23] - 54:11, 54:17, 54:24, 62:18, 65:7, 78:2, 78:3, 78:16, 89:22, 97:1, 102:9, 102:10, 102:17, 103:4, 113:20, 115:14, 116:8, 117:5, 117:13, 117:17, 118:24, 119:11, 119:15
**Twombly's** [1] - 92:22
**type** [6] - 40:10, 62:22, 97:24, 104:4, 105:20, 139:19
**typed** [2] - 22:10, 145:11
**types** [3] - 97:19, 98:12
**typically** [4] - 19:15, 47:1, 49:17, 65:20

**U**

**U.S** [1] - 60:5
**ultimately** [1] - 125:10
**unavoidable** [1] - 96:17
**uncertainty** [2] - 44:22, 105:2
**undefined** [1] - 90:24
**under** [22] - 32:3, 54:10, 66:25, 78:14, 79:24, 86:20, 86:24, 97:24, 102:8, 102:17, 102:18, 102:21, 112:20, 113:19, 115:10,

115:14, 116:1, 116:8, 118:24, 119:5, 129:4, 129:14
**undercut** [1] - 79:13
**underscore** [1] - 83:5
**understood** [5] - 27:14, 112:1, 112:2, 112:6, 149:2
**unique** [6] - 21:25, 22:5, 22:13, 22:24, 23:3, 30:25
**united** [1] - 3:2
**UNITED** [3] - 1:1, 1:4, 1:14
**United** [13] - 4:20, 4:24, 5:5, 60:8, 81:15, 82:8, 85:24, 98:9, 107:23, 120:15, 120:19, 147:11, 158:24
**units** [2] - 24:3, 35:13
**universally** [1] - 131:25
**unlawful** [4] - 54:22, 57:18, 60:10, 64:8
**unless** [11] - 15:15, 30:10, 32:7, 34:18, 70:2, 71:7, 80:12, 107:18, 122:25, 147:5, 150:13
**up** [56] - 8:15, 24:1, 26:25, 27:22, 31:18, 36:12, 36:14, 36:19, 37:22, 37:23, 41:14, 43:10, 46:1, 47:24, 49:3, 50:24, 52:6, 52:14, 54:3, 58:22, 71:11, 74:15, 81:10, 82:19, 85:13, 86:9, 92:17, 92:18, 94:21, 96:22, 96:25, 105:13, 105:15, 105:20, 115:5, 125:6, 125:16, 127:17, 131:14, 137:22, 138:1, 140:24, 141:8, 143:6, 143:10, 143:16, 145:6, 147:12, 147:20, 150:5, 152:12, 153:19, 154:5, 157:2, 157:20, 158:2
**upcoming** [1] - 112:4
**update** [10] - 39:16, 39:18, 39:21, 40:2, 40:4, 40:12, 40:16, 41:11, 41:13, 46:18
**updated** [2] - 39:10, 40:11

**updates** [7] - 39:11, 39:13, 40:14, 41:3, 44:3, 46:20, 47:7
**upgrade** [23] - 41:5, 42:10, 83:6, 83:7, 88:8, 91:1, 92:2, 94:13, 104:21, 107:1, 107:5, 107:6, 110:13, 110:15, 110:18, 113:1, 113:7, 113:18, 121:13, 131:4, 134:14, 146:20
**upgrades** [9] - 45:9, 45:11, 94:23, 106:22, 106:24, 107:3, 107:20, 109:19
**upper** [2] - 33:6, 33:8
**urge** [5] - 64:10, 69:19, 73:10, 80:5
**URL** [1] - 22:2
**usable** [1] - 108:3
**useful** [1] - 73:8
**user** [1] - 34:11
**users** [5] - 17:11, 17:23, 44:9, 47:18, 61:12
**uses** [1] - 138:22
**utterly** [2] - 77:2, 78:2

