UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-cv-25106-WILLIAMS/MCALILEY

UNITED AMERICAN CORPORATION,

      Plaintiff,

vs.

BITMAIN, INC., ROGER VER,
BITMAIN TECHNOLOGIES LTD.,
JIHAN WU, PAYWARD VENTURES,
INC. d/b/a KRAKEN, JESSE POWELL,
SHAMMAH CHANCELLOR and
JASON COX,

      Defendants.

_____/

**ORDER GRANTING DEFENDANTS' JOINT MOTION
TO DISMISS FIRST AMENDED COMPLAINT**

      The Court has before it three motions: (1) Defendants Bitmain, Inc., Roger Ver ("Ver"), Bitmain Technologies Ltd. ("Bitmain Technologies"), Jihan Wu ("Wu"), Payward Ventures, Inc. d/b/a Kraken ("Kraken"), Jesse Powell ("Powell"), Shammah Chancellor ("Chancellor") and Jason Cox's ("Cox") (collectively, the "Defendants") Joint Motion to Dismiss First Amended Complaint Under Federal Rule of Civil Procedure 12(b)(6) (the "Joint Motion to Dismiss") (ECF No. 144), and Kraken and Powell's Standalone Brief in Support of Defendants' Joint Motion to Dismiss the Amended Complaint (ECF No. 145); (2) Bitmain Technologies and Wu's Motion to Dismiss the Amended Complaint Under Federal Rule of Civil Procedure 12(b)(2) (ECF No. 142); and (3) Plaintiff United American Corporation's ("UAC") Motion for Leave to Conduct Jurisdictional Discovery (ECF

No. 149). The motions are fully briefed. (ECF Nos. 147-148, 151-153).

The parties consented to my presiding over the pending motions, and the Honorable Kathleen M. Williams referred those motions to me for final resolution. (ECF Nos. 154-55). For the reasons set forth below, the Court grants Defendants' Joint Motion to Dismiss (ECF No. 144) and dismisses the First Amended Complaint (ECF No. 138) with prejudice. The Court also denies as moot Bitmain Technologies and Wu's Motion to Dismiss the Amended Complaint Under Federal Rule of Civil Procedure 12(b)(2) (ECF No. 142) and UAC's Motion for Leave to Conduct Jurisdictional Discovery (ECF No. 149).

## I.    Background

### A. Procedural History

UAC filed its first complaint against Defendants in December 2018. (ECF No. 1). The motions now before the Court are the second round of motions that Defendants first filed in 2019.[1] That is, in response to the first complaint, all Defendants filed motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and Bitmain Technologies and Wu also sought dismissal under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction; in turn UAC sought leave to conduct jurisdictional discovery. (ECF Nos. 41-43, 56, 98-99, 114, 116, 121). The presiding District Court Judge, the Honorable Kathleen M. Williams, referred those motions to me for a Report and Recommendation. (ECF No. 46).

In January 2020, I heard lengthy oral argument on all motions. (ECF No. 136). At

---

[1] Over the course of 2019, the Court allowed UAC multiple extensions of time to affect service on foreign defendants. *See* (ECF No. 127).

the conclusion of that hearing I identified a number of ways in which the complaint was insufficiently plead, and I advised the parties that I believed the Court should dismiss the complaint with leave for UAC to file an amended complaint, and that the Court should deny, without prejudice, UAC's motion to conduct jurisdictional discovery. (*Id.* at 96, 114-117, 147). At that oral argument the Court and counsel had the opportunity to discuss UAC's allegations and the applicable law in detail, and I expressed my view that UAC should reasonably expect to have one more opportunity to attempt to state its claims, in an amended complaint. If the amended complaint fell short of the mark, then dismissal would likely be with prejudice. (*Id.* at 152-53). I advised the parties that with their consent to my presiding over the motions, I would rely on the comments I made at the oral argument about why I thought the complaint failed to state a claim, and I would issue a brief order of dismissal. (*Id.* at 117-23, 146-55).

With this knowledge, the parties consented to my presiding over the motions about which I had just heard argument, (ECF No. 133), and Judge Williams referred the motions to me for final resolution. (ECF No. 134). I then granted Defendants' motions to dismiss, denied without prejudice UAC's motion for leave to conduct jurisdictional discovery, dismissed the complaint without prejudice and granted UAC leave to amend the complaint. (ECF No. 135).

UAC thereafter filed its two-count First Amended Complaint (the "Complaint"). (FAC, ECF No. 138).[2] It seeks restitution, compensatory damages and/or disgorgement,

---

[2] Here, the Court cites the Complaint as "(FAC ___ )."

and injunctive relief, for Defendants' alleged per se and rule of reason antitrust violations of § 1 of the Sherman Act and § 4 of the Clayton Act. (FAC at 30).

Defendants filed motions to dismiss and UAC filed a motion for leave to conduct jurisdictional discovery, which are now before the Court. (ECF Nos. 142, 144, 149). In September 2020, I again heard lengthy oral argument. (ECF No. 164).

### B. Facts Alleged in the Complaint

The Court sets forth here UAC's allegations that are pertinent to Defendants' Joint Motion to Dismiss (ECF No. 144). The Court assumes, as it must at this stage of the proceedings, that UAC's factual allegations are true, and it casts those facts in the light most favorable to UAC. *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983) (citations omitted).

### 1. Cryptocurrencies and mining

Cryptocurrency is a form of digital currency that trades in currency markets. (FAC ¶¶ 22-23). The Satoshi Nakamoto whitepaper (the "Whitepaper"), published in October 2008, launched the idea of this "peer-to-peer" version of electronic cash that allows online payments from one party to another, independent of any financial institution. (*Id.* ¶ 27).[3] The Whitepaper coined the term "Bitcoin", and today Bitcoin and Bitcoin Cash are popular forms of cryptocurrency. (*Id.* ¶¶ 22, 27).[4]

Cryptocurrencies are a "permissionless" system that rely on a network of

---

[3] The Whitepaper is an exhibit to the Complaint. *See* (FAC at Ex. A).

[4] Many forms of cryptocurrency have since emerged. (FAC ¶¶ 22, 33).

decentralized encrypted public ledgers that document all digital transactions, known as a "blockchain". (*Id.* ¶¶ 28-29). The blockchain is a series of blocks, which are units of accounting that record new transactions in cryptocurrency. (*Id.* ¶ 42). Confidence and trust in the accuracy of the transactions in the blockchain is possible because the decentralized ledgers are identical and continuously updated and compared. (*Id.* ¶ 28). The system has mechanisms that allow for consensus on the validity of the blockchain. (*Id.* ¶ 29). One is "Proof-of-Work", which is designed to eliminate the insertion of fraudulent transactions in the blockchain. (*Id.*). Also, the "main chain" (normally, the longest chain) at any given time, is whichever valid chain of blocks has the most cumulative "Proofs-of-Work" associated with it. (*Id.*). A consensus being reached on the longest blockchain is essential to the integrity of the network. (*Id.* ¶ 89).

New cryptocurrency is created through a process called "mining". (*Id.* ¶ 24). Consumers – that is, individuals or institutions that operate servers – compete to "mine" virtual currencies by using computing power that solves complex math puzzles. (*Id.*). The computer servers that first solve the puzzles are rewarded with new cryptocurrency, and the solutions to those puzzles are used to encrypt and secure the currency. (*Id.*). The currency is then stored in a digital wallet associated with the computing device that solved the puzzle. (*Id.* ¶ 25).

The mining servers, which are called "nodes" (*id.* ¶ 24), consume a lot of energy, and electricity is the largest operating cost of mining. (*Id.* ¶ 31). To be profitable, miners must generate more cryptocurrency than the cost of electricity needed to mine. (*Id.*). As competition to mine cryptocurrency has increased, so have costs, and the ability to obtain

cryptocurrency has become more difficult. (*Id.* ¶¶ 26, 31). Those who mine cryptocurrency may create a "mining pool" by pooling their resources to share processing power over a network and share the reward. (*Id.* ¶ 30).

### 2.      Bitcoin and Bitcoin Cash

As noted, Bitcoin and Bitcoin Cash are among the existing forms of cryptocurrency. (*Id.* ¶¶ 22, 33). Cryptocurrencies have distinctive characteristics to include the size of the blocks in the blockchain, the software design of the cryptocurrency and the currency's usefulness to store value or conduct day-to-day transactions. (*Id.* ¶ 33).

The original Bitcoin cryptocurrency is now known as Bitcoin Core (or "BTC"). (*Id.* ¶ 42). Bitcoin Cash (or "BCH") emerged from it on August 1, 2017, as a result of a "hard fork". (*Id.*). A hard fork refers to a change to the protocol of a blockchain network whereby nodes that mine the newest version of the blockchain follow a new rules set, while nodes that mine the older version continue to follow the prior rules set. (*Id.* ¶ 45). Because the two rules sets are not compatible, two different chains of the blockchain are formed, with the new version branching off. (*Id.*).

The 2017 hard fork was the result of a dispute over Bitcoin's utility: whether it should primarily be used to store value or conduct transactions. (*Id.* ¶ 43). Bitcoin's original design featured a maximum block size of 1 MB, which meant that Bitcoin could not scale as more nodes sought to utilize it because transactions on the network would take too long to be confirmed and those seeking to transact in Bitcoin Core were required to pay disproportionately high fees to have their transactions confirmed. (*Id.* ¶ 42). Bitcoin Cash, on the other hand, was intended to be scalable, meaning that it was designed with larger

block data limitations so that transactions can be performed quickly and with relatively low transaction costs in a peer-to-peer system. (*Id.* ¶ 33). Bitcoin Cash is the most widely adopted form of peer-to-peer cryptocurrency cash-like system in the world. (*Id.*).

### 3.    Plaintiff

Between late 2017 and early 2018, UAC developed technologies for both the execution of blockchain transactions and mining cryptocurrencies. (*Id.* ¶¶ 34-35, 37-39). One, BlockNum, is a distributed and decentralized ledger technology that can be used by most telecommunications companies around the world. It allows the execution of blockchain transactions between any two telephone numbers regardless of their location, eliminating the need for cryptocurrency wallets. (*Id.* ¶ 35). The other, BlockchainDome, provides a low-cost energy-efficient solution for mining cryptocurrency. (*Id.* ¶ 37). UAC built the first BlockchainDome in March 2018 and built four domes in total that operate over 5,000 Bitcoin Cash-based miners. (*Id.* ¶ 39). UAC invested more than $4,000,000 in this infrastructure. (*Id.*).