**V**

**vacuum** [1] - 116:19
**vague** [4] - 92:19, 92:25, 94:6, 154:12
**vaguely** [1] - 93:5
**valid** [5] - 30:4, 43:23, 44:13, 124:5, 126:18
**validate** [2] - 33:12, 34:12
**validated** [1] - 28:13
**validating** [1] - 28:7, 28:9
**validation** [1] - 28:9
**validity** [1] - 135:23
**value** [26] - 17:12, 21:24, 22:9, 24:22, 63:13, 65:15, 66:22, 67:1, 70:5, 103:25, 109:4, 109:23, 110:5, 114:6, 114:11, 114:17, 115:5, 115:6, 115:8, 115:19, 130:12, 130:13, 130:14, 130:19, 131:2, 132:15
**values** [4] - 21:19, 21:21, 23:24, 25:6

**variants** [2] - 53:24, 72:2
**various** [6] - 13:19, 37:24, 38:15, 41:18, 44:18, 108:7
**VASQUEZ** [4] - 2:21, 6:4, 51:17, 100:21
**Vasquez** [3] - 6:5, 51:13, 100:20
**VENTURES** [1] - 2:10
**Ventures** [3] - 7:4, 12:4, 12:9
**Ver** [32] - 5:11, 5:14, 6:7, 6:9, 7:13, 58:23, 79:22, 80:20, 81:11, 82:5, 82:9, 83:1, 83:5, 83:7, 83:17, 84:2, 84:8, 84:13, 84:20, 85:24, 87:18, 87:19, 88:9, 88:20, 89:7, 90:12, 90:21, 116:15, 120:1, 122:4, 131:13, 145:24
**VER** [1] - 2:17
**Ver's** [1] - 90:14
**verbatim** [1] - 23:4
**verified** [2] - 26:7, 29:6
**verify** [2] - 23:9, 29:1
**version** [15] - 9:22, 24:17, 24:18, 33:3, 42:11, 91:1, 102:25, 107:15, 108:2, 110:20, 111:19, 111:20, 111:25, 141:9, 143:8
**versions** [1] - 130:23
**versus** [4] - 4:20, 109:24, 110:5, 131:2
**vertical** [5] - 60:12, 145:16, 146:3, 146:7, 146:9
**viability** [1] - 141:7
**victorious** [1] - 43:1
**video** [1] - 122:10
**videos** [2] - 83:5, 119:7
**view** [2] - 16:3, 121:9
**violated** [1] - 98:3
**violating** [1] - 128:9
**violation** [13] - 75:13, 76:15, 76:17, 76:21, 76:22, 82:16, 82:17, 144:18, 144:25, 145:1, 145:2, 146:25
**violations** [3] - 119:14, 136:10, 144:17
**virtual** [2] - 50:22,

138:22
**virtue** [1] - 129:25
**Visa** [1] - 38:12
**visible** [1] - 30:23
**visual** [5] - 15:10, 15:12, 18:2, 18:7, 24:5
**visually** [1] - 30:22
**voices** [1] - 13:25
**volumes** [1] - 38:7
**vote** [35] - 42:12, 42:21, 43:23, 87:20, 87:22, 89:8, 89:11, 89:14, 89:20, 91:18, 93:18, 93:19, 93:20, 93:21, 93:23, 93:24, 96:18, 99:25, 108:23, 112:7, 113:1, 113:4, 113:7, 113:8, 120:12, 120:14, 124:5, 130:6, 146:19, 154:6, 154:7, 154:8
**voted** [6] - 85:1, 95:5, 110:19, 112:4, 112:7, 113:19
**voters** [3] - 88:1, 89:11, 152:24
**votes** [3] - 87:7, 87:8, 87:25
**voting** [6] - 42:2, 43:20, 43:25, 59:7, 110:19, 111:5
**vs** [1] - 1:6