UAC developed these technologies to mine the Bitcoin Cash network, believing it would eventually generate more profit in transaction fees than mining. (*Id.* ¶ 38). UAC's businesses depended on continued efforts to scale up Bitcoin Cash for use as a peer-to-peer version of electronic cash. (*Id.*).

### 4.    Defendants

Defendants all engage in Bitcoin Cash in different ways, and they are easily grouped as follows: the Mining Defendants, who mine Bitcoin Cash (Ver, Wu and Bitmain

Technologies)[5], the Exchange Defendants (Kraken and Powell) and the Developer Defendants (Chancellor and Cox).

Defendant Wu is the CEO of Bitmain Technologies and one of its founders. (*Id.* ¶¶ 10, 58). Defendant Bitmain Technologies is a company based in China that operates mining servers. (*Id.* ¶¶ 9, 60-61). It is the largest designer of Application Specific Integrated Circuit ("ASIC") chips that are used for mining and sells those chips to customers. (*Id.* ¶¶ 19, 58). The ASIC chip powers the Antminer series of mining servers, which are the dominant servers mining on a number of cryptocurrency networks, including Bitcoin and Bitcoin derivatives. (*Id.* ¶ 58). It is estimated that Bitmain Technologies controls over 60% of the world's computer power for mining cryptocurrency. (*Id.* ¶ 60). Bitmain Technologies also operates two of the largest Bitcoin Core and Bitcoin Cash mining pools in the world: Antpool and BTC.com. (*Id.* ¶ 61).

Defendant Ver is the founder of Bitcoin.com, a company that provides Bitcoin and Bitcoin Cash services, such as purchasing and selling these cryptocurrencies. (*Id.* ¶¶ 62-63). Bitcoin.com, headquartered in Tokyo, has servers and programmers in the United States and operates a mining pool with hash power[6] provided by Bitmain Technologies. (*Id.* ¶ 62). Bitcoin.com is not a party to this lawsuit.

Defendants Ver and Wu were among the earliest Bitcoin and Bitcoin startup

---

[5] Bitmain, Inc. is also an alleged miner, but because the Complaint has no operative allegations against it, and it must certainly be dismissed without further analysis, I do not include it in this group.

[6] Hash power, or hash rate, is the speed at which a cryptocurrency mining device operates. Sheba Karamat, *What is Hash Rate?*, Coin Rivet (May 21, 2018), https://coinrivet.com/guides/what-is-cryptocurrency-mining/what-is-hash-rate (last visited March 31, 2021).

investors. (*Id.* ¶ 49).

Defendant Bitmain, Inc. is a corporation organized in Delaware and operates out of California. (*Id.* ¶ 7). It maintains numerous mining farms in the United States that mine cryptocurrency, such as Bitcoin and Bitcoin Cash. (*Id.*).[7]

Cryptocurrencies are traded on exchanges, and Defendant Kraken operates the exchange Kraken.com. (*Id.* ¶ 11). Kraken, which is based in this country, operates here and elsewhere. (*Id.* ¶ 71 n.5). It is a platform for the exchange of euros, U.S. dollars, Canadian dollars, Japanese yen and various cryptocurrencies, including Bitcoin and Bitcoin Cash. (*Id.*). It purports to be the largest Bitcoin exchange in euro volume and liquidity. (*Id.*).

Defendant Powell established Kraken and is its CEO. (*Id.* ¶¶ 12, 71 n.5). Ver, the founder of Bitcoin.com, is a principal investor in Kraken. (*Id.* ¶ 71). Ver and Powell were high school friends. (*Id.* ¶ 71 n.5).

Defendants Chancellor and Cox, both California residents, are cryptocurrency developers, who work on its software. (*Id.* ¶¶ 13-14, 87, 114).

### 5.      November 2018 hard fork

A routine software upgrade for each of the different software implementations used by Bitcoin Cash miners, was scheduled for November 15, 2018, at 11:40 a.m. (*Id.* ¶ 47). Before that upgrade, the nodes mining the Bitcoin Cash network used various computer software implementations that were compatible with each other and responded to the same rules set. (*Id.* ¶ 46). Two of those implementations – Bitcoin ABC 0.18.4 ("Bitcoin ABC")

---

[7] This is the sole allegation in the Complaint about this Defendant.

and Bitcoin SV 0.1.0 ("Bitcoin SV") – decided, however, to proceed with upgrades that no longer respected the same rules sets. (*Id.* ¶ 48).

A dispute thus arose over the rules set the Bitcoin Cash blockchain would follow after the upgrade. (*Id.*). Miners would resolve the dispute by engaging in a "hash war". (*Id.* ¶¶ 51-52). That is, consistent with the Whitepaper, the various nodes mining the network would "vote" for their preferred rules set, and the rules set mined with the most computer hashing power would prevail and continue the Bitcoin Cash blockchain going forward. (*Id.*). The "losing" rules set would be forced to create a new and distinct blockchain. (*Id.* ¶ 52).

Bitcoin ABC, led by Ver and supported by Bitmain Technologies and Wu, sought to preserve Bitcoin Cash's basic structure, to include a limited block size of 32 MB and to prevent major developments in the future. (*Id.* ¶ 49). In contrast, Bitcoin SV sought to increase the block size to a maximum of 128 MB, to accommodate more transactions with lower transaction costs. (*Id.* ¶ 50).[8] Before the hard fork, over 70% of the existing nodes mining on the Bitcoin Cash blockchain elected to use Bitcoin SV. (*Id.* ¶ 82 n.6).

### 6.    The conspiracy

Central to UAC's lawsuit is its claim that Ver and Bitcoin.com colluded with Wu and Bitmain Technologies to manipulate the network upgrade and take control of the Bitcoin Cash blockchain. Specifically, just minutes before the upgrade, Bitmain

---

[8] The size of the block determines how many Bitcoin Cash transactions can be confirmed in a 10-minute interval. (FAC ¶ 50). The larger the block, the more transactions can be processed at any given time, resulting in lower transaction costs for all Bitcoin Cash users. (*Id.*). This facilitates its use by merchants and consumers. (*Id.*).

Technologies temporarily reallocated up to 90,000 Antminer servers that had been mining the Bitcoin Core network, to mine the Bitcoin Cash network. (*Id.* ¶¶ 53-54, 67, 75, 82). That is, Ver, Wu and Bitmain Technologies brought in "mercenary" miners from another network to the Bitcoin Cash network, increased Bitcoin.com's hashing power by over 4,000% and thus diluted the "vote" being exercised by the nodes that were already mining the network during the upgrade. (*Id.* ¶¶ 67, 82). This violated the principles set forth in the Whitepaper, which users had relied on and respected for years. (*Id.* ¶¶ 80-82). Although the Whitepaper states that "nodes can leave and rejoin the network" to mine at any time, it had always been understood that it is the nodes that are mining the blockchain that are able to vote with their CPU power. (*Id.* ¶ 81).

The Complaint includes pie charts that show the "before and after" distribution of Bitcoin Cash blocks on the network, as an indication of the reallocation of servers for the network upgrade. (*Id.* ¶¶ 84-85). The week before the software upgrade, the Bitcoin.com and Bitmain Technologies mining pools were collectively awarded 20.1% of the blocks. (*Id.* ¶ 84).[9] On November 16, 2018, the day after the upgrade, those same mining pools were awarded 98.85% of the blocks on the Bitcoin Cash network. (*Id.* ¶ 85). Bitmain Technologies later removed its reallocated servers from the Bitcoin Cash network. (*Id.* ¶ 82).

This temporary reallocation of significant hash power required coordination between Wu, on behalf of Bitmain Technologies, and Ver, on behalf of Bitcoin.com,

---

[9] UAC alleges that the Bitcoin.com and Bitmain Technologies mining pools were collectively awarded 14.1% of the blocks, but the pie chart shows 20.1%. (FAC ¶ 84).

because the receiving pool (Bitcoin.com) had to prepare to accommodate the spike in hash power on its network. (*Id.* ¶ 70).

Bitmain Technologies reallocated its computer power without the authorization of customers who had previously joined Bitmain Technologies' mining pools. (*Id.* ¶ 68).[10] And, Bitmain Technologies diverted its hash power despite the expectation that Bitcoin Core's value would drop after the hard fork: Wu stated, "by relocating hash power from BTC mining to BCH mining – BTC price will dump below yearly support; it may even breach $5,000. But since CSW [Craig Wright – one of the proponents of SV] is relentless, I am all in to fight till death!" (*Id.* ¶ 69) (alteration in original).[11]

Five hours before the upgrade, Ver and Andreas Brekken – a self-proclaimed "advisor to some of the most successful blockchain projects in the world" and former software engineer for Kraken, who is not a party to this lawsuit –  were interviewed on an episode of an internet vlog. (*Id.* ¶ 76). On that same day, Brekken posted on Twitter that Ver diverted 300,000 s9 miners to secure the ABC version of the software upgrade. (*Id.* ¶ 77). Ver also posted on Twitter, "[t]he Bitcoin.com pool now has more hash rate on it than the entire BCH network had earlier today. Bitcoin is cash for the world! #BitcoinCash #bitcoincashfork". (*Id.* ¶ 78). Days after the scheduled upgrade, Ver posted a video where

---

[10] UAC pleads this fact "[u]pon information and belief" and includes in the Complaint web links to two articles: https://www.shitcoin.com/blog/shitcoin-com-newsletter-18-november-16-2018 and https://medium.com/@jiangzhuoer/abc-vs-bsv-hash-war-part-iii-the-war-of-the-hash-power-45fef8010467 (last visited March 31, 2021). (FAC ¶ 68).

[11] UAC pleads this fact "[u]pon information and belief." (FAC ¶ 69).

he alluded to the fact that he rented hash power during the upgrade. (*Id.* ¶ 79).[12]

UAC alleges that Kraken, and its CEO and founder Powell, joined the scheme. This became evident when, before the outcome of the fork was known, Powell released this public statement: "Bitcoin SV does not presently meet Kraken's listing requirements and is unlikely to be supported." (*Id.* ¶ 71).[13] By contrast, a different exchange, Binance, made no statement regarding either the ABC or SV proposals. (*Id.* ¶ 72).

The combined value of Bitcoin Cash decreased after the fork. (*Id.* ¶¶ 86, 97).