**W**

**wait** [2] - 4:7, 56:2
**waiting** [1] - 28:25
**walk** [5] - 15:7, 53:11, 55:2, 71:22, 71:23
**wallet** [1] - 27:16
**wants** [5] - 25:3, 115:24, 140:14, 142:23, 143:10
**War** [4] - 22:22, 23:2, 23:3, 23:6
**war** [13] - 42:2, 42:16, 42:24, 43:9, 43:25, 90:13, 90:22, 91:6, 124:13, 126:14, 142:1, 144:8, 144:9
**washington** [1] - 2:19
**water** [1] - 64:4
**ways** [5] - 21:22, 38:19, 133:9, 141:17, 154:8
**wayside** [1] - 61:4
**website** [5] - 18:20, 22:9, 31:18, 41:7,

57:14
**week** [3] - 13:17,
157:15, 157:16
**weigh** [2] - 54:15,
121:2
**weighed** [2] - 120:22,
152:20
**weighing** [1] - 121:17
**welcome** [4] - 8:1,
11:9, 50:4, 50:11
**well-defined** [2] -
57:20, 67:19
**well-known** [1] - 88:19
**whatsoever** [3] -
91:16, 97:12, 98:17
**whereby** [2] - 39:16,
111:18
**whistle** [1] - 122:18
**white** [3] - 24:18,
24:19, 114:16
**Whitepaper** [19] -
16:18, 43:16, 77:7,
77:8, 80:9, 98:4,
98:5, 98:7, 105:18,
108:1, 123:16,
123:17, 124:20,
124:22, 125:2,
125:22, 126:25,
127:2, 152:3
**whole** [8] - 19:7, 23:5,
61:2, 74:16, 103:8,
142:18, 154:5, 154:7
**widely** [1] - 84:7
**win** [4] - 122:11,
153:2, 153:3, 153:5
**window** [1] - 78:14
**winner** [5] - 94:12,
108:4, 108:22,
108:24, 143:13
**winning** [2] - 35:18,
113:4
**wish** [2] - 12:18, 13:9
**won** [1] - 122:13
**wonder** [2] - 68:5,
154:11
**wondered** [1] - 94:19
**wondering** [1] - 71:21
**word** [8] - 13:4, 23:15,
62:23, 88:25, 94:11,
99:2, 135:9, 149:1
**word-search** [1] -
62:23
**words** [8] - 23:14,
26:3, 55:5, 65:1,
125:15, 144:21,
144:24, 156:14
**workable** [1] - 56:10
**workload** [1] - 36:19
**works** [2] - 14:3, 32:12
**world** [27] - 25:16,

37:23, 43:11, 46:20,
74:16, 76:16, 76:17,
76:19, 76:20, 76:22,
76:25, 77:3, 77:4,
77:15, 77:16, 85:19,
90:16, 106:15,
107:6, 111:20,
119:8, 133:11,
135:6, 135:19
**worldwide** [6] - 66:10,
66:15, 135:5, 135:7,
135:14, 135:20
**worry** [1] - 10:3
**worse** [1] - 76:15
**worthwhile** [1] - 50:23
**Wright** [1] - 115:25
**write** [7] - 5:12, 5:13,
8:14, 14:19, 85:12,
157:20, 157:23
**writing** [3] - 6:16,
6:21, 7:6
**written** [3] - 84:24,
86:17, 86:18
**wrongful** [1] - 91:11
**wrote** [1] - 84:15
**WU** [1] - 2:4
**Wu** [20] - 6:15, 58:24,
72:8, 72:9, 79:25,
82:9, 84:20, 87:18,
88:9, 90:12, 113:25,
114:4, 116:1, 120:1,
122:3, 124:13,
131:13, 145:24,
156:9, 156:13
**www.coindust.com**
[1] - 57:14

## Y

**yearly** [1] - 115:23
**years** [3] - 16:13, 64:9,
106:3
**yesterday** [1] - 157:20
**York** [2] - 2:15
**yourself** [3] - 76:13,
110:12, 132:10
**YouTube** [2] - 83:4,
119:7

## Z

**zero** [1] - 71:23
**Zoom** [4] - 13:8,
13:17, 13:20, 14:1