The day after the upgrade, the developers of Bitcoin ABC – Defendants Chancellor and Cox, and Amaury Sechet (a non-party) – implemented a "checkpoint" on the resulting Bitcoin Cash ABC blockchain. (*Id.* ¶ 87). This allowed anyone with 51% hashing power to "cement control of the blockchain ledger" and "future changes to Bitcoin Cash functionality [and] consensus rules." (*Id.* ¶ 90). "Combining this checkpoint power with the hashing power of Bitcoin ABC backers like Ver (through Bitcoin.com) and Wu (through Bitmain Technologies' mining pools, AntPool and BTC.com) amounts to centralization" of control over the network. (*Id.*). The proponents of Bitcoin ABC thus gained the power to dictate any future software upgrades on the Bitcoin Cash network. (*Id.* ¶ 91). This created a centralized network, instead of a decentralized one as envisioned by the Whitepaper. (*Id.* ¶¶ 80, 88, 90-91, 98). It was also done without consulting other Bitcoin development

---

[12] Paragraph 79 includes a link to YouTube, but the Court is unable to view any video because the website states, "[p]rivate video [s]ign in if you've been granted access to this video". *See* https://www.youtube.com/watch?v=_kFscvMfGrI (last visited March 31, 2021).

[13] UAC pleads this fact "[u]pon information and belief." (FAC ¶ 71).

groups and the community at large. (*Id.* ¶ 93).

The day after the upgrade, Brekken held an online forum acknowledging that the developers of Bitcoin ABC and cryptocurrency exchanges, such as Kraken, agreed to implement centralized checkpoints. (*Id.* ¶ 94).[14] Brekken stated that "this has been planned for a long time" and "we knew within 30 minutes we had it." (*Id.*). Powell also posted on Twitter: "[t]he merits of [Bitcoin SV] are overshadowed by the alienating threats of a few grandiose personalities. Longer chain! = adoption. Victory may be pyrrhic." (*Id.* ¶ 96). Importantly, Powell decided that Kraken would maintain the Bitcoin Cash ticker (BCH) for the Bitcoin ABC chain, which "effectively recognized" Bitcoin ABC as the official blockchain of Bitcoin Cash and the winner of the upgrade. (*Id.*). Bitcoin SV branched off the blockchain and became a distinct blockchain. *See* (*id.* ¶ 52).

As a result, "the value of the cryptocurrency that [UAC] mines in its BlockchainDomes has fallen significantly." (*Id.* ¶ 97). UAC "has suffered and continues suffering significant damages through the loss of value of the currency". (*Id.* ¶ 99). Also, the decrease in value of both currencies created from the fork "has been severely detrimental to the market overall. Some trading platforms have chosen to list only one of the two resulting currencies, thus reducing liquidity and the value of the currencies." (*Id.* ¶ 97). The action caused "a global capitalization meltdown of more than $4 billion and caused many U.S. Bitcoin Cash holders – including [UAC] – to suffer damages and

---

[14] Paragraph 94 includes a link to YouTube, but the Court is unable to view any video because the website states, "[t]his video is no longer available due to a copyright claim by CoinSpice". *See* https://www.youtube.com/watch?v=UjAHJY0QZhs (last visited March 31, 2021).

irreparable harm." (*Id.* ¶ 2). There are also "significant long-term implications for world economies and particularly the U.S. economy." (*Id.* ¶ 3).

## II.    Analysis

### A. Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the plaintiff must plead facts that make out a claim that is plausible on its face and raises the right to relief beyond a speculative level. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The mere possibility that the defendant acted unlawfully is insufficient to survive a motion to dismiss. *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (citation omitted).

The Court's evaluation is a "context-specific task" that requires it to "draw on its judicial experience and common sense." *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010) (citation omitted). In the process, the Court must draw "all reasonable inferences" in favor of the plaintiff, *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002), and must limit its consideration to the four corners of the complaint and any attached exhibits. *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (citation omitted). The facts alleged must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted). Conclusory allegations are insufficient. *Id.* ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and

a formulaic recitation of the elements of a cause of action will not do . . . .") (second alteration in original) (citation omitted).

### B. Sherman Act Violations

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The Supreme Court has interpreted the Act to prohibit only "unreasonable" restraints on trade. *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (citation omitted). The elements of a § 1 claim are: (1) a conspiracy that (2) unreasonably (3) restrains interstate or foreign trade. *Id.* (citation omitted).

Over time, courts have recognized that some restraints on trade are per se illegal. Most, however, are subject to the "rule of reason", which requires "the finder of fact [to] decide whether the questioned practice imposes an *unreasonable* restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004) (alteration in original) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). UAC alleges that Defendants' conduct amounted to both a per se, and rule of reason, violation of § 1 of the Act.

It is useful to understand that § 1 applies both to agreements between companies that are direct competitors ("horizontal" agreements), and to agreements between businesses that operate at different levels of the same product's production or distribution

16

chain ("vertical" agreements). *Spanish Broad Sys.*, 376 F.3d at 1071. A hybrid form, dubbed a "hub and spoke" conspiracy, exists where an entity at one level of the market structure (the "hub") coordinates an agreement among competitors at a different level (the "spokes"). *See, e.g.*, *United States v. Apple, Inc.*, 791 F.3d 290, 322 (2d Cir. 2015); *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010); *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1291-92 (M.D. Fla. 2016).[15]

The Complaint is silent as to whether Defendants engaged in either a horizontal, vertical or hub-and-spoke agreement. The factual allegations do not support a claim that the alleged conspiracy is entirely horizontal (only the Mining Defendants Ver and Wu – through his company Bitmain Technologies – directly compete), or vertical (there is no suggestion that all Defendants operate at different levels of either the production, or distribution, chain of Bitcoin Cash). Nor does the Complaint support a finding that one Defendant is common to all others, thus eliminating a hub, from a hub-and-spoke agreement.

The Complaint's failure to conform to any of these paradigms foreshadows its multitude of pleading deficiencies.

---

[15] "A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) (citation omitted). There may even be a "rimless" hub-and-spoke conspiracy, or series of conspiracies, where "various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another other than the common defendant's involvement in each transaction." *Id.* at 1192 n.3 (quoting *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002)).

### 1.    Defendant Bitmain, Inc. must be dismissed

As a preliminary matter, UAC does not argue, and the Complaint does not contain any facts that allege, that Bitmain, Inc. joined any agreement in violation of § 1. *See generally* (FAC; ECF No. 147 at 8-15; ECF No. 164 at 149-150). The sole allegation is that Bitmain, Inc. is a corporation organized in Delaware, that operates out of California, and maintains mining farms that mine cryptocurrency, such as Bitcoin and Bitcoin Cash. (FAC ¶¶ 7-8). The Court therefore dismisses Bitmain, Inc. from this lawsuit.

### 2.    UAC fails to plead conspiracy

The question whether the other Defendants' actions amounted to a contract, combination or conspiracy is different from, and antecedent to, the question whether their actions were an unreasonable restraint on trade. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010). The Court considers first whether the Complaint satisfies the pleading requirements of the first element, conspiracy. It does not.

As noted, the Complaint must state facts – not conclusions – that plausibly suggest a conspiracy. *Quality Auto Painting*, 917 F.3d at 1261-62. That is, there must be facts that demonstrate that the challenged anticompetitive conduct stems from an agreement, tacit or express, rather than from independent decision. *Id.* at 1261 (citing *Twombly*, 550 U.S. at 553). A § 1 agreement is a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984) (citations omitted). Stated somewhat differently, "a plaintiff must demonstrate a unity of purpose or common design and understanding, or a meeting of minds in an unlawful arrangement." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th

18

Cir. 1991) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)).

Importantly, the *plausibility* pleading standard does not impose a *probability* requirement. *Quality Auto Painting*, 917 F.3d at 1261 (citing *Twombly*, 550 U.S. at 556). UAC must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. As noted, conclusory allegations of agreement are insufficient. *Id.* at 555.

The Complaint is filled with factual assertions, although on closer inspection many really are conclusions that beg for specific facts to give them meaning. Moreover, many factual assertions, while interesting, do not clearly support the necessary essential elements of the claims. After a painstaking review of the Complaint, the Court concludes that it lacks facts that create a "reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.

### a.  The Complaint does not expressly allege an agreement

Neither count of the Complaint expressly alleges that all Defendants entered into an agreement, much less states the terms of that agreement.

Both counts begin with a conclusory recitation of the elements of a § 1 violation. *See* (FAC ¶¶ 101, 110) ("Defendants . . . entered into and engaged in a conspiracy in unreasonable restraint of trade in violation . . . of the Sherman Act.").

The one direct allegation of an agreement, found in both counts, is both incomplete and conclusory:

> The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which

> Defendants manipulated the cryptocurrency market for Bitcoin Cash, effectively hijacked the Bitcoin Cash network, centralized the market, and violated all accepted standards and protocols associated with Bitcoin since its inception, and fixed, maintained, suppressed, stabilized and/or otherwise made artificial the values associated with the Bitcoin Cash network.

(*Id.* ¶¶ 103, 112).[16] The Complaint does not say *what* Defendants agreed to. It states that Defendants entered into an agreement "*in furtherance of which*" they did certain things, such as "hijack the Bitcoin Cash network." (*Id.*) (emphasis added). The implication is that UAC claims that Defendants *agreed* to do the things listed in the paragraph (*e.g.*, "hijack the Bitcoin Cash network"), and the Court accepts this as a reasonable inference.

However, the Complaint lacks factual assertions that *all* Defendants entered into a shared agreement, which is fatal. Both counts allege Defendants took these *actions*:

> Defendants took control of the Bitcoin Cash cryptocurrency market by artificially pumping up the chain implementation with computer hashes to dominate the temporary software upgrade *and* implemented a new software version with checkpoints that controlled and manipulated the value and quality of the Bitcoin Cash network going forward.

(*Id.* ¶¶ 102, 111) (emphasis added). UAC argues that this paragraph alleges that Defendants, in fact, agreed to a two-part scheme to, first, "artificially pump[] up the chain implementation with computer hashes to dominate the temporary software upgrade", and second, thereafter implement "a new software version with checkpoints that controlled and manipulated the value and quality of the Bitcoin Cash network going forward." (*Id.*); (ECF

---

[16] Count I, that alleges a per se violation, also makes conclusory and unsupported allegations that Defendants entered into an agreement. *See* (FAC ¶¶ 105-106). As explained below, the alleged agreements do not amount to a per se violation of § 1.

No. 147 at 10-15). The Complaint does not state this. But, recognizing that UAC could, by amendment of the Complaint, clearly state that all parties agreed to this two-part scheme, the Court analyzes the Complaint as if UAC made this allegation.

Of course the claims in these paragraphs (*e.g.*, "artificially pumping up the chain implementation with computer hashes to dominate the temporary software upgrade") need the support of factual assertions that make clear what they mean, and that plausibly suggest that Defendants in fact agreed to these actions. The Court looks to the "Factual Background" section of the Complaint – with its 78 paragraphs of allegations, all of which are incorporated by reference into the two counts – for facts that plausibly suggest that all Defendants made a "conscious commitment" to this alleged two-part agreement. (FAC ¶¶ 22-99). That factual support is absent and this alone is reason to dismiss the Complaint.

### b.  Plaintiff relies on circumstantial evidence

UAC may plead its claims with assertions of direct or circumstantial evidence. *See DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1508 (11th Cir. 1989) (citing *Monsanto Co.*, 465 U.S. at 768)). Direct evidence is explicit and does not require courts to make inferences to find an agreement. *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999).[17] Circumstantial evidence requires a court to draw "infer[ences] from the behavior of the alleged conspirators." *Seagood Trading Corp.*, 924 F.2d at 1573 (citation omitted).

---

[17] A recorded phone call in which two competitors agree to fix prices at a certain level would be an example of direct evidence of agreement. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

Direct evidence of a § 1 conspiracy is rare, and most antitrust conspiracies are proved by circumstantial evidence. *DeLong Equip. Co.*, 887 F.2d at 1515 (citation omitted). That is the case here: UAC relies entirely on allegations of circumstantial evidence to plausibly plead that Defendants entered into an agreement.

When the Court evaluates the pleading of an agreement, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Quality Auto Painting*, 917 F.3d at 1261 (quoting *Twombly*, 550 U.S. at 553). Antitrust plaintiffs may plead and prove a § 1 violation with circumstantial evidence that amounts to both "parallel conduct" plus "some further factual enhancement." *Twombly*, 550 U.S. at 557. UAC contends that in this manner it has successfully pled an agreement in its Complaint. (ECF No. 147 at 8-15).

### c.  Only the Mining Defendants engaged in parallel conduct

Parallel business behavior, or "parallel conduct," is circumstantial evidence that supports an inference of an antitrust agreement. *Quality Auto Painting*, 917 F.3d at 1261 (citing *Twombly*, 550 U.S. at 553). Standing alone, parallel conduct is inconclusive, as it is consistent with an unlawful conspiracy, as well as rational and competitive business strategy prompted by common perceptions of the market. *Twombly*, 550 U.S. at 554. Thus, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556. It is a starting point, though, of the analysis.

Other Circuits have defined parallel conduct as similar action. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) ("A plaintiff establishes

parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'") (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993)). Although the Eleventh Circuit has not expressly defined the term, its decisions are in accord. *See Quality Auto Painting*, 917 F.3d at 1263 (defendants' adoption of a "uniform" price suggests parallel conduct); *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1304 (11th Cir. 2003) ("repeated, synchronous pricing decisions" over seven years established parallel behavior).

The Complaint itself does not use the term parallel conduct. At oral argument, however, UAC contended that certain alleged behavior qualifies as such. (ECF No. 164 at 119-121).

UAC argues that all Defendants engaged in the parallel conduct of supporting Bitcoin ABC. (*Id.*). This notion of parallel conduct is so broad as to make it meaningless; it simply restates the most fundamental claim that all Defendants favored Bitcoin ABC at the time of the November 2018 hard fork. What is important here is that the various Defendants favored Bitcoin ABC in different ways; they did not all act in a similar manner.

The only truly parallel behavior of any Defendants was that of the miners. Ver, owner of non-defendant Bitcoin.com, and Defendant Bitmain Technologies and its CEO and founder Wu, were competitors to one another, as well as to UAC, as they all mined Bitcoin Cash at the relevant time. As alleged, these Defendants engaged in the similar conduct of pooling servers to mine Bitcoin ABC shortly before the hard fork. (FAC ¶ 67). This parallel conduct is pertinent to only the first part of the alleged conspiracy: to hijack the network by dominating the hash war. There are no factual allegations that Ver, Wu and

Bitmain Technologies engaged in similar action to further the second part of the scheme: to centralize the market by using checkpoints.

Moreover, there is no allegation of parallel conduct on the part of the Exchange Defendants (Kraken and Powell) and the Developer Defendants (Chancellor and Cox). Rather, the Complaint is clear that those two sets of defendants made unique contributions to the alleged conspiracy.

### d.  The plus factors fall short

To review, parallel conduct – plus an allegation of conspiracy – is insufficient to plead a § 1 agreement. *Twombly*, 550 U.S. at 556. However, when a plaintiff pleads facts that indicate that the defendants who engaged in parallel conduct also acted contrary to their economic self-interest or engaged in some other "plus factors" that tends to establish they were in a collusive agreement, this can satisfy the pleading requirement. *Quality Auto Painting*, 917 F.3d at 1261-62 (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 571 (11th Cir. 1998)). These factors "remove [a plaintiff's] evidence from the realm of equipoise and render that evidence more probative of conspiracy . . . ." *Williamson Oil Co.*, 346 F.3d at 1301 (citation omitted).

"There is no finite list of plus factors." *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1371 (N.D. Ga. 2017). Any fact that tends to exclude the possibility of independent action may qualify. *Williamson Oil Co.*, 346 F.3d at 1301 (citation omitted).

The Court reviews UAC's various alleged plus factors by Defendant groups, keeping in mind that it must weigh UAC's allegations as a whole. *See Quality Auto*

*Painting*, 917 F.3d at 1263 n.15 ("[A]ntitrust plaintiffs receive 'the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'") (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

UAC's alleged plus factors fall far short of its pleading obligation. In the end it is clear that the Complaint has no factual allegations that create a reasonable expectation that discovery will reveal evidence that *all* Defendants entered into the entire alleged two-part agreement.

### 1)  The Mining Defendants

#### i.    Advance coordination

UAC alleges:

> 70.    The reallocation of Bitmain Technologies' hashing power onto the Bitcoin.com pools *could not be accomplished without coordination* between Wu, on behalf of Bitmain Technologies, and Ver, on behalf of Bitcoin.com, because the reallocation of extensive amounts of hash power from one pool to another *requires preparation* by the receiving pool to ensure that it is able to accommodate the spike in hash power on its network.

(FAC ¶ 70) (emphasis added). This allegation that the Mining Defendants engaged in advance preparation is again stated in a later paragraph:

> 75.    The above described actions were intentional and clearly *planned in advance*, with Bitmain Technologies organizing redeployment of up to 90,000 Bitmain Antminer S9 servers in early November.

(*Id.* ¶ 75) (emphasis added). The paragraph then provides a web link[18] to an article for support. (*Id.*).[19]

The assertion that "the reallocation of extensive amounts of hash power from one pool to another requires preparation by the receiving pool to ensure that it is able to accommodate the spike in hash power on its network" does suggest that discovery would reveal evidence that Ver, Wu and their companies communicated to make this reallocation happen, and thus reached an agreement to do so. That is, it suggests they agreed to the first part of the scheme.

This plus factor, however, relates only to the conduct of the Mining Defendants and in no way suggests agreement on the part of Developer or Exchange Defendants.

UAC also includes a graph and pie charts to illustrate the surge in hash power shortly before the upgrade, and the redistribution of Bitcoin ABC blocks before and after the upgrade. (*Id.* ¶¶ 74, 84-85). Specifically, the week before the upgrade, the Mining Defendants – Bitcoin.com[20] and Bitmain Technologies operating through AntPool and BTC.com – accounted for 20.1% of the Bitcoin blocks. (*Id.* ¶ 84). That number jumped to 98.85% the day after the hash war. (*Id.* ¶ 85). These graphics certainly allege that the

---

[18] *See* Marie Huillet, *Mining Giant Bitmain Hurries to Deploy 90,000 S9 Antminers Ahead of Bitcoin Cash Hard Fork*, CoinTelegraph (Nov. 8, 2018), https://cointelegraph.com/news/mining-giant-bitmain-hurries-to-deploy-90-000-s9-antminers-ahead-of-bitcoin-cash-hard-fork (last visited March 31, 2021).

[19] The Court considers the content of this, and other online resources referenced in the Complaint, to the extent the Court can access the content. *See Grossman*, 225 F.3d at 1231 (the Court must limit its consideration to the four corners of the complaint and the exhibits attached thereto).

[20] As noted, Bitcoin.com is not a Defendant, but UAC alleges that Ver controlled its mining pool.

Mining Defendants worked toward the same goal at the time of the hard fork and were handsomely rewarded for the dramatic increase in hashing power they brought to the contest. The graphics do not suggest an agreement, however, over independent action.

### ii.    Actions against self-interest

UAC argues that the Complaint, in two ways, makes factual assertions that Wu and Bitmain Technologies acted against their self-interest, when they agreed to the first part of the scheme. I cannot agree.

First, UAC alleges, "[u]pon information and belief, Bitmain Technologies reallocated a significant portion of hash power from customers who had joined the Bitmain mining pools without the authorization or consent of those customers." (FAC ¶ 68).[21] Paragraph 68 includes two web links[22] to articles, but they do not support this allegation. In its memoranda UAC argues – without any explanation – that this was against Wu and Bitmain Technologies' economic self-interest. (ECF No. 147 at 11).

The Complaint says nothing about the relationship between Wu, Bitmain Technologies and customers of the company's mining pools, to support the notion that the company needed customer consent. At oral argument UAC made the assertion that if

---

[21] While "information and belief" pleading can sometimes survive a motion to dismiss, a plaintiff must allege specific facts sufficient to support a claim. "Conclusory allegations made upon information and belief are not entitled to a presumption of truth, and allegations stated upon information and belief that do not contain any factual support fail to meet the *Twombly* standard." *Scott v. Experian Info. Sols., Inc.*, No. 18-cv-60178, 2018 WL 3360754, at *6 (S.D. Fla. June 29, 2018) (citations omitted). Here, there is no factual support for this allegation.

[22]    *See*    https://www.shitcoin.com/blog/shitcoin-com-newsletter-18-november-16-2018    and https://medium.com/@jiangzhuoer/abc-vs-bsv-hash-war-part-iii-the-war-of-the-hash-power-45fef8010467 (last visited March 31, 2021). (FAC ¶ 68).

Bitmain Technologies' reallocation of servers violated contracts with its customers, this action could expose the company, and Wu, to liability. (ECF No. 164 at 127-28). UAC acknowledged, however, that it has no information about these contracts. (*Id.*).

One of the articles UAC cites in paragraph 68 appears to contradict UAC's assertion. It states: "miners in fact do not have to care about what coins they are actually mining" and "might not even know which coins are mined."[23] This suggests that Bitmain Technologies' contracts may grant it the discretion to decide what cryptocurrency to mine.[24] In the end it is all speculation, whether Wu and his companies' reallocation of mining nodes was, or was not, in their best interests. Pure speculation does not make out a plus factor.

Second, UAC also argues that the reallocation of servers was against Wu's economic self-interest, because "[u]pon information and belief, Wu stated prior to the fork that 'by relocating hash power from BTC mining to BCH mining – BTC price will dump below yearly support; it may even breach $5,000. But since CSW [Craig Wright – one of the proponents of SV] is relentless, I am all in to fight till death!'" (FAC ¶ 69) (alteration in original); (ECF No. 147 at 11). Essentially, UAC's argument here is that by relocating hash power from Bitcoin Core to Bitcoin Cash, Wu's investment in Bitcoin Core would lose value, and this action would be against his economic self-interest.

---

[23] Jiang Zhuoer, *ABC vs. BSV Hash War (Part III) — The War of the Hash power*, Medium (Nov. 14, 2018), https://medium.com/@jiangzhuoer/abc-vs-bsv-hash-war-part-iii-the-war-of-the-hash-power-45fef8010467 (last visited March 31, 2021). (FAC ¶ 68).

[24] This would be akin to contracts between a client and investment manager in which the client relies on the manager to make the best investment decisions on his or her behalf, to include the buying and selling of different securities (*e.g.*, stocks).

The Court notes, most importantly, that Wu's alleged statement does not plausibly suggest that he acted in concert with anyone. As for Wu's motivations, the Court must "exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest [it] be too quick to second-guess well-intentioned business judgments of all kinds." *Williamson Oil Co.*, 346 F.3d at 1310 (citation omitted). The statement does not give rise to one reasonable inference. It may indicate that Wu chose to lose money on Bitcoin Core to advance an unlawful agreement to unreasonably restrain trade in the Bitcoin Cash market, as UAC suggests. Alternatively, Wu may have viewed the upcoming hash war as an opportunity to further invest in Bitcoin Cash, believing it offered a greater return than Bitcoin Core, akin to an investor selling one stock for another.[25] Or, it may be that Wu's rivalry with Craig Wright steered his reallocation of resources. For all these reasons, Wu's alleged statement does not amount to a plus factor.

### iii.    Public statements

"Collusive communications . . . can occur in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways." *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) (citations omitted). UAC argues that several public statements tend to "demonstrate that Defendants coordinated, conspired and agreed with one other [sic]." (ECF No. 147 at 12-13). The Court does not agree.

---

[25] Bitmain Technologies, after all, was already mining Bitcoin Cash before the fork. *See* (FAC ¶¶ 61, 84).

First, UAC alleges that five hours before the upgrade, Ver and Andreas Brekken, a former employee of Kraken, were interviewed on an episode of an internet vlog regarding the hash war, and on that same day, "Brekken posted on Twitter . . . that 300,000 s9 miners were diverted by Ver to secure the ABC version of the upgrade." (FAC ¶¶ 76-77).[26] UAC argues that "[Brekken's] statement [on Twitter], along with the close relationship between Ver and Brekken and their physical meeting on the day of the upgrade, tends to demonstrate that Ver and Wu coordinated the diversion of Bitmain [Technologies] miners." (*Id.* ¶ 77).

This allegation indicates nothing more than Brekken's awareness of Ver's diversion of miners to participate in the hash war. It sheds no light on any agreement Ver made with other Defendants to do this.

Second, the Complaint alleges that Ver "posted a video on November 19, 2018 where he alluded to the fact that he rented hash power during the upgrade" and provides a link to YouTube, presumably to that video. (FAC ¶ 79).[27] Defendants dispute UAC's characterization of Ver's statements in the video and argue "Ver *never* acknowledged that he 'rented' hash power in the run-up to the hard fork . . . Ver made no reference to an agreement to behave in a certain manner or to *any* communication with other Defendants." (ECF No. 144 at 12). Drawing "all reasonable inferences" in favor of the plaintiff, *St.*

---

[26] Paragraph 76 includes a link to a YouTube video of the interview. *See* https://www.youtube.com/watch?v=4VilbwA0Hrs (last visited March 31, 2021). The Court reviewed the video and finds that it does not contain any evidence of an agreement among any Defendants. It simply supports UAC's allegation that Ver and Brekken were interviewed together on the day of the upgrade.

[27] The Court cannot consider the content of the video, as the link leads to a message that the video is unavailable.

*George*, 285 F.3d at 1337, the allegation that Ver publicly alluded to his renting of hash power, at best suggests that Ver agreed with *someone*, who is not named, to reallocate servers to use in the upcoming hash war. This is not a plus factor.

Third, UAC references this Twitter post Ver made on the day of the upgrade: "The Bitcoin.com pool now has more hash rate on it than the entire BCH network had earlier today. Bitcoin is cash for the world! #BitcoinCash #bitcoincashfork". (FAC ¶ 78). UAC also references its allegation that, after the fork, "Wu publicly congratulated Bitcoin.com for mining the first block with the ABC rule set." (*Id.* ¶ 73). These two statements do nothing to suggest that any of the Defendants agreed with any other Defendants to accomplish the two-part scheme.[28]

### 2)  The Exchange Defendants

Kraken, the exchange, allegedly released this public statement before the outcome of the fork was known: "Bitcoin SV does not presently meet Kraken's listing requirements and is unlikely to be supported." (*Id.* ¶ 71). UAC argues that this is evidence that Kraken and Powell "lent support to Ver and Wu's scheme by improperly influencing the outcome" of the hash war – by suggesting that the exchange would not trade Bitcoin SV. (ECF No. 147 at 12). As UAC's counsel put it at oral argument: Kraken thus put its "thumb on

---

[28] The Complaint alleges one more public statement that the parties do not address in their arguments. That is, on November 20, 2018, Sterlin Lujan, Bitcoin.com's Communications Ambassador, posted this Tweet: "Bitcoin ABC is sticking to the primary goal of bringing cryptocurrency to the world. In the end, it is all about economic freedom. The rest is just noise." (FAC ¶ 95). The Complaint does not provide the significance of this statement, except to allege that Lujan said it "on behalf of and regarding Bitcoin.com taking control". (*Id.*). The Court sees no basis to consider this a plus factor, and evidently UAC does not either.

the scale" of the hash competition, to encourage the mining of Bitcoin ABC. (ECF No. 164 at 121). UAC also alleges that Ver is a Kraken investor (FAC ¶ 64), and Ver and Powell are high school friends. (*Id.* ¶ 71 n.5). UAC argues that this relationship between Ver and Kraken/Powell, lends support to the conclusion that they agreed to the first and second part of the scheme. (ECF No. 147 at 11-12).

UAC further argues Kraken's statement, that suggested it would not support Bitcoin SV, was against its self-interest because Kraken's revenue depends on the volume of trade regardless of the asset being traded. (*Id.* at 12). Notably, the Complaint does not allege this. The Complaint does compare Kraken to another cryptocurrency exchange, Binance, which made no statements to support ABC or SV. (FAC ¶ 72).

At most, Kraken's statement suggests it has listing requirements for the currencies it trades. UAC does not plead facts that suggest that Kraken's listing requirements allowed it to support Bitcoin SV, or that the listing requirements were the same for all exchanges. The fact that Ver invested in Kraken and that Ver and Powell were friends from high school does not change this analysis, because this in no way suggests that they communicated about the hard fork or that Ver had any influence over Kraken's public statements or listing decisions.

Similarly, UAC's argument that Kraken made this statement against its economic self-interest is not persuasive. It is also plausible that an exchange's CEO may release statements to inform its current and potential customers of its listing requirements, and that Kraken acted on behalf of its customers by vetting the SV chain. If so, this may have been consistent with its self-interest. As for UAC's argument that Kraken's revenue depends on

the volume of trade regardless of the asset being traded, (ECF No. 147 at 12), UAC does not allege this in the Complaint. And again, the Complaint does not allege that Kraken's listing requirements allowed it to support Bitcoin SV.

As for the Complaint's comparison to Binance, UAC does not allege facts that suggest Binance's listing requirements are the same as Kraken's. The Court notes the Complaint's allegation that after the fork, "[s]ome trading platforms have chosen to list only one of the two resulting currencies . . . ." (FAC ¶ 97). It thus appears that Kraken was not the only exchange that chose to list one of the post-fork currencies. In sum, these allegations do not suggest that Kraken conspired with other Defendants, any more than it suggests that Kraken acted independently of them.

Next, UAC alleges that after the fork, "Powell's personal interest in the matter was expressed in a tweet where he declared that, 'The merits of BSV are overshadowed by the alienating threats of a few grandiose personalities. Longer chain! = adoption. Victory may be pyrrhic.'" (*Id.* ¶ 96). UAC argues that this statement is evidence of Powell's agreement to the second part of the scheme, and that the statement is "notable" because it expressed Powell's "commitment to the ABC version." (ECF No. 147 at 13). It is not clear what this statement means, much less that it is an expression of "commitment" to Bitcoin ABC. This statement falls short of suggesting any agreement between Powell and any Defendants.

Last, UAC alleges that "as early as the next day after the update, individuals in the cryptocurrency industry such as Brekken, held online forums acknowledging that Bitcoin ABC Developers and crypto exchanges such as Kraken agreed to implement centralized checkpoints." (FAC ¶ 94). UAC provides a link to a video that is no longer available and

a link to a website that provides background information about Brekken but does not offer any evidence of an agreement between Defendants. (*Id.*). The Complaint includes a screenshot of the referenced video and these quotes from Brekken: "this has been planned for a long time" and "we knew within 30 minutes we had it." (*Id.*). UAC argues these statements "tend[] to demonstrate that the Bitcoin ABC Developers and Kraken agreed to *the entire scheme* in advance . . . ." (ECF No. 147 at 13) (emphasis added).

Brekken was a *former* software engineer for Kraken and is not a Defendant, and the "we" and the "it" in "*we* knew within 30 minutes *we* had *it*" is not identified. The Court rejects UAC's argument that these statements, in the context of the other allegations, plausibly suggest "the Bitcoin ABC Developers and Kraken agreed to the entire scheme in advance . . . ." (*Id.*).

### 3)  The Developer Defendants

The Complaint has one substantive allegation about Chancellor and Cox: they "implemented a 'poison pill' in the resulting Bitcoin ABC chain referred to as a 'checkpoint.'" (FAC ¶ 87). UAC does not plead any facts to distinguish Chancellor's actions from Cox's; it groups them together as one, referring to them as the "Bitcoin ABC Developers." *See generally* (FAC).

UAC essentially argues that the implementation of the checkpoint itself is a plus factor. *See* (ECF No. 147 at 12-15). It makes the conclusory allegation that "[t]he implemented checkpoint is problematic because it also 'centralized' what should be a *decentralized* market due to the way the checkpoint was added and its location close to the tip of the blockchain." (FAC ¶ 88). UAC further alleges:

90.     The decision by Sechet, Chancellor and Cox to "lock down" the block chain after an arbitrary number of blocks close to the tip of the blockchain – through a mechanism referred to as "checkpoints" and "Deep Reorg Prevention" – will allow anyone with 51% hashing power to quickly cement control of the blockchain ledger. They would also cement control over future changes to Bitcoin Cash functionality as well as changes to the consensus rules. Combining this checkpoint power with the hashing power of Bitcoin ABC backers like Ver (through Bitcoin.com) and Wu (through Bitmain Technologies' mining pools, AntPool and BTC.com) amounts to centralization. Anyone who combines hashing power and checkpoints in this fashion will be able to override *any* consensus reached by the rest of the network, forcing others to conform or create an unwanted hard fork.

91.     The effect of creating the checkpoint was to ensure that only the proponents of Bitcoin Cash ABC could dictate any future software upgrades on that cryptocurrency network. Therefore, the decentralized process whereby competing participants in the Bitcoin Cash network could propose software changes to improve upon the quality of Bitcoin Cash was now centralized and controlled by those who had dominated the hash war that caused the hard fork.

(FAC ¶¶ 90-91). UAC also alleges that the decision to implement a checkpoint was "made without consulting other Bitcoin development groups and the community at large." (FAC ¶ 93). UAC does not explain how these allegations constitute a plus factor. *See* (ECF No. 147 at 12-15).

Importantly, UAC does not allege that Chancellor and/or Cox implemented the checkpoint by agreement with the other Defendants. UAC alleges no facts about how developers (specifically Chancellor and Cox) operate in this industry or what the purpose of a checkpoint on a blockchain is, other than the conclusion that it will allow "anyone with 51% hashing power to quickly cement control of the blockchain ledger." (FAC ¶ 90). It

may be equally plausible that checkpoints serve another purpose, instead of centralizing a cryptocurrency market, such as providing security for the blockchain, or as an efficiency measure.

In sum, UAC does not plead facts that demonstrate that Chancellor and Cox's implementation of a checkpoint tends to exclude the possibility of independent action.

UAC's allegations, when taken together, do not allege facts that tend to exclude the possibility of independent action.[29] *See Quality Auto Painting*, 917 F.3d at 1261-62. Instead, UAC lumps together groups of Defendants, who have different roles in the cryptocurrency industry and who took different actions, and states as a conclusion that they all agreed to the alleged two-part scheme. The Complaint does not plausibly suggest such an agreement. *See Quality Auto Painting*, 917 F.3d at 1262; *see also SD3, LLC*, 801 F.3d at 422 ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group."). Because the Complaint fails to plead the essential first element of a § 1 violation – an agreement – the Complaint must be dismissed.

---

[29] UAC argues in a footnote in its memorandum an additional plus factor: "It is also evident that the unregulated cryptocurrency market has a structure that is highly susceptible to collusion." (ECF No. 147 at 15 n.2). UAC cites other Circuit Courts of Appeal to state, "[s]everal circuits have held that allegations showing a market susceptible to collusion, while not alone sufficient, can nudge other factual allegations tending to show an agreement across the line to plausibility." (*Id.*). UAC raises this purported plus factor for the first time in its response memorandum, and therefore the Court does not consider it. *See Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 665 (11th Cir. 2015) ("We repeatedly have held that plaintiffs cannot amend their complaint through a response to a motion to dismiss.") (citation omitted). Even if the Court were to consider it, UAC provides no facts in the Complaint to support its argument.

### 3.     UAC has failed to plead a rule of reason claim

The Complaint also fails to make factual assertions that allow the Court to draw the reasonable inference that Defendants' alleged agreement was an unreasonable restraint of trade.

As noted earlier, Courts may evaluate these last elements of a § 1 claim under the "flexible, case-by-case standard: the . . . rule of reason." *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010) (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 58-62 (1911) (adopting the rule of reason)). "Under the rule of reason, 'the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'" *Id.* (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)).

An unreasonable restraint of trade is one that harms competition in general, rather than the plaintiff, or any other competitor. *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004).

> [T]he purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.

*Id.* (alterations in original) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993)).

Before the Court can evaluate harm to competition, it must know the market where this alleged harm has taken place. *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) (The "[r]ule of reason analysis requires the plaintiff to prove . . . an

anticompetitive effect of the defendant's conduct on the relevant market . . . ."). UAC, therefore, must "identify the relevant market in which the harm occurs." *Jacobs*, 626 F.3d at 1336 (citations omitted).

### a. Relevant markets

The Complaint must define both the geographic market and the product market and do so by presenting enough information to "plausibly suggest the contours of the … markets." *Jacobs*, 626 F.3d at 1336. The Complaint here does not expressly define either market. UAC argues, however, that the Complaint nonetheless alleges that the relevant product market is Bitcoin Cash and the geographic market is worldwide. (ECF No. 147 at 16-18).

### 1) Geographic market

Defendants do not dispute that the relevant geographic market is global, (ECF No. 164 at 66), and there are allegations that suggest this.[30] "The relevant geographic market is 'the area of effective competition in which a product or its reasonably interchangeable substitutes are traded.'" *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1263 (11th Cir. 2015) (quoting *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 423 (11th Cir. 1984)). Bitcoin Cash and other cryptocurrencies are mined and traded virtually which allows global access. With amendment, UAC could certainly

---

[30] *See, e.g.*, (FAC ¶ 2) ("This well-planned scheme caused a global capitalization meltdown of more than $4 billion . . . ."); (*id.* ¶ 3) (Defendants caused "significant long-term implications for world economies and particularly the U.S. economy."). The Complaint also alleges participants in the Bitcoin Cash market of various nationalities, (*id.* ¶¶ 6-16), that Bitcoin Cash is a virtual currency that involves electronic transactions, (*id.* ¶¶ 22-23), and that Bitmain Technologies maintains offices and research centers across the globe, including the United States, (*id.* ¶ 59).

expressly plead the geographic market. Knowing this, for purposes of its analysis here, the Court accepts the geographic market as well-pled.

### 2) Product market

The relevant product market is not well-plead. Yes, the Complaint alleges that Defendants' conduct took place in the Bitcoin Cash market[31] but the contours of that market are not clear.

The relevant product market is defined by identifying "producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services." *Jacobs*, 626 F.3d at 1337 (quoting *Levine*, 72 F.3d at 1552). "The market is composed of products that have reasonable interchangeability." *Levine*, 72 F.3d at 1552 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)). Courts thus "'pay particular attention to evidence of the cross-elasticity of demand'—the extent to which consumers demand less of the particular product as the price for its alleged substitute declines." *Duty Free Ams., Inc.*, 797 F.3d at 1264 (quoting *Jacobs*, 626 F.3d at 1337).

> A high cross-elasticity of demand (that is, consumers demanding proportionately greater quantities of Product X in response to a relatively minor price increase in Product Y) indicates that the two products are close substitutes for each other and are part of the same product market. In other words, a product market consists of products that have reasonable interchangeability for the purpose for which they were produced.

---

[31] *See, e.g.*, (FAC ¶ 1) (Defendants "manipulate[d] the cryptocurrency market for Bitcoin Cash . . . ."); (*id.* ¶¶ 103, 112) (same); (*id.* ¶¶ 102, 111) ("Defendants took control of the Bitcoin Cash cryptocurrency market . . . ."); (*id.* ¶¶ 107, 116) ("Defendants' conspiracy, and resulting impact on the market for Bitcoin Cash, occurred in or affected interstate and foreign commerce.").

*Duty Free Ams., Inc.*, 797 F.3d at 1264 (citations and quotation marks omitted).

The relevant product market may exist as a distinct submarket of a larger product market. *Jacobs*, 626 F.3d at 1337 (citation omitted). The Supreme Court has identified "practical indicia" that can determine the contours of the submarket, such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Duty Free Ams., Inc.*, 797 F.3d at 1264 (quoting *Polypore Intern., Inc. v. F.T.C.*, 686 F.3d 1208, 1217 (11th Cir. 2012)); *Jacobs*, 626 F.3d at 1337 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).[32]

Is Bitcoin Cash its own market or submarket? Or is it a part of a larger market of some or all cryptocurrencies? Beyond conclusions, the Complaint is silent.

The pleading requirements of a relevant product market are well illustrated in *Jacobs*, where the Eleventh Circuit affirmed a district court's dismissal of a complaint for failure to state a claim. There, the plaintiff consumer sued Tempur-Pedic, the manufacturer of eighty to ninety percent of visco-elastic foam mattresses sold in the United States. *Jacobs*, 626 F.3d at 1331. Plaintiff charged that Tempur-Pedic's setting of minimum retail prices that distributors charge for the mattresses – and its own adherence to those minimum prices – was a violation of § 1 of the Sherman Act. *Id.* The plaintiff alleged that visco-elastic foam mattresses are a separate sub-market of the overall mattress market. *Id.* at

---

[32] In *Jacobs*, the Eleventh Circuit noted that some Courts have criticized *Brown Shoe*'s language of "submarkets" and "practical indicia." 626 F.3d at 1337 n.12.

1338. The trial court, in dismissing the case under Rule 12(b)(6), concluded otherwise: "because visco-elastic foam mattresses and traditional innerspring mattresses are both products on which people sleep, the two products are interchangeable parts of the larger mattress market, a market as to which [the plaintiff] did not allege any anticompetitive effects." *Id.* (quotation marks omitted).

On appeal, the plaintiff argued that the trial court erred by not allowing plaintiff the opportunity in discovery to adduce facts that would establish that visco-elastic foam mattresses are a separate relevant product market. *Id.* The Eleventh Circuit squarely rejected this argument, writing that to accept the argument would

> absolve Jacobs of the responsibility under *Twombly* to plead facts "plausibly suggesting" the relevant submarket's composition. Jacobs's skimpy allegations of the relevant submarket do not meet this obligation. The complaint alleges, without elaboration, that the "[v]isco-elastic foam mattresses comprise a relevant product market, or sub-market, separate and distinct from the market for mattresses generally, under the federal antitrust laws." This conclusional statement merely begs the question of what, exactly, makes foam mattresses comprise this submarket. The complaint provides no factual allegations of the cross-elasticity of demand or other indications of price sensitivity that would indicate whether consumers treat visco-elastic foam mattresses differently than they do mattresses in general. Consumer preferences for visco-elastic foam mattresses versus traditional innerspring mattresses, and the costs associated with their sale, may vary widely, may vary little, or may not vary at all. Jacobs's complaint, however, gives no indication of which of these is the case. The allegations that visco-elastic foam mattresses are more expensive than traditional innerspring mattresses and that visco-elastic foam mattresses have "unique attributes" are similarly of little help. They do not indicate the degree to which consumers prefer visco-elastic foam mattresses to traditional mattresses because of these unique attributes and differences in price . . . These types of questions, which our precedent

> makes clear are crucial to understanding whether a separate
> market exists, go unanswered in the complaint.

*Id.* As already noted, unlike *Jacobs*, UAC does not even make a "conclusional" express

allegation that Bitcoin Cash is the relevant product market. And fatally, it fails to allege

facts that plausibly indicate that Bitcoin Cash is its own market.

The closest the Complaint gets is paragraph 33, which addresses distinct

characteristics of Bitcoin Cash:

> 33.    While there are many forms of cryptocurrency in
> existence, each form of cryptocurrency has distinctive
> characteristics that separate it from other forms of
> cryptocurrency. Those characteristics include the size of the
> blocks associated with the cryptocurrency, the software design
> underpinning the cryptocurrency, and the utility of the
> cryptocurrency as a means of storing value or as a means of
> conducting day-to-day transactions. Bitcoin Cash, specifically,
> is a unique form of cryptocurrency because it is intended to be
> scalable, meaning that it is designed with larger block data
> limitations so that transactions using Bitcoin Cash can be
> performed quickly and with relatively low transaction costs in
> a peer-to-peer system. Bitcoin Cash is also unique in that it is,
> by far, the most widely adopted form of peer-to-peer
> cryptocurrency cash-like system in the world.

(FAC ¶ 33). The fact that "each form of cryptocurrency has distinctive characteristics" says

little. This is true for many products that compete in a market. UAC's allegation that

Bitcoin Cash is "unique" because of its utility for peer-to-peer daily transactions and that

it is the most widely adopted form of a cash-like cryptocurrency leaves us hanging. It tells

us nothing that would allow us to discern the extent to which consumers prefer Bitcoin

Cash over the multitude of other cryptocurrencies, and says nothing about the other peer-

to-peer cash-like cryptocurrencies that apparently exist, or why Bitcoin Cash would be its

own market rather than, at minimum, in a shared market with similar cryptocurrencies that are also primarily used for transactions.

In addition, there are no factual assertions that plausibly show whether there is cross-elasticity of demand between the market for Bitcoin Cash (whether that market is before or after the hard fork, or both) and the market for Bitcoin Core or other cryptocurrencies, or even fiat currencies. In the words of the *Jacobs* Court, "these types of questions . . . go unanswered in the complaint." *Jacobs*, 626 F.3d at 1338.

The Court turns to the next step in the analysis, harm to competition. Assuming UAC pleads facts that plausibly suggest Bitcoin Cash is its own market, UAC fails to plausibly allege that Defendants' conduct harmed competition in that market.

### b. Harm to competition

Under the rule of reason analysis, UAC may show either actual or potential harm to competition in the relevant market. *Jacobs*, 626 F.3d at 1336 (citation omitted). To plead actual harm a plaintiff must show a factual connection between the alleged harmful conduct and its impact on competition in the market. *Id.* at 1339 (citation omitted). The plaintiff must demonstrate damage to competition with "specific factual allegations." *Id.* (quoting *Spanish Broad. Sys.*, 376 F.3d at 1073). "Actual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality." *Jacobs*, 626 F.3d at 1339 (citation omitted). To plead potential harm a plaintiff must "define the relevant market and establish that the defendants possessed power in that market", *id.* (quoting *Levine*, 72 F.3d at 1551), and then make "specific allegations linking market power to harm to competition in that market." *Jacobs*, 626 F.3d at 1339 (quoting *Spanish*

*Broad. Sys.*, 376 F.3d at 1073).

UAC alleges that Defendants' conduct harmed the "quality" of the Bitcoin Cash market – it makes no claim that a change in price, output, or something else, harmed competition in that market.[33] UAC is clear that the quality of Bitcoin Cash rests on its integrity, which depends on the market being decentralized "whereby no one entity controls the market (allowing for unbiased value of the currency)." (FAC ¶ 41). It alleges that "[f]or a cryptocurrency network to remain secure and trusted, the entire process must remain distributed and decentralized so that no single individual, entity or pool can control more than 50% of the computing power. If this 50% figure is exceeded, the network is no longer decentralized" which will cause its users to have a "lack [of] confidence and trust." (*Id.* ¶ 32); *see also* (*id.* ¶ 98) ("The Defendants' collective actions . . . created significant uncertainty and a lack of confidence in the network.").[34]

UAC makes this central allegation of harm to the quality of Bitcoin Cash:

> 114.   The conspiracy alleged constitutes an antitrust violation under the rule of reason analysis because it resulted in a deterioration in the quality of Bitcoin Cash. After the hard fork, and with the implementation of the checkpoint, competing developers who wish to propose innovative ways to improve upon the software implementations used to mine for Bitcoin Cash will be unable to do so to the detriment of all participants

---

[33] The Complaint makes allegations that "the value of the cryptocurrency that [UAC] mines in its BlockchainDomes has fallen significantly", "[t]he combined value of the forked currency is lower than the pre-fork currency", and "[UAC] has suffered and continues suffering significant damages through the loss of value of the currency." (FAC ¶¶ 97, 99). This is pertinent to UAC's own loss, not harm to competition.

[34] UAC also alleges that Defendants' conduct "violated the central tenets and principles established by [the] Whitepaper and relied upon by stakeholders and the market", (FAC ¶ 80), and that this "created significant uncertainty and a lack of confidence in the network." (*Id.* ¶ 98). The Whitepaper, of course, is neither a contract nor law that creates an enforceable standard.

in the Bitcoin Cash network. This harm is intended by Defendants to inure to their benefit in that only the Defendants can dictate to the market when and how upgrades are introduced. This concerted action has the effect of reducing the ability of Bitcoin Cash to innovate to prepare for greater and greater scalability as it is adapted more widely than its current use.

(*Id.* ¶ 114).[35]

These allegations are conclusions loaded with assumptions. There are no facts that explain how and why "competing developers" will be unable to "propose innovative ways to improve upon the software implementations used to mine for Bitcoin Cash." The claim that "only the Defendants can dictate to the market when and how upgrades are introduced" once again lacks the "how" and "why" allegations that might give this meaning.

The allegations about the "checkpoint" or "poison pill" that the Developer Defendants installed are central to UAC's claim that competition has been harmed – post-hard fork – in the Bitcoin ABC market. *See* (*id.* ¶¶ 87-94). This, again, amounts to conclusions. The allegation that the Developers' checkpoint "will allow anyone with 51% hashing power to quickly cement control of the blockchain ledger" (*id.* ¶ 90), begs for allegations that explain how.

Paragraphs 90 and 91 attempt to address this by alleging that Bitcoin Cash is centralized, and thus harmed, when the checkpoint is *combined* with the hashing power of the Mining Defendants:

---

[35] UAC further alleges that this "deterioration in quality" will cause "higher transaction costs for Bitcoin Cash consumers as Bitcoin Cash continues to be scaled." (FAC ¶ 115). UAC does not allege facts that plausibly suggest that these higher transaction fees harm competition in the Bitcoin Cash market.

90.     The decision of Sechet, Chancellor and Cox to "lock down" the block chain after an arbitrary number of blocks close to the tip of the blockchain – through a mechanism referred to as "checkpoints" and "Deep Reorg Prevention" – will allow anyone with 51% hashing power to quickly cement control of the blockchain ledger. They would also cement control over future changes to Bitcoin Cash functionality as well as changes to the consensus rules. *Combining this checkpoint power with the hashing power of Bitcoin ABC backers like Ver (through Bitcoin.com) and Wu (through Bitmain Technologies' mining pools, AntPool and BTC.com) amounts to centralization.* Anyone who combines hashing power and checkpoints in this fashion will be able to override *any* consensus reached by the rest of the network, forcing others to conform or create an unwanted hard fork.

91.     The effect of creating the checkpoint was to ensure that only the proponents of Bitcoin Cash ABC could dictate any future software upgrades on that cryptocurrency network. Therefore, the decentralized process whereby competing participants in the Bitcoin Cash network could propose software changes to improve upon the quality of Bitcoin Cash was now centralized and controlled by those who had dominated the hash war that caused the hard fork.

(*Id.* ¶¶ 90-91) (emphasis added).

These allegations assume all Defendants will continue to act in unison, as they allegedly did in the few days preceding and following the November 15, 2018 software upgrade, and that they will always support Bitcoin ABC and continue to hold power in that market.[36] Yet there are no non-conclusory assertions in the Complaint that makes this

---

[36] The only allegations in the Complaint concerning market power for Bitmain Technologies are that it controls "well in excess of 60% of the world's cryptocurrency mining computer (hashing) power" (FAC ¶ 60) and "operates Antpool and BTC.com, two of the largest Bitcoin and Bitcoin Cash mining pools in the world. As of December 2, 2018 . . . these two pools collectively controlled 31% of Bitcoin mining and 40% of Bitcoin Cash ABC." (*Id.* ¶ 61). The Complaint lacks specific allegations that link this market power of Bitmain Technologies to harm to competition in that market. *Jacobs*, 626 F.3d at 1336. As for Kraken, the only allegation that bears on its market power is that it "purports to be the largest Bitcoin exchange in Euro volume and liquidity." (*Id.*

plausible. In fact, the Complaint's allegations that Ver, Wu and Bitmain Technologies diverted servers in the days leading up to November 15, 2018, to participate in that hash competition, suggests otherwise. That is, the Complaint offers no factual basis to believe that those servers remain dedicated to mining the ABC version after November 2018. Ver, Wu and Bitmain Technologies may have since redirected their mining resources to other cryptocurrencies they consider profitable.[37] The notion that they – or other miners – would "combine . . . their hashing power" with the "checkpoint power" is simply an assertion, without plausible factual allegations to support it.[38]

For this multitude of reasons, the Court finds that UAC has failed to plead a Sherman Act § 1 rule of reason claim.

### 4.      UAC has failed to plead a per se violation

While most restraints on trade under § 1 of the Sherman Act are subject to a rule of reason analysis, some restraints are per se illegal. Per se violations "are limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition." *Jacobs*, 626 F.3d at 1334 (citations omitted).

The Supreme Court has "expressed reluctance to adopt *per se* rules with regard to restraints imposed in the context of business relationships where the economic impact of

---

¶ 71 n.5). The Complaint contains no allegations that all Defendants possessed power in the market for Bitcoin Cash – however that market may be defined – and does not link that market power to harm to competition. *See Jacobs,* 626 F.3d at 1336.

[37] This is also contradicted by a fundamental premise of the Whitepaper, stated in the abstract, that "nodes can leave and rejoin the network at will." (FAC at Ex. A).

[38] The Complaint also lacks factual assertions that explain any role the Exchange Defendants would continue to play that would harm competition in a Bitcoin Cash market.

certain practices is not immediately obvious." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007) (quoting *Khan*, 522 U.S. at 10). Thus, courts should apply the per se label "infrequently and with caution." *Seagood Trading Corp.*, 924 F.2d at 1567 (citations omitted).

When determining whether the conduct involved is per se illegal, courts analyze whether the conduct "always or almost always tend[s] to restrict competition and decrease output," without elaborate inquiry into the harm caused or business justification for that conduct. *Id.* (citations omitted).

Here, UAC alleges that Defendants committed a per se violation because Defendants' conduct was "in the nature of" bid rigging, or alternatively, a group boycott. (FAC ¶¶ 105-106).

### a. Bid Rigging

Bid rigging is a form of horizontal price fixing and is a per se violation of § 1. *See United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018); *United States v. Fenzl*, 670 F.3d 778, 780 (7th Cir. 2012); *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006); *United States v. Flom*, 558 F.2d 1179, 1183 (5th Cir. 1977) ("An agreement that one company would not submit a bid lower than another is price fixing of the simplest kind and is a per se violation").[39]

In one paragraph in Count I, UAC offers its only explanation how Defendants'

---

[39] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

conduct fits in this class:

> 105.   The conspiracy alleged constitutes a per se violation *in the nature of bid rigging* in that the Defendants came together in an agreement to pre-determine the outcome of the upgrade contest on November 15, 2018, and then worked together to secure the benefits of their dominance over the upgrade into perpetuity by implementing the checkpoint.

(FAC ¶ 105) (emphasis added). First, the Court notes that UAC qualifies its claim, stating Defendants' conduct was "in the nature of" bid rigging. That is, it is a variation of bid rigging. Next, tellingly, in its opposition brief, UAC argues only that the conduct of Ver and Wu amounted to big rigging:

> The miners (who are supposed to be competing with each other) were effectively bidding with their votes (their computing power) during the hash war. Defendants Ver and Wu agreed to rig the bid by reallocating hash power from another cryptocurrency network – essentially, bringing in unqualified bidders. They then changed the rules of future proposals after they won the bid.

(ECF No. 147 at 21). UAC makes no argument that the Exchange and Developer Defendants engaged in big rigging, and the Court can imagine none.

UAC's allegations do not plausibly suggest that Defendants committed bid rigging. Bid rigging occurs when "bidders agree to eliminate competition among them, as by taking turns being the low bidder." *Fenzl*, 670 F.3d at 780 (citations omitted). Stated somewhat differently, it occurs "when two or more competitors coordinate their bids to a third party." *Tal*, 453 F.3d at 1261 (citation omitted).[40]

---

[40] *Joyce* offers an example. There, the co-conspirators engaged in a scheme involving foreclosed property where they "agree[d] not to compete to purchase selected properties at public auctions; designat[ed] which conspirators would win selected properties at public auctions; refrain[ed] from

The facts alleged here differ from the practice of bid rigging. First, as discussed *supra*, not all Defendants are competitors, and therefore they cannot all engage in bid rigging. *See Joyce*, 895 F.3d at 677 ("[B]id rigging is a form of *horizontal* price fixing.") (emphasis added). When analyzing those Defendants that compete among each other – the Mining Defendants – UAC still does not allege that they formed an agreement to eliminate competition among them by coordinating bids to a third party. *See Fenzl*, 670 F.3d at 780; *Tal*, 453 F.3d at 1261. UAC instead generally alleges that Ver, Wu and Bitmain Technologies combined hash power to mine a software implementation of a cryptocurrency. They did not try to eliminate competition among other miners, they collaborated to win the hash war competition. This falls outside the "small class of antitrust practices whose character is well understood and that almost always harm competition." *Jacobs*, 626 F.3d at 1334.

### b. Group Boycott

In Count I UAC also devotes a single paragraph to make its alternative allegation that Defendants committed the § 1 per se violation of a group boycott:

> 106.   Alternatively, the conspiracy alleged constitutes a per se violation *in the nature of a group boycott*. Specifically, Wu and Bitmain Technologies, along with Ver and non-party Bitcoin.com, with the assistance of the Bitcoin ABC Developers, agreed to participate in a scheme whereby they rendered nugatory the competitive efforts of [UAC] to prevail during the hash war. Kraken and Powell joined in the scheme

---

bidding for selected properties at public auctions; purchas[ed] selected properties at public auctions at artificially suppressed prices; negotiat[ed], ma[de], and receiv[ed] payoffs for agreeing not to compete with coconspirators; and h[eld] second, private auctions, to determine the payoff amounts and choose the conspirator who would be awarded the selected property." *Joyce*, 895 F.3d at 676.

> by supporting the ABC version before the results of the hash war were even known.

(FAC ¶ 106) (emphasis added). Again, UAC hedges with its allegation that Defendants acted "in the nature of" a group boycott. This conclusory allegation also fails because Defendants' alleged conduct differs from a group boycott.

The Eleventh Circuit has defined a group boycott:

> A group boycott consists of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target. The ultimate target of the agreement can be either a competitor or a customer of some or all of the [boycotters] who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the [boycotters]. For boycotting to be <u>per se</u> illegal, it must involve horizontal agreements among direct competitors.

*Quality Auto Painting*, 917 F.3d at 1271 (alterations in original) (citations and quotation marks omitted).

Here, not all Defendants are competitors. Only Ver, Wu and Bitmain Technologies are competitors in mining. UAC has not alleged that those Defendants denied UAC access to goods or services because UAC refused to accede to terms they set. *See Quality Auto Painting*, 917 F.3d at 1271. Nor has UAC alleged that Defendants pressured UAC or any other miner to boycott Bitcoin SV. *See id.* Simply put, the conduct UAC alleges in this case does not fit the category of a group boycott. *See Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 612-13 (11th Cir. 1985) ("[T]he challenged conduct [must] fit[] into a [*per se*] proscribed category without distortion.") (last alteration in original) (quoting *M&H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 977 (1st Cir. 1984)).

51

I therefore conclude that UAC fails to make factual assertions that plausibly suggest Defendants, through bid rigging or a group boycott, committed a per se violation of § 1 of the Sherman Act.

### C. Standing

Defendants also move to dismiss the Complaint because UAC has not adequately alleged that it has antitrust standing under § 4 of the Clayton Act to bring this action. (ECF No. 144 at 27-30).

To determine whether a plaintiff has antitrust standing, courts review the allegations contained in the complaint. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991) (citations omitted). Antitrust standing involves more than the "case or controversy" requirement that satisfies constitutional standing; it requires "an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l. Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) (quoting *Todorov*, 921 F.2d at 1448).

The Eleventh Circuit provides a two-prong approach to determine whether a plaintiff has antitrust standing: (1) the plaintiff must have alleged an antitrust injury, and (2) the plaintiff must be an efficient enforcer of the antitrust laws. *Palmyra Park Hosp.*, 604 F.3d at 1299 (citing *Todorov*, 921 F.2d at 1449). Courts, however, should not consider standing if the plaintiff has not established an antitrust violation. *Jes Props., Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1228 (11th Cir. 2006) (citation omitted). The Eleventh Circuit explained:

> When a court concludes that no [antitrust] violation has

occurred, it has no occasion to consider standing .... An increasing number of courts, unfortunately, deny standing when they really mean that no violation has occurred. In particular, the antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition in a rule-of-reason case may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government— which enjoys automatic standing—must be dismissed.

*Id.* (alteration in original) (quoting *Levine*, 72 F.3d at 1545).

As stated, the Court concludes UAC failed to allege facts that plausibly suggest Defendants committed an antitrust violation. I therefore do not address whether UAC has adequately alleged that it has antitrust standing.

### III.    The Complaint must be dismissed with prejudice

The Court advised UAC, before it prepared its First Amended Complaint, that UAC should expect that this would be its final opportunity to plead its causes of action. This Order identifies certain elements of the Complaint that may be amenable to being well-plead on yet another amendment. Fundamental aspects of Defendants' alleged conduct, however, are not the proper subject of relief under § 1 of the Sherman Act. As noted, Defendants' alleged unlawful conduct fits into neither a horizontal, vertical nor hub-and-spoke restraint of trade paradigm. This underlies the impossibility of UAC properly pleading that all Defendants entered into an agreement to violate § 1 or pleading that Defendants' alleged conduct amounts to an antitrust harm to competition. It is also clear that it would be futile for UAC to replead per se claims against Defendants.

For these reasons, it would be futile to allow UAC to further attempt to state a claim that Defendants violated § 1 of the Sherman Act. Accordingly, the Court dismisses the Complaint with prejudice. *See Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1163 (11th Cir. 2019).

## IV.    Conclusion

For the foregoing reasons, the Court hereby **GRANTS** Defendants' Joint Motion to Dismiss First Amended Complaint Under Federal Rule of Civil Procedure 12(b)(6) (ECF No. 144). The Court also **DENIES AS MOOT** (1) Bitmain Technologies and Wu's Motion to Dismiss the Amended Complaint Under Federal Rule of Civil Procedure 12(b)(2) (ECF No. 142), and (2) UAC's Motion for Leave to Conduct Jurisdictional Discovery (ECF No. 149). The Court hereby **DISMISSES** the Complaint (ECF No. 138) **WITH PREJUDICE**.

DONE and ORDERED in Miami, Florida, this 31st day of March 2021.

CHRIS McALILEY
UNITED STATES MAGISTRATE JUDGE

cc:    The Honorable Kathleen M. Williams
       Counsel of Record